No. 26-3009

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————————

**UNITED STATES OF AMERICA**,
*Plaintiff—Appellee,*

*v.*

**BRIAN COLE, JR.,**
*Defendant—Appellant.*

—————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
THE HONORABLE AMIR H. ALI, DISTRICT JUDGE
CASE NO. 1:26-CR-00001

—————————————

## APPELLANT'S BRIEF AND MEMORANDUM OF LAW AND FACT

—————————————

MARIO B. WILLIAMS
JOHN M. SHOREMAN
HUMANITY DIGNITY AND
RIGHTS LLC
Life Time Work - Buckhead
3480 Peachtree Road, NE, 2d Flr
Atlanta, Georgia 30326
(470) 257-2485
mwilliams@hdrattorneys.com
jms@mcfaddenshoreman.com

J. ALEX LITTLE
ZACK C. LAWSON
JOHN R. GLOVER
LITSON PLLC
54 Music Sq. E., Ste. 300
Nashville, TN, 37203
(615) 985-8205
alex@litson.co
zack@litson.co
jr@litson.co

*Counsel for Defendant - Appellant*

February 25, 2026

# DISCLOSURE STATEMENT

**A.    Parties and Amici.**

This appeal involves defendant-appellant Brian Cole Jr., and the plaintiff-appellee, the United States of America. The parties have both appeared in this case. There are no other parties, intervenors, or amici.

**B.    Rulings Under Review.**

This is an appeal of the District Court's order denying Appellant release under 18 U.S.C. § 3060, A210, and the order affirming the magistrate judge's detention determination on January 29, 2026, A266.

**C. Related Cases.**

This case has not been before this Court previously. Appellant is unaware of any related cases.

# TABLE OF CONTENTS

Page(s)

DISCLOSURE STATEMENT ....................................................................i

TABLE OF CONTENTS..................................................................... ii

TABLE OF CITATIONS.................................................................v

GLOSSARY OF ABBREVIATIONS...............................................ix

STATEMENT OF JURISDICTION ..........................................................1

STATEMENT OF THE ISSUES ...................................................3

STATEMENT OF THE CASE ...................................................5

    I.    Statutory Background....................................................5

        *The Bail Reform Act* .................................................5

        *18 U.S.C. § 3060* ....................................................7

    II.    Factual and Procedural Background .........................................8

        *A. The Charges and Arrest*...........................................8

        *B. The § 3060 Proceedings* ..........................................9

        *C. The Bail Reform Act Proceedings*.........................................10

SUMMARY OF THE ARGUMENT ........................................................18

STANDARD OF REVIEW .......................................................21

ARGUMENT ...............................................................23

I.   The District Court Erred in Ordering Cole's
     Detention Under the Bail Reform Act ........................23

     A. The Bail Reform Act's Forward-Looking
        Framework Requires More Than Proof of
        Dangerous Offense Conduct....................................24

     B. The Record Establishes That Cole Does Not Pose
        an Articulable Present Danger That Conditions
        Cannot Mitigate.....................................................26

     C. The Proposed Conditions Reasonably Assure
        Community Safety..................................................29

     D. The District Court's Failure to Engage the
        Countervailing Evidence Requires Remand .........32

     E. Similarly Situated Defendants Have Been
        Granted Pre-Trial Release .....................................33

II.  The District Court Also Erred in Denying Cole's
     Motion for Release Under 18 U.S.C. § 3060(d) .........39

     A. The Obligation to Schedule the Preliminary
        Hearing Rested Exclusively with the Court .........40

     B. The Government's Attempt to Satisfy § 3060(e)
        Through a Superior Court Grand Jury Indictment
        Was Legally Invalid Under the Federal Rules of
        Criminal Procedure and the Rules Enabling Act ...45

        1. *The Federal Rules of Criminal Procedure
           unambiguously limit grand jury convening
           authority to federal courts* .................................46

        2. *The Rules Enabling Act supersedes D.C.
           Code § 11-1916(a)*.............................................47

3. *The Superior Court cannot return federal indictments* ...................................................... 49

4. *The government cannot invoke the ambiguity its own conduct created to justify Cole's continued detention* ............................................ 50

C. The January 6 Superseding Federal Indictment Did Not Retroactively Cure the § 3060(d) Violation, and Cole's Discharge Remains Mandatory ..................................... 55

CONCLUSION .................................................................... 59

CERTIFICATE OF STYLE COMPLIANCE ........................... 61

CERTIFICATE OF APPENDIX COMPLIANCE ................... 62

# TABLE OF CITATIONS

CASES                                                        Page No.

*Brown v. United States,*
    359 U.S. 41 (1959) ......................................................... 49

*Chafin v. Chafin,*
    568 U.S. 165 (2013) ...................................................... 58

*Coleman v. Burnett,*
    477 F.2d 1187 (D.C. Cir. 1973) ...................................... 1

*Elms v. United States,*
    457 F. Supp. 3d. 897 (D. Nev. 2020) ............................. 52

*Hairston v. United States,*
    359 F.2d 270 (D.C. Cir. 1966) ....................................... 43

*Moore v. United States,*
    342 A.3d 1222 (D.C. 2025) ............................................ 50

*Penfield Co. v. Securities & Exch. Comm'n,*
    330 U.S. 585 (1947) ....................................................... 47

*Thompson v. United States,*
    548 F.2d 1031 (D.C. Cir. 1976) ...................................... 49

*United States v. Almohandis,*
    297 F. Supp. 2d 404 (D. Mass. 2004) ....................... 35-36

*United States v. Al-Arian,*
    280 F. Supp. 2d 1345 (M.D. Fla. 2003) ......................... 37

*United States v. Alwan,*
    No. 1:02-cr-00214-WMS-HKS-2
    (W.D.N.Y. Jan. 14, 2003) .............................................. 37

*United States v. Aranda-Hernandez*,
  95 F.3d 977 (10th Cir. 1996) ...................................................41, 55

*United States v. Foster*,
  No. 1:07MJ2, 2007 WL 189456,
  (N.D.W. Va. Jan. 22, 2007) ...........................................................43

*United States v. Goba*,
  220 F. Supp. 2d 182 (W.D.N.Y. 2002) ...........................................37

*United States v. King*,
  482 F.2d 768 (D.C. Cir. 1973) ...........................................................1

*United States v. Melville*,
  306 F. Supp. 124 (S.D.N.Y. 1969) ...............................................36

*United States v. Munchel*,
  991 F.3d 1273 (D.C. Cir. 2021) ....................... 1, 6, 21, 24-29, 32-35

*United States v. Nwokoro*,
  651 F.3d 108 (D.C. Cir. 2011) ......................................................21

*United States v. Olano*,
  507 U.S. 725 (1993) ....................................................................42

*United States v. Reynoso*,
  38 F.4th 1083 (D.C. Cir. 2022) ...................................................42

*United States v. Rogers*,
  455 F.2d 407 (5th Cir. 1972) ....................................................55-56

*United States v. Salerno*,
  481 U.S. 739 (1987).............................................................5, 23, 38

*United States v. Smith*,
  22 F. App'x 137 (4th Cir. 2001) ...................................................22

*United States v. Soriano-Jarquin,*
    492 F.3d 495 (4th Cir. 2007) ........................................................22

*United States v. Stewart,*
    No. 25-mj-225 (D.D.C.) ...............................................................45-51

*United States v. U.S. Gypsum Co.,*
    333 U.S. 364 (1948) .......................................................................21

*United States v. Vaughn,*
    492 F. Supp. 3d 336 (D.N.J. 2020) ................................................52

*United States v. Williams,*
    526 F. App'x 29 (2d Cir. 2013) ......................................................55

<u>FEDERAL STATUTES</u>                 <u>Page No.</u>

18 U.S.C. § 844 .................................................................1, 6, 8, 14

18 U.S.C. § 3060 ......................................i, 1-5, 6-10, 18-22, 39-45, 50-59

18 U.S.C. § 3141 .............................................................................5

18 U.S.C. § 3142 ....................................1, 5-6, 17, 24, 32, 43, 58

18 U.S.C. § 3145 .......................................................................1, 15

18 U.S.C. § 3231 ......................................................................1, 49

28 U.S.C. § 1291 ..............................................................................1

28 U.S.C. § 2072 ......................................................................47-48

RULES                                                                    Page No.

FRCrP 1 ...................................................................................... 46

FRCrP 5.1 ..................................................................................... 7

FRCrP 6 ...................................................................................... 46

FRCrP 7 ...................................................................................... 46

D.C. Code § 11-1916(a) ............................................................ 47-48


OTHER                                                                    Page No.

