No. 26-3009

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————————

UNITED STATES OF AMERICA,
*Plaintiff—Appellee,*

*v.*

BRIAN COLE, JR.,
*Defendant—Appellant.*

—————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
THE HONORABLE AMIR H. ALI, DISTRICT JUDGE
CASE NO. 1:26-CR-00001

—————————————

## APPELLANT'S APPENDIX

—————————————

MARIO B. WILLIAMS
JOHN M. SHOREMAN
HUMANITY DIGNITY AND
RIGHTS LLC
Life Time Work - Buckhead
3480 Peachtree Road, NE, 2d Flr
Atlanta, Georgia 30326
(470) 257-2485
mwilliams@hdrattorneys.com
jms@mcfaddenshoreman.com

J. ALEX LITTLE
ZACK C. LAWSON
JOHN R. GLOVER
LITSON PLLC
54 Music Sq. E., Ste. 300
Nashville, TN, 37203
(615) 985-8205
alex@litson.co
zack@litson.co
jr@litson.co

*Counsel for Defendant - Appellant*

February 25, 2026

Page(s)

Docket Sheet............................................................................... A001-A012

Criminal Complaint (Dkt. 1) ...................................................... A013-A021

Government's Memorandum in Support of Pretrial
      Detention (Dkt. 17) ............................................................. A021-A043

Brian Cole's Response in Opposition to the
      Government's Motion for Detention (Dkt. 23)................. A044-A066

Defendant's Response in Opposition and Motion for
      Immediate Release (Dkt. 26)............................................ A067-A086

Memorandum Opinion and Order
      *(Detention Order) (*Dkt. 28) .............................................. A087-A105

Notice of Filing *(of Redacted Memorandum in Support*
      *of the Court's Inherent Authority to Accept Grand*
      *Jury Indictment Return)* (Dkt. 29) ................................... A106-A113

Indictment (Dkt. 31) ................................................................... A114-A115

Defendant's Emergency Motion for Review of
      Magistrate's Order Denying Release Pursuant
      to 18 U.S.C. §3060(d) (Dkt. 33) ....................................... A116-A120

Government's Opposition to Defendant's Emergency
      Motion (Dkt. 37) ................................................................ A121-A127

Reply in Support of Defendant's Emergency Motion for
      Review of Magistrate's Order Denying Release
      Pursuant to 18.U.S.C.§3060 (Dkt. 38) ............................ A128-A132

Minute Order (1/6/26) ........................................................................ A133

Indictment (Dkt. 39) ................................................................... A134-A135

i

Response to Court Order to Show Cause *why his*
*Emergency Motion for Review of Magistrate's Order*
*[33] should not be denied as moot* (Dkt. 41) .................. A136-A145

Government's Response in Support of Denying Defendant's
Emergency Motion as Moot (Dkt. 44) ............................ A146-A149

Reply in Support of Defendant's Response to
Court Order to Show Cause (Dkt. 47) ............................. A150-A154

Defendant's Motion for Revocation of Magistrate
Judge's Order Denying Pretrial Release with
Strict Conditions (Dkt. 48) ............................................. A155-A209

Order (Dkt. 49) ......................................................................... A210-A213

Government's Opposition to Defendant's Motion for
Revocation of Pretrial Detention Order (Dkt. 50) ........... A214-A252

Reply in Support of Defendant's Motion for
Revocation of Magistrate Judge's Order Denying
Pretrial Release with Strict Conditions (Dkt. 51) ........... A253-A263

Minute Order (1/29/26) ......................................................... A264-A265

Minute Order (1/29/26) ......................................................... A266-A267

Notice of Filing of Exhibits in Support of Reply in
Support of Defendant's Motion for Revocation .............. A268-A275

Transcript of Bond Review Hearing (Dkt. 53) .......................... A276-A345

**Query**     **Reports ▾**     **Utilities ▾**     **Help**     **Log Out**

APPEAL,CAT B

# U.S. District Court
## District of Columbia (Washington, DC)
## CRIMINAL DOCKET FOR CASE #: 1:26-cr-00001-AHA-1

Case title: USA v. COLE                                        Date Filed: 01/02/2026

Magistrate judge case number: 1:25-mj-00276-MAU

Assigned to: Judge Amir H. Ali
Appeals court case number: 26-3009

**Defendant (1)**

**BRIAN J. COLE, JR.**                 represented by     **John M. Shoreman**
MCFADDEN & SHOREMAN, LLC
1050 Connecticut Avenue, NW
Suite 500
Washington, DC 20036
(202) 772-3188
Fax: (202) 204-8610
Email: jms@mcfaddenshoreman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Mario Bernard Williams**
HDR LLC
5600 Roswell Road
Building C
Suite 103
Sandy Springs, GA 30342
404-341-4434
Email: mwilliams@hdrattorneys.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**John Ross Glover**
LITSON PLLC

A001

54 Music Sqaure East
Suite 300
Nashville, TN 37203
615-985-8205
Email: jr@litson.co
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Joseph Alex Little , IV**
LITSON PLLC
54 Music Square East
Suite 300
Nashville, TN 37203
615-985-8205
Email: alex@litson.co
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Zachary Carter Lawson**
LITSON PLLC
54 Music Sq. E.
Ste 300
Nashville, TN 37203
865-234-0247
Email: zack@litson.co
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Pending Counts**                                  **Disposition**

18:844(d); PENALTIES - IF DEATH OR
INJURY RESULTS; Interstate
Transportation of Explosives
(1)

18:844(d); PENALTIES - IF DEATH OR
INJURY RESULTS; Interstate
Transportation of Explosives
(1s)

18:844(i); PENALTIES - IF DEATH
RESULTS; Malicious Attempt to Use
Explosives
(2)

18:844(i); PENALTIES - IF DEATH

RESULTS; Malicious Attempt to Use
Explosives
(2s)

## Highest Offense Level (Opening)

Felony

## Terminated Counts                                        Disposition

None

## Highest Offense Level (Terminated)

None

## Complaints                                               Disposition

COMPLAINT in violation of 18:844(d)
and 18:844(i)

---

## Plaintiff

**USA**                          represented by    **Charles Robert Jones**
                                                   DOJ-USAO
                                                   601 D Street NW
                                                   Washington, DC 20530
                                                   (202) 740-4756
                                                   Email: charles.jones3@usdoj.gov
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*
                                                   *Designation: Assistant U.S. Attorney*

                                                   **Jocelyn S. Ballantine**
                                                   U.S, ATTORNEY'S OFFICE FOR THE
                                                   DISTRICT OF COLUMBIA
                                                   555 4th Street, NW
                                                   Suite 11-445
                                                   Washington, DC 20001
                                                   (202) 252-7252
                                                   Email: jocelyn.ballantine2@usdoj.gov
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*
                                                   *Designation: Assistant U.S. Attorney*

| Date Filed | # | Docket Text |
| --- | --- | --- |

| 12/03/2025 | 1 | SEALED COMPLAINT as to BRIAN J. COLE, JR (1). (Attachments: # 1 Affidavit In Support) (zmcg) (Main Document 1 replaced on 12/4/2025) (zmcg). (Attachment 1 replaced on 12/4/2025) (zmcg). (Main Document 1 replaced on 12/4/2025) (zmcg). (Main Document 1 replaced on 12/4/2025) (ztnr). (Attachment 1 replaced on 12/4/2025) (ztnr). [1:25-mj-00276-MAU] (Entered: 12/03/2025) |
| --- | --- | --- |
| 12/03/2025 | 3 | MOTION to Seal Case by USA as to BRIAN J. COLE, JR. (Attachments: # 1 Text of Proposed Order)(zmcg) (Main Document 3 replaced on 12/4/2025) (ztnr). (Attachment 1 replaced on 12/4/2025) (ztnr). [1:25-mj-00276-MAU] (Entered: 12/03/2025) |
| 12/03/2025 | 4 | ORDER granting 3 Motion to Seal Case as to BRIAN J. COLE JR. (1). Signed by Magistrate Judge Moxila A. Upadhyaya on 12/3/2025. (zmcg) (Main Document 4 replaced on 12/4/2025) (ztnr). [1:25-mj-00276-MAU] (Entered: 12/03/2025) |
| 12/04/2025 | | Case unsealed as to BRIAN J. COLE, JR. (ztnr) [1:25-mj-00276-MAU] (Entered: 12/04/2025) |
| 12/05/2025 | 5 | NOTICE OF ATTORNEY APPEARANCE: John M. Shoreman appearing for BRIAN J. COLE, JR (Shoreman, John) [1:25-mj-00276-MAU] (Entered: 12/05/2025) |
| 12/05/2025 | | Arrest of BRIAN J. COLE, JR in Woodbridge, VA. (znjb) [1:25-mj-00276-MAU] (Entered: 12/05/2025) |
| 12/05/2025 | 7 | Arrest Warrant Returned Executed on 12/4/2025 as to BRIAN J. COLE, JR. (znjb) (Main Document 7 replaced on 12/9/2025) (znjb). [1:25-mj-00276-MAU] (Entered: 12/05/2025) |
| 12/05/2025 | | ORAL MOTION for Temporary Detention by USA as to BRIAN J. COLE, JR. (znjb) [1:25-mj-00276-MAU] (Entered: 12/05/2025) |
| 12/05/2025 | | Minute Entry for proceedings held before Magistrate Judge Moxila A. Upadhyaya: Return on Arrest Warrant/Initial Appearance as to BRIAN J. COLE, JR held on 12/5/2025. The Court advised the Government of its Due Process Obligations under Rule 5(f). Defendant has Retained counsel. Oral Motion by the Government for Temporary Detention (3 & 10 day hold) as to BRIAN J. COLE JR.; heard and granted. Detention Hearing set for 12/15/2025 at 1:30 PM in Courtroom 6- In Person before Magistrate Judge G. Michael Harvey. Bond Status of Defendant: Defendant Held Without Bond; Court Reporter: FTR- GOLD; FTR Time Frame: CRTM 5: [1:03:45-1:11:55]; Defense Attorney: John Shoreman; US Attorney: Charles Jones; Pretrial Officer: Shania Fennell. (znjb) [1:25-mj-00276-MAU] (Entered: 12/05/2025) |
| 12/05/2025 | | MINUTE ORDER as to BRIAN J. COLE, JR.: As required by Rule 5(f), the United States is ordered to produce all exculpatory evidence to the defendant pursuant to Brady v. Maryland and its progeny. Not doing so in a timely manner may result in sanctions, including exclusion of evidence, adverse jury instructions, dismissal of charges and contempt proceedings. Signed by Magistrate Judge Moxila A. Upadhyaya on 12/5/2025. (znjb) [1:25-mj-00276-MAU] (Entered: 12/05/2025) |
| 12/09/2025 | 8 | NOTICE OF ATTORNEY APPEARANCE Charles Robert Jones appearing for USA. (Jones, Charles) [1:25-mj-00276-MAU] (Entered: 12/09/2025) |

| 12/10/2025 | 9 | Consent MOTION to Exclude *Time Under the Speedy Trial Act* by USA as to BRIAN J. COLE, JR. (Jones, Charles) [1:25-mj-00276-MAU] (Entered: 12/10/2025) |
|---|---|---|
| 12/11/2025 | 10 | Unopposed MOTION for Protective Order *Governing Discovery* by USA as to BRIAN J. COLE, JR. (Jones, Charles) [1:25-mj-00276-MAU] (Entered: 12/11/2025) |
| 12/11/2025 | 11 | ORDER granting 9 Motion to Continue the Detention Hearing and to Exclude Time as to BRIAN J. COLE JR. (1). Detention Hearing continued to 12/30/2025 at 1:00 PM in Courtroom 7- In Person before Magistrate Judge Matthew J. Sharbaugh. Signed by Magistrate Judge Moxila A. Upadhyaya on 12/11/2025. (ztl) [1:25-mj-00276-MAU] (Entered: 12/11/2025) |
| 12/11/2025 | 12 | PROTECTIVE ORDER setting forth procedures for handling confidential material; allowing designated material to be filed under seal as to BRIAN J. COLE, JR. Signed by Magistrate Judge Moxila A. Upadhyaya on 12/11/2025. (znjb) [1:25-mj-00276-MAU] (Entered: 12/12/2025) |
| 12/17/2025 | 13 | Unopposed MOTION for an Order to Allow In Person Professional Visits by BRIAN J. COLE, JR. (Attachments: # 1 Text of Proposed Order)(Shoreman, John) Modified event type and text on 12/17/2025 (zstd). [1:25-mj-00276-MAU] (Entered: 12/17/2025) |
| 12/17/2025 | 14 | ORDER granting 13 Motion for Order to Allow In Person Professional Visits as to BRIAN J. COLE JR. (1). Signed by Magistrate Judge G. Michael Harvey on 12/17/2025. (znjb) [1:25-mj-00276-MAU] (Entered: 12/17/2025) |
| 12/21/2025 | 15 | MOTION for Leave to Appear Pro Hac Vice Mario B. Williams Filing fee $ 100, receipt number ADCDC-12149149. Fee Status: Fee Paid. by BRIAN J. COLE, JR. (Attachments: # 1 Declaration, # 2 Exhibit)(Shoreman, John) [1:25-mj-00276-MAU] (Entered: 12/21/2025) |
| 12/23/2025 | 16 | MOTION for Leave to Appear Pro Hac Vice Joseph Alexander Little IV Filing fee $ 100, receipt number ADCDC-12153256. Fee Status: Fee Paid. by BRIAN J. COLE, JR. (Attachments: # 1 Declaration)(Shoreman, John) [1:25-mj-00276-MAU] (Entered: 12/23/2025) |
| 12/23/2025 | | NOTICE OF ERROR as to BRIAN J. COLE, JR regarding 16 MOTION for Leave to Appear Pro Hac Vice Joseph Alexander Little IV Filing fee $ 100, receipt number ADCDC-12153256. Fee Status: Fee Paid.. The following error(s) need correction: Pro Hac Vice motion must be accompanied by a Certificate of Good Standing issued within the last 30 days (LCrR 44.1 (c)(2)). Please file certificate as an Errata (zstd) [1:25-mj-00276-MAU] (Entered: 12/24/2025) |
| 12/28/2025 | 17 | MEMORANDUM in Support of Pretrial Detention by USA as to BRIAN J. COLE, JR (Jones, Charles) [1:25-mj-00276-MAU] (Entered: 12/28/2025) |
| 12/28/2025 | 18 | MOTION for Leave to Appear Pro Hac Vice Joseph Alexander Little IV Filing fee $ 100, receipt number ADCDC-12155381. Fee Status: Fee Paid. by BRIAN J. COLE, JR. (Attachments: # 1 Declaration, # 2 Exhibit COGS)(Shoreman, John) [1:25-mj-00276-MAU] (Entered: 12/28/2025) |

| 12/28/2025 | 19 | MOTION for Leave to Appear Pro Hac Vice Zachary Carter Lawson Filing fee $ 100, receipt number ADCDC-12155382. Fee Status: Fee Paid. by BRIAN J. COLE, JR. (Attachments: # 1 Declaration, # 2 Exhibit COGS)(Shoreman, John) [1:25-mj-00276-MAU] (Entered: 12/28/2025) |
|---|---|---|
| 12/28/2025 | 20 | MOTION for Leave to Appear Pro Hac Vice John Ross Glover Filing fee $ 100, receipt number ADCDC-12155384. Fee Status: Fee Paid. by BRIAN J. COLE, JR. (Attachments: # 1 Declaration, # 2 COGS)(Shoreman, John) [1:25-mj-00276-MAU] (Entered: 12/28/2025) |
| 12/28/2025 | 21 | MOTION to Clarify *Preliminary Hearing to be held on 12/30/25* by BRIAN J. COLE, JR. (Shoreman, John) [1:25-mj-00276-MAU] (Entered: 12/28/2025) |
| 12/29/2025 | 22 | MOTION for Release of Brady Materials , MOTION for Discovery by BRIAN J. COLE, JR. (Shoreman, John) [1:25-mj-00276-MAU] (Entered: 12/29/2025) |
| 12/29/2025 | | MINUTE ORDER granting 15 Motion for Leave to Appear Pro Hac Vice Mario B. Williams. **Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a).** Click for instructions as to BRIAN J. COLE JR. (1). Signed by Magistrate Judge G. Michael Harvey on 12/29/2025. (znjb) [1:25-mj-00276-MAU] (Entered: 12/29/2025) |
| 12/29/2025 | | MINUTE ORDER granting 18 Motion for Leave to Appear Pro Hac Vice Joseph Alexander Little IV. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a). Click for instructions as to BRIAN J. COLE, JR. Signed by Magistrate Judge Matthew J. Sharbaugh on 12/29/2025. (znjb) [1:25-mj-00276-MAU] (Entered: 12/30/2025) |
| 12/29/2025 | | MINUTE ORDER granting 19 Motion for Leave to Appear Pro Hac Vice Zachary Carter Lawson. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a). Click for instructions as to BRIAN J. COLE, JR. Signed by Magistrate Judge Matthew J. Sharbaugh on 12/29/2025. (znjb) [1:25-mj-00276-MAU] (Entered: 12/30/2025) |
| 12/29/2025 | | MINUTE ORDER granting 20 Motion for Leave to Appear Pro Hac Vice John Ross Glover. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCrR 44.5(a). Click for instructions as to BRIAN J. COLE, JR. Signed by Magistrate Judge Matthew J. Sharbaugh on 12/29/2025. (znjb) [1:25-mj-00276-MAU] (Entered: 12/30/2025) |
| 12/30/2025 | 23 | Memorandum in Opposition by BRIAN J. COLE, JR re MOTION for Temporary Detention *and Memorandum in Support [ECF 17]* (Attachments: # 1 Exhibit A) (Shoreman, John) [1:25-mj-00276-MAU] (Entered: 12/30/2025) |
| 12/30/2025 | 24 | NOTICE OF ATTORNEY APPEARANCE: Mario Bernard Williams appearing for BRIAN J. COLE, JR (Williams, Mario) [1:25-mj-00276-MAU] (Entered: 12/30/2025) |
| 12/30/2025 | | ORAL MOTION to Commit Defendant to Custody of Attorney General by USA as to BRIAN J. COLE, JR. (znjb) [1:25-mj-00276-MAU] (Entered: 12/30/2025) |
| 12/30/2025 | | ORAL MOTION for Release from Custody by BRIAN J. COLE, JR. (znjb) [1:25-mj- |

00276-MAU] (Entered: 12/30/2025)

| | | |
|---|---|---|
| 12/30/2025 | | Minute Entry for proceedings held before Magistrate Judge Matthew J. Sharbaugh: Detention Hearing as to BRIAN J. COLE, JR held on 12/30/2025. For reasons set forth on the record, Defense 21 Motion to Clarify as to BRIAN J. COLE JR.; heard and denied as moot. Defense 22 Motion for Release of Brady Materials, Motion for Discovery as to BRIAN J. COLE JR.; heard and denied without prejudice. ORAL MOTION by the Government to Commit Defendant to Custody of Attorney General by USA as to BRIAN J. COLE, JR.; heard and taken under advisement. ORAL MOTION for Release from Custody by BRIAN J. COLE, JR.; heard and taken under advisement. Order to be issued. Bond Status of Defendant: Defendant remain Held Without Bond; Court Reporter: FTR- GOLD; FTR Time Frame: CRTM 7: [1:15:00-2:29:31][RECESS: 2:29:32-2:55:19][2:55:20-2:58:06]; Defense Attorney: John Shoreman, Mario Williams, Alex Little & John Glover; US Attorney: Charles Jones & Jocelyn Ballantine; Pretrial Officer: Shania Fennell; Proposed 3rd Party Custodian: Loretta Cole-Donnette-Grandmother. (znjb) [1:25-mj-00276-MAU] (Entered: 12/30/2025) |
| 12/30/2025 | | MINUTE ORDER as to BRIAN J. COLE, JR.: As discussed during today's proceedings, the Court was presented yesterday afternoon with a two-count indictment in this case that was returned by a D.C. Superior Court grand jury, rather than a federal court grand jury. The indictment included the same two counts charged in the criminal complaint, namely 18 U.S.C. 844(d) and 844(i). In asking the Court to accept the indictment, the government invoked D.C. Code § 11-1916(a), which provides that "[a] grand jury serving in the District of Columbia may take cognizance of all matters brought before it regardless of whether an indictment is returnable in a Federal or District of Columbia courts." The Court recognizes that Chief Judge Boasberg recently upheld the propriety of this approach based on that statute, concluding that Section 11-1916(a) authorizes local D.C. grand juries to return indictments in U.S. District Court (and vice versa). United States v. Stewart, 2025 WL 3237833 (Nov. 20, 2025). But Judge Boasberg then stayed that ruling pending appeal, stating in part that "the public interest lies in letting the Court of Appeals decide this issue before the Government moves forward both on this case and in similar fashion on other cases." See Stewart, No. 25-mj-225, Order (Dec. 9, 2025). The Court yesterday deferred a decision on whether to accept the indictment pending further briefing from the parties on the question of whether Judge Boasberg's stay order extends to the circumstances here. The parties were directed to submit briefing on that question, and the Court intends to issue a decision in short order on whether to accept the indictment as proposed. Meanwhile, the Court ORDERS that both sides shall file their respective briefs on the public docket by close of business on December 31, 2025. Either side may request redactions to their briefs the extent they believe it necessary, provided that the filing is accompanied by an appropriate motion to seal. SO ORDERED. Signed by Magistrate Judge Matthew J. Sharbaugh on 12/30/2025. (znjb) [1:25-mj-00276-MAU] (Entered: 12/30/2025) |
| 12/31/2025 | 26 | RESPONSE by BRIAN J. COLE, JR re Accepting Indictment from Superior Court (Shoreman, John)[1:25-mj-00276-MAU] Modified text (zstd). (Entered: 12/31/2025) |
| 12/31/2025 | 43 | MOTION for Immediate Release by BRIAN J. COLE, JR. (See docket entry 26 to view document.) (zstd) (Entered: 01/08/2026) |

USCA Case #26-3009      Document #2161061      Filed: 02/25/2026      Page 11 of 350

| | | |
|---|---|---|
| 01/02/2026 | 28 | MEMORANDUM OPINION and ORDER as to BRIAN J. COLE, JR. Signed by Magistrate Judge Matthew J. Sharbaugh on 1/2/2026. (znjb) [1:25-mj-00276-MAU] (Entered: 01/02/2026) |
| 01/02/2026 | | MINUTE ORDER as to BRIAN J. COLE, JR.: The Court has reviewed the parties' submissions on the issue of whether it should accept the indictment returned by a Superior Court grand jury pursuant to D.C. Code § 11-1916(a). As previously noted, Chief Judge Boasberg recently upheld the legality of this approach based on that D.C. Code provision, *see United States v. Stewart*, 2025 WL 3237833 (Nov. 20, 2025), but he then stayed that ruling pending appeal and stated that "the public interest lies in letting the Court of Appeals decide this issue before the Government moves forward both on this case and in similar fashion on other cases." Stewart, No. 25-mj-225, Order (Dec. 9, 2025). In the Court's mind, the salient question presented is whether that stay order applies here under a theory that the government is proceeding "in similar fashion" as in *Stewart*. The government insists it is not, including because it did not previously seek an indictment from a federal court grand jury before turning to the Superior Court grand jury, and because no federal grand jury was in session at the time of the Superior Court grand jury return. The government also represents that it will promptly seek a superseding indictment from a federal grand jury panel as soon as those panels reconvene. In the Court's view, that last representation suffices to ensure the government is not proceeding "in similar fashion" as in *Stewart*, even without deciding whether the other proffered distinctions place this case beyond the *Stewart* stay order. Put another way, the Court finds significant the government's confirmation that it does not intend to use the Superior Court grand jury as an ultimate end-run around a federal grand jury empaneled by this Court. The undersigned will therefore accept the proffered indictment, on the understanding that the government will promptly pursue a superseding indictment from a federal court grand jury when those panels reconvene. The Court will hold a status conference on that front at 3:00 PM on Friday January 9, 2026. SO ORDERED. Signed by Magistrate Judge Matthew J. Sharbaugh on 1/2/2026. (znjb) [1:25-mj-00276-MAU] (Entered: 01/02/2026) |
| 01/02/2026 | 29 | NOTICE OF FILING REDACTED DOCUMENT by USA as to BRIAN J. COLE, JR (Attachments: # 1 Memorandum in Support of Court's Inherent Authority to Accept Grand Jury Indictment Return)(Jones, Charles) [1:25-mj-00276-MAU] (Entered: 01/02/2026) |
| 01/02/2026 | 31 | INDICTMENT as to BRIAN J. COLE, JR (1) count(s) 1, 2. (zmcg) (Entered: 01/02/2026) |
| 01/03/2026 | 33 | Emergency MOTION to Review Magistrate's Order Denying Release by BRIAN J. COLE, JR. (Shoreman, John) Modified text on 1/8/2026 (zstd). (Entered: 01/03/2026) |
| 01/03/2026 | | MINUTE ORDER as to BRIAN J. COLE, JR. The court is in receipt of Defendant's 33 emergency motion for review of magistrate's order denying release pursuant to 18 U.S.C. § 3060(d). The government shall file any response by January 5, 2026, at 6:00 p.m. Signed by Judge Amir H. Ali on 1/3/2026. (lcaha1) Modified on 1/5/2026. (zalh) (Entered: 01/03/2026) |
| 01/05/2026 | 34 | NOTICE OF ATTORNEY APPEARANCE: John Ross Glover appearing for BRIAN J. |

| | | |
|---|---|---|
| | | COLE, JR (Glover, John) (Entered: 01/05/2026) |
| 01/05/2026 | 35 | NOTICE OF ATTORNEY APPEARANCE: Zachary Carter Lawson appearing for BRIAN J. COLE, JR (Lawson, Zachary) (Entered: 01/05/2026) |
| 01/05/2026 | 36 | NOTICE OF ATTORNEY APPEARANCE: Joseph Alex Little, IV appearing for BRIAN J. COLE, JR (Little, Joseph) (Entered: 01/05/2026) |
| 01/05/2026 | 37 | RESPONSE by USA as to BRIAN J. COLE, JR re 33 Emergency MOTION to Review Magistrate's Order Denying Release (Jones, Charles) Modified text on 1/8/2026 (zstd). (Entered: 01/05/2026) |
| 01/06/2026 | 38 | REPLY TO OPPOSITION to Motion by BRIAN J. COLE, JR re 33 Emergency MOTION to Review Magistrate's Order Denying Release (Little, Joseph) Modified text on 1/8/2026 (zstd). (Entered: 01/06/2026) |
| 01/06/2026 | 39 | SUPERSEDING INDICTMENT as to BRIAN J. COLE, JR (1) count(s) 1s, 2s. (zmcg) (Main Document 39 replaced on 1/6/2026) (zmcg). (Main Document 39 replaced on 1/6/2026) (zmcg). (Main Document 39 replaced on 1/6/2026) (zmcg). (Entered: 01/06/2026) |
| 01/06/2026 | | MINUTE ORDER as to BRIAN J. COLE, JR. The court is in receipt of the 39 superseding indictment. In light of the superseding indictment, Defendant shall show cause by January 7, 2026, why his 33 emergency motion for review of magistrate's order denying release pursuant to 18 U.S.C. § 3060(d) should not be denied as moot. Signed by Judge Amir H. Ali on 1/6/2026. (lcaha1) Modified on 1/9/2026. (zalh) (Entered: 01/06/2026) |
| 01/07/2026 | | NOTICE OF HEARING as to BRIAN J. COLE, JR: Arraignment set for 1/9/2026 at 3:00 PM in Courtroom 7- In Person before Magistrate Judge Matthew J. Sharbaugh. (znjb) (Entered: 01/07/2026) |
| 01/07/2026 | 41 | RESPONSE TO ORDER OF THE COURT by BRIAN J. COLE, JR re Order, *To Show Cause Why His Emergency Motion for Review of Magistrates Order (Dkt. 33) Should Not Be Denied As Moot* (Little, Joseph) (Entered: 01/07/2026) |
| 01/08/2026 | | MINUTE ORDER as to BRIAN J. COLE, JR. The court is in receipt of Defendant's 41 response to the court's order to show cause why Defendant's 33 emergency motion for review of magistrate's order denying release pursuant to 18 U.S.C. § 3060(d) should not be denied as moot. The government shall file any response to Defendant's arguments by January 9, 2026. Signed by Judge Amir H. Ali on 1/8/2026. (lcaha1) (Entered: 01/08/2026) |
| 01/09/2026 | 44 | RESPONSE by USA as to BRIAN J. COLE, JR re 33 Emergency MOTION to Review *Magistrate's Acceptance of Indictment in Support of Denying Emergency Motion as Moot* (Jones, Charles) (Entered: 01/09/2026) |
| 01/09/2026 | 47 | REPLY in Support by BRIAN J. COLE, JR re 41 RESPONSE TO ORDER OF THE COURT (Little, Joseph) Modified to add link on 1/12/2026 (zstd). (Entered: 01/09/2026) |
| 01/09/2026 | | ORAL MOTION for Speedy Trial by USA as to BRIAN J. COLE, JR. (zltp) (Entered: |

| | | |
|---|---|---|
| | | 01/12/2026) |
| 01/09/2026 | | Minute Entry for proceedings held before Magistrate Judge Matthew J. Sharbaugh: Arraignment as to BRIAN J. COLE JR. (1) as to Count 1,1s,2,2s held on 1/9/2026. Plea of Not Guilty entered as to all counts. Oral Motion by the Government for Speedy Trial as to BRIAN J. COLE JR. (1); heard and granted. Speedy Trial Excluded from 1/9/2026 to 1/28/2026 in the Interest of Justice (XT). Status Conference set for 1/28/2026 at 3:30 PM in Courtroom 19- In Person before Judge Amir H. Ali. Bond Status of Defendant: Defendant committed/Commitment issued; Court Reporter: FTR Gold; FTR Time Frame: CTRM 7: [3:06:12 - 3:12:06]; Defense Attorney: John Shoreman & John Glover; US Attorney: Jocelyn Ballantine. (zltp) (Entered: 01/12/2026) |
| 01/16/2026 | 48 | MOTION to Revoke *Order Denying Pretrial Release [ECF28]* by BRIAN J. COLE, JR. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Shoreman, John) (Entered: 01/16/2026) |
| 01/16/2026 | 49 | ORDER as to BRIAN J. COLE, JR. Defendant's 33 emergency motion to review magistrate judge's order denying release is denied. See document for details. Signed by Judge Amir H. Ali on 1/16/2026. (lcaha1) Modified on 2/5/2026. (zalh) (Entered: 01/16/2026) |
| 01/20/2026 | | MINUTE ORDER as to BRIAN J. COLE, JR. The court is in receipt of Defendant's 48 motion to revoke order denying pretrial release [ECF 28]. The government shall file its response by January 23, 2026. Defendant shall file any reply by January 27, 2026, at 2:00 p.m. Signed by Judge Amir H. Ali on 1/20/2026. (lcaha1) (Entered: 01/20/2026) |
| 01/23/2026 | 50 | RESPONSE by USA as to BRIAN J. COLE, JR re 48 MOTION to Revoke *Order Denying Pretrial Release [ECF28]* (Jones, Charles) (Entered: 01/23/2026) |
| 01/26/2026 | | MINUTE ORDER as to BRIAN J. COLE, JR. Following the status conference set for January 28, 2026, the court will hear oral argument on Defendant's 48 motion to revoke order denying pretrial release [ECF 28]. Signed by Judge Amir H. Ali on 1/26/2026. (lcaha1) (Entered: 01/26/2026) |
| 01/27/2026 | 51 | REPLY in Support by BRIAN J. COLE, JR re 48 MOTION to Revoke *Order Denying Pretrial Release [ECF28]* (Little, Joseph) (Entered: 01/27/2026) |
| 01/27/2026 | 52 | NOTICE *of Filing of Exhibits* by BRIAN J. COLE, JR re 51 Reply in Support (Attachments: # 1 Exhibit Dr. Black Letter, # 2 Exhibit Delicia Declaration, # 3 Exhibit Brittany Declaration)(Little, Joseph) (Entered: 01/27/2026) |
| 01/28/2026 | | Minute Entry for proceedings held before Judge Amir H. Ali: Bond Review Hearing as to BRIAN J. COLE JR. held on 1/28/2026. Government's oral request for a 30 day continuance; heard and granted. Speedy Trial Excludable (XT) started 1/28/2026 until 2/27/2026, in the interest of justice. Status Conference set for 2/27/2026 at 10:30 AM in Courtroom 19- In Person before Judge Amir H. Ali. Defendant's 48 Motion to Revoke Order Denying Pretrial Release [ECF 28] is heard and taken under advisement. Order forthcoming via Chambers. Bond Status of Defendant: remains Committed/Commitment Issued; Court Reporter: Sonja Reeves; Defense Attorneys: John M. Shoreman, Mario Bernard Williams, Joseph Alex Little IV, and Zachary Carter Lawson; US Attorneys: Charles Robert Jones and Jocelyn S. Ballantine. (zalh) |

(Entered: 01/29/2026)

| | | |
|---|---|---|
| 01/29/2026 | | MINUTE ORDER as to BRIAN J. COLE, JR. At the court's January 28, 2026, hearing, the court heard the parties' evidence and arguments on Defendant's [48] motion to revoke order denying pretrial release [ECF 28] and took them under advisement. Defendant's motion to revoke is denied.<br><br>The court has independently considered the factors under 18 U.S.C. § 3142(g), as well as all the evidence and arguments presented by the parties, and agrees with the careful analysis and conclusions in Judge Sharbaugh's [28] memorandum opinion and order. Having considered the additional declarations and arguments submitted to this court in the first instance, the court concludes that they are insufficient to overcome the government's showing that pretrial detention is appropriate under the relevant factors. Accordingly, considering the nature and circumstances of the charged offense, the weight of the evidence against the defendant, the history and characteristics of the defendant, and the nature and seriousness of the danger to any person or the community posed by release, the court concludes the government has satisfied its burden of persuasion to show clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of others and the community. Signed by Judge Amir H. Ali on 1/29/2026. (lcaha1) (Entered: 01/29/2026) |
| 02/02/2026 | [53] | TRANSCRIPT OF BOND REVIEW HEARING in case as to BRIAN J. COLE, JR before Judge Amir H. Ali held on January 28, 2026; Page Numbers: 1-70. Court Reporter Sonja L. Reeves, RDR, CRR, Telephone number (202) 354-3246, Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 2/23/2026. Redacted Transcript Deadline set for 3/5/2026. Release of Transcript Restriction set for 5/3/2026.(Reeves, Sonja) (Entered: 02/02/2026) |
| 02/03/2026 | [54] | NOTICE OF APPEAL (Interlocutory) by BRIAN J. COLE, JR re Order on Motion to Revoke,,,,, [49] Order on Motion for Review. Filing fee $ 605, receipt number ADCDC-12221425. Fee Status: Fee Paid. (Little, Joseph) (Entered: 02/03/2026) |
| 02/03/2026 | [55] | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid as to BRIAN J. COLE, JR re [54] Notice of Appeal - Interlocutory. (zstd) (Entered: 02/03/2026) |

| 02/05/2026 | USCA Case Number as to BRIAN J. COLE, JR 26-3009 for [54](#) Notice of Appeal - Interlocutory filed by BRIAN J. COLE, JR.. (zmcg) (Entered: 02/05/2026) |
|---|---|

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/22/2026 12:27:40 | | |
| **PACER Login:** | ally.foresman | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:26-cr-00001-AHA |
| **Billable Pages:** | 9 | **Cost:** | 0.90 |

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
District of Columbia

| | |
|---|---|
| United States of America<br>v.<br>Brian J. Cole, Jr. ███████ | )<br>)<br>)<br>)<br>)<br>) |

Case: 1:25-mj-00276
Assigned To: Judge Upadhyaya, Moxila A.
Assign. Date: 12/3/2025
Description: COMPLAINT W/ARREST WARRANT

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____January 5, 2021_____ in the county of _____Washington_____ in the
_____ District of _____Columbia_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 844(d) | Explosive Device - transportation in interstate commerce with intent to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property |
| 18 U.S.C. § 844(i) | Explosive Device -malicious destruction or attempted malicious destruction by means of fire and explosive materials |

This criminal complaint is based on these facts:

See attached Statement of Facts.

☑ Continued on the attached sheet.

████████████
*Complainant's signature*

████████ Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____12/03/2025_____

*Judge's signature*

City and state: _____Washington, DC_____

Moxila A. Upadhyaya, United States Magistrate Jud
*Printed name and title*

A013

Case 1:25-mj-00276-MAU     Document 1-1
USCA Case #26-3009     Document #2161061

Case: 1:25-mj-00276
Assigned To: Judge Upadhyaya, Moxila A.
Assign. Date: 12/3/2025
Description: COMPLAINT W/ARREST WARRANT

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, ▮▮▮▮▮▮▮, being duly sworn, hereby depose and states as follows:

## INTRODUCTION AND AGENT BACKGROUND

I am a Special Agent with the (FBI) and have been so employed since 2009. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. As an FBI Special Agent, I have received extensive training in a variety of investigations of federal and state law. During my employment with the FBI, I have participated in mainly international and domestic terrorism investigations. These investigations have given me experience in preparing and assisting in the preparation of court orders and search warrant applications. Additionally, during the course of these and other investigations, I have also conducted or participated in physical and electronic surveillance, assisted in the execution of search and arrest warrants, debriefed informants, interviewed witnesses and suspects, and reviewed other pertinent records.

This affidavit is being submitted in support of a criminal complaint alleging that BRIAN J. COLE, JR. has  transported in interstate commerce an explosive with the knowledge or intent that it will be used to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property, in violation of 18 U.S.C. § 844(d); and has maliciously damaged and destroyed and attempted to damage and destroy, by means of fire and explosive materials, the headquarters of the Republican National Committee (RNC) and the Democratic National Committee in Washington, D.C., in violation of 18 U.S.C. § 844(i).

This affidavit is based on my personal knowledge, information provided to me by and through other law enforcement agents, law enforcement records, Rule 41 search warrants, witness interviews, and my training and experience, as well as the training and experience of other law enforcement agents.

Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have only set forth the facts that I believe are necessary to establish probable cause that Defendant violated 18 U.S.C. §§ 844(d) & (i).

### Background
*Discovery of Pipe Bombs on January 6, 2021*

At approximately 1:00 p.m. on January 6, 2021, multiple law enforcement agencies received reports of a suspected improvised explosive device (IED) in the vicinity of the headquarters of the Republican National Committee (RNC) in Washington, D.C. At approximately 1:15 p.m. on the same day, a second suspected IED was reported just a few blocks away in the vicinity of the headquarters of the Democratic National Committee in Washington, D.C. The RNC

and DNC are national organizations that engage in activities on a national level on behalf of their respective political parties, including the solicitation of donations from individuals outside of Washington, D.C. The headquarters of each organization is used in interstate commerce and in activity affecting interstate commerce.

The Hazardous Devices Section of the United States Capitol Police (USCP) responded and performed a render safe procedure on both devices. Subsequently, the FBI assessed that the two devices were both IEDs which contained a main explosive charge, a fuzing system, and a container. The FBI also assessed that the IEDs used a hard metal container (metal pipe nipples and end caps), which showed that weapon characteristics were present. The FBI recovered the components of the disrupted devices. These components were processed as evidence and submitted to the FBI Laboratory for analysis. The FBI Laboratory issued a report regarding the two devices, opining that the submitted items consisted of two disrupted destructive devices and that the use of a hard metal container showed that weapon characteristics were present.

The IEDs were both of a kind more commonly known as "pipe bombs." Both IEDs were manufactured using a collection of component parts and a main explosive charge. The component parts included a 1-inch by 8-inch pipe, end caps affixed to the pipe, 14-gauge electrical wire in red and black, alligator clips to connect the wires, a nine-volt (9v) battery, a nine-volt (9v) battery connector, a white kitchen timer, paper clips, steel wool, and homemade black powder.

*Pipe Bomber Identified on Surveillance Footage*

Review of video surveillance footage from the evening of January 5, 2021, shows that the pipe bombs at the RNC and DNC were placed by the same individual. The individual was observed on video surveillance footage at various locations in the surrounding neighborhood between approximately 7:34 p.m. and 8:18 p.m.

In video surveillance, the individual was wearing dark pants, a grey hooded sweatshirt, dark gloves, Nike Air Max Speed Turf shoes, and a facemask that obscured the person's face. The video surveillance footage shows the individual adjusting eyeglasses at times. The video surveillance footage shows the individual carrying a backpack.

Video footage shows the individual traveling on foot though the surrounding neighborhood of the RNC and DNC, including portions of the route of travel between the two locations. Through video surveillance, the FBI recreated the individual's path of travel, including timestamps associated with the individual's location along the route. The individual placed the pipe bomb at the DNC at approximately 7:54 p.m. and at the RNC at approximately 8:16 p.m. on January 5.

In January 2021, the FBI conducted a reverse projection photogrammetry examination (i.e., a height analysis) of the individual depicted in the video surveillance footage. The height analysis showed that the approximate distance from the ground to the top of the individual's head, including headwear, was 5 feet 7 inches with an error rate of +/- 1.1 inches.

## Identification of Brian J. Cole, Jr.

Brian J. Cole, Jr. ("COLE") is a 30 year-old resident of Woodbridge, Virginia. COLE is 5 feet 6 inches tall, and COLE wears corrective eyeglasses.

COLE lives in a single-family house with his mother and other family members. COLE works in the office of a bail bondsman in northern Virginia.

### *COLE's Purchases of Bombmaking Equipment*

The FBI has identified one bank checking account and six credit cards (the "Accounts") used by COLE. The FBI obtained records for the checking account and three credit cards for the time period January 2018 to January 2021. Three additional credit cards were obtained for the time period of January 2018 to November 2025. The FBI reviewed the transaction history for all of these Accounts.

During 2019 and 2020, COLE purchased multiple items consistent with the components that were used to manufacture the pipe bombs placed at the RNC and DNC. COLE used the Accounts to purchase these items from physical retail locations in northern Virginia, as described in more detail below:

- Both pipe bombs were manufactured using a 1" x 8" galvanized pipe with markings consistent with a particular manufacturer's (the "Pipe Manufacturer") product labeling. COLE purchased a total of six galvanized pipes of this size and shape on or about June 1, June 8, and November 16, 2020. The purchases were made at two different Home Depot location in northern Virginia. According to the Pipe Manufacturer, approximately 26,000 of these items from Pipe Manufacturer were sold in 2020, and over 22,000 of these items were sold to Home Depot.

- Both pipe bombs were manufactured using "end caps," which were used to close the ends of the eight-inch pipe. The pipe bombs placed outside the RNC and DNC contained a mix of both black and galvanized end caps. The end caps had markings consistent with Pipe Manufacturer's product labeling. COLE purchased a total of 12 black end caps and 2 galvanized end caps from four different Home Depots in northern Virginia on or about the following dates: October 22, 2019, and March 10, June 20, July 8, and November 16, 2020. According to the Pipe Manufacturer, approximately 233,000 of the black end caps from Pipe Manufacturer were distributed in 2020, including to Home Depot. In addition, approximately 179,200 galvanized end caps from Pipe Manufacturer were distributed in 2020, including to Home Depot.

- Both pipe bombs were manufactured using a nine-volt (9V) battery connector with attached red and black wires. The nine-volt battery connectors used in the pipe bombs had identifying information on the black and red insulated wires that were consistent with those distributed in North America by a known company and its predecessors (the "Nine Volt Distributor"). COLE purchased five of the Nine Volt Distributor's nine-volt battery connectors from Micro Center in northern Virginia on or about November 12

3

and December 28, 2019, including cash purchases made during the December transaction. Fewer than 8,000 of Nine Volt Distributor's nine-volt battery connectors were distributed in the United States between December 2017 and January 5, 2021.

- Both pipe bombs were manufactured using a white kitchen-style timer. COLE purchased two white kitchen timers from a Walmart in northern Virginia on or about June 3, 2020.

- Both pipe bombs used a mix of 14-gauge red and black electrical wire. COLE purchased 14-gauge electrical wire in red and black on or about May 23 and October 22, 2019, and on or about September 27, October 7, and November 24, 2020. COLE's purchases of 14-gauge red and black electrical wire were made from one Home Depot and one Lowes location in northern Virginia.

- Both pipe bombs were packed with steel wool. COLE purchased steel wool from a Home Depot in northern Virginia on or about December 4, 2020.

In addition to purchasing each type of component used to make the pipe bombs, COLE purchased equipment that would facilitate the manufacturing of a pipe bomb. Such items included:

- Safety glasses on or about July 8, 2020;

- A wire stripping tool on or about November 14, 2020;

- Wire nuts, which are used to join wires together, on or about November 14, 2020;

- Sandpaper on or about November 21, 2020;

- A machinist's file, a tool for shaping and smoothing metal parts, on or about November 21, 2020; and

- Protective gloves and disinfecting wipes on or about November 24, 2020.

Following the placement of the pipe bombs on January 5, 2021, COLE continued to make purchases of components used in bomb making. For example, on January 21, 2021, COLE purchased one white kitchen timer and two nine-volt batteries from Walmart; on January 22, 2021, COLE purchased 2 galvanized pipes measuring 1" x 8" and steel wool from Home Depot; on January 22, 2021, COLE purchased two of a different kind of Nine Volt Distributor's nine-volt battery clips from Micro Center; on January 23, 2021, COLE purchased various alligator clips from Home Depot.

*COLE's Location on January 5, 2021*

Since at least as early as January 5, 2021, COLE has been the user of a specific telephone number associated with a cellular phone ("COLE CELLPHONE").

4

The FBI obtained historical cell site records associated with cell towers located in the immediate vicinity of the RNC and DNC for the relevant time period on January 5, 2021. Historical cell site records associated with cell towers provide location data for cellular telephones at specific points in time when the cell phone engages in a transaction with the cell phone tower. Such transactions can include voice calls, text messages, or other data usage. Transactions involving data usage can include a user's active use of a phone, e.g., navigating to a web page, and during a user's passive use of a phone, such as when an application on the phone refreshes data in the background.

Records obtained from the cell phone provider that provides service to the COLE CELLPHONE (the "Provider") included historical cell site records associated with the location of devices on the Provider's network on January 5, 2021. Provider's records included location data for devices on its network that engaged in transactions including voice calls, text messages, and other data usage.

Each of Provider's cell phone towers in the vicinity of the RNC and DNC have sectors that provide coverage for the particular tower. Each sector of a cell phone tower provides approximately 120 degrees of coverage. Due to real world conditions and various forms of interference, the actual coverage on any particular day for a particular sector can extend beyond 120 degrees of coverage or be limited to less than 120 degrees of coverage.

For each cell phone tower, Provider's historical cell site records show the particular "sector" that engaged in each transaction for each individual cell phone. The FBI's Cellular Analysis Survey Team (CAST) has analyzed the location of the COLE CELLPHONE on January 5, 2021.

Provider records show that the COLE CELLPHONE connected with Provider cell phone towers consistent with the COLE CELLPHONE being in the area of the RNC and DNC on January 5, 2021. The COLE CELLPHONE engaged in approximately seven data session transactions with Provider towers between 7:39 p.m. and 8:24 p.m. Provider's historical cell site data shows the specific tower for each of the transactions along with the sector of the tower that engaged in the transaction with the COLE CELLPHONE.

The seven transactions between the COLE CELLPHONE and Provider's towers occurred at approximately 7:39 p.m., 7:44 p.m., 7:59 p.m., 8:14 p.m., 8:23 p.m., and 8:24 p.m. Two transactions took place at 7:39 p.m. During this time period, the COLE CELLPHONE had transactions with five different sectors on Provider's cell towers.

    a. At approximately 7:39:27 p.m., the COLE CELLPHONE interacted with a particular sector of Provider tower 59323, which faces southeast (approximately 120˚) from its location at 103 G Street, Southwest in Washington, D.C. ("Sector A"). Also at 7:39:27 p.m., the COLE CELLPHONE interacted with a particular sector of Provider tower 126187, which faces east[1] (approximately 90˚) from its

---

[1] In the Provider's published tower list in February 2021, which is the first published listing of this tower, the Provider listed this particular sector of Provider tower 126187 as facing north

location at 200 Independence Avenue, Southwest in Washington, D.C. ("Sector B"). Video surveillance footage shows that at approximately 7:39:32 p.m., the individual who placed the pipe bombs walked westbound on D Street, Southeast and then turned southbound on South Capitol Street, Southeast. These locations are consistent with the coverage areas of Sector A and B.

b.   At approximately 7:44:36 p.m., the COLE CELLPHONE interacted with Sector B of Provider tower 126187. Video surveillance footage shows that at approximately 7:44:36 p.m., the individual who placed the pipe bombs walked east on Ivy Street, Southeast. This location is consistent with the coverage area of Sector B.

c.   At approximately 7:59:36 p.m., the COLE CELLPHONE interacted with a particular sector of Provider tower 147990 which faces south (approximately 180˚) from its location at 200 Independence Avenue, Southwest in Washington, D.C. ("Sector C"). Video surveillance footage shows that at approximately 7:59:38 p.m., the individual who placed the pipe bombs walked southbound on New Jersey Avenue, Southeast then turned eastbound on E Street, Southeast. These locations are consistent with the coverage area of Sector C.

d.   At approximately 8:14:36 p.m., the COLE CELLPHONE interacted with Provider tower 45111 which faces west (approximately 255˚) from its location at 101 Independence Avenue, Southeast in Washington, D.C. ("Sector D"). Video surveillance footage shows that at approximately 8:14:15 p.m., the individual who placed the pipe bombs exited Rumsey Court and walked westbound through an alley between the Capitol Hill Club and the RNC then walked northbound onto First Street, Southeast. This location is consistent with the coverage area of Sector D.

e.   At approximately 8:23:59 p.m. and 8:24:06 p.m., the COLE CELLPHONE interacted with Provider tower 144340, which faces west (approximately 295˚) from its location at 600 Pennsylvania Avenue, Southeast in Washington, D.C. ("Sector E"). Video surveillance footage last captures the individual who placed the pipe bombs at 8:18 p.m. walking eastbound on Rumsey Court in the direction of tower 144340, which is approximately 1/2 mile east of the individual's last recorded location. The last recorded location is consistent with the coverage area of Sector E.

---

(approximately 345˚). In April 2021, the Provider updated the direction of this particular sector of Provider tower 126187 as facing east (approximately 90˚). The FBI's drive test conducted in January and February 2021 showed results from this particular sector that were consistent with this particular sector facing east (approximately 90˚). The drive test results were inconsistent with the sector facing north. Based on the totality of information available, including the data session transaction with Sector A at 7:39:27 p.m., CAST assesses that the Provider's listed information about the sector in February 2021 was an error that was corrected in April 2021.

COLE is the registered owner of a 2017 Nissan Sentra with a Virginia license plate. On January 5, 2021, at approximately 7:10 p.m., COLE's Nissan Sentra was observed driving past a License Plate Reader at the South Capitol Street exit from Interstate 395 South, which is less than one-half mile from the location where the individual who placed the devices was first observed on foot near North Carolina and New Jersey Avenues, Southeast at 7:34 p.m. Approximately 5 minutes later, at 7:39:27 p.m., the COLE CELLPHONE began to interact with Provider towers in the area.

### *COLE's Other Contacts with Washington, D.C.*

The FBI has analyzed COLE's purchase history associated with the Accounts. Between January 2018 and January 2021, COLE made a total of five purchases within Washington, D.C. on or about the following dates: January 13, 2018; January 16, 2018; October 31, 2019; December 5, 2020; and December 14, 2020.

Approximately three weeks before the pipe bombs were placed, on or about December 14, 2020, COLE made a purchase at a restaurant located near First and D Streets, Southeast. The restaurant is located across the street from the entrance to Rumsey Court on D Street, Southeast.

## <u>Conclusion</u>

For all of the reasons stated above, there is probable cause that, on January 5, 2021, COLE placed pipe bombs outside of the RNC and the DNC, in violation of 18 U.S.C. §§ 844(d) & (i).

I declare under penalty of perjury that the information provided above in this affidavit is true and correct to the best of my knowledge.

Respectfully submitted,



Federal Bureau of Investigation

Subscribed and sworn before me on December 3, 2025.

_____
MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:25-mj-00276** |
| | : | |
| **BRIAN J. COLE, JR.,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion for defendant Brian J. Cole, Jr. to be detained pending trial.   The defendant is charged by complaint with transporting and planting two improvised explosive devices (IEDs)—so-called "pipe bombs"—in the immediate vicinity of the headquarters of the Republican National Committee (RNC) and the Democratic National Committee (DNC) on January 5, 2021, in violation of 18 U.S.C. §§ 844(d) and 844(i).   Following his December 4, 2025 arrest, the defendant waived his *Miranda* rights and gave a detailed confession to the charged offenses.

The government seeks pretrial detention under 18 U.S.C. § 3142(f)(1)(A).   Section 844(i) is an offense listed as a federal crime of terrorism in § 2332b(g)(5)(B) carrying a maximum term of imprisonment of 10 years or more.   Upon a finding of probable cause that the defendant violated § 844(i), the federal bail statute creates a rebuttable presumption that no conditions will reasonably assure the community's safety if the defendant is released pending trial.   The defendant cannot rebut this presumption considering the extreme and profoundly serious nature of his crimes, the overwhelming evidence of his guilt, the years he has spent deceiving those around him to avoid accountability, and the intolerable risk that he will again resort to violence to express his frustration with the world around him.   The Court should detain the defendant pending trial.

## BACKGROUND

On December 4, 2025, the defendant was arrested, and a complaint was unsealed charging him with violations of 18 U.S.C. §§ 844(d) and 844(i).   *See* ECF No. 1.   The defendant made his initial appearance on December 5, 2025, and he was held pending a detention hearing.   The detention hearing is scheduled for December 30, 2025.

### *January 5, 2021*

The charges against the defendant arise from his manufacturing, transporting, and planting of two pipe bombs in downtown Washington, D.C. on January 5, 2021.   The defendant planted the first bomb at approximately 7:54 p.m. in the immediate vicinity of the DNC headquarters located at 430 South Capitol Street, Southeast.   He planted the second bomb at approximately 8:16 p.m. in the immediate vicinity of the RNC headquarters at 310 First Street, Southeast.   The two locations are approximately 0.2 miles apart.

Earlier that evening, at approximately 7:10 p.m., the defendant, driving his 2017 Nissan Sentra, took the South Capitol Street exit from Interstate 395 South, passing a license plate reader that recorded his vehicle and tag information.   Approximately 24 minutes later, at about 7:34 p.m., surveillance video first captured the defendant walking approximately one-half mile from the South Capitol Street exit, near the intersection of First Street and North Carolina Avenue, Southeast.   As captured on video, and shown below, the defendant was holding a backpack in his hand by the top strap and wearing dark pants, a grey hooded sweatshirt, dark gloves, Nike Air Max Speed Turf shoes, and a facemask and hood that obscured his face.

2



The footage also showed the defendant—who investigators from the Federal Bureau of Investigation (FBI), based on a height analysis of the video, estimated to stand 5 feet 7 inches tall with an error rate of +/- 1.1 inches—putting on a pair of eyeglasses and scanning the area, as depicted below.    The defendant is approximately 5 feet 6 inches tall and wears corrective eyeglasses.



3

At approximately 7:39:27 p.m., about five minutes after the defendant was first captured on surveillance video, his cellphone interacted with two cell towers consistent with him being in the area of the intersection of D Street and South Capitol Street, Southeast.[1]  Surveillance video showed that at approximately 7:39:32 p.m., the defendant walked westbound on D Street, Southeast then turned southbound on South Capitol Street, Southeast.   About five minutes later, at approximately 7:44:36 p.m., the defendant's cellphone interacted with a cell tower consistent with him being in the area of Ivy Street, Southeast, a one-block road bounded by Canal Street, Southeast and New Jersey Avenue, Southeast.   Surveillance video showed that at approximately 7:44:36 p.m., the defendant walked east on Ivy Street, Southeast.

About fifteen minutes later, at approximately 7:59:36 p.m., the defendant's cellphone interacted with a cell tower consistent with him being in the area of the intersection of New Jersey Avenue, Southeast and E Street, Southeast.   Surveillance video showed that at approximately 7:59:38 p.m., the defendant walked southbound on New Jersey Avenue, Southeast then turned eastbound on E Street, Southeast.   This intersection is approximately 0.1 miles from the immediate vicinity of the DNC headquarters, where the defendant placed the first pipe bomb, shown below, at approximately 7:54 p.m.

---

[1]  Records obtained from the relevant cellular provider listed the relevant sector of one of these towers as facing north as of February 2021.   However, the provider updated its records in April 2021 to reflect that the tower sector in fact faced east, an orientation that would provide coverage to the intersection of D Street and South Capitol Street, Southeast.   The eastward orientation was consistent with FBI drive tests conducted in January and February 2021.   Based on the information available, the FBI assesses that the provider record listing the relevant tower sector as facing north in February 2021 was an error that was corrected in April 2021, and that on January 5, 2021, that tower sector faced east.



About twenty minutes later, at approximately 8:14:36 p.m., the defendant's cellphone interacted with a cell tower consistent with him being in the area of Rumsey Court, Southeast, a single-block alley within the area bounded by 1st Street and 2nd Street, Southeast and C Street and D Street, Southeast.    Surveillance video showed that at approximately 8:14:15 p.m., the defendant exited Rumsey Court and walked westbound through an alley between the Capitol Hill Club and the RNC then walked northbound onto First Street, Southeast.    Surveillance video showed that the defendant then returned to Rumsey Court.    The video last captured the defendant walking eastbound on Rumsey Court at 8:18 p.m.    Based on the video, the defendant appears to have placed the second bomb, shown below, in the vicinity of the RNC at approximately 8:16 p.m.

5



Finally, at approximately 8:23:59 p.m. and 8:24:06 p.m., the defendant's cellphone interacted with a cell tower consistent with him being in the area east of Rumsey Court, where he was last captured on video about six minutes earlier. The graphic below illustrates the defendant's interactions with nearby cell towers in relation to the RNC and DNC headquarters where he placed the bombs.

6



*The Pipe Bombs and the Defendant's Purchasing History*

The pipe bombs that the defendant planted near the RNC and DNC did not detonate as intended and were not discovered until approximately 1:00 p.m. on January 6, 2021.    The Hazardous Devices Section of the United States Capitol Police (USCP) responded and performed a render safe procedure on both devices.    Subsequently, the FBI assessed that the two devices were both IEDs which contained a main explosive charge, a fuzing system, and a container.    The FBI also assessed that the IEDs used a hard metal container (metal pipe nipples and end caps), which showed that weapon characteristics were present.    The FBI recovered the components of

7

the disrupted devices.    These components were processed as evidence and submitted to the FBI

Laboratory for analysis.    The FBI Laboratory issued a report regarding the two devices, opining

that the submitted items consisted of two disrupted destructive devices and that the use of a hard

metal container showed that weapon characteristics were present.    The FBI explosives examiner

assessed that the pipe bombs were constructed using all the components necessary to explode and

that they were viable explosive devices.

Both pipe bombs were manufactured using a collection of component parts and a main

explosive charge.    The component parts included a 1-inch by 8-inch pipe nipple, end caps affixed

to the pipe, 14-gauge electrical wire in red and black, alligator clips to connect the wires, a nine-

volt (9v) battery, a nine-volt (9v) battery connector, a white kitchen timer, paper clips, steel wool,

and homemade black powder.    The general construction of the pipe bomb components is

illustrated below.



The FBI obtained records for the defendant's checking account and three of his credit cards for the time period January 2018 to January 2021.    Records for three additional credit cards were obtained for the period of January 2018 to November 2025.    The FBI reviewed the transaction history for all of these accounts.

Between 2018 and 2020, the defendant purchased numerous components that he used to manufacture the pipe bombs placed at the RNC and DNC.    The defendant purchased these components primarily from physical retail locations in northern Virginia, as listed in the table below.

9

| Component | Picture | Quantity | Purchase Date | Store |
|---|---|---|---|---|
| 9V Battery Connector | | 5 | 11/12/2019 12/28/2019 | Micro Center |
| Timer | | 2 | 6/3/2020 | Walmart |
| 1"x8" Pipe Nipple | | 6 | 6/1/2020 6/8/2020 11/16/2020 | Home Depot |
| Black Iron End Cap | | 12 | 10/22/2019 6/20/2020 7/8/2020 11/16/2020 | Home Depot |
| Galvanized End Cap | | 2 | 3/10/2020 | Home Depot |
| 14 Gauge Red Wire | | 350 ft | 5/23/2019 10/22/2019 9/27/2020 10/7/2020 | Home Depot |
| 14 Gauge Black Wire | | 150 ft | 9/27/2020 10/7/2020 | Home Depot |
| 14 Gauge Red Wire | | 100 ft | 11/24/2020 | Lowes |
| 14 Gauge Black Wire | | 100 ft | 11/24/2020 | Lowes |
| Steel Wool | | 1 | 12/4/2020 | Home Depot |
| Sulfur | | 1 lb | 1/14/2018 | Amazon |

In addition to purchasing each type of component used to make the pipe bombs, the defendant purchased equipment for manufacturing of pipe bombs. Such items included:

- Safety glasses on or about July 8, 2020;

- A wire stripping tool on or about November 14, 2020;

- Wire nuts, which are used to join wires together, on or about November 14, 2020;

- Sandpaper on or about November 21, 2020;

10

- A machinist's file, a tool for shaping and smoothing metal parts, on or about November 21, 2020; and

- Protective gloves and disinfecting wipes on or about November 24, 2020.

After planting the pipe bombs on January 5, 2021, the defendant continued to purchase bombmaking components, as illustrated below. The last identified purchase occurred on August 13, 2022.

| Component | Picture | Quantity | Purchase Date | Store |
|---|---|---|---|---|
| Timer | | 1 | 1/21/2021 | Walmart |
| 1"x8" Pipe Nipple | | 8 | 1/22/2021<br>3/20/2021<br>10/6/2021<br>8/10/2022 | Home Depot |
| Black Iron End Cap | | 11 | 4/4/2021<br>6/1/2021<br>6/8/2021<br>6/26/2021<br>10/11/2021<br>8/13/2022 | Home Depot |
| Galvanized End Cap | | 8 | 3/20/2021<br>3/21/2021<br>8/13/2022 | Home Depot |
| 14 Gauge Red Wire | | 50 ft | 6/1/2021 | Home Depot |
| 14 Gauge Black Wire | | 50 ft | 6/1/2021 | Home Depot |
| Steel Wool | | 1 | 1/22/2021 | Home Depot |
| Alligator Clips | | 2 | 1/23/2021 | Home Depot |

11

A031

### *The Defendant's Arrest and Confession*

On December 4, 2025, law enforcement executed an arrest warrant for the defendant and took him into custody.   Search warrants were executed on the defendant's person, his home in Woodbridge, Virginia, his Nissan Sentra, and his workplace in Fairfax, Virginia.

A Samsung cellular device was seized from the defendant's person at the time of his arrest. A forensic review of the device's contents showed that between December 2020 and December 2025, the device recorded 943 events identified as a "factory reset" or "wipe," including a "wipe" event approximately three hours before the defendant's arrest on December 4, 2025.[2]

Inside the defendant's home, law enforcement recovered, among other evidence, (1) a Home Depot shopping bag containing three black iron end caps, one galvanized end cap, two 1-inch by 8-inch pipe nipples, and a Home Depot receipt dated November 16, 2020, for two 1-inch by 8-inch pipe nipples, three black iron end caps, and gloves located inside a closet accessible only through the defendant's bathroom; (2) a Lowes shopping bag containing two galvanized end caps located inside the same closet; and (3) 14-gauge red wire and wire strippers located inside the garage.   Inside the defendant's vehicle, law enforcement recovered, among other evidence, (1) a Home Depot receipt dated August 10, 2022, for hand sanitizer, two 1-inch by 8-inch pipe nipples, and work gloves; (2) a Home Depot shopping bag containing two 1-inch by 8-inch pipe nipples; (3) a Home Depot shopping bag containing two black iron end caps and two galvanized end caps; and (4) a nine-volt (9v) battery.

---

[2] The first "factory reset" or "wipe" event took place on December 15, 2020.   The next such event did not occur until July 15, 2022.   From that date, the "factory reset" or "wipe" events occurred at least once a week.   On some days, the device appears to have been wiped multiple times in the same day.

Following his arrest, the defendant was transported from Woodbridge, Virginia to the FBI's Washington Field Office, where he executed a written waiver of his *Miranda* rights and was interviewed by investigators for multiple hours.    During the interview, which was video-recorded, the defendant initially denied manufacturing, transporting, and planting the pipe bombs.    When asked about his whereabouts on January 5, 2021, the defendant stated that he drove his Nissan Sentra to Washington, D.C. by himself that evening to attend a protest concerning the outcome of the 2020 election.    The defendant explained: "I didn't agree with what people were doing, like just telling half the country that they – that their – that they just need to ignore it. I didn't think that was a good idea, so I went to the protest."    The defendant "has never really been an openly political person" and does not discuss politics often with his family to avoid conflict. According to the defendant, "no one knows" his political views, including his family.    The defendant stated that he does not align politically with his family members and did not tell them that he "was going to a protest in support of [then President] Trump."

Later in the interview, the defendant explained that after the 2020 election, "when it first seemed like something was wrong" and "stuff started happening," he began following the issue closely on YouTube and Reddit and felt "bewildered."    In the defendant's view, if people "feel that, you know, something as important as voting in the federal election is being tampered with, is being, you know, being – you know, relegated null and void, then, like, someone needs to speak up, right?    Someone up top.    You know, just to, just to at the very least calm things down." The defendant felt that "the people up top," including "people on both sides, public figures," should not "ignore[e] people's grievances" or call them "conspiracy theorists," "bad people," "Nazis," or

13

"fascists."    Instead, "if people feel that their votes are like just being thrown away, then . . . at the very least someone should address it."

As the interview continued, the defendant maintained that he did not plant the pipe bombs. However, when the defendant was shown a picture of a Nike Air Max Speed Turf shoe, he admitted that he "used to have a pair" and stated that he "threw them away" because "they were old and they were coming apart."    After approximately two hours, during which the defendant maintained that he had not placed the bombs, one of the interviewing agents asked the defendant if he wanted to end the interview.    The defendant responded that "everything is just blank" and "a little too much to process."    The interviewing agents then suggested that the defendant look at video footage from the night of January 5, 2021.    When the defendant was shown a still image of himself on surveillance video close in time to the planting of the bombs, he stated that he did not recognize the person and had not previously seen the video.    The interviewing agents reminded the defendant that lying to them was an additional criminal offense and asked the defendant again whether he was the individual on the surveillance video.    This time, the defendant paused for approximately fifteen seconds, placed his head face down on the table, and answered, "yes."

After the defendant's admission, the interviewing agents explained to him that they could either continue to discuss his actions on January 5, 2021, or they could stop the interview and transport the defendant to court for his initial appearance.    The agents explained what an initial appearance is and that if the defendant continued with the interview, he would appear in court the following day.    The defendant asked for time to process things, and the agents stepped out of the interview room for approximately twenty minutes.    When they returned, the defendant expressed

14

his interest in continuing the interview and executed a written waiver to delay his presentment in court to the next day.

Over the next approximately one and one-half hours, the defendant walked the interviewing agents in detail through his construction, transportation, and planting of the pipe bombs.   The defendant explained that he made the black powder in the devices using charcoal, Lilly Miller sulfur dust, and potassium nitrate that he purchased from Lowes.   The defendant mixed these ingredients in a Pyrex bowel and used a spoon or measuring cup to pour the black powder into the devices.   According to the defendant, he learned to make the black powder from a video game that listed the ingredients, and he also viewed various science-related videos on YouTube to assist him in creating the devices.   Regarding the construction of the devices, the defendant explained that he used a hand drill and bit to drill the end caps on the devices, used pliers to crimp the alligator clips, and used kitchen timers rather than alarm clock timers because the kitchen timers were easier to use.   When asked where he kept the bombmaking materials, the defendant explained that he hid them in a closet inside his home so they would not be found by a family member.   The defendant stated that he assembled the devices in the hours before he drove to Washington, D.C. on January 5, 2021, and that he cleaned the devices with disinfectant wipes.   Eventually, the defendant admitted that he did not go to Washington, D.C. to attend a protest but in fact traveled there to plant the devices.

The defendant stated that he transported the devices to Washington, D.C. on January 5, 2021, inside a shoe box in the back seat of his Nissan Sentra.   He wore a mask and hood that evening to avoid identification, and he wore gloves to avoid leaving fingerprints.   When the defendant arrived in the city, he parked his car on D Street, Southeast, between 2nd Street and 3rd

Street and Folger and Providence Parks.    The defendant placed one of the devices in his backpack, exited his car, and walked toward the DNC.    He set the timer on the first device to the maximum duration (60 minutes) and planted the device near the DNC.    The defendant then returned to his car, retrieved the second device and placed it in his backpack, and walked to the RNC, where he set the timer for 60 minutes and planted the device.    The defendant explained that he had used Google Maps to look up these locations in advance.    After planting the devices, the defendant returned to his car, left the city, picked up food from a restaurant in Virginia, and returned home.

According to the defendant, he was not really thinking about how people would react when the bombs detonated, although he hoped there would be news about it.    The defendant stated that he had not tested the devices before planting them.    He claimed that when he learned that the devices did not detonate, he was "pretty relieved," and asserted that he placed the devices at night because he did not want to kill people.    After seeing himself on the news, the defendant stated that he discarded all the bombmaking materials he had at a nearby dump.    The defendant stated that he did not tell anyone about the pipe bombs before planting them or in the years since. Although the defendant denied building additional explosive devices, he admitted that sometime after he built the pipe bombs used in this case, he purchased beaker sets and conducted another science experiment to create potassium chlorate, which he claimed was unrelated to bombmaking.

When the interviewing agents returned to the defendant's motive, he explained that "something just snapped" after "watching everything, just everything getting worse."    The defendant wanted to do something "to the parties" because "they were in charge."    When asked why he placed the devices at the RNC and DNC, the defendant responded, "I really don't like

16

either party at this point."    The defendant also explained that the idea to use pipe bombs came from his interest in history, specifically the Troubles in Ireland.    The defendant denied that his actions were directed toward Congress or related to the proceedings scheduled to take place on January 6.

## ARGUMENT

The defendant poses an intolerable risk of danger to the community if released, and he should be detained pending trial under 18 U.S.C. § 3142(f)(1)(A).    The defendant is charged by complaint with transporting explosives across state lines intending to use them to intimidate and damage or destroy property in violation of 18 U.S.C. § 844(d), and with maliciously attempting to use those explosives to damage or destroy property in violation of 18 U.S.C. § 844(i).    The latter offense is listed as a federal crime of terrorism in § 2332b(g)(5)(B) and carries a maximum term of imprisonment of 20 years, thereby requiring a detention hearing and judicial determination as to whether any condition or combination of conditions would reasonably assure the community's safety if the defendant were released pending trial.    18 U.S.C. § 3142(f)(1)(A).    Upon a finding of probable cause that the defendant violated § 844(i), the federal bail statute creates a rebuttable presumption that no such conditions exist.    *Id.* § 3142(e)(3)(C).

The Court must weigh four factors in determining whether the defendant has rebutted the presumption of detention: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.    *See* 18 U.S.C. § 3142(g).    In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the

17

[detention] hearing." *Id.* § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996).

The defendant cannot rebut the statutory presumption of detention considering the extreme and profoundly serious nature of his crimes, the overwhelming evidence of his guilt, the years he has spent deceiving those around him to avoid accountability, and the intolerable risk that he will again resort to violence to express his frustration with the world around him. The facts and circumstances in this case compel the conclusion that there is no condition or combination of conditions that would reasonably assure the safety of the community if the defendant were released pending trial.

### A. <u>Nature and Circumstances of the Charged Offenses</u>

The nature and circumstances of the defendant's crimes weigh heavily in favor of pretrial detention. The defendant is charged with transporting two explosive devices into Washington, D.C. and planting them at the headquarters of the two major political parties in the United States. By his own admission, the defendant committed these chilling acts because he was unhappy with the response of political leaders on both sides of the political aisle to questions raised about the results of the 2020 election, and "something just snapped."

While the defendant may have reached a psychological breaking point, his crimes were anything but impulsive. Indeed, the defendant's pipe bombs—and the fear and terror they instilled in the general public—were the product of weeks of premeditation and planning. The defendant purchased the components that he used to construct the bombs over a series of months, including before and after the 2020 election. The defendant acquired the knowledge necessary

18

to assemble the devices, according to him, by watching YouTube science videos and playing video games.    Whatever the precise contours of the defendant's research and preparation, it was sufficiently extensive for him to assemble the two pipe bombs in the hours leading up to his travel to Washington, D.C. to plant them on January 5, 2021.    And it was sophisticated enough for him to construct viable explosive devices using all the components necessary to cause an explosion. The calculated nature of the defendant's criminal conduct over an extended period should feature prominently in the Court's detention determination.

Perhaps more than anything else, the defendant's choice of targets demonstrates the extreme and deeply dangerous nature of his conduct.    Although the defendant acquired the bombmaking components in the months leading up to January 5, 2021, he chose to plant them at the headquarters of the nation's two major political parties in downtown Washington, D.C., on the eve of the January 6 certification of the electoral college vote.    In his own words, the defendant did so because he did not "like either party," but "they were in charge" and thus were, in the defendant's mind, an appropriate target for extreme acts of violence.    The defendant's choice of targets risked the lives not only of innocent pedestrians and office workers but also of law enforcement, first responders, and national political leaders who were inside of the respective party headquarters or drove by them on January 6, 2021, including the Vice President-elect and Speaker of the House.[3]    In this sense, the defendant's invocation of the Troubles in Northern Ireland is telling; bombings were used frequently throughout that period to kill officials and civilians for

---

[3] *See* Staff of H. Subcomm. on Oversight & H. Subcomm. on Admin. State, Reg. Reform, and Antitrust, 119th Cong., *Four Years Later: Examining the State of the Investigation into the RNC and DNC Pipe Bombs* (Jan. 2, 2025) (Interim Report), at 19, 25.

19

political purposes.[4]   The Court should consider the gravity of the defendant's targets in assessing the nature of the charged offenses.

Ultimately, it was luck, not lack of effort, that the defendant failed to detonate one or both of his devices and that no one was killed or maimed due to his actions.   Indeed, the defendant admitted that he set both devices to detonate 60 minutes after he placed them.   His failure to accomplish his objectives does not mitigate the profoundly dangerous nature of his crimes. Appropriately, the defendant now faces criminal charges that carry significant penalties, including a five-year mandatory minimum sentence for violating 18 U.S.C. §§ 844(i).   The defendant's actions, and the significant potential sentence he now faces, demonstrate the need for pretrial detention in this case.

### B.   Weight of the Evidence Against the Defendant

The overwhelming weight of the evidence in this case favors pretrial detention.   The video, location, and purchase history evidence that led to the defendant's arrest and charging is powerful proof of guilt in itself.   That evidence is now corroborated not only by the recovery of consistent bombmaking components from the defendant's home and vehicle, but by the defendant's hours-long videotaped confession, in which he explained his criminal conduct and intent in detail to investigators.   The weight of the evidence against the defendant, and the attendant likelihood of his conviction for serious offenses, support pretrial detention.

---

[4] *See, e.g.*, *The Troubles: Northern Ireland History*, Encyc. Britannica, (last visited Dec. 23, 2025), https://www.britannica.com/event/The-Troubles-Northern-Ireland-history.

**C.  The Defendant's History and Characteristics**

Although the defendant has not had prior contact with the criminal justice system, his personal history and circumstances demonstrate that conditions less restrictive than detention will not reasonably assure the community's safety while this case proceeds.   After placing two explosives at significant targets on January 5, 2021, the defendant spent the immediate aftermath, and the nearly five years since, engaged in a comprehensive effort to evade detection and apprehension by law enforcement.   By his own admission, the defendant, having disguised himself during the commission of the charged offenses to avoid identification, discarded direct evidence of his crimes after they were publicized in the media.   Disturbingly, however, the defendant continued to purchase bombmaking components through mid-2022 and used those materials to create, or attempt to create, potassium chlorate.   While the defendant claimed in his interview that this was an innocent science experiment, potassium chlorate is an oxidizing agent commonly used in explosives.[5]

Critically for the Court's consideration, the defendant engaged in all the relevant conduct—developing his motive, purchasing the bombmaking materials, constructing the devices, traveling to D.C. to plant them, and evading apprehension for years—while living under the roof of his family's home.   Given the scrutiny of a years-long national investigation into his actions, the defendant had an understandable incentive to keep those closest to him in the dark.   Indeed, the defendant apparently wiped his personal cellphone nearly one thousand times during this period. The defendant now faces the scrutiny of a federal criminal prosecution.   Under these

---

[5] *See, e.g.*, Masahiro Tagawa et al., *Effects of composition on the explosive properties of potassium chlorate and oils*, 10 FORENSIC SCIS. RSCH. 1 (2025).

circumstances, there is simply no reason to expect that the defendant, if released pending trial, will conduct himself differently than he has for the past five years.   Rather, there are substantial grounds to conclude that the defendant would continue to present an intolerable danger to the community.

### D. **Danger to the Community**

The defendant has confessed to planting explosive devices outside the headquarters of the nation's two major political parties in downtown Washington, D.C.   He has confessed to constructing the pipe bombs, to filling them with explosive powder, and to setting their timers to detonate.   The evidence gathered in law enforcement's investigation in this case corroborates the defendant's confession.   And it establishes that these explosive devices were viable weapons.

Put simply, the defendant poses an uncommonly serious danger to the community if released pending trial.   For nearly five years, the defendant has evaded law enforcement and avoided accountability for actions that endangered lives and created a widespread sense of fear and terror.   The community should not be subjected to the risk that the defendant, now identified and facing a public prosecution, will again resort to violence as his chosen means to express his dissatisfaction with the world around him.   There is simply no combination of conditions that will reasonably assure the community's safety if the defendant is released, and he should be detained pending trial in this case.

## CONCLUSION

The government respectfully requests that the Court grant its motion and detain the defendant pending trial.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:    /s/ Charles R. Jones
CHARLES R. JONES
D.C. Attorney No. 1035541
Assistant United States Attorney
National Security Section
601 D Street N.W.
Washington, D.C. 20530
(202) 252-6976
Charles.Jones3@usdoj.gov

23

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

     Plaintiff,

**v.**

**BRIAN COLE JR**

     Defendant.

Case No: 1:25-mj-00276-MAU

## BRIAN COLE'S RESPONSE IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR DETENTION

Defendant Brian Cole Jr. respectfully submits this response in opposition to the government's motion for pretrial detention and in advance of the detention hearing scheduled for December 30, 2025. Mr. Cole should be released pending trial because the governing, multi-factor analysis demonstrates that bail is required under a set of strict conditions, as proposed herein.

### INTRODUCTION

The defense understands that the detention hearing will begin with preliminary discussions that concern whether a rebuttable presumption that Mr. Cole should be detained arises in this case. The defense's position is that the government cannot continue to keep Mr. Cole in custody absent a valid finding of probable cause.

Probable cause or not, Mr. Cole should be released pending trial. The Bail Reform Act starts with liberty, not jail; detention is the "carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).   The government-induced excitement around the arrest of Mr. Cole should not take this Court's focus away from two essential principles of law that govern bail hearings.[1]

First, "[i]n the absence of a concrete, prospective threat to public safety that cannot be mitigated by strict conditions, th[e] Court must apply the default rule favoring liberty." *United States v. Klein,* 539 F. Supp. 3d 145, 155 (D.D.C. 2021) (quoting *United States v. Cua,* 2021WL 918244 at *8); *see also United States v. Taylor*, 289 F. Supp. 3d 55, 62 (D.D.C. 2018) (quoting *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) ("The default position of the law, therefore, is that a defendant should be released pending trial.").

Second, whether Mr. Cole is guilty of the offenses charged is wholly irrelevant to his bail proceeding: "[a] district court assessing the weight of the evidence must not consider the evidence of defendant's guilt, but rather must consider only the

---

[1]       Indeed the U.S. Attorney has made numerous comments in contravention of Local Criminal Rule 57.7(b), specifically concerning the "existence or contents of any confession, admission, or statement given by the accused" ((b)(3)(ii)) and "opinion[s] as to the accused's guilt or innocence or as to the merits of the case or the evidence in the case" ((b)(3)(vi)). *See* https://abcnews.go.com/US/pipe-bomb-suspect-disappointed -2020-election-results-us/story?id=128157568 (U.S. Attorney Pirro telling the media that based on the evidence, it is "unmistakable" that Mr. Cole is guilty and that "[t]his guy was an equal opportunity bomber."); *see also* https://www.facebook.com/judgeje aninepirro/posts/my-office-has-filed-court-documents-that-brian-cole-jr-accused- ofplacing-pipe-b/1424070829083142/ (U.S. Attorney Pirro posting on Facebook that Mr. Cole "has admitted that he was responsible for the devices and gave a detailed confession to the charged offenses").

weight of the evidence of defendant's dangerousness." *United States v. Hunt*, 240 F. Supp. 3d 128, 134 (D.D.C. 2017).

The government's detention motion tells the Court little more than the government is optimistic that it will be able to convict Mr. Cole at trial. It focuses on "the overwhelming evidence of his guilt," and "[t]he weight of evidence against the defendant, and the attendant likelihood of his conviction for serious offense, support pretrial detention." Dkt. 17 at 1, 20. The government is wrong. Mr. Cole is presumed innocent, and any attempt to argue his guilt at this point, in support of detention, is misguided. *Hunt*, 240 F. Supp. 3d at 134.

The burden on the government is far greater than merely reciting Mr. Cole's criminal charges and concluding, without more, that he is "dangerous." *Id*. The question is whether there is a present danger—a contention the government never actually makes, and something belied by the past four years in which Mr. Cole has lived without incident. The government's burden to demonstrate a present danger becomes insurmountable when considering the following factors favoring pretrial release:

1.  Mr. Cole is an African American adult who has been diagnosed with Autism Spectrum Disorder, Level 1 and with obsessive compulsive disorder;

2.  Mr. Cole has zero criminal history;

3.  Mr. Cole has had no issues complying with court orders;

4.     Mr. Cole is a high school graduate, who has had continual employment since his teenage years;

5.     Mr. Cole has lived in the same community since childhood, without incident;

6.     Mr. Cole's neighbours and others who have dealt with him over many years, vouch for his character;

7.     Mr. Cole has a reliable job waiting for him upon release;

8.     Mr. Cole can have a vetted custodian where he will live upon release;

9.     Mr. Cole submits to house arrest;

10.     Mr. Cole submits to an ankle monitor and weekly reporting;

11.     Mr. Cole submits to unannounced visits by pre-trial services;

12.     No one was actually harmed as a result of the conduct for which Mr. Cole has been charged; and

13.     No property was damaged as a result of the conduct for which Mr. Cole has been charged.

*See Klein,* 539 F. Supp. 3d 145; see also *Hunt*, 240 F. Supp. 3d 128; see also 18 U.S.C. § 3142(e)(3) & (g); *see also United States v. Munchel*, 991 F.3d 1273, 1289 (D.C. Cir. 2021) (Katsas, J., concurring). The government cannot negate these facts, and thus this Court should order Mr. Cole's pre-trial release under strict conditions, as proposed herein.

# **ARGUMENT**

The Eighth Amendment guarantees reasonable bail. U.S. Const. amend. VIII. Congress has implemented this guarantee through the Bail Reform Act, which permits pretrial detention only when "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).

When ordering pretrial detention based solely on the danger to the community prong, the government must present "clear and convincing evidence" of dangerousness. 18 U.S.C. § 3142(f). "The default position of the law, therefore, is that a defendant should be released pending trial." *Taylor*, 289 F. Supp. 3d at 62 (quoting *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010)).

True, the Bail Reform Act creates a rebuttable presumption "that no condition or combination of conditions will reasonably assure . . . the safety of the community if . . . there is probable cause to believe that the person committed" one of an enumerated list of crimes. 18 U.S.C. § 3142(e)(2). *But* for purposes of making that determination, "[a] grand jury indictment, by itself" is what establishes the probable cause "to believe that a defendant committed the crime with which he is charged." *Taylor*, 289 F. Supp. 3d at 62 (quoting *Stone*, 608 F.3d at 945); *see also United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) ("[T]he indictment alone would have been enough to raise the rebuttable presumption that no condition would reasonably assure the safety of the community.") Moreover, this Court has made clear that "[t]o require an independent finding of probable cause apart from those of the grand jury

for purposes of section 3142(e) would be a waste of judicial resources." *United States v. Williams*, 903 F.2d 844 (D.C. Cir. 1990) (per curiam) (unpublished). The reasoning makes sense when considering the fact that regardless of the outcome, the Defendant would still be brought to trial under indictment, and thus "[a]t the very least, such a result would tend to undermine the role of the grand jury as the **"sole method for preferring charges in serious criminal cases"** and diminish the **"high place it [has] held as an instrument of justice**." *United States v. Contreras*, 776 F.2d 51, 55 (2d Cir. 1985).

Where there is no indictment, like here, no pretrial detention hearing can begin with such a presumption. And even if there were one, a defendant's "burden of production" to overcome it is not "heavy." *United States v. Lee*, 195 F.Supp.3d 120, 125 (D.D.C. 2016) (citations omitted). The defendant must proffer at least "some evidence" or basis to conclude that the case falls "outside the congressional paradigm" giving rise to the presumption. *United States v. Jessup*, 757 F.2d 378, 387 (1st Cir. 1985); *see also United States v. Bess*, 678 F. Supp. 929, 934 (D.D.C. 1988) (finding that the presumption "represents Congress's general factual view about the special flight risks and the special risks of danger to the community presented by defendants who commit the crimes to which it attaches"). In all cases, the defendant's burden is only a burden of *production*; the burden of *persuasion* remains with the government throughout the proceeding. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

I.     **The Section 3142(g) Factors Favor Pretrial Release in this Case.**

Mr. Cole should be released pending trial. He has no criminal history, and there is zero evidence to suggest he will flee. Each factor supports release with conditions that will reasonably assure Mr. Cole's appearance, as well as the safety of the community.

A.     **The Nature and Circumstances of the Offense.**

The nature and circumstances of the charged offense, while serious, do not support detention. The government proceeds on a complaint alleging violations of 18 U.S.C. § 844(d) (transporting an explosive in interstate commerce with intent to injure or intimidate or to damage property) and § 844(i) (malicious damage or attempted damage to property used in interstate commerce by fire or explosive) based on what it calls two "pipe bomb" devices placed outside the RNC and DNC headquarters on the evening of January 5, 2021. According to the affidavit, both devices were rendered safe by the U.S. Capitol Police and later assessed by the FBI Laboratory to have "weapon characteristics," with components consistent with improvised explosive devices. No device detonated, no person was injured, and no property was damaged.

Section 3142(g)(1) directs the Court to consider whether the offense "is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device." While the government's theory involves an explosive device, that fact is not dispositive. The statute's enumerated categories inform the analysis; they do not

create an automatic rule of detention. The Bail Reform Act still requires an individualized, forward-looking assessment of whether any danger can be reasonably mitigated by conditions. *See Munchel*, 991 F.3d at 1280–83.

Measured against § 3142(g)(1)'s purpose—evaluating the offense's inherent risk profile—the record favors conditional release. No actual harm occurred. The devices were rendered safe. There were no injuries and no property damage. Dkt. 1-1 at 2–3. The charged conduct is temporally remote. The alleged placements occurred on January 5, 2021—nearly *four years* before Mr. Cole's arrest and the government's detention request—and the affidavit does not allege comparable conduct in the years since. *Id*. at 3–5. The government's proffer, taken at face value, is retrospective and circumstantial; it ties consumer purchases and historical cellular records to a past route on a single evening. Those assertions go primarily to identity and past conduct—a merits question the Act cautions courts not to resolve at a bail hearing— rather than to a present, unmitigable danger. *See Taylor*, 289 F. Supp. 3d at 66 (weight of evidence cannot, by itself, justify detention); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

Finally, the unique conditions surrounding January 5–6, 2021, are unlikely to recur in a way that would present the same risk profile for Mr. Cole. The Court must ask whether conditions such as home detention, GPS monitoring, and third-party supervision can mitigate any residual risk. *Munchel*, 991 F.3d at 1283 (even though the January 6 riots were dangerous, courts "have a grave constitutional obligation to ensure that the facts and circumstances of each case warrant th[e] exceptional

treatment" of pretrial detention); *see also Klein*, 539 F. Supp. 3d at 151–56. On this record—no detonation, no injury or damage, a four-year gap without similar conduct, and no proffer of ongoing dangerous activity—§ 3142(g)(1) does not support detention where stringent conditions can reasonably assure community safety.

## B. The Weight of the Evidence Factor Does Not Consider Likelihood of Guilt.

The weight of the evidence does not support detention. This factor is the least important of those enumerated in § 3142(g). *See United States v. Lynch*, No. 18-CR-577, 2023 WL 3436091, at *3 (N.D. Cal. May 11, 2023).

The *Hunt* court warned against assessing the weight of the evidence in terms of the defendant's guilt; instead, courts must consider only the weight of the evidence regarding the defendant's *dangerousness*: "[a] district court assessing the weight of the evidence must not consider evidence of defendant's guilt, but rather must consider only the weight of the evidence of defendant's dangerousness." See *Hunt*, 240 F. Supp. 3d at 134. The D.C. Circuit has reasoned that the Bail Reform Act does not "authorize pretrial detention based simply on a preliminary assessment of the defendant's guilt." *Taylor*, 289 F. Supp. at 66. Indeed, "[e]ven *overwhelming* evidence of guilt would not, alone, meet th[e] test [for pretrial detention]." *Id.* (emphasis added). Consequently, no pretrial determination of guilt is made at a bail hearing. *Id.*

That established, the *Hunt* Court noted that the defendant's conspiracy to sell addictive and dangerous drugs was not an "isolated event." *Id.* Accordingly, the court examined a pattern of unlawful behavior to determine that the likelihood of engaging in future dangerous conduct was substantial. *Id.* at 136 ("[A]nd the Court has every

reason to believe that this conduct would not stop if defendant were to be released…
because he was already given that opportunity, and he was unable to comply with his
conditions of release for even one month. So, the Court finds that this factor also
weighs in favor of detention.").

Moreover, when evaluating a pattern of unlawful or potentially dangerous
conduct to assess the likelihood of future conduct, this Court has considered whether
"the specific circumstances that made it possible for that violence to arise are likely
to manifest themselves again. . ." *Klein,* 539 Supp. 3d at 155. That analysis requires
courts "to consider whether the risk that a defendant poses can be mitigated by
supervisory conditions, such as home detention or the presence of a third-party
custodian." *Id*.

The government's showing is entirely retrospective and circumstantial. Even
if credited, the government's evidence describes an isolated window on a single
evening nearly four years ago. It does not point to a "pattern of troubling activity"
that would typically warrant detention in other cases. *Klein*, 539 F. Supp. 3d at 155.
No device detonated, and the government has not alleged any comparable conduct or
dangerous affiliations in the years since. This circumstantial proof—absent a direct
forensic tie or evidence of *ongoing* threats—cannot overcome the Bail Reform Act's
default in favor of release subject to appropriate conditions. *See Munchel*, 991 F.3d at
1283 (The "threat [to the community] must also be considered in context.").

**C.  The History and Characteristics of Mr. Cole Demonstrate He Is Unequivocally Entitled to Conditional Bail.**

In *Klein*, the court reasoned that, when reviewing the history and characteristics of a defendant, the following factors must be considered:

1.  The available information concerning the defendant's character, as well as his physical and mental condition. *Id*. at 154;

2.  Family ties. *Id*.;

3.  Employment. *Id*.;

4.  Financial resources. *Id*.;

5.  Length of residence in the community and community ties. *Id*.;

6.  Past conduct, including history relating to drug or alcohol abuse, criminal history, and records concerning appearance at court proceedings. *Id*.; and

7.  Whether, at the time of the offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under federal, state, or local law. *Hunt*, 240 F. Supp. 3d at 134.

In undertaking this analysis, the *Klein* court found the following favorable to the defendant: (1) he came from a close-knit family; (2) he attended a local college; (3) he had previously maintained steady employment; (4) he had no history of drug or alcohol abuse; and (5) he  had a minimal criminal history. After crediting the defendant with these favorable factors, the court in *Klein* also noted unfavorable factors, including a history of participating in "Proud Boy" events, where he was "at

the very least, prepared to engage in violent conduct." *Klein*, 539 F. Supp. 3d at 151. The court characterized this conduct as "Klein engaged in a pattern of troubling activity…" *Id*. at 155.  Mr. Cole's circumstances seem similar, yet, differ significantly in some significant respects.

First, Mr. Cole is a high school graduate who has maintained employment with his family-run business since age 14. Second, Mr. Cole has strong family ties in the community, having been raised in Woodbridge, Virginia and having lived in that community with his parents for the past 21 years. Moreover, Mr. Cole's community ties are further exemplified by the strong character references provided by his neighbors and others who have interacted with over the years. (See Exhibit A.)

Indeed, Mr. Cole can continue being a productive member of society upon release, because he has the same job waiting for him. Mr. Cole's employment history working in his family's bail bonding business is steady and meaningful. Mr. Cole is a high school graduate who works in a northern Virginia office of his family's business. In that role, he supports bonded individuals to comply with their court-imposed obligations. From this, Mr. Cole is familiar with court processes and understands his commitment to appear as required. His position remains available to him upon release, which will provide immediate structure and accountability. Moreover, Mr. Cole has no history of drug or alcohol abuse.

Additionally, Mr. Cole has no criminal history; has never been arrested or convicted; has no history of failures to appear, and was not on probation, parole, or any other form of supervision at the time of the alleged conduct. These are classic

markers of reliability and compliance that weigh strongly against detention. *See e.g.*, *United States v. Nwokoro*, 651 F.3d 108, 111 (D.C. Cir. 2011). None of these facts are in dispute. There is no pattern of alarming conduct either prior to or after the alleged conduct at issue in this case. Mr. Cole does not pose a danger to the community.

Relevantly, the government, when discussing Mr. Cole's history and characteristics, fails to even mention the vast majority of statutory factors highlighted above, choosing to simply focus on cursory unsupported allegations. For example, the government argues that Mr. Cole spent nearly five years trying to evade detection. Dkt. 17 at 21. Not true: Mr. Cole lived with his parents the entire time, never moved, and followed his same routine daily. Avoiding the litany of statutory factors that favor Mr. Cole only highlights the weakness of the government's position for detention. *Id*. Notably, the government *fails to cite even one case* in its entire argument section.

In sum, nothing in the record suggests evasive conduct or resistance to law enforcement. The government does not allege that Mr. Cole attempted to flee, obstruct, or commit additional crimes. Mr. Cole simply does not pose a danger to the community.

### D.    Mr. Cole Poses No Danger to the Community—evidenced by the last four years of his life.

The government bears the burden to prove by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person and the community. 18 U.S.C. § 3142(f). Detention must rest on a concrete, forward-looking finding of dangerousness; past conduct, standing alone, is

insufficient. The inquiry is whether the risk, if any, can be *mitigated* by strict conditions. Here, it can.

On this record, the government has not carried its burden. "[I]n the absence of a concrete, prospective threat to public safety that cannot be mitigated by strict conditions, this Court must apply the default rule favoring liberty.*" Klein*, 539 F. Supp. 3d at 156 (quoting *Cua*, 2021 WL 918255, at *8).

The alleged conduct here is a single, discrete episode on January 5, 2021. The Court must examine whether "the specific circumstances that made it possible" for the alleged conduct to arise in the first place. *Munchel*, 991 F.3d at 1282 (A defendant likely presented a danger to the community because "in media interviews [he] showed no remorse and indicated that he would 'undertake such actions again.'").

The circumstances giving rise to the charged offense in this case are incredibly unlikely to manifest themselves again. And even if they were, as discussed above, conditions can neutralize any residual risk. The government has not identified any present-day factor—access to weapons, ongoing procurement, recent extremist postings, organizing conduct, or similar—that would make future dangerous conduct likely. Nor could it because none exist. Whatever risk the government posits is theoretical and backward-looking, belied by the past four years where Mr. Cole lived at home with his family without incident. All of this weighs heavily against an inference of current danger to the community at large.

In any event, stringent conditions will reasonably assure community safety. Mr. Cole will submit to home detention enforced by GPS monitoring, under the

supervision of a vetted third-party custodian, his grandmother, in Gainesville, Virgina. He will surrender any passport, restrict travel to the Northern District of Virginia, and submit to Pretrial Services oversight with in-person reporting as directed. He will abide by a no-weapons order and remove any firearms from the residence.

To specifically address the government's apparent theory, Mr. Cole will agree not to possess any explosive materials or associated components referenced in the criminal complaint (including metal pipe and end caps, black powder or precursors, blasting caps, commercial igniters, large-gauge wiring, timers, or alligator clips) without prior written approval of Pretrial Services, and will consent to unannounced inspections by Pretrial Services to verify compliance. He will refrain from contacting any witnesses outside the presence of counsel, from posting about the case on social media, and from engaging in any conduct that could be perceived as threatening or harassing. He will maintain verified employment and comply with any substance use or mental health evaluation and treatment that Pretrial Services recommends.

Courts in this district have recognized that such conditions can sufficiently mitigate any community danger even in serious January 6 matters where the record does not demonstrate an ongoing, unmanageable threat. *See Munchel*, 991 F.3d at 1289 (Katsas, J., concurring) ("[B]ecause the record strongly suggests that [defendants] would present no safety risk if subjected to strict release conditions, the district court clearly erred in finding that the government had proved its case by clear and convincing evidence."); *Klein*, 539 F. Supp. 3d at 155–56 ("[D]espite the serious

concerns raised by [defendant's] conduct on and prior to January 6," the appointment of a third-party custodian, home detention; GPS monitoring, appropriate social media restrictions; and a ban on access to any firearm or other weapon would sufficiently "provide sufficient assurances of community safety."); *Cua*, 2021 WL 918255, at *1 (ordering pretrial release for a January 6 rioter who sat "atop the Senate dais, in the chair previously occupied by former Vice President Mike Pence, with his feet up on [ ] the desk.").

Here, a years-long gap free of similar conduct and a robust package of tailored restrictions, the government has not shown—much less by clear and convincing evidence—that detention is the *only* means to protect the community. The Court should order release on the conditions outlined above or such additional conditions as it deems appropriate.

## CONCLUSION

For the foregoing reasons, the Court should order release on the proposed conditions, or on any other combination of conditions the Court deems appropriate.

Respectfully submitted this December 30, 2025.

**/s/ MARIO B. WILLIAMS**           **/s/JOHN SHOREMAN**
Mario B. Williams                John M. Shoreman
**Ga. Bar No. 235254**             (DC Bar #407626)
**(**Pro Hac Vice)                 McFadden & Shoreman
                                 HDR LLC

**HUMANITY DIGNITY AND RIGHTS LLC**
Life Time Work - Buckhead - at Phipps Plaza
3480 Peachtree Road, NE, Second (2nd) Floor
Atlanta, Georgia 30326
Tel.: 470-257-2485
Email: mwilliams@hdrattorneys.com, jms@mcfaddenshoreman.com
***Counsel for Brian Cole Jr***

/s/ ***J. ALEX LITTLE***
J. Alex Little
(*pro hac vice pending*)
Zachary C. Lawson
(*pro hac vice pending*)
John R. Glover
(*pro hac vice pending*)

**LITSON PLLC**
54 Music Square East, Suite 300
Nashville, TN 37203
Telephone: 615-985-8205
alex@litson.co
zack@litson.co
jr@litson.co
***Counsel for Brian Cole Jr.***

**CERTIFICATE OF SERVICE**

I hereby certify that I have on this day served a copy of the **BRIAN COLE'S RESPONSE IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR PRETRIAL DETENTION** upon the all attorneys of record via the Court's CM/ECF electronic filing system.

Respectfully submitted on this December 30, 2025,

**/s/ JOHN M. SHOREMAN**
John M. Shoreman

# ORP, LLC

████████████████████████

## FAIRFAX, VA 22030

Date:          December 12, 2025

Re:            Character Reference Letter for Brian Cole Jr.

This letter is being presented in reference to the character of Brian Cole Jr.

I am currently the property manager for the building located at ███████████████████ in Fairfax Virginia. The Cole family, and their various businesses, have been one of my tenants for approximately 22 years.

During this time my experience with the Cole family has been nothing but positive. They have always paid their rent on time, been respectful of the property, and been great neighbors to the other tenants.

Since Brian Cole Jr. has been coming into the Fairfax office, he keeps to himself and has not caused any disruption on the property or to other tenants. From what I have seen, his daily routine is to monitor the front desk in suite 101, make trips to the bank, and other administrative tasks for the business. While completing these tasks, I have not seen or heard anything from Brian Cole Jr. that would be considered violent, disruptive, or concerning. I have only known him to be quiet, respectful, and kind.

While I understand the seriousness of the charges against Brian Cole Jr., these charges seem totally out of character from the Brian Cole Jr. that I have observed over many years.

If I can be of further assistance, please do not hesitate to contact me.

Sincerely,

J███ P P███

████████████

A062

# Independent Surety Agents of America, LLC

R█████ L S██████

Jacksonville, NC 28546

Date:       December 8, 2025

Re:         Character Reference Letter for Court

Subject:    Brian Cole Jr.

I am writing this letter to provide insight into the character of Brian Cole Jr., as to the young man that I know him to be. I was hired by his father, Brian J Cole, in May of 2003 to work in the office of the Bail Bonding Business at that time called Cole Surety but now known as Independent Surety Agents of America, LLC.

During this time, I have observed Brian Cole Jr going from a young boy to a young man who never showed anger or frustration. He has always been a very polite and respectful and always showed kindness to the other employees or clients coming into the office. Brian Jr has always been a calm person who loved computers. Even though I moved from that area in 2006, I have had the pleasure of dealing with Brian Jr when he answers the phone at the office.

I know I can only give a very limited amount of information, but I do know that the charges against him does not fit the character of the young man that I know.

If you have any questions, please do not hesitate to contact me at

Sincerely,

R█████ L S██████



# VZ COLLECTIVE
### VA DCJS School ID #88-30202

Date:       December 6, 2025

Re:         Character Reference Letter for Court
Subject:    Brian Cole Jr.

I am writing this letter to provide insight into the character of Brian Cole Jr., whom I have known for over ten years in the capacity as a business associate of his father and as a Private Security Services DCJS instructor for the private security and the bail bonding programs. This letter is submitted in support of Brian's pending court cases.

During the time that I have known Brian Cole Jr., I have had the opportunity to observe his personal and professional behavior. One of the most admirable qualities that stands out is and was his peaceful nature.

Over the years of my interactions with him, I have never seen him emotionally angry, upset, or even frustrated. His demeanor has always been calm, collected, respectful, and simply kind to others. He was at work every day I had occasion to go to the business office, and he was always committed to doing his work and manning the front desk of the office.

I understand the seriousness of the situation that Brian Cole Jr. is currently facing and do not wish to undermine the legal process. However, the limited information I possess and the alleged actions leading to his involvement in the case are not reflective of his true character. I have only witnessed him as a decent and well-mannered young man in all my encounters and interactions with him.

Should you require any further information or wish to discuss this matter in more detail, I may be reached directly on my cell phone at ▓▓▓▓▓▓

Thank you for your time and consideration.

K▓▓ E. V▓

VZ Collective (VA DCJS ID #88-30202)



**Heads & Hearts
Together, LLC**

High Point, NC  27265

Date:        December 8, 2025

Re:          Character Reference Letter

Subject:    Brian Cole, Jr.

I am writing this letter in support of Brian Cole, Jr., and to give my knowledge of his character. I have the pleasure of being a part of the Cole's Surety 'family' for twenty-five years in the role of Manager of one of the bail bonding businesses in North Carolina.

Whenever interacting with Brian Cole, Jr., he has always had a quiet, calm, and respectful demeanor. On every occasion I had to speak with him, he was never angry, emotional or raised his voice. He never missed a day of work and is a valued asset of the office staff.

The public portrayal of his involvement in this situation saddens me greatly as it does not reflect the character of the young man I have had the privilege of knowing these many years.

In the event I can offer more insight or discuss this matter further, I can be available anytime. Thank you for any consideration you may give to my words.



E █ D███████ Jr. 
████████████████

Gainesville, VA 20155

December 11, 2025

To Whom It May Concern,

I am writing this letter to provide a character reference for my step-grandson, Brain Cole, Jr. I have known Brian all his life, and during this time, I have had the privilege of watching Brain grow into a responsible, caring, and hardworking individual.

Brain consistently demonstrates qualities such as integrity, kindness, and respect for others. He has shown great dedication to work, his dog and family responsibilities. For instance, I have never seen him angry or disrespectful to anyone. My interactions with Brian has always been positive and very polite. He was always at work doing his job diligently and not bothering anyone else.

In addition to his strong moral character, Brain is dependable and trustworthy. I have no doubt that he will continue to make positive contributions to his community and uphold the values that define good character.

Please feel free to contact me at ████████ or ███████████████ if you need any additional information.

Sincerely,



E █ D███████ Jr.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:25-mj-00276 |
| | ) | |
| BRIAN COLE, JR., | ) | ~~UNDER SEAL~~[1] |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## DEFENDANT'S RESPONSE IN OPPOSITION
## AND MOTION FOR IMMEDIATE RELEASE

Defendant Brian Cole Jr. respectfully submits this response in opposition to the government's memorandum, filed late yesterday, December 29, 2025, asking this "Court [to] accept the indictment return," referencing a document returned earlier that day not by a grand jury of this Court but rather by a grand jury organized by, and sitting at the behest of, the D.C. Superior Court. (Gov. Mem. at 7.)

For the reasons detailed below, this Court should not accept the purported indictment, nor should it read Chief Judge Boasberg's order issuing a stay of his Memorandum Opinion in *United States v. Kevontae Stewart*, Case No. 25-mj-225, as allowing it to accept an indictment contrary to the Federal Rules of Criminal Procedure.

---

[1] The Defendant does not believe that this pleading should be sealed, given the important public policy concerns implicated by these issues. He has filed it under seal to permit the Court to determine if any aspect of his response needs to be redacted. But, by doing so, he does not concede that sealing is appropriate.

Absent the timely return of a valid indictment, and because the government apparently is unwilling or unable to establish probable cause for the charged crimes at a preliminary hearing, the Court must "discharge[ Mr. Cole] from custody or from the requirement of bail or any other condition of release," pursuant to 18 U.S.C. § 3060(d). To be sure, the government may later—*if it is able*—secure a valid indictment from a properly constituted federal grand jury. But it cannot hold Mr. Cole for weeks longer than the statute allows while it attempts to do so.

## INTRODUCTION

The government wants to avoid a preliminary hearing, where its evidence will be tested in public. Rather than subject its proof to cross-examination, the government sprinted to a different court—supervised by different judges and subject to different rules of evidence, privilege, and juror competency—to secure a last-minute indictment. It now blames the defense for forcing it to violate the Federal Rules of Criminal Procedure and asks this Court to bless its end-around by accepting an indictment that does not comply with those Rules. The Court should not do so.

To defend its actions here, which Chief Judge Boasberg recognized as "unorthodox" in *Stewart*, the government points fingers. But the government alone is responsible for its failure to comply with Rule 5.1 and 18 U.S.C. § 3060. The government chose to initiate this case by complaint rather than indictment, entitling Mr. Cole to a timely preliminary hearing absent a valid indictment. According to the government's own pleading, the federal grand jury was available over the following two weeks to hear evidence and return an indictment if probable cause existed. Yet

the government chose not to present evidence during that period. Only *after* defense counsel insisted on holding the preliminary hearing did the government pursue its current path—seeking a federal indictment from a D.C. Superior Court grand jury. This "indictment" does not comply with federal law, including Rules 5.1(a)(2), 6, and 7 of the Federal Rules of Criminal Procedure, and 18 U.S.C. § 3060(e). Because it does not, and because Chief Judge Boasberg's stay does not require this Court to conclude otherwise, the government either must present evidence at a preliminary hearing sufficient to establish probable cause, or the Court must release Mr. Cole from custody without conditions.

## FACTUAL BACKGROUND

1. The government arrested Mr. Cole on December 4, 2025, pursuant to an arrest warrant issued by a criminal complaint charging two federal crimes under 18 U.S.C. § 844. (Dkt. 1, 7.) This was permitted by Fed. R. Crim. P. 4.

2. The next day, the Court held an initial appearance pursuant to Rule 5(a)(1)(A), at which time Mr. Cole was advised of the charges against him.

3. At that hearing, the government asked that Mr. Cole be held in custody pending a detention hearing, which it was permitted to do by 18 U.S.C. § 3142(f)(2).

4. The Court scheduled the detention hearing for December 15, 2025.

5. Because Mr. Cole was arrested on a complaint, the Court was required to "fix[]" "the date for the preliminary [hearing]" at the initial appearance, 18 U.S.C. § 3060(b), but it failed to do so. It also was required to hold a preliminary hearing "within a reasonable time, but no later than 14 days after the initial appearance."

Fed. R. Crim. P. 5.1. These mandates are self-executing and need not be formally requested by the defendant.

6.    On December 10, the government filed a motion to exclude certain time for bringing an indictment under the Speedy Trial Act, specifically 18 U.S.C. § 3161(b). (Dkt. 9.) Nowhere in the motion did the government mention its obligations under 18 U.S.C. § 3060(b)(1), which required that a preliminary hearing be held within 14 days.

7.    To support the motion, the government noted that "the requested continuance of the indictment deadline and exclusion of time will allow the defense reasonable time to review voluminous initial discovery and have a meaningful opportunity to prepare for the detention hearing, which the defense is seeking to continue for the same reasons." (*Id.* at 2.) Nowhere does the government explain why its ability to seek an indictment would be delayed by allowing the *defense* more time to review discovery and prepare for the detention hearing.

8.    Nonetheless, in that same motion, the parties agreed to reschedule the detention hearing for December 30, 2025—an additional fifteen days. (*Id.* at 5.)

9.    This sort of agreement is consistent with § 3060(c), which allows for the continuance of the preliminary hearing "[w]ith the consent of the arrested person." Mr. Cole has never waived his right to a preliminary hearing nor consented to any delay beyond December 30, 2025.

10.    The Court granted the motion and reset the detention hearing for December 30, 2025. (Dkt. 11.) The Court again failed to mention the preliminary hearing in its order. (*Id*.)

11.    Prior to December 30, 2025, Mr. Cole's "counsel of record," as the government describes them, understood that he could not be detained at that hearing unless the government had established probable cause either by returning an indictment or presenting evidence at a preliminary hearing. *See* 18 U.S.C. § 3060(e) and Fed. R. Crim. P. 5.1(f). In other words, they understood that the detention hearing would necessarily include the preliminary hearing if the government had not secured an indictment before December 30.

12.    Given the need to prepare differently for a combined hearing on probable cause and detention rather than simply a detention hearing, counsel of record inquired with the AUSA about how the government intended to proceed. The relevant exchange, which the government failed to include in full in its brief, started on December 24, 2025 and states:

> We also need to know whether the government plans on holding a probabl[e] cause hearing on Tuesday [December 30, 2025]. We have received no information regarding an indictment and thus would like to know the government's position on this. Please let us know by December 27, 2025.

Email from Mr. Williams to AUSA Jones, December 24, 2025.

13.    In other words, defense counsel had expected based on past practice that the government would secure an indictment before December 30, 2025—thus

removing the need for (and right to) a preliminary hearing. This email asked, in essence: *Are you going to indict this case before next Tuesday?*

14.    As to this question, the government responded two days later with one sentence:

> Tuesday's hearing is a detention hearing under 18 U.S.C. § 3142(f).  The government will be proceeding by proffer.

Email from AUSA Jones to Mr. Williams, December 26, 2025, at 9:54 pm.

15.    This answer did not address whether the government intended to seek an indictment before Tuesday or whether the government previously had attempted to do so but failed. Nor could defense counsel understand how the government could expect to proceed "by proffer" to seek detention absent a probable cause finding based on evidence it presented at a preliminary hearing. Similarly, as the Court is aware, defense counsel generally are not provided with the schedule for when the federal grand jury meets, and so Mr. Cole's legal team did not know if it were possible (and if the government were planning) to seek an indictment on December 29, 2025.

16.    In this context, two options seemed likely: (1) the government had tried and failed to secure an indictment; or (2) it was still planning to obtain an indictment from the federal grand jury on Monday. To that end, Mr. Williams quickly wrote back:

> Also, please tell us whether the government has sought an indictment before a grand jury on the charges against Brian Cole Jr. If an indictment was sought before a grand jury, we are requesting all documents demonstrating the outcome of the grand jury. For example, if a "No Bill" was rendered by the grand jury on Brian Cole Jr's charges, please provide us with that. Please provide us with this documentation prior to this Monday.

Email from Mr. Williams to AUSA Jones, December 27, 2025 at 12:10 am.

17.    In a follow-up to Mr. Williams's email, Mr. Shoreman acknowledged what is noted above, which was that "Rule 5.1 was not discussed at the preliminary hearing. Only the date of the detention hearing (Dec. 15) was discussed." Email from Mr. Shoreman to Mr. Williams and AUSA Jones, December 28, 2025 at 9:08 am.

18.    The next day, Sunday, December 28, 2025, the government responded on these issues:

> As John [Shoreman] indicated below, the parties have not yet scheduled a Rule 5.1 preliminary hearing given the defense's request to continue the December 15 detention hearing (at which we would typically have scheduled the preliminary hearing). Please let me know if you have a view on when to schedule that hearing.
>
> Had there been a "no bill" in this matter, we would have promptly reported it to the Court pursuant to FRCP 6(f).[2] The government has not yet sought a grand jury indictment in this case given the defense's request to continue the detention hearing and your agreement to exclude time under the Speedy Trial Act's 30-day indictment deadline. Additionally, there are no sitting grand juries in D.C. District Court between 12/19 and 1/5.

Email from AUSA Jones to Defense Counsel, December 28, 2025, at 9:08 am.

19.    In its email, the AUSA did not explain (i) why he believed that "the parties," as opposed to the magistrate judge, had to schedule the preliminary hearing; (2) why it was "typical[]" to ignore the statute and wait until the detention hearing to schedule the preliminary hearing; and (iii) why the defense's initial request to continue the detention hearing would delay the government's ability to secure an

---

[2]    The government must only make the report of a "No True Bill" under Fed. R. Crim. P. 6(f) "[i]f a complaint or information is pending against the defendant," so the government's response does not say whether it sought (and failed to receive) such an indictment *prior* to Mr. Cole's arrest. From discovery, the defense team is aware that federal agents had placed the defendant under surveillance for a long period of time before his arrest, suggesting again that they had plenty of time to seek an indictment.

indictment. Further, the prosecutor's reference to the schedule of sitting grand juries in D.C. District Court was new information to the defense team, which led it to wonder why the government had not attempted to secure an indictment before the grand jurors left for the holidays. To the government, this schedule was no surprise.

20.     Upon learning the federal grand jury schedule, the defense team recognized that the government would not be able to validly indict this case before the date set for the preliminary hearing—that is, Tuesday, December 30. In turn, defense counsel finally had the answer to the question they had asked four days earlier: *No, the government is not going to indict this case before next Tuesday*. This meant, based on a plain reading of the relevant federal Rules and statutes, that there would have to be a preliminary or Mr. Cole would be released without conditions.

21.     Recognizing that the government usually seeks to avoid a preliminary hearing, defense counsel offered a compromise. Less than 30 minutes after the government's last email, defense counsel replied, in pertinent part:

> (1) "We can exchange dates for the preliminary hearing;" and (2) "[W]ould the government be interested in waiving the preliminary hearing in exchange for bail under a strict set of agreeable conditions placed on Mr. Cole?"

Email from Mr. Williams to AUSA Jones, December 28, 2025 at 1:24 pm.

22.     As the email made clear, Mr. Cole never waived his right to a preliminary hearing.

23.     About 20 minutes later, the government responded on these two points by writing: (1) "Would the afternoon on January 7 or January 8 work for a preliminary hearing?"; and (2) "We're not willing to agree to release under conditions in exchange

for a waiver of the preliminary hearing." Email from AUSA Jones to Defense Counsel,

December 28, 2025, at 1:43 pm.

24.     Given that a federal grand jury would reconvene on January 6, 2025, it

would have been malpractice for defense counsel to agree to delay the preliminary

hearing again until a date as late as January 7, 2026. Accordingly, "a new counsel for

the defendant," as the government describes it, responded back 3 minutes later:

> We are not willing to wait until January 7 or 8 for the preliminary
> hearing. We agreed to December 30.
>
> It is not the parties' obligation to schedule that hearing but rather a
> mandatory obligation of the magistrate judge. It certainly appears here
> that the parties and the judge failed to mention this hearing along with
> the detention hearing at the initial appearance. That does not change
> the fact that, under Rule 5.1(c), the preliminary hearing must be set "no
> later than 14 days after the initial appearance" where "the defendant is
> in custody." Under Rule 5.1(d), the hearing can be continued with the
> defendant's consent — which he did as reflected in the prior joint motion
> setting Tuesday, December 30 as the hearing date.
>
> But the defense presumed you understood your obligation to present
> evidence at such a hearing, and that's what we've been preparing for on
> December 30.
>
> As you can see from my colleagues' emails, we've been working to
> understand if you planned to indict before then. Otherwise, we insist
> that the hearing be Tuesday.

Email from Mr. Little to AUSA Jones, December 28, 2025 at 1:46 pm.

25.     Despite the flurry of emails over the past three hours, the government

did not respond to that email for the rest of the day. Mr. Cole's defense team thus

prepared for a preliminary hearing, including by flying out a witness to testify about

the lack of probable cause.

26.    Instead of responding on the preliminary hearing issue, the government filed its detention memo. (Dkt. 17.) In that pleading, the government mentioned that it would rely on "a finding of probable cause." (*Id.* at 1, 17)

27.    Given the government's implicit claim in the emails that it did not need a probable cause hearing to detain Mr. Cole, the defense team wanted to ensure that the Court was made aware of these issues as early as possible before the Tuesday hearing began. To that end, Mr. Cole filed a Motion to Confirm Preliminary Hearing Date. (Dkt. 21.)

28.    In his motion, Mr. Cole asked the Court:

(ii) to confirm that December 30, 2025 will proceed as both the preliminary hearing and detention hearing, (iii) to direct the government to be prepared to present evidence, (iv) to deny any further continuance absent the strict Rule 5.1(d) showing, which the government cannot make here; and, (v) if the preliminary hearing is not timely held and no indictment has intervened, to order Mr. Cole's immediate discharge from custody pursuant to 18 U.S.C. § 3060(d).

(Dkt. 21 at 4.)

29.    The Motion to Confirm Preliminary Hearing Date was filed early Monday morning, December 29. (*Id.*) The government did not file a response.

30.    Instead, at 5:20 pm, the Court advised Mr. Cole's counsel that:

This afternoon, the U.S. Attorney's Office sought to present an indictment in this case that was returned today by a D.C. Superior Court grand jury, invoking D.C. Code § 11-1916(a). Mindful of recent developments in the case of *United States v. Stewart*, 25-mj-225 (D.D.C.), the Court did not immediately accept the indictment and deferred that determination.

. . .

> As noted, the Court this afternoon declined to formally accept the indictment pending further briefing from both sides as to whether Judge Boasberg's stay order extends to the circumstances presented here . . . . The Court understands that the government is prepared to file a brief in support of its position, and the Court will then allow the defense to file a response. Following briefing, the Court will determine how it will proceed with respect to the indictment.

Email from U.S. Magistrate Judge Matthew J. Sharbaugh to all counsel.

31.     At approximately 11 pm on December 29, the government served a redacted copy of this briefing upon Mr. Cole's counsel. In its memorandum in support of accepting the D.C. Superior Court indictment, the government claimed that "[t]he circumstances presented here are easily distinguished from those presented in *Stewart*, and thus, the Court may properly receive the defendant's indictment returned on December 29, 2025." (Gov. Memo. at 4.)

32.     The government blamed its decision to seek an indictment from a D.C. Superior Court grand jury rather than a district court grand jury on the defense, claiming that it "sought an indictment return from a Superior Court grand jury panel out of necessity due to the absence of any federal panels and in direct response to changed circumstances brought about by the defense." (Gov. Memo. at 5-6.)

33.     The "changed circumstances" were unstated but apparently consist of the government's prior belief that it could ignore the commands of 18 U.S.C. § 3060(b) and Fed. R. Crim. P. 5.1(c) so long as defense counsel and the Court did not notice.

34.     This is not hyperbole. The government admits as much, stating that it "would have sought [] an early indictment from a federal grand jury panel had there been any indication that the defense, contrary to all indications, intended to pursue

a preliminary hearing on December 30, 2025." In other words, the government expected defense counsel to drop the ball.[3] That is not "changed circumstances."

35.    Nor could these possibly be "extenuating circumstances comparable to those in [the redacted case]." Although Mr. Cole's counsel knows nothing of the redacted case the government references, it is absurd to suggest that this case presents "newly arising, time-sensitive circumstances beyond the government's control." (Gov. Memo. at 7.) The government had plenty of time to seek an indictment in this case from the proper grand jury in the first half of December; it chose not to. The government has every ability to present evidence at a preliminary hearing today; it apparently will decline to do so. The only thing that was apparently beyond the government's control was accounting for the statutory deadlines for a preliminary hearing. This is not good cause to break the rules.

36.    Further, on the question of the scope of the *Stewart* stay, the government seems to rely on the argument that "analysis of the *Nken* factors is case specific" and that "the circumstances presented in this case are markedly different from those in *Stewart*." (*Id.* at 4-5.) It does not address, *inter alia*, "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay

---

[3]    The government does not proffer any reason why competent defense counsel would agree to forego a preliminary hearing in the absence of receiving some benefit, such as an agreement to release the defendant from custody. That is because there is none—making the government's purported reliance on this "indication[]" entirely unreasonable.

will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." (Gov. Memo. at 4.)

## ARGUMENT

The stay issued by Chief Judge Boasberg in *Stewart* contemplated that a criminal defendant "could well be irreparably harmed if his prosecution moves forward on an indictment ultimately held invalid." (*Stewart*, Dkt. 45 at 1.) As a result, in *Stewart*, the D.C. Superior Court indictment has not been returned—even though the Court determined it was validly issued under D.C. Code. The reason? The question whether the government's action is legal or not "is a close and challenging one." (*Id.* at 1.) And the Court of Appeals should be the ones to decide it. (*Id.* at 2.)

So, too, here. The Court should not accept the indictment absent direction from the Court of Appeals. The *Nken* factors support this result. And it leaves the government exactly where it was before yesterday: With the opportunity to salvage its case by presenting evidence in a preliminary hearing today, as federal law directs. Absent such a showing, Mr. Cole must be released.

## I.    There Is a Strong Likelihood That the D.C. Circuit Will Find the Purported "Indictment" Invalid.

Judge Boasberg summarized the argument against the "indictment" here as follows: "a D.C. Superior Court grand jury was not convened by a 'court' in accordance with the Federal Rules, and any indictment returned by such a grand jury is invalid under those Rules." (Mem. Op. at 11.) He continued to say:

> The text of the Federal Rules of Criminal Procedure offers a single path
> to formally charge a defendant with a felony in federal court: via
> indictment returned by a grand jury, which in turn is convened by a

> federal (not D.C. Superior) "court." The Federal Rules, furthermore, "govern the procedure in all criminal proceedings in the United States district courts." Rule 1(a)(1). Indeed, "one of the central purposes of the Rules was to make uniform the practices of all the district courts." *United States v. Wallace & Tiernan, Inc.*, 349 F.2d 222, 226 (D.C. Cir. 1965). It follows that an indictment obtained through a different path — namely, by a non-federal grand jury — does not comply with the Rules' strictures, and is thus invalid. . . . Magistrate Judge Faruqui adopted this interpretation.

(*Id.* at 11-12.) Ultimately, however, the Court concluded that, because "the Advisory Committee Note to the 2002 Amendment characterizes most of the changes to Rule 6 as 'stylistic,'" the 2002 Amendments "do not alter preexisting jurisdictional arrangements," which the Court found permitted the D.C. Superior Court to return indictments in D.C. District Court. (*Id.* at 7-11.) Further, the Court concluded that it could not read the 2002 Amendments literally because it would "render[ D.C. Code] Section 11-1916(a) meaningless." (*Id.* at 13.) "To conclude that Congress intended to gut Section 11-1916(a)'s application to one of those two functions (indictment), this Court would require evidence of a 'clear and manifest' legislative intention to do so." (*Id.* at 13-14.)

But the Court's decision misapprehends or fails to note three critical issues, all of which cut against its reading of the relevant rules and statutes:

*First*, courts use the same tools of statutory construction when analyzing the Federal Rules as they do when analyzing federal statutes. And chief among these is the recognition that the text of the Rule controls, absent ambiguity. In other words, courts interpret the Rules (like other Congressional acts) to mean what they say. Here, the text of the relevant Rules leaves no ambiguity: a court is a federal court,

only federal courts can empanel grand juries, and only these grand juries can return indictments in federal courts. There is no need to look at the Advisory Committee Notes because there is no mysterious language to decipher. The Rules mean what they say—and that is even true if we all believe that Congress failed to catch a substantive change in the law that we all believe in hindsight must have been unintended. As Judge Boasberg notes in another context, even when the resulting "scenarios are . . . troubling . . . the remedy would lie with Congress" to fix the Rules, "not this Court" to interpret them contrary to the plain meaning of their text.

*Second*, the Rules Enabling Act, 28 U.S.C. § 2072, provides ample statutory ground to support the conclusion that the 2002 Amendments to the Federal Rules of Criminal Procedure supersede Section 11-1916(a) of the D.C. Code. Again, the relevant statutory language is clear: "All laws in conflict with [the Federal Rules] shall be of no further force or effect after such rules have taken effect." 28 U.S.C. § 2072(b). And this, too, means what it says. *See Penfield Co. v. Securities & Exch. Comm'n*, 330 U.S. 585, 589 n.5 (1947) ("Where a Rule of Civil Procedure conflicts with a prior statute, the Rule prevails."); 4 Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 1030 & n.2, at 125 (2d ed. 1987) ("Statutes enacted prior to the rules that are inconsistent with them are superseded."). Here, Section 11-1916(a) of the D.C. Code was enacted 32 years *before* the 2002 Amendments to the Federal Rules of Criminal Procedure. When the two conflict, the later-enacted Federal Rules—including their unambiguous definition of "court," *see* Fed. R. Crim. P. 1(b)(2), (b)(3)—prevail.

*Third*, because the grand jury is "an appendage of the court, powerless to perform its investigative function without the court's aid," *Brown v. United States*, 359 U.S. 41, 49 (1959), *overruled on other grounds by Harris v. United States*, 382 U.S. 162 (1965), the grand jury summoned by the D.C. Superior Court cannot investigate matters—and return indictments—that are beyond the jurisdiction of the court itself. *See Thompson v. United States*, 548 F.2d 1031, 1037 n.33 (D.C. Cir. 1976) (reading the D.C. Code to "most certainly . . . divest [D.C. Superior] Court of jurisdiction to hear criminal cases involving United States Code offenses"); *see also* 18 U.S.C. § 3231 ("The district courts of the United States shall have original jurisdiction, *exclusive* of the courts of the States, of all offenses against the laws of the United States.") (emphasis added). Ultimately, "[i]t is the court's process which summons the witness to attend and give testimony, and it is the court which must compel a witness to testify if, after appearing, he refuses to do so." *Brown*, 359 U.S. at 49. But, here, the D.C. Code makes clear that the Superior Court is powerless to enforce federal criminal laws. Reading section 11-1916(a) as still permitting such jurisdiction through the supervision and enforcement of a grand jury investigation of those federal laws contradicts this clear statutory command.

These jurisdictional deficits lead to massive practical issues. For example, may the government choose to investigate a federal crime through a grand jury of the D.C. Superior Court—subject to the law of privileges established by the D.C. Court of Appeals—when that non-Article-III court provides less protection for a witness than the D.C. Circuit would allow? *Cf. Moore v. United States*, 342 A.3d 1222, 1226 (D.C.

2025) (holding "that criminal threats to cause death or substantial bodily harm fall outside the attorney-client privilege"). This and other potential constitutional problems can be avoided by reading the Federal Rules to mean what they say.

## II.    Mr. Cole Will Be Irreparably Injured Absent a Stay.

Here, more than in *Stewart*, Mr. Cole will be irreparably harmed absent a stay that maintains the status quo. Like in *Stewart*, Mr. Cole will "be irreparably harmed if his prosecution moves forward on an indictment ultimately held invalid." (*Stewart*, Dkt. 45 at 1.) But the defendant in *Stewart* was not in custody (like Mr. Cole) when the Court issued the stay, and he did not risk losing any constitutional or statutory rights. This case is different. If this Court accepts the invalid indictment, Mr. Cole may well be detained longer than federal law allows. *See* 18 U.S. Code § 3060(d). So, too, would the Court's denial of the stay and acceptance of the disputed indictment deprive him of his right to a preliminary hearing under Fed. R. Crim. P. 5.1(f).

Further, the fact that the *federal* statute and *federal* Rule at issue each reference an "indictment" demonstrates the stakes. Those provisions are tied to a term that Congress used—in every other context—to refer only to *federal* indictments returned by *federal* grand juries. Allowing Mr. Cole to lose those federal rights without a showing that the government has met the conditions Congress intended would cause additional, irreparable harm.

### III.    The Stay Will Not Substantially Injure the Government.

If this Court refuses to return the disputed indictment until the D.C. Circuit rules, and thereby maintains the stay in *Stewart*, the government would not suffer any harm. It has all the tools it needs to protect its interests—namely maintaining Mr. Cole's detention and persisting in this prosecution.

Specifically, the stay does nothing to prevent the government from proving probable cause at a preliminary hearing—and thereby avoiding the provisions of Rule 5.1(f) or section 3060(d). If the government is harmed by these provisions, it is harmed by its own inaction and unwillingness to do what due process requires: subject its proof to an adversarial contest.

### IV.    The Stay Is In the Public Interest.

As the Court recognized in *Stewart*, "the public interest lies in letting the Court of Appeals decide this issue before the Government moves forward . . . in similar fashion on other cases." (*Stewart*, Dkt. 45 at 2.) This is one of the other cases Judge Boasberg predicted. And although it represents a different kind of irregularity, it is no less irregular. As made clear above, the government apparently believed it could ignore the applicable Federal Rules and federal statutes governing when a detained defendant must be provided an opportunity to challenge the evidence against him. The public has an interest in ensuring that, if the government seeks to pursue such a shortcut, it must be blessed by the Court of Appeals.

## CONCLUSION

For the foregoing reasons, the purported "indictment" does not comply with federal law, including Rules 5.1(a)(2), 6, and 7 of the Federal Rules of Criminal Procedure, and 18 U.S.C. § 3060(e). Because it does not, and because Chief Judge Boasberg's stay does not require this Court to conclude otherwise, the government either must present evidence at a preliminary hearing sufficient to establish probable cause, or the Court must release Mr. Cole from custody without conditions.

Respectfully submitted this December 31, 2025.

**/s/ J. ALEX LITTLE**
J. Alex Little
(*pro hac vice pending*)
Zachary C. Lawson
(*pro hac vice pending*)
John R. Glover
(*pro hac vice pending*)

**LITSON PLLC**
54 Music Square East, Suite 300
Nashville, TN 37203
Telephone: 615-985-8205
alex@litson.co
zack@litson.co
jr@litson.co

**/s/ MARIO B. WILLIAMS**
Mario B. Williams
Ga. Bar No. 235254 (Pro Hac Vice)

**/s/JOHN SHOREMAN**
John M. Shoreman
DC Bar #407626

**HUMANITY DIGNITY AND RIGHTS LLC**
Life Time Work - Buckhead - at Phipps Plaza
3480 Peachtree Road, NE, Second (2nd) Floor
Atlanta, Georgia 30326
Tel: 470-257-2485
mwilliams@hdrattorneys.com
jms@mcfaddenshoreman.com

***Counsel for Brian Cole Jr.***

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served a copy of the foregoing pleading upon all attorneys of record via the email.

Respectfully submitted on this December 31, 2025,

**/s/ John M. Shoreman**
John M. Shoreman

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

    v.

BRIAN J. COLE, JR.,

       Defendant.

Case No. 1:25-mj-276

### MEMORANDUM OPINION AND ORDER

Defendant Brian J. Cole, Jr. stands charged with two criminal offenses under federal law. Both charges stem from an accusation that Mr. Cole built, transported, and tried to detonate two improvised explosive devices ("IEDs")—so-called "pipe bombs"—near the headquarters of the Democratic National Committee ("DNC") and the Republican National Committee ("RNC"), in the heart of Washington, D.C., on the evening of January 5, 2021.

The case is before the Court on the government's motion for pretrial detention. On the specific circumstances presented here, the Court's analysis begins with a rebuttable presumption that Mr. Cole's preventive detention is required under the governing statute. Even assuming Mr. Cole successfully rebuts that starting presumption, the Court concludes that the government carried its ultimate burden to demonstrate that there are no conditions of release the Court could impose to reasonably assure the safety of the community. So the Court **GRANTS** the government's motion and orders that Mr. Cole shall remain detained while this case proceeds.

### BACKGROUND

The underlying circumstances here are widely known, at least in broad strokes. On January 6, 2021, law enforcement discovered two IEDs near the DNC and RNC headquarters in Washington, D.C., both in close proximity to the U.S. Capitol. January 6, 2021, of course, was the

date Congress convened to certify the results of the 2020 election, and U.S. lawmakers were assembled nearby to carry out that constitutional duty. Neither device detonated, and the U.S. Capitol Police were able to carry out a "render safe procedure" on the IEDs without incident. But all the same, the surrounding events triggered serious alarm, particularly given the timing and broader context within which they occurred. And so, the government commenced what would become a lengthy investigation to identify and hold accountable the suspected perpetrator(s).

Fast forward nearly five years. On December 3, 2025, law enforcement criminally charged Mr. Cole with planting the IEDs. Specifically, the criminal complaint against him encompasses two offenses: (1) transportation of an explosive device in interstate commerce with the intent to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property, under 18 U.S.C. § 844(d); and (2) malicious destruction or attempted malicious destruction by means of fire and explosive materials, under 18 U.S.C. § 844(i). (*See* ECF No. 1, Compl.) According to the government's proffer in support of detention, its investigation pointed to Mr. Cole for at least the following reasons:

- The government assessed that the IEDs were placed at approximately 7:54 and 8:16 PM at the DNC and RNC headquarters, respectively. The government's analysis of Mr. Cole's cellphone records showed that his phone interacted with five different cell towers in the vicinity of those two locations during that same window on January 5, 2021. (ECF No. 17 at 4–7.)

- A license plate reader recorded Mr. Cole's vehicle and tag in the area around 7:10 PM that evening, exiting I-395 South at South Capitol Street. (*Id.* at 2.)

- The government reviewed Mr. Cole's financial records, including credit card and bank account statements, which showed that he purchased nearly all the distinct components used to construct the two IEDs from retail locations in Northern Virginia on various dates throughout 2019 and 2020. The government's detention memorandum catalogues in detail these component parts and their purchase dates in chart format. (*See id.* at 10.)[1]

---

[1] As discussed later, the government's proffer also indicates that Mr. Cole purchased more of these same component parts for many months after the events in question, up to and including in August 2022.

On December 4, 2025, law enforcement arrested Mr. Cole at his home in Woodbridge, Virginia. In conjunction with the arrest, law enforcement executed various search warrants, including on Mr. Cole's residence and his vehicle. Inside the residence, in a closet that was accessible only through Mr. Cole's bedroom, law enforcement recovered several of the same parts that had been used in the explosive devices recovered outside the DNC and RNC headquarters in January 2021, including metal pipes, iron and galvanized end caps, wire, and more. And inside Mr. Cole's vehicle, law enforcement recovered more of these same parts, including metal pipes, iron and galvanized end caps, and a nine-volt (9v) battery. Law enforcement also seized a cellular device from Mr. Cole's person during the arrest; the government's forensic review of the device revealed that it was "wiped"—*i.e.*, subject to a "factory reset"—943 times between December 2020 and December 2025, occurring at least weekly since July 2022.

Following his arrest, Mr. Cole was transported to the FBI's Washington Field Office, where he reportedly executed a written waiver of his *Miranda* rights and agreed to be interviewed by law enforcement. According to the government's characterization of the video-recorded interview—a characterization the defense did not contest as part of the detention proceedings, whether in its written submissions or during the detention hearing—the following transpired.

Mr. Cole initially denied any involvement with the underlying offenses. He acknowledged that he drove into D.C. on the evening of January 5, 2021, but claimed he was simply attending a protest "in support of [then-President] Trump" about the outcome of the 2020 election. Reportedly, after several hours, though, Mr. Cole admitted he was the suspect depicted in the surveillance videos. At that point, the government represents, the interviewing agents advised Mr. Cole that they could continue the interview or stop it. Mr. Cole asked for time to process things, and the

agents stepped out for about twenty minutes. When they returned, Mr. Cole reportedly agreed to continue the interview and executed a written waiver to delay his presentment in court.

Mr. Cole, according to the government's proffer, then walked the interviewing agents through his construction, transportation, and placement of the explosive devices on the evening of January 5, 2021. He described how he manufactured the devices, including the black powder inside. He told the agents he assembled the devices in the hours before he drove them into Washington, D.C. from Virginia that same evening. Mr. Cole explained that after parking his vehicle near the relevant area on Capitol Hill, he put one of the devices in his backpack and walked toward the DNC headquarters, where he set the timer to its maximum duration (60 minutes) and placed it under a public bench near the building. At that point, Mr. Cole stated that he returned to his car, placed the second device in his backpack, and walked to the RNC headquarters where he likewise set that timer for 60 minutes and left the device next to a trash bin outside the building. (Mr. Cole explained he had used Google Maps to look up these locations in advance.) Afterward, Mr. Cole returned to his vehicle, left the city, picked up food at a restaurant, and went home.

Mr. Cole explained to the interviewing agents—again, at least according to the government's characterization of the post-arrest interview—that he was not really thinking about how people would react when the bombs detonated, but he hoped there would be news about it. He said that when he learned the devices did not detonate, he was "pretty relieved," reportedly stating that he planted the devices at night because he did not want to kill people. When the agents asked about Mr. Cole's motive, he said that "something just snapped" after "watching everything, just everything getting worse." He described wanting to do something "to the parties" because "they were in charge," and stated that "[he did not] like either party." During the interview, Mr.

Cole apparently denied that his actions were directed at Congress or the election certification proceedings scheduled to take place on January 6, 2021.

On December 5, 2025, Mr. Cole had his initial court appearance. During that hearing, the government moved for his pretrial detention, and the presiding judge scheduled a hearing on the matter for December 15—an agreed date between the parties. About a week later, the parties filed a consent motion to continue the detention hearing by about two weeks to December 30, which the court granted. (ECF Nos. 9, 11.) Both sides filed briefs in advance. (ECF Nos. 17, 23.) The undersigned presided over the detention hearing and took the matter under advisement in lieu of ruling from the bench. This written ruling now follows.[2]

## DISCUSSION

Under the Bail Reform Act of 1984, 18 U.S.C. §§ 3141, *et seq.*, if a judicial officer finds after conducting a hearing that "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community, such judicial officer shall order the detention of the [defendant] before trial." 18 U.S.C. § 3142(e)(1). For purposes of that assessment, the Court's default must generally tilt toward release, as "detention prior to trial … is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 742 (1987); *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021). But through the Bail Reform Act, Congress identified certain categories of offenses that trigger a rebuttable presumption in favor of pretrial detention, not release. 18 U.S.C. § 3142(e)(2), (e)(3). Where such a presumption is implicated, it imposes a "burden of production on the defendant to

---

[2] On December 29, 2025—the afternoon before the detention hearing—the government asked the Court to accept an indictment against Mr. Cole that had been returned by a D.C. Superior Court grand jury earlier that day. The indictment charges Mr. Cole with the same two counts as the complaint (18 U.S.C. §§ 844(d) and 844(i)). For reasons explained on the record and in a separate order (Min. Order, Dec. 30, 2025), the Court deferred a decision on whether to accept that indictment and requested briefing on the issue.

offer some credible evidence contrary to the statutory presumption[.]" *United States v. Boykins*, 316 F. Supp. 3d 434, 436 (D.D.C. 2018) (emphasis added) (citing *United States v. Taylor*, 289 F. Supp. 3d 55, 63 (D.D.C. 2018)). "While the burden of production may not be heavy," *United States v. Lee*, 195 F. Supp. 3d 120, 125 (D.D.C. 2016), it requires that the defendant proffer "some credible evidence contrary to the statutory presumption," *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985). "If the defendant meets his burden of production, the presumption does not disappear entirely but remains a factor to be considered among those weighed by the district court." *United States v. Thomas*, 456 F. Supp. 3d 69, 71 (D.D.C. 2020); *United States v. Gamble*, 810 F. App'x 7, 8 (D.C. Cir. 2020) ("[T]he statutory presumption does not disappear like a 'bursting bubble' once a defendant offers some evidence that he is not a danger to the community[.]"). In any case, the presumption "does not shift the burden of persuasion, which remains with the government." *Boykins*, 316 F. Supp. 3d at 436 (emphasis added). This means the government retains the ultimate burden to establish some basis for pretrial detention, either by demonstrating that the defendant poses an unmitigated risk of flight by a preponderance of the evidence, *United States v. Vasquez-Benitez*, 919 F.3d 546, 551 (D.C. Cir. 2019), or an unmitigated risk of danger to the community by clear and convincing evidence, *Munchel*, 991 F.3d at 1279.

Applying these principles here, the Court concludes that this case implicates a rebuttable presumption of detention. And even assuming Mr. Cole rebutted that presumption, the government has shown by clear and convincing evidence that there are no conditions of release that can reasonably assure the safety of the community.[3]

---

[3] During the hearing, the government confirmed that it does not presently seek Mr. Cole's detention under a risk-of-flight theory, so the Court's discussion focuses on a dangerousness analysis.

## I.    Rebuttable Presumption of Detention

The Bail Reform Act triggers a rebuttable presumption "that no condition or combination of conditions will reasonably assure ... the safety of the community if ... there is probable cause to believe that the person committed" one of a list of crimes enumerated by statute, including a violation of 18 U.S.C. § 844(i). *See* 18 U.S.C. § 3142(e)(3)(C); 18 U.S.C. § 2332b(g)(5)(B). On this basis, the government says a rebuttable presumption of detention applies here. The defense says otherwise, insisting the government has not established probable cause to believe that Mr. Cole committed an offense under Section 844(i). The Court agrees with the government.

As an initial matter, the defense argued in its brief that the only way the government can show probable cause for these purposes is through an indictment returned by the grand jury. (*See* ECF No. 23 at 6 ("Where there is no indictment, like here, no pretrial detention hearing can begin with such a presumption.").) That is wrong. The two cases cited by the defense did not hold that a grand jury indictment was the only path to a finding of probable cause in this context. Instead, they considered and rejected a theory that some "independent finding of probable cause," above and beyond a grand jury indictment, was necessary. *United States v. Williams*, 903 F.2d 844 (D.C. Cir. 1990) (per curiam) (unpublished); *United States v. Contreras*, 776 F.2d 51, 55 (2d Cir. 1985) (similar). In other words, the defense's cases stand for the proposition that a grand jury indictment is *sufficient*, but not *necessary*, to establish probable cause for purposes of triggering a rebuttable presumption of detention under Section 3142(e). And longstanding caselaw in this District is consistent with that understanding. Apart from an indictment, "the facts found by the judicial officer at the detention hearing [can] determine whether the statutory presumption is implicated[.]" *United States v. Bess*, 678 F. Supp. 929 (D.D.C. 1988); *see also, e.g.*, *United States v. Johnston*, 2017 WL 4326390, at *3 n.2 (D.D.C. Sept. 28, 2017) (reasoning that "the government's proffer"

in the detention-hearing proceedings "provide[d] the requisite probable cause" to trigger the "rebuttable presumption of detention," despite the absence of an indictment).[4] During the hearing in this case, defense counsel retreated from this sweeping theory, pivoting to argue that an indictment is the preferred method for showing probable cause, even if not required.

In any case, the facts proffered to the Court in connection with the detention hearing, including the government's description of Mr. Cole's own reported statements to law enforcement during his post-arrest interview, provide an ample basis to conclude, at least for present purposes, that there is probable cause to believe Mr. Cole violated 18 U.S.C. § 844(i)—*i.e.*, that he maliciously attempted to damage or destroy, by means of fire and explosive materials, real or personal property affecting interstate commerce (namely, the DNC and RNC headquarters). So the Court concludes that a rebuttable presumption of detention applies.[5]

From there, the defense points to several considerations that it says should serve to rebut any presumption. Mr. Cole has no criminal history, for instance, and he is a high-school graduate who has held steady employment in the area since his teenage years. More, Mr. Cole has considerable family and community support. The Court assumes these points meet the modest burden of production to rebut the statutory presumption. *See, e.g.*, *United States v. Hunt*, 240 F. Supp. 3d 128, 133 (D.D.C. 2017) (assuming same based on somewhat similar facts).

---

[4] In fact, there is at least some authority in this District for the proposition that a judge can find probable cause that a defendant committed a presumption-triggering offense that is uncharged altogether, whether by complaint or indictment. *See, e.g.*, *United States v. Lee*, 206 F. Supp. 3d 106, 110–11 (D.D.C. 2016). The Court need not go so far here because the government has at least charged Mr. Cole by complaint with violating 18 U.S.C. § 844(i). But the Court raises the point to further demonstrate the fallacy of an indictment-only theory as applied to the Bail Reform Act's rebuttable-presumption framework.

[5] Finally, the Court is mindful that a Superior Court grand jury *did* return an indictment on the 844(i) charge against Mr. Cole. The Court has not yet accepted that indictment for reasons explained elsewhere, so it does not rely on the indictment for present purposes. But even still, the Court notes that the indictment is consistent with the Court's independent probable cause determination at this juncture.

But as noted, that does not mean the presumption disappears entirely. Instead, it remains "a factor to be considered among those weighed" in the normal course under Section 3142(g). *United States v. Klein*, 539 F. Supp. 3d 145, 152 (D.D.C. 2021). This is so because the presumption is "not simply an evidentiary tool designed for the courts" but serves as a reflection of "Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial[.]" *United States v. Lee*, 195 F. Supp. 3d 120, 125 (D.D.C. 2016) (quoting *United States v. Stone*, 608 F.3d 939, 945–46 (6th Cir. 2010)); *see also United States v. Ali*, 793 F. Supp. 2d 386, 391 (D.D.C. 2011) (explaining that, even when rebutted, the "presumption is incorporated into the other factors considered by this Court in determining whether to grant a conditional release and is given substantial weight"); *United States v. Cherry*, 221 F. Supp. 3d 26, 32 (D.D.C. 2016) (same).

The Court therefore proceeds to analyze the relevant factors set forth in Section 3142(g) to determine whether pretrial detention is warranted here.

## II.    Section 3142(g) Factors

In evaluating "whether there are conditions of release that will reasonably assure … the safety of any other person and the community," the Court must consider: (1) "the nature and circumstances of the offense[s] charged"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person"; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

### A.    Nature and Circumstances of the Offenses

Start with the nature and circumstances of the charged offenses. As the government fairly describes this case, Mr. Cole "is charged with transporting two explosive devices into Washington, D.C. and planting them at the headquarters of the two major political parties of the United States." (ECF No. 17 at 18.) The charged offenses are undeniably serious as a general matter. To simply

describe them is to demonstrate as much. More, the U.S. Code prescribes significant penalties for these specific criminal offenses. If convicted, Mr. Cole faces up to ten years of imprisonment on the first charge under Section 844(d) and up to twenty years of imprisonment on the second charge under Section 844(i), with a five-year mandatory minimum. 18 U.S.C. §§ 844(d), 844(i). These lengthy periods of potential imprisonment reflect Congress's views about the seriousness of the charges. *See, e.g.*, *United States v. Brown*, 538 F. Supp. 3d 154, 167 (D.D.C. 2021) ("These substantial terms of imprisonment reflect Congress' appreciation for the severity of these offenses."); *United States v. Wills*, 311 F. Supp. 3d 144, 148 (D.D.C. 2018) (finding that a five-year mandatory minimum "reflect[ed] Congress' judgment as to the seriousness of the offense"). Further, the statute specifically directs the Court to consider "whether the offense … involves a … firearm, explosive, or destructive device," 18 U.S.C. § 3142(g)(1), as is true here.

Further, the specific circumstances by which the offenses are alleged to have been carried out—including the timing and broader context—further amplify their severity. After all, Mr. Cole is charged with placing the two IEDs in the immediate vicinity of the U.S. Capitol the night before U.S. lawmakers were set to gather to certify the results of the 2020 election. Although Mr. Cole, during his post-arrest interview, apparently disclaimed any intent to interfere with that process, the resulting fear and alarm followed all the same—and how could it not? Even still, the defense strives to minimize the offenses because the IEDs never detonated, such that nobody was injured and no property was damaged. The Court finds that point decidedly unpersuasive. As the government appropriately observes (*see* ECF No. 17 at 20), "it was luck, not lack of effort," that caused the devices not to detonate. *See also Klein*, 539 F. Supp. 3d at 153 (rejecting similar claim that the defendant's actions did not precipitate "specific acts of violence or the death or injury of any person," as "more a product of fortune than fate"). After all, Mr. Cole reportedly stated that he

planted the devices—one of them underneath a public bench, no less—hoping they would detonate and that there would be news about it. Mercifully, that did not happen. But if the plan had succeeded, the results could have been devasting: creating a greater sense of terror on the eve of a high-security Congressional proceeding, causing serious property damage in the heart of Washington, D.C., grievously injuring DNC or RNC staff and other innocent bystanders, or worse.

Simply put, the nature and circumstances of the charged offenses here are gravely serious, so this factor points strongly toward pretrial detention.

### B.    Weight of the Evidence

Next up, the weight of the evidence. This factor puts the Court in the somewhat awkward position of assessing the evidence before trial, but the statute requires its consideration. For all the reasons laid out in the government's detention memorandum, the weight of the evidence against Mr. Cole is significant. Among other things, the government's proffer places Mr. Cole's vehicle in the general vicinity of the DNC and RNC headquarters during the timeframe at issue, shows that Mr. Cole's cell phone interacted with five different cell towers in the relevant locations during the key timeframe, and catalogues in detail how Mr. Cole's credit card and financial records reflect his purchase of many distinctive component parts found in those explosive devices. And that is all before the Court even gets to the statements Mr. Cole made to law enforcement during his post-arrest interview with the FBI—reportedly admitting that he was responsible for the explosive devices, describing how he built and transported them, and more. All in all, the government's proffered evidence is compelling, so this factor likewise points toward detention.

In response, the defense principally argues that the government is approaching this factor through the wrong lens: that courts should not assess the weight of the evidence "in terms of the defendant's guilt," but rather only as to "the defendant's *dangerousness*." (ECF No. 23 at 9.) In

support, the defense cites *United States v. Hunt*, 240 F. Supp. 3d 128. But *Hunt* did not endorse that view. Instead, *Hunt* evaluated the weight of the evidence against the defendant on the underlying charges (*i.e.*, evidence of guilt), before observing that "[c]ourts in other circuits consider only the weight of the evidence of the defendant's dangerousness," and finding even that alternative perspective tilted in favor of detention on the facts there. *Id.* at 134. Courts in this District recognize that the weight-of-the-evidence factor necessarily encompasses consideration of the defendant's guilt for the charged offense(s). *United States v. Taylor*, 289 F. Supp. 3d 55, 66 (D.D.C. 2018); *United States v. Ausby*, 2019 WL 2452988, at *4 n.3 (D.D.C. June 11, 2019). The defense's narrower view is misplaced.

## C.    Individual History and Characteristics

Turn then to Mr. Cole's history and characteristics. This factor requires the Court to assess, among other considerations, "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings[.]" 18 U.S.C. § 3142(g)(3)(A). The defense rightly highlights several points that tilt in Mr. Cole's favor here. For one thing, Mr. Cole has no prior criminal history, let alone any history of failing to comply with court orders or conditions of probation or supervised release. He has longstanding ties to the community and a network of family support. Mr. Cole graduated high school and has remained steadily employed in his family's business for many years. Finally, the defense reports that Mr. Cole is diagnosed with autism spectrum disorder and obsessive-compulsive disorder. These facts, the Court agrees, typically point against the need for pretrial detention and instead suggest that conditions of release could reasonably mitigate any prospective risk of danger that Mr. Cole might pose.

The government acknowledges, at least implicitly, that this factor—at least more than the others—favors Mr. Cole. But it urges the Court to pay close attention to Mr. Cole's conduct after the date of the underlying offense. Specifically, the government highlights that Mr. Cole reportedly continued to purchase some of the same component parts used in the IEDs across more than a dozen different transactions during 2021 and up through August 2022. (*See* ECF No. 17 at 11.) Relatedly, the government points to Mr. Cole's reported statement that he again created—or at least attempted to create—a black powder substance, albeit ostensibly for a science experiment. Further, the government stresses that Mr. Cole reportedly wiped his phone "nearly one thousand times" during the "years-long national investigation into his actions," which the government paints as an effort to obfuscate his actions and evade responsibility. These points, certainly taken together, do cut against the other facets of Mr. Cole's history and characteristics highlighted by the defense and summarized above. In the Court's view, however, they are more appropriately considered in connection with the fourth factor under Section 3142(g), which the Court discusses next. As to this third factor, though, the Court believes that it points on balance more toward release than detention.

### D.    Nature and Seriousness of the Danger Posed by Release

That leaves the final factor: "the nature and seriousness of the danger to any person or the community that would be posed by [Mr. Cole's] release." 18 U.S.C. § 3142(g)(4).

Start with the law. The D.C. Circuit has made clear that "to order a defendant preventatively detained, a court must identify an articulable threat posed by the defendant to an individual or the community." *Munchel*, 991 F.3d at 1283; *see also id.* at 1285 (Katsas, J., concurring) (describing the analysis as a "forward-looking assessment"). In other words, the inquiry is fundamentally a prospective one—focused on the risk of future danger—though a defendant's prior conduct can

inform that prospective assessment. *See id.* at 1283 ("Whether the defendant poses a threat of dealing drugs, for instance, may depend on the defendant's past experience dealing[.]").

In terms of Mr. Cole's past conduct, his alleged construction and placement of explosive devices intended to detonate outside the DNC and RNC headquarters, on the eve of the January 6 electoral college certification at the nearby U.S. Capitol, demonstrates a startling and significant capacity for dangerousness. In this way, the government's focus on the conduct giving rise to the charges is important to the Court's assessment. But the Court cannot make a dangerousness determination based on past conduct alone—it simply informs the Court's prospective view.

In looking ahead, the defense urges the Court to focus on the fact that the underlying offense conduct here occurred nearly five years ago (almost to the day), without any claim or proffered evidence from the government that Mr. Cole engaged in any similar conduct—or seemingly any dangerous or violent conduct at all—over the past several years. The Court finds that argument reasonably persuasive, at least as far as it goes. And if there were truly no proffered evidence about comparable or otherwise dangerous conduct across the past five years, the Court might consider this a more suitable case for release on strict conditions.

But there is more. Because as the government's proffer shows, after January 5, 2021, Mr. Cole reportedly purchased many of the same parts used in the explosive devices—including metal pipes, end caps, wire, steel wool, a timer, and more. (ECF No. 17 at 11 (chart).) These purchases spanned at least a dozen different transactions between January 21, 2021, and August 13, 2022. This evidence undercuts the suggestion that Mr. Cole's alleged conduct was some anomalous event that occurred only once many years ago. Instead, for at least the better part of two years afterward, Mr. Cole reportedly engaged in the same activity leading up to the offense conduct, amassing the same sorts of parts he used to construct the two explosive devices giving rise to these charges.

More, and relatedly, Mr. Cole apparently told the FBI that at some point after January 5, 2021, he again created (or attempted to create) another batch of powder, although he claimed it was unrelated to bombmaking. This ongoing alleged activity—which is at least consistent with continued "bombmaking" activity, as described by the government—tempers the notion that the five-year span between the underlying offense conduct and today mitigates any future risk.

Even still, the Court considered that Mr. Cole's additional purchases of component parts is only shown to have taken place through August 2022, ending nearly two and a half years ago now. That itself is a material passage of time. So again, if there were no evidence about other concerning conduct between August 2022 and today, the Court might take a different view.

But there is still more. Because when law enforcement arrested Mr. Cole in early December 2025 and executed search warrants, the government recovered many of the same component parts just described in his possession, some in Mr. Cole's residence and others in his vehicle. Although several were found alongside receipts dating back years (seemingly to some of the earlier 2021 and 2022 purchases listed in the government's brief), the fact remains that Mr. Cole was still in possession of those materials as recently as last month. And importantly, these items were not in some offsite storage unit or distant stash house. They were recovered in a closet in Mr. Cole's home and inside his car—two locations essentially within arm's reach of Mr. Cole's daily routine. His ongoing retention of and access to the same components used to construct the explosive devices recovered outside the DNC and RNC headquarters in January 2021 raise substantial red flags in the Court's mind about a prospective risk to public and community safety.

Both points just discussed—Mr. Cole's continuing purchases of parts to construct the explosive devices, and his continuing possession of parts as recently as last month—are especially troubling to the Court considering that he reportedly told law enforcement that he was "relieved"

that the devices did not detonate on January 5, 2021. If true, then that fortunate outcome should have been a stark wake-up call for Mr. Cole. But based on the information presented to the Court, it was not. To the contrary, that very same month—in late January 2021—Mr. Cole reportedly purchased more of the same kinds of parts he allegedly used to construct the explosive devices recovered outside the DNC and RNC buildings, including a metal pipe, steel wool, alligator clips, and a timer. And he seemingly remained in possession of those types of items throughout the last five years, until as recently as last month, including in his home and in his car.

Of course, the Court evaluates those concerns alongside conditions of release it could fashion to mitigate them. And the defense, to its credit, is not simply asking the Court to release Mr. Cole on his personal recognizance. The defense is proposing that Mr. Cole be released pursuant to a set of strict conditions, including home detention, GPS monitoring, the appointment of a third-party custodian, and more. But the Court can—and should—appropriately consider "whether it believes the defendant will actually abide by its conditions." *Munchel*, 991 F.3d at 1280–81. And based on the record before it, the Court has concrete concerns on that front.

For one thing, as the government characterizes Mr. Cole's post-arrest interview, he reportedly told the FBI that he carried out the underlying offenses here because "something just snapped." (ECF No. 17 at 16.) The sudden and abrupt motivation behind Mr. Cole's alleged actions presents concerns about how quickly the same abrupt and impulsive conduct might recur. More, Mr. Cole reportedly told the FBI that he assembled the IEDs "in the hours before he drove to Washington, D.C. on January 5, 2021" (*id.* at 15), suggesting he can prepare dangerous explosive devices in short order, over a matter of hours, not necessarily days or weeks. Given the precipitousness with which Mr. Cole reportedly acted, and the speed with which he was able to construct the so-called "pipe bombs," the Court lacks confidence that even the most rigorous set

of release conditions can reasonably guard against the risk of future danger. More, the Court shares the government's concerns about Mr. Cole's efforts to hide and obfuscate his activities—efforts that would hamper the ability of even the most well-intentioned custodian to effectively monitor him. For instance, beginning in 2022, Mr. Cole reportedly carried out repeated "wipes" or "factory resets" of his cellular device, occurring at least once per week and sometimes multiple times per day. The defense has proffered that Mr. Cole suffers from obsessive-compulsive disorder, and the Court recognizes that this behavior could stem from symptoms related to that condition. But Mr. Cole's alleged behavior is at least equally suggestive of efforts to conceal and destroy information about his personal communications and online activity. That is troubling and portends real challenges in monitoring his conduct in a home-detention setting.

Although home incarceration and a GPS monitor would provide some check against Mr. Cole's ability to carry out any menacing or dangerous conduct in the community, the Court is simply not satisfied these conditions rise to the necessary level for the reasons explained. This is particularly true based on the severity of the potential danger Mr. Cole is alleged to pose, given his alleged persistent acquisition and retention of so-called "bombmaking parts," and given his reported penchant and capacity to create explosive devices and deploy them in public settings.

On this last point, the defense argues, in reliance on *Munchel*, that "[t]he circumstances giving rise to the charged offense in this case are incredibly unlikely to manifest themselves again." (ECF No. 23 at 14.) Presumably this refers to the fact that Mr. Cole is charged with planting the explosive devices amid Congress's electoral certification on January 6. The Court agrees it must "consider[] the specific circumstances that made [the offense conduct] possible," *Munchel*, 991 F.3d at 1284, but it disagrees that this factor helps Mr. Cole here. To start, *Munchel* made this point in connection with the "unique opportunity" afforded those defendants "to obstruct democracy on

January 6," largely because the presence of the large crowd gathered at the Capitol "was critical to their ability to obstruct the vote and cause danger to the community." *Id.* (emphasizing that those defendants "did not vandalize any property or commit violence"). Based on the charges here, Mr. Cole is very differently situated. His alleged actions were not facilitated by the presence of a large crowd gathered for some distinct purpose, as in *Munchel*. Instead, Mr. Cole is accused of acting alone on the streets of Washington, D.C., choosing targets accessible to the general public at any time, day or night. (Plus, Mr. Cole reportedly disclaimed to law enforcement that his actions were directed at Congress or related to the Congressional proceedings on January 6). Unlike *Munchel*, then, the Court sees no basis to conclude that the underlying circumstances here were materially "unique" for purposes of its prospective dangerousness analysis.

*    *    *

Finally, the Court ends this analysis where it began: returning to the presumption of detention that applies here. Because even assuming Mr. Cole came forward with sufficient evidence to rebut that presumption, Congress's substantive judgment in favor of preventive detention in this case remains a factor in the Court's analysis, and one that should receive "substantial weight." *Ali*, 793 F. Supp. 2d at 391. That factor, along with the other considerations discussed above, leads to a conclusion that there are no conditions of release the Court can fashion to reasonably assure the safety of others and the community in this case.

**CONCLUSION**

The Court is keenly aware that pretrial detention must be "the carefully limited exception,"

*Salerno*, 481 U.S. at 755, due in no small part to the fact that Mr. Cole, like all defendants, is

entitled to a presumption of innocence at this juncture. And the Court understands its "grave

constitutional obligation to ensure that the facts and circumstances of each case warrant this

exceptional treatment." *Munchel*, 991 F.3d at 1285. But based on the Court's careful consideration

of the relevant factors that govern its determination, this case fits that bill.

Accordingly, the Court **GRANTS** the government's motion for pretrial detention and

orders that Mr. Cole shall remain detained pending trial.

Dated: January 2, 2026

_____
MATTHEW J. SHARBAUGH
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 1:25-mj-00276** |
| | : | |
| **BRIAN J. COLE, JR.,** | : | |
| | : | |
| Defendant. | : | |

**NOTICE OF FILING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files the attached redacted Memorandum in Support of the Court's Inherent Authority to Accept Grand Jury Indictment Return, which was submitted to the Court under seal on December 29, 2025. As directed by the Court on December 30, 2025, the government sought authorization from the Court on December 31 to file the memorandum with redactions. Having received the Court's authorization today, the government now files the redacted memorandum on the docket.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:   */s/ Charles R. Jones*
CHARLES R. JONES (D.C. Bar No. 1035541)
JOCELYN BALLANTINE (CA Bar No. 208267)
Assistant United States Attorneys
National Security Section
601 D Street, NW
Washington, D.C. 20530
Tel: (202) 252-6976
Charles.Jones3@usdoj.gov
Tel: (202) 252-7252
Jocelyn.Ballantine2@usdoj.gov

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 1:25-mj-00276** |
| | : | |
| **BRIAN J. COLE, JR.,** | : | <u>**UNDER SEAL**</u> |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF THE COURT'S INHERENT AUTHORITY TO ACCEPT GRAND JURY INDICTMENT RETURN

Defendant Brian Cole Jr. is charged in United States District Court for the District of Columbia by way of an indictment returned on December 29, 2025, by a grand jury empaneled by the Superior Court of the District of Columbia. The indictment was properly returned, and the Court has the authority to accept the indictment return, notwithstanding Chief Judge Boasberg's recent stay of his order in *United States v. Kevontae Stewart*. *See* D.D.C. Case No. 25-mj-225, ECF No. 45 (hereinafter the "Stay"). Importantly, in the Stay, Chief Judge Boasberg held that D.C. Code § 11-1916(a) permits local grand juries to return indictments in federal court. *Id.*, ECF No. 38 at 1.[1]

The indictment in this case charges the defendant with violations of 18 U.S.C. §§ 844(d) (interstate transportation of explosives) and 844(i) (malicious attempt to use explosives). The charges arise from the defendant's manufacturing, transporting, and planting of two pipe bombs in the immediate vicinity of the headquarters of the Republican and Democratic National

---

[1] D.C. Code § 11-1916(a) states: "A grand jury serving in the District of Columbia may take cognizance of all matters brought before it regardless of whether an indictment is returnable in the Federal or District of Columbia courts." *See United States v. Seals*, 130 F.3d 451, 458-60 (D.C. Cir. 1997) (rejecting constitutional challenge to D.C. Code § 11-1916(a)); *see also id.* at 453 (describing, without questioning, district court's holding that Congress "validly authorized the D.C. Superior Court . . . to supervise a grand jury that can indict for both D.C. and federal offenses").

Committees in downtown Washington, D.C. on January 5, 2021.  The defendant was charged by federal criminal complaint with the same offenses and arrested on December 4, 2025.  ECF No. 1.

On December 5, 2025, the defendant was presented on the federal complaint.  The Court ordered the defendant to be detained pending a detention hearing, which the defense agreed to schedule for December 15, 2025.  On December 10, 2025, defense counsel—specifically, counsel of record John Shoreman and co-counsel Mario Williams, who later moved for admission *pro hac vice*, ECF No. 15 (collectively, "defense counsel of record")—requested a continuance of the December 15 detention hearing to have additional time to review the significant amount of discovery provided by the government.  The defense consented to the exclusion of time under the Speedy Trial Act from December 4, 2025, through the date of the rescheduled detention hearing, which the parties agreed would be reset for December 30, 2025.  *See* ECF No. 9 at 1–2.  On December 11, 2025, the Court issued a written order "that the currently scheduled detention hearing on December 15, 2025, be continued to December 30, 2025," and excluded time under the Speedy Trial Act between December 15 and December 30, 2025.  ECF No. 11 at 1.

On December 24, 2025, defense counsel of record emailed the government asking, among other things, "whether the government plans on holding a probabl[e] cause hearing on Tuesday [December 30]."  On December 25, 2025, government counsel responded, in relevant part: "Tuesday's hearing is a detention hearing under 18 U.S.C. § 3142(f).  The government will be proceeding by proffer."  On December 27, 2025, defense counsel of record emailed the government asking, among other things, "whether the government has sought an indictment before a grand jury on the charges against Brian Cole Jr."  Shortly thereafter, defense counsel of record clarified by email that the parties had only discussed the date of a detention hearing and had not discussed the date of a Rule 5.1 preliminary hearing.

The government responded on December 28, 2025, in relevant part, agreeing that the parties had "not yet scheduled a Rule 5.1 preliminary hearing given the defense's request to continue the December 15 detention hearing (at which we would typically have scheduled the preliminary hearing)," asking for the defense's preference as to when to schedule the preliminary hearing, and explaining both that the government had "not yet sought a grand jury indictment in this case given the defense's request to continue the detention hearing and your agreement to exclude time under the Speedy Trial Act's 30-day indictment deadline" and also that "there are no sitting grand juries in D.C. District Court between 12/19 and 1/5." Defense counsel of record responded the same day, stating, in relevant part: "We can exchange dates for the preliminary hearing." Defense counsel of record further inquired if the government would be willing to agree to the defendant's release "under a strict set of agreeable conditions" in exchange for a waiver of the preliminary hearing that the parties were attempting to schedule. The government responded declining to agree to the defense's proposal and suggesting that the parties schedule the preliminary hearing for January 7 or 8, 2026.

On December 28, 2025, at 1:46 p.m., a new counsel for the defendant, whose motion for admission *pro hac vice* is pending, ECF No. 18, emailed the government taking the position for the first time that the defense intended to proceed on December 30 with a preliminary hearing under Federal Rule of Criminal Procedure 5.1, notwithstanding that such a hearing had not been scheduled by the Court and that, just minutes earlier, the parties were discussing when to schedule a preliminary hearing. According to this new defense counsel, "we've been working to understand if you planned to indict before [December 30]. Otherwise, we insist that the [preliminary] hearing be Tuesday."[2]

---

[2] Late in the evening on December 28, 2025, the defense in this case filed a motion requesting that the Court order the government to proceed with a preliminary hearing on December

The circumstances presented here are easily distinguished from those presented in *Stewart*, and thus, the Court may properly receive the defendant's indictment returned on December 29, 2025. Chief Judge Boasberg issued a stay of his order in *Stewart*, which had held that the indictment was valid, after analyzing the four factors articulated by the Supreme Court in *Hilton*, and subsequently analyzed in *Nken*: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). Chief Judge Boasberg went on to note that "the public interest lies in letting the Court of Appeals decide this issue before the Government moves forward both on this case *and in similar fashion on other cases*." Stay at 2 (emphasis added). Given this language, the question is whether the Stay prevents this Court from accepting indictments returned by a grand jury empaneled by the Superior Court of the District of Columbia in other cases presenting circumstances materially different from those in *Stewart*.

As a threshold matter, it is well-settled that analysis of the *Nken* factors is case specific. *See, e.g.*, *Sofinet v. I.N.S.*, 188 F.3d 703, 707 (7th Cir. 1999); *In re Feingold*, 730 F.3d 1268, 1277 (11th Cir. 2013). Accordingly, the Stay should not automatically be construed to enjoin the return of *all* indictments returned in District Court by a grand jury empaneled by the Superior Court of

---

30, 2025, as well as the scheduled detention hearing. ECF No. 21. That pleading omits the emailed statements of defense counsel of record discussed above (1) that the parties had only previously discussed a detention hearing and not a Rule 5.1 preliminary hearing (December 27 email), (2) that the parties "can exchange dates for the preliminary hearing" (December 28 email)—which prompted the government to offer potential dates, and (3) attempting to negotiate a waiver of that hearing (December 28 email). Instead, the defense in its pleading represents to the Court: (1) "The defense did not waive the right to a preliminary hearing. To the contrary, it has consistently expected it to proceed on December 30."; and (2) "On December 28, 2025, when pressed on the question of proceeding with the preliminary hearing on December 30, the government asked to push the preliminary hearing to either January 7 or 8." ECF No. 21 at 1.

the District of Columbia during the pendency of the appeal of Chief Judge Boasberg's order to the D.C. Circuit. *See Rojas-Espinoza v. Bondi*, 2025 WL 3289117, at *10 (9th Cir. Nov. 25, 2025) ("[i]t is manifestly unlawful to allow a temporary administrative stay to be continued for such an undue length of time after an opposed stay motion has been fully briefed, much less to do so without any case-specific judicial involvement") (citing *Nken*, 556 U.S. at 433-34).

Furthermore, the circumstances presented in this case are markedly different from those in *Stewart*. The government has not previously sought an indictment for this defendant from a grand jury empaneled in either District Court or Superior Court. Moreover, as described above, defense counsel of record requested that the detention hearing scheduled for December 15—at which the parties, consistent with general practice, would have scheduled a preliminary hearing— be continued to December 30, and agreed to extend the government's deadline to indict through that date. Both the government and defense plainly understood the Court to have scheduled only a detention hearing for December 30, as the parties were actively discussing when to schedule a preliminary hearing as late as the afternoon of December 28, 2025, before new defense counsel took a materially different position.

In good-faith reliance on the representations of defense counsel of record, the government chose not to secure an early indictment in this case on or before December 19, 2025, the last date on which grand jury panels would be sitting in the District Court for the District of Columbia until January 6, 2026. The government would have sought such an early indictment from a federal grand jury panel had there been any indication that the defense, contrary to all indications, intended to pursue a preliminary hearing on December 30, 2025. Thus, the circumstances in this case establish that the government sought an indictment return from a Superior Court grand jury panel out of necessity due to the absence of any federal panels and in direct response to changed

circumstances brought about by the defense.  Moreover, when federal grand jury panels resume sitting next week, the government will promptly secure a superseding indictment.

Finally, this case presents extenuating circumstances comparable to those in █████████  There, the government was forced to react to constraints presented by the unavailability of federal grand juries during the weeks of December 22 and 29, 2025, ███████████████████████

Like ██████████, the government in this case sought an indictment return from a Superior Court grand jury panel out of necessity due to the unavailability of any federal panels and in direct

---

[3] The government has sought to unseal this hearing for the limited purpose of obtaining an expedited transcript of the proceeding.  The transcript is not available to the government at the time of this filing.

6

response to newly arising, time-sensitive circumstances beyond the government's control. Moreover, as stated, the government in this case will promptly secure a superseding indictment from a federal grand jury panel when those panels reconvene on January 6, 2026, meaning the indictment returned on December 29, 2025, by the Superior Court panel will be in place for only approximately one week.

For the foregoing reasons, the government respectfully submits that the indictment in this case was properly returned and that the Court should accept the indictment return.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:    _/s/ Charles R. Jones_____
CHARLES R. JONES (D.C. Bar No. 1035541)
JOCELYN BALLANTINE (CA Bar No. 208267)
Assistant United States Attorneys
National Security Section
601 D Street, NW
Washington, D.C. 20530
Tel: (202) 252-6976
Charles.Jones3@usdoj.gov
Tel: (202) 252-7252
Jocelyn.Ballantine2@usdoj.gov

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### Holding a Criminal Term

### Grand Jury Sworn in on November 21, 2025[1]

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL NO.:** |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| **v.** | : | **MAGISTRATE NO.: 25-mj-276** |
| | : | |
| **BRIAN J. COLE, JR.,** | : | **VIOLATIONS:** |
| | : | |
| **Defendant.** | : | **18 U.S.C. § 844(d)** |
| | : | **(Interstate Transportation of Explosives)** |
| | : | |
| | : | **18 U.S.C. § 844(i)** |
| | : | **(Malicious Attempt to Use Explosives)** |

## I N D I C T M E N T

The Grand Jury charges that:

## COUNT ONE

On or about January 5, 2021, in the District of Columbia and elsewhere, the defendant, **BRIAN J. COLE, JR.,** knowingly transported in interstate commerce two explosives, that is, two explosive devices commonly referred to as "pipe bombs," with the knowledge and intent to use those explosives to intimidate any individual and unlawfully to damage and destroy any building and other real property in Washington, D.C., that is, the headquarters of the Democratic National Committee, located at 430 South Capitol Street, Southeast, Washington, D.C., and the

---

[1] This grand jury was empaneled in the Superior Court of the District of Columbia and returned this indictment pursuant to its authority under D.C. Code § 11-1916(a). No grand juries currently empaneled in the District Court for the District of Columbia were or will be scheduled to sit between Friday, December 19, 2025, and Tuesday, January 6, 2026.

headquarters of the Republican National Committee, located at 310 First Street, Southeast,

Washington, D.C.

(**Interstate Transportation of Explosives**, in violation of
Title 18, United States Code, Section 844(d))

## COUNT TWO

On or about January 5, 2021, within the District of Columbia, the defendant, **BRIAN J.**

**COLE, JR.,** maliciously attempted to damage and destroy, by means of fire and an explosive, any

building and surrounding real property, that is, the headquarters of the Democratic National

Committee, located at 430 South Capitol Street, Southeast, Washington, D.C., and the

headquarters of the Republican National Committee, located at 310 First Street, Southeast,

Washington, D.C., both of which were used in interstate and foreign commerce and were used in

an activity affecting interstate and foreign commerce.

(**Malicious Attempt to Use Explosives**, in violation of
Title 18, United States Code, Section 844(i))

A TRUE BILL:

FOREPERSON

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:
Jocelyn Ballantine
Deputy Chief, National Security Section

2

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:26-cr-0001-AHA |
| | ) | |
| BRIAN COLE, JR., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S EMERGENCY MOTION
## FOR REVIEW OF MAGISTRATE'S ORDER
## DENYING RELEASE PURSUANT TO 18 U.S.C. § 3060(d)

Pursuant to Local Criminal Rule 57.17(a)(5) and 59.3(a) and 28 U.S.C. § 636(b)(3), Defendant Brian Cole Jr. respectfully submits this emergency motion seeking immediate review of Magistrate Sharbaugh's January 2, 2025 Minute Order conditionally "accepting" the indictment returned by the D.C. Superior Court in this matter on December 29, 2025, thereby denying Mr. Cole's motion for release under 18 U.S.C. § 3060(d). (Dkt. 26.)

The Magistrate's order commits two legal errors: (1) it conditionally accepts the Superior Court indictment returned in this case without any legal analysis of its validity; and (2) uses that conditional acceptance as the basis to keep Mr. Cole detained beyond the time permitted under federal law. The time for establishing probable cause already expired under both Fed. R. Crim. P. 5.1 and 18 U.S.C. § 3060. Every hour Mr. Cole is unlawfully detained is irreparable harm.

The Magistrate's brief minute order—entered three days after these issues were raised—allows Mr. Cole's detention to continue in direct violation of 18 U.S.C. § 3060(d), and it does so while avoiding any legal analysis of the dispositive issue, which is whether a valid indictment has been returned in this case. The Magistrate did not decide whether a D.C. Superior Court grand jury can validly return an indictment in federal court under the Federal Rules. Nor did the Magistrate apply 18 U.S.C. § 3060's *mandatory* remedy where a detained defendant is not accorded a timely preliminary hearing and no valid indictment has intervened. *See* 18 U.S.C. § 3060(d)–(e). All this was error, and Mr. Cole faces ongoing detention without legal basis as a result.

On December 30, 2025, the defense filed a 20-page brief (less than 12 hours after the government filed its brief) urging the Court to reject the Superior Court indictment. The Court's order neither resolves nor even addresses the arguments raised by Mr. Cole. Instead, the order treats the government's promise to "promptly" seek a superseding *federal* indictment as close enough to distinguish this case from this Court's decision to stay its order accepting the indictment in *Stewart*. Federal law demands more than the Magistrate's "close enough" approach to an issue this Court has already recognized as "close and challenging" in *Stewart*. (Case No. 25-mj-225, Dkt. 45 at 1.)

The Court must decide whether the purported "indictment" is enough to satisfy section 3060(d). If it is not, then Mr. Cole must be released immediately.

Even taking the Minute Order by its terms, the Magistrate has not actually "accepted" an indictment that moots Fed. R. Crim. P 5.1 or section 3060(d). The Court set no arraignment for Mr. Cole nor any further proceedings under the Rules that attach when an indictment is returned. The Order accepts the return only "on the understanding" that the government will *later* cure what the Magistrate ostensibly saw as a fraught position. Indeed, it gave the government until January 9, 2025, to fix this problem and get its case on sure footing. None of this provides a legal basis for the Court to ignore the statutory commands of federal law, namely section 3060. It is simply a mechanism to allow the government to continue to flout the law.

The Magistrate's attempt at throwing the government a life raft eschews the most critical point: *federal law requires Mr. Cole's release now*, regardless of what the government does before January 9, 2026. The Magistrate's conditional "acceptance" neither converts this matter into an indicted case nor extinguishes Mr. Cole's immediate right to a preliminary hearing—which he sought and was denied on December 30, 2025. Rule 5.1(f) makes clear that it is a returned, operative indictment—not a *future intention* to obtain one, as the government professes here— that obviates the hearing. Until a valid federal indictment is in place and the case proceeds accordingly, 18 U.S.C. § 3060(d) governs, and explicitly requires that Mr. Cole be "discharged from custody." As things stand, Mr. Cole is being detained on a court-created stopgap measure. That's wrong.

The Magistrate's conditional acceptance of the indictment is insufficient to continue to detain Mr. Cole. But it's also plainly wrong on the merits. *Stewart*'s stay

counsels restraint "before the Government moves forward . . . in similar fashion on other cases." (Case No. 25-mj-225, Dkt. 45 at 2.) The Magistrate's order here never engages the controlling question whether the Federal Rules permit non-federal grand juries to indict in federal court at all, especially not the arguments that were not raised in *Stewart*. It cites no authority resolving the Rules Enabling Act issue or the Rules' definitions of "court" and "grand jury," and it does not address the jurisdictional defects and practical problems detailed in the defense's brief. When a defendant's liberty is at stake, the law demands more than giving the government a court-created "close enough" exception.

The Court should: (i) set aside the Magistrate's order; (ii) decline to accept or give effect to the Superior Court return for the reasons raised in Dkt. 26; and (iii) enforce 18 U.S.C. § 3060(d) and order Mr. Cole's immediate release.

Respectfully submitted this January 3, 2026.

**/s/ J. ALEX LITTLE**
J. Alex Little (Pro Hac Vice)
Zachary C. Lawson (Pro Hac Vice)
John R. Glover (Pro Hac Vice)

**LITSON PLLC**
54 Music Square East, Suite 300
Nashville, TN 37203
Telephone: 615-985-8205
alex@litson.co

**/s/ MARIO B. WILLIAMS**
Mario B. Williams
Ga. Bar No. 235254 (Pro Hac Vice)

**/s/JOHN SHOREMAN**
John M. Shoreman
DC Bar #407626

**HUMANITY DIGNITY AND RIGHTS LLC**
Life Time Work - Buckhead - at Phipps Plaza
3480 Peachtree Road, NE, Second (2nd) Floor
Atlanta, Georgia 30326
Tel: 470-257-2485
mwilliams@hdrattorneys.com
jms@mcfaddenshoreman.com

*Counsel for Brian Cole Jr.*

### CERTIFICATE OF SERVICE

I hereby certify that I have on this day served a copy of the foregoing pleading upon all attorneys of record via the email.

Respectfully submitted on this January 3, 2026,

**/s/ALEX LITTLE**
Alex Little
(*Pro Hac Vice*)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 1:26-cr-00001-AHA |
| | : | |
| BRIAN J. COLE, JR., | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S EMERGENCY MOTION**

The government respectfully opposes defendant Brian J. Cole Jr.'s emergency motion asking this Court to set aside Magistrate Judge Sharbaugh's January 2, 2026, order accepting the indictment returned in this case, and to immediately release the defendant.  *See* ECF No. 33 (Def.'s Em. Mot.).  On December 29, 2025, pursuant to D.C. Code § 11-1916(a), the indictment was returned to the United States District Court for the District of Columbia by a grand jury empaneled by the Superior Court of the District of Columbia, as no grand juries empaneled by the federal court were or would be scheduled to sit between December 19, 2025, and January 6, 2026.  *See* ECF No. 31 (Indictment) at 1 n.1.[1]

The defendant asks this Court to set aside Judge Sharbaugh's January 2, 2026, orders accepting the indictment and detaining the defendant pending trial because, the defendant claims, Judge Sharbaugh improperly "conditionally accept[ed]" the indictment.  *See, e.g.*, Def.'s Em. Mot. at 1.  That is wrong.  Judge Sharbaugh applied settled law to conclude that the indictment

---

[1] The indictment charges the defendant with violations of 18 U.S.C. §§ 844(d) (interstate transportation of explosives) and 844(i) (malicious attempt to use explosives).  The charges arise from the defendant's manufacturing, transporting, and planting of two pipe bombs in the immediate vicinity of the headquarters of the Republican and Democratic National Committees in downtown Washington, D.C. on January 5, 2021.  The circumstances surrounding the unavailability of federal grand juries and the government's use of the Superior Court grand jury in this case are discussed in the government's Memorandum in Support of the Court's Inherent Authority to Accept Grand Jury Indictment Return.  ECF No. 29-1.

was valid, he properly and unequivocally accepted it, and he correctly determined that there was

no basis to stay the case from proceeding on the accepted indictment under the circumstances.

These rulings are correct, and this Court should deny the defendant's emergency motion to set

them aside.

I.    **The Challenged Orders Declaring the Indictment Valid, Accepting the Indictment, and Detaining the Defendant**

Judge Sharbaugh did not, as the defendant claims, "conditionally accept" the indictment.

*See* Def.'s Em. Mot. at 1, 3.  Rather, he applied settled law—*i.e.*, clear statutory authority upheld

by the D.C. Circuit[2] as well as Chief Judge Boasberg's recent reaffirmance of that authority in a

separate case, *United States v. Stewart*, D.D.C. Case No. 25-mj-225—to find the indictment

legally valid and accept it.  Min. Order (Jan. 2, 2026).  Judge Sharbaugh also considered whether

Chief Judge Boasberg's discretionary stay of the *Stewart* case pending appeal should apply to

this case.   Judge Sharbaugh concluded that the stay in *Stewart* did not apply because the

government here was not proceeding "in similar fashion" to *Stewart*—in particular because the

government obtained the indictment in this case during a time of federal grand jury unavailability

and committed to promptly pursue a superseding indictment from a federal grand jury panel

when those panels reconvene, and thus was not "us[ing] the Superior Court grand jury as an

ultimate end-run around a federal grand jury empaneled by this Court."  *Id.*  Judge Sharbaugh

scheduled a hearing for January 9, 2026, to address this matter.  *Id.*

---

[2] D.C. Code § 11-1916(a) states: "A grand jury serving in the District of Columbia may take cognizance of all matters brought before it regardless of whether an indictment is returnable in the Federal or District of Columbia courts."  *See United States v. Seals*, 130 F.3d 451, 458-60 (D.C. Cir. 1997) (rejecting constitutional challenge to D.C. Code § 11-1916(a)); *see also id.* at 453 (describing, without questioning, district court's holding that Congress "validly authorized the D.C. Superior Court . . . to supervise a grand jury that can indict for both D.C. and federal offenses").

Judge Sharbaugh also did not, as the defendant claims, rely on a purportedly "conditional acceptance" of the indictment to keep the defendant "detained beyond the time permitted under federal law." Def.'s Em. Mot. at 1. On January 2, 2026, Judge Sharbaugh issued a thorough, 19-page memorandum opinion and order that analyzed the record and arguments made by the parties in writing as well as during a lengthy detention hearing held on December 30, 2025, and concluded that preventive detention was necessary. *See generally* ECF No. 28 (Mem. Op. and Order). In that opinion, Judge Sharbaugh acknowledged that he had "deferred a decision on whether to accept th[e] indictment and requested briefing on the issue." *Id.* at 5 n.2. Later the same day, Judge Sharbaugh issued a separate order expressly accepting the indictment and explaining the legal basis for doing so. Min. Order (Jan. 2, 2026).

## II. The Magistrate Judge Correctly Determined that the Indictment is Valid, Appropriately Accepted the Indictment, and Properly Detained the Defendant Pending Trial

The fundamental premise of the defendant's argument in support of emergency relief—that Judge Sharbaugh improperly "conditionally accepted" the indictment—is incorrect. The defendant conflates Judge Sharbaugh's unconditional ruling on the legal merits that the indictment is valid with his discretionary determination that the stay issued in *Stewart* did not stop this case from proceeding on the accepted indictment. Having accepted a validly returned indictment, Judge Sharbaugh's decision to detain the defendant pending trial complied with Federal Rule of Criminal Procedure 5.1 and 18 U.S.C. § 3060. These rulings are well supported by the law and the record in this case.

As to the merits, Judge Sharbaugh made clear that his decision to accept the indictment was based on the statutory authority conferred by D.C. Code § 11-1916(a) as well as Chief Judge Boasberg's recent decision on review upholding "the legality of this approach based on that D.C.

Code provision."  Min. Order (Jan. 2, 2026) (citing *United States v. Stewart*, 2025 WL 3237833

(Boasberg, C.J.) (Nov. 20, 2025).  In *Stewart*, after multiple rounds of briefing and argument,

Chief Judge Boasberg issued a 15-page memorandum opinion upholding the government's use

of the authority conferred by D.C. Code § 11-1916(a) and rejecting the position advanced by the

defendant in *Stewart* (and by the defendant in this case).  D.D.C. Case No. 25-mj-225, ECF

No. 38 (Mem. Op.).  Chief Judge Boasberg reasoned, in summary, that the statutory language in

D.C. Code § 11-1916(a) is clear, that the D.C. Circuit had previously upheld the provision

against constitutional attack in *United States v. Seals*, 130 F.3d 451 (D.C. Cir. 1997) in a manner

indicating approval of the authority conferred by the statute, that other decisions in this district

demonstrated a "unanimity across courts" that "bolster[ed]" the conclusion that the government's

use of the statute was proper, and that arguments that other authorities, including the non-

substantive 2002 amendments to Federal Rule of Criminal Procedure 6, should be interpreted to

have later effectively nullified or amended the statute were unpersuasive.  *Id.* at 7–15.

Judge Sharbaugh's express reliance on Chief Judge Boasberg's recent opinion in

*Stewart*—which addressed the same legal issue on review of a magistrate's order and did so with

the benefit of extensive briefing and argument—was eminently appropriate under the

circumstances.  The defendant's claims that Judge Sharbaugh "avoid[ed] any legal analysis of

the dispositive issue" and failed to resolve or even to address the merits, *see* Def.'s Em. Mot.

at 2, are unsupported.  And his suggestion that Judge Sharbaugh bent the rules to deliver a

"court-created stopgap measure" and "throw[] the government a life raft," *id.* at 3, is unavailing.

There is no basis to disturb Judge Sharbaugh's decision that the indictment in this case is valid.[3]

---

[3] The defendant complains that Judge Sharbaugh's order did not specifically address the
reasons why, in the defendant's view, Chief Judge Boasberg's opinion in *Stewart* was wrongly
decided.  Def.'s Em. Mot. at 4.  But his points are simply corollaries of the arguments that Chief
Judge Boasberg considered and rejected—principally, that the 2002 amendments to the Federal

As to the stay issue, Judge Sharbaugh appropriately distinguished this case from *Stewart* because the government here is not proceeding "in similar fashion" to *Stewart*, which is operative language that Chief Judge Boasberg used in his stay order. *See* D.D.C. No. 25-mj-225, ECF No. 45 (Order) at 2. Because the government in this case obtained the indictment during a time of federal grand jury unavailability and would be promptly presenting the case to a federal grand jury upon its return, the stay in *Stewart* did not preclude this case from proceeding, however briefly, on an indictment that Judge Sharbaugh had already determined, based on settled law, to be valid. Min. Order (Jan. 2, 2026); *see Stewart*, D.D.C. No. 25-mj-225, ECF No. 45 (Order) at 1–2 (stay order emphasizing harm to defendant "if his prosecution moves forward on an indictment ultimately held invalid"). There is no basis for the defendant's claim that Judge Sharbaugh's "understanding" that the government would proceed in a certain manner (a fact relevant to his consideration of the propriety of the stay) somehow means that his ruling was not "actually" an acceptance of the indictment. *See* Def.'s Em. Mot. at 3. The "understanding" or "condition" that Judge Sharbaugh invoked—*i.e.*, that the government would promptly present the case to a federal grand jury panel when it reconvened—was the basis on which he concluded that it would be improper to interpret *Stewart* to stay this case from proceeding on a valid and accepted indictment. There is no reason to disturb Judge Sharbaugh's ruling that the stay in

---

Rules of Criminal Procedure, which were substantively unrelated and intended to be "stylistic," somehow "supersede" D.C. Code § 11-1916(a). *See* ECF No. 26 (Def.'s Resp. in Opp'n) at 14–16 (defendant contending that "same tools of statutory construction" that apply to statutes should be applied to Federal Rules of Criminal Procedure, that Rules Enabling Act supports argument that Federal Rules "prevail" over D.C. Code, and that there are jurisdictional and practical problems with interpreting D.C. Code § 11-1916(a) as Chief Judge Boasberg did). Chief Judge Boasberg addressed in detail the argument that the Federal Rules should prevail over the D.C. Code, as well as arguments that the jurisdictional arrangement reflected in D.C. Code § 11-1916(a) was improper and raised practical concerns. *See Stewart*, D.D.C. Case No. 25-mj-225, ECF No. 38 (Mem. Op.); *see also Seals*, 130 F.3d at 455–61 (addressing jurisdictional and practical considerations in context of constitutional challenge to D.C. Code § 11-1916(a)).

*Stewart* did not apply to this case and that, therefore, the case can proceed on the accepted indictment before it is presented to a federal grand jury panel.[4]

At bottom, the defendant asks this Court to set aside Judge Sharbaugh's orders accepting the indictment and detaining the defendant pending trial on the premise that Judge Sharbaugh only "conditionally accepted" the indictment. Because that premise is wrong, and because Judge Sharbaugh's rulings are legally and factually correct, the Court should deny the defendant's motion.[5]

---

[4] In its briefing concerning the stay issue, the government analogized this case to another matter in which Chief Judge Boasberg recently determined that the stay in *Stewart* did not prevent the case from proceeding for a brief period before it was presented to a federal grand jury panel when those panels reconvene. *See* ECF No. 29-1 at 6–7 (redacted with judicial authorization). The government submitted its argument concerning the other matter, which is sealed, *ex parte* in a sealed filing provided to the Court on December 29, 2025. The government obtained an order to unseal the hearing referenced in the pleading for the limited purpose of obtaining an expedited transcript of the proceeding. The government received that transcript on January 5, 2026.

[5] As a final matter, the government notes that the defendant expressly consented to an extension of time to December 30, 2025, under Rule 5.1(d) and 18 U.S.C. § 3060(c). *See, e.g.*, ECF No. 21 (Def.'s Mot. to Clarify) at 3. The parties disagree as to whether that consent extended beyond December 30. Regardless, on December 30, Judge Sharbaugh expressly found under Rule 5.1(d) and 18 U.S.C. § 3060(c) that extraordinary circumstances justified further delay of a preliminary hearing to allow the Court time to consider and resolve the validity of the indictment. Those circumstances apply equally to the defendant's request for review of Judge Sharbaugh's decision. Moreover, the relief sought by the defendant in his emergency motion, immediate release under § 3060(d), is not available where, prior to a preliminary hearing, "an indictment is returned." 18 U.S.C. § 3060(e). The indictment in this case was returned on December 29, 2025, before a preliminary hearing, thus satisfying the statute. The indictment was then received on January 2, 2026. *See* D.D.C. Local Cr. Rule 57.17(a)(5) (magistrate judge's general duties include to "[r]eceive indictments returned by the grand jury").

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:    _/s/ Charles R. Jones_____
CHARLES R. JONES (D.C. Bar No. 1035541)
JOCELYN BALLANTINE (CA Bar No. 208267)
Assistant United States Attorneys
National Security Section
601 D Street, NW
Washington, D.C. 20530
Tel: (202) 252-6976
Charles.Jones3@usdoj.gov
Tel: (202) 252-7252
Jocelyn.Ballantine2@usdoj.gov

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:26-cr-00001 |
| | ) | |
| BRIAN COLE, JR., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPLY IN SUPPORT OF DEFENDANT'S EMERGENCY MOTION FOR REVIEW OF MAGISTRATE'S ORDER DENYING RELEASE PURSUANT TO 18 U.S.C. § 3060(d)

Defendant Brian Cole Jr. respectfully submits this reply in support of his emergency motion seeking immediate review of Magistrate Sharbaugh's January 2, 2026 Minute Order conditionally "accepting" the indictment returned by the D.C. Superior Court in this matter. The government's response gets three things fundamentally wrong.

*First*, the Magistrate did not "unequivocally" accept the D.C. Superior Court indictment, as the government claims. (Dkt. 37 at 2.) The Order accepts the indictment only "*on the understanding* that the government will promptly pursue a superseding indictment" from a federal grand jury. That's a condition. The Magistrate even set a status conference for January 9—no doubt to ascertain the status of that condition. Nothing about its Order is unequivocal acceptance. The Magistrate's Order is a placeholder contingent on a future cure.

The Order's explicit conditional language isn't the only giveaway on this point. No arraignment was set and no Rule 10 proceeding scheduled—if the case were truly "proceeding on an indictment," arraignment would follow, not a check-in status conference on January 9. Additionally, the Order's own contingency refutes the government's "unequivocal" label. Rule 5.1(f) requires a returned, operative indictment *now*—not an intention to get one next week—to moot a preliminary hearing. The same is true of 18 U.S.C. § 3060(e). "Receiving" paperwork does not resolve Rule 5.1 or § 3060.

*Second*, the government's response ducks the dispositive question: under the Federal Rules of Criminal Procedure, who can convene the grand jury that returns a federal indictment? The Rules answer it. Rule 6(a)(1) authorizes only "the court" to summon a grand jury. Rule 1 defines "court" as a federal court. *See* Fed. R. Crim. P. 1(b)(2)-(3). The government offers no theory by which a D.C. Superior Court can be "the court" for purposes of Rules 1 and 6 or how a grand jury it supervises can return an indictment operative in federal court. Nor does the government offer any rebuttal to the argument that the Rules Enabling Act explicitly supersedes the previously enacted provisions of the D.C. Code—an argument that Chief Judge Boasberg never considered in *Stewart*.

Instead of responding to the arguments on the table, the government simply assures the Court that the Magistrate Judge "applied settled law" to decide this complex issue. But no such thing happened. The Magistrate Judge's Minute Order is only a few sentences long. It cites no Federal Rule, analyzes none of the text of those

Rules, confronts no Rules Enabling Act issue, and offers no analysis of how a non-federal "court" can be "the court" under Rules 1 and 6. What the Magistrate Judge was actually addressing with its brief order—what it even called "the salient question"—was simply whether the *Stewart* stay applies to this case. That misses the point of Mr. Cole's present motion, which is that no valid indictment has been returned, so he is entitled to immediate release under 18 U.S.C. § 3060.

What the government's response *really* invokes is the separate, 19-page detention memorandum entered by the Magistrate.[1] But that order offers the government no help in making its point here because it expressly noted the indictment issue had been "deferred." Dkt. 28 at 5 n.2. The detention order did not (and could not) resolve the conflicts the defense raised under Rules 1, 6, and 7 and 28 U.S.C. § 2072(b). The government's repeated insistence that the indictment issue is "settled" does not supply the missing analysis.

*Finally*, to differentiate from the *Stewart* stay, the government reads "in similar fashion" as a narrow carve-out that turns on its own case-specific details and motives (such as the grand jury holiday calendar, a promise to supersede later, and no prior federal presentment). That is not what Chief Judge Boasberg wrote. Chief Judge Boasberg explained the core concern: a defendant "could well be irreparably harmed if his prosecution moves forward on an indictment ultimately held invalid," and "the public interest lies in letting the Court of Appeals decide this issue before

---

[1]    Mr. Cole intends to appeal this detention order by separate motion.

the Government moves forward both on this case and in similar fashion on other cases." *Stewart*, No. 1:25-mj-225, Dkt. 45 at 1-2.

Chief Judge Boasberg's concerns exist here. "Similar fashion" plainly refers to the general practice—moving a federal prosecution forward on the strength of an indictment whose validity is unsettled—not to a tiny subset of scenarios with identical procedural histories. Here, just like in *Stewart*, the government is pressing ahead on a D.C. Superior Court indictment while the legality of that practice is unresolved. Whether it promises to "fix it later" with a superseding federal indictment is beside the point; the harm and the stay's purpose are about proceeding now on a potentially invalid indictment. The fact that the government can (or at least tried to) differentiate its motives here is not an escape valve. The government's narrowing would gut the stay.

In sum, the government's response cannot supply what the record and the Rules lack: a valid, operative **<u>federal</u>** indictment. The Court should vacate the Minute Order and order Mr. Cole's immediate release under 18 U.S.C. § 3060(d). In the alternative, at the very least, this Court must do what the Magistrate Judge avoided: address the legal issues raised by the defendant that his continued detention is illegal.

Respectfully submitted this January 6, 2026.

**/s/ J. ALEX LITTLE**
J. Alex Little (Pro Hac Vice)
Zachary C. Lawson (Pro Hac Vice)
John R. Glover (Pro Hac Vice)

**LITSON PLLC**
54 Music Square East, Suite 300
Nashville, TN 37203
Telephone: 615-985-8205
alex@litson.co

**/s/ MARIO B. WILLIAMS**
Mario B. Williams
Ga. Bar No. 235254 (Pro Hac Vice)

**/s/JOHN SHOREMAN**
John M. Shoreman
DC Bar #407626

**HUMANITY DIGNITY AND RIGHTS LLC**
Life Time Work - Buckhead - at Phipps Plaza
3480 Peachtree Road, NE, Second (2nd) Floor
Atlanta, Georgia 30326
Tel: 470-257-2485
mwilliams@hdrattorneys.com
jms@mcfaddenshoreman.com

*Counsel for Brian Cole Jr.*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served a copy of the foregoing pleading upon all attorneys of record via the Court's electronic filing system.

Respectfully submitted on this January 6, 2026,

**/s/ALEX LITTLE**
Alex Little
(Pro Hac Vice)

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### District of Columbia

## Notice of Electronic Filing

The following transaction was entered on 1/6/2026 at 5:23 PM EDT and filed on 1/6/2026

| | |
|---|---|
| **Case Name:** | USA v. COLE |
| **Case Number:** | 1:26-cr-00001-AHA |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
 **MINUTE ORDER as to BRIAN J. COLE, JR. The court is in receipt of the [39] superseding indictment. In light of the superseding indictment, Defendant shall show cause by January 7, 2026, why his [33] emergency motion should not be denied as moot. Signed by Judge Amir H. Ali on 1/6/2026. (lcaha1)**

**1:26-cr-00001-AHA-1 Notice has been electronically mailed to:**

John M. Shoreman     jms@mcfaddenshoreman.com, ecfnotices@ndh-law.com, kkrueger@ndh-law.com, mdobbs@ndh-law.com, mvcarminati@ndh-law.com, mwilliams@ndh-law.com, osimkins@ndh-law.com

Jocelyn S. Ballantine     jocelyn.ballantine2@usdoj.gov, USADC.CriminalDocket@usdoj.gov

Mario Bernard Williams     mwilliams@hdrattorneys.com, osimkins@ndh-law.com, sbuettner@hdrattorneys.com

Charles Robert Jones     charles.jones3@usdoj.gov

Joseph Alex Little, IV     alex@litson.co, ally@litson.co, litson@ecf.courtdrive.com

Zachary Carter Lawson     zack@litson.co, ally@litson.co, litson@ecf.courtdrive.com

John Ross Glover     jr@litson.co, ally@litson.co, litson@ecf.courtdrive.com

**1:26-cr-00001-AHA-1 Notice will be delivered by other means to::**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**

**Grand Jury Sworn in on December 16, 2025**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.: 26-cr-0001 |
| | : | |
| | : | |
| | : | |
| | : | |
| v. | : | MAGISTRATE NO.: 25-mj-276 |
| | : | |
| BRIAN J. COLE, JR., | : | VIOLATIONS: |
| | : | |
| Defendant. | : | 18 U.S.C. § 844(d) |
| | : | (Interstate Transportation of Explosives) |
| | : | |
| | : | 18 U.S.C. § 844(i) |
| | : | (Malicious Attempt to Use Explosives) |

**I N D I C T M E N T**

The Grand Jury charges that:

**COUNT ONE**

On or about January 5, 2021, in the District of Columbia and elsewhere, the defendant, **BRIAN J. COLE, JR.**, knowingly transported in interstate commerce two explosives, that is, two explosive devices commonly referred to as "pipe bombs," with the knowledge and intent to use those explosives to intimidate any individual and unlawfully to damage and destroy any building and other real property in Washington, D.C., that is, the headquarters of the Democratic National Committee, located at 430 South Capitol Street, Southeast, Washington, D.C., and the headquarters of the Republican National Committee, located at 310 First Street, Southeast, Washington, D.C.

(**Interstate Transportation of Explosives**, in violation of
Title 18, United States Code, Section 844(d))

## COUNT TWO

On or about January 5, 2021, within the District of Columbia, the defendant, **BRIAN J. COLE, JR.,** maliciously attempted to damage and destroy, by means of fire and an explosive, any building and surrounding real property, that is, the headquarters of the Democratic National Committee, located at 430 South Capitol Street, Southeast, Washington, D.C., and the headquarters of the Republican National Committee, located at 310 First Street, Southeast, Washington, D.C., both of which were used in interstate and foreign commerce and were used in an activity affecting interstate and foreign commerce.

(**Malicious Attempt to Use Explosives**, in violation of
Title 18, United States Code, Section 844(i))

A TRUE BILL

FOREPERSON

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By: _____
Jocelyn Ballantine
Deputy Chief, National Security Section

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:26-cr-00001 |
| | ) | |
| BRIAN COLE, JR., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## RESPONSE TO COURT ORDER TO SHOW CAUSE

Defendant Brian Cole Jr. respectfully submits this memorandum in response to the Court's January 6, 2026, order requiring Defendant to show cause why his Emergency Motion for Review of Magistrate's Order (Dkt. 33) should not be denied as moot. As explained below, it is not. The Court can still grant effective relief because 18 U.S.C. § 3060(d) mandates Mr. Cole's release notwithstanding the new indictment.

## SUMMARY

Mr. Cole's motion is not moot because the Court can still grant effective relief: his immediate release from custody under 18 U.S.C. § 3060(d). The legal basis is straightforward. Federal law required the government to either hold a preliminary hearing or obtain a valid *federal* indictment by December 30, 2025—the deadline Mr. Cole consented to extend. The government did neither. When that deadline passed without compliance, the statute's mandatory remedy attached: Mr. Cole "*shall be discharged from custody or from the requirement of bail or any other condition of release.*" *Id.* (emphasis added). The government's subsequent January 6, 2026

indictment came too late to prevent this violation. Section 3060(e)'s safe harbor applies only when an indictment is returned "*prior* to the date fixed for the preliminary examination"—it does not retroactively erase a breach that already occurred under subsection (d). *Id.* (emphasis added). Congress chose release as the consequence for missing the deadline, using mandatory language. To be sure, this remedy does not dismiss the charges, but it requires discharge from custody.

The requested relief is thus concrete and prospective: ordering Mr. Cole's immediate release while allowing the January 6 indictment to proceed. This gives full effect to the statute's text, which expressly provides that discharge is "without prejudice . . . to the institution of further criminal proceedings . . . upon the charge upon which he was arrested." 18 U.S.C. § 3060(d). The government remains free to prosecute Mr. Cole under the January 6 indictment, but it cannot retroactively cure its December 30 violation. The statute requires release just as much now as it did a week ago. And nothing about the new indictment changes that. If Mr. Cole had been released as required on December 30, the government could not immediately re-detain him upon that indictment without satisfying the Bail Reform Act's requirements for revisiting a release decision based on new material information. And the new indictment, which simply tracks the arrest warrant's charges, does not meet that standard. Because the Court can still order relief now—by changing Mr. Cole's custody status from detained to released—the case is not moot under Article III's standard requiring only that some "effectual relief whatever" remain available.

## BACKGROUND

Mr. Cole was arrested on December 4, 2025, on a complaint, and he made his initial appearance on December 5, 2025. *See* Dkt. 1, 7. Because he was in custody, a preliminary hearing had to be held "within a reasonable time, but no later than 14 days after the initial appearance," Fed. R. Crim. P. 5.1(c), and the Court was required at the initial appearance to "fix[]" the date for that hearing. 18 U.S.C. § 3060(b).

None of that happened on December 4. Instead, the Court initially set a detention hearing for December 15, 2025, but the hearing was reset to December 30, 2025. *See* Dkt. 9, 11. Mr. Cole consented to extend the detention hearing deadline to December 30, 2025, but he did not waive his right to a preliminary hearing or consent to any extension beyond that date. *See* Dkt. 21. No federal indictment was returned and no preliminary hearing was held on or before December 30.

In the days leading up to December 30, defense counsel asked the government to confirm whether it would secure a federal indictment before that date or proceed with a preliminary hearing at that time. Instead, the government sought to push the preliminary hearing to January 7 or 8, something that the defense refused. Perhaps recognizing the problems it faced with 18 U.S.C. § 3060(d), the government chose a different route. On December 29, 2025, it presented an indictment returned that day by a D.C. Superior Court grand jury. The Magistrate deferred acceptance and requested briefing in light of *Stewart*.

On January 2, 2026, the Magistrate issued a brief Minute Order conditionally "accepting" the Superior Court indictment "on the understanding" that the

government would promptly obtain a superseding federal indictment and set a January 9 status conference.

After the defense's emergency motion, the government's opposition, and the defense's reply, the government announced that it obtained a federal grand jury indictment on January 6, 2026.

<u>ARGUMENT</u>

Article III mootness turns on whether it is "impossible" for the Court to provide "any effectual relief whatever." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013). It can. Congress prescribed a specific, mandatory remedy when the 18 U.S.C. § 3060 clock expires without a timely preliminary hearing or a valid, operative federal indictment. In those cases, the defendant "*shall be discharged* from custody or from the requirement of bail or any other condition of release." 18 U.S.C. § 3060(d) (emphasis added). That remedy attached here before January 6, 2026, and it remains fully enforceable today. Ordering Mr. Cole's discharge is concrete, prospective relief that changes his custody status.

Nothing in § 3060 allows the government to cure a violation retroactively by indicting *later*. Subsection (e) is a limited safe harbor. When "prior to . . . the preliminary examination" an indictment is returned, a preliminary hearing is unnecessary. 18 U.S.C. § 3060(e). The subsection is not a time machine that nullifies a breach that *already occurred* under subsection (d)—which is what happened here. Reading a post-deadline indictment to erase § 3060(d)'s "shall be discharged" command would render (d) meaningless and invert the statute's structure. "[A]

defendant's remedy for an improperly delayed preliminary examination is discharge from custody or the requirement of bond under 18 U.S.C. § 3060(d)." *United States v. Milano*, 443 F.2d 1022, 1024-25 (10th Cir. 1971); *United States v. Aranda-Hernandez*, 95 F.3d 977, 979 (10th Cir. 1996) (The § 3060(d) remedy "extends only to defendants who *remain in custody* without being properly charged") (emphasis added).

If Mr. Cole were asking this Court to dismiss the new indictment with prejudice due to the government's violation of § 3060(d), he would have a tough case. The statute explicitly allows a case to continue even when a defendant is ordered released. But, by the same token, the statute does not establish a harmless-error regime when it comes to *custody*. As to these options, Congress chose release (rather than dismissal with prejudice) as the consequence, and it used mandatory language. *Cf. United States v. Montalvo-Murillo*, 495 U.S. 711, 717–21 (1990) (declining automatic release where the Bail Reform Act lacked an express release remedy for missed deadlines). Here, by contrast, § 3060(d) expressly requires discharge. Because the Court can still order that relief now, the controversy is not moot.

Section 3060(e) doesn't change any of the above. It removes the need for a preliminary hearing only when, "prior to the date fixed for the preliminary examination," an indictment is returned. That is a forward-looking condition. If the government indicts *in time*, no preliminary hearing is required. It does not authorize continuing illegal custody under § 3060(d) when the statutory deadline passed without a timely preliminary hearing or a valid, operative federal indictment.

Reading § 3060(e) as a retroactive fix would nullify § 3060(d)'s mandatory remedy. Congress paired bright-line timing rules with a clear consequence: if the deadline is missed, the defendant "shall be discharged from custody or from the requirement of bail or any other condition of release." 18 U.S.C. § 3060(d). If the government could always avoid that consequence by obtaining an indictment later, subsection (d) would be surplusage. The structure and text instead assign the government the risk of delay. It can comply in time and invoke (e)'s safe harbor. Or it can miss the deadline, and (d)'s discharge remedy attaches.

Rule 5.1(f) points the same way. It mirrors § 3060(e) by eliminating the preliminary hearing when an indictment exists, but it says nothing about undoing § 3060(d)'s custody remedy once the clock has run like here. The Rules govern whether a hearing is needed going forward, and § 3060(d) governs what happens when the government fails to meet the deadline. *See, e.g.*, *United States v. Vaughn*, 492 F. Supp. 3d 336, 343-44 (D.N.J. 2020). Bottom line: § 3060(e) prevents a violation if satisfied in time; it does not retroactively extinguish § 3060(d)'s mandatory discharge once that violation has occurred. Here, the January 6, 2026 federal indictment was too late to fall under §3060(e).

The remedy is straightforward and far from moot. The Court should order Mr. Cole's immediate discharge under § 3060(d) and make clear that the January 6 indictment may proceed. That relief gives full effect to Congress's chosen sanction for missing the preliminary-hearing deadline while respecting the line of cases making clear that § 3060(d) does not authorize dismissal of charges with prejudice. *See, e.g.*,

*United States v. Rogers*, 455 F.2d 407, 412 (5th Cir. 1972) (remedy is release, not dismissal); *United States v. Smith*, 22 F. App'x 137, 138 (4th Cir. 2001); *United States v. Williams*, 526 F. App'x 29, 35–36 (2d Cir. 2013); *United States v. Lizarraga-Tomayo*, 2005 WL 3303856, at *2 (D. Ariz. Dec. 1, 2005); *United States v. Assenza*, 337 F. Supp. 1057 (M.D. Fla. 1972); *United States v. Battle*, 2020 WL 5531585, at *2 (E.D.N.Y. Sept. 15, 2020). Those cases confirm only that defendants cannot seek dismissal as the remedy in situations like this. They do not hold—and cannot hold consistent with the statute's text—that a late indictment retroactively nullifies § 3060(d)'s mandatory discharge once the deadline has passed. Ordering Mr. Cole's discharge is precisely what should have occurred on December 30 when the deadline expired without an operative federal indictment or a preliminary hearing. *See Rogers*, 455 F.2d at 412 (defendant "should have directed that he be released [when] not promptly given a preliminary hearing" prior to the federal indictment). The subsequent January 6 indictment does not rewrite that history.

When Mr. Cole should have been released on December 30, the government remained free to prosecute under a future indictment (like the one it obtained on January 6, 2026) because Mr. Cole's release would have been "without prejudice . . . to the institution of further criminal proceedings against him upon the charge upon which he was arrested." 18 U.S.C. § 3060(d). But, even in that circumstance, it may not immediately re-detain Mr. Cole absent the showing Congress requires to revisit a release decision.

Had the Court applied § 3060(d) on December 30—as it was required to do given the absence of a valid federal indictment and the Superior Court return's invalidity—Mr. Cole "shall [have been] discharged." That release determination is not a transitory waypoint. It should have been the governing rule for Mr. Cole's release status going forward. Under the law-of-the-case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case," absent a recognized exception. *Arizona v. California*, 460 U.S. 605, 618 (1983). Here, the controlling legal conclusion is that the government's failure to secure a valid federal indictment or present evidence at a preliminary hearing by December 30 triggered § 3060(d)'s mandatory discharge. That ruling would have, and should have, "continued to govern" the parties' positions on custody thereafter.

To be sure, had Mr. Cole been released on December 30 (which he should have), the government could seek to re-detain him. But at that point, the Bail Reform Act would have supplied its only path for doing so. The government, after obtaining the January 6 federal indictment, would need to satisfy 18 U.S.C. § 3142(f)(2)(B) by showing "information . . . not known to the [government] at the time of the [prior] hearing" that has a "material bearing" on flight or danger. A belated indictment on January 6 is not such information and, had things gone that way, would not have satisfied the Bail Reform Act. The January 6 indictment was merely a different vehicle for probable cause—one the government could have obtained before December 30 or established at a preliminary hearing that day. Allowing the government to miss

the § 3060 deadline, procure an indictment later, and then treat that indictment as a "change in circumstances" would nullify the very sanction Congress selected. Law-of-the-case thus dovetails with § 3142(f): once the Court enforces § 3060(d) and orders release, the government cannot re-detain Mr. Cole absent genuinely new, material facts—not the government's own delayed satisfaction of probable cause.

All these issues remain live, and the Court should resolve them.[1] When it does so, it should order Mr. Cole released from custody without prejudice to the case against him under the new indictment proceeding in its normal course.

Respectfully submitted this January 7, 2026.

**/s/ J. ALEX LITTLE**
J. Alex Little (Pro Hac Vice)
Zachary C. Lawson (Pro Hac Vice)
John R. Glover (Pro Hac Vice)

**LITSON PLLC**
54 Music Square East, Suite 300
Nashville, TN 37203
Telephone: 615-985-8205
alex@litson.co

**/s/ MARIO B. WILLIAMS**
Mario B. Williams
Ga. Bar No. 235254 (Pro Hac Vice)

**/s/JOHN SHOREMAN**
John M. Shoreman
DC Bar #407626

---

[1]    Even if the release issue were moot—and it is not—the Court nonetheless will have to determine the validity of the purported "indictment" obtained in the D.C. Superior Court at some point in this litigation. This is true because the January 6 indictment contains at least one charge that has a five-year statute of limitations, and that period expired before the indictment was obtained from the federal grand jury.

**HUMANITY DIGNITY AND RIGHTS LLC**
Life Time Work - Buckhead - at Phipps Plaza
3480 Peachtree Road, NE, Second (2nd) Floor
Atlanta, Georgia 30326
Tel: 470-257-2485
mwilliams@hdrattorneys.com
jms@mcfaddenshoreman.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served a copy of the foregoing pleading upon all attorneys of record via the Court's electronic filing system.

Respectfully submitted on this January 7, 2026,

**/s/ALEX LITTLE**
Alex Little
(Pro Hac Vice)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 26-cr-00001 (AHA) |
| | : | |
| BRIAN J. COLE, JR., | : | |
| | : | |
| Defendant. | : | |

GOVERNMENT'S RESPONSE IN SUPPORT OF
DENYING DEFENDANT'S EMERGENCY MOTION AS MOOT

The government respectfully asks the Court to deny defendant Brian J. Cole, Jr.'s emergency motion for release under 18 U.S.C. § 3060(d), ECF No. 33, as moot. Under the statute's plain terms, and as interpreted by numerous courts, "as a result of being indicted, any claim that the defendant might have had for release pending further criminal proceedings was rendered moot." *United States v. Williams*, 526 F. App'x 29, 35–36 (2d Cir. 2013).

On January 6, 2026, a federal grand jury returned a superseding indictment charging the defendant with violations of 18 U.S.C. §§ 844(d) (interstate transportation of explosives) and 844(i) (malicious attempt to use explosives). For the reasons stated in the government's earlier pleadings, the original indictment returned December 29, 2025, was valid and properly accepted by Magistrate Judge Sharbaugh on January 2, 2026. *See* ECF Nos. 29-1, 37. Moreover, on December 30, 2025, Judge Sharbaugh expressly found under Federal Rule of Criminal Procedure 5.1(d) and 18 U.S.C. § 3060(c) that extraordinary circumstances justified further delay of a preliminary hearing to allow him time to consider and resolve the validity of the original indictment.[1] Those circumstances apply equally to the defendant's emergency motion, which

---

[1] Judge Sharbaugh stated, in relevant part, "I find in this case that there are extraordinary circumstances, specifically, the development that I just discussed with the parties, because, of course, the return of an indictment, under both the Rules of Criminal Procedure and the statute, obviate the need for a preliminary hearing. . . . This is not the government seeking more time

requests review of Judge Sharbaugh's decision that the indictment was valid and his acceptance of it.

This Court need not address the defendant's challenge to the original indictment or Judge Sharbaugh's findings under 5.1(d) and 18 U.S.C. § 3060(c) to deny the defendant's emergency motion. With the return of the superseding indictment, the motion is now moot.

On January 6, 2026, following the return of the superseding indictment, the Court ordered the defendant to show cause why his emergency motion should not be denied as moot. *See* Min. Order (Jan. 6, 2026). In response to that order, the defendant took the position that the remedy of discharge remained available under § 3060(d) even after an indictment had been returned. *See* ECF No. 41 (Def.'s Show Cause Resp.). The defendant cited a string of decisions from federal courts around the country, which he represented "confirm only that defendants cannot seek dismissal as the remedy in situations like this." *Id.* at 6–7. According to the defendant, these authorities "do not hold" that a subsequent indictment moots the remedy of release under § 3060(d). *Id.* at 7. The government disagrees with the defendant's reading of the law on which he relies.

In *United States v. Williams*, for example, the Second Circuit explicitly considered the defendant's claim that he did not waive his right to a Rule 5.1 preliminary hearing and thus was entitled to release under § 3060(d) when such a hearing did not take place within 14 days. 526 F. App'x 29, 35–36 (2d Cir. 2013); *see* Def.'s Show Cause Resp. at 7 (citing *Williams*). The *Williams* court explained:

---

simply so that it can pursue an indictment, it's done so. . . . And so, again, if the Court concludes that that indictment should be accepted, then there would be no basis to move forward with the preliminary hearing. And if the Court concludes that the indictment should not be accepted, then the Court would promptly and expeditiously convene a preliminary hearing, but I think the interests of justice are best served by the Court making a determination on that threshold issue before it convenes a preliminary hearing in this case." Rough Hr'g Tr. (Dec. 30, 2025) at 6–7.

> Even assuming, as Williams claims, that he did not waive his right
> to a preliminary hearing under Federal Rule of Criminal Procedure
> 5.1, ***his claim was mooted by the grand jury's indictment***.
> Pursuant to Rule 5.1(c), a preliminary hearing must be held "within
> a reasonable time, but no later than 14 days after the initial
> appearance if the defendant is in custody." A failure to timely hold
> such a preliminary hearing requires that a defendant be released
> "without prejudice ... to the institution of further criminal
> proceedings against him upon the charge upon which he was
> arrested." *See* 18 U.S.C. § 3060(d). Even if Rule 5.1 was violated,
> further criminal proceedings based on the charge for which he was
> arrested were instituted against him. Moreover, Rule 5.1(a) states
> that a preliminary hearing is not required if "the defendant is
> indicted." ***As a result of being indicted, any claim that Williams***
> ***might have had for release pending further criminal proceedings***
> ***was rendered moot.***

526 F. App'x at 35–36 (emphases added).  Similarly, in *United States v. Smith*, the Fourth

Circuit made clear that "[o]nce the grand jury returned an indictment against Smith, his right to

discharge pursuant to § 3060 ceased."  22 F. App'x 137, 138 (4th Cir. 2001); *see* Def.'s Show

Cause Resp. at 7 (citing *Smith*).  And in *United States v. Aranda-Hernandez*, the Tenth Circuit

explained that the discharge remedy in § 3060(d) "extends only to defendants who remain in

custody ***without being properly charged***."  95 F.3d 977, 979 (10th Cir. 1996) (emphasis added);

*see* Def.'s Show Cause Resp. at 5 (citing *Aranda-Hernandez*).  As one court later put it, "[t]he

Tenth Circuit's reasoning appears to have been adopted by all of the courts which have

subsequently considered the issue."  *United States v. Vaughn*, 492 F.Supp.3d 336, 344–45

(D.N.J. 2020) (citing *Smith* and *Williams*, among others, to deny "requested 18 U.S.C. § 3060(d)

remedy of dismissal and discharge" where indictment returned after improperly granted

extension of preliminary hearing); *see also United States v. Rogers*, 455 F.2d 407, 412 (5th Cir.

1972) (remedy of discharge based on delayed preliminary hearing "went only to [defendant's]

detention prior to indictment. Once indicted, the government was entitled to hold him under the

indictment. . ."); *United States v. Villanueva*, Nos. 07-M-24, 07-CR-149, 2007 WL 1813922,

at *1 (E.D. Wis. June 21, 2007) (where preliminary hearing not timely held, "the defendant's subsequent indictment moots a motion for release under 18 U.S.C. § 3060(d)").

It is unclear to the government why the defendant seeks to cast the foregoing authorities as inapposite to the post-indictment availability of discharge under § 3060(d), given that many of the cases directly address the issue and resolve it in the government's favor. In any event, as the court in *Vaughn* observed, "[t]he case law is virtually unanimous that an indictment, even if belated, cures a defect in the preliminary hearing process." 492 F.Supp.3d at 343. Here, as noted, there was no defect considering the validity of the original indictment and Judge Sharbaugh's December 30 findings. But even if this Court were to assume that the defendant's positions on those matters have merit, it should apply the apparently unanimous view of federal courts who have addressed similar circumstances and deny the emergency motion as moot.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:    */s/ Charles R. Jones*
CHARLES R. JONES (D.C. Bar No. 1035541)
JOCELYN BALLANTINE (CA Bar No. 208267)
Assistant United States Attorneys
National Security Section
601 D Street, NW
Washington, D.C. 20530
Tel: (202) 252-6976
Charles.Jones3@usdoj.gov
Tel: (202) 252-7252
Jocelyn.Ballantine2@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:26-cr-00001 |
| | ) | |
| BRIAN COLE, JR., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPLY IN SUPPORT OF DEFENDANT'S
## RESPONSE TO COURT ORDER TO SHOW CAUSE

Defendant Brian Cole Jr. respectfully submits this reply in support of his memorandum submitted in response to the Court's January 6, 2026, order requiring Defendant to show cause whether his Emergency Motion for Review of Magistrate's Order (Dkt. 33) is moot.

The government says courts across the country share a "unanimous view" of two things: (1) whether an indictment must be dismissed when a preliminary hearing isn't held within the time set by 18 U.S.C. §3060(b)-(c), and (2) whether a defendant is still entitled to a preliminary hearing if the government satisfies 18 U.S.C. § 3060(e). The "unanimous view" on both of those questions is "no." And Mr. Cole takes no issue with this, because he seeks neither of those remedies here.

For Article III standing, the Court asks a single, practical question: Can the Court still afford "any effectual relief whatever" to the party who prevailed on the law. That answer is "yes" here: release. That's what Mr. Cole is entitled to under federal law.

Mr. Cole's emergency motion doesn't ask the Court to opine on some "abstract propositions" or to "declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992). It asks for the Court to "discharge[ Mr. Cole] from custody." 18 U.S.C. § 3060(d). And it asks for that relief because the government violated a federal statute. The Court can and should decide whether the government did just that. If it decides that the government violated the law, Mr. Cole should be released.

The government's opposition stands for one thing only: that Mr. Cole is no longer entitled to a preliminary hearing under Fed. R. Crim. P. 5.1. That's true (and moot). But it's also not what Mr. Cole argued. His emergency motion seeks release because the government failed to follow the law, and it does not get to detain Mr. Cole now because the Magistrate Judge failed to properly release him on December 30.

Each case cited in the government's brief speaks to the need for a preliminary hearing *going forward*, not to the separate, already-triggered custody remedy that Congress prescribed when the deadline is *missed*, like here. Cases like *Williams* and *Smith* tersely conclude that an indictment eliminates the preliminary-hearing entitlement once an indictment is returned. They do not engage § 3060(d)'s text, which commands discharge once the period "fixed . . . in compliance with" §§ 3060(b)–(c) expires. Nor do they grapple with § 3060(e)'s sequencing: the safe harbor applies only if an indictment is returned "prior to the date fixed for the preliminary examination." Reading those decisions to erase an accrued statutory remedy conflicts with the statute's structure and with Article III's effectual-relief standard.

Section 3060(d) does not condition discharge on the defendant remaining unindicted at the moment the court orders relief. But the government's response assumes it does. The statute conditions discharge on what happened *by the deadline*. Once the period lapsed on December 30 without a valid federal indictment or a preliminary hearing, its "shall be discharged" mandate attached. Full stop.

Mr. Cole's injury is ongoing because he remains detained. Ordering his release would remedy that continuing harm. And, to be sure, § 3060(d) itself preserves the prosecution "without prejudice," confirming that Congress anticipated precisely this posture: <u>enforce the custody sanction</u> against the government <u>while allowing the case to proceed</u>. 18 U.S.C. § 3060(d); *see e.g., United States v. Montalvo-Murillo*, 495 U.S. 711, 719 (1990) (holding that the word "shall" in Bail Reform Act's detention hearing timeline requirement is "mandatory" but "does not operate to bar all authority to seek pretrial detention once time limit has passed" and does not remove the government's "later powers to act").

In sum, a late indictment cannot rewrite the fact that Mr. Cole should have had a preliminary hearing on December 30. Section 3060(d)'s "discharge" remedy attached then, and the Court can and should give it effect today. Because the Court can still change Mr. Cole's custody status, this dispute is not moot. The Court should order his immediate release under § 3060(d).

The government's argument to the contrary fails to engage the actual text of the statute or its counterpart in 18 U.S.C. § 3142(f)(2)(B). Had the Court properly discharged Mr. Cole on December 30, 2025, the subsequent January 6 indictment

would not entitle the government to hold Mr. Cole in custody. And the government has cited no statute that would allow it to do so. On the contrary, had Mr. Cole been properly released—as he should have been—the government could only seek detention again under § 3142(f)(2)(B) based on "information . . . not known to the [government] at the time of the [prior] hearing" that has a "material bearing" on flight or danger. An indictment charging the same crimes as a complaint does not meet this standard. But, again, the government engages none of this, relying instead on cases that did not raise the arguments here and sought different relief.

The release issue is hardly moot, and the government has refused to engage Mr. Cole's arguments on the merits. This Court should order his release, as section 3060(d) requires.

Respectfully submitted this January 9, 2026.

**/s/ J. ALEX LITTLE**
J. Alex Little (Pro Hac Vice)
Zachary C. Lawson (Pro Hac Vice)
John R. Glover (Pro Hac Vice)

**LITSON PLLC**
54 Music Square East, Suite 300
Nashville, TN 37203
Telephone: 615-985-8205
alex@litson.co

**/s/ MARIO B. WILLIAMS**
Mario B. Williams
Ga. Bar No. 235254 (Pro Hac Vice)

**/s/JOHN SHOREMAN**
John M. Shoreman
DC Bar #407626

**HUMANITY DIGNITY AND RIGHTS LLC**
Life Time Work - Buckhead - at Phipps Plaza
3480 Peachtree Road, NE, Second (2nd) Floor
Atlanta, Georgia 30326
Tel: 470-257-2485
mwilliams@hdrattorneys.com
jms@mcfaddenshoreman.com

***Counsel for Brian Cole Jr.***


## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served a copy of the foregoing pleading upon all attorneys of record via the Court's electronic filing system.

Respectfully submitted on this January 9, 2026,

**/s/ALEX LITTLE**
Alex Little (Pro Hac Vice)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

     Plaintiff,

**v.**

**BRIAN COLE JR**

     Defendant.

**Case** No: 1:26-cr-00001-AHA

## DEFENDANT'S MOTION FOR REVOCATION OF MAGISTRATE JUDGE'S ORDER DENYING PRETRIAL RELEASE WITH STRICT CONDITIONS [ECF 28]

Defendant Brian Cole, Jr. respectfully moves the Court to vacate the Order to hold him in pretrial detention [ECF 28], entered by the Magistrate Judge on January 2, 2026 (the "Order"), and to order that Cole be released from custody on strict conditions, pursuant to the Bail Reform Act of 1985. 18 U.S.C. § 3145(b). The Bail Reform Act starts with liberty, not jail - detention is an "exception." *United States v. Salerno*, 481 U.S. 739, 750–52 (1987). The ruling of the Magistrate Judge departs from an essential principle of law governing pretrial detention: "In the absence of a concrete, prospective threat to public safety that cannot be mitigated by strict conditions, th[e] Court must apply the default rule

favoring liberty." *United States v. Klein,* 539 F. Supp. 3d 145, 155 (D.D.C. 2021);

see also *United States v. Taylor*, 289 F. Supp. 3d 55, 62 (D.D.C. 2018) (quoting

*United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010), "[t]he default position of

the law, therefore, is that a defendant should be released pending trial").[1]  In

weighing whether pretrial detention is warranted for dangerousness, a court

must consider four statutory factors: (1) "the nature and circumstances of the

offense charged," (2) "the weight of the evidence against the person," (3) "the

history and characteristics of the person," and (4) "the nature and seriousness of

the danger to any person or the community that would be posed by the person's

release." 18 U.S.C. § 3142(g)(1)-(4); *United States v. Munchel*, 991 F.3d 2173, 1279

(D.C. Cir. 2021). Cole is charged with two offenses based on the government's

accusation that he manufactured and transported across state lines two

"explosive devices" and planted them near the headquarters of the Democratic

National Committee and the Republican National Committee in Washington,

D.C. on the evening of January 5, 2021. (Order, at 1).

    In considering whether Cole poses a threat of imminent harm, the

Magistrate Judge was under basic a misconception about Cole's capability to

---

[1] The government concedes that Defendant does not pose a flight risk. (Order, at 6).

make dangerous "explosive devices in short order, over a matter of hours, not necessarily days or weeks." (Order, at 16). Too much weight was given to what was perceived as an ability to rapidly manufacture and deploy a viable explosive device. Facts that weighed heavily in favor of Cole's release, such as the lack of a criminal record, were brushed aside in the face of what the Magistrate Judge considered a sever threat to the community. (Order, at 16-17).

But, as shown herein, no credible evidence exists that Cole ever actually could, or ever actually has, made and deployed a viable explosive device. See Exhibit 1 (Interim Report of explosives expert concluding the devices allegedly planted by Cole were harmless). The government accuses Cole of mixing gunpowder and assembling dangerous, explosive devices shortly before, or on, January 5, 2021. But if Cole was in fact incapable of making a viable device on or before January 5, 2021, when free from any restraint on his ability to do so, it is highly unlikely that he could do so in the future if released under strict conditions of home detention and monitoring. Cole's level of dangerousness is, in fact, negligible, and application of the default rule favoring pretrial release with strict conditions is warranted. See, e.g., *Klein*, at 155.

## STANDARD OF REVIEW

Section 3145(b) provides for *de novo* review of a Magistrate Judge's detention order. See *United States v. Hunt*, 240 F. Supp. 3d 128, 132-133 (D.D.C. 2017) (court emphasized the district court's *de novo* review of the magistrate judge's detention decision); *United States v. Caldwell*, 540 F. Supp. 3d 66, 76 (D.D.C. 2021)(Bail Reform Act permits pretrial detention only in carefully defined circumstances and that the district court may consider evidence and reasons beyond those relied upon by the magistrate judge).

## ARGUMENT

The following is a list of facts concerning Cole that the government did not, and could not, contest at the Magistrate Judge's detention hearing:

1.  Cole is an African American adult who has been diagnosed with Autism Spectrum Disorder, Level 1, and obsessive compulsive disorder ("OCD");

2.  Cole has no criminal history;

3.  Cole has had no issue in complying with court orders;

4.  Cole is a high school graduate, who has been employed continuously since age 14;

5.  Cole has lived in the same community since childhood, without incident;

6.  Cole's neighbours and others who have dealt with him over many years vouch for his character;

7.  Cole has a reliable job waiting for him upon pretrial release;

8.  Cole has a vetted custodian upon release;

9.  Cole submits to house arrest;

10. Cole submits to an ankle monitor and weekly reporting;

11. Cole submits to unannounced visits by pre-trial services;

12. No one was actually harmed as a result of the conduct for which Cole has been charged;

13. No property was damaged as a result of the conduct for which Cole has been charged;

14. Cole has no pattern of criminal conduct prior to or after the charged conduct.

These facts favor pretrial release with strict conditions as they are more than sufficient to rebut the presumption of pretrial detention under 18 U.S.C. § 3142(e)(3)(C). See *Klein,* 539 F. Supp. 3d 145; see also *Hunt*, 240 F. Supp. 3d 128; and *United States v. Munchel*, 991 F.3d 1273, 1289 (D.C. Cir. 2021) (Katsas, J., concurring). The Magistrate Judge acknowledged that the statutory presumption

was rebutted, but ruled, nevertheless, that no conditions of release exist that can reasonably assure the safety of the community. (Order, at 1).

The rebuttable presumption is only one of many factors a court must consider in assessing a defendant's liberty interest. See *Hunt*, 240 F. Supp. 3d at 131. In the case of Cole, clear and compelling evidence—no criminal history, strong family, ties to the community, and a willingness to abide by a set of strict conditions, *inter alia*—demonstrated he is not a danger to his community. The government always bears the burden of persuasion. *Id*. This means that, in the context of bail proceedings, the government must produce sufficient facts upon which "[t]he judicial officer relies to support a finding . . . that no condition or combination of conditions will reasonably assure the safety of any other person and the community." *Id*. This finding by the judicial officer "[must] be supported by clear and convincing evidence" produced by the government. *Klein*, 539 F. Supp. 3d at 151.

## I.    Factor 1: Nature and Circumstances of the Charged Offenses.

There is no doubt that Cole is charged with serious offenses. But in weighing the nature and circumstances of the offences, the Magistrate Judge's focus was on the possible consequences if the devices had exploded in the vicinity

of the U.S. Capitol.[2] (Order, at 10-11). As proffered by Cole at the detention

hearing, what the Magistrate Judge referred to as "IEDs" were not, in fact, viable

explosive devices. (Order, at 10). The Magistrate Judge ignored that proffer and

quoted the government in stating, "it was luck, not lack of effort that caused the

devices not to detonate." (Order, at 10). And, quoting *Klein*, Cole's failure to cause

damage was "more a product of fortune than fate." 539 F. Supp. 3d at 153.

    But it was neither luck nor fortune. The devices did not explode due to the

immutable laws of chemistry. The Interim Report of Brennan Phillips, an

explosives expert with over 30 years of government experience, concludes the

devices allegedly planted by Cole were not viable explosive devices, as asserted in

the government's proffer at the detention hearing. (Exhibit 1).  The Interim Report

accepts the government's representations of how the so-called "gunpowder" was

mixed. For purposes of the Interim Report, the expert relied only on the FBI lab

report and chemical analyses produced by the government in this case. (Exhibit 1).

Mr. Brennan concludes: ". . . it is my opinion that neither device is a bomb capable

of causing an explosion" (Exhibit 1).

    In ruling that the nature and circumstances of the charged offenses weighed

in favor of detention, the Magistrate Judge was heavily influenced by the potential

---

[2] Cole is, of course, entitled to a presumption of innocence as to all charges.

for death, injury and destruction posed by the devices, which the government

alleges were planted by Cole. (Order, 10-11). In fact, there was no possibility of

death, injury or destruction as the devices were harmless. (See, Exhibit 1).

Accordingly, this factor does not weigh against release on strict conditions as the

safety of the public can be reasonably assured by home detention and active

monitoring.

## II.    Factor 2: Weight of the Evidence.

The Magistrate Judge found that physical evidence and statements attributed

to Cole by the government in a post-arrest interview favored detention. (Order, at

11).  However, the weight of evidence alone does not mean that no conditions of

release can reasonably assure the safety of the community. Rather, the weight of

the evidence must be balanced with evidence of dangerousness. The Bail Reform

Act "does not purport to – nor could it, consistent with due process – authorize

pretrial detention based simply on a preliminary assessment of the defendant's

guilt . . . overwhelming evidence of guilt would not, alone, establish that no

conditions of release would reasonably assure the safety of the community." *U.S.*

*v. Taylor*, 289 F. Supp. 3d at 66. The Magistrate Judge considered the weight of

the evidence factor in a vacuum without consideration of how it relates to an

assessment of dangerousness. (Order, at 11-12). It was therefore error, and a slight

to due process, to rule the weight of evidence factor favored detention without balancing it with evidence of dangerousness. *Taylor*, at 66.

## III.    Factor 3: Individual History and Characteristics.

That Cole poses no threat of harm that a set of strict conditions could not mitigate is even more evident when his history and characteristics are assessed. In *Klein*, the court reasoned that, when reviewing the history and characteristics of a defendant, the following factors must be considered:

1. The available information concerning the defendant's character, as well as his physical and mental condition. *Id*. at 154;

2. Family ties. *Id.*;

3. Employment. *Id.*;

4. Financial resources. *Id.*;

5. Length of residence in the community and community ties. *Id.*;

6. Past conduct, including history relating to drug or alcohol abuse, criminal history, and records concerning appearance at court proceedings. *Id.*; and,

7. Whether, at the time of the offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under federal, state, or local law. *Hunt*, 240 F. Supp. 3d at 134.

Cole is a high school graduate who has maintained employment with his family-run business since age 14. Cole has strong family ties in the community, having been raised in Woodbridge, Virginia, and having lived in that community with his parents for the past 21 years. Cole's close ties to his community are shown by the strong character references provided by neighbors and others who have interacted with him over the years. (Exhibit 2).

Cole can continue being a productive citizen on pretrial release. He has his job waiting for him. Cole's work for his family's bail bonding business is steady and meaningful. In that work, which he can perform from home detention, Cole supports bonded individuals in complying with court-imposed obligations. Cole understands court processes and the obligation to comply with conditions of release. Importantly, Cole's continued employment will provide immediate structure, accountability and routine. Cole has no history of drug or alcohol abuse.

Cole has no criminal history; has no history of failing to appear, and was not on probation, parole, or any other form of supervision at the time of the alleged incident. These are classic predictors of reliability and compliance that weigh strongly in favor of pretrial release. None of these facts are in dispute. As the Magistrate Judge stated, "[t]hese facts . . . typically point against the need for pretrial detention and instead suggest that conditions of release could reasonably

mitigate any prospective danger . . ." (Order, at 12). Nevertheless, in the Magistrate

Judge's analysis, even though Cole's history and characteristics favored release,

the government's accusations concerning Cole's activities in the years following

January 5, 2021, weighed more heavily in favor of detention. The alleged post-

incident activities were considered under the fourth factor. (Order, at 13).

## IV.    Factor 4: Nature and Seriousness of the Danger Posed by Release.

It is established that "to order a defendant preventively detained, a court

must identify an articulable threat posed by the defendant to an individual or the

community." (Order, at 13, quoting *Munchel*, 991 F.3d at 1283).  The inquiry is

supposed to focus on the risk of future danger. *Munchel*, at 1283; see also at 1285

(Katsos, J. concurring)(describing the analysis as a forward-looking assessment).

In evaluating a pattern of unlawful or potentially dangerous conduct to

assess the likelihood of future conduct, this Court considers whether "the specific

circumstances that made it possible for that violence to arise are likely to manifest

themselves again…." *Klein,* 539 Supp. 3d at 155. That analysis requires the court

"to consider whether the risk that a defendant poses can be mitigated by

supervisory conditions, such as home detention or the presence of a third-party

custodian." *Id*.

In Cole's case, the circumstances giving rise to the charged offenses are highly unlikely to manifest themselves again. And even if they were, conditions can neutralize any residual risk. Among the hundreds of thousands of documents in its possession, the government has produced not a scintilla of evidence that Cole —prior to or after January 5, 2021— ever engaged in any activity similar to that for which he now stands accused. In fact, the government has not identified any present-day factors—access to weapons, ongoing procurement, extremist postings, organizing conduct, or similar—that would make future dangerous conduct likely. Nor can it, because none exist. Whatever risk the government posits is theoretical and backward-looking, belied by the past four years where Cole lived peaceably with his family.

Under the facts of this case, strict conditions exist that can address any perceived risk that Cole might engage in the accused conduct while on pretrial release. (*Klein*, 539 F. Supp. 3d at 151–56). It is now apparent that Cole lacks the technical skills to make viable explosive devices such as those described in the criminal complaint. Strict monitoring conditions would curtail any risk that Cole might engage in any similar activity on pretrial release. The Magistrate Judge's observation that a problem in fashioning conditions of pretrial release was the possible recurrence of what the government characterized as Cole's "abrupt and

impulsive conduct" was misplaced. There is no evidence at all that Cole has

"snapped" or engaged in any abrupt or precipitousness behavior in the past four

years. There is nothing to suggest Cole has been "on the edge" psychologically

over the last four years, and the government proffered no clear and convincing

evidence of abrupt or excitable behavior during that period. Certainly, in a proper,

forward-looking analysis, any concern of this nature can be mitigated by strict

conditions of release. See, e.g., *Munchel*, 991 F.3d at 1280.

The allegation relied on by the Magistrate Judge that Cole tried to make

"blackpowder" sometime after January 5, 2021, is entirely unsupported and false.

(Order, at 14-15). The government's proffer actually referred to a failed chemistry

experiment by Cole to create potassium chlorate, not black powder. The

experiment occurred more than a year before January 5, 2021. No evidence exists

that Cole was attempting to create potassium chlorate for purposes of an explosive

device. The experiment failed and was never repeated.  And, again, absolutely no

evidence was proffered by the government that Cole purchased the ingredients

needed to produce black powder following January 5, 2021, or that he possessed

any such ingredients at the time of his arrest.

The Magistrate Judge also accepted the government's proffer that "many of

the same parts used in explosive devices" were found in his home and vehicle and

appeared to have been purchased prior to January 5, 2021. (Order, 15). Similar

parts appear to have been purchased through August 13, 2022. The latter date is

more than three years before Cole's arrest of Cole on December 5, 2025. The

government made no proffer, nor could it, concerning Cole's purchase of explosive

powders, or ingredients to prepare explosive powders at any time after January 5,

2021. There is no evidence whatsoever that Cole attempted to assemble an

explosive device at any time after January 5, 2021. The government seized all the

materials found in Cole's home and vehicle, so the question is whether strict

conditions can be imposed that can reasonably assure the Court that Cole will not

purchase similar materials during pretrial detention. No conditions of release

reasonably assured the Magistrate Judge because of what the government alleged

were Cole's acts of evasion and obfuscation in the years prior to his arrest. (Order,

at 17).

There is no evidence that the government's failure to make an arrest in this

case for four years was due to an effort by Cole to hide evidence. (Order, at 17).

Indeed, the Magistrate Judge recognized repeated "wipes" of Cole's phone

(beginning more than a year after January 5, 2021) were possibly related to OCD

symptoms. *Id*. And, since they did not occur immediately following the alleged

incident that is entirely logical. The government made no proffer that Cole was

engaged in any online activity that could raise concerns over conspiracy or nefarious influences. In fact, the government concedes it has no evidence whatsoever that Cole ever posted to platforms usually associated with radical political viewpoints. The government admits there is not a single text message or internet posting by Cole that implies any level of dangerousness, extremism or agitated mental state. And, although the government claims that Cole erased content from his phone, it utterly failed to show that Cole had any knowledge or reason to believe he was under investigation from 2021 until his arrest. As the Magistrate Judge first suggested, the repeated wiping of his phone was a manifestation of Cole's OCD, not an attempt to avoid detection. The Magistrate Judge's finding that Cole might hide illegal activity from his custodian, based on this history of "evasion," is mere speculation and lacks any basis in clear and convincing evidence presented by the government. (Order, at 17).

## V.    The Detention Order Must be Vacated in the Interests of Justice.

It is submitted that Cole can safely be released from pretrial detention on the following conditions: (1) home arrest, (2) an ankle monitor, (3) an approved custodian, his grandmother, by Pretrial Services; (4) submit to Pretrial Services oversight with in-person reporting as directed, and unannounced inspections by pre-trial  services to verify compliance; (5) abide by a no-weapons order; and (6)

maintain verified employment and comply with any substance use or mental health evaluation and treatment conditions that Pretrial Services recommends. The government cannot meet its burden of showing, by clear and convincing evidence, that those six conditions do not provide a reasonable assurance of safety to the community. Pretrial detention requires that a defendant's history, characteristics and alleged criminal conduct "make clear that he or she poses a concrete, prospective threat to public safety." *Munchel*, at 1280.

Since the record strongly suggests that Cole does not present a safety risk if subjected to strict conditions of release, the Magistrate Judge's failure to order pretrial release is reversible error. *Munchel*, 991 F.3d at 1289 (Katsas, J., concurring) (stating "[b]ecause the record strongly suggests that [defendants] would present no safety risk if subjected to strict release conditions, the district court clearly erred in finding that the government had proved its case by clear and convincing evidence."); *Klein*, 539 F. Supp. 3d at 155–56 (stating "[d]espite the serious concerns raised by [defendant's] conduct on and prior to January 6," the appointment of a third-party custodian, home detention; GPS monitoring, appropriate social media restrictions; and a ban on access to any firearm or other weapon would sufficiently "provide sufficient assurances of community safety"). "In the absence of a concrete, prospective threat to public safety that cannot be

mitigated by strict conditions, th[e] Court must apply the default rule favoring

liberty". *Id.* Accordingly, the Court should order the release of Cole under a set of

strict conditions, to include those discussed above. *Id.*

CONCLUSION

Based on the above, Brian  Cole, Jr. requests pretrial release under a strict

set of conditions as set forth above.

Respectfully submitted this January 16, 2026.

/s/ MARIO B. WILLIAMS                    /s/JOHN SHOREMAN
Mario B. Williams                        John M. Shoreman
Ga. Bar No. 235254                       (DC Bar #407626)
**(**Pro Hac Vice)


**HUMANITY DIGNITY AND RIGHTS LLC**
Life Time Work - Buckhead - at Phipps Plaza
3480 Peachtree Road, NE, Second (2nd) Floor
Atlanta, Georgia 30326
Tel.: 470-257-2485
Email: mwilliams@hdrattorneys.com, jms@mcfaddenshoreman.com
***Counsel for Brian Cole Jr***

*/s/ J. ALEX LITTLE*
J. Alex Little
(*pro hac vice*)
Zachary C. Lawson
(*pro hac vice*)
John R. Glover
(*pro hac vice*)

**LITSON PLLC**
54 Music Square East, Suite 300
Nashville, TN 37203
Telephone: 615-985-8205
alex@litson.co
zack@litson.co
jr@litson.co
**Counsel for Brian Cole Jr.**

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served a copy of the DEFENDANT'S

MOTION FOR REVOCATION OF MAGISTRATE JUDGE'S ORDER DENYING

PRETRIAL RELEASE WITH STRICT CONDITIONS upon the all attorneys of

record via the Court's CM/ECF electronic filing system.

Respectfully submitted on this January 16, 2026,

**/s/JOHN SHOREMAN**
John M. Shoreman
(DC Bar #407626)

Statement of Brennan Phillips, M.S.F.S.

**Interim Report, US v. Brian Cole, Jr., January 5, 2026**

## Qualifications and Experience

I have over 30 years of combined experience in Military Explosive Ordnance Disposal (EOD) and Public Safety Bomb Disposal, including 20 years as a Senior Explosives Enforcement Officer with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). My duties included the rendering safe and disassembly of bombs and other destructive devices, the forensic examination of explosive and incendiary devices, and providing device determinations and expert testimony in support of those determinations in judicial proceedings. Additionally, I was responsible for conducting post-blast investigations, explosive product testing and evaluation, disposal of deteriorated and unwanted explosives, and providing training on explosive-related issues to military and public safety agencies. I am a graduate of the U.S. Naval School Explosive Ordnance Disposal (EOD), the Federal Bureau of Investigation's Hazardous Devices School, and the Irish Defense Force Improvised Explosive Device Disposal Course. I retired from service in the US Army as a Master Explosives Ordnance Disposal Officer, in the rank of Lieutenant Colonel. I hold a master's degree in forensic science, explosives investigations, from Oklahoma State University Center for Health Sciences, School of Forensic Sciences.

## Items Reviewed for Evaluation

- FBI Laboratory Report No. 2021-00019-2, dated January 12, 2021.

- FBI Laboratory Report No. 2021-00019-1, dated January 13, 2021.

- FBI Laboratory Report No. 2021-00019-16, dated January 16, 2021.

- FBI Laboratory Metallurgy Photography Log - 2021-00019.

- Photos of Sample Vials labeled: MAC002, MAC003 & MAC004.

- Government's Memorandum in Support of Pretrial Detention, filed December 28, 2025.

## Items Unavailable for Evaluation

- Complete set of photos and notes detailing evidence collected from the disrupted devices.

- Detailed description of flame tests to include photos and video.

- Physical evidence from the two devices in question.

- The Government's theory of how the two devices could have caused an explosion.

1

Case 1:26-cr-00001-AHA    Document 48-1    Filed 01/16/26    Page 2 of 32
USCA Case #26-3009    Statement of Brennan Phillips, M.S.F.S.    Filed: 02/25/2026    Page 177 of 350
Document #2161061

**Interim Report, US v. Brian Cole, Jr., January 5, 2026**

**Summary of Findings:**

Based on my review of the materials provided, the two suspected pipe bombs in question do not
contain an explosive filler capable of causing an explosion. According to the reviewed FBI
Laboratory reports, the two pipes contained the chemicals potassium nitrate (an oxidizer),
charcoal (a fuel), and sulfur (a tinder/fuel). These chemicals are the three classic ingredients
used to make Black Powder, the oldest explosive and propellant known. However, their mere
presence does not make Black Powder. These chemicals need to be apportioned into a workable
fuel-to-oxidizer ratio: 75% potassium nitrate (also known as saltpeter), 15% charcoal, and 10%
sulfur is the most widely cited Black Powder ratio. The three chemicals must then be sufficiently
incorporated into a homogeneous mixture capable of sustaining a deflagration (type of
explosion) (Conkling, 2010). According to the Government's detention memorandum, the
chemicals placed in the two pipes were mixed in a Pyrex bowl. The photos of the lab samples
taken from the powders recovered from the two pipes show mostly large white particles with
some flecks of dark material, which is not visually consistent with Black Powder but is
consistent with inadequate mixing in a bowl.

The first FBI Forensic Chemistry Report, dated Jan 12, 2021, indicated negative flame test
results of powder samples taken from the two disrupted pipes. Specifically, item 2, powder
sample from device #1 (the DNC Device), and items 9 & 10-1, powder samples from device #2
(the RNC Device). An additional FBI Forensic Chemistry Report, dated Jan 16, 2021, was
issued, which examined some powder associated with the steel wool sample (item 10-3) taken
from device #2 (the RNC device), which did produce a flame test "with positive results." While
no details are given of this positive result, it seems unlikely that this small amount of flame-
reactive powder would be capable of causing the bulk of the insufficiently mixed powder to react
or burst the steel pipe by itself.

Beyond the lack of a viable explosive filler for the two pipes, neither device has a functional
fuzing and firing system capable of igniting a flame-sensitive explosive filler. Based on my
experience and testing, a single 9-volt battery attached to a 1.5-inch square of steel wool will not
generate enough heat to ignite Black Powder.

In the absence of information from the Government detailing a workable theory for how these
devices could have been made to cause an explosion, it is my opinion that neither device is a
bomb capable of causing an explosion.

2

Statement of Brennan Phillips, M.S.F.S.

### Interim Report, US v. Brian Cole, Jr., January 5, 2026

**Black Powder:** As implied by the name, it is black in color, owing to the charcoal it is made from. Quality black powder, whether commercial or made by a knowledgeable hobbyist in a home setting, is granular and resembles tiny lumps of coal (Thurman, 2010). This granular black powder, made from 75% potassium nitrate, 15% charcoal, and 10% sulfur, is the result of a multi-step process that involves grinding, milling, pressing, and corning to achieve a high-quality product. The quality of Black Powder can vary widely, particularly when homemade, and powder capable of sustaining a deflagration cannot be created by lightly mixing the three precursor chemicals (Conkling, 2010). Ultimately, Black Powder requires intimate incorporation to achieve meaningful explosive potential.

A description of the "modern" commercial manufacturing of Black Powder includes mixing or blending the dampened powdered materials at approximately 130 degrees. The wetted substance is then incorporated using mill wheels weighing eight tons or more. The resulting caked material is broken into small pieces and pressed in a hydraulic press. From there, the material undergoes a corning (granulating) process, followed by glazing. The resulting granules are screened and graded by size (Tenny L. Davis, 1943).

It is possible to make quality homemade Black Powder, and there is much online information available from hobbyists interested in pyrotechnics and antique firearms. Just like commercial-made powder, incorporation is key. In the home environment, this is typically achieved by first purchasing or creating finely ground precursor chemicals. For example, a hobbyist might use a coffee grinder to grind lump charcoal into a fine powder. Once the finely ground powders of potassium nitrate, charcoal, and sulfur are acquired, they need to be combined into a homogeneous mixture. A common starting point is to mix the materials using progressively finer mesh screens. The resulting early-stage powder is sometimes called green mix and ranges from non-reactive to marginally reactive. Future incorporation is needed to make Black Powder viable. This can be done by wetting the chemicals, mixing, and drying. This wet process is sometimes called the CIA method in online forums. Many hobbyists use a rock tumbler or ball mill to incorporate the chemicals by milling for many hours, even days. The resulting powders are typically low-strength and require pressing to achieve the performance required for Black Powder firearms, or bomb making. In the home hobby environment, this is often done using a hydraulic press, the type available at local hardware stores. From there, the resulting pellets are broken into small chunks and perhaps run through a home corning process using a grinder.

3

Typically, the home hobbyist goes through a lengthy process of trial and error before learning to produce reliable Black Powder.

**Pipe Bombs as Explosive Weapons:** They are some of the most common improvised explosive devices encountered by bomb disposal personnel in the United States. Pipe bombs are generally made from steel pipe or plastic (PVC) plumbing pipes and their corresponding fittings. A pipe-bomb-type device made from a metal pipe is relatively simple to make and can be easily fashioned from a length of threaded galvanized water or gas pipe and two threaded end caps. Typically, these devices are filled with low-explosive powders that are easy to obtain and sensitive to flame initiation.

As stated in the FBI Laboratory report (2021-00019-1), low explosives deflagrating in a sealed pipe create gas pressure that overpressures the pipe walls and causes the pipe to explode. For a pipe bomb to be effective as a weapon, the explosive filler needs to be powerful enough to overcome the strength of the pipe, break the pipe into fragments, and project those fragments of the torn-apart pipe body with sufficient force to do damage.

Today, the most common fillers in the U.S. are smokeless powders, black powder substitutes (such as Pyrodex), flash powders, and pyrotechnic powders harvested from fireworks. Black Powder has become less common because it is less available in the marketplace and can be expensive. Even less common is homemade Black Powder because it is time-consuming to make and only marginally effective. In contrast, homemade chlorate and perchlorate explosives mixtures are far more commonly encountered by bomb squad personnel. In fact, even when commercially produced, Black Powder does not perform well in metal pipe bombs. This is because of the relative strength of metal plumbing pipes. When explosives of lower strength, like Black Powder, are used, the end caps tend to fail first due to the relatively slow buildup of pressure and vent the pipe bomb, ultimately producing minimal fragmentation. This is noted in the Characterizing the Performance of Pipe Bombs study, University of Rhode Island, 2017 (Jimmie C. Oxley, et al., 2017). It should be noted that the face of an end cap fitting driven by Black Powder has the potential to cause serious injury to a person or damage to objects in its path.

**Pipe Bomb Initiation:** It is common for pipe bombs filled with flame-sensitive low-explosive powders to be fused with some type of burning or heat-producing means of initiation, such as a

4

### Interim Report, US v. Brian Cole, Jr., January 5, 2026

length of burning pyrotechnic cannon fuse. An improvised bridge wire made from steel wool is a common arrangement in electrically initiated devices; however, reliability can be an issue if not properly constructed. In my experience, having made numerous such improvised initiation systems for training and demonstration purposes, a single 9-volt battery wired to too much steel wool will not work. A much smaller section of steel wool is needed to make a bridge wire for a reliable initiator capable of glowing red hot and lighting Black Powder.

**Some Basic Concepts and Definitions:**

Black Powder: A deflagrating intimate physical mixture of sulfur, charcoal, and an alkali nitrate, usually potassium, but sometimes sodium nitrate (Committee on Smokeless and Black Powder, Board on Chemical Sciences and Technology, 1998).

Smokeless Powder: A granular, free-flowing, solid propellant of various morphologies, using nitrocellulose as an active ingredient. It is classified as single-base (with nitrocellulose as the only active ingredient), double-base (with nitrocellulose and nitroglycerin), or triple-base (with nitrocellulose, nitroglycerin, and nitroguanidine). Smokeless powder is commonly used in small-arms ammunition (Committee on Smokeless and Black Powder, Board on Chemical Sciences and Technology, 1998).

IED (improvised explosive device): IED is a commonly used term in the bomb disposal community and in the Military; however, it is not well-defined and can be misleading depending on the context. The terms used in Federal Law and Regulations are destructive device, explosive bomb, and explosive device.

Explosives vs an Explosive Weapon: While all explosive weapons (such as bombs, grenades, missiles, mines, etc.) contain explosives, many explosives have legitimate purposes and are not designed or used as weapons.

Detonation: The description of detonation found in The Chemistry of Explosives, reads "Explosive substances which, on initiation, decompose via the passage of a shockwave rather than a thermal mechanism are called detonation explosives (Akhavan, 2011)."

5

**Statement of Brennan Phillips, M.S.F.S.**

**Interim Report, US v. Brian Cole, Jr., January 5, 2026**

Deflagration: Importantly, Black Powder is a deflagrating explosive, not a detonating explosive. Introduction to the Technology of Explosives describes deflagration as a "burning, or deflagration, the oxidation takes place relatively slowly. The burn front propagates through the burning material at less than the velocity of sound" (Cooper & Kurowski, 1996)."

Low-Explosives and High-Explosives: Low-explosives are explosives that function by deflagration, in contrast to high-explosives, which function by shockwave-driven detonation process (Committee on Smokeless and Black Powder, Board on Chemical Sciences and Technology, 1998).

_Brennan Phillips_          5 Jan 26

Brennan Phillips, M.S.F.S          Dated

# References

Akhavan, D. J. (2011). *The Chemistry of Explosives*. Cambridge : RCS Publishing .

Committee on Smokeless and Black Powder, Board on Chemical Sciences and Technology. (1998). *Black and Smokeless Powders: Technologies for Finding Bombs and the Bomb Makers (1998)*. Washington, D.C.: NATIONAL ACADEMY PRESS. Retrieved from the National Academies of science, engineering, and medicine.: https://www.nationalacademies.org/read/6289/chapter/15

Conkling, J. A. (2010). *Chemistry of Pyrotechnics: basic principles and theory.* Boca Raton: CRC Press.

Cooper, & Kurowski. (1996). *Introduction to the Technology of Explosives.* New York: Wiley - VCH.

Jimmie C. Oxley, P., James L. Smith, P., Evan T. Bernier, P., Fredrick Sandstrom, M., Gregory G. Weiss, M., Gunther W. Recht, B., & David Schatzer, B. (2017). Characterizing the Performance of Pipe Bombs. *Journal of Forensic Sciences*.

Tenny L. Davis, P. D. (1943). *The Chemistry of Powder and Explosives.* Las Vegas: Angriff Press.

Thurman, J. T. (2010). *Practical Bomb Scene Investigation.* Boca Raton: CRS Press .

6

7-1 LIMS (Rev. 10-2-17)

UNCLASSIFIED



# FBI Laboratory

2501 Investigation Parkway
Quantico, Virginia 22135

4940 Fowler Road
Huntsville, Alabama 35898

## LABORATORY REPORT

To:  Washington Field Office

Date: January 13, 2021

Case ID No.: WF-3366725

Lab No.: 2021-00019-1

Communication(s): January 7, 2021

Agency Reference(s):

Subject(s):

Victim(s):

Discipline(s):    Explosives Device

FBI Laboratory Evidence Designator(s):

| | |
|---|---|
| Item 1 | Battery, wires, electronic components (1B1) |
| Item 1-1 | White colored powder (1B1) |
| Item 1-2 | Swab of Item 1 (1B1) |
| Item 1-3 | Steel wool, debris, plastic from Item 1 (1B1) |
| Item 2 | Powder sample (1B5) |
| Item 3 | Metal pipe (1B3) |
| Item 3-1 | Swab of Item 3 |
| Item 4 | Metal end cap (1B4) |
| Item 5 | Fabric (1B2) |
| Item 6 | Blank control swab (1B8) |
| Item 7 | Control swab of collector (1B6) |
| Item 8 | Swab of north curb at Ivy and Canal Street SE (1B7) |
| Item 9 | Powder sample (1B12) |
| Item 10 | Metal pipe, two metal end caps, wires, plastic, metal clips (1B15) |
| Item 10-1 | Powder from pipe (1B15) |
| Item 10-2 | Swab of Item 10 |

Page 1 of 22

- Lab Report-Released-(96296).pdf

Item 10-3      Steel wool and powder from Item 10 (1B15)

Item 11        Pieces of electronic components (1B14)

Item 11-1      Swab of Item 11

Item 11-2      Wires, plastic and debris (1B14)

Item 12        Pieces of plastic and metal (1B13)

Item 12-1      Pieces of fuzing system (1B13)

**This report contains the results of the Explosives and Hazardous Device Examinations performed in the Explosives Unit.**

**ADMINISTRATIVE:**



**Figure 1, Device 1, located near the DNC 400 Canal St, SE Washington, D.C**



**Figure 2, Device 2 located near the RNC 300 Block of 1st, SE Washington, D.C.**

According to your incoming communication, on 01/06/21, two (2) pipe bombs, (Figures 1 and 2) were discovered in Washington D.C. by an Unknown Subject (UNSUB). One pipe bomb was discovered at the 400 Block of Canal Street Southeast Washington D.C. A second pipe bomb was discovered at the 300 Block of 1st Street Southeast Washington D.C. near the U.S. Capitol building. MPDC Bomb Squad and FBI Special Agent Bomb Technicians (SABTs) responded to the scene.

Page 2 of 22

2021-00019-1

Your office further advised that the bomb squad performed a render safe procedure (RSP) on the suspected IEDs. An RSP is a disassembly procedure that utilizes tools to remotely separate suspected live devices thereby making it safe to approach and collect the evidence. The items were collected and submitted to the FBI.

This report will be broken down into three (3) Sections. Section 1 will cover the conclusion, Section 2 will cover an overview of the functioning of the pipe bombs and the results of the examinations for each device, and Section 3 will cover similarities between the two devices.

## SECTION 1

## CONCLUSION:

Present in the submitted specimens, Device 1 (Figure 1) consisting of Item 1, Item 1-3, Item 2, Item 3, Item 4, and Device 2 (Figure 2) consisting of Item 9, Item 10, Item 10-1, Item 10-3, Item 11, Item 11-2 and Item 12-1 are the dissembled remains of two (2) Improvised Explosive Devices (IED's), also known as homemade bombs. The general components of an IED are a main explosive charge, a fuzing system and a container.

Device 1 contained the chemical oxidizer and fuels that when mixed in the proper proportions can form the low explosive black powder. Device 2 contained the low explosive black powder. For detailed information of the chemical analyses conducted on the powders, see the FBI Laboratory Reports of Jason V. Miller dated January 12, 2021, Report number 2021-00019-2 and dated January 16, 2021, Report number 2021-00019-16. (JVM)

The powders from both devices were contained within a metal pipe and utilized an electric fuzing system. When made properly and ignited by a suitable source of heat, low explosives are designed to deflagrate and generate gases. Within a confinement container, such as a pipe, these gases create large amounts of pressure on the container walls and cause an explosion of the container. This explosion would result in fragments of the container being propelled outwards at high velocities into the surrounding environment.

When properly assembled and initiated an IED of this sort can cause property damage, bodily injury, or death. A detailed description of the components that comprised these IEDs is provided hereafter.

## DESTRUCTIVE DEVICE:

It is also the opinion of this Explosives and Hazardous Devices Examiner that the submitted items consisted of two (2) disrupted Destructive Devices. The use of a hard metal container (metal pipe nipples and end caps) shows that weapon characteristics are present.

Page 3 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf

## SECTION 2

## RESULTS OF EXAMINATIONS:

**Overview:**

Both IED's were constructed using similar components. A logical construction technique to produce an IED similar to those submitted is described below and shown in Figure 3:

- Obtain one (1) pipe nipple and two (2) end caps (main charge container), a low explosive (main charge), wires, clock, battery, and steel wool.
- Screw one end cap to one end of the pipe nipple.
- From the other end, fill the pipe with low explosive materials.
- Drill a priming hole in one of the end caps. (A priming hole is used in an IED utilizing pipe nipple and end caps to allow a fuse to be inserted to initiate an energetic material such as low explosives).
- Attach two wires to steel wool.  Run the wires through the priming hole and insert the steel wool into the end cap.
- Screw the second end cap onto the pipe nipple ensuring the steel wool is in contact with the main charge material.
- Modify the timer using metal contacts to produce a switch that closes when the timer counts down.
- To deploy the IED one would set the timer, opening the switch, then connect the battery and the leads from the steel wool into a circuit that functions when the timer switch closes.
- As current passes through the steel wool, the steel wool would heat up and burn with enough heat to ignited low explosive materials.
- The gases generated from the deflagrating low explosives would put pressure on the container walls and cause an explosion of the container.
- The explosion of the container would result in fragments of pipe and end caps being propelled outwards into the surrounding environment, which could cause property damage, personal injury and death.

Page 4 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf

UNCLASSIFIED



**Figure 3 Logical construction diagram.**

## DEVICE 1

### Explosive Main Charge (Device 1):

Powder from Device 1, Item 2 contained the oxidizer potassium nitrate, the fuel sulfur, and a fuel consistent with charcoal. The powder was tested for thermal susceptibility (flame test) with negative results. In the proper proportions, these chemicals can form the low explosive black powder.

For detailed information of the chemicals analyses conducted on the powder, see the FBI Laboratory Report of Jason V. Miller dated January 12, 2021, Report number 2021-00019-2. (JVM)

When properly ignited by a suitable source of heat, low explosives are designed to deflagrate and generate gases. When properly confined in a container such as a can, bottle, or pipe, the gases generate pressure on the container walls and cause an explosion of the container.

Page 5 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf

**Main Charge Container (Device 1):**



**Figure 4 Item 3 pipe nipple.**



**Figure 5 Item 4 One (1) end cap with priming hole.**

Page 6 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf

Item 3 (Figure 4) and Item 4 (Figure 5) consisted of one (1) silver colored metal pipe nipple with one (1) dark gray colored metal end cap. The pipe nipple was threaded on both ends. These items together were utilized as a main charge container.

Present in the end cap (Item 4) is a hole measuring approximately 0.22 inch in diameter. This hole, commonly referred to as a priming hole, is a modification made to the pipe to allow for the insertion of the fuzing system into the container.

Device 1 only had one end cap submitted, Item 4. However, the picture from the scene shows that the device had two (2) end caps prior to the RSP conducted by the bomb squad.

The pipe nipple in Device 1 had an approximate length of 8.0 inches with an inner diameter of approximately 1.0 inch. The following manufacturer information etched into the pipe nipple; "M" and below that CHINA" which is visually consistent with Mueller Industries product labeling.

The end cap associated with the pipe nipple, Item 4 measured approximately 1.18 inches in height and an approximate inner diameter of 1.13 inches. The following manufacturer information etched into the pipe nipple; "M", "FM", "CHINA", and "1" which is visually consistent with Mueller Industries product labeling.


**Fuzing System (Device 1):**

Present in Device 1 (Figure 6 and Figure 7) are the disassembled components of an electrical fuzing system. An electrically activated fuzing system consists of a power source, conductors, switch(es), and load (ignitor). All of these items are present in Device 1.



**Figure 6, Item 1, Pieces of the fuzing system.**

Page 7 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf



**Figure 7, Item 1 Kitchen timer, paper clip, alligator clip and wire.**

**Power Source: (Device 1)**

Present in Item 1 is one (1) Energizer 9 volt battery (Figure 8) with a measured voltage of approximately 8.10 volts.



**Figure 8, Item 1, 9 volt battery**

Page 8 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf

UNCLASSIFIED

Manufacturer information on the battery is as follows: "12-2023""ALKALINE BATTERY", "Made in Malaysia for Energizer Brands, LLC, St. Louis, MO 63141", "SNI 04-2051.2-2004", "9V SIZE FORMAT-522 6LF22-6AM6-9V" and on the bottom of the battery was "0818". The battery measures approximately 1.76 inches in length with a width of 1.04 inches.

## Conductors (Device 1)



**Figure 9, Item 1 Conductors (Wire, Alligator clips, 9 volt snap connector, and steel wool)**

Present in Device 1 (Figure 9), Item 1 are the below listed conductor components.

Three (3) lengths of red insulated multi-strand wire, one (1) length of black insulated multi-strand wire, 9 volt snap connector, two (2) paper clips and six (6) alligator clips. Three of the alligator clips were still attached to the red insulated wire, while the other three appear to have been separated from the wire.

The red insulated multi-strand copper colored wire varies in length from 1.5 inches to 5.0 inches with an approximately AWG of 14. Information printed on the red insulation is as follows: "…SOLINE AND OIL RESISTANT 11 OR AWM 600V VW-1 – c(UL) T90 NYLON OR TWN 75 600V FT1..-AN….", "SOUTHWIRE E51583 F(UL) AWG 1……", "T1,,-ANCE 90C---RoHS".

The single black insulated multi-strand copper colored wire is approximately 7.5 inches in length with an approximate AWG of 14. Information printed on the black insulation is as follows: "…RESISTANT 11 OR AWM 600V VW-1--- c(UL) T90 NYLON OR TWN 75 600V FT1…"

Page 9 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf

The 9 volt snap connector consisted of a black vinyl material covering two (2) metal terminals. Connected to the two (2) terminals was two (2) insulated multi strand silver colored wires, (one black in color insulated wire and one red in color insulated wire). Both wires has an approximate length of 6.0 inches with an approximate AWG of 24. The following manufacturer information was on the black insulated wire: "AWM E214382 1007 24 AWG VW-1 80 C 300V KA1 TAT" and the following manufacturer information was on the red insulated wire: "AWM I A 80 C 300V 24 AWG FT1".

The six (6) silver colored alligator clips in Item 1 were all similar in dimensions with an overall approximate length of 2.03 inches and an approximate width of 0.29 inch.

Item 1 also contained two (2) silver colored paper clips. Paper clips can be used as conductors in conjunction with the timer to produce a switch. One of the paper clips was attached to the clock face as seen in Figure 2 and has a diameter of approximately 0.03 inch.

If similar evidence items are recovered some components of Item 1 are suitable for comparison.

**Switch (Device 1):**



**Figure 10, Item 1, Kitchen timer face**          **Figure 11, Kitchen timer face rear.**

Submitted in Item 1 (Figure 10 and Figure 11) were pieces of one (1) kitchen timer. On the face of the kitchen timer is one (1) paper clip that is hot glued in place secured at the zero mark and the thirty mark. Attached to one end of the paper clip is an alligator clip with a red insulated wire attached to it. The wire runs from the zero side of the timer to the positive side of the 9 volt snap connector.

The face of the timer is white with black colored numbering from "0 to 59" in a counter clock wise direction. The face has tick marks for each minute and actual numbers every 5th tick mark. There are instructions on the timer face: "1. Turn fully clock wise", "2. Then select time". The face of the timer has an approximate diameter of 2.41 inches and a thickness of .04 inch. The

Page 10 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf

base of the timer (Figure 7) is silver metal with mechanical components above and below a black casing held in place by three Philips head screws.

Modified timers as describe above can be used as a switch in an IED.

If similar evidence items are recovered some components of Item 1 are suitable for comparison.

**Ignitor (Device 1):**

Submitted in Item 1 was one piece of steel wool that still had two alligator clips attached to it (Figure 9). Steel wool is a conductor of electrical energy and is suitable to be used as an ignitor in an IED. When electrical current is applied to the steel wool, it can glow and begin to burn. If the steel wool is in contact with a low explosive material it can provide enough heat to cause a low explosive material to ignite and burn.

A sample of the steel wool was separated from Item 1 and tested. The steel wool glowed and burned when hooked up to a new 9V battery.

**DEVICE 2**

**Explosive Main Charge (Device 2):**

Powder from Device 2, Item 10-3 contained the low explosive black powder. It consisted of the oxidizer potassium nitrate, the fuel sulfur, and a fuel consistent with charcoal. Other minor components were also detected but not further identified. The powder was tested for thermal susceptibility (Flame test) with positive results.

For detailed information of the chemicals analyses conducted on the powder, see the FBI Laboratory Report of Jason V. Miller dated January 16, 2021, Report number 2021-00019-16. (JVM)

When properly ignited by a suitable source of heat, low explosives are designed to deflagrate and generate gases. When properly confined in a container such as a can, bottle, or pipe the gases generate pressure on the container walls and cause an explosion of the container.

Page 11 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf

**Main Charge Container (Device 2):**



**Figure 12 Item 10, Pipe nipple with solid end cap**



**Figure 13, Item 11, End cap with priming hole.**

Item 10 (Figure 12 and Figure 13) consisted of one (1) silver colored metal pipe nipple with two (2) dark gray colored end caps. These items together were utilized as a main charge container. The pipe nipple was threaded on both ends.

Page 12 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf

Present in one of the end caps (Item 10) is a hole measuring approximately 0.22 inch in diameter. This hole, commonly referred to as a priming hole, is a modification made to the end cap to allow for the insertion of the fuzing system into the container.

The pipe nipple in Device 2 had an approximate length of 8.0 inches with an inner diameter of approximately 1.0 inch. The following manufacturer information etched into the pipe nipple; "M" and below that CHINA" which is visually consistent with Mueller Industries product labeling. The Device 2 pipe nipple (Item 10) is visually consistent with the pipe nipple in Device 1 (Item 3).

The end caps associated with the pipe nipple measured approximately 1.18 inches in height and an approximate inner diameter of 1.13 inches.  Each cap had some or all of the following manufacturer information etched into it; "M", "FM", "CHINA", and "1" which is visually consistent with Mueller Industries product labeling.

The three (3) end caps associated with the pipe nipples, Item 4 (Device 1) (One (1) end cap) and Item 10 (Device 2) (Two (2) end caps) are consistent with each other measuring approximately 1.18 inches in height and an approximate inner diameter of 1.13 inches.  All of the end caps have all or some of the identical manufacture information etched into the top of the cap; "M", "FM", "CHINA", and "1".  This information is visually consistent with Mueller Industries product labeling. If similar evidence items are recovered some components of Item 10 are suitable for comparison.

**Fuzing System (Device 2):**

Present in Device 2 (Figure 14, Figure 15 and Figure 16) are the disassembled components of an electrical fuzing system. An electrically activated fuzing system consists of a power source, conductors, switch(es), and load. All of these items are present in Device 2.



**Figure 14, Item 10, Pieces of the fuzing system.**

Page 13 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf

UNCLASSIFIED



**Figure 15, Item 10, Pieces of the fuzing system.**



**Figure 16, Item 11, Pieces of the fuzing system.**

Page 14 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf

**Power Source (Device 2):**

Present in Item 11 (Figure 17 and Figure 18) is one (1) fragmented Energizer 9 volt battery no measured voltage was able to be obtained due to the fragmented nature of the item.



Figure 17, Item 11, 9 volt battery.          Figure 18 Item 11, 9 volt battery.

Manufacturer information on the battery is as follows: "ENERGIZER", "9V", "12-2023", "ALKALINE BATTERY", "9V SIZE – FORMAT – 522 OU22 – 6AM6 -9V". Item 11 is visually consistent with the battery seen in Item 1. If similar evidence items are recovered some components of Item 11 are suitable for comparison.

**Conductors (Device 2)**

Present in Device 2, Item 10 and Item 11 (Figure 14, Figure 15 and Figure 16) are conductor components listed below.

Two (2) lengths of insulated multi-strand wire, one (1) length of black insulated multi-strand wire and one (1) length of red insulated multi-strand wire. The two (2) wires as submitted were running through the priming hole of the end cap (Figure 15).

Both wires are stripped at the ends consisting of multi-stranded copper colored wire. The red insulated wire is approximately 14.5 inches in length and the black insulated wire is approximately 10 inches in length. The red wire still has an alligator clip partially attached to one end of it.

Page 15 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf

UNCLASSIFIED

The red insulated multi-strand copper colored wire has the following manufacturer information printed on the insulation is as follows: "…INE AND OIL RESISTAN……. AWM 600V VW-1 ---…… NYLON OR TWN … 600V FT1…AN…C ---RoHS" and "SOUTHWIRE E51583 F(UL) (AWG 14) 2,082m…C4 TYPE MTW OR THWN OR…..".

The single black insulated multi-strand copper colored wire is approximately 7.5 inches in length with an approximate AWG of 14. Information printed on the black insulation is as follows: "…RESISTANT……AWM 6…OLTS…………ON OR TWN…..00V FT1 NoM-ANCE 80C---RoHS SOUTHWIRE E51583.E (UL) (AWG 14) 2".

Present in Item 11 (Figure 16) are the disassembled remains of a 9 volt snap connector consisting of a black vinyl material covering two (2) metal terminals. Connected to the two (2) terminals was two (2) insulated multi-strand silver colored wires, (one black in color insulated wire and one red in color insulated wire). Both wires have an approximate length of 6.0 inches with an approximate AWG of 24. The following manufacturer information was on the black insulated wire: "A... 80 C 300V" and the following manufacturer information was on the red insulated wire: "AWM…E…22..14382..".

Also present in Item 10 are two (2) silver color alligator clips and in Item 11 are three (3) silver in color alligator clips, all similar in dimensions with an overall approximate length of 2.03 inches and an approximate width of 0.29 inch. One (1) of the alligator clips in Item 11 was still attached to the red insulated wire and the other three appeared to of been separated from the wires.

Item 11-2 contained two (2) silver colored paper clips. Paper clips can be used as conductors in conjunction with the timer to produce a switch.

The red insulated wire, the black insulated wire, the 9V battery snap connector, the alligator clips, and the paper clips associated with Devices 2 are visually consistent with the corresponding items found in Device 1.

If similar evidence items are recovered some components of Item 10 and Item 11 are suitable for comparison.

Page 16 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf

**Switch (Device 2):**



**Figure 19, Item 11 Face of Kitchen timer.**

Submitted in Item 11 and Item 12-1 (Figure 14 and Figure 19) were fragmented pieces of one (1) kitchen timer. The face of the timer is white with black colored numbering from "0 to 59" in a counter clock wise direction. The face has tick marks for each minute and actual numbers every 5th tick mark. There are instructions on the timer face: "1. Turn fully clock wise", "2. Then select time". The face of the timer has an approximate diameter of 2.41 inches and a thickness of .04 inch. This timer face is visually consistent with the timer used in Device 1.

Modified timers as describe above can be used as a switch in an IED. If similar evidence items are recovered Item 11 and Item 12-1 are suitable for comparison.

**Ignitor (Device 2):**

Item 10-3 was one piece of steel wool that was in one of the end caps. Steel wool is a conductor of electric energy and is suitable to be used as an ignitor in an IED. When electrical current is applied to the steel wool, it can glow and begin to burn. If the steel wool is in contact with a low explosives material it can provide enough heat to cause the low explosive material to ignite and burn.

A sample of the steel wool was separated from Item 10-3 and tested. The steel wool glowed and burned when hooked up to a new 9V battery.

**Miscellaneous:**

The following were located near Device 1 and were not part of the device.

Page 17 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf



**Figure 20, Item 1-1 small circular tin.**

Item 1-1 (Figure 20), consisted of a small circular tin, similar to a small candle, with a diameter of approximately 1.5 inches and a height of .40 inch. It contained a white waxy powder material.

Powder from Item 1-1 was tested for the presence of explosives with negative results. For detailed information of the chemicals analyses conducted on the powder, see the FBI Laboratory Report of Jason V. Miller dated January 12, 2021, Report number 2021-00019-2. (JVM)



**Figure 21, Item 1-3  Rubber tube.**

Item 1-3 (Figure 21) was a rubber tube, with a blue and white plastic ends. The outer diameter of the rubber was approximately 0.56 inch. The inner tube had a small plastic.

Page 18 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf



**Figure 22, Item 5 Piece of fabric.**

Present in Item 5 (Figure 22) was one piece of fabric material.

The following items were located near Device 2 and were not part of the device.

Item 12 multiple pieces of black plastic and metal components. Black plastic pieces were part of black container (Mouse trap) that was near the device.

Any remaining items listed in this report were not analyzed for the hazardous devices examinations and were either determined to have no forensic value or were examined by Forensic Examiners of other disciplines commensurate with their area of expertise.

## <u>SECTION 3</u>

A kitchen timer was purchased by the FBI Explosives unit as an exemplar. This kitchen timer was purchased at Walmart and has a similar appearance. Based on this Device Examiner's opinion, it appears that kitchen timers used in Device 1 and Device 2 were removed from their housing unit and modified to produce a timed improvised switch. The exemplar face of the kitchen timer and internal working components are visually and dimensionally similar to the kitchen timers from Device 1 and Device 2. The kitchen timer was a 'MAINSTAYS TIMER' and has the same directions printed on the face of the dial; "1. TURN FULLY CLOCKWISE", "2. THEN SELECT TIME" and has timer increments from 0 to 59 minutes. Below are three photos of the exemplar timer. Figure 23 is the original packaging, housing unit, clock face and inner working of the kitchen timer.  Figure 24 and Figure 25 are the front and back of the packaging for the "MAINSTAYS TIMER".

The items from Device 1, recovered at the DNC and Device 2, recovered at the RNC are visually and dimensionally similar to each other. The devices have similar construction, components and main charge powders. Below is a comparison chart (Figure 26) of the items from each device.

Page 19 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf

Case 1:26-cr-00001-AHA    Document 48-1    Filed 01/16/26    Page 26 of 32
USCA Case #26-3009    Document #2161061    Filed: 02/25/2026    Page 201 of 350
UNCLASSIFIED

Exemplar Images:





**Figure 23 Kitchen timer**      **Figure 24 Packaging**    **Figure 25 Packaging back**

Comparison Chart:

| | Device 1 DNC | Device 2 RNC |
|---|---|---|
| Main Charge Powder | Item 2 | Item 9, 10-1, 10-3 |
| Pipe Nipple (Container) | Item 3 | Item 10 |
| Pipe End Caps (priming hole) | Item 4 | Item 10 |
| 9 Volt snap connector | Item 1 | Item 11 |
| Red wire | Item 1 | Item 10 |
| Black wire | Item 1 | Item 10 |
| Alligator clips | Item 1 | Item 11 |
| Steel Wool (Initiator) | Item 1 | Item 10-3 |
| Paper Clips | Item 1 | Item 11 |
| Battery 9 Volt Energizer | Item 1 | Item 11 |
| Timer | Item 1 | Item 11 |
| Timer Exemplar | Item 1 | Item 11 |

**Figure 26 Comparison Chart.**

Page 20 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf

**METHODS:**

The methods utilized during the analysis of the evidentiary items included the following, as appropriate:

- visual examinations of observable, physical characteristics;
- visual comparison examinations of observable, physical characteristics;
- microscopical examinations of observable, physical characteristics;
- microscopical comparison examinations of observable, physical characteristics;
- measurements of physical characteristics;
- measurement comparison examinations of physical characteristics;
- visual examinations of photographs;
- visual examinations of x-ray images, and
- reviews of references.

**GENERAL LIMITATIONS:**

- Item source identifications that refer to a specific distributor or manufacturer have not been confirmed with that distributor or manufacturer unless otherwise stated in this report.

- The physical characteristics, such as, but not limited to, material type, shape, and color of all evidentiary items described in the Results of Examination section of this report are based on visual and/or microscopical observations, unless otherwise noted. Other parameters such as, but not limited to, distances, angles, and voltages associated with individual evidentiary items described in the Results of Examination section of this report are based on physical measurements and are approximate, unless otherwise noted. Should a more complete characterization of these items be required, additional examinations can be requested of the appropriate forensic discipline. Diagrams such as, but not limited to, drawings and schematics are not to scale, unless otherwise noted.

**SPECIFIC INTERPRETATIONS AND LIMITATIONS:**

Due to the absence or alterations of specific manufacturer or other unique markings on items of evidence, conclusive identification of the source of an item may not always be effected in every case. Conclusive determinations of the exact design and functioning of a rendered safe or disassembled improvised explosive device may not be effected in every case due to the condition of the components.

**Remarks:**

For questions about the content of this report, please contact Forensic Examiner Kevin D. Finnerty at 703-632-7022 or kdfinnerty@fbi.gov.

Page 21 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf

UNCLASSIFIED

For questions about the status of your submission, including any remaining forensic examinations, please contact SSA Kevin D Finnerty at 703-632-7022.

The evidence will be returned under separate cover.

This report contains the opinions and interpretations of the issuing examiner(s) and is supported by records retained in the FBI Laboratory files. Please allow a minimum of thirty days from the date of a discovery request for the FBI Laboratory to provide the related materials. The FBI cannot ensure timely delivery of discovery requests received in less time.

The work described in this report was conducted at the Quantico Laboratory.

Kevin D. Finnerty
Explosives Unit

Page 22 of 22

2021-00019-1

- Lab Report-Released-(96296).pdf

7-1 LIMS (Rev. 10-2-17)

UNCLASSIFIED



## FBI Laboratory

2501 Investigation Parkway
Quantico, Virginia 22135

4940 Fowler Road
Huntsville, Alabama 35898

### LABORATORY REPORT

To:   Washington Field Office
Justin Winecoff

Date: January 12, 2021

Case ID No.: WF-3366725

Lab No.: 2021-00019-2

Communication(s):   January 7, 2021

Agency Reference(s):

Subject(s):

Victim(s):

Discipline(s):   Explosives Chemistry

FBI Laboratory Evidence Designator(s):

Item 1-1        White colored powder (1B1)

Item 2          Powder sample (1B5)

Item 9          Powder sample (1B12)

Item 10-1       Powder from pipe (1B15)

Item 43         Explosives Unit Chemistry Secondary Evidence (1 plastic case with 4 SEM stubs)

This report contains the results of the chemistry examinations performed by the Explosives unit.

**Results of Examination:**

Item 1-1 was tested for the presence of explosives with negative results.

Item 2, Item 9, and Item 10-1 contained the oxidizer potassium nitrate, the fuel sulfur, and a fuel consistent with charcoal. Particles that appeared to be metallic and other minor components were also detected but not further identified. The powders were tested for thermal susceptibility (flame test) with negative results. However, in the proper proportions, potassium nitrate, sulfur, and charcoal form the low explosive black powder.

The terminology "consistent with" does not imply an identification of a specific chemical or product. A substance is termed "consistent with" a material when the analytical data does not support an identification of a specific chemical or product, but does provide reliable

Page 1 of 2

- Lab Report-Released-(96251).pdf

UNCLASSIFIED

information to include the substance within a class of materials. The phrase "consistent with" is also used when an appropriate reference standard could not be obtained.

The following techniques were used during the examination of the items listed above: visual and microscopic inspection, Fourier transform infrared spectroscopy, mass measurements, Raman spectroscopy, scanning electron microscopy with energy dispersive X-ray spectroscopy, thermal susceptibility testing, and X-ray diffractometry.

**Remarks:**

For questions about the content of this report, please contact Forensic Examiner Jason V. Miller at 703-632-7634 or jvmiller@fbi.gov.

For questions about the status of your submission, including any remaining forensic examinations and disposition of the evidence (to include Secondary Evidence Item 43), please contact Kevin D. Finnerty at 703-632-7022.

This report contains the opinions and interpretations of the issuing examiner(s) and is supported by records retained in the FBI Laboratory files. Please allow a minimum of thirty days from the date of a discovery request for the FBI Laboratory to provide the related materials. The FBI cannot ensure timely delivery of discovery requests received in less time.

The work described in this report was conducted at the Quantico Laboratory.

Jason V. Miller
Explosives Unit

Page 2 of 2

2021-00019-2

- Lab Report-Released-(96251).pdf

7-1 LIMS (Rev. 10-2-17)

UNCLASSIFIED



## FBI Laboratory

2501 Investigation Parkway
Quantico, Virginia 22135

4940 Fowler Road
Huntsville, Alabama 35898

### LABORATORY REPORT

To:   Washington Field Office
      Justin Winecoff

Date: January 16, 2021

Case ID No.: WF-3366725

Lab No.: 2021-00019-16

Communication(s):    January 7, 2021

Agency Reference(s):

Subject(s):

Victim(s):

Discipline(s):    Explosives Chemistry

FBI Laboratory Evidence Designator(s):

Item 10-3       Steel wool and powder from Item 10 (1B15)

This report contains the results of the chemistry examinations performed by the Explosives unit.

**Results of Examination:**

Item 10-3 contained the low explosive black powder. It consisted of the oxidizer potassium nitrate, the fuel sulfur, and a fuel consistent with charcoal. Other minor components were also detected but not further identified. The powder was tested for thermal susceptibility (flame test) with positive results.

**Comparison of Powders:**

Item 2 originated from submission #1 from suspected device #1. Item 9, Item 10-1, and Item 10-3 originated from submission #2 from suspected device #2. The results from the analysis of Item 2, Item 9, and Item 10-1 were previously reported in Laboratory Report 2021-00019-2, dated January 12, 2021, authored by Forensic Examiner Jason V. Miller.

The powders submitted from each suspected device were compared and the main components (potassium nitrate, sulfur, and charcoal) are visually and chemically consistent with each other; however, this does not indicate the items originated from the same source to the absolute exclusion of all other sources. The powder in Item 10-3 appeared darker in color than the others and produced a positive thermal susceptibility test result. The powder in Item 2, Item 9, and Item 10-1 were lighter in color and produced a negative thermal susceptibility test result,

Page 1 of 2

- Lab Report-Released-(96341).pdf

however when the components are in the proper proportions, these chemicals can form the low explosive black powder.

The terminology "consistent with" does not imply an identification of a specific chemical or product. A substance is termed "consistent with" a material when the analytical data does not support an identification of a specific chemical or product, but does provide reliable information to include the substance within a class of materials. The phrase "consistent with" is also used when an appropriate reference standard could not be obtained.

The following techniques were used during the examination of the items listed above: visual and microscopic inspection, Fourier transform infrared spectroscopy, Raman spectroscopy, scanning electron microscopy with energy dispersive X-ray spectroscopy, thermal susceptibility testing, and X-ray diffractometry.

**Remarks:**

For questions about the content of this report, please contact Forensic Examiner Jason V. Miller at 703-632-7634 or jvmiller@fbi.gov.

For questions about the status of your submission, including any remaining forensic examinations and disposition of the evidenc, please contact Kevin D. Finnerty at 703-632-7022.

This report contains the opinions and interpretations of the issuing examiner(s) and is supported by records retained in the FBI Laboratory files. Please allow a minimum of thirty days from the date of a discovery request for the FBI Laboratory to provide the related materials. The FBI cannot ensure timely delivery of discovery requests received in less time.

The work described in this report was conducted at the Quantico Laboratory.

Jason V. Miller
Explosives Unit

- Lab Report-Released-(96341).pdf

# ORP, LLC

███████████████████████

## FAIRFAX, VA 22030

Date:        December 12, 2025

Re:          Character Reference Letter for Brian Cole Jr.

This letter is being presented in reference to the character of Brian Cole Jr.

I am currently the property manager for the building located at ████████████████ in Fairfax Virginia. The Cole family, and their various businesses, have been one of my tenants for approximately 22 years.

During this time my experience with the Cole family has been nothing but positive. They have always paid their rent on time, been respectful of the property, and been great neighbors to the other tenants.

Since Brian Cole Jr. has been coming into the Fairfax office, he keeps to himself and has not caused any disruption on the property or to other tenants. From what I have seen, his daily routine is to monitor the front desk in suite 101, make trips to the bank, and other administrative tasks for the business. While completing these tasks, I have not seen or heard anything from Brian Cole Jr. that would be considered violent, disruptive, or concerning. I have only known him to be quiet, respectful, and kind.

While I understand the seriousness of the charges against Brian Cole Jr., these charges seem totally out of character from the Brian Cole Jr. that I have observed over many years.

If I can be of further assistance, please do not hesitate to contact me.

Sincerely,

J████ P P███

████████████

# Independent Surety Agents of America, LLC

R███ L S████

Jacksonville, NC 28546

Date:       December 8, 2025

Re:         Character Reference Letter for Court

Subject:    Brian Cole Jr.

I am writing this letter to provide insight into the character of Brian Cole Jr., as to the young man that I know him to be. I was hired by his father, Brian J Cole, in May of 2003 to work in the office of the Bail Bonding Business at that time called Cole Surety but now known as Independent Surety Agents of America, LLC.

During this time, I have observed Brian Cole Jr going from a young boy to a young man who never showed anger or frustration. He has always been a very polite and respectful and always showed kindness to the other employees or clients coming into the office. Brian Jr has always been a calm person who loved computers. Even though I moved from that area in 2006, I have had the pleasure of dealing with Brian Jr when he answers the phone at the office.

I know I can only give a very limited amount of information, but I do know that the charges against him does not fit the character of the young man that I know.

If you have any questions, please do not hesitate to contact me at

Sincerely,

R███ L S████



# VZ COLLECTIVE
### VA DCJS School ID #88-30202

Date:        December 6, 2025

Re:          Character Reference Letter for Court
Subject:     Brian Cole Jr.

I am writing this letter to provide insight into the character of Brian Cole Jr., whom I have known for over ten years in the capacity as a business associate of his father and as a Private Security Services DCJS instructor for the private security and the bail bonding programs. This letter is submitted in support of Brian's pending court cases.

During the time that I have known Brian Cole Jr., I have had the opportunity to observe his personal and professional behavior. One of the most admirable qualities that stands out is and was his peaceful nature.

Over the years of my interactions with him, I have never seen him emotionally angry, upset, or even frustrated. His demeanor has always been calm, collected, respectful, and simply kind to others. He was at work every day I had occasion to go to the business office, and he was always committed to doing his work and manning the front desk of the office.

I understand the seriousness of the situation that Brian Cole Jr. is currently facing and do not wish to undermine the legal process. However, the limited information I possess and the alleged actions leading to his involvement in the case are not reflective of his true character. I have only witnessed him as a decent and well-mannered young man in all my encounters and interactions with him.

Should you require any further information or wish to discuss this matter in more detail, I may be reached directly on my cell phone at ▮▮▮▮▮▮▮▮

Thank you for your time and consideration.

K▮▮ E. V▮

VZ Collective (VA DCJS ID #88-30202)

1



**Heads & Hearts**
**Together, LLC**

High Point, NC  27265

Date:        December 8, 2025

Re:          Character Reference Letter

Subject:     Brian Cole, Jr.

I am writing this letter in support of Brian Cole, Jr., and to give my knowledge of his character. I have the pleasure of being a part of the Cole's Surety 'family' for twenty-five years in the role of Manager of one of the bail bonding businesses in North Carolina.

Whenever interacting with Brian Cole, Jr., he has always had a quiet, calm, and respectful demeanor. On every occasion I had to speak with him, he was never angry, emotional or raised his voice. He never missed a day of work and is a valued asset of the office staff.

The public portrayal of his involvement in this situation saddens me greatly as it does not reflect the character of the young man I have had the privilege of knowing these many years.

In the event I can offer more insight or discuss this matter further, I can be available anytime. Thank you for any consideration you may give to my words.





Jr.

Gainesville, VA 20155

December 11, 2025

To Whom It May Concern,

I am writing this letter to provide a character reference for my step-grandson, Brain Cole, Jr. I have known Brian all his life, and during this time, I have had the privilege of watching Brain grow into a responsible, caring, and hardworking individual.

Brain consistently demonstrates qualities such as integrity, kindness, and respect for others. He has shown great dedication to work, his dog and family responsibilities. For instance, I have never seen him angry or disrespectful to anyone. My interactions with Brian has aways been positive and very polite. He was always at work doing his job diligently and not bothering anyone else.

In addition to his strong moral character, Brain is dependable and trustworthy. I have no doubt that he will continue to make positive contributions to his community and uphold the values that define good character.

Please feel free to contact me at ████████ or ████████████ if you need any additional information.

Sincerely,



Jr.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BRIAN J. COLE, JR.,<br><br>*Defendant*. | Criminal Action No. 26-00001 (AHA) |

## Order

Defendant Brian J. Cole, Jr. has been charged with interstate transportation of explosives, in violation of 18 U.S.C. § 844(d), and malicious attempt to use explosives, in violation of 18 U.S.C. § 844(i). ECF No. 39. Cole, who has been held in custody since his arrest, previously argued he must be released from custody because the government failed to show his release would pose a risk to community safety and because the court did not timely hold a preliminary hearing following his initial appearance. *See* ECF No. 23; ECF No. 26. A magistrate judge rejected both arguments, and Cole now moves for review of the second one. *See* ECF No. 28; Minute Order (Jan. 2, 2026); ECF No. 33. The court disagrees with Cole; he is not entitled to release based on the lack of a preliminary hearing.

The law requires a court to hold a preliminary hearing for a defendant in custody no later than 14 days after the defendant's initial appearance, unless (1) the defendant waives the hearing, (2) the defendant agrees to continue the hearing to a later date, or (3) the court finds "extraordinary circumstances exist and justice requires" delaying the hearing. *See* 18 U.S.C. § 3060(b), (c); Fed. R. Crim. P. 5.1 (a), (c), (d). If a court simply fails to hold a preliminary hearing within 14 days without waiver, an agreed continuance, or making the appropriate finding, then the defendant has

to be released without prejudice to instituting further criminal proceedings. 18 U.S.C. § 3060(d). Where a court has fixed a preliminary hearing date (within the 14-day period or pursuant to an appropriate continuance or warranted delay) but the government returns an indictment before that hearing happens, the hearing is obviated and no discharge is appropriate based on the lack of a hearing. *Id*. § 3060(e); *see also* Fed. R. Crim. P. 5.1(a) (recognizing exceptions to the preliminary hearing requirement, including where the defendant waives the hearing or is indicted).

Cole's initial appearance was on December 5, 2025, and therefore, absent an exception, he was entitled to a preliminary hearing by December 19. As Cole appears to acknowledge, however, he waived—or, at a minimum, agreed to continue the hearing to a date past—that deadline. At Cole's initial appearance, the magistrate judge informed him of his right to a preliminary hearing and instructed: "if you wish to invoke your right to a preliminary hearing, please let your attorney know." Hr'g Recording at 1:08:25–1:08:45 (Dec. 5, 2025). The parties asked the magistrate judge to set a detention hearing for December 15, and neither party asked to set a preliminary hearing. *Id.* at 1:10:00–1:10:41. Cole later asked the magistrate judge to continue the detention hearing, and the parties jointly proposed December 30. ECF No. 9 at 1–2. The continuance motion, again, did not mention any preliminary hearing. Cole concedes that, on this record, he was not entitled to a preliminary hearing within 14 days—in other words, he concedes that he waived, or at least agreed to continue any preliminary hearing beyond, the presumptive statutory deadline. *See* ECF No. 21 at 3; ECF No. 26 at 4; ECF No. 41 at 3.

Cole instead argues he must be released from custody because the magistrate judge did not hold a preliminary hearing by December 30, 2025—the date he and the government had proposed for a detention hearing. ECF No. 33; ECF No. 41 at 3. That is unpersuasive. First, the magistrate judge did not hold a preliminary hearing by December 30 because of defense counsels' own

litigation conduct. As described, Cole admits he agreed to at least a continuance of a preliminary hearing. Despite requesting a detention hearing and later asking to continue it to December 30, Cole did not seek a preliminary hearing in either request. Only two days before the detention hearing did Cole first mention a preliminary hearing, asserting to the magistrate judge that he "has not waived his right to a preliminary hearing." ECF No. 21 at 1. While counsel framed this as an effort to "confirm that the hearing already set for Tuesday, December 30, 2025 will proceed as both the Rule 5.1 preliminary hearing and the detention hearing" and stated that Cole "consistently expected it to proceed on December 30," *id*, the fact is that counsel forwent the statutory 14-day deadline for a preliminary hearing and did so without ever setting any fixed date for the hearing. On this record, Cole likely waived his right to a preliminary hearing. *See* 18 U.S.C. § 3060(b) (providing no preliminary hearing is required where "the arrested person waives" it); Fed. R. Crim. P. 5.1(a)(1) (same).

Second, even assuming Cole properly asserted his right to a preliminary hearing by first raising it 23 days after his initial appearance and in a last-minute request to convert the detention hearing into both a detention hearing and a preliminary hearing, he is not entitled to release because, at the December 30 hearing, the magistrate judge made the requisite finding that extraordinary circumstances and justice justified delaying the hearing. *See* 18 U.S.C. § 3060(c). After Cole told the government of his desire to have a preliminary hearing, the government secured an indictment from a D.C. Superior Court grand jury before December 30. *See* Minute Order (Dec. 30, 2025). Cole then challenged the efficacy of that indictment because it was returned by a D.C. Superior Court grand jury, rather than a grand jury of this court. Given the circumstances, the magistrate judge found extraordinary circumstances and justice warranted continuing any preliminary hearing pending resolution of Cole's arguments about the efficacy of the D.C. Superior

Court indictment. Draft Hr'g Tr. at 7 (Dec. 30, 2025). Insofar as Cole continues to dispute the efficacy of the D.C. Superior Court indictment, the magistrate judge's finding of extraordinary circumstances remains undisturbed.

Third, Cole is not entitled to release based on the lack of a preliminary hearing because he has been indicted. *See* 18 U.S.C. § 3060(e) (stating that a defendant shall not be discharged from custody under § 3060(d) if "an indictment is returned" before "the date fixed" for the preliminary hearing). While Cole challenged the efficacy of his first indictment because it was returned by a D.C. Superior Court grand jury, he has since been indicted by a grand jury convened by this court. *See* ECF No. 39. Courts consistently hold that once a defendant is indicted, there is no right to release under 18 U.S.C. § 3060(d). *See, e.g.*, *United States v. Williams*, 526 F. App'x 29, 36 (2d Cir. 2013) ("As a result of being indicted, any claim that Williams might have had for release pending further criminal proceedings was rendered moot."); *United States v. Smith*, 22 F. App'x 137, 138 (4th Cir. 2001) ("Once the grand jury returned an indictment against Smith, his right to discharge pursuant to § 3060 ceased."). Here, that result follows from the text of § 3060(e), which states that no preliminary hearing is required and there shall be no discharge under § 3060(d) if an indictment is returned "prior to the date fixed" for a preliminary hearing. 18 U.S.C. § 3060(e). Cole was indicted by a grand jury of this court before any date fixed for a preliminary hearing, and he is accordingly not eligible for release under § 3060(d).

The court accordingly denies Cole's emergency motion to review magistrate judge's order denying release, ECF No. 33.

AMIR H. ALI
United States District Judge

Date:   January 16, 2026

4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Case No. 1:26-cr-00001-AHA** |
| | : | |
| **BRIAN J. COLE, JR.,** | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR REVOCATION OF PRETRIAL DETENTION ORDER

The government opposes defendant Brian J. Cole, Jr.'s motion to revoke the pretrial detention order in this case.   The defendant is charged with traveling to the District of Columbia and attempting to bomb the national headquarters of the country's two major political parties, an extraordinary act of political violence.   The defendant then, by his own admission, destroyed direct evidence of these crimes before experimenting with a new explosive compound and accumulating still more bombmaking components, many of which were in his possession at the time of his arrest in 2025, more than four years after the attempted bombing.   A magistrate judge received extensive briefing and held a lengthy hearing on the government's request for pretrial detention.   The magistrate judge's decision to detain the defendant pending trial, reflected in a thorough and comprehensive opinion, is correct and should not be disturbed.   The facts and circumstances in this case, together with Congress's judgment that those who maliciously use explosives should ordinarily be detained pending trial, establish that detention is warranted here.

## BACKGROUND

On December 4, 2025, the defendant was arrested, and a complaint was unsealed charging him with violations of 18 U.S.C. §§ 844(d) and 844(i), ECF No. 1—offenses for which the defendant has since been indicted, ECF No. 39.   The defendant made his initial appearance on

December 5, 2025, and he was held pending a detention hearing.   On December 28, 2025, the government filed a memorandum in support of its oral motion for pretrial detention, ECF No. 17, and the defendant submitted a memorandum and various exhibits in opposition, ECF No. 23.   On December 30, 2025, the magistrate judge held a nearly two-hour detention hearing, after which he indicated that he would issue a written opinion on the matter.   Three days later, on January 2, 2026, the magistrate judge issued a nineteen-page memorandum opinion analyzing the parties' submissions and arguments, considering in detail each statutory detention factor, and concluding that the record established clear and convincing evidence that "there are no conditions of release the Court can fashion to reasonably assure the safety of others and the community in this case." ECF No. 28 ("Detention Order") at 6, 18.   The magistrate judge ordered the defendant to be detained pending trial.

On January 16, 2026, the defendant moved to revoke the magistrate judge's pretrial detention order, arguing that the defendant "was in fact incapable" of constructing a viable explosive, that there is "not a scintilla of evidence" from any point in time indicating that the defendant "ever engaged in any activity similar to" the charged conduct, and that his lack of criminal history and other favorable circumstances "were brushed aside" by the magistrate judge. ECF No. 48 ("Def.'s Mot.") at 3, 11–12.   For the reasons set forth below, based on the record before the magistrate judge and now before this Court, the defendant's arguments fail, and his motion should be denied.

### *January 5, 2021*

The charges against the defendant arise from his manufacturing, transporting across state lines, and planting of two improvised explosive devices—so-called "pipe bombs"—in downtown

2

Washington, D.C. on January 5, 2021.   The defendant planted the first bomb at approximately

7:54 p.m. in the immediate vicinity of the DNC headquarters located at 430 South Capitol Street,

Southeast.   He planted the second bomb at approximately 8:16 p.m. in the immediate vicinity of

the RNC headquarters at 310 First Street, Southeast.   The two locations are approximately 0.2

miles apart.

Earlier that evening, at approximately 7:10 p.m., the defendant, driving his 2017 Nissan

Sentra, took the South Capitol Street exit from Interstate 395 South, passing a license plate reader

that recorded his vehicle and tag information.   Approximately 24 minutes later, at about

7:34 p.m., surveillance video first captured the defendant walking approximately one-half mile

from the South Capitol Street exit, near the intersection of First Street and North Carolina Avenue,

Southeast.   As captured on video, and shown below, the defendant was holding a backpack in his

hand by the top strap and wearing dark pants, a grey hooded sweatshirt, dark gloves, Nike Air Max

Speed Turf shoes, and a facemask and hood that obscured his face.



3

The footage also showed the defendant—who investigators from the Federal Bureau of Investigation (FBI), based on a height analysis of the video, estimated to stand 5 feet 7 inches tall from the ground to the top of his clothing, with an error rate of +/- 1.1 inches—putting on a pair of eyeglasses and scanning the area, as depicted below.    The defendant is approximately 5 feet 6 inches tall and wears corrective eyeglasses.



At approximately 7:39:27 p.m., about five minutes after the defendant was first captured on surveillance video, his cellphone interacted with two cell towers consistent with him being in the area of the intersection of D Street and South Capitol Street, Southeast.[1]    Surveillance video

---

[1]    Records obtained from the relevant cellular provider listed the relevant sector of one of these towers as facing north as of February 2021.    However, the provider updated its records in April 2021 to reflect that the tower sector in fact faced east, an orientation that would provide coverage to the intersection of D Street and South Capitol Street, Southeast.    The eastward orientation was consistent with FBI drive tests conducted in January and February 2021.    Based on the information available, the FBI assesses that the provider record listing the relevant tower sector as facing north in February 2021 was an error that was corrected in April 2021, and that on January 5, 2021, that tower sector faced east.

showed that at approximately 7:39:32 p.m., the defendant walked westbound on D Street, Southeast then turned southbound on South Capitol Street, Southeast.   About five minutes later, at approximately 7:44:36 p.m., the defendant's cellphone interacted with a cell tower consistent with him being in the area of Ivy Street, Southeast, a one-block road bounded by Canal Street, Southeast and New Jersey Avenue, Southeast.   Surveillance video showed that at approximately 7:44:36 p.m., the defendant walked east on Ivy Street, Southeast.

About fifteen minutes later, at approximately 7:59:36 p.m., the defendant's cellphone interacted with a cell tower consistent with him being in the area of the intersection of New Jersey Avenue, Southeast and E Street, Southeast.   Surveillance video showed that at approximately 7:59:38 p.m., the defendant walked southbound on New Jersey Avenue, Southeast then turned eastbound on E Street, Southeast.   This intersection is approximately 0.1 miles from the immediate vicinity of the DNC headquarters, where the defendant placed the first pipe bomb beneath a public bench, as shown below, at approximately 7:54 p.m.

5



About twenty minutes later, at approximately 8:14:36 p.m., the defendant's cellphone interacted with a cell tower consistent with him being in the area of Rumsey Court, Southeast, a single-block alley within the area bounded by 1st Street and 2nd Street, Southeast and C Street and D Street, Southeast.    Surveillance video showed that at approximately 8:14:15 p.m., the defendant exited Rumsey Court and walked westbound through an alley between the Capitol Hill Club and the RNC then walked northbound onto First Street, Southeast.    Surveillance video showed that the defendant then returned to Rumsey Court.    The video last affirmatively captured the defendant walking eastbound on Rumsey Court at 8:18 p.m.    Based on the video, the defendant placed the second bomb near the RNC at approximately 8:16 p.m., planting it next to a trash can, as shown below.

6



    Finally, at approximately 8:23:59 p.m. and 8:24:06 p.m., the defendant's cellphone interacted with a cell tower consistent with him being in the area east of Rumsey Court, where he was last captured on video about six minutes earlier. The graphic below illustrates the defendant's interactions with nearby cell towers in relation to his paths of travel around the RNC and DNC headquarters where he placed the bombs.

7



*The Pipe Bombs and the Defendant's Purchasing History*

The pipe bombs that the defendant planted near the RNC and DNC did not explode as intended and were not discovered until approximately 1:00 p.m. on January 6, 2021, after which time multiple buildings in the area were evacuated.    The Hazardous Devices Section of the United States Capitol Police (USCP) responded and performed a render safe procedure on both devices, which resulted in the devices being broken apart with their component parts scattered around the areas where they were disrupted.    Subsequently, the FBI assessed that the two devices were both

8

improvised explosive devices which contained a main explosive charge, a fuzing system,[2] and a container.    The FBI also assessed that the devices used a hard metal container (metal pipe nipples and end caps), which showed that weapon characteristics were present.    The FBI recovered the components of the disrupted devices.    These components were processed as evidence and submitted to the FBI Laboratory for analysis.    The FBI Laboratory issued a report regarding the two devices, opining that the submitted items consisted of two disrupted destructive devices and that the use of a hard metal container showed that weapon characteristics were present.    The FBI explosives examiner assessed that the pipe bombs were constructed using all the components necessary to explode and that they were viable explosive devices.

Both pipe bombs were manufactured using a collection of component parts and a main explosive charge.    The component parts included a 1-inch by 8-inch pipe nipple, end caps affixed to the pipe, 14-gauge electrical wire in red and black, alligator clips to connect the wires, a nine-volt (9v) battery, a nine-volt (9v) battery connector, a white kitchen timer, paper clips, steel wool, and homemade black powder.    The general construction of the pipe bomb components is illustrated below.

---

[2]  A "fuze" or "fuse" refers "to a device that initiates an explosion after a delay."    *United States v. Sheehan*, 838 F.3d 109, 117 n.5 (2d Cir. 2016).

Case 1:26-cr-00001-AHA    Document 50    Filed 01/23/26    Page 10 of 39
USCA Case #26-3009    Document #2161061    Filed: 02/25/2026    Page 226 of 350

10

Each device contained an electrical fuzing system consisting of a power source (battery), wires, a switch (timer), and an ignitor (steel wool). The electrical fuzing systems were each connected to a 9v battery and designed, upon completion of the electrical circuit by the switch, to deliver electricity and heat to the steel wool inside the metal pipe. The steel wool would then begin to burn and ignite the black powder, filling the metal pipe with gas until it exploded. The FBI explosives examiner confirmed that when connected to a 9v battery, the steel wool in each device in fact glowed and burned, indicating that the fuzing systems, when appropriately assembled, were capable of generating heat to initiate an explosion after a delay. The disrupted components of each electrical fuzing system are shown below.



**Device 1 (DNC)**



**Device 2 (RNC)**



11

The FBI obtained records for the defendant's checking account and three of his credit cards for the time period January 2018 to January 2021.    Records for three additional credit cards were obtained for the period of January 2018 to November 2025.    The FBI reviewed the transaction history for all of these accounts.

Between 2018 and 2020, the defendant purchased numerous components that he used to manufacture the pipe bombs placed at the RNC and DNC.    The defendant purchased these components primarily from physical retail locations in northern Virginia, as listed below.

| Component | Picture | Quantity | Purchase Date | Store |
|---|---|---|---|---|
| 9V Battery Connector | | 5 | 11/12/2019<br>12/28/2019 | Micro Center |
| Timer | | 2 | 6/3/2020 | Walmart |
| 1"x8" Pipe Nipple | | 6 | 6/1/2020<br>6/8/2020<br>11/16/2020 | Home Depot |
| Black Iron End Cap | | 12 | 10/22/2019<br>6/20/2020<br>7/8/2020<br>11/16/2020 | Home Depot |
| Galvanized End Cap | | 2 | 3/10/2020 | Home Depot |
| 14 Gauge Red Wire | | 350 ft | 5/23/2019<br>10/22/2019<br>9/27/2020<br>10/7/2020 | Home Depot |
| 14 Gauge Black Wire | | 150 ft | 9/27/2020<br>10/7/2020 | Home Depot |
| 14 Gauge Red Wire | | 100 ft | 11/24/2020 | Lowes |
| 14 Gauge Black Wire | | 100 ft | 11/24/2020 | Lowes |
| Steel Wool | | 1 | 12/4/2020 | Home Depot |
| Sulfur | | 1 lb | 1/14/2018 | Amazon |

Notably, the sulfur that the defendant purchased was Lilly Miller brand sulfur dust.

In addition to purchasing each type of component used to make the pipe bombs, the defendant purchased equipment consistent with manufacturing pipe bombs. Such items included:

- Safety glasses on or about July 8, 2020;

- A wire stripping tool on or about November 14, 2020;

13

- Wire nuts, which are used to join wires together, on or about November 14, 2020;

- Sandpaper on or about November 21, 2020;

- A machinist's file, a tool for shaping and smoothing metal parts, on or about November 21, 2020; and

- Protective gloves and disinfecting wipes on or about November 24, 2020.

After planting the pipe bombs on January 5, 2021, the defendant continued to use his personal credit and debit cards to purchase bombmaking components, as illustrated below.   The last identified purchase occurred on August 13, 2022.

| Component | Picture | Quantity | Purchase Date | Store |
|---|---|---|---|---|
| Timer |  | 1 | 1/21/2021 | Walmart |
| 1"x8" Pipe Nipple |  | 8 | 1/22/2021 3/20/2021 10/6/2021 8/10/2022 | Home Depot |
| Black Iron End Cap |  | 11 | 4/4/2021 6/1/2021 6/8/2021 6/26/2021 10/11/2021 8/13/2022 | Home Depot |
| Galvanized End Cap |  | 8 | 3/20/2021 3/21/2021 8/13/2022 | Home Depot |
| 14 Gauge Red Wire |  | 50 ft | 6/1/2021 | Home Depot |
| 14 Gauge Black Wire |  | 50 ft | 6/1/2021 | Home Depot |
| Steel Wool |  | 1 | 1/22/2021 | Home Depot |
| Alligator Clips |  | 2 | 1/23/2021 | Home Depot |

14

In addition to purchasing the types of components used in the pipe bombs that the defendant planted on January 5, 2021, the defendant also used his credit and debit cards to purchase:

- Four alarm clocks and duct tape on March 28, 2020;

- A pressure cooker on July 25, 2020;

- Three analog wrist watches in separate purchases on November 25, 2020, December 23, 2020, and January 21, 2021;

- A funnel and canning jar on January 28, 2021;

- Nails on February 10, 2021, and June 26, 2021;

- A 2-inch by 2-foot PVC pipe on March 20, 2021;

- A 1-inch by 10-inch galvanized pipe nipple, a 2-inch PVC plug, and a PVC pipe adapter on March 21, 2021; and

- A drill bit set on June 10, 2021.[3]

### The Defendant's Arrest and Confession

On December 4, 2025, law enforcement executed an arrest warrant for the defendant and took him into custody. Search warrants were executed on the defendant's person, his home in Woodbridge, Virginia, his Nissan Sentra, and his workplace in Fairfax, Virginia.

A Samsung cellular device was seized from the defendant's person at the time of his arrest. A forensic review of the device's contents showed that between December 2020 and December

---

[3] These purchases were not included in the government's original factual proffer and thus not relied on by the magistrate judge in his decision to detain the defendant. The government supplements its proffer of facts with this information.

2025, the device recorded 943 events identified as a "factory reset" or "wipe," including a "wipe" event approximately three hours before the defendant's arrest on December 4, 2025.[4]

Inside the defendant's home, law enforcement recovered, among other evidence, (1) a Home Depot shopping bag containing three black iron end caps, one galvanized end cap, two 1-inch by 8-inch pipe nipples, and a Home Depot receipt dated November 16, 2020, for two 1-inch by 8-inch pipe nipples, three black iron end caps, and gloves located inside a closet accessible only through the defendant's bathroom; (2) a Lowes shopping bag containing two galvanized end caps located inside the same closet; and (3) 14-gauge red wire and wire strippers located inside the garage. Inside the defendant's vehicle, law enforcement recovered, among other evidence, (1) a Home Depot receipt dated August 10, 2022, for hand sanitizer, two 1-inch by 8-inch pipe nipples, and work gloves; (2) a Home Depot shopping bag containing two 1-inch by 8-inch pipe nipples; (3) a Home Depot shopping bag containing two black iron end caps and two galvanized end caps; and (4) a nine-volt (9v) battery.

Following his arrest, the defendant was transported from Woodbridge, Virginia to the FBI's Washington Field Office, where he executed a written waiver of his *Miranda* rights and was interviewed by investigators for multiple hours. An image of the defendant during the interview is shown below.

---

[4] The first "factory reset" or "wipe" events took place on December 15 and 21, 2020. The next such event did not occur until July 15, 2022. From that date, the "factory reset" or "wipe" events occurred at least once a week. On some days, the device appears to have been wiped multiple times in the same day.

16



During the interview, which was video-recorded, [5] the defendant initially denied manufacturing, transporting, and planting the pipe bombs.   When asked about his whereabouts on January 5, 2021, the defendant stated that he drove his Nissan Sentra to Washington, D.C. by himself that evening to attend a protest concerning the outcome of the 2020 election.   The defendant explained: "I didn't agree with what people were doing, like just telling half the country that they – that their – that they just need to ignore it. I didn't think that was a good idea, so I went to the protest."   The defendant "has never really been an openly political person" and does not

---

[5]  The government provided multiple video and audio-recorded versions of the defendant's custodial interview to the defense on December 8, 2025.   In its memorandum in support of pretrial detention, the government summarized that interview in substantially the same terms as it is summarized in this pleading.   *See* ECF No. 17.   On January 12, 2026, counsel for the defendant gave a media interview in which he reportedly said that "the statements that are in the government's filing" about the defendant's interview "are missing context, and at some point, the government is making affirmative false statements," and that "[s]ome of the representations that the government made, in our opinion, are false."   *See* FOX 5 Washington DC, *DC pipe bomb suspect voted for Trump twice, attorney says*, available at https://www.fox5dc.com/news/dc-pipe-bomb-suspect-voted-trump-twice-qualifies-pardon-like-other-j6-defendants-lawyer-says.   The defendant does not repeat these claims in his motion for relief from this Court.

17

discuss politics often with his family to avoid conflict.   According to the defendant, "no one knows" his political views, including his family.   The defendant stated that he does not align politically with his family members and did not tell them that he "was going to a protest in support of [then President] Trump."

Later in the interview, the defendant explained that after the 2020 election, "when it first seemed like something was wrong" and "stuff started happening," he began following the issue closely on YouTube and Reddit and felt "bewildered."   In the defendant's view, if people "feel that, you know, something as important as voting in the federal election is being tampered with, is being, you know, being – you know, relegated null and void, then, like, someone needs to speak up, right?   Someone up top.   You know, just to, just to at the very least calm things down."   The defendant felt that "the people up top," including "people on both sides, public figures," should not "ignore[e] people's grievances" or call them "conspiracy theorists," "bad people," "Nazis," or "fascists."   Instead, "if people feel that their votes are like just being thrown away, then . . . at the very least someone should address it."

As the interview continued, the defendant maintained that he did not plant the pipe bombs. However, when the defendant was shown a picture of a Nike Air Max Speed Turf shoe, he admitted that he "used to have a pair" and stated that he "threw them away" because "they were old and they were coming apart."   After approximately two hours, during which the defendant maintained that he had not placed the bombs, one of the interviewing agents asked the defendant if he wanted to end the interview.   The defendant responded that "everything is just blank" and "a little too much to process."   The interviewing agents then suggested that the defendant look at video footage from the night of January 5, 2021.   When the defendant was shown the still image below

18

of himself on surveillance video close in time to the planting of the bombs, he stated that he did not recognize the person and had not previously seen the video.



The interviewing agents reminded the defendant that lying to them was an additional criminal offense and asked the defendant again whether he was the individual on the surveillance video. This time, the defendant paused for approximately fifteen seconds, placed his head face down on the table, and answered, "yes."

After the defendant's admission, the interviewing agents explained to him that they could either continue to discuss his actions on January 5, 2021, or they could stop the interview and transport the defendant to court for his initial appearance.    The agents explained what an initial appearance is and that if the defendant continued with the interview, he would appear in court the following day.    The defendant asked for time to process things, and the agents stepped out of the interview room for approximately twenty minutes.    When they returned, the defendant expressed

19

his interest in continuing the interview and executed a written waiver to delay his presentment in court to the next day.

Over the next approximately one and one-half hours, the defendant walked the interviewing agents in detail through his construction, transportation, and planting of the pipe bombs.    The defendant explained that he made the black powder in the devices using charcoal, Lilly Miller sulfur dust, and potassium nitrate that he purchased from Lowes.    The defendant mixed these ingredients in a Pyrex bowel and used a spoon or measuring cup to pour the black powder into the devices.    According to the defendant, he learned to make the black powder from a video game that listed the ingredients, and he also viewed various science-related videos on YouTube to assist him in creating the devices.    Regarding the construction of the devices, the defendant explained that he used a hand drill and bit to drill the end caps on the devices, used pliers to crimp the alligator clips, and used kitchen timers rather than alarm clock timers because the kitchen timers were easier to use.    When asked where he kept the bombmaking materials, the defendant explained that he hid them in a closet inside his home so they would not be found by a family member.    The defendant stated that he assembled the devices in the hours before he drove to Washington, D.C. on January 5, 2021, and that he cleaned the devices with disinfectant wipes.    Eventually, the defendant admitted that he did not go to Washington, D.C. to attend a protest but in fact traveled there to plant the devices.

The defendant stated that he transported the devices to Washington, D.C. on January 5, 2021, inside a shoe box in the back seat of his Nissan Sentra.    He wore a mask and hood that evening to avoid identification, and he wore gloves to avoid leaving fingerprints.    When the defendant arrived in the city, he parked his car on D Street, Southeast, between 2nd Street and 3rd

Street and Folger and Providence Parks.   The defendant placed one of the devices in his backpack, exited his car, and walked toward the DNC.   He set the timer on the first device to the maximum duration (60 minutes) and planted the device near the DNC.   The defendant then returned to his car, retrieved the second device and placed it in his backpack, and walked to the RNC, where he set the timer for 60 minutes and planted the device.[6]   The defendant explained that he had used Google Maps to look up these locations in advance.   After planting the devices, the defendant returned to his car, left the city, picked up food from a restaurant in Virginia, and returned home.

According to the defendant, he was not really thinking about how people would react when the bombs exploded, although he hoped there would be news about it.   The defendant stated that he had not tested the devices before planting them.   He claimed that when he learned that the devices did not explode, he was "pretty relieved," and asserted that he placed the devices at night because he did not want to kill people.   After seeing himself on the news, the defendant stated that he discarded all the bombmaking materials he had at a nearby dump.   The defendant stated that he did not tell anyone about the pipe bombs before planting them or in the years since. Although the defendant denied building additional explosive devices, he admitted that sometime after he built the pipe bombs used in this case, he used beaker sets to conduct another science

---

[6] During the interview, the defendant indicated that he may have purchased the backpack he used to transport the pipe bombs from Target, and that he did not recall where he had purchased the grey hooded sweatshirt.   The defendant's purchase history reflected purchases from Target throughout 2020.   Records obtained from Target showed that two the of the specific items that the defendant purchased in 2020 were identified as "Men's Dome Backpack - Goodfellow & Co™ Olive Green" and "Men's Sherpa Lined Hooded Fleece Jacket - Goodfellow & Co™ Gray L." Based on a visual comparison, the purchased items appear to be consistent in shape and size with the backpack and sweatshirt seen on surveillance video.

experiment to create potassium chlorate, which he claimed was unrelated to bombmaking. Potassium chlorate is an oxidizing agent commonly used in explosives.[7]

When the interviewing agents returned to the defendant's motive, he explained that "something just snapped" after "watching everything, just everything getting worse." The defendant wanted to do something "to the parties" because "they were in charge." When asked why he placed the devices at the RNC and DNC, the defendant responded, "I really don't like either party at this point." The defendant also explained that the idea to use pipe bombs came from his interest in history, specifically the Troubles in Ireland. The defendant denied that his actions were directed toward Congress or related to the proceedings scheduled to take place on January 6.

## ARGUMENT

On January 5, 2021, the defendant traveled to downtown Washington, D.C and attempted to bomb the national headquarters of the country's two major political parties. He did so to intimidate political leaders and public officials. Upon realizing that his conduct had generated significant public attention, the defendant, by his own admission, destroyed direct evidence of his criminal conduct. He nevertheless continued to pursue his interest in bombmaking, experimenting with a new and more reactive explosive compound (potassium chlorate) and purchasing additional components for constructing pipe bombs, many of which were in his car and home when he was arrested in December 2025.

---

[7] *See, e.g.*, Masahiro Tagawa et al., *Effects of composition on the explosive properties of potassium chlorate and oils*, 10 FORENSIC SCIS. RSCH. 1 (2025).

The defendant has been indicted with transporting explosives across state lines intending to use them to intimidate and damage or destroy property in violation of 18 U.S.C. § 844(d), and with maliciously attempting to use those explosives to damage or destroy property in violation of 18 U.S.C. § 844(i). The latter offense is listed as a federal crime of terrorism in § 2332b(g)(5)(B) and carries a maximum term of imprisonment of 20 years. *See* 18 U.S.C. § 3142(f)(1)(A).

As the magistrate judge found, the record in this case establishes "ample" probable cause that the defendant maliciously attempted to use explosives in violation of § 844(i), giving rise to a rebuttable presumption that no combination of conditions exist that would reasonably assure the community's safety if the defendant were released. *See* Detention Order at 8; 18 U.S.C. § 3142(e)(3)(C). Even assuming the defendant rebutted this statutory presumption of detention,[8] "the presumption does not disappear entirely but remains a factor to be considered among those weighed by the district court." *United States v. Thomas*, 456 F. Supp. 3d 69, 71 (D.D.C. 2020); *United States v. Gamble*, 810 F. App'x 7, 8 (D.C. Cir. 2020) ("[T]he statutory presumption does not disappear like a 'bursting bubble' once a defendant offers some evidence that he is not a danger to the community[.]"). Indeed, even when rebutted, the presumption "is given substantial weight," *United States v. Ali*, 793 F. Supp. 2d 386, 391 (D.D.C. 2011), as it is "not simply an evidentiary tool designed for the courts" but also serves as a reflection of "Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial[.]"

---

[8] In his motion, the defendant claims that the magistrate judge "acknowledged that the statutory presumption was rebutted." Def.'s Mot. at 5–6. In fact, the magistrate judge made clear no less than four times that even *assuming* the presumption was rebutted, there was clear and convincing evidence that no conditions of release would reasonably assure the community's safety. *See* Detention Order at 1, 6, 8, & 18.

23

*United States v. Lee*, 195 F. Supp. 3d 120, 125 (D.D.C. 2016) (quoting *United States v. Stone*, 608 F.3d 939, 945–46 (6th Cir. 2010)).

Together with the statutory presumption of detention, the Court must consider: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.    *See* 18 U.S.C. § 3142(g).

The record in this case compels the conclusion that there is no condition or combination of conditions that would reasonably assure the community's safety if the defendant were released pending trial.    Detention is warranted based on the extreme and profoundly serious nature of the defendant's crimes, the overwhelming evidence of his guilt, his continued interest in and pursuit of bombmaking activity, his destruction of evidence and sustained efforts to conceal and obfuscate, and the intolerable risk that he will again resort to violence to express his frustration with the world around him.    The magistrate judge, giving due consideration to each detention factor and the presumption, correctly found that there is clear and convincing evidence on this record that the defendant poses an unacceptable risk of danger to the community if released and appropriately ordered him detained pending trial.    There is no basis to disturb that decision, and the Court should deny the defendant's motion.

### A.  <u>Nature and Circumstances of the Charged Offenses</u>

The nature and circumstances of the defendant's crimes weigh heavily in favor of pretrial detention.    The defendant assembled two bombs, brought them into Washington, D.C., and planted them outside the headquarters of the two major political parties in the United States.    By his own admission, the defendant committed these chilling acts because he was unhappy with the

24

A237

response of political leaders on both sides of the political aisle to questions raised about the results of the 2020 election, and "something just snapped."    As the magistrate judge observed, the nature of the defendant's crimes is "gravely serious," and "[t]o simply describe them is to demonstrate as much."    Detention Order at 9–11; *see* 18 U.S.C. § 3142(g)(1) (directing courts considering nature and circumstances of offense to specifically "take into account" whether the crimes involved an "explosive" or "destructive device").

While the defendant may have reached a psychological breaking point, his crimes were anything but impulsive.    Indeed, the defendant's pipe bombs—and the fear and terror they instilled in the general public—were the product of weeks of premeditation and planning.    The defendant purchased the components that he used to construct the bombs over a series of months, including before and after the 2020 election.    The defendant acquired the knowledge necessary to assemble the devices, according to him, by watching YouTube science videos and playing video games.    Whatever the precise contours of the defendant's research and preparation, it was sufficiently extensive for him to assemble the two pipe bombs in the hours leading up to his travel to Washington, D.C. to plant them on January 5, 2021.    *See* Detention Order at 16 (emphasizing "the speed with which [the defendant] was able to construct the so-called 'pipe bombs'").    And it was sophisticated enough for him to construct viable explosive devices using all the components necessary to cause an explosion.    The calculated nature of the defendant's criminal conduct over an extended period weighs heavily in favor of pretrial detention.

Perhaps more than anything else, the defendant's choice of targets demonstrates the extreme and deeply dangerous nature of his conduct.    Although the defendant acquired the bombmaking components in the months leading up to January 5, 2021, he chose to plant them at

25

the headquarters of the DNC and RNC in downtown Washington, D.C., on the eve of the January 6 certification of the electoral college vote.  *See* Detention Order at 10 (emphasizing "the timing and broader context" of the defendant's conduct and "the resulting fear and alarm [that] followed").   In his own words, the defendant did so because he did not "like either party," but "they were in charge" and thus were, in the defendant's mind, an appropriate target for extreme acts of violence.   The defendant's choice of targets risked the lives and safety of innocent pedestrians and office workers who could have been near the bombs at the time they were set to explode, law enforcement and first responders who encountered and disrupted the devices when they were discovered the next day, and anyone who unknowingly came near the bombs between their placement and disruption, including national political leaders, such as the Vice-President-elect and Speaker of the House, who were inside of the respective party headquarters or drove by them on January 6, 2021.[9]   In this sense, the defendant's invocation of the Troubles in Northern Ireland is telling; bombings were used frequently throughout that period to kill officials and civilians for political purposes.[10]   As the magistrate judge appropriately observed, "if the plan had succeeded, the results could have been devasting: creating a greater sense of terror on the eve of a high-security Congressional proceeding, causing serious property damage in the heart of Washington, D.C., grievously injuring DNC or RNC staff and other innocent bystanders, or

---

[9] *See* Staff of H. Subcomm. on Oversight & H. Subcomm. on Admin. State, Reg. Reform, and Antitrust, 119th Cong., *Four Years Later: Examining the State of the Investigation into the RNC and DNC Pipe Bombs* (Jan. 2, 2025) (Interim Report), at 19, 25.

[10] *See, e.g.*, *The Troubles: Northern Ireland History*, Encyc. Britannica, (last visited Dec. 23, 2025), https://www.britannica.com/event/The-Troubles-Northern-Ireland-history.

26

worse." Detention Order at 11. The Court should consider this context and the gravity of the defendant's targets in assessing the nature of the charged offenses.

Ultimately, it was "more a product of fortune than fate" that the defendant failed to explode one or both of his bombs and that no one was killed or maimed due to his actions. *See United States v. Klein*, 539 F. Supp. 3d 145, 153 (D.D.C. 2021) (rejecting claim that defendant's actions did not precipitate "specific acts of violence or the death or injury of any person" as "more a product of fortune than fate"). Indeed, the defendant admitted that he set both devices to ignite and explode 60 minutes after he planted them. His failure to accomplish his objectives does not mitigate the profoundly dangerous nature of his crimes. Appropriately, the defendant now faces criminal charges that carry significant penalties, including a twenty-year maximum sentence and five-year mandatory minimum sentence for malicious use of explosives in violation of 18 U.S.C. §§ 844(i)—"substantial terms of imprisonment [that] reflect Congress' appreciation for the severity of these offenses." *United States v. Brown*, 538 F. Supp. 3d 154, 167 (D.D.C. 2021); *see also United States v. Wills*, 311 F. Supp. 3d 144, 148 (D.D.C. 2018) (five-year mandatory minimum "reflect[ed] Congress' judgment as to the seriousness of the offense"). The defendant's actions, and the significant potential sentence he now faces, reflect the need for pretrial detention in this case.

According to the defendant, however, the District of Columbia's good fortune that he was not a more skilled bombmaker should weigh in favor of his release into the community while pending trial for attempting to bomb buildings in the nation's capital. Stated plainly, the defendant's motion minimizes the severity of his conduct. Although the defendant admitted on video that he manufactured and planted the pipe bombs, set them to explode, and intended that

27

they would explode to generate news coverage, he now claims that "no credible evidence exists" that he has "ever" made a viable explosive, that he is "incapable" of doing so, and that "there was no possibility" that anyone could have been hurt by his actions because the devices were "harmless." Def.'s Mot. at 3, 7–8. This Court should conclude, as the magistrate judge did, that these efforts to minimize are "decidedly unpersuasive." Detention Order at 10.

The defendant did not plant prop bombs filled with sand or sugar, or constructed with Legos. The defendant assembled two improvised explosive devices, he planted them, and he set each to explode. The evidence need not establish that the defendant exhibited expertise or professionalism in his bombmaking to show his dangerousness. Indeed, the rudimentary and amateurish nature of improvised explosive devices is at least in part what makes them so dangerous.

Nevertheless, the defendant's motion relies heavily on a submission by a defense witness to dispute the likelihood that his bombs would have exploded. *See* ECF No. 48-1 ("Def.'s Mot., Ex. 1"). As an initial matter, even if the Court were to credit the defense witness—and assume, counterfactually, that the FBI explosives examiner who personally assessed the pipe bombs had not opined that each device contained all the components necessary to explode and was viable— the defendant still transported and maliciously attempted to use explosives as charged under 18 U.S.C. § 844. The term "explosive" as defined in § 844(j) includes explosive bombs and similar devices as well as fuzes, gunpowders, and materials containing any oxidizing and combustible units that may cause an explosion upon ignition. *See* 18 U.S.C. §§ 844(j), 232(5). In other

28

words, the defendant committed serious federal criminal offenses regardless of the probability that his bombs would have exploded.[11]

This legal reality notwithstanding, the Court should evaluate critically the defense witness's submission.   For example, the defense witness opined definitively that neither bomb "contain[ed] an explosive filler capable of causing an explosion" before acknowledging, in seeming contradiction to that conclusion, that the black powder recovered from the bomb placed outside the RNC "did produce a flame test 'with positive results.'"   Def.'s Mot., Ex. 1 at 2. Although the defense witness claimed that "no details are given of this positive result," *id.*, in fact, the FBI explosives chemistry examiner who conducted the flame test detailed in his case file that this powder sample, when heated, "sizzled, produced flying burning embers, and sustained a flame."[12]

The defense witness nevertheless went on to opine: "[I]t seems unlikely that this small amount of flame-reactive powder would be capable of causing the bulk of the insufficiently mixed powder to react or burst the steel pipe by itself."   Def.'s Mot., Ex. 1 at 2.   The basis for this

---

[11]   *See also United States v. Musso*, 914 F.3d 26, 30, 32–33 (1st Cir. 2019) (inoperable grenades containing explosive material were "destructive devices" under relevant statute); *United States v. Sheehan*, 838 F.3d 109, 119–20 (2d Cir. 2016) (nonfunctioning homemade bomb containing explosive charge with inoperable fuze was "explosive bomb" under relevant statute). Moreover, the fuzes themselves constitute explosives under § 844.   *See United States v. Guillen*, 995 F.3d 1095, 1101 (10th Cir. 2021) (case charging violation of § 844(i) in which evidence established that "[a] fuse ran through the pressure cooker's release valve and connected to an electric soldering iron, which was plugged into a timer that was plugged into the wall with a power strip" and that "device was designed so that the timer would turn on the soldering iron, which would heat up, ignite the fuse, and cause an explosion").

[12]   The chemistry examiner's case file was produced to the defense on December 23, 2025. It is unclear whether the defense witness was provided the complete case file for review, as the submission lists only the examiner's final reports as "items reviewed for evaluation."   Def.'s Mot., Ex. 1 at 1.

opinion is unstated. Although the FBI chemistry examiner made clear in his case file that, for each of the powder samples that did not produce positive flame test results, the examiner was "[u]nable to conduct accurate [thermal susceptibility testing] due to small amounts of inhomogeneous powders present," the defense witness apparently assumed that each pipe bomb was filled not with explosive black powder but with the "inhomogeneous powder" (what the defense witness referred to as "insufficiently mixed powder"). Def.'s Mot., Ex. 1 at 2. The defense witness also apparently assumed that any "insufficiently mixed powder"—which the witness acknowledged consisted of the fuels charcoal and sulfur along with the oxidizer potassium nitrate[13]—would have simply remained inert when exposed to the sustained heat generated by the explosive black powder. These assumptions are wholly unsupported. First, the powder samples were collected after the destructive devices were disrupted—*i.e.*, after they had broken into pieces and scattered during the render safe procedures employed by the Hazardous Device Section of the USCP. Not surprisingly, some of the powder samples collected contained apparent "vegetation or plant material" and other foreign particles. Notably, however, the black powder sample that produced a sustained flame was recovered along with a piece of steel wool from inside of one of the device end caps, meaning its exposure to foreign particles was limited. Moreover, even the "inhomogeneous" samples were not inert—one of those samples, when heated, produced "flying burning embers" and "[p]ossible short bursts of sustained flame" but was ultimately too "[d]ifficult

---

[13]  *See* Def.'s Mot., Ex. 1 at 2 (describing these chemicals as "the three classic ingredients used to make Black Powder"). The defense witness claimed that unless these three chemicals are apportioned in the "most widely cited" 75/15/10 ratio, they are not black powder. *Id.* However, as explained in one of the reference books on which the defense witness relied, historically "the formulas for black powder" have varied significantly from the modern composition. *See* TENNY L. DAVIS, *THE CHEMISTRY OF POWDER AND EXPLOSIVES* 39 (1943).

30

to discern due to [the] small amount of material" tested.    The defense witness does not acknowledge, much less address, these facts, and there is no basis to credit his submission.[14]

Ultimately, the defendant cannot dispute that he taught himself how to make explosive material and created a mixture of sulfur, charcoal, and potassium nitrate—the three ingredients of explosive black powder; that he taught himself how to construct pipe bombs and assembled two such devices; and that each bomb contained his homemade explosive material encased in a capped metal pipe and rigged to ignite and explode using an electrical fuzing system.    The defendant did all of this for the purpose of engaging in an act of political violence, which the D.C. Circuit has recognized places him "in a different category of dangerousness."    *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021); *see id.* at 1285 n.1 (Katsas, J., concurring in part and dissenting in part).    The nature and circumstances of these crimes weigh heavily in favor of pretrial detention.

---

[14] The defense witness also opined unequivocally that "neither device has a functional fuzing and firing system" and that a 9v battery and steel wool could not ignite black powder. Def.'s Mot., Ex. 1 at 2.    The defense witness provided no basis for these opinions, and it is unclear to the government what could support them.    As noted, the fuzing systems in this case were broken into pieces when the pipe bombs were disrupted.    And a cursory review of public source information shows how easily and efficiently steel wool burns simply by touching the terminals of a 9v battery. *See, e.g.*, TKOR, *Steel Wool and Batteries Have a CRAZY Reaction*, https://www.youtube.com/watch?v=dxjE9O0n6YI (starting at 1:36, demonstrating how steel wool ignites and burns immediately upon touching 9v battery).    Indeed, the defense witness's opinion as to the powder samples is the only opinion for which he provided any reasoning that could be subjected to analysis.    Moreover, although the defense witness described as "unavailable for evaluation" the government's "theory of how the two devices could have caused an explosion," Def.'s Mot., Ex. 1 at 1, the FBI explosives examiner's final report, which is attached to the witness's submission, included a "logical construction diagram" and a step-by-step description of how the device components could be assembled to cause an explosion, *see id.* at 10–11.

B. __Weight of the Evidence Against the Defendant__

The overwhelming weight of the evidence in this case also favors pretrial detention. The video, location, and purchase history evidence that led to the defendant's arrest and charging is powerful proof of guilt in itself. That evidence has been corroborated not only by the recovery of consistent bombmaking components from the defendant's home and vehicle, but by the defendant's hours-long videotaped confession, in which he explained his criminal conduct and intent in detail to investigators. The weight of the evidence against the defendant, and the attendant likelihood of his conviction for serious offenses, heavily support pretrial detention.

The defendant takes issue with the magistrate judge's consideration of this factor, claiming that he viewed it "in a vacuum without consideration of how it relates to an assessment of dangerousness." Def.'s Mot. at 8–9; *id.* (calling the magistrate judge's purported failure to consider evidence of dangerousness a "slight to due process."). In fact, the magistrate judge rejected the defendant's legally unsupported position that evidence of guilt was "wholly irrelevant to his bail proceeding" and that the court was required to consider only evidence of dangerousness, ECF No. 23 at 2; Detention Order at 11–12, before considering in detail the evidence of the defendant's dangerousness, Detention Order at 13–18. In any event, "[i]f the government possesses overwhelming evidence that the defendant is guilty of the crime charged—and the nature of the charged offense involves a danger to the community—then the second factor will help meet the government's burden of persuasion." *United States v. Taylor*, 289 F.Supp.3d 55, 65–66 (D.D.C. 2018); *see also*, *e.g.*, *United States v. Glasgow*, Case No. 1:20-cr-27-7, 2021 WL 2403136, at *8 n.5 (D.D.C. June 11, 2021) ("Because Glasgow has been charged with an inherently dangerous crime (conspiring to distribute and possess with intent to distribute fentanyl and crack

32

cocaine), the evidence proffered by the Government in support of the conspiracy charge is probative of his dangerousness.").    The weight of the evidence here establishes decidedly that the defendant attempted to bomb the national headquarters of the DNC and RNC, and that evidence demonstrates his guilt of the charged crimes as well as his dangerousness.    *See* Detention Order at 12.

### C. The Defendant's History and Characteristics

Although the defendant has not had prior contact with the criminal justice system, his personal history and circumstances demonstrate that conditions less restrictive than detention will not reasonably assure the community's safety while this case proceeds.    After placing two explosives at significant targets on January 5, 2021, the defendant spent the immediate aftermath, and the ensuing years, engaged in a comprehensive effort to avoid apprehension by law enforcement.    By his own admission, the defendant, having disguised himself during the commission of the charged offenses to avoid identification, destroyed direct evidence of his crimes after they were publicized in the media.    Disturbingly, however, the defendant continued to purchase bombmaking components through mid-2022 and used those materials to create, or attempt to create, potassium chlorate.    While the defendant claimed in his interview that this was an innocent science experiment, as discussed further below, potassium chlorate is an oxidizing agent commonly used in the manufacture of improvised explosive devices.

Critically for the Court's consideration, the defendant engaged in all the relevant conduct— developing his motive, purchasing the bombmaking materials, constructing the devices, traveling to D.C. to plant them, and avoiding apprehension for years—while living under the roof of his family's home.    Given the scrutiny of a years-long national investigation into his actions, the

33

defendant had an understandable incentive to keep those closest to him in the dark.    Indeed, the defendant apparently wiped his personal cellphone nearly one thousand times during this period. The defendant now faces the scrutiny of a federal criminal prosecution.    Under these circumstances, there is simply no reason to expect that the defendant, if released pending trial, will conduct himself differently than he has for the past five years.    Rather, there are substantial grounds to conclude that the defendant would continue to hide and obfuscate his activities and present an intolerable danger to the community.

In his motion, the defendant contends that the magistrate judge simply "brushed aside" his lack of criminal history and other favorable circumstances.    Def.'s Mot. at 3.    In fact, the magistrate judge considered this factor in detail, agreeing that, "on balance," it weighed in the defendant's favor.    Detention Order at 12–13 (specifically noting defendant's lack of criminal history or history of non-compliance, ties to community, familial support, education, employment, and diagnoses proffered by defense).    Thus, on this issue, and others, the defendant's reliance on *Munchel*—in which the reviewing court remanded because the detention determination did not address "substantial countervailing evidence that supported release," 991 F.3d at 1282—is misplaced.

### D.  <u>Nature and Seriousness of the Danger Posed by Release</u>

The defendant has confessed to planting pipe bombs outside the headquarters of the nation's two major political parties in downtown Washington, D.C.    He has confessed to constructing the devices, to filling them with his homemade explosive powder, and to setting their timers to explode.    The evidence gathered in law enforcement's investigation in this case corroborates the defendant's confession.    And it establishes that these explosive devices were

34

viable weapons.    Put simply, the defendant poses a serious danger to the community if released

pending trial.    By destroying evidence and deceiving those around him, the defendant has for five

years avoided accountability for actions that endangered lives and created a widespread sense of

fear and terror.    The community should not be subjected to the "articulable threat" that the

defendant, now identified and facing a public prosecution, will again resort to violence as his

chosen means to express his dissatisfaction with the world around him.    *See Munchel*, 991 F.3d

at 1283–84; Detention Order at 18 (distinguishing this case from the "unique" circumstances in

*Munchel* because the defendant here apparently acted alone, chose targets accessible to the general

public day or night, and his actions "were not facilitated by the presence of a large crowd gathered

for some distinct purpose").

The magistrate judge carefully analyzed the record evidence supporting the prospective

danger posed by the defendant if released.    *See* Detention Order at 13–18.    In his motion, the

defendant dismisses this analysis, claiming baldly that there is "not a scintilla of evidence" from

any point in time indicating that the defendant "ever engaged in any activity similar to that for

which he now stands accused."    Def.'s Mot. at 11–12.    The magistrate judge, however, engaged

directly with this argument, calling it "reasonably persuasive, at least as far as it goes."    Detention

Order at 14.

But the argument does not go far.    The magistrate judge articulated the circumstances in

this case that "cut against" the defendant's position, including (1) the defendant's documented

purchases of bombmaking components—pipes, end caps, wires, a timer, and more—between late

January 2021 and August 2022, showing that he "engaged in the same activity leading up to the

offense conduct, amassing the same sorts of parts he used to construct the two explosive devices

giving rise to these charges," *id.*; (2) the defendant's admitted effort to create more explosive material after January 5, 2021, *id.* at 15; (3) the "substantial red flags" raised by the recovery in December 2025 of still more bombmaking components from "a closet in Mr. Cole's home and inside his car—two locations essentially within arm's reach of Mr. Cole's daily routine," *id.*; (4) the defendant's "sudden and abrupt motivation" and the speed with which the defendant, by his own admission, assembled the explosives "over a matter of hours," *id.* at 16; and (5) the defendant's "efforts to hide and obfuscate his activities"—including by wiping his cellphone hundreds of times—which are indicative of "efforts to conceal and destroy information about his personal communications and online activity" and "would hamper the ability of even the most well-intentioned custodian to effectively monitor him," *id.* at 17.    All of this, the magistrate judge concluded, "temper[ed] the notion that the five-year span between the underlying offense conduct and today mitigates any future risk."    *Id.* at 15.    And for good reason.    As the D.C. Circuit recognized in *Munchel*, when a court assesses the prospective threat posed by a defendant, it should consider both "the nature of the threat" and "the resources and capabilities of the defendant"—*i.e.*, whether the defendant has the "means of continuing to" engage in the same conduct "in the future." 991 F.3d at 1283.

The defendant offers no serious response to the magistrate judge's analysis of prospective danger.    Although he faults the magistrate judge for mistakenly describing the defendant's admitted post-January 2021 experimentation with explosive material as involving more black powder, *see* Def.'s Mot. at 13, the reality is even worse.    As the defendant acknowledges, he told FBI agents that he made potassium chlorate, an even *more* reactive and efficient explosive oxidizer

that is well-known in the world of improvised explosive devices.[15]    Indeed, as the defendant's witness recognized in his submission, "homemade chlorate and perchlorate explosives mixtures are far more commonly encountered by bomb squad personnel."    Def.'s Mot., Ex. 1 at 4.    And although the defendant now claims that his potassium chlorate work occurred before January 5, 2021, he told the interviewing agents that this "happened, like, way after," before agreeing that he had used "a bunch of beaker sets" to create the compound.    *Cf.* Def.'s Mot. at 14 (claiming that "[t]he government made no proffer, nor could it, concerning Cole's purchase of explosive powders, or ingredients to prepare explosive powders at any time after January 5, 2021").

Moreover, while the defendant asserts that "the repeated wiping of his phone was a manifestation of [his] OCD, not an attempt to avoid detection," Def.'s Mot. at 15, he provides no explanation for why this purported symptom happened to manifest starting in the summer of 2022, at approximately the same time that the defendant apparently made his final credit or debit card (*i.e.*, traceable) purchases of bombmaking components.    As the magistrate judge correctly observed, the defendant's "alleged behavior is at least equally suggestive of efforts to conceal and

---

[15]    *See* Tom Vanden Brook, *Afghan Bomb Makers Shifting to New Explosives for IEDs*, USA TODAY (June 25, 2013), https://www.usatoday.com/story/news/world/2013/06/25/ ammonium-nitrate-potassium-chlorate-ieds-afghanistan/2442191/ (describing potassium chlorate as "the explosive of choice for insurgents" in Afghanistan "fueling 60% of the IEDs" after the sale of fertilizer, a source of nitrate, was banned). *See generally* "Potassium chlorate," *Wikipedia*, last modified Jan. 20, 2026, https://en.wikipedia.org/wiki/Potassium_chlorate#:~:text= Potassium%20chlorate%2C%20often%20in%20combination,that%20used%20in%20smoke%20 grenades.

destroy information about his personal communications and online activity." Detention

Order at 17.[16]

The defendant's efforts to conceal support not only his continued, prospective

dangerousness, but also the "concrete concerns" that the magistrate judge expressed in

"consider[ing] 'whether [the court] believes the defendant will actually abide by its conditions.'"

Detention Order at 16 (quoting *Munchel*, 991 F.3d at 1280–81). These concerns are self-evident

given the nature of the defendant's post-offense conduct—which includes destroying evidence,

apparently deceiving family members, and repeatedly wiping his cellphone—and "portend[ ] real

challenges in monitoring [the defendant's] conduct in a home-detention setting," even for "the

most well-intentioned custodian." Detention Order at 17. On this point, the Court should be

aware that on January 5, 2021, at approximately 4:17 p.m.—about three hours before the defendant

arrived in the area of the DNC and RNC—one of the defendant's siblings sent a text message to

the defendant's mother stating, "I'm going to dc .. Grams said it may be crazy out there so I was

just letting you know." That same sibling had sent a text message to the defendant a few hours

earlier, at approximately 12:39 p.m. on January 5. In the three days preceding January 5, 2021,

the defendant exchanged text messages only with this sibling and his mother. At the

December 30 detention hearing, the defendant identified this sibling as a character witness who

would supervise the defendant in his employment if released. And the defendant has offered his

---

[16] The government notes that the defendant has not proffered any information in support of the representation that he "has been diagnosed with Autism Spectrum Disorder, Level 1, and obsessive compulsive disorder ("OCD")." Def.'s Mot. at 4. It is unclear to the government what symptoms the defendant experiences in connection with these purported diagnoses or how they are or could be relevant to an assessment of the defendant's dangerousness.

grandmother as his proposed third-party custodian should the Court grant his motion.    *See* Def.'s

Mot. at 15.

At bottom, the offense conduct in this case is extraordinarily serious, there is significant

evidence of the defendant's continued interest in bombmaking, and there are concrete reasons to

doubt that the defendant will abide by release conditions or that a third-party custodian will

effectively monitor him.    On this record, and given the statutory presumption of detention, there

is clear and convincing evidence that no combination of conditions will reasonably assure the

community's safety if the defendant is released.    The magistrate judge's decision to detain the

defendant pending trial was correct and should not be disturbed.

## **CONCLUSION**

The government respectfully requests that the Court deny the defendant's motion to revoke

the pretrial detention order in this case.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:        */s/ Charles R. Jones*
CHARLES R. JONES
D.C. Attorney No. 1035541
Assistant United States Attorney
National Security Section
601 D Street N.W.
Washington, D.C. 20530
(202) 252-6976
Charles.Jones3@usdoj.gov

39

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:26-cr-00001 |
| | ) | |
| BRIAN COLE, JR., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPLY IN SUPPORT OF DEFENDANT'S
## MOTION FOR REVOCATION OF MAGISTRATE JUDGE'S ORDER
## DENYING PRETRIAL RELEASE WITH STRICT CONDITIONS

Defendant Brian Cole Jr. respectfully submits this reply in support of his motion for revocation of the Magistrate Judge's order denying pretrial release with strict conditions (Dkt. 28). In support, Defendant would show as follows:

## INTRODUCTION

Mr. Cole is a 30-year-old man with autism. He has no criminal history. He has lived in the same community his entire life, held steady employment since he was a teenager, and has the support of his family and neighbors.

The charged conduct occurred more than five years ago, when Mr. Cole was 25. Since then, there is no evidence that Mr. Cole has harmed anyone, threatened anyone, or done anything dangerous. The government cannot show otherwise, and its attempts to do so rest on speculation that is demonstrably false. It points to hardware-store purchases that ended more than three years ago, and to compulsive phone activity that began eighteen months after the charged conduct—timing

inconsistent with evidence destruction but consistent with Mr. Cole's documented OCD. The government has no evidence of recent threats, recent weapons acquisition, or recent extremist activity. It has no evidence that Mr. Cole poses a present danger to anyone.

Unable to identify an actual, present threat, the government resorts to insinuation. It closes its response by suggesting that Mr. Cole's sister and grandmother may have been involved in the charged conduct. (Dkt. 50 at 38-39). Its proof? Text messages showing that Mr. Cole's sister—a club promoter who frequently works in Washington, D.C.—told her mother she was going to the city, and that her grandmother had warned it might be crowded. The government also notes that Mr. Cole texted his mother and sister in the days before January 5, 2021, but says nothing about the contents of those messages—as if it is nefarious for a young man with autism who lives and works with his family to communicate with them. That is not evidence of involvement. Nor is it evidence of dangerousness. It is family checking in with each other. The government's decision to publicly imply, with no factual basis, that these private citizens are connected to domestic terrorism is reckless and reveals how little actual evidence it has that Mr. Cole poses a continuing danger.

Mr. Cole is willing to submit to home detention, GPS monitoring, a third-party custodian, weekly reporting, unannounced inspections by Pretrial Services, a no-weapons order, and compliance with any mental health treatment Pretrial Services recommends. His grandmother, the proposed custodian, lives with her husband—Mr. Cole's step-grandfather—who is a retired law enforcement officer with the General

Services Administration. His family understands the seriousness of court-ordered conditions and is committed to ensuring Mr. Cole's compliance. In fact, his family have built an extensive business centered around ensuring that defendants show up for court and stay out of trouble. They will ensure the same of Mr. Cole.

## ARGUMENT

### I. Mr. Cole's History and Characteristics Favor Release.

The Bail Reform Act requires the Court to consider the defendant's character, family ties, employment, length of residence in the community, and criminal history. 18 U.S.C. § 3142(g)(3)(A). Every one of these factors favors Mr. Cole.

Mr. Cole has no criminal history—none. He has no history of violence, no substance abuse issues, and no record of failing to appear or comply with court orders. He has lived in Woodbridge, Virginia his entire life. He graduated high school and has worked continuously since age 14, currently in his family's bail bonding business—work that requires him to help others comply with court-imposed obligations. His neighbors and colleagues have provided character references vouching for him.

Mr. Cole has been diagnosed with Autism Spectrum Disorder, Level 1, and obsessive-compulsive disorder. Exhibit 1. Individuals with autism often thrive with structure and routine—precisely what the proposed conditions of release would provide. Mr. Cole has demonstrated an ability to maintain steady employment and comply with expectations when given a clear framework. Home detention with GPS

monitoring, regular reporting, and oversight by a third-party custodian would provide that structure.

The government's response does nothing to dispute Mr. Cole's personal characteristics, which the Magistrate Judge agreed favored release.

## II. There Is No Evidence Mr. Cole Has Been Dangerous Since the Charged Conduct.

The Bail Reform Act requires a "forward-looking assessment." *United States v. Munchel*, 991 F.3d 1273, 1285 (D.C. Cir. 2021) (Katsas, J., concurring). The question is not what Mr. Cole allegedly did more than five years ago, but whether he poses a danger *now* that conditions cannot mitigate. The government has no evidence that he does.

Consider what the government *does not* claim. It does not claim that Mr. Cole has made any threats since January 2021. It does not claim he has engaged in any extremist activity. It does not claim he has posted anything violent or alarming online; indeed, the government concedes it has found no such posts. It does not claim he has acquired any weapons. It does not claim he has purchased any explosive materials, or the ingredients to make them, at any point after January 5, 2021. And it does not claim he has purchased anything that can even be described as a "component" for any explosive in ***years***.

The government does point out, however, that Mr. Cole purchased a pressure cooker. (Dkt. 50 at 15.) The implication is obvious. But this item was purchased years ago. Mr. Cole explained during his interrogation that he bought it for the house for cooking, and there is no evidence it has ever been used for anything else. Millions of

Americans own pressure cookers. The government's inclusion of this item in a list of purported "bombmaking components" is the kind of innuendo that pervades its argument—suggestive without context but unsupported by any actual evidence.

The government also points to Mr. Cole's statement that he experimented with making potassium chlorate, suggesting this shows continued interest in explosives. (Dkt. 50 at 36-37.) But the government has the timeline wrong. This experiment occurred *years before* the charged conduct, not after. During his interview, Mr. Cole described the experiment in detail: he used beakers and got bleach on the carpet. The government's own discovery confirms that the beakers the government describes were purchased in 2018. And Mr. Cole's mother's declaration confirms the bleach stain on the carpet and that it happened when Mr. Cole's two siblings, Brandon and Bridgette, were still living in the house. *See* Exhibit 2. This means that it must have occurred in 2018 at the latest. Id. Her declaration also explains her understanding that Mr. Cole's experiment was to make "rocket fuel," a common experiment among children and hobbyists. This happened more than seven years ago. The experiment failed, leaving a bleach stain as the only lasting result, and Mr. Cole never repeated it. This is not evidence of ongoing dangerousness.

### III. The Evidence Undercuts the Government's Concealment Theory.

Lacking any evidence that Mr. Cole presents an ongoing danger to anyone, particularly under the restrictive conditions he proposes, the government paints him as a criminal mastermind who engaged in a sustained effort to avoid apprehension. But the government's own evidence tells a different story.

Start with the phone activity. The government notes that Mr. Cole's phone was wiped nearly a thousand times from July 2022 to December 2025. (Dkt. 50 at 15-16). But this activity did not begin until July 2022—eighteen months after the charged conduct. *Id.* at 16 n.4.[1] The government's own discovery shows that Mr. Cole purchased CCleaner, an application that advertises its ability to make phones and computers operate faster by cleaning out junk files.[2] According to Mr. Cole's interview, he understood it to be antivirus software. According to the government, beginning in July 2022, he started compulsively using the cleaning function—a pattern consistent with his documented OCD. (Dkt. 50 at 16 n.4.)

The timing is critical. July 2022 was a year and a half after the charged conduct. And within a few days of the offense, pictures of the suspect were released to the public and covered on national news. If Mr. Cole were trying to destroy evidence of the January 5, 2021, offense, one would expect the wiping to begin immediately afterward, not eighteen months later. The timing is inconsistent with concealment but entirely consistent with the compulsive behavior associated with OCD. Exhibit 1.

The physical evidence is even more telling. When law enforcement searched Mr. Cole's home and vehicle in December 2025, they found pipes, end caps, and other "components"—with receipts dating back to 2020. (Dkt. 50 at 16.) The government cites this as evidence of dangerousness. But consider what it actually shows: Mr. Cole

---

[1]     The government notes that the first "wipe events" took place in December 2020, but the next wipe, and the pattern of wiping at least once a week, did not begin until July 15, 2022. (Dkt. 50 at 16 n.4.)

[2]     *CCleaner*, https://www.ccleaner.com

left these items sitting in his closet and his car, with the original receipts, for four to five years.

The government cannot have it both ways. Either Mr. Cole is a meticulous evidence-destroyer who carefully concealed his involvement for years, or he is someone who left Home Depot receipts from November 2020 in his vehicle until December 2025. The evidence overwhelmingly supports the latter. A defendant trying to cover his tracks does not keep receipts for years. He does not leave incriminating materials in arm's reach for half a decade. The presence of these items undercuts the concealment narrative—and it undercuts the claim that Mr. Cole poses an ongoing danger. If he intended to use these materials, he had years to do so. He did not.

## IV. The Government's Insinuations About Mr. Cole's Family Are Baseless.

Unable to establish that Mr. Cole poses a present danger, the government pivots to his family. It notes that on January 5, 2021, Mr. Cole's sister texted their mother: "I'm going to dc .. Grams said it may be crazy out there so I was just letting you know." (Dkt. 50 at 38.) The government also pointed out the fact that Mr. Cole texted his mother and sister in the days before January 5, 2021—but says nothing about the contents of those messages. And it observes that Mr. Cole's sister has been proposed as someone who could supervise his employment, and that his grandmother has been proposed as his third-party custodian. The implication is clear. The government is suggesting these family members may have been involved in the charged conduct, without offering any legitimate evidence for this accusation.

This suggestion is reckless. As her declaration confirms, Mr. Cole's sister is a club promoter who frequently travels to Washington, D.C. for work. *See* Exhibit 3. Her text to her mother was exactly what it appears to be: a daughter letting her mother know she would be in a city where protests were expected, relaying that her grandmother was worried about crowds. And the notion that it is suspicious for a young man with autism who lives and works with his family to text his mother and sister is absurd. That is not evidence of involvement in a crime or dangerousness. It is evidence of a family communicating with each other like normal families do.

But that did not stop the government from publicly suggesting, in a filed court document, that Mr. Cole's sister and elderly grandmother may be connected to domestic terrorism. It has done so without any actual evidence. These are private citizens who have not been charged with anything and against whom there is no evidence of wrongdoing. And if the government did not mean to suggest their involvement, it should say so and make its point about the text messages clear. Otherwise, this sort of defamation does not make their case for detention.

### V. Strict Conditions Can Reasonably Assure Community Safety.

The D.C. Circuit has made clear that district courts can consider whether the risk that a defendant poses can be mitigated by supervisory conditions. *Munchel*, 991 F.3d at 1280-81. The defense has proposed comprehensive conditions: home detention at his grandmother's residence, GPS monitoring via ankle bracelet, his grandmother as third-party custodian, weekly reporting to Pretrial Services, unannounced inspections, a no-weapons order, and compliance with any mental health treatment

Pretrial Services recommends. (Dkt. 48 at 15-16.) Mr. Cole's step-grandfather, a retired law enforcement officer with the General Services Administration, also lives in the home.

The government does not explain why these conditions are insufficient. It asserts that the Court should have "concrete concerns" about compliance, but it identifies no basis for such concerns in Mr. Cole's actual history. (Dkt. 50 at 38.) Mr. Cole has no record of violating court orders. He has no record of absconding. The proposed conditions would place him under constant electronic surveillance, in a home with a retired law enforcement officer, and subject him to random compliance checks. Any violation would result in immediate revocation.

The government argues that Mr. Cole's alleged conduct shows he can act quickly, assembling devices "over a matter of hours." *Id*. at 36. But this ignores what else he would need. Mr. Cole cannot manufacture explosives under home detention with GPS monitoring and unannounced inspections. For starters, he cannot acquire the materials without detection. And he has shown no inclination to do so: there is no evidence he has purchased explosive materials or their ingredients at any point in the past five years.

Mr. Cole's alleged conduct occurred more than five years ago. He has done nothing dangerous since. He has no criminal history, strong community ties, and family—including a retired law enforcement officer—willing to ensure his compliance. He is prepared to accept the most restrictive conditions of release available. Under these circumstances, continued detention is not the "carefully

limited exception" the Constitution requires—it is an unjustified deprivation of liberty. *United States v. Salerno*, 481 U.S. 739, 755 (1987).

## CONCLUSION

For all the reasons above, the Court should grant Mr. Cole's motion and order his release on strict conditions.

Respectfully submitted this January 27, 2026.

/s/ **J. ALEX LITTLE**
J. Alex Little (Pro Hac Vice)
Zachary C. Lawson (Pro Hac Vice)
John R. Glover (Pro Hac Vice)

**LITSON PLLC**
54 Music Square East, Suite 300
Nashville, TN 37203
Telephone: 615-985-8205
alex@litson.co

/s/ **MARIO B. WILLIAMS**
Mario B. Williams
Ga. Bar No. 235254 (Pro Hac Vice)

/s/**JOHN SHOREMAN**
John M. Shoreman
DC Bar #407626

**HUMANITY DIGNITY AND RIGHTS LLC**
Life Time Work - Buckhead - at Phipps Plaza
3480 Peachtree Road, NE, Second (2nd) Floor
Atlanta, Georgia 30326
Tel: 470-257-2485
mwilliams@hdrattorneys.com
jms@mcfaddenshoreman.com

***Counsel for Brian Cole Jr.***

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served a copy of the foregoing pleading upon all attorneys of record via the Court's electronic filing system.

Respectfully submitted on this January 27, 2026,

**/s/ALEX LITTLE**
Alex Little (Pro Hac Vice)

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

### District of Columbia

## Notice of Electronic Filing

The following transaction was entered on 1/29/2026 at 1:52 PM EDT and filed on 1/28/2026

| | |
|---|---|
| **Case Name:** | USA v. COLE |
| **Case Number:** | 1:26-cr-00001-AHA |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
 **Minute Entry for proceedings held before Judge Amir H. Ali: Bond Review Hearing as to BRIAN J. COLE JR. held on 1/28/2026. Government's oral request for a 30 day continuance; heard and granted. Speedy Trial Excludable (XT) started 1/28/2026 until 2/27/2026, in the interest of justice. Status Conference set for 2/27/2026 at 10:30 AM in Courtroom 19- In Person before Judge Amir H. Ali. Defendant's [48] Motion to Revoke Order Denying Pretrial Release [ECF 28] is heard and taken under advisement. Order forthcoming via Chambers. Bond Status of Defendant: remains Committed/Commitment Issued; Court Reporter: Sonja Reeves; Defense Attorneys: John M. Shoreman, Mario Bernard Williams, Joseph Alex Little IV, and Zachary Carter Lawson; US Attorneys: Charles Robert Jones and Jocelyn S. Ballantine. (zalh)**

**1:26-cr-00001-AHA-1 Notice has been electronically mailed to:**

John M. Shoreman     jms@mcfaddenshoreman.com, ecfnotices@ndh-law.com, kkrueger@ndh-law.com, mdobbs@ndh-law.com, mvcarminati@ndh-law.com, mwilliams@ndh-law.com, osimkins@ndh-law.com

Jocelyn S. Ballantine     jocelyn.ballantine2@usdoj.gov, USADC.CriminalDocket@usdoj.gov

Mario Bernard Williams     mwilliams@hdrattorneys.com, osimkins@ndh-law.com, sbuettner@hdrattorneys.com

Charles Robert Jones     charles.jones3@usdoj.gov

Joseph Alex Little, IV     alex@litson.co, ally@litson.co, litson@ecf.courtdrive.com

Zachary Carter Lawson     zack@litson.co, ally@litson.co, litson@ecf.courtdrive.com

John Ross Glover     jr@litson.co, ally@litson.co, litson@ecf.courtdrive.com

**1:26-cr-00001-AHA-1 Notice will be delivered by other means to::**

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### District of Columbia

## Notice of Electronic Filing

The following transaction was entered on 1/29/2026 at 6:03 PM EDT and filed on 1/29/2026

| | |
|---|---|
| **Case Name:** | USA v. COLE |
| **Case Number:** | 1:26-cr-00001-AHA |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
**MINUTE ORDER as to BRIAN J. COLE, JR. At the court's January 28, 2026, hearing, the court heard the parties' evidence and arguments on Defendant's [48] motion to revoke order denying pretrial release and took them under advisement. Defendant's motion to revoke is denied.**

The court has independently considered the factors under 18 U.S.C. § 3142(g), as well as all the evidence and arguments presented by the parties, and agrees with the careful analysis and conclusions in Judge Sharbaugh's [28] memorandum opinion and order. Having considered the additional declarations and arguments submitted to this court in the first instance, the court concludes that they are insufficient to overcome the government's showing that pretrial detention is appropriate under the relevant factors. Accordingly, considering the nature and circumstances of the charged offense, the weight of the evidence against the defendant, the history and characteristics of the defendant, and the nature and seriousness of the danger to any person or the community posed by release, the court concludes the government has satisfied its burden of persuasion to show clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of others and the community. Signed by Judge Amir H. Ali on 1/29/2026. (lcaha1)

**1:26-cr-00001-AHA-1 Notice has been electronically mailed to:**

John M. Shoreman     jms@mcfaddenshoreman.com, ecfnotices@ndh-law.com, kkrueger@ndh-law.com, mdobbs@ndh-law.com, mvcarminati@ndh-law.com, mwilliams@ndh-law.com, osimkins@ndh-law.com

Jocelyn S. Ballantine     jocelyn.ballantine2@usdoj.gov, USADC.CriminalDocket@usdoj.gov

Mario Bernard Williams     mwilliams@hdrattorneys.com, osimkins@ndh-law.com, sbuettner@hdrattorneys.com

Charles Robert Jones    charles.jones3@usdoj.gov

Joseph Alex Little, IV    alex@litson.co, ally@litson.co, litson@ecf.courtdrive.com

Zachary Carter Lawson    zack@litson.co, ally@litson.co, litson@ecf.courtdrive.com

John Ross Glover    jr@litson.co, ally@litson.co, litson@ecf.courtdrive.com

**1:26-cr-00001-AHA-1 Notice will be delivered by other means to::**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:26-cr-00001 |
| | ) | |
| BRIAN COLE, JR., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## NOTICE OF FILING OF EXHIBITS IN SUPPORT OF REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR REVOCATION

Defendant Brian Cole Jr. respectfully submits this Notice of Filing of Exhibits in support of his reply in support of his motion for revocation of the Magistrate Judge's order denying pretrial release with strict conditions (Dkt. 51). Exhibits attached to this notice are as follows:

1. Letter by Dr. Black;

2. Declaration of Delicia Cole; and

3. Declaration of Brittany Cole.

Respectfully submitted this January 27, 2026.

/s/ J. ALEX LITTLE
J. Alex Little (Pro Hac Vice)
Zachary C. Lawson (Pro Hac Vice)
John R. Glover (Pro Hac Vice)

**LITSON PLLC**
54 Music Square East, Suite 300
Nashville, TN 37203
Telephone: 615-985-8205
alex@litson.co

**/s/ MARIO B. WILLIAMS**
Mario B. Williams
Ga. Bar No. 235254 (Pro Hac Vice)

**/s/JOHN SHOREMAN**
John M. Shoreman
DC Bar #407626

**HUMANITY DIGNITY AND RIGHTS LLC**
Life Time Work - Buckhead - at Phipps Plaza
3480 Peachtree Road, NE, Second (2nd) Floor
Atlanta, Georgia 30326
Tel: 470-257-2485
mwilliams@hdrattorneys.com
jms@mcfaddenshoreman.com

***Counsel for Brian Cole Jr.***

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served a copy of the foregoing pleading upon all attorneys of record via the Court's electronic filing system.

Respectfully submitted on this January 27, 2026,

**/s/ALEX LITTLE**
Alex Little (Pro Hac Vice)

# CENTER for ASSESSMENT AND TREATMENT

David O. Black, PhD, Director

January 27, 2026

Re: Brian Cole, Jr. (date of birth: ▮▮▮▮ 1995)

To Whom It May Concern:

I evaluated Brian Cole, Jr., December 16 and 19, 2025. Based on that evaluation I diagnosed him with Autism Spectrum Disorder, Level 1 (Requiring support) and Obsessive Compulsive Disorder. Over the past several years, Mr. Cole has repetitively wiped his phone of junk files. Repetitive behavior of this nature is consistent with behavior that is often seen in Obsessive Compulsive Disorder.

David Black, Ph.D.
Neuropsychologist
Licensed Psychologist (MD #04542)

8401 Connecticut Ave, Suite 700
Chevy Chase, MD 20815

Office (240) 424-0184
Fax: (240) 580-2360

info@caatonline.com
http://caatonline.com

A271

Docusign Envelope ID: A88D6B4D-B5B7-4F50-B061-9A9A4E1358F5

# <u>DECLARATION OF DELICIA COLE</u>

1.      I, Delicia Cole, state that I am over the age of eighteen and competent to make this sworn declaration.

2.      I am a resident of Woodbridge, Virginia.

3.      Brian Cole, Jr. ("Brian") is my son, whom I raised through adulthood.

4.      Brian lives with me in my home in Woodbridge, Virginia.

5.      In or before 2018, while living in my home, Brian attempted a science experiment to create homemade "rocket fuel."

6.      This science experiment involved the use of potassium chlorate, which I have learned is commonly used in these science experiments.

7.      My understanding is that to attempt to make the chemical potassium chlorate, Brian used bleach. I observed numerous articles and YouTube videos, accessible through a Google search, with instructions on the use of bleach to make potassium chlorate.[1]

8.      While using bleach for his science experiment, Brian spilled bleach on the carpet in our home.

---

[1]      *See,     e.g.,*     https://www.instructables.com/Make-Potassium-Chlorate-from-Bleach/, https://www.youtube.com/watch?v=4Kq9r5vFoQU, https://www.youtube.com/watch?v=7MsHq_dUfnY.

Docusign Envelope ID: ...

Case 1:26-cr-00001-AHA    Document 52-2    Filed 01/27/26    Page 2 of 2
USCA Case #26-3009    Document #2161061    Filed: 02/25/2026    Page 276 of 350

9.    I observed numerous articles and YouTube videos, accessible through a Google search, with instructions on the use of potassium chlorate to make homemade "rocket fuel."[2]

10.    Brian's attempt to create "rocket fuel" was an innocuous science experiment without any ill intent.

11.    During the time of Brian's science experiment, his sister (and my daughter), Bridgette, and his brother (and my son), Brandon, also lived in the home and were aware of his "rocket fuel" experiment. Brian's father (and my ex-husband), Brian Cole Sr., also lived in the home and was aware of Brian's experiment.

12.    Brandon moved out of my home by approximately 2018. Brian Cole Sr. and I separated, and he moved out by approximately 2020. Bridgette moved out shortly thereafter.

13.    Because I know Brandon, Bridgette, and Brian Sr. were living in the home at the time it happened, I know that this experiment occurred years before January 5, 2021.

I, Delicia Cole, declare under penalty of perjury that the foregoing is true and correct.

Executed on January 27, 2026.

DocuSigned by:

*Delicia Cole*

19A9507D58D040D...

Delicia Cole

---

[2]    *See, e.g.,* https://melscience.com/US-en/articles/rocket-experiment/?srsltid=AfmBOooSHx4F0tvdQUqH1OJkMKP5_Yu5QIG4S8zXMDuSn9vvPAREvS5w, https://pubs.acs.org/doi/10.1021/ed500522c, https://www.youtube.com/watch?v=yQdOwgk22ng.

## DECLARATION OF BRITTANY COLE

1.     I, Brittany Cole, state that I am over the age of eighteen and competent to make this sworn declaration.

2.     I currently reside in Alexandria, Virginia.

3.     Brian Cole, Jr. ("Brian") is my brother and employee.

4.     In January 2021, I was employed at Statewide Bonding, Inc., with the position of Supervisor.

5.     Brian was also employed at Statewide Bonding, Inc., with the position of Data Entry Specialist from approximately January 2020 to December 2026. Brian's role was to enter data from files that he was provided.

6.     In addition to my job at Statewide Bonding, Inc., I was also a club promoter. I served as an event marketer for nightclubs, helping drive attendance and business for the clubs I marketed for.

7.     As part of my work, I routinely had meetings and would attend events in the Washington, D.C., area. I attended these meetings and events as a networking event for my work and the nightclubs I marketed before.

8.     Brian's attorneys had me review page 38 of the government's filing, Dkt. 50, as well as the text referenced in that filing between my mother and me in early January 2021.

9.     On or about January 5, 2021, I traveled to Washington, D.C. The timing was consistent with my routine trips to the city for my work as a club promoter. I am

Docusign Envelope ID: EC430BDP-D938-4F39-0A6F-31ADDA63E8F3

Case 1:26-cr-00001-AHA    Document 52-3    Filed 01/27/26    Page 2 of 2
USCA Case #26-3009    Document #2161061    Filed: 02/25/2026    Page 278 of 350

not aware of any other reason I would have traveled to Washington, D.C., on this date.

10.     The government's filing quotes a text I sent to my mother, stating "I'm going to dc .. Grams said it may be crazy out there so I was just letting you know."

11.     The context for this text is that I told my grandma that I would be traveling to Washington, D.C on or about January 5, 2021. My grandma warned me that she heard that there may be large-scale political protests and urged me to be safe. I sent this text to my mother informing her that I was traveling to Washington, D.C., and passing along the message my grandmother gave me.

12.     My trip to Washington, D.C., on or about January 5, 2021, was not at all related to the events that transpired on or about January 5-6, 2021, including the crimes that Brian is accused of.

13.     None of the texts between me and Brian or our mother were related to the events that transpired on or about January 5-6, 2021, including the crimes that Brian is accused of.

I, Brittany Cole, declare under penalty of perjury that the foregoing is true and correct.

Executed on January 27, 2026.

Signed by:

*Brittany Cole*
29E46B38109A471

Brittany Cole

1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2

3   UNITED STATES OF AMERICA,      )
                                   )
4           Plaintiff,             )
                                   )
5       vs.                        ) CASE NO. 1:26-cr-00001
                                   )
6   BRIAN J. COLE, JR.,            )
                                   )
7           Defendant.             )
    _____  )
8

9               TRANSCRIPT OF BOND REVIEW HEARING
         **BEFORE THE HONORABLE AMIR H. ALI, DISTRICT JUDGE**
10             Wednesday - January 28, 2026
                 3:36 p.m. - 4:52 p.m.
11                   Washington, DC

12  **FOR THE GOVERNMENT:**
         Office of the United States Attorney
13       BY:  CHARLES ROBERT JONES and JOCELYN S. BALLANTINE
         601 D Street, NW
14       Washington, DC 20530

15  **FOR THE DEFENDANT:**
         McFadden & Shoreman, LLC
16       BY:  JOHN M. SHOREMAN
         1050 Connecticut Avenue, NW, Suite 500
17       Washington, DC 20036

18       Litson PLLC
         BY:  JOSEPH ALEX LITTLE, IV and ZACHARY CARTER LAWSON
19       54 Music Square East, Suite 300
         Nashville, Tennessee 37203
20
         HDR LLC
21       BY:  MARIO BERNARD WILLIAMS
         5600 Roswell Road, Building C, Suite 103
22       Sandy Springs, Georgia 30342

23                    **SONJA L. REEVES**
                 **Registered Diplomate Reporter**
24                 **Certified Realtime Reporter**
                 **Federal Official Court Reporter**
25        Transcript Produced from the Stenographic Record

1          (Call to Order of the Court at 3:36 p.m.)

2          DEPUTY CLERK:  This is Criminal Matter 26-1, *United*

3  *States of America versus Brian Cole, Junior.*

4          May I have counsel approach the lectern and state your

5  appearance for the record, beginning with the government.

6          MR. JONES:  Good afternoon, Your Honor.  Charles Jones

7  and Jocelyn Ballantine for the United States.

8          THE COURT:  Good afternoon to both of you.

9          MR. SHOREMAN:  Good afternoon, Your Honor.  John

10 Shoreman, Mario Williams, Zach Lawson and Alex Little.  Thank

11 you, Your Honor.

12         THE COURT:  Good afternoon to you, Mr. Shoreman, and

13 to the team as well.

14         Good afternoon, Mr. Cole.

15         THE DEFENDANT:  Good afternoon.

16         THE COURT:  Good to be with you all.

17         Mr. Cole, let me just say at the outset, I know you

18 have appeared in front of a few different judges at this point,

19 and there have been some magistrate judges that have overseen

20 some of the preliminary matters in the case.  I'll be presiding

21 over the case from here on out now that an indictment has been

22 filed, so there will be fewer new faces as you come in and out

23 of the courtroom, at least on this side of the bench.

24         In your last court appearance, you were arraigned

25 under the federal indictment, so, in other words, the charges

1    were presented and you entered your plea of not guilty.  Today

2    we're here for our first status conference in your case.  In

3    other words, I'm going to have some conversation with the

4    government, with your attorneys, and we're going to talk about

5    where things stand and next steps.

6         Turning to the attorneys, I have a couple quick

7    housekeeping matters for counsel.  We'll then proceed with the

8    first status conference.

9         I have resolved, as you know, the detention challenge

10   that was premised on the indictment and the preliminary hearing

11   issue.  I understand defense counsel is challenging the merits

12   of Judge Sharbaugh's detention determination.  I have reviewed

13   the papers and all the evidence that is attached to them, and

14   reviewed Judge Sharbaugh's decision closely.

15        And I'm going to let the parties have some time at the

16   end of this hearing to present argument, and I can kind of

17   direct you to what I'm most interested in at that point.

18        Anything else to put on my radar at the moment before

19   I jump into the housekeeping issues that I mentioned?

20        MR. JONES:  Not from the government.

21        MR. SHOREMAN:  No, Your Honor.

22        THE COURT:  Let me just address counsel for both sides

23   on two preliminary matters.

24        First, this is a case with some public attention

25   attached to it.  I prefer to just say this at the outset to

1   avoid any issue.  This is not made in response to any

2   particular thing that's happened, but let's be clear that this

3   is a court of law.  It's not a pressroom.  I have very little

4   patience for antics from counsel or otherwise.

5        So, you know, my interest is first and foremost going

6   to be to ensure a fair process, that will be for the

7   government, which is entitled to put its case on, and it will

8   certainly be for Mr. Cole as well, whose rights will be

9   respected.

10        And I'll treat you all with dignity.  I'll expect the

11   parties to treat one another with dignity and civility.  So I'm

12   going to leave it at that.  Again, like I said, it's not in

13   response to anything in particular at this point, and let's not

14   have to come back to it at any point.

15        Second, my policy is to have everything take place on

16   the record.  I know different courts, different judges have

17   different practices around this.  I like to just be clear on

18   mine.  If at any point you think you need clarification on

19   something or you're entitled to some sort of relief, do it in

20   writing on the docket rather than through a phone call.

21        My chambers will not give information that route or

22   through an email to chambers, we'll do it through the docket.

23        One caveat is for hearings, scheduling hearings, in

24   which case you can correspond with my courtroom deputy, who

25   will reach out to you when there is a need for that.  Okay?

1    But that won't relate to anything in substance.  All of that

2    will happen on the record.

3            Those are my two housekeeping matters.  Why don't we

4    jump into the status conference, and maybe I'll hear from the

5    government on where we are at a minimum with respect to

6    discovery.

7            MR. JONES:  Thank you, Your Honor.  The government has

8    been providing discovery on a rolling basis.  On January 20th,

9    the government met with the defense team, specifically on the

10   topic of discovery, and explained our approach to what is a

11   considerable amount of information.

12           And during the course of that conversation, we

13   articulated the way we're approaching discovery.  The defense

14   indicated to the government that they did not object to how the

15   government plans to proceed.  So at least from the government's

16   perspective, we plan to proceed consistent with what we

17   discussed during that meeting.

18           And at this time, we don't have anything to raise with

19   the Court, but should that happen, we would involve the Court

20   at that time.

21           THE COURT:  Can you give me more details on what you

22   mean by your approach and how you plan to proceed?

23           MR. JONES:  Sure.  So I don't know how detailed you

24   want me to get, but with respect to --

25           THE COURT:  Maybe you can give me just a high level

1    understanding of what the discovery looks like and what needs

2    to be provided and what's been provided to date or a timeline

3    for providing it.

4         MR. JONES:  This case, obviously, involved a five-year

5    investigation.  The FBI opened a file related to that

6    investigation.  Mr. Cole, as a suspect, did not emerge until

7    very late in that investigation.

8         And so the government's approach in terms of providing

9    discovery to the defense team has been to create a new case,

10   the FBI created a new case for Mr. Cole in particular, and then

11   to re -- what the FBI calls serialize -- but essentially to

12   copy all the information pertaining to Mr. Cole as sort of the

13   first step into a new case file, that has been produced to the

14   defense.

15        And that would include targeted legal process

16   pertaining to Mr. Cole, things like his purchase history, cell

17   phone data, the results of Rule 41 search warrants, those types

18   of things.

19        What we are still in the process of figuring out the

20   best way to provide to the defense is the broader legal process

21   that was issued in the course of the case.  So, for example, a

22   subpoena to a hardware store for all purchases between X date

23   and X date.  In that case, the government didn't have reason to

24   believe that Mr. Cole's identifiers were contained in that set

25   of records, but the government still plans to provide it.  It's

1  just voluminous.

2        That's just one example of that kind of category of

3  information that we are taking on next, as well as legal

4  process that would have been targeted to individuals other than

5  Mr. Cole during the course of the investigation, which is also

6  a large universe of material that the government is in the

7  process of preparing for the defense to be provided in

8  discovery.  And these are all in general terms the topics that

9  I covered with the defense team.

10        THE COURT:  Okay.  Got it.  Is that latter category,

11  just getting it, kind of also you have got the case file as it

12  relates to Mr. Cole in particular, but also, obviously,

13  thinking about it from the lens of *Brady* and all of that?

14        MR. JONES:  Exactly.  As the Court might imagine, over

15  the five years, the FBI looked at various individuals in

16  connection with this investigation, and so we're in the process

17  of preparing that material for production.

18        Of course, that's going to implicate personal

19  identifying information, privacy considerations.  At this time,

20  we have a protective order in place, so we're planning to

21  provide that material to the defense.

22        THE COURT:  That's really helpful.  Anything else that

23  you want to put on my radar at this point?

24        MR. JONES:  Nothing specific at this time, but the

25  defense provided the government with at least a sort of

1   preliminary understanding of the areas that they are interested

2   in beyond what I have been articulating here.

3         I think the most efficient way to deal with that will

4   be for the parties to have an open line of communication, a

5   dialogue on those topics, and if we get to an impasse where the

6   Court would need to resolve a dispute, we can address it then.

7         THE COURT:  That will be fine.  Do you have a rough

8   broader timeline for how long you think you will need to get

9   through these various tranches of production to the other side

10  and also a more immediate next step for us today?

11        MR. JONES:  I think in terms of what I have summarized

12  so far, we would be talking about weeks, several weeks to get

13  that material prepared.  What we're trying to be mindful of is

14  to not bury the defense in material and to be thoughtful about

15  the way that we produce it.

16        But I think we're talking about a matter of several

17  weeks to get those categories of information turned over.

18        THE COURT:  Have you discussed that timeline with the

19  defense?

20        MR. JONES:  I don't know if I put it in those terms.

21        THE COURT:  I can ask them.  That's fine.

22        What are you proposing in terms of a next status

23  conference?

24        MR. JONES:  We discussed prior to the start of the

25  hearing setting a status date for 30 days out.  The defense

A283

1    indicated that they would be willing to toll the speedy trial

2    clock between now and 30 days, and I think that that would

3    allow the parties a little bit of extra time to discuss how

4    this case will proceed from here.

5            THE COURT:  Okay.  Anything else?

6            MR. JONES:  That's all for now.

7            THE COURT:  Okay.  Let me hear from defense counsel.

8            MR. LITTLE:  I don't have anything to disagree with

9    the government on, except to say that there is going to be a

10   ton of discovery.

11           One of the things that we proposed that wasn't

12   mentioned is we need a way to track the discovery that's being

13   provided.  Most of this, if not all of it, is digital, and so

14   it's not easily susceptible to Bates stamps or even load files,

15   any of that sort of thing.

16           We have -- did you receive it today from us, our

17   proposed spreadsheet?  We have provided the government with

18   sort of a proposed running log that is already at 8,000 items

19   that they have produced, so that we can sort of confirm we have

20   it, that we're able to open it, that it was a valid file, that

21   lists what the file is, so we don't have a dispute two months

22   down the road that they say they gave us something and they

23   didn't.  Just as an initial step, we're working on a log

24   between the two of us that's pretty monumental.

25           In the course of those conversations, I understand

 1   there is FBI files that the government has mentioned, which is,

 2   I think, expected.  One thing we've made a request that we want

 3   to put on the Court's radar is if there are other agency

 4   communications, and, in particular, interagency communications,

 5   we certainly think that would be discoverable and we want

 6   access to that information.

 7          We're concerned there may be *Brady* hanging out at ATF

 8   or the Capitol Police or somewhere like that, and we want to

 9   make sure that that stuff is captured in what's being produced.

10          Similarly, I want to put on the Court's radar --

11          THE COURT:  Just give me a minute before you move on.

12   Helpful to have context and understand what's going on, even

13   though these are things that I'll expect you all to largely

14   work out between the two of you, between the two sides.

15          Are you raising that because you anticipate there is

16   going to be an issue, or have those conversations so far been

17   ones you can work out, just in terms of the organization, the

18   systems, and also the interagency component?

19          MR. LITTLE:  I think that given the amount of stuff

20   that's out there, I think it's possible the government, through

21   inadvertence, may not have what they need, so I want to put on

22   the record that we made that request ahead of time that

23   anything that's not just in the FBI more broadly is captured.

24          Similarly, we have made a request around CIPA,

25   classified information.  If there is any information contained

1   in intelligence agency's files about this, it is certainly not

2   I think crazy to believe that intelligence services may have

3   been involved at least in tracking, reporting or looking for

4   reporting about this incident after it happened, and so we want

5   to make sure if there is any reporting that suggests potential

6   perpetrators or things of that sort that we be allowed that.

7   There may be CIPA issues implicated.  The government hasn't

8   raised that so I wanted to put that on the Court's radar as

9   well.

10         THE COURT:  They haven't mentioned it today.  From

11   where you're standing, have they given you any sort of

12   indication that they are not willing to look at that?

13         MR. LITTLE:  No, but I will say when I raised it, I

14   think it was a new idea.  I don't know that it was something

15   that they had started to look for, so we want to again make

16   clear they are looking for that as well.

17         The third category, which we raised on the discovery

18   call that we want to put on the record is there was a very long

19   congressional hearing about this a few weeks back.  I

20   understand it was a whole separate congressional investigation

21   related specifically to this incident.  There have been members

22   of Congress who have talked about whistleblower information

23   that they have obtained.  This is a circumstance where we might

24   be seeking subpoenas of different congressional materials, so

25   that's something I want to put on the Court's radar now in

1    terms of housekeeping.

2    　　　　We'll certainly seek to do that sooner to let that

3    process play out, but that is something we're trying to get our

4    head around what might be in congressional files that wouldn't

5    be in DOJ files that would be relevant that we would be

6    entitled to.

7    　　　　THE COURT:  Okay.  All right.  Anything else?

8    　　　　MR. LITTLE:  I think that's the mass of things that we

9    have today.

10    　　　　THE COURT:  Okay.  Let me give the government a chance

11    to respond to anything it wants to respond to there.  I

12    understand it's not like there was a request for relief on any

13    of these things, but just give me any context you want to add.

14    　　　　MR. JONES:  Sure.  In our conversation a week ago, we

15    spoke about those general topics at that level of generality.

16    It's hard to address in the abstract.

17    　　　　I will say that just as a sort of baseline matter, of

18    course, the government's discovery obligations are not the

19    whole of government, they are defined by the scope of the

20    prosecution team.  So that's something that when the government

21    receives specific requests for materials we would then need to

22    be able to assess whether those are materials that would be in

23    the possession of the prosecution team.

24    　　　　At this time, we don't have any reason to believe that

25    there are holdings in the U.S. intelligence community, but,

 1  again, those are matters that I think would require more

 2  specific requests to be made so the government would be in a

 3  position to respond in an informed fashion.

 4        THE COURT:  Got it.  I assume what you were just

 5  discussing was geared principally towards the intelligence

 6  comment, but things like ATF, Capitol Police, other law

 7  enforcement, I assume you guys are going to take a look and

 8  figure out if there is any information there?

 9        MR. JONES:  Again, I think that that would depend on

10  the agency and whether they would be considered part of the

11  prosecution team for purposes of this investigation.

12        And, obviously, with respect to materials in the

13  possession of Congress, that is not something that the

14  government would view as in its possession for purposes of this

15  criminal prosecution.

16        The last point, just because it was raised, is we

17  discussed the idea of a joint log.  I will say the government,

18  when it has produced materials in this case, it has provided

19  letters summarizing the materials that were produced.  It's

20  what we do in normal practice.

21        In principal, I don't have a problem looking at what

22  the defense has provided.  I will just say that at this time I

23  don't know that it's something that's necessary, and the

24  government is not committing to, at this stage, to agreeing to

25  a joint log beyond what the government would normally do, which

1    is to provide summary discovery letters.

2          THE COURT:  Got it.  I mean, obviously, there is, I

3    would think, an interest on both sides in being pretty

4    organized about this so there is not confusion later.

5    Hopefully, you both have incentive to kind of work out a way to

6    communicate back and forth.

7          I don't usually have to get into that type of issue,

8    and I'm certainly not going to get into it in a hearing this

9    early on.  I'm going to count on you all to work that out and

10   be able to communicate back and forth clearly and also stay

11   organized.

12         Let me hear from defense counsel on just timing and

13   next steps as well.

14         MR. LITTLE:  We were in agreement with the 30 days.

15         THE COURT:  Okay.  In agreement with coming back in

16   30 days?

17         MR. LITTLE:  That's right.  As the government noted,

18   they haven't produced everything.  We need to sort of wrap our

19   head around what's produced and what's there.

20         I think 30 days is a reasonable amount of time.  It

21   sounds like they will probably still be producing up until

22   then.  Then we can at least get a sense of how long it's going

23   to take us to review that and think about trial questions.

24         THE COURT:  At this point, you may not have a full

25   sense of it if you don't have the discovery yet, but is the

1    defense team anticipating filing motions?

2         MR. LITTLE:  Yes.  I think there will be extensive

3    motion practice on multiple issues.  Just to raise a couple,

4    the Court may be aware that the Supreme Court took cert

5    recently in a case involving geofence warrants.  We don't

6    believe there were necessarily geofence warrants here, but

7    there were cell phone dump warrants, which implicate some of

8    the same Fourth Amendment issues, and so there will certainly

9    be some Fourth Amendment practice I would suspect.

10        We do have concerns about the alleged confession.  I

11   would expect us to have motions practice around that.  There

12   are other issues specific to this case and the unusual nature

13   of it that I think are particularly unusual that we may be

14   raising as motions as well.

15        Right now, I can imagine four or five separate

16   categories of motion practice.

17        THE COURT:  Those will follow discovery?

18        MR. LITTLE:  I think we will try to move the motions

19   practice as quickly as we can on stuff that is not implicated

20   by discovery.  A few of the things I've mentioned are not

21   implicated by discovery.  We will try to get those before the

22   Court as quickly as possible.

23        Some of them, like the phone dump warrants, the cell

24   sites, that's going to require necessarily us to see the

25   warrants.  We don't have those in place.

1        Also, as you can imagine, given that they said there

2   are multiple sort of persons of interest before our client,

3   it's going to be maybe difficult for us to follow the fruit of

4   the poisonous tree to kind of how they ended up looking at

5   different pieces of information.

6        And so that's going to, I think, take longer than it

7   might in a normal situation to trace back the original sort of

8   point of attack from a Fourth Amendment perspective.

9        THE COURT:  That's helpful context to have.  I know

10  some of my colleagues set trial dates this far out.  I don't do

11  that.  We'll set a time to come back and we'll have a better

12  sense of where we are.  And I like to set trial dates when they

13  stick on my calendar, and I just don't think we have the

14  context right now for that to be the case.

15       Have you all pre-cleared a date for our next status

16  conference or do we need to open up the calendars?

17       MR. LITTLE:  We have not.

18       MR. SHOREMAN:  Is Friday, the 27th, available, Your

19  Honor?

20       THE COURT:  I could have a hearing Friday, the 27th,

21  in the late morning, so, say, 10:30 or 11:00 a.m. would work

22  for me.  That works for the defense team?

23       MR. SHOREMAN:  That's fine for the defense.

24       THE COURT:  Does that work for the government?

25       MR. JONES:  It does.

1          THE COURT:  Let's say Friday, the 27th, at 10:30 a.m.

2          I am going to exclude the time between today and when

3    we get back together on February 27th under 18 U.S.C. Section

4    3161(h).  I find it in the interest of justice to exclude the

5    time, and that those interests outweigh the interests of the

6    public and the parties in a speedier trial.

7          And the reason to exclude time is, of course, to give

8    the parties the opportunity to exchange discovery thoroughly,

9    look for appropriate discovery, *Brady* materials, et cetera, and

10   for defense to have the opportunity to both organize itself,

11   review those files themselves, and then also review those files

12   and the discovery with Mr. Cole.

13         Are those reasons satisfactory from the government's

14   perspective?

15         MR. JONES:  Yes, Your Honor.

16         THE COURT:  Okay.  Having completed the status

17   conference, I did say I would give an opportunity for an

18   argument on the merits of Judge Sharbaugh's detention decision.

19         I will tell you I have reviewed Judge Sharbaugh's

20   decision carefully.  I have reviewed the original briefing,

21   including the government's detention memo and the opposition

22   and the attachments.  I have reviewed the motion to revoke from

23   the defense and the evidence attached to it, including the

24   Phillips report and letters.  I have reviewed the government's

25   opposition and the evidence that's described throughout the

1   opposition.  I have reviewed the reply, and then the

2   declarations that were filed from Mr. Cole's mother, sister and

3   Dr. Black yesterday.  So I have those.  I don't need you to

4   retread all of that ground.

5        It is defense counsel's motion, so I'll hear from

6   defense counsel first.  And it won't surprise you to know I'm

7   most interested in what you think Judge Sharbaugh did

8   incorrectly.  Where is the error in his opinion?

9        Let me let you go ahead and start, and then I'll maybe

10  direct you to a few things I'm most interested in.

11       MR. LITTLE:  So I mean, first, I think I would say

12  this is a de novo determination.  So we're not in a position of

13  this Court looking at that and saying I agree or I don't agree.

14  I think, as the Court knows, it has to make a de novo

15  determination based on the record.

16       I think there are a few things about the record which

17  are different than the way that the magistrate judge viewed the

18  record.  And I think it's most notable when you look at this

19  case it comes down to a question of dangerousness.  Under the

20  statute, the government has to prove by clear and convincing

21  evidence that there is no condition or combination of

22  conditions that would protect the public from a crime.

23       The only crime that the government has accused my

24  client of committing is a crime that occurred five years ago.

25  I don't want to understate the seriousness of what they have

 1  charged, but they point to really three factors to say this is

 2  why he needs to be locked up to keep the public safe.

 3        The first is that the crime was very serious.  The

 4  second was that there is continued evidence of bomb making.

 5  And the third was that there are reasons to doubt, they say,

 6  that he will abide by conditions of release.

 7        That somewhat tracks the magistrate judge's reasoning

 8  in walking through those issues, but the second and third, I

 9  think, are entirely unsupported by the record, and certainly

10  aren't supported by the record at a clear and convincing

11  evidence standard.  I could address a few of those.

12        THE COURT:  Let me just start with, I mean, you have

13  Judge Sharbaugh's opinion.  I take your point about needing to

14  undertake an independent review.  That's why I tell you that I

15  have looked at everything.  But we do have an opinion that's

16  helpful to kind of ground us in and you can kind of work off of

17  to tell me where it went wrong.

18        I have his background section in his opinion where he

19  describes various things, including the investigation and what

20  pointed to Mr. Cole, what was found during the arrest, the cell

21  phone and the cell phone wipes.

22        And then there is also the characterization of the

23  police interview, which at least Judge Sharbaugh says you

24  didn't contest the characterization, the government's

25  characterization of, and I think I didn't see that either.  So

1   I guess starting with just the facts, are we at least working

2   off the same requisite set of facts, and, if not, tell me where

3   we're not.

4          MR. LITTLE:  I don't think so, and there's a couple

5   that are critical.  The idea that the cell phones wiped are at

6   all tied to this is completely fictional.

7          The government doesn't tend to suggest how this

8   individual, who now they have on the record is diagnosed, and

9   if they had been the investigation into this I think they would

10  have confirmed in their interviews, in their own files, is an

11  individual who has extreme autism and OCD, and it is entirely

12  consistent, as the doctor says, to do things like that in a

13  compulsive way.

14         The phone wipes they are talking about happened two

15  years after the alleged offense.  There is no connection to

16  those and to any investigative step, any concern that he was a

17  suspect.  In fact, there were pictures up within days of this

18  suspect.  There wasn't any phone wiping done in 2021.  There

19  wasn't any phone wiping done for the next two years.

20         And so the idea that they just sort of glom onto that

21  as evidence -- they call it evidence of trying to hide his

22  tracks.  I think it is --

23         THE COURT:  I have the point about the phone wipes

24  largely occurring after 2022, if I understand correctly.

25  What's the evidence before 2022?

1      MR. LITTLE:  There is no evidence of any sort of

2  attempt to evade.  There are no phone wipes that were supposed

3  to happen -- the first time they mention it is that this

4  happened in 2022, and on and off for the next two years.

5      What I'm saying is there is an absence of evidence of

6  any similar activity between the time of the alleged crime --

7      THE COURT:  Of any wipe prior to 2022?

8      MR. LITTLE:  That's exactly right.  Of any evasive

9  activity at all.  And the magistrate judge didn't deal with

10  this either, that on the one hand the government is claiming

11  this is just an individual who is doing everything he can to

12  deceive individuals around him about his guilt and hiding

13  facts.

14      On the other end, he has pieces of metal pipes and

15  receipts from Home Depot in his car for years.  And so they

16  sort of when they want to point out that he's a scary guy, they

17  point to he's got bombs.  On the other hand, they say, oh, but

18  he was hiding things, but he didn't happen to hide those

19  things.  I think there's just an incongruity in the way the

20  magistrate court sort of failed to reconcile --

21      THE COURT:  I also have your point about the OCD

22  diagnosis and the declaration that this could be consistent

23  with OCD, but I don't know that that is the same thing from

24  necessarily from showing, proving that it's disconnected from

25  trying to hide something, or maybe you can tell me it is.

 1          MR. LITTLE:  I guess my point is there is no evidence

 2    that it is connected, other than they say he committed a crime

 3    in the past, and so any subsequent act he makes to erase

 4    evidence must be connected to that.  Like, there is no -- they

 5    don't even posit a causal connection there between those two

 6    activities.

 7          THE COURT:  It would be a much -- your argument would

 8    be at its strongest if you could show that, I suppose, there

 9    has been phone wipes for the past 20 years, right, and they

10    have been happening all the time and then there just happened

11    to be this event, and then it probably wouldn't be significant

12    to point to something that happened in 2021 to say -- you know,

13    you would have a good argument, but this did happen afterwards.

14          MR. LITTLE:  Yes, and I think we have a similar sort

15    of fact.  The fact that I can't tell you what compelled him to

16    do that at this time I don't think is evidence that it had to

17    be this sort of idea that there was no reporting, there was no

18    reason to believe he was a suspect.

19          There is just an absence of anything, and so even if

20    you were to say I'll give it 51 percent likelihood, we're in

21    clear and convincing evidence standard land.  And it's

22    certainly not clear and convincing evidence to tie that.  But

23    it also relates, I think a little bit, to the idea around this

24    they say continued interest in bomb making.

25          They point to this discussion, which the entire review

1    is certainly suggestive, but of him sort of doing things with

2    potassium chloride.  And they say, well, here is evidence of

3    continued interest post 2021 in bomb making.

4         We have put in through our declarations definitively

5    that that happened well before this event.  And the family

6    characterized it as sort of exactly the way that he

7    characterized it in the interview as science experiments.

8         THE COURT:  You're talking about the declaration that

9    was filed yesterday?

10        MR. LITTLE:  Yes.  And there is nothing that sort of,

11   again, suggests that that actually happened in the time period

12   the government points it to.  And so there is no evidence of

13   continued interest in bomb making activity.  There is no

14   interest in actual evasive action taken by this individual.

15        And so when you get down to it, all they are left with

16   is he's alleged to have done a very bad thing and look at all

17   the evidence we have.  And on the flip side of that, you have a

18   set of conditions --

19        THE COURT:  Can I come back to the very bad thing?

20   Some of these may be easy questions for you.  If they are easy

21   to kind of narrow the issues, that's productive.  You don't

22   need to get defensive about it.

23        I know that we have a rebuttable presumption in this

24   case.  I know you had some challenges to whether the rebuttable

25   presumption applies in the first place before Judge Sharbaugh.

```
 1    I think it was about whether there had been an indictment or
 2    not.  I think he didn't think the indictment was necessarily
 3    required.  I think you guys gave that much up in front of him,
 4    and now we actually have an indictment.  So are you fighting
 5    that there is a rebuttable presumption in the first place?
 6            MR. LITTLE:  There is a rebuttable presumption under
 7    the statute.
 8            THE COURT:  Good.  And then you do say in your
 9    briefing that Judge Sharbaugh acknowledged that the presumption
10    was overcome.
11            MR. LITTLE:  I think that's probably incorrect.  He
12    talks about it being met.  At least looking at the --
13            THE COURT:  He says "assuming it was overcome."  All
14    right.
15            MR. LITTLE:  I think it would be difficult on our
16    record to presume that it wasn't met.  And I think to the
17    extent the Court can look at the extensive evidence of
18    third-party custodians or of lack of other criminal history,
19    looking at the other case law in this circuit, that type of
20    evidence that we put forward I don't think has ever been found
21    not to meet the presumption, and so I'll leave it at that.
22            THE COURT:  Understood.  I know there is also case
23    law, and you can tell me if you disagree with it, that says
24    that even if the presumption is overcome, it's still something
25    that a court has to consider.  In other words, the fact that
```

 1  Congress believes this is the type of offense that

 2  presumptively should come with detention is something that

 3  still stays in the background.

 4      MR. LITTLE:  Absolutely, as part of the statutory

 5  scheme that also includes the requirement for clear and

 6  convincing evidence that he be a danger to the community absent

 7  there is no condition.  That's part of that equation.

 8      So I think it says, hey, we think the sort of person

 9  who might do this is dangerous.  That fits in clearly with

10  saying, but we do think if we can show there is conditions that

11  would make that person not dangerous --

12      THE COURT:  Your argument is, sure, I understand there

13  is a presumption, but if there was ever a case, this is it.

14      MR. LITTLE:  Absolutely.

15      THE COURT:  Okay.  I understand that you have

16  evidence, and some of this I think wasn't before Judge

17  Sharbaugh --

18      MR. LITTLE:  It was not.

19      THE COURT:  -- that the device couldn't have

20  detonated.

21      MR. LITTLE:  That's right.

22      THE COURT:  And I think you rely on that with respect

23  to the nature and circumstances of the offense principally.

24      MR. LITTLE:  I think it goes to the question of

25  dangerousness, and so what the Court --

1          THE COURT:  The question of dangerousness is the

2    overall thing.  That's the overall inquiry.  Of course, that's

3    the ultimate inquiry.

4          MR. LITTLE:  It's not actually in this case, because

5    what we're looking at with respect to that question of whether

6    this thing, if he did it, was viable, is a question of what

7    threat does he currently pose to the public.

8          So for the government to prevail, they have got to

9    convince you beyond clear and convincing evidence that there is

10   nothing that the Court can do in terms of conditions to stop my

11   client from hurting someone.  That's the type of crime that

12   he's charged with. There is no evidence they are suggesting

13   that he's selling drugs or harming the community in any other

14   way.

15         And so the question is how could he harm someone.  As

16   we pointed out the first time around when they sat there for a

17   month and did surveillance for a month between the time they

18   thought he was a suspect or believed he was guilty of this and

19   arrested him.  At the time of the arrest, they left guns in the

20   home.  They certainly didn't think that guns were related to

21   this case in any way.

22         The only evidence they have that this is a violent act

23   related to these pieces of metal and this homemade powder,

24   which they did not have at the time, there was nothing -- no

25   such evidence at the time that they arrested him this past

 1    year.

 2            So what is their theory as to how he's going to

 3    endanger the public?  And this is the point where I do disagree

 4    with the magistrate judge's order, that somehow, well, he said

 5    he just snapped and we have to be careful that he's not going

 6    to snap again, and I can't be sure he's not going to snap

 7    again.

 8            I think that is a completely counterfactual reading

 9    based on some things the government picked out about a

10    suggestive interview as to what happened here.

11            THE COURT:  If I understand that excerpt from the

12    magistrate judge was taken from the description of the

13    interview.  Are you saying that that wasn't said, or are you --

14            MR. LITTLE:  I'm saying to the extent that the

15    government -- like other things were said in that interview,

16    which I think we have talked about that I was not trying --

17    when I did experiment with this other stuff it had nothing to

18    do with this, the government just discounts.

19            They take the things from the interview that they

20    like, but they don't want to sort of acknowledge the entire

21    sort of whole of the interview.

22            And interviews like that, particularly when they are

23    suggestive, particularly with the type of individual involved

24    and his age, you have issues around consistency and is he

25    understanding what he's putting forward.  I think even if you

1    take much of what the government has proffered though as true,

2    none of it suggests present dangerousness.

3           To get back to that issue, the government, I guess,

4    has to be saying that somehow if you were to put him under

5    third-party custody, in some high-intensity supervision with

6    GPS or other monitoring, that he would be able to escape from

7    that monitoring, go to a store, purchase the components to buy

8    a bomb, assemble them with no one noticing, and then leave that

9    bomb somewhere.

10           That is entirely farcical based on the facts.  There

11    is no chance that's going to happen.

12           THE COURT:  Does it have to be that it would be a

13    bomb?  I mean, I think the government gets the benefit of

14    future dangerousness generally, and I think that's the reason

15    of focusing on the language about snapping.

16           MR. LITTLE:  I don't think that there is -- again,

17    give me evidence that he's going to go -- does he use knives?

18    Does he have an obsession with firearms?  There is no evidence

19    of any of the things to suggest that there are types of

20    dangerousness that could not be met with conditions.  Zero.

21           And so that's what -- I don't actually think -- I

22    think I disagree with the Court's conclusion here, and I want

23    to put this on the record.  I don't think that you can just say

24    because we have evidence to suggest this crime is committed in

25    the past that he is dangerous in all possible ways and we have

A303

```
 1    to therefore think about hypothetical ways that someone could
 2    be dangerous that they have never previously shown themselves
 3    to be.
 4            THE COURT:  To be clear, I was never suggesting that.
 5    The statute lays out the factors that have to be considered,
 6    and all of them have be considered.  I think you are also
 7    leaning more heavily on some that you like and away from other
 8    that you don't like, and I think the government is leaning on
 9    some too.
10            I think just like you're suggesting that the
11    government can't turn away from factors, you can't either.  I
12    mean, the actual nature of the offense matters here.
13            MR. LITTLE:  Absolutely.  And that nature of the
14    offense is the type of offense, this entirely susceptible
15    conditions for exactly the reason I have described, because
16    under those conditions, even if there was a situation, which is
17    not likely based on his history in the past five years of
18    complete -- no evidence of sort of criminal activity,
19    particularly violent criminal activity --
20            THE COURT:  You are just shifting away from nature of
21    the offense.  You are going to the factors you like.  You are
22    talking about his history.  That's a totally different factor.
23            MR. LITTLE:  Take those natures of the offense, there
24    is no world in which that offense could be recreated, or the
25    things the government says led to that offense in the
```

1    present --

2        THE COURT:  I guess that's where I think you're

3    narrowing.  I don't think the inquiry is consider the nature of

4    the offense, and then once you understand the nature of the

5    offense, the sole inquiry is whether that exact thing could be

6    recreated.  That's not what the statute tells you to look at.

7        MR. LITTLE:  The case law certainly suggests if you

8    have got a drug defendant, this is the type of ways they have

9    harmed the community, we think they may still harm the

10   community in that way.

11       THE COURT:  I guess I'm just saying I don't think -- I

12   didn't even see this argument in your briefing, but I don't

13   think the government is so hamstrung that it has to show that

14   this exact offense would be created.  I think they also have

15   the opportunity to show what the statute talks about, which is

16   danger to people or the community.

17       MR. LITTLE:  With evidence.

18       THE COURT:  Of course.  There is a burden of

19   persuasion.  They also have an evidentiary presumption.

20       MR. LITTLE:  But there is no evidence that he has ever

21   used or shown an obsession with guns or knives.  There is no

22   evidence that he has ever attempted --

23       THE COURT:  Can I ask you -- well, let me just ask you

24   a question that I was trying to get at before.  I understand

25   the point about the devices not being capable of exploding, but

1    let me give you the -- finish that sentence for me, "and

2    therefore," tell me why that's so important.

3          MR. LITTLE:  And therefore the Court, especially with

4    conditions, can feel comforted that there is not certainly

5    clear and convincing evidence --

6          THE COURT:  Now you're just jumping to the conclusion.

7    Is the idea that he couldn't do it even when he wanted to --

8          MR. LITTLE:  Yes.

9          THE COURT:  -- and therefore there is nothing to worry

10   about?  Is that the idea?

11         MR. LITTLE:  There is a difference between creating

12   inert props that could never explode and creating viable

13   weapons.

14         THE COURT:  This is where -- I think where you

15   responded to this was in response to Judge Sharbaugh's point

16   where he said this was luck, not lack of effort.

17         Take away the luck point, just focus with the not lack

18   of effort point.  Does the fact that it wasn't capable of

19   actually exploding, what was actually constructed, take that to

20   be true, assume it to be true, because that's your argument,

21   show that this was not for lack of effort?  That was his point,

22   right?

23         MR. LITTLE:  There is a difference between effort and

24   ability.  If you had an individual who had committed a crime

25   with a gun that turned out to be an airsoft gun, and they tried

1   to commit acts with an airsoft, and the evidence showed that

2   they didn't know the difference between an airsoft gun and a

3   regular gun -- if you had a defendant who committed an armed

4   robbery or something of the same effect with an airsoft gun,

5   the evidence showed that they didn't know the difference

6   between an airsoft gun and a regular gun, I certainly think

7   that factor of the defendant's inability to understand would

8   demonstrate they don't have the ability.

9           And maybe there they chose wrong.  It's easy for that

10  person to get a real gun.  Here, there is a real question of

11  ability that goes directly to dangerousness.  And that's why I

12  think that aspect of --

13          THE COURT:  I do think that -- I'm not going to put

14  words in the government's mouth, but I think that's what is

15  going on here, right.  If you have someone who had a thought

16  that something was a real automatic gun and instead it was a

17  plastic one, but then they still went into that public place

18  and tried to use it, I don't think you would look at that and

19  say, well, no one was hurt and it was a plastic gun and this

20  person is not a danger.

21          They were still willing to do all of that, and it was,

22  again, as Judge Sharbaugh said, not for lack of effort.  I'm

23  trying to understand exactly what the difference is here.

24          MR. LITTLE:  I think the difference is at what point

25  do you sort of have to have show actual dangerousness.  If I

1   have a desire -- I don't want to concede at all that he did,

2   because we don't think that he did and we don't think this is

3   the right person, but if that were true, you then have to at

4   least say he's dangerous because he had a desire to do

5   something which is complicated, which is incapable of doing

6   even if he wanted to.  I do think that goes to the

7   dangerousness analysis in that manner.

8          THE COURT:  Can you explain your argument to me about

9   the second factor.  I think that there is a back and forth

10  between the defense and Judge Sharbaugh on this question of

11  whether the weight of the evidence is relevant for the purposes

12  of guilt or the purposes of dangerousness.

13         MR. LITTLE:  I think it depends on the type of case

14  the government presents for detention.  If this were a case of

15  whether or not the person is going to show up, I think evidence

16  of guilt could suggest that the person might run because they

17  are concerned about certain conviction.

18          And so if this were a flight case, it could be

19  relevant there.  I think it depends on the type of case.  On a

20  dangerousness case, I think the reason and the only way it's

21  relevant is that it supports the government's argument the

22  person is capable of being dangerous.  That's one piece of

23  evidence, they are capable of being dangerous because I have

24  got evidence that he was dangerous before.

25          And the same way that if you had someone who committed

1    crime A, and they showed evidence of crime B, C, D, the

2    evidence and the strength of the evidence about crime B, C, D

3    would suggest that the person is dangerous because they are

4    capable of harming someone.

5         So I think the dangerousness equation here relates

6    only to does that indicate that he was capable of doing this

7    thing which suggests that he is dangerous.  And even then, if

8    you were to accept the government, however much weight they put

9    on it, the government has a five-year gap --

10        THE COURT:  I kind of -- I agree with you at the high

11   level that maybe it turns on -- it's related to or the

12   persuasive value and significance of it depends on the

13   particular context.

14        I don't know that it's fair to say that it's more

15   relevant in the flight context, although I think you

16   constructed a way in which it could be relevant.  It seems to

17   me like it also depends on the first factor, the type of

18   offense and the nature of the circumstance of the offense.

19        I could see how if you would say, look, the offense

20   was tax fraud, there was no violence at all whatsoever, really

21   putting a thumb on the needle, I guess if the government, in

22   that circumstance, if they wanted to say, we've got so much

23   evidence so the second factor wins, how much would that

24   actually show a propensity for danger, right?

25        I guess they could argue, well, we've got a lot of

1    evidence so he's going to be incarcerated at the end of the day

2    so it's less of an injustice, but they wouldn't have that kind

3    of not only do we have a dangerous offense, but we have a lot

4    of evidence.

5          It seems like that doesn't really work for you here

6    because the offense that's being charged is an explosive

7    offense, so one would think that the weight is actually pretty

8    significant.  This is not a percentages game, but if there is a

9    one percent chance someone did an explosive offense versus a

10   higher percentage chance, that would bear on dangerousness.

11         My question is getting at how significant is this

12   distinction between guilt and dangerousness in your particular

13   context.

14         MR. LITTLE:  Massive.  So let me give you a different

15   example.  There are federal murder offenses that have an

16   unlimited or a very long statute of limitations.  If you had a

17   crime charged here in federal court for a murder that occurred

18   25 years ago, and the government came in and said here is the

19   DNA, he confessed to somebody last week, we have got him dead

20   to rights, this guy is going down for a murder case, it's a

21   federal death penalty offense that happened 30 years ago.  And

22   the defense comes in and says let me tell you about those 30

23   years.  Turns out the guy is a literal saint, here is the lack

24   of dangerousness, there is no evidence of any criminal history.

25         The fact that he was -- a very serious offense,

1    actually killed a human being, would have very little weight on

2    a detention question because it ultimately is a question of

3    that person's dangerousness.  They would be able to say, hey,

4    one time you killed somebody.

5        THE COURT:  I think I get the point you're making, but

6    aren't you just shifting to the other factors you like again?

7    I think you're shifting to the history and characteristics of

8    the person and the seriousness of the danger, which are the

9    third and fourth factors.

10        MR. LITTLE:  I'm saying the first factor can have a

11    role, but it can no way be dispositive for exactly that reason.

12        THE COURT:  I was talking about the first and the

13    second factor.

14        MR. LITTLE:  The second factor?  You're going to have

15    to remind me where we are now.

16        THE COURT:  Is the weight of the evidence against the

17    person.

18        MR. LITTLE:  But I think, again, the weight of the

19    evidence only assists the Court in determining how dangerous

20    they are presently, if it's a dangerous offense.

21        For example, in a white collar offense, if you have

22    somebody again --

23        THE COURT:  I guess my point was this is not a white

24    collar offense.

25        MR. LITTLE:  But then it collapses into dangerousness

1  for exactly this reason.

2        THE COURT:  But the ultimate inquiry is about safety

3  of the community and people, so everything collapses into

4  dangerousness.

5        MR. LITTLE:  It collapses into element one, the

6  circumstances of the offense being the type that is

7  dangerousness.  I guess that's the way to sort of expand that

8  thought.  The it, in a particular case like this, collapses

9  into an issue, one category of what is the charged conduct,

10  what does that tell us about the person generally.

11        THE COURT:  Let me give you the opportunity to answer

12  one question that is also important to me.  What facts do I

13  have that were not in front of Judge Sharbaugh?

14        MR. LITTLE:  You have the confirmed diagnosis.  You

15  have the opinion that OCD is consistent with that.  You have

16  the fact that --

17        THE COURT:  You're talking about the Phillips

18  statement and the Black statement?

19        MR. LITTLE:  All the declarations you have.

20        THE COURT:  The letters were in front of Judge

21  Sharbaugh, the character letters?

22        MR. LITTLE:  Yes, but the most recent set of

23  declarations, including the declarations of family laying out

24  the timeline of when these things occurred, so those are all

25  different.

A312

 1          THE COURT:  Is there anything else that I have that
 2    Judge Sharbaugh didn't have?
 3          MR. LITTLE:  I don't think so.  I think those are the
 4    primary ones.  He had a bit of this.  We did emphasize it more
 5    in the reply that the proposed third-party custodian, her
 6    spouse is a former federal law enforcement officer.  That was
 7    mentioned briefly.  I don't think it made it in much
 8    discussion.  It was very briefly mentioned in the magistrate's
 9    order, but I think we expanded on that a bit.
10          It's not been mentioned, and it wasn't really argued
11    originally, she said this in the transcript, but I think we
12    pointed this out again in the reply, the third-party custodian,
13    in fact, this whole family, his job was working in a bail
14    bonding company that operates in multiple states.  You have a
15    family that their whole professional livelihood --
16          THE COURT:  That point I have, and I think it was
17    clear from the character letters, many of whom were business
18    associates.
19          MR. LITTLE:  I think to the extent that we didn't
20    argue that -- the government says in their third point that
21    there is no evidence the third-party custodians can control
22    him.  This is particularly a set of third-party custodians who
23    not only risk the court, whatever sanctions would happen here
24    if they didn't comply, but would have professional
25    repercussions across their entire business in all of the 16

1    states they operate in.  I think that was not something that

2    was sufficiently raised before.

3         THE COURT:  Got it.  That's helpful.  Any other points

4    you want to raise on this?

5         MR. LITTLE:  Not at this time, Your Honor.

6         Oh, for the appellate record, we do think the 3060

7    issue that the Court has already ruled upon, to the extent that

8    there is adverse decision here and we appeal, I think one of

9    our things I want to preserve is what we raised in that

10   original motion was if the government had -- if he had properly

11   been discharged at the time that the sort of fake indictment

12   was brought and properly been released, the government would

13   only be able to redetain on new circumstances.

14        THE COURT:  You made those arguments in your

15   pleadings.

16        MR. LITTLE:  There is no change in circumstances under

17   3164 that would sufficiently allow detention at this time.

18        THE COURT:  I'm not sure I have that, but it sounds

19   like you're trying to build something for appeal.  You can go

20   ahead and pursue whatever remedies you have available to you.

21        Let me hear from the government on this.

22        MR. JONES:  Your Honor, the answer to the initial

23   question that you asked with respect to Judge Sharbaugh's

24   opinion is that he didn't get anything wrong.  His analysis was

25   careful, it was thorough, it was comprehensive, it addressed

1  every argument that's been raised by the defense.  There is

2  nothing that has changed since he issued that opinion, and it

3  is affirmatively correct and there is no reason to set it

4  aside.

5       I think ultimately the three points that I would like

6  to make in response to the arguments that the defense has made

7  in their papers and today are:

8       One, these bombs were not "harmless," which is the

9  word that the defense has used to characterize them.

10      Two, this conduct, the charged conduct was not

11  isolated.  It was not isolated to January 5th of 2021.  It was

12  part of a broader years-long continuum of conduct that should

13  concern the Court in a variety of ways.

14      And the third point is that the defense, their

15  attempts to explain or characterize the defendant's concerning

16  behavior over the last few years, they fall far short of what

17  would be reliable for the Court to consider in a case like

18  this.  And I'm talking about these -- the four-sentence letter

19  submitted by Dr. Black related to these diagnoses that were

20  apparently made a month ago after the criminal case was

21  initiated.

22      So I'll take those points in turn.  Of course we have

23  briefed this extensively.  But with respect to the first point,

24  the devices that the defendant is charged with using

25  maliciously in this case to try to bomb the national

A315

1   headquarters of the RNC and the DNC on January 5th, the

2   government has never taken the position that the defendant is a

3   professional bomb maker or that he is an expert bomb maker.

4        But what the record before the Court establishes quite

5   clearly is that he is an amateur bomb maker with extensive

6   interest and access to improvised explosive device materials.

7   And an unskilled bomb maker poses a significant threat to the

8   community, and, in fact, poses threats that perhaps somebody

9   skilled in this area wouldn't pose.

10        The submission from the defense, the Phillips report,

11   doesn't change the analysis for this Court.  It doesn't change

12   the analysis that Judge Sharbaugh conducted with respect to the

13   nature of the offenses.

14        I'll note that the proffer was made at the initial

15   detention hearing that there was a defense expert who would

16   opine as Mr. Phillips did in this case, and Judge Sharbaugh

17   deemed it not relevant to consider at that point.

18        But I think ultimately putting aside the factual

19   disputes, which we have laid out why --

20        THE COURT:  In other words, I don't want to focus too

21   much on any one sentence, but sometimes it's just helpful to

22   get reactions to and to understand parties' positions.  Judge

23   Sharbaugh has his sentence where he says "the bomb didn't go

24   off," which is something obviously the government knows and

25   Judge Sharbaugh knew, and he says, "that was luck, not lack of

1  effort."

2        And is your point essentially, if he were to have

3  said, you know, it was not -- or it was luck and inability, not

4  lack of effort, your point is that doesn't change anything?

5        MR. JONES:  It wouldn't change it if it was inability,

6  but I don't think that the record --

7        THE COURT:  You're saying it's just not luck, it might

8  have been lack of skill, but it doesn't matter is your point.

9        MR. JONES:  It doesn't matter as a matter of law.

10  These were explosives under the law regardless.

11        THE COURT:  Go kind of to the facts, not the -- I

12  think it's more helpful to understand specifically the argument

13  as to dangerousness and safety.

14        MR. JONES:  So what the Court should keep in mind is

15  that the devices, when they were disrupted, they were broken

16  into pieces.  I mean, they were destroyed, and so the FBI

17  explosives examiner who assessed them had to put them back

18  together in essence.

19        And in his report, which was attached to the defense's

20  submission, he provided a step-by-step set of instructions as

21  to how you put those pieces back together to create a

22  functional pipe bomb.  It had all of the components necessary

23  to create a viable device.  And what we included in our papers,

24  which is a diagram showing that construction was what the

25  explosives examiner actually put together.

1          And so I think that factually supports conclusively

2     the opinion of the explosives examiner, who is the only person

3     who has actually assessed the devices, that they were viable.

4     The dispute, I think, is about the probability that they would

5     have exploded based on those powder samples with respect to

6     black powder, whether it was explosive in one sample versus not

7     explosive in another sample.

8          I think we have addressed those, and where the defense

9     submission ignores inconvenient facts in the record about those

10    samples, but putting that to the side, what the evidence here

11    shows, and you can see it in the video of the defendant's

12    actions on January 5th, is that he certainly believed that

13    those devices were explosive.

14         There is a reason why he told the FBI that he only put

15    one device in his backpack at a time, and there is a reason why

16    when he had devices in that backpack, he was holding the

17    backpack by the top strap away from his body to keep it stable.

18    He was worried that those devices were volatile and might

19    explode on him, and that's where he told the FBI that he set

20    them to explode, he set those timers to explode 60 minutes

21    later.

22         And so when the Court is assessing dangerousness,

23    we're talking about the nature of these offenses in the context

24    of the ultimate question, which is what kind of danger the

25    defendant poses to the community if released, the Court has to

1  consider --

2        THE COURT:  You had three points.  Is there anything

3  critical on the first point before we move?  I'm interested in

4  the second one.

5        MR. JONES:  No, I think that covers the first point.

6        THE COURT:  I understood the second one to be kind of

7  the pattern and the consistency throughout.  Can you do that,

8  but also make it specifically -- obviously, I have read the

9  pleadings, but specifically responsive, including -- I'm sure

10  you saw the declarations that were filed yesterday.  They are

11  not wholly new, but they do support some of the arguments that

12  the -- I should say they are new declarations, but they are not

13  wholly new ideas in the case.  They do support some of the

14  timeline arguments that the defense has been trying to make.

15  Can you respond to those, but give me your argument at the same

16  time?

17        MR. JONES:  Sure.  So I think first and foremost, what

18  we're relying on here in seeking detention or asking the Court

19  to deny the motion to revoke Judge Sharbaugh's order is a

20  years-long, as I said earlier, continuum of conduct.  And so it

21  stretches from, based on the declarations, it stretches back

22  farther than the government even understood when we previously

23  litigated these issues, because, apparently, back in 2018, the

24  defendant was -- that was when he was experimenting with

25  potassium chlorate.  That's been represented in the declaration

1   as an innocuous science experiment to make rocket fuel.  That

2   was raised for the first time yesterday in the reply brief.

3          So it prompted the government to go back and look at

4   what the defendant was purchasing around the same time in 2018,

5   because, as I said, this is farther back than even we realized.

6   And it showed us that the defendant purchased the beaker sets

7   that he used, on his own admission, to create this potassium

8   chlorate, which is an oxidizer used in IEDs, on the same day

9   from Amazon as the sulfur dust that he used in the pipe bombs

10  in 2021.

11         Later on, in 2018, he purchased copper pipes, he

12  purchased steel pipes, he purchased a hacksaw, he purchased

13  wires.  What didn't he purchase?  He didn't purchase fins or

14  cones or the type of lightweight material that somebody like a

15  hobbiest would purchase if they were going to make a model

16  rocket at home.

17         The record here supports the conclusion, certainly to

18  a clear and convincing standard, that what the defendant was

19  experimenting with in 2018 was another very potent oxidizer

20  that's commonly used in improvised explosive devices, and that

21  I think sets the table for what the record shows happens over

22  the ensuing years, which is that before January 5th of 2021,

23  the defendant is experimenting with these materials.  Then he

24  has this triggering event that prompts him to assemble these

25  devices and to use them in an act of political violence in

```
 1    2021.  That required him to do research in order to understand

 2    how to manufacture these pipe bombs.

 3         It also required him to understand how to make

 4    homemade black powder, the different components that are used

 5    to make explosive black powder.  And then ultimately, on

 6    January 5th, he executed that plan.

 7         THE COURT:  Can I ask you, you used the word

 8    "triggering event," which I think was described in the papers

 9    as taking the quote of snapping, which I understand is the

10    description of the police interview.

11         I'm not meaning to oversimplify or put words in

12    defense counsel's mouth, so I'll just put it in mine.  If

13    someone were to say, well, look, you have got evidence of one

14    snap over the course of all of those years, your response would

15    be?

16         MR. JONES:  My response would be that the defendant is

17    now under extraordinarily difficult and challenging

18    circumstances facing a public prosecution based on his conduct.

19    That is not at all dissimilar from the type of circumstances

20    that led him to snap.

21         In fact, it might be even more difficult for a person

22    to deal with than in 2020, when he was simply aggrieved about

23    his views on a political matter, and that was the snapping

24    event back then.

25         And of course, all of this is in the context of
```

1   somebody who has an interest, demonstrated interest and

2   proclivity for assembling these types of devices, accumulating

3   the components used to create these materials.

4        And so I think when the Court is considering the

5   ultimate question, the question is not with absolute certainty

6   can the Court say that if you release the defendant he would

7   never make another bomb, which is the way the defense has kind

8   of characterized it, it is whether the Court can fashion

9   conditions that would reasonably assure the community's safety.

10        And it's an assessment of the risk of danger that the

11   defendant poses.  And here, the defendant's conduct, the

12   sustained conduct, in combination with the wiping of the

13   electronic devices -- and there is additional information on

14   that topic that the government can proffer in response to what

15   the defense has filed -- that leads the Court --

16        THE COURT:  It's hard for me to have you just say that

17   without understanding what you mean.  I was going to ask you to

18   respond to this kind of 2022, everything happened after 2022

19   with respect to the wiping.

20        Can you address that narrow point first?  Is that

21   accurate?

22        MR. JONES:  When we talk about wiping, first of all,

23   we're talking about factory resets of the device.  We're

24   talking about wiping all user content on the phone.  We're not

25   talking about wiping junk files.

1      There were, my understanding is, two factory resets of

2    the device in December of 2020, so it would have been a couple

3    of weeks before the defendant planted the pipe bombs.  And then

4    the next factory reset does not take place until August of

5    2022.

6      Now, the significance of that timeline is that for

7    that 18-month period, there is record evidence that the

8    defendant was continuing to purchase the components that he

9    used to manufacture the pipe bombs.  In fact, his purchasing

10   accelerated.  He bought more pipes and end caps after

11   January 5th of 2021 than he did before January 5th of 2021.

12      But then when you get to the summer of 2022, mid 2022,

13   his use of credit cards and debit cards to purchase those

14   components stops, but what starts, the daily factory resetting

15   of his electronic device.  And that also coincides with in May

16   of 2022, the defendant begins to regularly purchase a PC, a

17   personal computer, a desktop or laptop, cleaner, called

18   CCleaner.  He started to spend hundreds of dollars on those

19   products, which are designed to clear, among other --

20      THE COURT:  Can I ask you to connect the dots to make

21   it explicit in terms of dangerousness.  I mean, one could look

22   at those facts and say, okay, he was really interested in this

23   a long time ago, realized he had snapped this one time, all

24   those other purchases were foolish, and now he's like I feel

25   terrible about this, I'm going to erase all of the proof I ever

1    did this.

2        MR. JONES:  The concern is that something in mid 2022

3    caused him to take extraordinary measures to conceal his

4    digital activity.  Whether that was somebody learning or

5    suspecting or what he was doing, it made him realize that he

6    should no longer be purchasing components using traceable

7    credit cards, and that if he was going to use his cell phone,

8    he needed to factory reset it every day.

9        He also purchased, as I mentioned, the cleaning

10   product for his computer, which would clear browsing data.  And

11   when his devices, the desktop and laptop, were examined in this

12   case, there was a browser called Brave, a secure browser that

13   allows for --

14       THE COURT:  Doesn't this go more towards, like, maybe

15   flight risk or wanting to evade law enforcement than it does to

16   dangerousness?  I know you're not arguing the former, but help

17   me understand why it goes to dangerousness.

18       MR. JONES:  It goes to go whether the Court can or

19   should have confidence that the defendant will abide by

20   conditions, and whether a third-party custodian could

21   effectively monitor him given his penchant for concealing his

22   digital activity.

23       THE COURT:  That's helpful.  Maybe we could turn to

24   that.  And the law requires me to consider whether there is any

25   condition or combination of conditions that would assure

1  safety, and I take that seriously.

2       And here it's not like the defense is coming in saying

3  release on own recognizance.  They are saying home confinement

4  with a custodian and GPS.  I know you have kind of already

5  built some of this, but tell me why can't the government keep

6  the community safe with all of those conditions?

7       MR. JONES:  The fundamental problem with that proposed

8  release plan is that it puts the defendant in substantially the

9  same place that he was in when all of this happened.  This is

10  not somebody who was living on their own unsupervised in an

11  apartment somewhere making bombs.

12       This is somebody who constructed these devices,

13  apparently experimented with potassium chlorate with the

14  knowledge of family members in their home and still was able to

15  effect these criminal offenses, to plant explosive devices at

16  the RNC and the DNC on the eve of a significant and

17  high-security event the next day.

18       He was able to do all of that while living in his

19  family's home with multiple family members, living the same

20  kind of life and existence that the proposed release plan would

21  return him to, which is to live a solitary plaintiff at the

22  family's home and only leave to go to work.  And so under the

23  facts and circumstances of this case, those conditions are

24  simply insufficient to assure the community's safety.

25       THE COURT:  I don't know if you got all the way

1    through the third point you wanted to make, or if there is

2    anything else you wanted to say on that.

3         MR. JONES:  The third point I think was simply to

4    address the defense's attempt to explain everything away with

5    these diagnoses.  And I have addressed to some extent the

6    argument -- I guess I haven't really directly addressed the

7    argument that the phone wiping is explained by OCD.

8         What's before the Court is, as I mentioned, a

9    four-sentence letter written by a doctor yesterday, and it

10   simply says that he examined the defendant for two days and

11   he's diagnosed him with autism level one, which I think defense

12   counsel characterized as extreme autism.  That is the mildest

13   form of autism, as well as OCD.

14        And it simply says that repetitively deleting junk

15   files from your phone is consistent with obsessive compulsive

16   disorder.  Of course, that's not what the defendant did here,

17   but that was what was -- that was the information provided to

18   this doctor informing his opinion.

19        THE COURT:  Can you clarify that.  When you say "this

20   is not what the defendant did here," can you finish that

21   thought for me?

22        MR. JONES:  To be more precise, the defendant in

23   factory resetting his phone was not clearing junk files.  He

24   was deleting all user content on his device on a daily basis.

25        But be that as it may, repetitive behavior might be

1  consistent with OCD, sure, but on the facts and the record

2  before this Court, it is far more consistent with concealing

3  digital activity.

4       The defense has not made any proffer as to how the

5  defendant's OCD diagnosis manifests in any other way other than

6  wiping his cell phone, so there is no proffer that the

7  defendant suffers from any other symptoms of OCD except for

8  wiping his cell phone to explain the otherwise obviously

9  incriminating nature of that kind of conduct.

10       THE COURT:  I heard you make an argument about the

11  credibility of the declaration from Dr. Black that came in

12  yesterday, and I think I have heard you make an argument that

13  it could be consistent with OCD and also consistent with

14  covering your tracks.

15       Are you -- is that your argument?  Is there another

16  component of it, that it just doesn't matter if it's because of

17  OCD?

18       MR. JONES:  No, I'm arguing that it's far more

19  consistent with covering your tracks, which is the analysis

20  that Judge Sharbaugh engaged in.  I mean, he considered the

21  exact same question and he determined based on the facts in

22  this case it was more consistent with concealing and hiding and

23  obfuscating than it was explainable by innocuous explanations.

24       THE COURT:  Okay.  I think I have that argument.

25  Anything else?

1          MR. JONES:  The last one is simply that just because

2     it's been referred to so many times in the pleadings and the

3     proceeding that the defendant has been diagnosed with autism

4     spectrum disorder level one, there has been no attempt to

5     explain what, if any, relationship that diagnosis has to

6     whether the defendant poses a danger to the community if

7     released.

8          But what I will say is that the Court can review the

9     interview, the Court can review the transcript and the video

10    recording of the defendant's four-hour conversation with the

11    FBI agents who arrested him on December 4th.  What you will see

12    is a 30-year-old man who went into an FBI interview after being

13    arrested and proceeded to give them a carefully planned cover

14    story explaining the evidence that placed him in Washington, DC

15    on the evening of January 5th of 2021.

16         That cover story was that he was going to DC to attend

17    a protest at the Capitol, which would explain the evidence

18    placing him in the area that night.  He stuck to that story for

19    two hours before he finally admitted -- realized that there was

20    no way out and admitted that it was in fact him that placed

21    those pipe bombs.  That demonstrates that we're talking about

22    somebody who does not have any appreciable deficit in any

23    meaningful way that would affect the Court's analysis here.

24         And without any specific proffer from the defense,

25    there is no reason for the Court to consider that diagnosis as

1   bearing on the ultimate question before the Court.

2       THE COURT:  Got it.  Your point is that autism level

3   one or not, focused on keeping the community safe, he has shown

4   what is needed to require detention?  Is that your point?  I'm

5   trying to just make sure I understand whether that's what

6   you're arguing or you're trying to say go watch the video and

7   you're going to find that he doesn't look like he's autistic?

8       MR. JONES:  I'm saying that, in terms of

9   dangerousness, there is nothing mitigating on this record about

10  the defendant's diagnosis.  My point is simply that the

11  defendant sat for that four-hour interview, and if you watch

12  that interview, you will see a person who appears to have all

13  of their intellectual faculties.  You can tell that because he

14  is providing the FBI with a carefully planned cover story for

15  his conduct, and he sticks to that story for hours.

16      This is not, contrary to the way it's been portrayed

17  by the defense, this is not a situation where the FBI agents

18  were simply saying things to the defendant and he was

19  responding yes or no.  These were in his own words.  He is the

20  one who provided a carefully planned cover story to the FBI and

21  then eventually, when he realized, based off of the evidence

22  that the FBI had gathered in the investigation that he didn't

23  have a way out, he finally admitted what he had done.

24      There is no intellectual deficit on this record that

25  should concern the Court in terms of dangerousness.

1          THE COURT:  I appreciate your submissions.

2          I can give the defense a brief opportunity to rebut

3    anything focused -- again, this is not a chance to make some

4    broad plea.  This is a chance to focus on error and facts that

5    you think would be helpful for me at this point.

6          MR. LITTLE:  The government asked why we didn't raise

7    all the other ways that OCD might exhibit itself.  Because they

8    weren't relevant to this hearing.  If they were relevant to

9    this hearing, we would have put it forward.

10          We were specifically responding to what the government

11    proffered as somehow as evidence of this dangerousness

12    continuing because he was wiping his phone every day.  I think

13    that fact is just wildly sort of ends oriented.  They say it

14    shows something and they try to make a path as to how it shows

15    something.  It's inconsistent with all the evidence, which is

16    this is not somebody who is sitting out there trying to hide

17    something secretly from everybody, which also goes to the

18    question of the alleged confession and the idea of autism.

19          To the extent there is future motions practice to

20    suppress that alleged confession, I think you can read it

21    differently.  This is somebody who truthfully was telling the

22    truth and then had his will overcome and then just said

23    whatever the government wanted him to say.  I don't think the

24    Court needs to resolve that here.  I don't think it helps the

25    government though at all in any which way.

1    The reason we raised that issue is to address

2    specifically some of the other things, those other categories

3    the government says makes my client dangerous, and they are not

4    there.

5    The last thing they talk about with some of these

6    things.  Well, something caused him to do it.  They don't know

7    what it is.  They are just asking the Court to assume that

8    there is something that happened bad that my client did between

9    2021 and the present that the Court should be concerned of.

10    The fact remains on this record there is just no

11    evidence of any continuing dangerousness that my client

12    exhibited.

13    The last point I'll make is the idea around the

14    third-party custodian, the fact that he allegedly committed

15    this crime in the same situation.  When I was young, my sister

16    almost burned down the house because she had a box of matches

17    and she dropped it and burned down a room.  She continued to

18    live in our house, and we kept the matches away from her

19    because we had the knowledge that she couldn't be trusted with

20    them.

21    This is an individual who the Court could certainly

22    fashion taking away digital access.  The Court can fashion GPS.

23    The Court can fashion certain types of supervision and

24    reporting, all of which will directly address any of the things

25    which allegedly allowed this to occur.

A331

 1          The government doesn't really have an answer to that

 2     other than to say, well, we disagree.  There is no reasoned

 3     basis to believe that the conditions could not sort of directly

 4     address the circumstances that allegedly allowed this to occur.

 5          THE COURT:  All right.  Okay.  Appreciate your

 6     submissions.

 7          I'm not going to rule from the bench on this.  I'm

 8     going to take this and what I have heard today under

 9     advisement, and I'll issue a written order.

10          MR. WILLIAMS:  Is there any way I have can two minutes

11     to add one thing about something you said?

12          THE COURT:  Come on up, Mr. Williams.

13          MR. WILLIAMS:  I'll do it just real quick.  Your

14     Honor, you hit the nail on the head when you said you take

15     seriously whether there is a set of circumstances or

16     conditions, strict conditions that could reasonably assure that

17     this wouldn't happen.

18          And the starting point really is what is the standard

19     we're going by, sufficient evidence to basically convince you

20     to have a firm belief or a conviction that absolutely there is

21     no set of strict conditions that would give you reasonable

22     assurance that he's not going to create bombs, and the

23     government said what we're fearing is is we see a pattern of

24     accumulating components to use these materials to create bombs.

25          But what they won't address, other than to talk about

 1  him doing it at a time when he didn't have any conditions, he

 2  didn't have any monitoring, he didn't have any conditions at

 3  all, is what is it about house arrest and ankle monitor,

 4  constant supervision, checking in weekly, and being in the

 5  supervision of people who now know or suspect, say, hey, I'm

 6  going to really watch you closely, what is it about those

 7  conditions that won't basically tell Your Honor, hey, he just

 8  tried to go to Wal-Mart and buy something?

 9          Because as soon as he leaves the house -- they try to

10  get around the leaving the house saying he wants to go work.

11  We have already conceded we would give that up.  He would stay

12  in that house.  So you're trying to say all of those conditions

13  don't reasonably assure that that he won't go and accumulate

14  bomb materials?  That doesn't make sense.  That's the law.  All

15  this other stuff, Your Honor, I'm willing to concede.

16          THE COURT:  I think I have your point.  I understand

17  the legal standard.  I stated it.  I take it very seriously

18  that that's what's required.  I don't think it's so narrow as

19  you said.  It's not just going to buy the exact same stuff that

20  he's accused of.

21          MR. WILLIAMS:  Leaving the house to purchase anything,

22  to do anything.

23          THE COURT:  I think I have got your point.  And I

24  understand the conditions that are available, and I appreciate

25  it.  Okay.

1    All right.  I will take the parties' arguments under

2    advisement, and I'll issue a written order once I have come to

3    a decision.

4    And I think we have handled everything else through

5    the status conference, so we can go ahead and adjourn.

6    Appreciate it.

7        (Proceedings concluded at 4:52 p.m.)

8

9                        CERTIFICATE

10    I, Sonja L. Reeves, Federal Official Court Reporter in and
for the United States District Court of the District of
11    Columbia, do hereby certify that the foregoing transcript is a
true and accurate transcript from the original stenographic
12    record in the above-entitled matter and that the transcript
page format is in conformance with the regulations of the
13    Judicial Conference of the United States.

14    Dated this 30th day of January, 2026.

15

16                        /s/ Sonja L. Reeves
                       SONJA L. REEVES, RDR-CRR
17                       FEDERAL OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25

## /

**/s** [1] - 59:16

## 1

**103** [1] - 1:21
**1050** [1] - 1:16
**10:30** [2] - 16:21, 17:1
**11:00** [1] - 16:21
**16** [1] - 38:25
**18** [1] - 17:3
**18-month** [1] - 48:7
**1:26-cr-00001** [1] - 1:5

## 2

**20** [1] - 22:9
**20036** [1] - 1:17
**2018** [4] - 44:23, 45:4, 45:11, 45:19
**2020** [2] - 46:22, 48:2
**2021** [11] - 20:18, 22:12, 23:3, 40:11, 45:10, 45:22, 46:1, 48:11, 53:15, 56:9
**2022** [11] - 20:24, 20:25, 21:4, 21:7, 47:18, 48:5, 48:12, 48:16, 49:2
**2026** [2] - 1:10, 59:14
**20530** [1] - 1:14
**20th** [1] - 5:8
**25** [1] - 35:18
**26-1** [1] - 2:2
**27th** [4] - 16:18, 16:20, 17:1, 17:3
**28** [1] - 1:10

## 3

**30** [7] - 8:25, 9:2, 14:14, 14:16, 14:20, 35:21, 35:22
**30-year-old** [1] - 53:12
**300** [1] - 1:19
**30342** [1] - 1:22
**3060** [1] - 39:6
**30th** [1] - 59:14
**3161(h)** [1] - 17:4
**3164** [1] - 39:17
**37203** [1] - 1:19
**3:36** [2] - 1:10, 2:1

## 4

**41** [1] - 6:17

**4:52** [2] - 1:10, 59:7
**4th** [1] - 53:11

## 5

**500** [1] - 1:16
**51** [1] - 22:20
**54** [1] - 1:19
**5600** [1] - 1:21
**5th** [8] - 40:11, 41:1, 43:12, 45:22, 46:6, 48:11, 53:15

## 6

**60** [1] - 43:20
**601** [1] - 1:13

## 8

**8,000** [1] - 9:18

## A

**a.m** [2] - 16:21, 17:1
**abide** [2] - 19:6, 49:19
**ability** [3] - 31:24, 32:8, 32:11
**able** [8] - 9:20, 12:22, 14:10, 28:6, 36:3, 39:13, 50:14, 50:18
**above-entitled** [1] - 59:12
**absence** [2] - 21:5, 22:19
**absent** [1] - 25:6
**absolute** [1] - 47:5
**Absolutely** [1] - 25:4
**absolutely** [3] - 25:14, 29:13, 57:20
**abstract** [1] - 12:16
**accelerated** [1] - 48:10
**accept** [1] - 34:8
**access** [3] - 10:6, 41:6, 56:22
**accumulate** [1] - 58:13
**accumulating** [2] - 47:2, 57:24
**accurate** [2] - 47:21, 59:11
**accused** [1] - 18:23, 58:20
**acknowledge** [1] - 27:20
**acknowledged** [1] - 24:9
**act** [3] - 22:3, 26:22,

45:25
**action** [1] - 23:14
**actions** [1] - 43:12
**activities** [1] - 22:6
**activity** [8] - 21:6, 21:9, 23:13, 29:18, 29:19, 49:4, 49:22, 52:3
**acts** [1] - 32:1
**actual** [3] - 23:14, 29:12, 32:22
**add** [2] - 12:13, 57:11
**additional** [1] - 47:13
**address** [10] - 3:22, 8:6, 12:16, 19:11, 47:20, 51:4, 56:1, 56:24, 57:4, 57:25
**addressed** [4] - 39:25, 43:8, 51:5, 51:6
**adjourn** [1] - 59:5
**admission** [1] - 45:7
**admitted** [3] - 53:19, 53:20, 54:23
**adverse** [1] - 39:8
**advisement** [2] - 57:9, 59:2
**affect** [1] - 53:23
**affirmatively** [1] - 40:3
**afternoon** [6] - 2:6, 2:8, 2:9, 2:12, 2:14, 2:15
**afterwards** [1] - 22:13
**age** [1] - 27:24
**agency** [2] - 10:3, 13:10
**agency's** [1] - 11:1
**agents** [2] - 53:11, 54:17
**aggrieved** [1] - 46:22
**ago** [6] - 12:14, 18:24, 35:18, 35:21, 40:20, 48:23
**agree** [3] - 18:13, 34:10
**agreeing** [1] - 13:24
**agreement** [2] - 14:14, 14:15
**ahead** [4] - 10:22, 18:9, 39:20, 59:9
**airsoft** [5] - 31:25, 32:1, 32:2, 32:4, 32:6
**Alex** [1] - 2:10
**ALEX** [1] - 1:18
**ALI** [1] - 1:9
**alleged** [6] - 15:10, 20:15, 21:6, 23:16,

55:18, 55:20
**allegedly** [3] - 56:14, 56:25, 57:4
**allow** [2] - 9:3, 39:17
**allowed** [3] - 11:6, 56:25, 57:4
**allows** [1] - 49:13
**almost** [1] - 56:16
**amateur** [1] - 41:5
**Amazon** [1] - 45:9
**Amendment** [3] - 15:8, 15:9, 16:8
**America** [1] - 2:3
**AMERICA** [1] - 1:3
**AMIR** [1] - 1:9
**amount** [3] - 5:11, 10:19, 14:20
**analysis** [6] - 33:7, 39:24, 41:11, 41:12, 52:19, 53:23
**ankle** [1] - 58:3
**answer** [3] - 37:11, 39:22, 57:1
**anticipate** [1] - 10:15
**anticipating** [1] - 15:1
**antics** [1] - 4:4
**apartment** [1] - 50:11
**appeal** [2] - 39:8, 39:19
**appearance** [2] - 2:5, 2:24
**appeared** [1] - 2:18
**appellate** [1] - 39:6
**applies** [1] - 23:25
**appreciable** [1] - 53:22
**appreciate** [4] - 55:1, 57:5, 58:24, 59:6
**approach** [4] - 2:4, 5:10, 5:22, 6:8
**approaching** [1] - 5:13
**appropriate** [1] - 17:9
**area** [2] - 41:9, 53:18
**areas** [1] - 8:1
**argue** [2] - 34:25, 38:20
**argued** [1] - 38:10
**arguing** [3] - 49:16, 52:18, 54:6
**argument** [18] - 3:16, 17:18, 22:7, 22:13, 25:12, 30:12, 31:20, 33:8, 33:21, 40:1, 42:12, 44:15, 51:6, 51:7, 52:10, 52:12, 52:15, 52:24

**arguments** [5] - 39:14, 40:6, 44:11, 44:14, 59:1
**armed** [1] - 32:3
**arraigned** [1] - 2:24
**arrest** [3] - 19:20, 26:19, 58:3
**arrested** [4] - 26:19, 26:25, 53:11, 53:13
**articulated** [1] - 5:13
**articulating** [1] - 8:2
**aside** [2] - 40:4, 41:18
**aspect** [1] - 32:12
**assemble** [2] - 28:8, 45:24
**assembling** [1] - 47:2
**assess** [1] - 12:22
**assessed** [2] - 42:17, 43:3
**assessing** [1] - 43:22
**assessment** [1] - 47:10
**assists** [1] - 36:19
**associates** [1] - 38:18
**assume** [4] - 13:4, 13:7, 31:20, 56:7
**assuming** [1] - 24:13
**assurance** [1] - 57:22
**assure** [5] - 47:9, 49:25, 50:24, 57:16, 58:13
**ATF** [2] - 10:7, 13:6
**attached** [4] - 3:13, 3:25, 17:23, 42:19
**attachments** [1] - 17:22
**attack** [1] - 16:8
**attempt** [3] - 21:2, 51:4, 53:4
**attempted** [1] - 30:22
**attempts** [1] - 40:15
**attend** [1] - 53:16
**attention** [1] - 3:24
**Attorney** [1] - 1:12
**attorneys** [2] - 3:4, 3:6
**August** [1] - 48:4
**autism** [7] - 20:11, 51:11, 51:12, 51:13, 53:3, 54:2, 55:18
**autistic** [1] - 54:7
**automatic** [1] - 32:16
**available** [3] - 16:18, 39:20, 58:24
**Avenue** [1] - 1:16

**avoid** [1] - 4:1
**aware** [1] - 15:4

## B

**background** [2] - 19:18, 25:3
**backpack** [3] - 43:15, 43:16, 43:17
**bad** [3] - 23:16, 23:19, 56:8
**bail** [1] - 38:13
**BALLANTINE** [1] - 1:13
**Ballantine** [1] - 2:7
**based** [9] - 18:15, 27:9, 28:10, 29:17, 43:5, 44:21, 46:18, 52:21, 54:21
**baseline** [1] - 12:17
**basis** [3] - 5:8, 51:24, 57:3
**Bates** [1] - 9:14
**beaker** [1] - 45:6
**bear** [1] - 35:10
**bearing** [1] - 54:1
**BEFORE** [1] - 1:9
**beginning** [1] - 2:5
**begins** [1] - 48:16
**behavior** [2] - 40:16, 51:25
**belief** [1] - 57:20
**believes** [1] - 25:1
**bench** [2] - 2:23, 57:7
**benefit** [1] - 28:13
**BERNARD** [1] - 1:21
**best** [1] - 6:20
**better** [1] - 16:11
**between** [16] - 6:22, 9:2, 9:24, 10:14, 17:2, 21:6, 22:5, 26:17, 31:11, 31:23, 32:2, 32:6, 33:10, 35:12, 56:8
**beyond** [3] - 8:2, 13:25, 26:9
**bit** [4] - 9:3, 22:23, 38:4, 38:9
**black** [6] - 18:3, 40:19, 43:6, 46:4, 46:5, 52:11
**Black** [1] - 37:18
**body** [1] - 43:17
**bomb** [16] - 19:4, 22:24, 23:3, 23:13, 28:8, 28:9, 28:13, 40:25, 41:3, 41:5, 41:7, 41:23, 42:22, 47:7, 58:14

**bombs** [10] - 21:17, 40:8, 45:9, 46:2, 48:3, 48:9, 50:11, 53:21, 57:22, 57:24
**BOND** [1] - 1:9
**bonding** [1] - 38:14
**bought** [1] - 48:10
**box** [1] - 56:16
**Brady** [2] - 7:13, 10:7, 17:9
**Brave** [1] - 49:12
**BRIAN** [1] - 1:6
**Brian** [2] - 2:3
**brief** [2] - 45:2, 55:2
**briefed** [1] - 40:23
**briefing** [3] - 17:20, 24:9, 30:12
**briefly** [2] - 38:7, 38:8
**broad** [1] - 55:4
**broader** [3] - 6:20, 8:8, 40:12
**broadly** [1] - 10:23
**broken** [1] - 42:15
**brought** [1] - 39:12
**browser** [2] - 49:12
**browsing** [1] - 49:10
**build** [1] - 39:19
**Building** [1] - 1:21
**built** [1] - 50:5
**burden** [1] - 30:18
**burned** [2] - 56:16, 56:17
**bury** [1] - 8:14
**business** [2] - 38:17, 38:25
**buy** [3] - 28:7, 58:8, 58:19
**BY** [4] - 1:13, 1:16, 1:18, 1:21

## C

**calendar** [1] - 16:13
**calendars** [1] - 16:16
**capable** [6] - 30:25, 31:18, 33:22, 33:23, 34:4, 34:6
**Capitol** [3] - 10:8, 13:6, 53:17
**caps** [1] - 48:10
**captured** [2] - 10:9, 10:23
**car** [1] - 21:15
**cards** [3] - 48:13, 49:7
**careful** [2] - 27:5, 39:25
**carefully** [4] - 17:20, 53:13, 54:14, 54:20

**CARTER** [1] - 1:18
**case** [41] - 2:20, 2:21, 3:2, 3:24, 4:7, 4:24, 6:4, 6:9, 6:10, 6:13, 6:21, 6:23, 7:11, 9:4, 13:18, 15:5, 15:12, 16:14, 18:19, 23:24, 24:19, 24:22, 25:13, 26:4, 26:21, 30:7, 33:13, 33:14, 33:18, 33:19, 33:20, 35:20, 37:8, 40:17, 40:20, 40:25, 41:16, 44:13, 49:12, 50:23, 52:22
**CASE** [1] - 1:5
**categories** [3] - 8:17, 15:16, 56:2
**category** [4] - 7:2, 7:10, 11:17, 37:9
**causal** [1] - 22:5
**caused** [2] - 49:3, 56:6
**caveat** [1] - 4:23
**CCleaner** [1] - 48:18
**cell** [9] - 6:16, 15:7, 15:23, 19:20, 19:21, 20:5, 49:7, 52:6, 52:8
**cert** [1] - 15:4
**certain** [2] - 33:17, 56:23
**certainly** [16] - 4:8, 10:5, 11:1, 12:2, 14:8, 15:8, 19:9, 22:22, 23:1, 26:20, 30:7, 31:4, 32:6, 43:12, 45:17, 56:21
**certainty** [1] - 47:5
**CERTIFICATE** [1] - 59:9
**Certified** [1] - 1:24
**certify** [1] - 59:11
**cetera** [1] - 17:9
**challenge** [1] - 3:9
**challenges** [1] - 23:24
**challenging** [2] - 3:11, 46:17
**chambers** [2] - 4:21, 4:22
**chance** [6] - 12:10, 28:11, 35:9, 35:10, 55:3, 55:4
**change** [5] - 39:16, 41:11, 42:4, 42:5
**changed** [1] - 40:2
**character** [2] - 37:21, 38:17
**characteristics** [1] - 36:7

**characterization** [3] - 19:22, 19:24, 19:25
**characterize** [2] - 40:9, 40:15
**characterized** [4] - 23:6, 23:7, 47:8, 51:12
**charged** [7] - 19:1, 26:12, 35:6, 35:17, 37:9, 40:10, 40:24
**charges** [1] - 2:25
**CHARLES** [1] - 1:13
**Charles** [1] - 2:6
**checking** [1] - 58:4
**chlorate** [3] - 44:25, 45:8, 50:13
**chloride** [1] - 23:2
**chose** [1] - 32:9
**CIPA** [2] - 10:24, 11:7
**circuit** [1] - 24:19
**circumstance** [3] - 11:23, 34:18, 34:22
**circumstances** [9] - 25:23, 37:6, 39:13, 39:16, 46:18, 46:19, 50:23, 57:4, 57:15
**civility** [1] - 4:11
**claiming** [1] - 21:10
**clarification** [1] - 4:18
**clarify** [1] - 51:19
**classified** [1] - 10:25
**cleaner** [1] - 48:17
**cleaning** [1] - 49:9
**clear** [15] - 4:2, 4:17, 11:16, 18:20, 19:10, 22:21, 22:22, 25:5, 26:9, 29:4, 31:5, 38:17, 45:18, 48:19, 49:10
**cleared** [1] - 16:15
**clearing** [1] - 51:23
**clearly** [3] - 14:10, 25:9, 41:5
**CLERK** [1] - 2:2
**client** [6] - 16:2, 18:24, 26:11, 56:3, 56:8, 56:11
**clock** [1] - 9:2
**closely** [2] - 3:14, 58:6
**coincides** [1] - 48:15
**COLE** [1] - 1:6
**Cole** [12] - 2:3, 2:14, 2:17, 4:8, 6:6, 6:10, 6:12, 6:16, 7:5, 7:12, 17:12, 19:20
**Cole's** [2] - 6:24, 18:2

**collapses** [4] - 36:25, 37:3, 37:5, 37:8
**collar** [2] - 36:21, 36:24
**colleagues** [1] - 16:10
**Columbia** [1] - 59:11
**COLUMBIA** [1] - 1:1
**combination** [3] - 18:21, 47:12, 49:25
**comforted** [1] - 31:4
**coming** [2] - 14:15, 50:2
**comment** [1] - 13:6
**commit** [1] - 32:1
**committed** [6] - 22:2, 28:24, 31:24, 32:3, 33:25, 56:14
**committing** [2] - 13:24, 18:24
**commonly** [1] - 45:20
**communicate** [2] - 14:6, 14:10
**communication** [1] - 8:4
**communications** [2] - 10:4
**community** [12] - 12:25, 25:6, 26:13, 30:9, 30:10, 30:16, 37:3, 41:8, 43:25, 50:6, 53:6, 54:3
**community's** [2] - 47:9, 50:24
**company** [1] - 38:14
**compelled** [1] - 22:15
**complete** [1] - 29:18
**completed** [1] - 17:16
**completely** [2] - 20:6, 27:8
**complicated** [1] - 33:5
**comply** [1] - 38:24
**component** [2] - 10:18, 52:16
**components** [8] - 28:7, 42:22, 46:4, 47:3, 48:8, 48:14, 49:6, 57:24
**comprehensive** [1] - 39:25
**compulsive** [2] - 20:13, 51:15
**computer** [2] - 48:17, 49:10
**conceal** [1] - 49:3

**concealing** [3] - 49:21, 52:2, 52:22
**concede** [2] - 33:1, 58:15
**conceded** [1] - 58:11
**concern** [4] - 20:16, 40:13, 49:2, 54:25
**concerned** [3] - 10:7, 33:17, 56:9
**concerning** [1] - 40:15
**concerns** [1] - 15:10
**concluded** [1] - 59:7
**conclusion** [3] - 28:22, 31:6, 45:17
**conclusively** [1] - 43:1
**condition** [3] - 18:21, 25:7, 49:25
**conditions** [23] - 18:22, 19:6, 23:18, 25:10, 26:10, 28:20, 29:15, 29:16, 31:4, 47:9, 49:20, 49:25, 50:6, 50:23, 57:3, 57:16, 57:21, 58:1, 58:2, 58:7, 58:12, 58:24
**conduct** [10] - 37:9, 40:10, 40:12, 44:20, 46:18, 47:11, 47:12, 52:9, 54:15
**conducted** [1] - 41:12
**cones** [1] - 45:14
**conference** [7] - 3:2, 3:8, 5:4, 8:23, 16:16, 17:17, 59:5
**Conference** [1] - 59:13
**confessed** [1] - 35:19
**confession** [3] - 15:10, 55:18, 55:20
**confidence** [1] - 49:19
**confinement** [1] - 50:3
**confirm** [1] - 9:19
**confirmed** [2] - 20:10, 37:14
**conformance** [1] - 59:12
**confusion** [1] - 14:4
**Congress** [3] - 11:22, 13:13, 25:1
**congressional** [4] - 11:19, 11:20, 11:24, 12:4
**connect** [1] - 48:20

**connected** [2] - 22:2, 22:4
**Connecticut** [1] - 1:16
**connection** [3] - 7:16, 20:15, 22:5
**consider** [7] - 24:25, 30:3, 40:17, 41:17, 44:1, 49:24, 53:25
**considerable** [1] - 5:11
**considerations** [1] - 7:19
**considered** [4] - 13:10, 29:5, 29:6, 52:20
**considering** [1] - 47:4
**consistency** [2] - 27:24, 44:7
**consistent** [11] - 5:16, 20:12, 21:22, 37:15, 51:15, 52:1, 52:2, 52:13, 52:19, 52:22
**constant** [1] - 58:4
**constructed** [3] - 31:19, 34:16, 50:12
**construction** [1] - 42:24
**contained** [2] - 6:24, 10:25
**content** [2] - 47:24, 51:24
**contest** [1] - 19:24
**context** [10] - 12:10, 12:13, 16:9, 16:14, 34:13, 34:15, 35:13, 43:23, 46:25
**continued** [5] - 19:4, 22:24, 23:3, 23:13, 56:17
**continuing** [3] - 48:8, 55:12, 56:11
**continuum** [2] - 40:12, 44:20
**contrary** [1] - 54:16
**control** [1] - 38:21
**conversation** [4] - 3:3, 5:12, 12:14, 53:10
**conversations** [2] - 9:25, 10:16
**conviction** [2] - 33:17, 57:20
**convince** [1] - 26:9, 57:19
**convincing** [8] - 18:20, 19:10, 22:21, 22:22, 25:6, 26:9,

31:5, 45:18
**copper** [1] - 45:11
**copy** [1] - 6:12
**correct** [1] - 40:3
**correctly** [1] - 20:24
**correspond** [1] - 4:24
**counsel** [9] - 2:4, 3:7, 3:11, 3:22, 4:4, 9:7, 14:12, 18:6, 51:12
**counsel's** [2] - 18:5, 46:12
**count** [1] - 14:9
**counterfactual** [1] - 27:8
**couple** [4] - 3:6, 15:3, 20:4, 48:2
**course** [13] - 5:12, 6:21, 7:5, 7:18, 9:25, 12:18, 17:7, 26:2, 30:18, 40:22, 46:14, 46:25, 51:16
**Court** [45] - 1:24, 2:1, 5:19, 7:14, 8:6, 15:4, 15:22, 18:13, 18:14, 24:17, 25:25, 26:10, 31:3, 36:19, 39:7, 40:13, 40:17, 41:4, 41:11, 42:14, 43:22, 43:25, 44:18, 47:4, 47:6, 47:8, 47:15, 49:18, 51:8, 52:2, 53:8, 53:9, 53:25, 54:1, 54:25, 55:24, 56:7, 56:9, 56:21, 56:22, 56:23, 59:10, 59:10
**COURT** [91] - 1:1, 2:8, 2:12, 2:16, 3:22, 5:21, 5:25, 7:10, 7:22, 8:7, 8:18, 8:21, 9:5, 9:7, 10:11, 11:10, 12:7, 12:10, 13:4, 14:2, 14:15, 14:24, 15:17, 16:9, 16:20, 16:24, 17:1, 17:16, 19:12, 20:23, 21:7, 21:21, 22:7, 23:8, 23:19, 24:8, 24:13, 24:22, 25:12, 25:15, 25:19, 25:22, 26:1, 27:11, 28:12, 29:4, 29:20, 30:2, 30:11, 30:18, 30:23, 31:6, 31:9, 31:14, 32:13, 33:8, 34:10, 36:5, 36:12, 36:16, 36:23, 37:2, 37:11, 37:17, 37:20, 38:1, 38:16,

39:3, 39:14, 39:18, 41:20, 42:7, 42:11, 44:2, 44:6, 46:7, 47:16, 48:20, 49:14, 49:23, 50:25, 51:19, 52:10, 52:24, 54:2, 55:1, 57:5, 57:12, 58:16, 58:23, 59:17
**court** [6] - 2:24, 4:3, 21:20, 24:25, 35:17, 38:23
**Court's** [6] - 10:3, 10:10, 11:8, 11:25, 28:22, 53:23
**courtroom** [2] - 2:23, 4:24
**courts** [1] - 4:16
**cover** [4] - 53:13, 53:16, 54:14, 54:20
**covered** [1] - 7:9
**covering** [2] - 52:14, 52:19
**covers** [1] - 44:5
**crazy** [1] - 11:2
**create** [7] - 6:9, 42:21, 42:23, 45:7, 47:3, 57:22, 57:24
**created** [2] - 6:10, 30:14
**creating** [2] - 31:11, 31:12
**credibility** [1] - 52:11
**credit** [2] - 48:13, 49:7
**crime** [14] - 18:22, 18:23, 18:24, 19:3, 21:6, 22:2, 26:11, 28:24, 31:24, 34:1, 34:2, 35:17, 56:15
**criminal** [7] - 13:15, 24:18, 29:18, 29:19, 35:24, 40:20, 50:15
**Criminal** [1] - 2:2
**critical** [2] - 20:5, 44:3
**CRR** [1] - 59:16
**custodian** [5] - 38:5, 38:12, 49:20, 50:4, 56:14
**custodians** [3] - 24:18, 38:21, 38:22
**custody** [1] - 28:5

## D

**daily** [2] - 48:14, 51:24
**danger** [8] - 25:6, 30:16, 32:20, 34:24, 36:8, 43:24, 47:10,

53:6
**dangerous** [14] - 25:9, 25:11, 28:25, 29:2, 33:4, 33:22, 33:23, 33:24, 34:3, 34:7, 35:3, 36:19, 36:20, 56:3
**dangerousness** [28] - 18:19, 25:25, 26:1, 28:2, 28:14, 28:20, 32:11, 32:25, 33:7, 33:12, 33:20, 34:5, 35:10, 35:12, 35:24, 36:3, 36:25, 37:4, 37:7, 42:13, 43:22, 48:21, 49:16, 49:17, 54:9, 54:25, 55:11, 56:11
**data** [2] - 6:17, 49:10
**date** [5] - 6:2, 6:22, 6:23, 8:25, 16:15
**Dated** [1] - 59:14
**dates** [2] - 16:10, 16:12
**days** [7] - 8:25, 9:2, 14:14, 14:16, 14:20, 20:17, 51:10
**DC** [5] - 1:11, 1:14, 1:17, 53:14, 53:16
**de** [2] - 18:12, 18:14
**dead** [1] - 35:19
**deal** [3] - 8:3, 21:9, 46:22
**death** [1] - 35:21
**debit** [1] - 48:13
**deceive** [1] - 21:12
**December** [2] - 48:2, 53:11
**decision** [5] - 3:14, 17:18, 17:20, 39:8, 59:3
**declaration** [4] - 21:22, 23:8, 44:25, 52:11
**declarations** [8] - 18:2, 23:4, 37:19, 37:23, 44:10, 44:12, 44:21
**deemed** [1] - 41:17
**defendant** [27] - 30:8, 32:3, 40:24, 41:2, 43:25, 44:24, 45:4, 45:6, 45:18, 45:23, 46:16, 47:6, 47:11, 48:3, 48:8, 48:16, 49:19, 50:8, 51:10, 51:16, 51:20, 51:22, 52:7, 53:3, 53:6, 54:11, 54:18
**Defendant** [1] - 1:7

**DEFENDANT** [2] -
1:15, 2:15
**defendant's** [7] -
32:7, 40:15, 43:11,
47:11, 52:5, 53:10,
54:10
**defense** [42] - 3:11,
5:9, 5:13, 6:9, 6:14,
6:20, 7:7, 7:9, 7:21,
7:25, 8:14, 8:19, 8:25,
9:7, 13:22, 14:12,
15:1, 16:22, 16:23,
17:10, 17:23, 18:5,
18:6, 33:10, 35:22,
40:1, 40:6, 40:9,
40:14, 41:10, 41:15,
43:8, 44:14, 46:12,
47:7, 47:15, 50:2,
51:11, 52:4, 53:24,
54:17, 55:2
**defense's** [2] -
42:19, 51:4
**defensive** [1] - 23:22
**deficit** [2] - 53:22,
54:24
**defined** [1] - 12:19
**definitively** [1] - 23:4
**deleting** [2] - 51:14,
51:24
**demonstrate** [1] -
32:8
**demonstrated** [1] -
47:1
**demonstrates** [1] -
53:21
**deny** [1] - 44:19
**Depot** [1] - 21:15
**DEPUTY** [1] - 2:2
**deputy** [1] - 4:24
**described** [3] -
17:25, 29:15, 46:8
**describes** [1] - 19:19
**description** [2] -
27:12, 46:10
**designed** [1] - 48:19
**desire** [2] - 33:1,
33:4
**desktop** [2] - 48:17,
49:11
**destroyed** [1] - 42:16
**detailed** [1] - 5:23
**details** [1] - 5:21
**detention** [11] - 3:9,
3:12, 17:18, 17:21,
25:2, 33:14, 36:2,
39:17, 41:15, 44:18,
54:4
**determination** [3] -
3:12, 18:12, 18:15
**determined** [1] -

52:21
**determining** [1] -
36:19
**detonated** [1] - 25:20
**device** [8] - 25:19,
41:6, 42:23, 43:15,
47:23, 48:2, 48:15,
51:24
**devices** [14] - 30:25,
40:24, 42:15, 43:3,
43:13, 43:16, 43:18,
45:20, 45:25, 47:2,
47:13, 49:11, 50:12,
50:15
**diagnosed** [3] - 20:8,
51:11, 53:3
**diagnoses** [2] -
40:19, 51:5
**diagnosis** [6] -
21:22, 37:14, 52:5,
53:5, 53:25, 54:10
**diagram** [1] - 42:24
**dialogue** [1] - 8:5
**difference** [6] -
31:11, 31:23, 32:2,
32:5, 32:23, 32:24
**different** [12] - 2:18,
4:16, 4:17, 11:24,
16:5, 18:17, 29:22,
35:14, 37:25, 46:4
**differently** [1] -
55:21
**difficult** [4] - 16:3,
24:15, 46:17, 46:21
**digital** [5] - 9:13,
49:4, 49:22, 52:3,
56:22
**dignity** [2] - 4:10,
4:11
**Diplomate** [1] - 1:23
**direct** [2] - 3:17,
18:10
**directly** [4] - 32:11,
51:6, 56:24, 57:3
**disagree** [5] - 9:8,
24:23, 27:3, 28:22,
57:2
**discharged** [1] -
39:11
**disconnected** [1] -
21:24
**discounts** [1] - 27:18
**discoverable** [1] -
10:5
**discovery** [19] - 5:6,
5:8, 5:10, 5:13, 6:1,
6:9, 7:8, 9:10, 9:12,
11:17, 12:18, 14:1,
14:25, 15:17, 15:20,
15:21, 17:8, 17:9,

17:12
**discuss** [1] - 9:3
**discussed** [5] - 5:17,
8:18, 8:24, 13:17
**discussing** [1] - 13:5
**discussion** [2] -
22:25, 38:8
**disorder** [2] - 51:16,
53:4
**dispositive** [1] -
36:11
**dispute** [3] - 8:6,
9:21, 43:4
**disputes** [1] - 41:19
**disrupted** [1] - 42:15
**dissimilar** [1] - 46:19
**distinction** [1] -
35:12
**District** [1] - 59:10
**DISTRICT** [3] - 1:1,
1:1, 1:9
**DNA** [1] - 35:19
**DNC** [2] - 41:1, 50:16
**docket** [2] - 4:20,
4:22
**doctor** [2] - 20:12,
51:9, 51:18
**DOJ** [1] - 12:5
**dollars** [1] - 48:18
**done** [4] - 20:18,
20:19, 23:16, 54:23
**dots** [1] - 48:20
**doubt** [1] - 19:5
**down** [6] - 9:22,
18:19, 23:15, 35:20,
56:16, 56:17
**Dr** [3] - 18:3, 40:19,
52:11
**dropped** [1] - 56:17
**drug** [1] - 30:8
**drugs** [1] - 26:13
**dump** [1] - 15:7,
15:23
**during** [4] - 5:12,
5:17, 7:5, 19:20
**dust** [1] - 45:9

---

**E**

**early** [1] - 14:9
**easily** [1] - 9:14
**East** [1] - 1:19
**easy** [3] - 23:20, 32:9
**effect** [2] - 32:4,
50:15
**effectively** [1] -
49:21
**efficient** [1] - 8:3
**effort** [7] - 31:16,
31:18, 31:21, 31:23,

32:22, 42:1, 42:4
**either** [3] - 19:25,
21:10, 29:11
**electronic** [2] -
47:13, 48:15
**element** [1] - 37:5
**email** [1] - 4:22
**emerge** [1] - 6:6
**emphasize** [1] - 38:4
**end** [4] - 3:16, 21:14,
35:1, 48:10
**endanger** [1] - 27:3
**ended** [1] - 16:4
**ends** [1] - 55:13
**enforcement** [3] -
13:7, 38:6, 49:15
**engaged** [1] - 52:20
**ensuing** [1] - 45:22
**ensure** [1] - 4:6
**entered** [1] - 3:1
**entire** [3] - 22:25,
27:20, 38:25
**entirely** [4] - 19:9,
20:11, 28:10, 29:14
**entitled** [4] - 4:7,
4:19, 12:6, 59:12
**equation** [2] - 25:7,
34:5
**erase** [1] - 22:3,
48:25
**error** [2] - 18:8, 55:4
**escape** [1] - 28:6
**especially** [1] - 31:3
**essence** [1] - 42:18
**essentially** [2] -
6:11, 42:2
**establishes** [1] -
41:4
**et** [1] - 17:9
**evade** [2] - 21:2,
49:15
**evasive** [2] - 21:8,
23:14
**eve** [1] - 50:16
**evening** [1] - 53:15
**event** [6] - 22:11,
23:5, 45:24, 46:8,
46:24, 50:17
**eventually** [1] -
54:21
**evidence** [61] - 3:13,
17:23, 17:25, 18:21,
19:4, 19:11, 20:21,
20:25, 21:1, 21:5,
22:1, 22:4, 22:16,
22:21, 22:22, 23:2,
23:12, 23:17, 24:17,
24:20, 25:6, 25:16,
26:9, 26:12, 26:22,
26:25, 28:17, 28:18,

28:24, 29:18, 30:17,
30:20, 30:22, 31:5,
32:1, 32:5, 33:11,
33:15, 33:23, 33:24,
34:1, 34:2, 34:23,
35:1, 35:4, 35:24,
36:16, 36:19, 38:21,
42:13, 46:13, 48:7,
53:14, 53:17, 54:21,
55:11, 55:15, 56:11,
57:19
**evidentiary** [1] -
30:19
**exact** [4] - 30:5,
30:14, 52:21, 58:19
**exactly** [7] - 7:14,
21:8, 23:6, 29:15,
32:23, 36:11, 37:1
**examined** [2] -
49:11, 51:10
**examiner** [3] - 42:17,
42:25, 43:2
**example** [4] - 6:21,
7:2, 35:15, 36:21
**except** [2] - 9:9, 52:7
**excerpt** [1] - 27:11
**exchange** [1] - 17:8
**exclude** [3] - 17:2,
17:4, 17:7
**executed** [1] - 46:6
**exhibit** [1] - 55:7
**exhibited** [1] - 56:12
**existence** [1] - 50:20
**expand** [1] - 37:7
**expanded** [1] - 38:9
**expect** [3] - 4:10,
10:13, 15:11
**expected** [1] - 10:2
**experiment** [2] -
27:17, 45:1
**experimented** [1] -
50:13
**experimenting** [3] -
44:24, 45:19, 45:23
**experiments** [1] -
23:7
**expert** [2] - 41:3,
41:15
**explain** [6] - 33:8,
40:15, 51:4, 52:8,
53:5, 53:17
**explainable** [1] -
52:23
**explained** [2] - 5:10,
51:7
**explaining** [1] -
53:14
**explanations** [1] -
52:23
**explicit** [1] - 48:21

**explode** [4] - 31:12, 43:19, 43:20
**exploded** [1] - 43:5
**exploding** [2] - 30:25, 31:19
**explosive** [9] - 35:6, 35:9, 41:6, 43:6, 43:7, 43:13, 45:20, 46:5, 50:15
**explosives** [4] - 42:10, 42:17, 42:25, 43:2
**extensive** [1] - 15:2, 24:17, 41:5
**extensively** [1] - 40:23
**extent** [6] - 24:17, 27:14, 38:19, 39:7, 51:5, 55:19
**extra** [1] - 9:3
**extraordinarily** [1] - 46:17
**extraordinary** [1] - 49:3
**extreme** [2] - 20:11, 51:12

**F**

**faces** [1] - 2:22
**facing** [1] - 46:18
**fact** [15] - 20:17, 22:15, 24:25, 31:18, 35:25, 37:16, 38:13, 41:8, 46:21, 48:9, 53:20, 55:13, 56:10, 56:14
**factor** [8] - 29:22, 32:7, 33:9, 34:17, 34:23, 36:10, 36:13, 36:14
**factors** [6] - 19:1, 29:5, 29:11, 29:21, 36:6, 36:9
**factory** [6] - 47:23, 48:1, 48:4, 48:14, 49:8, 51:23
**facts** [12] - 20:1, 20:2, 21:13, 28:10, 37:12, 42:11, 43:9, 48:22, 50:23, 52:1, 52:21, 55:4
**factual** [1] - 41:18
**factually** [1] - 43:1
**faculties** [1] - 54:13
**failed** [1] - 21:20
**fair** [2] - 4:6, 34:14
**fake** [1] - 39:11
**fall** [1] - 40:16
**family** [2] - 23:5,

34:9
**five-year** [2] - 6:4, 34:9
**flight** [3] - 33:18, 34:15, 49:15
**flip** [1] - 23:17
**focus** [3] - 31:17, 41:20, 55:4
**focused** [2] - 54:3, 55:3
**focusing** [1] - 28:15
**follow** [2] - 15:17, 16:3
**foolish** [1] - 48:24
**FOR** [3] - 1:1, 1:12, 1:15
**foregoing** [1] - 59:11
**foremost** [2] - 4:5, 44:17
**form** [1] - 51:13
**format** [1] - 59:12
**former** [2] - 38:6, 49:16
**forth** [3] - 14:6, 14:10, 33:9
**forward** [4] - 24:20, 27:25, 55:9
**four** [5] - 15:15, 40:18, 51:9, 53:10, 54:11
**four-hour** [2] - 53:10, 54:11
**four-sentence** [2] - 40:18, 51:9
**Fourth** [3] - 15:8, 15:9, 16:8
**fourth** [1] - 36:9
**fraud** [1] - 34:20
**Friday** [3] - 16:18, 16:20, 17:1
**front** [4] - 2:18, 24:3, 37:13, 37:20
**fruit** [1] - 16:3
**fuel** [1] - 45:1
**full** [1] - 14:24
**functional** [1] - 42:22
**fundamental** [1] - 50:7
**future** [2] - 28:14, 55:19

**G**

**game** [1] - 35:8
**gap** [1] - 34:9
**gathered** [1] - 54:22
**geared** [1] - 13:5
**general** [2] - 7:8, 12:15
**generality** [1] - 12:15

**generally** [2] - 28:14, 37:10
**geofence** [2] - 15:5, 15:6
**Georgia** [1] - 1:22
**given** [4] - 10:19, 11:11, 16:1, 49:21
**glom** [1] - 20:20
**GOVERNMENT** [1] - 1:12
**government** [66] - 2:5, 3:4, 3:20, 4:7, 5:5, 5:7, 5:9, 5:14, 5:15, 6:23, 6:25, 7:6, 7:25, 9:9, 9:17, 10:1, 10:20, 11:7, 12:10, 12:19, 12:20, 13:2, 13:14, 13:17, 13:24, 13:25, 14:17, 16:24, 18:20, 18:23, 20:7, 21:10, 23:12, 26:8, 27:9, 27:15, 27:18, 28:1, 28:3, 28:13, 29:8, 29:11, 29:25, 30:13, 33:14, 34:8, 34:9, 34:21, 35:18, 38:20, 39:10, 39:12, 39:21, 41:2, 41:24, 44:22, 45:3, 47:14, 50:5, 55:6, 55:10, 55:23, 55:25, 56:3, 57:1, 57:23
**government's** [9] - 5:15, 6:8, 12:18, 17:13, 17:21, 17:24, 19:24, 32:14, 33:21
**GPS** [3] - 28:6, 50:4, 56:22
**ground** [2] - 18:4, 19:16
**guess** [10] - 20:1, 22:1, 28:3, 30:2, 30:11, 34:21, 34:25, 36:23, 37:7, 51:6
**guilt** [4] - 21:12, 33:12, 33:16, 35:12
**guilty** [2] - 3:1, 26:18
**gun** [10] - 31:25, 32:2, 32:3, 32:4, 32:6, 32:10, 32:16, 32:19
**guns** [3] - 26:19, 26:20, 30:21
**guy** [3] - 21:16, 35:20, 35:23
**guys** [2] - 13:7, 24:3

**H**

**hacksaw** [1] - 45:12
**hamstrung** [1] -

30:13
**hand** [2] - 21:10, 21:17
**handled** [1] - 59:4
**hanging** [1] - 10:7
**hard** [2] - 12:16, 47:16
**hardware** [1] - 6:22
**harm** [2] - 26:15, 30:9
**harmed** [1] - 30:9
**harming** [2] - 26:13, 34:4
**harmless** [1] - 40:8
**HDR** [1] - 1:20
**head** [3] - 12:4, 14:19, 57:14
**headquarters** [1] - 41:1
**hear** [5] - 5:4, 9:7, 14:12, 18:5, 39:21
**heard** [3] - 52:10, 52:12, 57:8
**HEARING** [1] - 1:9
**hearing** [9] - 3:10, 3:16, 8:25, 11:19, 14:8, 16:20, 41:15, 55:8, 55:9
**hearings** [2] - 4:23
**heavily** [1] - 29:7
**help** [1] - 49:16
**helpful** [9] - 7:22, 10:12, 16:9, 19:16, 39:3, 41:21, 42:12, 49:23, 55:5
**helps** [1] - 55:24
**hereby** [1] - 59:11
**hide** [4] - 20:21, 21:18, 21:25, 55:16
**hiding** [3] - 21:12, 21:18, 52:22
**high** [4] - 5:25, 28:5, 34:10, 50:17
**high-intensity** [1] - 28:5
**high-security** [1] - 50:17
**higher** [1] - 35:10
**history** [6] - 6:16, 24:18, 29:17, 29:22, 35:24, 36:7
**hit** [1] - 57:14
**hobbiest** [1] - 45:15
**holding** [1] - 43:16
**holdings** [1] - 12:25
**home** [6] - 26:20, 45:16, 50:3, 50:14, 50:19, 50:22
**Home** [1] - 21:15
**homemade** [2] -

37:23, 38:13, 38:15, 50:14, 50:19
**family's** [2] - 50:19, 50:22
**far** [6] - 8:12, 10:16, 16:10, 40:16, 52:2, 52:18
**farcical** [1] - 28:10
**fashion** [5] - 13:3, 47:8, 56:22, 56:23
**FBI** [15] - 6:5, 6:10, 6:11, 7:15, 10:1, 10:23, 42:16, 43:14, 43:19, 53:11, 53:12, 54:14, 54:17, 54:20, 54:22
**fearing** [1] - 57:23
**February** [1] - 17:3
**federal** [6] - 1:24, 2:25, 35:15, 35:17, 35:21, 38:6
**Federal** [1] - 59:10
**FEDERAL** [1] - 59:17
**few** [7] - 2:18, 11:19, 15:20, 18:10, 18:16, 19:11, 40:16
**fewer** [1] - 2:22
**fictional** [1] - 20:6
**fighting** [1] - 24:4
**figure** [1] - 13:8
**figuring** [1] - 6:19
**file** [5] - 6:5, 6:13, 7:11, 9:20, 9:21
**filed** [5] - 2:22, 18:2, 23:9, 44:10, 47:15
**files** [11] - 9:14, 10:1, 11:1, 12:4, 12:5, 17:11, 20:10, 47:25, 51:15, 51:23
**filing** [1] - 15:1
**finally** [2] - 53:19, 54:23
**fine** [3] - 8:7, 8:21, 16:23
**finish** [2] - 31:1, 51:20
**fins** [1] - 45:13
**firearms** [1] - 28:18
**firm** [1] - 57:20
**first** [22] - 3:2, 3:8, 3:24, 4:5, 6:13, 18:6, 18:11, 19:3, 21:3, 23:25, 24:5, 26:16, 34:17, 36:10, 36:12, 40:23, 44:3, 44:5, 44:17, 45:2, 47:20, 47:22
**fits** [1] - 25:9
**five** [6] - 6:4, 7:15, 15:15, 18:24, 29:17,

26:23, 46:4

**Honor** [12] - 2:6, 2:9, 2:11, 3:21, 5:7, 16:19, 17:15, 39:5, 39:22, 57:14, 58:7, 58:15

**HONORABLE** [1] - 1:9

**hopefully** [1] - 14:5

**hour** [2] - 53:10, 54:11

**hours** [2] - 53:19, 54:15

**house** [7] - 56:16, 56:18, 58:3, 58:9, 58:10, 58:12, 58:21

**housekeeping** [4] - 3:7, 3:19, 5:3, 12:1

**human** [1] - 36:1

**hundreds** [1] - 48:18

**hurt** [1] - 32:19

**hurting** [1] - 26:11

**hypothetical** [1] - 29:1

## I

**idea** [10] - 11:14, 13:17, 20:5, 20:20, 22:17, 22:23, 31:7, 31:10, 55:18, 56:13

**ideas** [1] - 44:13

**identifiers** [1] - 6:24

**identifying** [1] - 7:19

**IEDs** [1] - 45:8

**ignores** [1] - 43:9

**imagine** [3] - 7:14, 15:15, 16:1

**immediate** [1] - 8:10

**impasse** [1] - 8:5

**implicate** [2] - 7:18, 15:7

**implicated** [3] - 11:7, 15:19, 15:21

**important** [2] - 31:2, 37:12

**improvised** [2] - 41:6, 45:20

**inability** [3] - 32:7, 42:3, 42:5

**inadvertence** [1] - 10:21

**incapable** [1] - 33:5

**incarcerated** [1] - 35:1

**incentive** [1] - 14:5

**incident** [2] - 11:4, 11:21

**include** [1] - 6:15

**included** [1] - 42:23

**includes** [1] - 25:5

**including** [5] - 17:21, 17:23, 19:19, 37:23, 44:9

**incongruity** [1] - 21:19

**inconsistent** [1] - 55:15

**inconvenient** [1] - 43:9

**incorrect** [1] - 24:11

**incorrectly** [1] - 18:8

**incriminating** [1] - 52:9

**independent** [1] - 19:14

**indicate** [1] - 34:6

**indicated** [2] - 5:14, 9:1

**indication** [1] - 11:12

**indictment** [7] - 2:21, 2:25, 3:10, 24:1, 24:2, 24:4, 39:11

**individual** [7] - 20:8, 20:11, 21:11, 23:14, 27:23, 31:24, 56:21

**individuals** [3] - 7:4, 7:15, 21:12

**inert** [1] - 31:12

**information** [14] - 4:21, 5:11, 6:12, 7:3, 7:19, 8:17, 10:6, 10:25, 11:22, 13:8, 16:5, 47:13, 51:17

**informed** [1] - 13:3

**informing** [1] - 51:18

**initial** [3] - 9:23, 39:22, 41:14

**initiated** [1] - 40:21

**injustice** [1] - 35:2

**innocuous** [2] - 45:1, 52:23

**inquiry** [5] - 26:2, 26:3, 30:3, 30:5, 37:2

**instead** [1] - 32:16

**instructions** [1] - 42:20

**insufficient** [1] - 50:24

**intellectual** [2] - 54:13, 54:24

**intelligence** [4] - 11:1, 11:2, 12:25, 13:5

**intensity** [1] - 28:5

**interagency** [2] - 10:4, 10:18

**interest** [7] - 4:5, 14:3, 16:2, 17:4, 22:24, 23:3, 23:13, 23:14, 41:6, 47:1

**interested** [6] - 3:17, 8:1, 18:7, 18:10, 44:3, 48:22

**interests** [2] - 17:5

**interview** [12] - 19:23, 23:7, 27:10, 27:13, 27:15, 27:19, 27:21, 46:10, 53:9, 53:12, 54:11, 54:12

**interviews** [2] - 20:10, 27:22

**investigation** [10] - 6:5, 6:6, 6:7, 7:5, 7:16, 11:20, 13:11, 19:19, 20:9, 54:22

**investigative** [1] - 20:16

**involve** [1] - 5:19

**involved** [3] - 6:4, 11:3, 27:23

**involving** [1] - 15:5

**isolated** [1] - 40:11

**issue** [10] - 3:11, 4:1, 10:16, 14:7, 28:3, 37:9, 39:7, 56:1, 57:9, 59:2

**issued** [2] - 6:21, 40:2

**issues** [9] - 3:19, 11:7, 15:3, 15:8, 15:12, 19:8, 23:21, 27:24, 44:23

**items** [1] - 9:18

**itself** [2] - 17:10, 55:7

**IV** [1] - 1:18

## J

**January** [11] - 1:10, 5:8, 40:11, 41:1, 43:12, 45:22, 46:6, 48:11, 53:15, 59:14

**job** [1] - 38:13

**Jocelyn** [1] - 2:7

**JOCELYN** [1] - 1:13

**John** [1] - 2:9

**JOHN** [1] - 1:16

**joint** [2] - 13:17, 13:25

**JONES** [32] - 1:13, 2:6, 3:20, 5:7, 5:23, 6:4, 7:14, 7:24, 8:11, 8:20, 8:24, 9:6, 12:14, 13:9, 16:25, 17:15, 39:22, 42:5, 42:9, 42:14, 44:5, 44:17, 46:16, 47:22, 49:2, 49:18, 50:7, 51:3, 51:22, 52:18, 53:1,

54:8

**Jones** [1] - 2:6

**JOSEPH** [1] - 1:18

**JR** [1] - 1:6

**Judge** [22] - 3:12, 3:14, 17:18, 17:19, 18:7, 19:13, 19:23, 23:25, 24:9, 25:16, 31:15, 32:22, 33:10, 37:13, 37:20, 38:2, 39:23, 41:12, 41:16, 41:25, 44:19, 52:20

**judge** [4] - 18:17, 21:9, 27:12, 41:22

**JUDGE** [1] - 1:9

**judge's** [2] - 19:7, 27:4

**judges** [3] - 2:18, 2:19, 4:16

**Judicial** [1] - 59:13

**jump** [2] - 3:19, 5:4

**jumping** [1] - 31:6

**Junior** [1] - 2:3

**junk** [3] - 47:25, 51:14, 51:23

**justice** [1] - 17:4

## K

**keep** [4] - 19:2, 42:14, 43:17, 50:5

**keeping** [1] - 54:3

**kept** [1] - 56:18

**killed** [2] - 36:1, 36:4

**kind** [18] - 3:16, 7:2, 7:11, 14:5, 16:4, 19:16, 23:21, 34:10, 35:2, 42:11, 43:24, 44:6, 47:7, 47:18, 50:4, 50:20, 52:9

**knives** [2] - 28:17, 30:21

**knowledge** [2] - 50:14, 56:19

**knows** [2] - 18:14, 41:24

## L

**lack** [9] - 24:18, 31:16, 31:17, 31:21, 32:22, 35:23, 41:25, 42:4, 42:8

**laid** [1] - 41:19

**land** [1] - 22:21

**language** [1] - 28:15

**laptop** [2] - 48:17, 49:11

**large** [1] - 7:6

**largely** [2] - 10:13,

20:24

**last** [7] - 2:24, 13:16, 35:19, 40:16, 53:1, 56:5, 56:13

**late** [2] - 6:7, 16:21

**latter** [1] - 7:10

**law** [11] - 4:3, 13:6, 24:19, 24:23, 30:7, 38:6, 42:9, 42:10, 49:15, 49:24, 58:14

**Lawson** [1] - 2:10

**LAWSON** [1] - 1:18

**laying** [1] - 37:23

**lays** [1] - 29:5

**leads** [1] - 47:15

**leaning** [2] - 29:7, 29:8

**learning** [1] - 49:4

**least** [9] - 2:23, 5:15, 7:25, 11:3, 14:22, 19:23, 20:1, 24:12, 33:4

**leave** [4] - 4:12, 24:21, 28:8, 50:22

**leaves** [1] - 58:9

**leaving** [2] - 58:10, 58:21

**lectern** [1] - 2:4

**led** [2] - 29:25, 46:20

**left** [2] - 23:15, 26:19

**legal** [4] - 6:15, 6:20, 7:3, 58:17

**lens** [1] - 7:13

**less** [1] - 35:2

**letter** [2] - 40:18, 51:9

**letters** [13] - 13:19, 14:1, 17:24, 37:20, 37:21, 38:17

**level** [6] - 5:25, 12:15, 34:11, 51:11, 53:4, 54:2

**life** [1] - 50:20

**lightweight** [1] - 45:14

**likelihood** [1] - 22:20

**likely** [1] - 29:17

**limitations** [1] - 35:16

**line** [1] - 8:4

**lists** [1] - 9:21

**literal** [1] - 35:23

**litigated** [1] - 44:23

**Litson** [1] - 1:18

**LITTLE** [53] - 1:18, 9:8, 10:19, 11:13, 12:8, 14:14, 14:17, 15:2, 15:18, 16:17, 18:11, 20:4, 21:1, 21:8, 22:1, 22:14,

23:10, 24:6, 24:11, 24:15, 25:4, 25:14, 25:18, 25:21, 25:24, 26:4, 27:14, 28:16, 29:13, 29:23, 30:7, 30:17, 30:20, 31:3, 31:8, 31:11, 31:23, 32:24, 33:13, 35:14, 36:10, 36:14, 36:18, 36:25, 37:5, 37:14, 37:19, 37:22, 38:3, 38:19, 39:5, 39:16, 55:6

**live** [2] - 50:21, 56:18
**livelihood** [1] - 38:15
**living** [3] - 50:10, 50:18, 50:19
**LLC** [2] - 1:15, 1:20
**load** [1] - 9:14
**locked** [1] - 19:2
**log** [4] - 9:18, 9:23, 13:17, 13:25
**look** [14] - 11:12, 11:15, 13:7, 17:9, 18:18, 23:16, 24:17, 30:6, 32:18, 34:19, 45:3, 46:13, 48:21, 54:7
**looked** [2] - 7:15, 19:15
**looking** [8] - 11:3, 11:16, 13:21, 16:4, 18:13, 24:12, 24:19, 26:5
**looks** [1] - 6:1
**luck** [5] - 31:16, 31:17, 41:25, 42:3, 42:7

**M**

**magistrate** [7] - 2:19, 18:17, 19:7, 21:9, 21:20, 27:4, 27:12
**magistrate's** [1] - 38:8
**maker** [4] - 41:3, 41:5, 41:7
**maliciously** [1] - 40:25
**man** [1] - 53:12
**manifests** [1] - 52:5
**manner** [1] - 33:7
**manufacture** [2] - 46:2, 48:9
**MARIO** [1] - 1:21
**Mario** [1] - 2:10
**Mart** [1] - 58:8
**mass** [1] - 12:8
**massive** [1] - 35:14

**matches** [2] - 56:16, 56:18
**material** [6] - 7:6, 7:17, 7:21, 8:13, 8:14, 45:14
**materials** [12] - 11:24, 12:21, 12:22, 13:12, 13:18, 13:19, 17:9, 41:6, 45:23, 47:3, 57:24, 58:14
**matter** [8] - 8:16, 12:17, 42:8, 42:9, 46:23, 52:16, 59:12
**Matter** [1] - 2:2
**matters** [6] - 2:20, 3:7, 3:23, 5:3, 13:1, 29:12
**McFadden** [1] - 1:15
**mean** [10] - 5:22, 14:2, 18:11, 19:12, 28:13, 29:12, 42:16, 47:17, 48:21, 52:20
**meaning** [1] - 46:11
**meaningful** [1] - 53:23
**measures** [1] - 49:3
**meet** [1] - 24:21
**meeting** [1] - 5:17
**members** [3] - 11:21, 50:14, 50:19
**memo** [1] - 17:21
**mention** [1] - 21:3
**mentioned** [10] - 3:19, 9:12, 10:1, 11:10, 15:20, 38:7, 38:8, 38:10, 49:9, 51:8
**merits** [2] - 3:11, 17:18
**met** [4] - 5:9, 24:12, 24:16, 28:20
**metal** [2] - 21:14, 26:23
**mid** [2] - 48:12, 49:2
**might** [11] - 7:14, 11:23, 12:4, 16:7, 25:9, 33:16, 42:7, 43:18, 46:21, 51:25, 55:7
**mildest** [1] - 51:12
**mind** [1] - 42:14
**mindful** [1] - 8:13
**mine** [2] - 4:18, 46:12
**minimum** [1] - 5:5
**minute** [1] - 10:11
**minutes** [2] - 43:20, 57:10
**mitigating** [1] - 54:9
**model** [1] - 45:15

**moment** [1] - 3:18
**monitor** [2] - 49:21, 58:3
**monitoring** [3] - 28:6, 28:7, 58:2
**month** [3] - 26:17, 40:20
**months** [1] - 9:21
**monumental** [1] - 9:24
**morning** [1] - 16:21
**most** [7] - 3:17, 8:3, 9:13, 18:7, 18:10, 18:18, 37:22
**mother** [1] - 18:2
**motion** [6] - 15:3, 15:16, 17:22, 18:5, 39:10, 44:19
**motions** [5] - 15:1, 15:11, 15:14, 15:18, 55:19
**mouth** [2] - 32:14, 46:12
**move** [3] - 10:11, 15:18, 44:3
**MR** [90] - 2:6, 2:9, 3:20, 3:21, 5:7, 5:23, 6:4, 7:14, 7:24, 8:11, 8:20, 8:24, 9:6, 9:8, 10:19, 11:13, 12:8, 12:14, 13:9, 14:14, 14:17, 15:2, 15:18, 16:17, 16:18, 16:23, 16:25, 17:15, 18:11, 20:4, 21:1, 21:8, 22:1, 22:14, 23:10, 24:6, 24:11, 24:15, 25:4, 25:14, 25:18, 25:21, 25:24, 26:4, 27:14, 28:16, 29:13, 29:23, 30:7, 30:17, 30:20, 31:3, 31:8, 31:11, 31:23, 32:24, 33:13, 35:14, 36:10, 36:14, 36:18, 36:25, 37:5, 37:14, 37:19, 37:22, 38:3, 38:19, 39:5, 39:16, 39:22, 42:5, 42:9, 42:14, 44:5, 44:17, 46:16, 47:22, 49:2, 49:18, 50:7, 51:3, 51:22, 52:18, 53:1, 54:8, 55:6, 57:10, 57:13, 58:21
**multiple** [4] - 15:3, 16:2, 38:14, 50:19
**murder** [3] - 35:15, 35:17, 35:20
**Music** [1] - 1:19
**must** [1] - 22:4

**N**

**nail** [1] - 57:14
**narrow** [3] - 23:21, 47:20, 58:18
**narrowing** [1] - 30:3
**Nashville** [1] - 1:19
**national** [1] - 40:25
**nature** [11] - 15:12, 15:23, 29:12, 29:13, 29:20, 30:3, 30:4, 34:18, 41:13, 43:23, 52:9
**natures** [1] - 29:23
**necessarily** [4] - 15:6, 15:24, 21:24, 24:2
**necessary** [2] - 13:23, 42:22
**need** [11] - 4:18, 4:25, 8:6, 8:8, 9:12, 10:21, 12:21, 14:18, 16:16, 18:3, 23:22
**needed** [2] - 49:8, 54:4
**needing** [1] - 19:13
**needle** [1] - 34:21
**needs** [3] - 6:1, 19:2, 55:24
**never** [5] - 29:2, 29:4, 31:12, 41:2, 47:7
**new** [9] - 2:22, 6:9, 6:10, 6:13, 11:14, 39:13, 44:11, 44:12, 44:13
**next** [10] - 3:5, 7:3, 8:10, 8:22, 14:13, 16:15, 20:19, 21:4, 48:4, 50:17
**night** [1] - 53:18
**NO** [1] - 1:5
**none** [1] - 28:2
**normal** [2] - 13:20, 16:7
**normally** [1] - 13:25
**notable** [1] - 18:18
**note** [1] - 41:14
**noted** [1] - 14:17
**nothing** [8] - 7:24, 23:10, 26:10, 26:24, 27:17, 31:9, 40:2, 54:9
**noticing** [1] - 28:8
**novo** [2] - 18:12, 18:14
**NW** [2] - 1:13, 1:16

**O**

**obfuscating** [1] - 52:23
**object** [1] - 5:14
**obligations** [1] - 12:18
**obsession** [2] - 28:18, 30:21
**obsessive** [1] - 51:15
**obtained** [1] - 11:23
**obviously** [7] - 6:4, 7:12, 13:12, 14:2, 41:24, 44:8, 52:8
**occur** [2] - 56:25, 57:4
**occurred** [3] - 18:24, 35:17, 37:24
**occurring** [1] - 20:24
**OCD** [12] - 20:11, 21:21, 21:23, 37:15, 51:7, 51:13, 52:1, 52:5, 52:7, 52:13, 52:17, 55:7
**OF** [3] - 1:1, 1:3, 1:9
**offense** [26] - 20:15, 25:1, 25:23, 29:12, 29:14, 29:21, 29:23, 29:24, 29:25, 30:4, 30:5, 30:14, 34:18, 34:19, 35:3, 35:6, 35:7, 35:9, 35:21, 35:25, 36:20, 36:21, 36:24, 37:6
**offenses** [4] - 35:15, 41:13, 43:23, 50:15
**Office** [1] - 1:12
**officer** [1] - 38:6
**OFFICIAL** [1] - 59:17
**Official** [2] - 1:24, 59:10
**once** [2] - 30:4, 59:2
**one** [32] - 4:11, 4:23, 7:2, 9:11, 10:2, 21:10, 28:8, 32:17, 32:19, 33:22, 35:7, 35:9, 36:4, 37:5, 37:9, 37:12, 39:8, 40:8, 41:21, 43:6, 43:15, 44:4, 44:6, 46:13, 48:21, 48:23, 51:11, 53:1, 53:4, 54:3, 54:20, 57:11
**ones** [2] - 10:17, 38:4
**open** [3] - 8:4, 9:20, 16:16
**opened** [1] - 6:5
**operate** [1] - 39:1

**operates** [1] - 38:14
**opine** [1] - 41:16
**opinion** [9] - 18:8, 19:13, 19:15, 19:18, 37:15, 39:24, 40:2, 43:2, 51:18
**opportunity** [6] - 17:8, 17:10, 17:17, 30:15, 37:11, 55:2
**opposition** [3] - 17:21, 17:25, 18:1
**order** [7] - 7:20, 27:4, 38:9, 44:19, 46:1, 57:9, 59:2
**Order** [1] - 2:1
**organization** [1] - 10:17
**organize** [1] - 17:10
**organized** [2] - 14:4, 14:11
**oriented** [1] - 55:13
**original** [4] - 16:7, 17:20, 39:10, 59:11
**originally** [1] - 38:11
**otherwise** [2] - 4:4, 52:8
**outset** [2] - 2:17, 3:25
**outweigh** [1] - 17:5
**overall** [1] - 26:2
**overcome** [4] - 24:10, 24:13, 24:24, 55:22
**overseen** [1] - 2:19
**oversimplify** [1] - 46:11
**own** [5] - 20:10, 45:7, 50:3, 50:10, 54:19
**oxidizer** [2] - 45:8, 45:19

**P**

**p.m** [4] - 1:10, 2:1, 59:7
**page** [1] - 59:12
**papers** [4] - 3:13, 40:7, 42:23, 46:8
**part** [4] - 13:10, 25:4, 25:7, 40:12
**particular** [8] - 4:2, 4:13, 6:10, 7:12, 10:4, 34:13, 35:12, 37:8
**particularly** [5] - 15:13, 27:22, 27:23, 29:19, 38:22
**parties** [6] - 3:15, 4:11, 8:4, 9:3, 17:6, 17:8
**parties'** [2] - 41:22,

59:1
**party** [8] - 24:18, 28:5, 38:5, 38:12, 38:21, 38:22, 49:20, 56:14
**past** [5] - 22:3, 22:9, 26:25, 28:25, 29:17
**path** [1] - 55:14
**patience** [1] - 4:4
**pattern** [2] - 44:7, 57:23
**PC** [1] - 48:16
**penalty** [1] - 35:21
**penchant** [1] - 49:21
**people** [3] - 30:16, 37:3, 58:5
**percent** [2] - 22:20, 35:9
**percentage** [1] - 35:10
**percentages** [1] - 35:8
**perhaps** [1] - 41:8
**period** [2] - 23:11, 48:7
**perpetrators** [1] - 11:6
**person** [15] - 25:8, 25:11, 32:10, 32:20, 33:3, 33:15, 33:16, 33:22, 34:3, 36:8, 36:17, 37:10, 43:2, 46:21, 54:12
**person's** [1] - 36:3
**personal** [2] - 7:18, 48:17
**persons** [1] - 16:2
**perspective** [2] - 5:16, 16:8, 17:14
**persuasion** [1] - 30:19
**persuasive** [1] - 34:12
**pertaining** [2] - 6:12, 6:16
**Phillips** [1] - 17:24, 37:17, 41:10, 41:16
**phone** [20] - 4:20, 6:17, 15:7, 15:23, 19:21, 20:14, 20:18, 20:19, 20:23, 21:2, 22:9, 47:24, 49:7, 51:7, 51:15, 51:23, 52:6, 52:8, 55:12
**phones** [1] - 20:5
**picked** [1] - 27:9
**pictures** [1] - 20:17
**piece** [1] - 33:22
**pieces** [5] - 16:5, 21:14, 26:23, 42:16,

42:21
**pipe** [6] - 42:22, 45:9, 46:2, 48:3, 48:9, 53:21
**pipes** [4] - 21:14, 45:11, 45:12, 48:10
**place** [8] - 4:15, 7:20, 15:25, 23:25, 24:5, 32:17, 48:4, 50:9
**placed** [2] - 53:14, 53:20
**placing** [1] - 53:18
**Plaintiff** [1] - 1:4
**plaintiff** [1] - 50:21
**plan** [5] - 5:16, 5:22, 46:6, 50:8, 50:20
**planned** [2] - 53:13, 54:14, 54:20
**planning** [1] - 7:20
**plans** [2] - 5:15, 6:25
**plant** [1] - 50:15
**planted** [1] - 48:3
**plastic** [2] - 32:17, 32:19
**play** [1] - 12:3
**plea** [2] - 3:1, 55:4
**pleadings** [3] - 39:15, 44:9, 53:2
**PLLC** [1] - 1:18
**point** [48] - 2:18, 3:17, 4:13, 4:14, 4:18, 7:23, 13:16, 14:24, 16:8, 19:1, 19:13, 20:23, 21:16, 21:17, 21:21, 22:1, 22:12, 22:25, 27:3, 30:25, 31:15, 31:17, 31:18, 31:21, 32:24, 36:5, 36:23, 38:16, 38:20, 40:14, 40:23, 41:17, 42:2, 42:4, 42:8, 44:3, 44:5, 47:20, 51:1, 51:3, 54:2, 54:4, 54:10, 55:5, 56:13, 57:18, 58:16, 58:23
**pointed** [2] - 19:20, 26:16, 38:12
**points** [5] - 23:12, 39:3, 40:5, 40:22, 44:2
**poisonous** [1] - 16:4
**Police** [2] - 10:8, 13:6
**police** [2] - 19:23, 46:10
**policy** [1] - 4:15
**political** [2] - 45:25, 46:23
**portrayed** [1] - 54:16
**pose** [2] - 26:7, 41:9

**poses** [5] - 41:7, 41:8, 43:25, 47:11, 53:6
**posit** [1] - 22:5
**position** [3] - 13:3, 18:12, 41:2
**positions** [1] - 41:22
**possession** [3] - 12:23, 13:13, 13:14
**possible** [3] - 10:20, 15:22, 28:25
**post** [1] - 23:3
**potassium** [4] - 23:2, 44:25, 45:7, 50:13
**potent** [1] - 45:19
**potential** [1] - 11:5
**powder** [5] - 26:23, 43:5, 43:6, 46:4, 46:5
**practice** [7] - 13:20, 15:3, 15:9, 15:11, 15:16, 15:19, 55:19
**practices** [1] - 4:17
**pre** [1] - 16:15
**pre-cleared** [1] - 16:15
**precise** [1] - 51:22
**prefer** [1] - 3:25
**preliminary** [4] - 2:20, 3:10, 3:23, 8:1
**premised** [1] - 3:10
**prepared** [1] - 8:13
**preparing** [2] - 7:7, 7:17
**present** [4] - 3:16, 28:2, 30:1, 56:9
**presented** [1] - 3:11
**presently** [1] - 36:20
**presents** [1] - 33:14
**preserve** [1] - 39:9
**presiding** [1] - 2:20
**pressroom** [1] - 4:3
**presume** [1] - 24:16
**presumption** [9] - 23:23, 23:25, 24:5, 24:6, 24:9, 24:21, 24:24, 25:13, 30:19
**presumptively** [1] - 25:2
**pretty** [3] - 9:24, 14:3, 35:7
**prevail** [1] - 26:8
**previously** [2] - 29:2, 44:22
**primary** [1] - 38:4
**principal** [1] - 13:21
**principally** [2] - 13:5, 25:23
**privacy** [1] - 7:19
**probability** [1] - 43:4
**problem** [2] - 13:21,

50:7
**proceed** [5] - 3:7, 5:15, 5:16, 5:22, 9:4
**proceeded** [1] - 53:13
**proceeding** [1] - 53:3
**Proceedings** [1] - 59:7
**process** [8] - 4:6, 6:15, 6:19, 6:20, 7:4, 7:7, 7:16, 12:3
**proclivity** [1] - 47:2
**produce** [1] - 8:15
**Produced** [1] - 1:25
**produced** [7] - 6:13, 9:19, 10:9, 13:18, 13:19, 14:18, 14:19
**producing** [1] - 14:21
**product** [1] - 49:10
**production** [2] - 7:17, 8:9
**productive** [1] - 23:21
**products** [1] - 48:19
**professional** [3] - 38:15, 38:24, 41:3
**proffer** [5] - 41:14, 47:14, 52:4, 52:6, 53:24
**proffered** [2] - 28:1, 55:11
**prompted** [1] - 45:3
**prompts** [1] - 45:24
**proof** [1] - 48:25
**propensity** [1] - 34:24
**properly** [2] - 39:10, 39:12
**proposed** [6] - 9:11, 9:17, 9:18, 38:5, 50:7, 50:20
**proposing** [1] - 8:22
**props** [1] - 31:12
**prosecution** [5] - 12:20, 12:23, 13:11, 13:15, 46:18
**protect** [1] - 18:22
**protective** [1] - 7:20
**protest** [1] - 53:17
**prove** [1] - 18:20
**provide** [4] - 6:20, 6:25, 7:21, 14:1
**provided** [11] - 6:2, 7:7, 7:25, 9:13, 9:17, 13:18, 13:22, 42:20, 51:17, 54:20
**providing** [4] - 5:8, 6:3, 6:8, 54:14

A342

**proving** [1] - 21:24
**public** [8] - 3:24, 17:6, 18:22, 19:2, 26:7, 27:3, 32:17, 46:18
**purchase** [9] - 6:16, 28:7, 45:13, 45:15, 48:8, 48:13, 48:16, 58:21
**purchased** [6] - 45:6, 45:11, 45:12, 49:9
**purchases** [2] - 6:22, 48:24
**purchasing** [3] - 45:4, 48:9, 49:6
**purposes** [4] - 13:11, 13:14, 33:11, 33:12
**pursue** [1] - 39:20
**put** [23] - 3:18, 4:7, 7:23, 8:20, 10:3, 10:10, 10:21, 11:8, 11:18, 11:25, 23:4, 24:20, 28:4, 28:23, 32:13, 34:8, 42:17, 42:21, 42:25, 43:14, 46:11, 46:12, 55:9
**puts** [1] - 50:8
**putting** [4] - 27:25, 34:21, 41:18, 43:10

### Q

**questions** [2] - 14:23, 23:20
**quick** [2] - 3:6, 57:13
**quickly** [2] - 15:19, 15:22
**quite** [1] - 41:4
**quote** [1] - 46:9

### R

**radar** [6] - 3:18, 7:23, 10:3, 10:10, 11:8, 11:25
**raise** [4] - 5:18, 15:3, 39:4, 55:6
**raised** [9] - 11:8, 11:13, 11:17, 13:16, 39:2, 39:9, 40:1, 45:2, 56:1
**raising** [2] - 10:15, 15:14
**rather** [1] - 4:20
**RDR** [1] - 59:16
**RDR-CRR** [1] - 59:16
**re** [1] - 6:11
**reach** [1] - 4:25
**reactions** [1] - 41:22
**read** [2] - 44:8, 55:20

**reading** [1] - 27:8
**real** [4] - 32:10, 32:16, 57:13
**realize** [1] - 49:5
**realized** [4] - 45:5, 48:23, 53:19, 54:21
**really** [10] - 7:22, 19:1, 34:20, 35:5, 38:10, 48:22, 51:6, 57:1, 57:18, 58:6
**Realtime** [1] - 1:24
**reason** [14] - 6:23, 12:24, 17:7, 22:18, 28:14, 29:15, 33:20, 36:11, 37:1, 40:3, 43:14, 43:15, 53:25, 56:1
**reasonable** [2] - 14:20, 57:21
**reasonably** [3] - 47:9, 57:16, 58:13
**reasoned** [1] - 57:2
**reasoning** [1] - 19:7
**reasons** [2] - 17:13, 19:5
**rebut** [1] - 55:2
**rebuttable** [4] - 23:23, 23:24, 24:5, 24:6
**receipts** [1] - 21:15
**receive** [1] - 9:16
**receives** [1] - 12:21
**recent** [1] - 37:22
**recently** [1] - 15:5
**recognizance** [1] - 50:3
**reconcile** [1] - 21:20
**Record** [1] - 1:25
**record** [25] - 2:5, 4:16, 5:2, 10:22, 11:18, 18:15, 18:16, 18:18, 19:9, 19:10, 20:8, 24:16, 28:23, 39:6, 41:4, 42:6, 43:9, 45:17, 45:21, 48:7, 52:1, 54:9, 54:24, 56:10, 59:12
**recording** [1] - 53:10
**records** [1] - 6:25
**recreated** [2] - 29:24, 30:6
**redetain** [1] - 39:13
**REEVES** [1] - 1:23, 59:16
**Reeves** [2] - 59:10, 59:16
**referred** [1] - 53:2
**regardless** [1] - 42:10
**Registered** [1] - 1:23

**regular** [2] - 32:3, 32:6
**regularly** [1] - 48:16
**regulations** [1] - 59:12
**relate** [1] - 5:1
**related** [6] - 6:5, 11:21, 26:20, 26:23, 34:11, 40:19
**relates** [3] - 7:12, 22:23, 34:5
**relationship** [1] - 53:5
**release** [5] - 19:6, 47:6, 50:3, 50:8, 50:20
**released** [3] - 39:12, 43:25, 53:7
**relevant** [9] - 12:5, 33:11, 33:19, 33:21, 34:15, 34:16, 41:17, 55:8
**reliable** [1] - 40:17
**relief** [2] - 4:19, 12:12
**rely** [1] - 25:22
**relying** [1] - 44:18
**remains** [1] - 56:10
**remedies** [1] - 39:20
**remind** [1] - 36:15
**repercussions** [1] - 38:25
**repetitive** [1] - 51:25
**repetitively** [1] - 51:14
**reply** [4] - 18:1, 38:5, 38:12, 45:2
**report** [3] - 17:24, 41:10, 42:19
**REPORTER** [1] - 59:17
**Reporter** [4] - 1:23, 1:24, 1:24, 59:10
**reporting** [5] - 11:3, 11:4, 11:5, 22:17, 56:24
**represented** [1] - 44:25
**request** [4] - 10:2, 10:22, 10:24, 12:12
**requests** [2] - 12:21, 13:2
**require** [3] - 13:1, 15:24, 54:4
**required** [4] - 24:3, 46:1, 46:3, 58:18
**requirement** [1] - 25:5
**requires** [1] - 49:24
**requisite** [1] - 20:2

**research** [1] - 46:1
**reset** [2] - 48:4, 49:8
**resets** [2] - 47:23, 48:1
**resetting** [2] - 48:14, 51:23
**resolve** [2] - 8:6, 55:24
**resolved** [1] - 3:9
**respect** [10] - 5:5, 5:24, 13:12, 25:22, 26:5, 39:23, 40:23, 41:12, 43:5, 47:19
**respected** [1] - 4:9
**respond** [5] - 12:11, 13:3, 44:15, 47:18
**responded** [1] - 31:15
**responding** [2] - 54:19, 55:10
**response** [7] - 4:1, 4:13, 31:15, 40:6, 46:14, 46:16, 47:14
**responsive** [1] - 44:9
**results** [1] - 6:17
**retread** [1] - 18:4
**return** [1] - 50:21
**REVIEW** [1] - 1:9
**review** [7] - 14:23, 17:11, 19:14, 22:25, 53:8, 53:9
**reviewed** [7] - 3:12, 3:14, 17:19, 17:20, 17:22, 17:24, 18:1
**revoke** [2] - 17:22, 44:19
**rights** [2] - 4:8, 35:20
**risk** [3] - 38:23, 47:10, 49:15
**RNC** [2] - 41:1, 50:16
**Road** [1] - 1:21
**road** [1] - 9:22
**robbery** [1] - 32:4
**ROBERT** [1] - 1:13
**rocket** [2] - 45:1, 45:16
**role** [1] - 36:11
**rolling** [1] - 5:8
**room** [1] - 56:17
**Roswell** [1] - 1:21
**rough** [1] - 8:7
**route** [1] - 4:21
**Rule** [1] - 6:17
**rule** [1] - 57:7
**ruled** [1] - 39:7
**run** [1] - 33:16
**running** [1] - 9:18

### S

**safe** [3] - 19:2, 50:6, 54:3
**safety** [5] - 37:2, 42:13, 47:9, 50:1, 50:24
**saint** [1] - 35:23
**sample** [2] - 43:6, 43:7
**samples** [2] - 43:5, 43:10
**sanctions** [1] - 38:23
**Sandy** [1] - 1:22
**sat** [2] - 26:16, 54:11
**satisfactory** [1] - 17:13
**saw** [1] - 44:10
**scary** [1] - 21:16
**scheduling** [1] - 4:23
**scheme** [1] - 25:5
**science** [2] - 23:7, 45:1
**scope** [1] - 12:19
**search** [1] - 6:17
**second** [9] - 4:15, 19:4, 19:8, 33:9, 34:23, 36:13, 36:14, 44:4, 44:6
**secretly** [1] - 55:17
**section** [1] - 19:18
**Section** [1] - 17:3
**secure** [1] - 49:12
**security** [1] - 50:17
**see** [8] - 15:24, 19:25, 30:12, 34:19, 43:11, 53:11, 54:12, 57:23
**seek** [1] - 12:2
**seeking** [2] - 11:24, 44:18
**selling** [1] - 26:13
**sense** [4] - 14:22, 14:25, 16:12, 58:14
**sentence** [5] - 31:1, 40:18, 41:21, 41:23, 51:9
**separate** [2] - 11:20, 15:15
**serialize** [1] - 6:11
**serious** [2] - 19:3, 35:25
**seriously** [3] - 50:1, 57:15, 58:17
**seriousness** [2] - 18:25, 36:8
**services** [1] - 11:2
**set** [14] - 6:24, 16:10, 16:11, 16:12, 20:2, 23:18, 37:22, 38:22,

40:3, 42:20, 43:19, 43:20, 57:15, 57:21
**sets** [2] - 45:6, 45:21
**setting** [1] - 8:25
**several** [2] - 8:12, 8:16
**Sharbaugh** [15] - 18:7, 19:23, 23:25, 24:9, 25:17, 32:22, 33:10, 37:13, 37:21, 38:2, 41:12, 41:16, 41:23, 41:25, 52:20
**Sharbaugh's** [8] - 3:12, 3:14, 17:18, 17:19, 19:13, 31:15, 39:23, 44:19
**shifting** [3] - 29:20, 36:6, 36:7
**Shoreman** [3] - 1:15, 2:10, 2:12
**SHOREMAN** [5] - 1:16, 2:9, 3:21, 16:18, 16:23
**short** [1] - 40:16
**show** [8] - 22:8, 25:10, 30:13, 30:15, 31:21, 32:25, 33:15, 34:24
**showed** [4] - 32:1, 32:5, 34:1, 45:6
**showing** [2] - 21:24, 42:24
**shown** [3] - 29:2, 30:21, 54:3
**shows** [4] - 43:11, 45:21, 55:14
**side** [4] - 2:23, 8:9, 23:17, 43:10
**sides** [3] - 3:22, 10:14, 14:3
**significance** [2] - 34:12, 48:6
**significant** [5] - 22:11, 35:8, 35:11, 41:7, 50:16
**similar** [2] - 21:6, 22:14
**similarly** [2] - 10:10, 10:24
**simply** [8] - 46:22, 50:24, 51:3, 51:10, 51:14, 53:1, 54:10, 54:18
**sister** [2] - 18:2, 56:15
**sites** [1] - 15:24
**sitting** [1] - 55:16
**situation** [4] - 16:7, 29:16, 54:17, 56:15
**skill** [1] - 42:8

**skilled** [1] - 41:9
**snap** [4] - 27:6, 46:14, 46:20
**snapped** [2] - 27:5, 48:23
**snapping** [3] - 28:15, 46:9, 46:23
**sole** [1] - 30:5
**solitary** [1] - 50:21
**someone** [6] - 26:11, 26:15, 29:1, 32:15, 33:25, 34:4, 35:9, 46:13
**sometimes** [1] - 41:21
**somewhat** [1] - 19:7
**somewhere** [3] - 10:8, 28:9, 50:11
**SONJA** [2] - 1:23, 59:16
**Sonja** [2] - 59:10, 59:16
**soon** [1] - 58:9
**sooner** [1] - 12:2
**sort** [30] - 4:19, 6:12, 7:25, 9:15, 9:18, 9:19, 11:6, 11:11, 12:17, 14:18, 16:2, 16:7, 20:20, 21:1, 21:16, 21:20, 22:14, 22:17, 23:1, 23:6, 23:10, 25:8, 27:20, 27:21, 29:18, 32:25, 37:7, 39:11, 55:13, 57:3
**sounds** [2] - 14:21, 39:18
**specific** [5] - 7:24, 12:21, 13:2, 15:12, 53:24
**specifically** [7] - 5:9, 11:21, 42:12, 44:8, 44:9, 55:10, 56:2
**spectrum** [1] - 53:4
**speedier** [1] - 17:6
**speedy** [1] - 9:1
**spend** [1] - 48:18
**spouse** [1] - 38:6
**spreadsheet** [1] - 9:17
**Springs** [1] - 1:22
**Square** [1] - 1:19
**stable** [1] - 43:17
**stage** [1] - 13:24
**stamps** [1] - 9:14
**stand** [1] - 3:5
**standard** [5] - 19:11, 22:21, 45:18, 57:18, 58:17
**standing** [1] - 11:11
**start** [3] - 8:24, 18:9,

19:12
**started** [2] - 11:15, 48:18
**starting** [1] - 20:1, 57:18
**starts** [1] - 48:14
**state** [1] - 2:4
**statement** [2] - 37:18
**STATES** [2] - 1:1, 1:3
**states** [2] - 38:14, 39:1
**States** [5] - 1:12, 2:3, 2:7, 59:10, 59:13
**status** [8] - 3:2, 3:8, 5:4, 8:22, 8:25, 16:15, 17:16, 59:5
**statute** [6] - 18:20, 24:7, 29:5, 30:6, 30:15, 35:16
**statutory** [1] - 25:4
**stay** [2] - 14:10, 58:11
**stays** [1] - 25:3
**steel** [1] - 45:12
**stenographic** [1] - 59:11
**Stenographic** [1] - 1:25
**step** [6] - 6:13, 8:10, 9:23, 20:16, 42:20
**step-by-step** [1] - 42:20
**steps** [2] - 3:5, 14:13
**stick** [1] - 16:13
**sticks** [1] - 54:15
**still** [9] - 6:19, 6:25, 14:21, 24:24, 25:3, 30:9, 32:17, 32:21, 50:14
**stop** [1] - 26:10
**stops** [1] - 48:14
**store** [2] - 6:22, 28:7
**story** [6] - 53:14, 53:16, 53:18, 54:14, 54:15, 54:20
**strap** [1] - 43:17
**Street** [1] - 1:13
**strength** [1] - 34:2
**stretches** [2] - 44:21
**strict** [2] - 57:16, 57:21
**strongest** [1] - 22:8
**stuck** [1] - 53:18
**stuff** [6] - 10:9, 10:19, 15:19, 27:17, 58:15, 58:19
**submission** [3] - 41:10, 42:20, 43:9
**submissions** [2] - 55:1, 57:6

**submitted** [1] - 40:19
**subpoena** [1] - 6:22
**subpoenas** [1] - 11:24
**subsequent** [1] - 22:3
**substance** [1] - 5:1
**substantially** [1] - 50:8
**suffers** [1] - 52:7
**sufficient** [1] - 57:19
**sufficiently** [2] - 39:2, 39:17
**suggest** [5] - 20:7, 28:19, 28:24, 33:16, 34:3
**suggesting** [3] - 26:12, 29:4, 29:10
**suggests** [5] - 11:5, 23:11, 28:2, 30:7, 34:7
**Suite** [3] - 1:16, 1:19, 1:21
**sulfur** [1] - 45:9
**summarized** [1] - 8:11
**summarizing** [1] - 13:19
**summary** [1] - 14:1
**summer** [1] - 48:12
**supervision** [4] - 28:5, 56:23, 58:4, 58:5
**support** [2] - 44:11, 44:13
**supported** [1] - 19:10
**supports** [3] - 33:21, 43:1, 45:17
**suppose** [1] - 22:8
**supposed** [1] - 21:2
**suppress** [1] - 55:20
**Supreme** [1] - 15:4
**surprise** [1] - 18:6
**surveillance** [1] - 26:17
**susceptible** [2] - 9:14, 29:14
**suspect** [7] - 6:6, 15:9, 20:17, 20:18, 22:18, 26:18, 58:5
**suspecting** [1] - 49:5
**sustained** [1] - 47:12
**symptoms** [1] - 52:7
**systems** [1] - 10:18

**T**

**table** [1] - 45:21
**talks** [2] - 24:12, 30:15
**targeted** [2] - 6:15, 7:4
**tax** [1] - 34:20
**team** [9] - 2:13, 5:9, 6:9, 7:9, 12:20, 12:23, 13:11, 15:1, 16:22
**tend** [1] - 20:7
**Tennessee** [1] - 1:19
**terms** [11] - 6:8, 7:8, 8:11, 8:20, 8:22, 10:17, 12:1, 26:10, 48:21, 54:8, 54:25
**terrible** [1] - 48:25
**THE** [94] - 1:1, 1:9, 1:12, 1:15, 2:8, 2:12, 2:15, 2:16, 3:22, 5:21, 5:25, 7:10, 7:22, 8:7, 8:18, 8:21, 9:5, 9:7, 10:11, 11:10, 12:7, 12:10, 13:4, 14:2, 14:15, 14:24, 15:17, 16:9, 16:20, 16:24, 17:1, 17:16, 19:12, 20:23, 21:7, 21:21, 24:8, 24:13, 24:22, 25:12, 25:15, 25:19, 25:22, 26:1, 27:11, 28:12, 29:4, 29:20, 30:2, 30:11, 30:18, 30:23, 31:6, 31:9, 31:14, 32:13, 33:8, 34:10, 36:5, 36:12, 36:16, 36:23, 37:2, 37:11, 37:17, 37:20, 38:1, 38:16, 39:3, 39:14, 39:18, 41:20, 42:7, 42:11, 44:2, 44:6, 46:7, 47:16, 48:20, 49:14, 49:23, 50:25, 51:19, 52:10, 52:24, 54:2, 55:1, 57:5, 57:12, 58:16, 58:23
**themselves** [2] - 17:11, 29:2
**theory** [1] - 27:2
**therefore** [4] - 29:1, 31:2, 31:3, 31:9
**thinking** [1] - 7:13
**third** [16] - 11:17, 19:5, 19:8, 24:18, 28:5, 36:9, 38:5, 38:12, 38:20, 38:21, 38:22, 40:14, 49:20,

51:1, 51:3, 56:14
**third-party** [8] - 24:18, 28:5, 38:5, 38:12, 38:21, 38:22, 49:20, 56:14
**thorough** [1] - 39:25
**thoroughly** [1] - 17:8
**thoughtful** [1] - 8:14
**threat** [2] - 26:7, 41:7
**threats** [1] - 41:8
**three** [3] - 19:1, 40:5, 44:2
**throughout** [2] - 17:25, 44:7
**thumb** [1] - 34:21
**tie** [1] - 22:22
**tied** [1] - 20:6
**timeline** [6] - 6:2, 8:8, 8:18, 37:24, 44:14, 48:6
**timers** [1] - 43:20
**timing** [1] - 14:12
**today** [8] - 3:1, 8:10, 9:16, 11:10, 12:9, 17:2, 40:7, 57:8
**together** [4] - 17:3, 42:18, 42:21, 42:25
**toll** [1] - 9:1
**ton** [1] - 9:10
**took** [1] - 15:4
**top** [1] - 43:17
**topic** [2] - 5:10, 47:14
**topics** [3] - 7:8, 8:5, 12:15
**totally** [1] - 29:22
**towards** [2] - 13:5, 49:14
**trace** [1] - 16:7
**traceable** [1] - 49:6
**track** [1] - 9:12
**tracking** [1] - 11:3
**tracks** [4] - 19:7, 20:22, 52:14, 52:19
**tranches** [1] - 8:9
**Transcript** [1] - 1:25
**TRANSCRIPT** [1] - 1:9
**transcript** [5] - 38:11, 53:9, 59:11, 59:11, 59:12
**treat** [2] - 4:10, 4:11
**tree** [1] - 16:4
**trial** [5] - 9:1, 14:23, 16:10, 16:12, 17:6
**tried** [3] - 31:25, 32:18, 58:8
**triggering** [2] - 45:24, 46:8
**true** [5] - 28:1, 31:20,

33:3, 59:11
**trusted** [1] - 56:19
**truth** [1] - 55:22
**truthfully** [1] - 55:21
**try** [5] - 15:18, 15:21, 40:25, 55:14, 58:9
**trying** [13] - 8:13, 12:3, 20:21, 21:25, 27:16, 30:24, 32:23, 39:19, 44:14, 54:5, 54:6, 55:16, 58:12
**turn** [1] - 29:11, 40:22, 49:23
**turned** [2] - 8:17, 31:25
**Turning** [1] - 3:6
**turns** [2] - 34:11, 35:23
**two** [15] - 3:23, 5:3, 9:21, 9:24, 10:14, 20:14, 20:19, 21:4, 22:5, 40:10, 48:1, 51:10, 53:19, 57:10
**type** [13] - 14:7, 24:19, 25:1, 26:11, 27:23, 29:14, 30:8, 33:13, 33:19, 34:17, 37:6, 45:14, 46:19
**types** [4] - 6:17, 28:19, 47:2, 56:23

## U

**U.S** [1] - 12:25
**U.S.C** [1] - 17:3
**ultimate** [5] - 26:3, 37:2, 43:24, 47:5, 54:1
**ultimately** [4] - 36:2, 40:5, 41:18, 46:5
**under** [12] - 2:25, 17:3, 18:19, 24:6, 28:4, 29:16, 39:16, 42:10, 46:17, 50:22, 57:8, 59:1
**understate** [1] - 18:25
**understood** [3] - 24:22, 44:6, 44:22
**undertake** [1] - 19:14
**UNITED** [2] - 1:1, 1:3
**United** [5] - 1:12, 2:2, 2:7, 59:10, 59:13
**universe** [1] - 7:6
**unlimited** [1] - 35:16
**unskilled** [1] - 41:7
**unsupervised** [1] - 50:10
**unsupported** [1] - 19:9

**unusual** [2] - 15:12, 15:13
**up** [9] - 14:21, 16:4, 16:16, 19:2, 20:17, 24:3, 33:15, 57:12, 58:11
**user** [2] - 47:24, 51:24

## V

**valid** [1] - 9:20
**value** [1] - 34:12
**variety** [1] - 40:13
**various** [3] - 7:15, 8:9, 19:19
**versus** [3] - 2:3, 35:9, 43:6
**viable** [4] - 26:6, 31:12, 42:23, 43:3
**video** [3] - 43:11, 53:9, 54:6
**view** [1] - 13:14
**viewed** [1] - 18:17
**views** [1] - 46:23
**violence** [2] - 34:20, 45:25
**violent** [2] - 26:22, 29:19
**volatile** [1] - 43:18
**voluminous** [1] - 7:1
**vs** [1] - 1:5

## W

**Wal** [1] - 58:8
**Wal-Mart** [1] - 58:8
**walking** [1] - 19:8
**wants** [2] - 12:11, 58:10
**warrants** [6] - 6:17, 15:5, 15:6, 15:7, 15:23, 15:25
**Washington** [4] - 1:11, 1:14, 1:17, 53:14
**watch** [3] - 54:6, 54:11, 58:6
**ways** [5] - 28:25, 29:1, 30:8, 40:13, 55:7
**weapons** [1] - 31:13
**Wednesday** [1] - 1:10
**week** [2] - 12:14, 35:19
**weekly** [1] - 58:4
**weeks** [5] - 8:12, 8:17, 11:19, 48:3
**weight** [6] - 33:11,

34:8, 35:7, 36:1, 36:16, 36:18
**whatsoever** [1] - 34:20
**whistleblower** [1] - 11:22
**white** [1] - 36:21, 36:23
**whole** [5] - 11:20, 12:19, 27:21, 38:13, 38:15
**wholly** [2] - 44:11, 44:13
**wildly** [1] - 55:13
**Williams** [2] - 2:10, 57:12
**WILLIAMS** [4] - 1:21, 57:10, 57:13, 58:21
**willing** [4] - 9:1, 11:12, 32:21, 58:15
**wins** [1] - 34:23
**wipe** [1] - 21:7
**wiped** [1] - 20:5
**wipes** [5] - 19:21, 20:14, 20:23, 21:2, 22:9
**wiping** [11] - 20:18, 20:19, 47:12, 47:19, 47:22, 47:24, 47:25, 51:7, 52:6, 52:8, 55:12
**wires** [1] - 45:13
**word** [2] - 40:9, 46:7
**words** [7] - 2:25, 3:3, 24:25, 32:14, 41:20, 46:11, 54:19
**works** [1] - 16:22
**world** [1] - 29:24
**worried** [1] - 43:18
**worry** [1] - 31:9
**wrap** [1] - 14:18
**writing** [1] - 4:20
**written** [2] - 51:9, 57:9, 59:2

## Y

**year** [3] - 6:4, 27:1, 34:9
**years** [16] - 7:15, 18:24, 20:15, 20:19, 21:4, 21:15, 22:9, 29:17, 35:18, 35:21, 35:23, 40:12, 40:16, 44:20, 45:22, 46:14
**years-long** [2] - 40:12, 44:20
**yesterday** [6] - 18:3, 23:9, 44:10, 45:2, 51:9, 52:12

**young** [1] - 56:15

## Z

**Zach** [1] - 2:10
**ZACHARY** [1] - 1:18
**zero** [1] - 28:20

Respectfully submitted,

By:  */s/ J. Alex Little*
    _____
J. ALEX LITTLE (TN BPR # 029858)
ZACK C. LAWSON (TN BPR # 036092)
JOHN R. GLOVER (TN BPR # 037772)
Litson PLLC
54 Music Square East, Suite 300
Nashville, TN 37203
Telephone: 615-985-8205
alex@litson.co
zack@litson.co
jr@litson.co

*Attorneys for Defendant Brian Cole, Jr.*

**s/ MARIO B. WILLIAMS**
Mario B. Williams
Ga. Bar No. 235254 (Pro Hac Vice)

**/s/JOHN SHOREMAN**
John M. Shoreman
DC Bar #407626

**HUMANITY DIGNITY AND RIGHTS LLC**
Life Time Work - Buckhead - at Phipps Plaza
3480 Peachtree Road, NE, Second (2nd) Floor
Atlanta, Georgia 30326
Tel: 470-257-2485
mwilliams@hdrattorneys.com
jms@mcfaddenshoreman.com

***Counsel for Brian Cole Jr.***

1

## CERTIFICATE OF APPENDIX COMPLIANCE

I hereby certify that the Appendix bound with this brief includes all documents required by Circuit Rules 30(a) and (b).

By: _____*/s/ J. Alex Little*_____

J. ALEX LITTLE
*Counsel for Defendant*