4 Charles A. Wright & Arthur R. Miller, *Federal Practice
    & Procedure* § 1030 n.2 (2d ed. 1987)  ......................................47-48

Lois Beckett, *Revealed: Majority of People Charged in Capitol
    Attack Aren't in Jail,* The Guardian (May 28, 2021, 6:00 PM),
    https://www.theguardian.com/us-news/2021/may/28/us-capitol-
    attack-suspects-jail-trial..............................................................33-34

Spencer Hsu*, Man Photographed with Foot on Desk in Pelosi's Office
    Released from Jail Pending Trial in Jan. 6 Capitol Riot*, Wash.
    Post (Apr. 27, 2021), https://www.washingtonpost.com/local/legal-
    issues/pelosi-desk-rioter-released/2021/04/27/9fb5f3f8-a797-11eb-
    8d25-7b30e74923ea_story.html .................................................34-35

*Tennessee Mother and Son ("Zip Tie Guy") Sentenced on Felony and
    Misdemeanor Charges Related to Jan. 6 U.S. Capitol Breach*, U.S.
    Dep't of Just. (Sep. 8, 2023), https://www.justice.gov/usao-
    dc/pr/tennessee-mother-and-son-zip-tie-guy-sentenced-felony-and-
    misdemeanor-charges-related-jan .................................................34

## GLOSSARY OF ABBREVIATIONS

<u>Abbreviation</u>                                                                      <u>Meaning</u>

A000 ...................................................................Appendix Page Number
Det. Hrg. Tr. ...........................Transcript of 12/30/25 Detention Hearing

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction over this federal criminal proceeding under 18 U.S.C. § 3231. Cole is charged with violations of 18 U.S.C. §§ 844(d) and 844(i).

This Court has jurisdiction over Cole's appeal on at least two independent bases. First, the Bail Reform Act provides that an appeal from a decision denying revocation of a detention order "shall be determined promptly." 18 U.S.C. § 3145. This prompt review includes that by a court of appeals. *Id.* (referencing 28 U.S.C. § 1291). A district court's detention order is immediately appealable. *See, e.g., United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir.), *judgment entered*, 844 F. App'x 373 (D.C. Cir. 2021) (immediately reviewing district court's detention order). Second, this Court has jurisdiction over Cole's appeal of the district court's order denying release under 18 U.S.C. § 3060, as denials of the right to a preliminary hearing are immediately appealable. *United States v. King*, 482 F.2d 768, 771 (D.C. Cir. 1973) ("[T]he motions invoking appellant's preliminary hearing entitlements" taken on "immediate appeal."); *see also Coleman v. Burnett*, 477 F.2d 1187, 1192–93 (D.C. Cir. 1973) (immediately reviewing "entitlements of the

criminally accused at federal preliminary hearings," citing 18 U.S.C. § 3060 throughout).

The district court denied Cole's § 3060 motion on January 16, 2026. (A210.) The district court entered its order affirming the magistrate judge's detention determination on January 29, 2026. (A266.) Both orders are immediately reviewable as collateral orders that conclusively determine rights—discharge from custody and release pending trial— that would be effectively unreviewable after conviction. Cole filed a timely notice of appeal on February 3, 2026. (ECF No. 54.) This appeal followed.

## STATEMENT OF THE ISSUES

Rather than presenting its case to a federal grand jury before making an arrest, the government chose to charge Cole by criminal complaint. That choice triggered 18 U.S.C. § 3060's mandatory framework requiring the magistrate to hold a preliminary hearing within 14 days unless the government secures a federal indictment before the hearing. After the parties agreed to extend the detention hearing to December 30, defense counsel sought to confirm that a preliminary hearing would occur on that date. The government—apparently unaware of, or indifferent to, its obligations under § 3060 and facing the reality that no federal grand jury would be available—raced instead to a D.C. Superior Court grand jury as an end-around to avoid a probable cause hearing. Cole objected and requested immediate release. The magistrate judge accepted that indictment on the condition that the government would promptly secure a federal indictment. One week after the statutory deadline under § 3060 had passed, the government obtained a superseding federal indictment. The district court denied Cole's motion for release, relying on that sequence of events. And the district court affirmed the magistrate's detention order in a one-paragraph minute

3

order that did not engage much of the substance of Cole's argument and evidence, including new evidence the magistrate had not considered. This appeal raises the following issues:

I.     Whether the district court erred in ordering Cole's pretrial detention under the Bail Reform Act, where the record shows no articulable present danger, comprehensive release conditions would reasonably assure community safety, and the district court failed to engage the substantial countervailing evidence Cole submitted on revocation.

II.     Whether the district court erred in denying Cole's motion for release under 18 U.S.C. § 3060(d), where the magistrate failed to schedule the mandatory preliminary hearing, the government's Superior Court grand jury indictment did not satisfy § 3060(e), and the federal indictment obtained a week after the deadline did not retroactively cure the violation.

4

## STATEMENT OF THE CASE

### I.    Statutory Background

Two statutory schemes govern this appeal. The first is the Bail Reform Act of 1984, 18 U.S.C. § 3141, *et seq.*, which governs pretrial detention and, as construed by this Court, requires a forward-looking assessment of whether conditions of release can contain any current, identified danger.

The second is 18 U.S.C. § 3060, which establishes mandatory requirements for the scheduling and procedure of preliminary hearings and prescribes discharge from custody as the remedy for noncompliance.

### *The Bail Reform Act*

The Bail Reform Act of 1984 establishes a strong presumption in favor of pretrial release. 18 U.S.C. § 3142(b), (c). Detention is authorized only where a judicial officer finds, after a hearing, that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Pretrial detention must be "the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

For certain enumerated offenses—including a violation of 18 U.S.C. § 844(i), which is charged in this case—the Act creates a rebuttable presumption that no conditions of release can reasonably assure community safety. 18 U.S.C. § 3142(e)(3)(C). Even where that presumption applies and is not fully rebutted, the government retains the burden of establishing by clear and convincing evidence that detention is warranted under four statutory factors: (i) the nature and circumstances of the offense, (ii) the weight of the evidence, (iii) the defendant's history and characteristics, and (iv) the nature and seriousness of the danger posed by release. 18 U.S.C. § 3142(g).

The D.C. Circuit has held that a court ordering pretrial detention "must identify an articulable threat posed by the defendant to an individual or the community." *Munchel*, 991 F.3d 1283 (D.C. Cir. 2021). That inquiry is "forward-looking": it asks not what the defendant allegedly did, but whether he poses a present danger that conditions cannot contain. *Id.* at 1285 (Katsas, J., concurring). When a defendant presents "substantial countervailing evidence supports release," a district court that fails to engage that evidence commits reversible error. *Id.* at 1282.

*18 U.S.C. § 3060*

Section 3060 of Title 18 and Federal Rule of Criminal Procedure 5.1 work together. Section 3060 of Title 18 establishes a mandatory framework governing the timing and scheduling of preliminary hearings in federal criminal proceedings. At a defendant's initial appearance, "[t]he date for the preliminary examination shall be fixed by the . . . magistrate judge." 18 U.S.C. § 3060(b). That date must fall within the window prescribed by Federal Rule of Criminal Procedure 5.1(c): no later than fourteen days after the initial appearance if the defendant is in custody. Fed. R. Crim. P. 5.1(c); 18 U.S.C. § 3060(b)(1). The date may be continued beyond that period only upon "the consent of the arrested person" or upon a finding that "extraordinary circumstances exist and justice requires the delay." 18 U.S.C. § 3060(c).

If the court fails to conduct a timely preliminary hearing and none of § 3060's exceptions apply, subsection (d) commands a specific remedy: the defendant "shall be discharged from custody or from the requirement of bail or any other condition of release." 18 U.S.C. § 3060(d). That discharge is "without prejudice . . . to the institution of further criminal proceedings against him upon the charge upon which he was arrested."

7

*Id.* Section 3060(e) provides a safe harbor, allowing the government to avoid a preliminary hearing and mandatory discharge if "an indictment is returned" before the date fixed for the preliminary examination. 18 U.S.C. § 3060(e).

## II.    Factual and Procedural Background

Because this appeal arises from pretrial detention proceedings rather than a trial, much of the factual record consists of the government's proffers and the courts' findings based on those proffers. The following sections describe the charges and arrest, the government's factual proffer and Cole's responsive evidence, and the § 3060 and Bail Reform Act proceedings below.

### A. The Charges and Arrest

On December 3, 2025, the government filed a criminal complaint charging Brian Cole, Jr. with two counts: (i) transporting an explosive device in interstate commerce with intent to kill, injure, or intimidate, in violation of 18 U.S.C. § 844(d); and (ii) malicious attempted destruction by means of explosive materials, in violation of 18 U.S.C. § 844(i). (A013.) Both charges arose from allegations that Cole manufactured two improvised pipe bombs, transported them from Virginia to Washington,

D.C., and placed them near the headquarters of the Democratic National Committee and the Republican National Committee on the evening of January 5, 2021. *Id.* Cole was arrested nearly five years later on December 4, 2025, and made his initial appearance before a magistrate judge on December 5, 2025. (Min. Entry, Dec. 5, 2025.)

### B. The § 3060 Proceedings

The magistrate did not fix a date for a preliminary hearing at Cole's December 5, 2025 initial appearance, as § 3060(b) required. The magistrate judge initially set a detention hearing (but not a preliminary hearing) for December 15, 2025. Min. Entry, Dec. 5, 2025. On December 10, 2025, the parties filed a consent motion to continue the detention hearing to December 30, which the magistrate granted. (ECF Nos. 9, 11.) Neither that motion, order, nor any prior order referenced a preliminary hearing. *Id.*

On December 24, defense counsel emailed the government to confirm that the probable cause hearing would occur at the hearing set on December 30. *See* ECF No. 21 at 1-2. Defense counsel made plain that the defense expected a preliminary hearing on December 30 and refused to consent to further delay. *Id.* On December 29, 2025—the day before

the detention hearing—the government presented an indictment returned by a D.C. Superior Court grand jury and asked the magistrate to accept it. (A091 n.2.) The magistrate deferred a decision on whether to accept the indictment, requested briefing, and made a finding of "extraordinary circumstances" under § 3060(c). *See* Min. Order, Dec. 30, 2025.

On January 6, 2026—one week after the § 3060(d) deadline—the government obtained a superseding federal indictment. (A134.) Cole moved for release under § 3060(d), arguing that the discharge obligation had attached on December 30 and could not be retroactively extinguished by the belated indictment. (A116.) The district court denied that motion. (A210.)

### C. The Bail Reform Act Proceedings

The government concedes that Cole is not a flight risk. 12/30/25 Det. Hrg. Tr. at 19:8-18. According to the government[1], surveillance footage and cell tower records placed Cole in the vicinity of the DNC and RNC headquarters during the relevant timeframe on January 5, 2021.

---

[1]    Cole contests each of the government's factual claims. The description of the government's proffers in this brief should not be construed as an admission that the government's allegations are correct.

(A024-A027.) It claims that a license plate reader captured Cole's vehicle entering the area earlier that evening. (A022.) It also claims that financial records reflected purchases of various hardware components—pipes, end caps, wire, and related materials—between 2019 and November 2020, which the government contends were later used to construct the devices. (A029-A031.) Following his arrest, Cole was transported to the FBI's Washington Field Office. (A033.) After initially denying involvement and approximately two hours of questioning, he allegedly acknowledged being responsible for placing the devices. (A033-A036.) The government represents that Cole described the construction and placement of the devices in detail during that interview, including that he assembled them in the hours before traveling to Washington. (A035.)

The government also proffers that after January 5, 2021, Cole continued to purchase certain hardware components through August 2022. (A031.) Law enforcement recovered some of those components, with original purchase receipts, from Cole's home closet and vehicle at the time of his arrest years later in December 2025. (A032.) The government contends that Cole's cellular device recorded approximately 943 "factory

reset" or "wipe" events between December 2020 and December 2025. *Id.*;
12/30/25 Det. Hrg. Tr. at 15:6-9.

Cole disputes the government's characterization of this evidence.
He presented a letter from a neuropsychologist who evaluated Cole that
the phone-wiping behavior is consistent with Cole's obsessive-compulsive
disorder and did not begin in earnest until eighteen months after the
charged conduct, a timing inconsistent with deliberate evidence
destruction. (A258; A271.) In addition, he presented evidence that the
retained hardware components were accompanied by their original
purchase receipts, undercutting any inference of ongoing dangerous
activity. (A258-A259.) And he offered declarations and testimony from
his proposed custodians, including his grandmother, who lives with his
step-grandfather, a retired law enforcement officer with the General
Services Administration—demonstrating the adequacy of the proposed
supervisory conditions. (A254-255.)

Cole proposed the following comprehensive release conditions:
home detention at his grandmother's residence, GPS monitoring via
ankle bracelet, a retired law enforcement officer in the household, weekly
reporting to Pretrial Services, unannounced inspections, a no-weapons

order, and mandatory compliance with any mental health treatment Pretrial Services recommends. (A169-A170.)

One of Cole's proposed custodians, his grandmother, Loretta Donnette testified at the detention hearing. Mrs. Donnette testified that she has known Cole his whole life. (12/30/25 Det. Hrg. Tr. at 41:22-24.) She testified that she and her husband have an alarm system and "cameras everywhere" throughout their home in their gated community, where "an actual guard" mans the front gate "24 hours" a day. *Id.* at 42:23-25; 43:20-25, 44:1-4. She has cameras "watching the front, up and down the street, on the side of the house, and the rear." *Id.* at 43:7-8. She told the Court that someone would be home with Cole at all times, because even on the rare occasion when she stays late at work, her retired husband is home "all day." *Id.* at 53:18-54:1.

She also told the Court that she and her husband had a plan to provide a means for Cole to maintain his employment by working in one of the two home offices she and her husband have set up in the home. *Id.* at 45:10-18. Mrs. Donnette's husband owns a firearm, but they both expressed willingness to remove it from their home to have Cole come live with them if released. *Id.* at 46:4-8.

In closing, Mrs. Donnette testified that she was willing to be "the eyes and ears of the Court" in serving as Cole's custodian. *Id.* 46:19-22. While she told the Court she believed Cole didn't "belong in jail," she testified that "if he's not doing something right [on pretrial release], I have to let the Court know. That's just me." *Id.* at 48:3-8. Because her family runs a bail bonding agency, she has tremendous respect for the judicial process and the importance of supervision while on release. *Id.* at 48:7-16.

In addition to Mrs. Donnette's testimony at the December 30, 2025 detention hearing, the magistrate received extensive briefing and heard nearly two hours of argument. *See* Min. Entry, Dec. 30, 2025. On January 2, 2026, the magistrate issued a nineteen-page Detention Order concluding that, even assuming Cole rebutted the rebuttable presumption triggered by the § 844(i) charge, the government had shown by clear and convincing evidence that "there are no conditions of release the Court can fashion to reasonably assure the safety of others and the community." (A104.)

The magistrate found the nature of the charged offenses weighed "strongly toward pretrial detention," and the weight of the evidence was

14

"significant." A097. The magistrate found that Cole's history and characteristics—including his lack of criminal history, stable employment, community ties, and diagnoses of autism spectrum disorder and OCD—"point[ed] on balance more toward release than detention." (A099.) On the fourth factor, the magistrate found that Cole's post-offense hardware purchases, his retention of components at arrest, and the phone-wiping conduct "temper[ed] the notion that the five-year span between the underlying offense conduct and today mitigates any future risk." (A101.) The magistrate found that Cole's "sudden and abrupt motivation" and ability to assemble the devices "over a matter of hours" raised concerns that even comprehensive release conditions could not adequately address. (A102.)

On January 16, 2026, Cole moved in the district court to revoke the magistrate's detention order under 18 U.S.C. § 3145(b). (A155.) In the course of his motion and reply in support, Cole presented new evidence not before the magistrate:

First, Cole submitted a medical declaration establishing his autism and OCD diagnosis. (A271.) Dr. David Black, who evaluated Mr. Cole on December 16 and 19, diagnosed him with Autism Spectrum Disorder,

Level One and Obsessive-Compulsive Disorder. *Id.* Dr. Black further explained that "repetitively wip[ing] his phone of junk files" is consistent with Cole's OCD diagnosis and is, in fact, "often seen" in people with that diagnosis. *Id.*

Second, Cole submitted a declaration from his mother, Delicia Cole. (A272-73.) The government suggested in the detention briefing that Mr. Cole's interview statements about a previous experiment with potassium chlorate at home indicated an ongoing interest in explosives. (A249-A250.) But that was wrong. As Cole's mother explained, this experiment did happen, but it occurred *years before* the charged conduct (at least in 2018), not after. (A272 ¶ 5.) Cole was trying to create rocket fuel as part of a science experiment, during which Ms. Cole specifically recalled her son spilled bleach on the carpet, leaving a stain. (*Id.* at ¶ 8.) Even back then, he was not attempting to create an explosive. (A272-73.)

Lastly, Cole submitted a declaration from his sister, Brittany Cole. (A274-75.) Without any proof, the government hinted in its detention briefing that Brittany she was in league with her brother because she texted with her brother, mother, and grandmother about each of their general activities in the days leading up to January 5, 2021. (A251-A252.)

The government's insinuation was wrong here too. Ms. Cole's traveled into D.C. on January 5 was for her job as a club promoter. (A274 at ¶ 9.) She texted her mother and grandmother to let them know of her whereabouts because both had warned her that there may be large-scale political protests and urged her to be safe. *Id* at ¶ 11 . She explained that none of her texts with her family related in any way to the offenses with which her brother is charged or the broader events of January 6 at the U.S. Capitol. *Id*. at ¶¶ 12-13.

On January 29, 2026, the district court denied the motion in a minute order. (A266.) The court stated that it had "independently considered the factors under 18 U.S.C. § 3142(g), as well as all the evidence and arguments presented by the parties," and agreed with the magistrate's "careful analysis and conclusions." *Id*. The court summarily held that the additional arguments and declarations Cole submitted were "insufficient to overcome the government's showing that pretrial detention is appropriate." *Id*. This appeal followed.

17

## SUMMARY OF ARGUMENT

Two independent grounds compel reversal. Cole has been held based on alleged conduct from five years ago, with no evidence of present danger and comprehensive release conditions available. The district court's one-paragraph Minute Order does not engage substantively with these issues. And the Bail Reform Act does not permit that result. Separately, the government chose to charge Cole by criminal complaint rather than grand jury indictment, which triggered § 3060's mandatory preliminary hearing framework. It then failed to comply with that framework. And the district court let it.

*First*, the Bail Reform Act detention order cannot stand. Pretrial detention is authorized only to prevent a present, articulable danger that conditions cannot contain—not to punish past alleged conduct, however serious. The government cannot identify such a danger here. By its own concession, Cole has not committed a crime in the last five years and has done nothing even arguably dangerous in years. Moreover, the government's theory that Cole was wiping his phone to hide evidence ignores that the behavior began eighteen months after the charged

18

conduct—a timeline inconsistent with evidence destruction and entirely consistent with Cole's documented OCD.

The proposed conditions—home detention, GPS monitoring, a retired law enforcement officer in the household, weekly reporting to Pretrial Services, unannounced inspections, a no-weapons order, maintaining employment, and mandatory compliance with any mental health treatment Pretrial Service recommends—would ensure Cole would pose no threat to the public. And the district court's Minute Order provides no explanation to the contrary. It also failed to engage the substantial new evidence Cole presented on revocation, medical declaration, custodian declarations, chronological evidence on the potassium chlorate experiment, compounding the error and independently warranting remand. The record compels reversal and release.

*Second*, and independently, the district court erred in refusing to discharge Cole under 18 U.S.C. § 3060(d). Section 3060 required the magistrate judge to fix a preliminary hearing date at Cole's initial appearance. The magistrate did not. To avoid a hearing, the same statute required the government to obtain a valid indictment before the

deadline—not an indictment from a D.C. Superior Court grand jury that lacks authority under the Federal Rules of Criminal Procedure and the Rules Enabling Act to return a federal indictment. The government did not obtain such an indictment before the deadline.

Section 3060 required Cole's discharge once the deadline passed without compliance. The district court instead permitted the government to paper over that violation with a superseding federal indictment obtained a week after the deadline had already run. But § 3060 does not work that way. The discharge obligation attached when the deadline passed. A Superior Court indictment is not a placeholder, and a subsequent federal indictment cannot reach back in time to satisfy a condition that was not met when it was due. This Court should reverse and order Cole's release.

## STANDARD OF REVIEW

Cole appeals the district court's minute order denial of his motion to revoke the detention order against him. A district court's determination of a defendant's danger to the community is reviewed for clear error. *United States v. Munchel*, 991 F.3d 1273, 1282 (D.C. Cir. 2021) (citations omitted). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, (1948)).

If "it does not appear that the District Court considered substantial countervailing evidence that supported release when analyzing the detention factors, [this Court] sometimes remand[s] for reconsideration rather than reverse[s]." *Id.* (remanding where the "District Court did not demonstrate that it adequately considered, in light of all the record evidence, whether [the defendants] present an identified and articulable threat to the community"); *see also United States v. Nwokoro,* 651 F.3d 108, 110 (D.C. Cir. 2011) (remanding where the "district court [did not]

21

demonstrate that it considered many of the facts apparent from the record before it").

In addition, Cole appeals the district court's order denying him release under 18 U.S.C. § 3060, the preliminary hearing statute. (A210.) This Circuit reviews district court orders related to preliminary hearings and 18 U.S.C. § 3060 *de novo*. *See King*, 482 F.2d at 771-773. This is consistent with other courts. *See United States v. Soriano-Jarquin*, 492 F.3d 495, 501–02 n.2 (4th Cir. 2007) (reviewing *de novo* the district court's denial of defendant's motion to dismiss and discharge from detention under 18 U.S.C. § 3060(d)); *see also United States v. Aranda-Hernandez*, 95 F.3d 977, 979 (10th Cir. 1996) (reviewing *de novo* the defendant's argument that the government's charging practice violated 18 U.S.C. § 3060's preliminary examination requirement); *United States v. Smith*, 22 F. App'x 137, 138 (4th Cir. 2001) (reviewing *de novo* the defendant's challenge to the indictment as violative of 18 U.S.C. § 3060 because he was not provided a preliminary hearing within ten days of his initial appearance).

## ARGUMENT

## I.    The District Court Erred in Ordering Cole's Detention Under the Bail Reform Act.

The Bail Reform Act treats pretrial detention as "the carefully limited exception," *United States v. Salerno*, 481 U.S. 739, 755 (1987), and demands a "specific, forward-looking assessment" of present danger, not a backward-looking recitation of alleged past conduct. *Munchel*, 991 F.3d at 1285 (Katsas, J., concurring). A court ordering detention must "identify an articulable threat posed by the defendant to an individual or the community"—one that conditions of release cannot reasonably mitigate. *Id.* at 1283. And when a defendant presents "substantial countervailing evidence that support[s] release," a district court that fails to engage that evidence commits reversible error. *Id.* at 1282.

The district court committed that error. The magistrate judge acknowledged that Cole's five-year gap in dangerous conduct was "reasonably persuasive," (A100) and that the history-and-characteristics factor favored Cole. (A098-A099.) Nonetheless, the magistrate judge found danger based on retained materials (with receipts proving they dated to 2021 and 2022), that Cole allegedly assembled the devices "over a matter of hours," and concern about phone-wiping behavior. (A100-

23

A103.) The district court adopted that analysis wholesale in a one-paragraph minute order, Min. Order Jan. 29, 2026, without engaging the new evidence Cole presented: a detailed medical diagnosis explaining the phone behavior, declarations from his proposed custodians, or the chronological evidence undermining the government's concealment narrative. (A253-A263, A268-A275.) That is not the searching, evidence-specific inquiry *Munchel* requires.

## A. The Bail Reform Act's Forward-Looking Framework Requires More Than Proof of Dangerous Offense Conduct.

*Munchel* establishes that a dangerousness finding under § 3142(g)(4) demands a prospective inquiry. The relevant question is not whether a defendant is a "bad" person, but whether there is no combination of conditions of release that will reasonably assure the safety of the community. *See Munchel*, 991 F.3d at 1279. Past conduct informs, but does not answer, that question. As *Munchel* explained, the past must be taken into context, insofar as it illuminates the "nature of the threat" and the defendant's "resources and capabilities" to carry a threat out in the future. *Id.* at 1283. Where the specific circumstances

that enabled past conduct cannot replicate themselves, detention may be unwarranted even for serious offenses. *Id.* at 1284.

This framework imposes real discipline on detention decisions. Pretrial detention is not punishment for what a defendant allegedly did; it is a prophylactic measure against what he might do while awaiting trial. When the government seeks detention solely on dangerousness grounds (like it did here), it must identify an articulable, prospective threat that release conditions cannot contain. Generalizations about the gravity of past conduct are not a substitute for that analysis. Neither is the statutory presumption, which—even when not fully rebutted—does not relieve the government of its burden to demonstrate that the defendant's release "poses a concrete, prospective threat to public safety." *Id.* at 1279–80.

The magistrate judge recited this framework but did not apply it with the rigor *Munchel* demands. The court focused primarily on the 2021 conduct, treated retained materials as evidence of present danger without confronting the defense's explanation for their presence, and declined to engage with whether the proposed conditions could contain any identified risk. The district court compounded the error by adopting

that analysis in a minute order that acknowledged Cole's new evidence but dismissed it as "insufficient" without explanation. That is the kind of failure to engage substantial countervailing evidence that *Munchel* identified as grounds for remand.

### B. The Record Establishes That Cole Does Not Pose an Articulable Present Danger That Conditions Cannot Mitigate.

The magistrate judge acknowledged that Cole's argument about the five-year gap since he allegedly committed the offense, with no crime committed since, was "reasonably persuasive, at least as far as it goes." (A100.) It goes further than the court allowed.

Between January 2021 and now, the government cannot point to a single threatening act, a single violent communication, a single extremist affiliation, or a single acquisition of explosive materials. It does not claim Cole threatened anyone. It does not claim he posted anything alarming online; indeed, it concedes it found no such posts. It does not claim he acquired any explosive powders, or ingredients to make them, since prior to the alleged crime more than five years ago. A defendant who has demonstrated no dangerous conduct whatsoever for years is a fundamentally different risk proposition than a defendant who has.

*Munchel* itself recognized as much: the court emphasized that a detention decision must account for "the specific circumstances that made [the offense conduct] possible," and assess whether those circumstances are likely to recur. *Id.* at 1284. Nothing like that exists here.

The government's response to this argument is its evidence of post-offense component purchases and the potassium chlorate experiment. But those purchases ended in August 2022, more than three years before Cole's arrest. And even taking those purchases at face value, they consisted of readily available household hardware: pipes, end caps, wire. The absence of any purchase, acquisition, or dangerous activity from August 2022 through the present—a span of over three years—is exactly the kind of temporal evidence that should inform a forward-looking danger assessment.

The magistrate judge's concern about Cole's "efforts to hide and obfuscate" rested heavily on the phone-wiping evidence and the suggestion that Cole's post-offense conduct reflected sustained concealment. But the government cannot have it both ways. Either Cole was a meticulous concealer who carefully covered his tracks for nearly five years, or he was someone who left Home Depot receipts from

November 2020 in his vehicle until December 2025, stored pipe components in a closet and his car with their original purchase receipts, and purchased every component using his own credit and debit cards under his own name.

The latter is what the evidence actually shows. Cole retained the receipts. He retained the materials in his home closet and his car — not in an offsite storage unit or a concealed location, but in "two locations essentially within arm's reach of Mr. Cole's daily routine." (A101.) A person engaged in active concealment does not store evidence in his bathroom closet with the receipts attached. The magistrate judge's characterization of this retention as a "red flag," *id.*, inverts the inference the evidence supports. The presence of these materials, with their original receipts proving their vintage, is evidence that Cole stopped— not that he continued.

The magistrate judge acknowledged that Cole's phone-wiping behavior "could stem from symptoms related to" his OCD diagnosis but found it "at least equally suggestive of efforts to conceal." (A103.) That equivalence does not support detention by clear and convincing evidence. The government has never alleged what Cole was attempting to conceal

with his obsessive phone wipes, that he actually concealed or destroyed anything, or how this behavior is evidence of dangerousness. (A032.)

More fundamentally, the court did not engage with the critical fact that consistent weekly wiping did not begin until July 2022—eighteen months after the charged conduct. If Cole were wiping his phone to destroy evidence of the January 5, 2021 offense, one would expect the behavior to have begun immediately after that offense became public rather than a year and a half later. The timing is inconsistent with concealment and entirely consistent with a compulsive behavioral pattern tied to his documented disorder. The district court received a medical declaration explaining this connection and dismissed it without engagement. That failure is reversible error.

## C. The Proposed Conditions Reasonably Assure Community Safety.

District courts can consider whether the risk that a defendant poses can be mitigated by supervisory conditions. *Munchel*, 991 F.3d at 1280-81. That inquiry requires genuine engagement with the specific conditions proposed—not a generalized finding that the alleged offense was serious.

The conditions Cole proposed are comprehensive: home detention at his grandmother's residence, GPS monitoring via ankle bracelet, a retired law enforcement officer in the household, weekly reporting to Pretrial Services, unannounced inspections, a no-weapons order, and mandatory compliance with any mental health treatment Pretrial Services recommends. (A169-A170.) These conditions are not window dressing. GPS monitoring makes unauthorized departure immediately detectable. A retired law enforcement officer resident in the home provides daily, knowledgeable supervision. Unannounced inspections deny Cole any opportunity to prepare for scrutiny. A no-weapons order, combined with the inability to receive packages without detection, would make the acquisition of any dangerous materials immediately apparent.

The government's primary objection—that Cole assembled the devices "over a matter of hours"—misses the point. Speed of assembly is irrelevant if Cole cannot acquire the materials. Under home detention with GPS monitoring and unannounced inspections, Cole cannot travel to hardware stores. He cannot receive shipments without detection. He cannot procure explosive materials or components of any kind without leaving a detectable trail. The government has produced no evidence that

Cole has access to any stockpile that would allow him to act without acquisition. The materials recovered at his arrest were hardware-store components with receipts — they were not a hidden cache assembled for future use. And the government has not claimed that Cole has demonstrated any present desire to procure explosive materials. Nonetheless, under the proposed conditions, any attempt to replicate even that modest acquisition would be immediately detectable.

The magistrate expressed doubt that "even the most well-intentioned custodian" could monitor Cole given his alleged concealment behavior. (A103.) But that concern presupposes the very concealment narrative that the evidence undercuts. An autistic person who left receipts in his car for five years, who purchased every component by credit card, and whose phone behavior is explained by documented OCD, is not a sophisticated concealer capable of evading the combined scrutiny of GPS monitoring, a retired law enforcement officer, Pretrial Services, and random inspections. The magistrate's concern rests on a characterization of Cole that the record does not support.

### D. The District Court's Failure to Engage the Countervailing Evidence Requires Remand.

When Cole moved to revoke the magistrate's detention order, he presented new evidence: a medical declaration diagnosing and explaining his autism and OCD; declarations from his grandmother and step-grandfather, the proposed custodians; declarations establishing the chronology of the potassium chlorate experiment; and a declaration from his sister rebutting the government's insinuations about family involvement. (A253, A268.) The district court summarily found this evidence "insufficient to overcome the government's showing." (A266.)

That one-sentence conclusion is not an adequate engagement with "substantial countervailing evidence" that *Munchel* requires. 991 F.3d at 1282. *Munchel* requires a district court to demonstrate that it has "adequately considered" evidence supporting release before ordering detention. *Id.* A minute order that recites the § 3142(g) factors and defers entirely to the magistrate's analysis does not satisfy that obligation with respect to evidence the magistrate never saw. The medical declaration was not before the magistrate. The custodian declarations were not before the magistrate. The sister's declaration rebutting the family insinuations was not before the magistrate. The district court received

32

that evidence in the first instance and disposed of it in a sentence. Under *Munchel*, that is at least grounds for remand.

Cole asks this Court to do more than remand. He asks for reversal and an order of release, because the record, fairly assessed, compels the conclusion that strict conditions will reasonably assure community safety. The government cannot identify an articulable present threat. The five-year gap is significant. The concealment narrative is self-refuting. And the proposed conditions are comprehensive. Cole has no criminal history, strong community ties, and a family—including a retired law enforcement officer—prepared to ensure his compliance. Pretrial detention under these circumstances is not "the carefully limited exception" the Constitution requires. *Salerno*, 481 U.S. at 755. It is an unjustified deprivation of liberty that this Court should end.

### E. Similarly Situated Defendants Have Been Granted Pre-Trial Release.

After considering the substantial countervailing evidence that Cole has presented, this Court ordering that Cole be released on conditions would not be anomalous. At least 70% of January 6 defendants were granted pre-trial release. Lois Beckett, *Revealed: Majority of People Charged in Capitol Attack Aren't in Jail,* The Guardian (May 28, 2021,

6:00 PM), https://www.theguardian.com/us-news/2021/may/28/us-capitol-attack-suspects-jail-trial. This includes Eric Munchel and Lisa Eisenhart, who wore tactical vests, entered the Capitol, intended to intimidate Congress, and stole flexi-cuffs from inside the Capitol, according to Judge Lamberth, "because they intended to take senators hostage." *Tennessee Mother and Son ("Zip Tie Guy") Sentenced on Felony and Misdemeanor Charges Related to Jan. 6 U.S. Capitol Breach*, U.S. Dep't of Just. (Sep. 8, 2023), https://www.justice.gov/usao-dc/pr/tennessee-mother-and-son-zip-tie-guy-sentenced-felony-and-misdemeanor-charges-related-jan. Munchel was armed with a taser. (*Id.*)

The District Court found that Munchel and Eisenhart were dangerous to the community and ordered them detained. *Munchel*, 991 F.3d at 1279. The defendants appealed, and this Court remanded the detention orders for reconsideration. *Id.* at 1285. On remand, the government withdrew its detention requests, and the District Court ordered both defendants released pending trial. *United States v. Munchel*, No. 1:21-cr-118-RCL (D.D.C. Mar. 29, 2021), at Dkt. 60.

Following *Munchel*, January 6 defendant Richard Barnett was also released from pre-trial detention. Spencer Hsu*, Man Photographed with*

*Foot on Desk in Pelosi's Office Released from Jail Pending Trial in Jan. 6 Capitol Riot*, Wash. Post (Apr. 27, 2021), https://www.washingtonpost.com/local/legal-issues/pelosi-desk-rioter-released/2021/04/27/9fb5f3f8-a797-11eb-8d25-7b30e74923ea_story.html. Barnett was also armed with a stun gun when he breached the Capitol and was photographed with his foot on Speaker Pelosi's desk. *Id.* Barnett was detained after calling himself a nationalist prepared for violent death and attempting to get rid of his phone, guns, and clothes in anticipation of law enforcement activity following January 6. *Id.* Judge Cooper did not find "a whole lot of daylight" between Barnett's case and *Munchel* and ordered Barnett released to home confinement and electronic monitoring. *Id.*

Outside of the January 6 context, defendants charged with explosives or terrorism charges also have been released pending trial. In *United States v. Almohandis*, the defendant was charged with carrying an explosive or incendiary device on an airplane and false statements to federal law enforcement. 297 F. Supp. 2d 404, 404 (D. Mass. 2004). While the government sought detention, the magistrate released the defendant on conditions, including allowing him to return home to Saudi Arabia. *Id.*

at 405. The judge reasoned, among other things, that "there very well may be triable issues as to whether the three devices were 'explosive' or 'incendiary' devices as those terms are used in the statute" and thus "there could very well be protracted pre-trial proceedings before a trial could even take place." *Id.* The government appealed the release order to the district court, who refused to detain the defendant, instead amending his conditions of release to require that the defendant remain in Massachusetts on electronic monitoring. *United States v. Almohandis*, No. 1:04-cr-10004-PBS (D. Mass. Jan. 21, 2004), at Dkt. 18. The defendant was later acquitted on all counts. *Id.* at Dkt. 75.

In *United States v. Melville*, the defendants were charged with conspiring to explode bombs in a number of federal and other buildings in New York City. 306 F. Supp. 124, 125 (S.D.N.Y. 1969). The defendants sought the district court's review of their conditions of release, requesting that the court lower their bail amounts. Judge Frankel lowered their bail amounts, even after finding that "[t]he objectives of the alleged conspiracy are, obviously, terrifying." *Id.* The court stressed that "[w]hile the charge is grave and alarming, the defendants are presumed to be

36

innocent." *Id.* While the Bail Reform Act of 1966 controlled at the time, *id.* at 126, much of Judge Frankel's analysis is still valid today.

In *United States v. Goba*, the defendants were charged with conspiracy to provide material support to a foreign terrorist organization. 220 F. Supp. 2d 182, 184 (W.D.N.Y. 2002). The defendants traveled from their homes in New York to attend an al-Qaeda terrorist training camp in Afghanistan, at which Osama bin Laden spoke. *Id.* at 189-191. The magistrate ordered that one of the defendants, Samir Alwan, be released pending trial. *Id.* at 194. The court found that Alwan presented sufficient evidence to rebut the government's dangerousness and flight arguments. *Id.* This evidence included that Alwan removed himself from the terrorist training camp and returned home, voluntarily cooperated with the FBI, made disclosures about his and his co-defendant's activities, and made express statements against the beliefs of al-Qaeda and the use of terrorism against Americans. *Id.* The government did not appeal Alwan's release order to the district court. *United States v. Alwan*, No. 1:02-cr-00214-WMS-HKS-2 (W.D.N.Y. Jan. 14, 2003), at Dkt. 82.

In *United States v. Al-Arian*, the defendants were charged with various crimes related to being members of an international terrorist

organization, including conspiracy to murder, maim, or injure persons outside the United States, conspiracy to commit racketeering, and conspiracy to provide material support to a designated terrorist organization. 280 F. Supp. 2d 1345, 1350 (M.D. Fla. 2003). All four defendants faced up to life imprisonment. *Id.* at 1350 n.5-6. The magistrate judge ordered that two of the four defendants be released pending trial, even though their "terror rips civilization's fabric." *Id.* at 1351. The court found that the case against the two released defendants to be less substantial than the two detained defendants, rebutting the presumption of dangerousness and flight. *Id.* at 1353-55. The court made this finding even though both released defendants were intercepted on wiretaps related to terrorist acts, fundraising, and training. *Id.* at 1353-55.

Courts across the country, including in this Circuit, have ordered that defendants similarly-situated to Cole be released from detention pending trial. Because "[i]n our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception," this Court should do the same. *Salerno*, 481 U.S. at 755.

## II.    The District Court Also Erred in Denying Cole's Motion for Release Under 18 U.S.C. § 3060(d).

As separate, independent grounds for discharge, this Court should reverse the district court's order denying Cole his right to a preliminary hearing.

Congress enacted 18 U.S.C. § 3060 to ensure that a person arrested on a complaint could not be held indefinitely without a judicial determination of probable cause. The mechanism Congress chose is direct: the court *shall* fix a date for the preliminary hearing at the defendant's initial appearance, the government must either hold that hearing or obtain a valid indictment by the date set, and if it does neither, the defendant *shall* be discharged from custody. 18 U.S.C. § 3060(b), (d), (e). These are mandatory commands, not suggestions. They do not yield to prosecutorial convenience. And they are not satisfied by procedural workarounds that the statute does not contemplate.

The statute's commands were violated here. The magistrate never fixed a hearing date at Cole's initial appearance, as § 3060(b) required. The government initiated this case by complaint, allowed the statutory clock to run down, then sprinted to a D.C. Superior Court grand jury—a tribunal with no authority to return a federal indictment—in a last-

minute effort to avoid a preliminary hearing at which it would have had to present evidence in an adversarial proceeding or see Cole released. The magistrate judge allowed this indictment to act as a placeholder so long as the government promptly obtained a federal indictment. Min. Order, Jan. 2, 2026. The government obtained the federal indictment one week after the statutory deadline had already passed, and the district court treated the belated indictment as a retroactive cure. That was error on all three counts. This Court should reverse.

### A. The Obligation to Schedule the Preliminary Hearing Rested Exclusively with the Court.

In denying Cole's motion for release, the district court held that he "likely" waived the preliminary hearing by not moving to schedule the hearing. (A212.) But it is not the defendant's obligation to schedule and hold the preliminary hearing. And the court acknowledged as much, noting that where a court simply fails to hold a preliminary hearing within the statutory period, "the defendant has to be released without prejudice to instituting further criminal proceedings." (A210-A211) (citing 18 U.S.C. § 3060(d)). The court nonetheless held that Cole forfeited its protections by failing to affirmatively invoke his right to the preliminary hearing. (A210.) That reasoning cannot be squared with the

40

statute's text, its structure, or the most basic principles governing waiver of statutory rights.

Section 3060(b) is unambiguous: "The date for the preliminary examination *shall* be fixed by the judge or the magistrate judge at the initial appearance of the arrested person." 18 U.S.C. § 3060(b) (emphasis added). Rule 5.1(c) imposes the same mandatory obligation: "The magistrate judge *must* hold the preliminary hearing within a reasonable time . . . ." Fed. R. Crim. P. 5.1(c) (emphasis added). Neither provision conditions that duty on a motion, a demand, or any affirmative act by the defendant. Case law makes clear that the duty is solely the court's. *See United States v. Rogers,* 455 F.2d 407, 411 (5th Cir. 1972) ("Title 18, U.S.C. § 3060(b) *requires the . . . magistrate . . . to order* a preliminary examination for the determination of probable cause . . . .") (emphasis added); *see also Aranda-Hernandez*, 95 F.3d at 979 ("If a defendant is in custody, *the magistrate must schedule* the preliminary examination within 10 days.") (emphasis added). The hearing date is the court's to set. The court has no discretion to omit it. And the defendant bears no responsibility for the court's compliance with its own mandatory obligation.

41

That is not a novel reading of the statute. It is the only reading the text supports. When Congress uses the word "shall" to address a court's conduct, it imposes a nondiscretionary duty. The magistrate judge did not fix a hearing date at Cole's December 5 initial appearance. Min. Entry, Dec. 5, 2025. The magistrate did not fix a date when resetting the detention hearing on December 11. ECF 11. Neither docket entry mentions a preliminary hearing. *See id.; see also* Min. Entry, Dec. 5, 2025. That was a failure of the court's own statutory duty, and the district court's attempt to attribute that failure to Cole inverts the statute's plain command.

Waiver, moreover, requires the "intentional relinquishment or abandonment of a known right." *United States v. Reynoso*, 38 F.4th 1083, 1095 (D.C. Cir. 2022) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). Where the court never offered the hearing, never fixed a date, and never placed Cole on notice that he must affirmatively request the proceeding, there was nothing for him to waive. A defendant cannot relinquish a right the court has never tendered. The district court's waiver holding is therefore unsound at its foundation: it punishes Cole for the court's own omission.

The district court pointed to Cole's agreement to reschedule the detention hearing as evidence of waiver. (A211-A212.) But the parties' continuance motion addressed the detention hearing, not the preliminary hearing—two distinct proceedings governed by distinct statutory provisions. ECF 9; *compare* 18 U.S.C. § 3142(f) (detention hearing statute), *with* 18 U.S.C. § 3060 (preliminary hearing statute). The detention hearing continuance motion did not mention a preliminary hearing. ECF 9. The court's order granting it did not mention one either. ECF 11. An agreement to reschedule a detention hearing cannot, without more, constitute consent to forgo a preliminary hearing that the statute separately requires. *See e.g.*, *Hairston v. United States*, 359 F.2d 270, 271 (D.C. Cir. 1966) (Waiver of a preliminary hearing requires an "informed decision" by the defendant); *see also United States v. Foster*, No. 1:07MJ2, 2007 WL 189456, at *1 (N.D.W. Va. Jan. 22, 2007) ("accept[ing]" a waiver of a preliminary hearing only because it was "knowingly and voluntarily made" and "in writing").

The contemporaneous correspondence confirms the point. Defense counsel's December 24 email asked the government whether it "plan[ned] on holding a probabl[e] cause hearing on Tuesday[, December 30]." That

question does not reflect an intent to abandon the hearing; it reflects an intent to confirm that one would occur. When the government responded ambiguously, defense counsel followed up two days later asking whether an indictment had been sought before the grand jury. And when new counsel finally received a clear answer—that no federal grand jury would sit before January 6 and no indictment had been obtained—counsel immediately made plain that the defense expected a preliminary hearing on December 30 and refused to consent to any further delay.

The government's own December 28 email seals the point. The AUSA wrote that the parties had "not yet scheduled a Rule 5.1 preliminary hearing"—an admission that no scheduling had occurred, not that Cole had agreed to forgo the hearing. Whatever else that email establishes, it confirms that Cole never waived the preliminary hearing. Section 3060(c)'s consent mechanism is a narrow exception that requires the consent of "the arrested person" to a specific continuance. It cannot be satisfied by inference drawn from ambiguous correspondence about an entirely different proceeding.

### B. The Government's Attempt to Satisfy § 3060(e) Through a Superior Court Grand Jury Indictment Was Legally Invalid Under the Federal Rules of Criminal Procedure and the Rules Enabling Act.

Even assuming Cole's right to a preliminary hearing had not been forfeited—and it had not—the government's attempt to satisfy § 3060(e) through a D.C. Superior Court grand jury indictment was legally invalid. Section 3060(e) provides that no preliminary hearing is required and no discharge shall be ordered if "an indictment is returned" before the date fixed for the preliminary examination. 18 U.S.C. § 3060(e). The statute's reference to "an indictment" is a reference to a valid federal indictment. The Superior Court return was not one.

The government did not seek the Superior Court indictment because it was the right vehicle. It sought it because no federal grand jury was available, and it had no intention of presenting evidence at a preliminary hearing. Chief Judge Boasberg himself described the practice in a similar case as "unorthodox," *United States v. Stewart*, No. 25-mj-225 (D.D.C.), ECF 38 at 1, and stayed his own order approving it pending this Court's review because the question was "close and challenging," *Stewart*, ECF 45. The legal infirmities of that indictment

are not close at all. Three independent grounds—each sufficient on its own—establish its invalidity.

### 1. The Federal Rules of Criminal Procedure unambiguously limit grand jury convening authority to federal courts.

The Federal Rules of Criminal Procedure leave no room for ambiguity on the question of who may convene a grand jury. Rule 6(a)(1) provides that "the court must order that enough legally required persons be summoned" to constitute a grand jury. Rule 1(b)(2) defines "court" to mean "a federal judge performing functions authorized by law." And Rule 7(a)(1) requires that felony offenses "be prosecuted by indictment"—an indictment that must be returned in compliance with Rules 1 and 6.

The D.C. Superior Court is not a federal court. Its judges are not Article III judges performing functions authorized by federal statute in the sense contemplated by Rule 1(b)(2). Its grand jury is not summoned by the court as Rule 6(a)(1) requires. On the plain text of the Rules, the Superior Court had no authority to convene the grand jury that purported to return the December 29 indictment, and that indictment therefore did not comply with the Federal Rules.

Chief Judge Boasberg declined to apply this textual reading in *Stewart* because the 2002 Advisory Committee Notes characterized certain amendments to Rule 6 as "stylistic." *Stewart*, ECF 38 at 12. But resort to Advisory Committee Notes is appropriate only when the rule text is ambiguous. Here, the text of Rules 1 and 6 is clear. "Court" means a federal court. Only a federal court may convene a grand jury. An indictment returned by a Superior Court grand jury does not comply with those requirements. There is no ambiguity to resolve and therefore no occasion to consult the Notes — particularly when doing so produces a reading at war with the Rules' plain meaning.

### 2. The Rules Enabling Act supersedes D.C. Code § 11-1916(a).

Where the Rules and a D.C. Code, the Rules Enabling Act confirms that the Rules supersede. That Act provides: "All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect." 28 U.S.C. § 2072(b). The command is categorical. When federal rules conflict with a prior statute, the Rules prevail. *See Penfield Co. v. Securities & Exch. Comm'n*, 330 U.S. 585, 589 n.5 (1947) ("Where a Rule of Civil Procedure conflicts with a prior statute, the Rule prevails."); 4 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* §

47

1030 n.2 (2d ed. 1987) ("Statutes enacted prior to the promulgation of the rules that are inconsistent with them are superseded.").

D.C. Code § 11-1916(a) was enacted in 1970 — thirty-two years before the 2002 amendments to Rules 1 and 6. Those amendments clarified the definition of "court" in terms that cannot be reconciled with a Superior Court grand jury's authority to return federal indictments. To the extent § 11-1916(a) conflicts with the Federal Rules as amended, § 2072(b)'s supersession clause controls. The later-enacted, Supreme Court-promulgated Rules prevail.

This argument is not the same as the one Chief Judge Boasberg addressed in *Stewart*. Cole raised the Rules Enabling Act expressly in his district court briefing below, A089-A082, and specifically noted in his reply that the argument was "never considered in *Stewart*," A129. The district court here had the opportunity to address the argument but declined to do so. This Court therefore reaches the question on a clean slate. No court has yet applied § 2072(b)'s supersession clause to D.C. Code § 11-1916(a). The statute's plain text requires that it do so here.

48

*3. The Superior Court cannot return federal indictments.*

The infirmity runs deeper still. A grand jury is "an appendage of the court, powerless to perform its investigative function without the court's aid." *Brown v. United States*, 359 U.S. 41, 49 (1959). It derives its authority from the court that convenes it. It can investigate only what that court has jurisdiction to adjudicate.

The D.C. Superior Court does not have jurisdiction over federal criminal offenses. Congress vested "original jurisdiction, exclusive of the courts of the States," in the federal district courts "of all offenses against the laws of the United States." 18 U.S.C. § 3231. This Court has read the D.C. Code to "most certainly . . . divest [D.C. Superior] Court of jurisdiction to hear criminal cases involving United States Code offenses." *Thompson v. United States*, 548 F.2d 1031, 1037 n.33 (D.C. Cir. 1976). If the Superior Court lacks jurisdiction over the underlying federal offenses, its grand jury—an appendage of that court—lacks the authority to investigate and return indictments on those offenses.

The practical consequences of the government's contrary reading are instructive. A Superior Court grand jury operates under the privilege law established by the D.C. Court of Appeals, not the D.C. Circuit. *See*

*Moore v. United States*, 342 A.3d 1222, 1228 (D.C. 2025). A witness before a Superior Court grand jury may enjoy different—and potentially fewer—protections than a witness before a federal grand jury. The government cannot invoke one court's grand jury process to obtain federal indictments while the witnesses subjected to that process receive diminished constitutional protections. Reading § 11-1916(a) to survive the Federal Rules' 2002 amendments creates precisely these anomalies. Reading the Rules to mean what they say avoids them entirely.

### 4. The government cannot invoke the ambiguity its own conduct created to justify Cole's continued detention.

There is a final dimension to the invalidity of the Superior Court indictment that goes beyond the Rules' text. The magistrate's decision not to hold a preliminary hearing on December 30 rested on a finding of "extraordinary circumstances" under § 3060(c). *See* A212. The magistrate found that the "question . . . [of] whether [the Court] can accept [the D.C. Superior Court] indictment" was "an extraordinary circumstance." 12/30/25 Det. Hrg. Tr. at 7:1-3. Specifically, the magistrate found extraordinary, "the unique judicial structure, the unique court structure we have in the District of Columbia, this is, so far as I can tell, the only

district in which this [non-federal grand jury indictment] could potentially occur." *Id.* at 7:7-13.

But these circumstances existed only because the government had just presented a legally contested Superior Court indictment. The very ambiguity the magistrate used to delay the preliminary hearing was manufactured by the government's own decision to pursue that "unorthodox" and improper path.

That is a form of bootstrapping courts should not countenance. Chief Judge Boasberg himself recognized in issuing his stay in *Stewart* that a criminal defendant "could well be irreparably harmed if his prosecution moves forward on an indictment ultimately held invalid," and that "the public interest lies in letting the Court of Appeals decide this issue." *Stewart*, ECF 45 at 1-2. Those same concerns are present here, and they are intensified by the fact that Cole, unlike the defendant in *Stewart*, was in custody when the dispute arose. Every day Cole remained detained was a day during which the government, having chosen an unauthorized procedural vehicle, was extracting a liberty cost from the defendant whose rights it had declined to honor. Courts should not permit the government to use the controversy generated by its own

procedural overreach as the predicate for extending a defendant's detention.

Courts have foreclosed considering analogous circumstances as "extraordinary" under § 3060(c). Extraordinary circumstances "must surely mean circumstances that prevent the government from holding a preliminary hearing — not circumstances that prevent the government from obtaining an indictment and thereby avoiding a preliminary hearing." *United States v. Vaughn*, 492 F. Supp. 3d 336, 340 (D.N.J. 2020). The government's decision to seek a non-federal grand jury indictment in this case because no federal grand jury panel was available is not an extraordinary circumstance under § 3060(c). *See, e.g., Elms v. United States*, 457 F. Supp. 3d. 897, 903 (D. Nev. 2020) (ordering defendants released under § 3060(d) because government failed to conduct preliminary hearings before statutory deadline, finding that "the government knew or should have known" about the "unavailability of a grand jury" due to COVID-19 pandemic); *Vaughn*, 492 F. Supp. 3d. at 342 (finding that government's inability to obtain a grand jury quorum during COVID-19 pandemic was an "insufficient justification" and not an extraordinary circumstance). Nor can the question of whether the Court

could accept this "unorthodox" indictment be a valid extraordinary circumstance. Neither the magistrate nor district judge cited any authority that justified the finding that such delay was an extraordinary circumstance, likely because none exists.

### C. The January 6 Superseding Federal Indictment Did Not Retroactively Cure the § 3060(d) Violation, and Cole's Discharge Remains Mandatory.

On December 30, 2025, no valid federal indictment had intervened, no preliminary hearing had been held, and no lawful extraordinary circumstances finding had extended the deadline. At that moment, by operation of statute, the government's right to hold Cole in custody expired. Section 3060(d) provided that he "shall be discharged from custody or from the requirement of bail or any other condition of release." 18 U.S.C. § 3060(d). The mandatory language admits no exception for a later, better indictment. The question is whether a superseding federal indictment obtained one week later, on January 6, 2026, retroactively extinguished that obligation. It did not.

The text of § 3060(d) establishes the discharge obligation in unconditional terms: where the court fails to hold a timely preliminary hearing, and no exception under § 3060 applies, the person "shall be

discharged." That command attached on December 30. Nothing in § 3060(d) provides that a subsequent indictment retroactively extinguishes an obligation already triggered.

The government's mootness argument relies on § 3060(e), which provides that no preliminary hearing is required (and no discharge shall be ordered) if "an indictment is returned" before "the date fixed for the preliminary examination." 18 U.S.C. § 3060(e). But § 3060(e) is a forward-looking safe harbor, not a retroactive remedy. Its condition—indictment "prior to the date fixed"—is either satisfied or it is not at the time the deadline arrives. If the government indicts in time, no preliminary hearing is required and no violation occurs. If it does not, the violation is complete and § 3060(d)'s discharge obligation attaches. A subsequent indictment cannot reach back in time and satisfy a condition that was not met.

The structural relationship between subsections (d) and (e) confirms this reading. Section 3060(e) operates prospectively: it prevents a violation from occurring. Section 3060(d) operates retrospectively: it provides a remedy for a violation that has already occurred. They work in sequence. If (e) is satisfied, (d) never comes into play. Once (d) is

triggered by the deadline passing without compliance, (e) has no further role. Reading (e) as a retroactive cure for a (d) violation would render (d) surplusage: if a late indictment always moots the discharge obligation, Congress's mandatory "shall be discharged" language does no work at all. The canon against surplusage forbids that reading.

The cases the government cited in response to Cole's motion for release—*United States v. Williams*, 526 F. App'x 29 (2d Cir. 2013); *Smith*, 22 F. App'x 137; *Rogers*, 455 F.2d 407; *Aranda-Hernandez*, 95 F.3d 977— do not resolve this question in the government's favor. In each case, the defendant sought *reversal of their convictions* because of § 3060(d) violations. *See, e.g., Rogers*, 455 F.2d at 412 ("A failure to grant a preliminary hearing *does not acquit* the defendant of the charges preferred against him.") (emphasis added); *Aranda-Hernandez*, 95 F.3d at 979 ("If an indictment has been returned and the defendant is subsequently convicted, *the conviction will not be reversed* for failure to hold the preliminary examination.") (citations omitted) (emphasis added). Here, Cole merely seeks release from detention, the relief § 3060(d) provides. *See Rogers*, 455 F.2d at 412 ("[W]e think the District

Court . . . should have directed that [the defendant] be released if not promptly given a preliminary hearing.").

The district court offered an additional rationale: that § 3060(e)'s condition—indictment before "the date fixed for the preliminary examination"—was satisfied because no date was ever fixed for the examination. (A212-A213.) Under this reading, if the court simply never schedules a preliminary hearing, the government can always avoid § 3060(d) by obtaining an indictment at any point, because there will never be a fixed date for the indictment to precede.

That reasoning proves too much. Taken to its logical conclusion, it would allow a court to insulate the government from Congress's mandatory discharge obligation under § 3060 simply by omitting the preliminary hearing date from its scheduling order—the precise failure that occurred here. A court's noncompliance with § 3060(b)'s mandatory scheduling obligation would become the government's permanent get-out-of-jail card. That cannot be what Congress intended when it wrote that defendants "shall" be discharged from custody if the statutory requirements are not met.

The "date fixed" language in § 3060(e) must be read in light of § 3060(b)'s equally mandatory scheduling command. Because § 3060(b) *required* the magistrate to fix a date at the initial appearance, and because that date was required to fall no later than 14 days after the initial appearance, Fed. R. Crim. P. 5.1(c), the statute supplies its own operative deadline. Cole appeared on December 5. The 14-day period ran on December 19. The parties' continuance agreement—which addressed the detention hearing, not the preliminary hearing—can be read, at most, to extend the period to December 30, the date Cole's counsel understood to be the outer limit. In no event could the absence of a formally "fixed" date, occasioned by the court's own failure to comply with § 3060(b), operate to erase the government's obligation to satisfy § 3060(e) before that date.

The appropriate remedy—immediate release—is still required. To be sure, the case can continue. Congress designed the remedy to permit prosecution to continue while imposing a custody sanction on the government for its failure to comply with the preliminary hearing requirements. That design would be thwarted if the government could

immediately re-detain the defendant on the strength of the same indictment that was supposed to cure the violation.

The Bail Reform Act forecloses that outcome. Under 18 U.S.C. § 3142(f)(2)(B), a detention hearing may be reopened only upon a finding that "information . . . not known to the movant at the time of the hearing" that has a "material bearing" on the risk of flight or danger to the community. An indictment charging the same offenses as the complaint on which Cole was originally arrested is not new information. It is the government's delayed satisfaction of the probable cause obligation that § 3060 required it to meet on December 30. Permitting the government to treat its own untimely compliance as a change in circumstances warranting re-detention would nullify the custody sanction Congress built into § 3060(d).

Cole's injury is ongoing. He remains detained. This Court can order his release. That is concrete, effectual relief—the only standard Article III requires. *See Chafin v. Chafin*, 568 U.S. 165, 172 (2013). Congress prescribed mandatory discharge as the consequence for the government's failure to comply with the preliminary hearing statute. That consequence should be imposed now.

## CONCLUSION

For the reasons above, this Court should reverse the district court's orders and direct Cole's immediate release. On the § 3060 claim, Cole is entitled to discharge as a matter of statutory right. On the Bail Reform Act claim, the record compels release on conditions, and this Court should order release rather than remand for further proceedings that would only prolong an unlawful detention. In the alternative, this Court should remand with instructions to set conditions of release consistent with this Court's opinion.

Respectfully submitted,

*/s/ J. Alex Little*

By: _____

J. ALEX LITTLE (TN BPR # 029858)
ZACK C. LAWSON (TN BPR # 036092)
JOHN R. GLOVER (TN BPR # 037772)
LITSON PLLC
54 Music Square East, Suite 300
Nashville, TN 37203
Telephone: 615-985-8205
alex@litson.co
zack@litson.co
jr@litson.co

MARIO B. WILLIAMS
JOHN M. SHOREMAN
HUMANITY DIGNITY AND
RIGHTS LLC
Life Time Work – Buckhead
3480 Peachtree Road, NE, Second Floor
Atlanta, Georgia 30326
Telephone: 470-257-2485
mwilliams@hdrattorneys.com
jms@mcfaddenshoreman.com


*Attorneys for Defendant Brian Cole, Jr.*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME, TYPEFACE, AND STYLE REQUIREMENTS

This document contains complies with the type-volume limitation of Circuit Rule 32(c), because it contains 10,809 words according to the Microsoft Word word processing program, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), Fed. R. App. P. 32(a)(6), and Circuit Rule 32(b), because it has been prepared in a proportionally spaced serif typeface, Century Schoolbook, at a font-size of 14.

By: */s/ J. Alex Little*

J. ALEX LITTLE
*Counsel for Defendant*

Dated:  February 25, 2026

## CERTIFICATE OF APPENDIX COMPLIANCE

I hereby certify that the Appendix bound with this brief includes all documents required by Circuit Rules 30(a) and (b).

By: *  /s/ J. Alex Little*

J. ALEX LITTLE
*Counsel for Defendant*