No. 26-3009

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————————

UNITED STATES OF AMERICA,
*Plaintiff—Appellee,*

*v.*

BRIAN COLE, JR.,
*Defendant—Appellant.*

—————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
THE HONORABLE AMIR H. ALI, DISTRICT JUDGE
CASE NO. 1:26-CR-00001

—————————————

## APPELLANT'S SUPPLEMENT

—————————————

MARIO B. WILLIAMS
JOHN M. SHOREMAN
HUMANITY DIGNITY AND
RIGHTS LLC
Life Time Work - Buckhead
3480 Peachtree Road, NE, 2d Flr
Atlanta, Georgia 30326
(470) 257-2485
mwilliams@hdrattorneys.com
jms@mcfaddenshoreman.com

J. ALEX LITTLE
ZACK C. LAWSON
JOHN R. GLOVER
LITSON PLLC
54 Music Sq. E., Ste. 300
Nashville, TN, 37203
(615) 985-8205
alex@litson.co
zack@litson.co
jr@litson.co

*Counsel for Defendant - Appellant*

March 11, 2026

Appellant Brian Cole Jr., by and through undersigned counsel, gives notice of his filing of this supplement in support of his Memorandum of Law and Facts. This supplement includes:

1. Transcript of 12/30/2025 Detention Hearing; and

2. Transcript of 01/28/2026 Bond Review Hearing.

## CERTIFICATE OF SERVICE

I hereby certify on March 11, 2026, that the foregoing document was served via the Court's CM/ECF system upon all counsel of record.

By: */s/ J. Alex Little*_____
J. ALEX LITTLE

1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3   UNITED STATES OF AMERICA,        )
                                     )
4           Plaintiff,               )
                                     )
5       vs.                          ) CASE NO. 1:25-mj-00276-MAU
                                     )
6   BRIAN J. COLE, JR.,              )
                                     )
7           Defendant.               )
    _____ )
8

9                    TRANSCRIPT OF DETENTION HEARING
        **BEFORE THE HONORABLE MATTHEW J. SHARBAUGH, U.S. MAGISTRATE**
10                      December 30, 2025
                      1:15 p.m. - 2:57 p.m.
11                       Washington, DC

12  **FOR THE GOVERNMENT:**
        Office of the United States Attorney
13      BY:  CHARLES ROBERT JONES and JOCELYN S. BALLANTINE
        601 D Street, NW
14      Washington, DC 20530

15  **FOR THE DEFENDANT:**
        McFadden & Shoreman, LLC
16      HDR LLC
        BY:  JOHN SHOREMAN, MARIO WILLIAMS, ALEX LITTLE
17          and JOHN GLOVER
        3480 Peachtree Road, NE, 2nd Floor
18      Atlanta, Georgia 30326
        Washington, DC 20036
19

20  **PRETRIAL OFFICER:**  Shania Fennell

21

22                    **SONJA L. REEVES**
                   **Registered Diplomate Reporter**
23                   **Certified Realtime Reporter**
                   **Federal Official Court Reporter**
24                   333 Constitution Avenue, NW
                        Washington, DC 20001
25          Transcript Produced from the Digital Record

1          (Call to Order of the Court at 1:15 p.m.)

2          DEPUTY CLERK:  Good afternoon, Your Honor.  This is

3    Magistrate Case 25-276, *United States of America versus Brian*

4    *J. Cole, Jr*.  This matter is set for a detention hearing.

5          Parties, please introduce yourselves for the record,

6    starting with the government.

7          MS. BALLANTINE:  Good afternoon, Your Honor.  Jocelyn

8    Ballantine and Charles Jones for the government.

9          Prior to beginning, we would ask to approach on a very

10   discrete matter, once counsel has identified themselves.

11         THE COURT:  Good afternoon, Ms. Ballantine, Mr. Jones.

12   Let's get appearances entered, and then I'll hear briefly from

13   you at the bench.

14         MR. SHOREMAN:  Good afternoon, Your Honor.  John

15   Shoreman on behalf of the defendant, Brian J. Cole, Jr.

16         With me today, Mario Williams, HDR LLC; Alex Little,

17   and John Glover.

18         THE COURT:  All right.  Good afternoon to you all.

19   And good afternoon, Mr. Cole.

20         PRETRIAL OFFICER:  Good afternoon, Shania Fennell,

21   Pretrial Service Agency.

22         THE COURT:  Ms. Fennell.  Good afternoon.

23         All right.  So we're on the record.  This matter is

24   set down today for a detention hearing.  Before we turn to

25   that, there are a few preliminary matters that the Court will

1  address.

2          So first, as the Court has discussed with counsel,

3  there was a development in the case yesterday, specifically

4  that the United States Attorney's Office secured an indictment

5  from a grand jury.  The grand jury was the grand jury sitting

6  in the Superior Court of the District of Columbia.

7          That grand jury returned a true bill on two counts,

8  the same two counts in the complaint for Section 844(d) and

9  844(i).  The Court did not receive the indictment, did not

10 accept the indictment yesterday, and here is why.

11         There is some ongoing debate in our district and our

12 circuit about whether it is proper for this court, the U.S.

13 District Court for the District of Columbia, the federal court,

14 to receive an indictment that was returned by a grand jury in

15 the Superior Court, the Superior Court of the District of

16 Columbia, which, of course, is our local court here in the

17 district.

18         There is a DC Code section, Section 11-1916(a), which

19 the government takes the position, and at least one judge in

20 this district has taken the position, permits that sort of

21 approach.  In other words, that the DC Code section allows for

22 a grand jury sitting in the Superior Court, or, conversely, a

23 grand jury sitting in this court, to return indictments in

24 either jurisdiction.  That case is the *Kevontae Stewart* case.

25 It's 25-mj-225 in this district.

1          So without rehashing the entire history, in November,

2     Chief Judge Boasberg issued a ruling concluding that the DC

3     Code section allowed this approach, and rejected arguments from

4     the defense to the contrary.

5          Subsequent to that decision, the defense appealed that

6     ruling to the DC Circuit, where the case remains today.

7     Meanwhile, Chief Judge Boasberg issued an order staying his

8     ruling.  That was on December 9th of 2025.  And in pertinent

9     part, that ruling stated as follows, that, quote, "The public

10    interest lies in letting the Court of Appeals decide this issue

11    before the government moves forward, both on this case and in

12    similar fashion on other cases," end quote.

13         So the concern that this Court had yesterday

14    principally was whether that stay order somehow divested me of

15    the ability to accept that indictment.  I haven't reached a

16    determination on that yet.  I have not.

17         Instead, I have asked both sides to submit briefing on

18    that issue, and once I receive that briefing, I'll make a

19    determination as to whether that stay order precludes me from

20    accepting the indictment or does not, and the case would then

21    proceed from there.

22         So in light of that development, the Court has not as

23    yet accepted an indictment in this case, but, again, I'll note

24    that one has been returned by the Superior Court grand jury on

25    these issues.

1    So that is a recap of what happened in the proceedings

2    yesterday.  I will enter an order on the docket today that

3    memorializes this to some effect.  And both parties have

4    provided me with briefing, which the Court will direct be filed

5    on the public docket.  If either side believes that redactions

6    are appropriate, I will consider that, but it should be

7    accompanied with an appropriate motion to seal to the extent

8    that any redactions are requested.

9    All right.  So that is issue number one.  I will at

10   this point provide counsel an opportunity to weigh in on that

11   issue to the extent that you wish to at this point, although,

12   again, I do not intend to make a decision on that subject

13   today.  I'm going to review the briefs so that I can

14   appropriately study the question and make a decision that I

15   think is appropriate.

16   So with that, Mr. Jones, Ms. Ballantine, anything that

17   the government wants to add at this point?

18   MS. BALLANTINE:  Your Honor, may we approach?

19   THE COURT:  Yes.

20   (Proceedings took place at a sealed bench conference

21   that are not included in this transcript, after which,

22   proceedings continued as follows.)

23   THE COURT:  All right.  So the second preliminary

24   issue is that on Sunday, the defense filed a motion to confirm

25   that not only would the Court be conducting a detention hearing

1   today, but also a preliminary hearing.

2   I'll note for the record that no preliminary hearing

3   was scheduled today.  And I'll hear briefly from counsel, but

4   let me just give you my thinking in light of recent

5   developments.

6   So the parties are in sharp disagreement over who

7   bears responsibility, if anyone, for a preliminary hearing not

8   being scheduled today or one side or the other not being

9   prepared to proceed with the preliminary hearing.  I'm not

10   going to weigh in to all of that, because here is where I come

11   out on this.

12   So I understand that the defendant, at least to this

13   point, does not consent to any additional extension of a

14   preliminary hearing.  Is that still the defense's position?

15   (No audible response.)

16   THE COURT:  All right.  Be that as it may, Rule 5.1 of

17   the Rules of Criminal Procedure and 18 U.S.C. Section 3060

18   allow the Court to continue the time in which a preliminary

19   hearing would need to occur if the Court finds extraordinary

20   circumstances to do so.

21   And I find in this case that there are extraordinary

22   circumstances, specifically, the development that I just

23   discussed with the parties, because, of course, the return of

24   an indictment, under both the Rules of Criminal Procedure and

25   the statute, obviate the need for a preliminary hearing.

1          An indictment has been returned.  The question in
2    front of me is whether I can accept that indictment.  And so in
3    my view, that is an extraordinary circumstance.  This is not
4    the government seeking more time simply so that it can pursue
5    an indictment, it's done so.  It's a question of whether that
6    indictment is one the Court can accept.

7          And given the unique judicial structure, the unique
8    court structure we have here in the District of Columbia, this
9    is, so far as I can tell, the only district in which this could
10   potentially occur.  So to me, that is an extraordinary
11   circumstance -- extraordinary circumstance, and not something
12   that occurs often or frequently, or perhaps ever in any
13   district outside of this one.

14         And so, again, if the Court concludes that that
15   indictment should be accepted, then there would be no basis to
16   move forward with the preliminary hearing.  And if the Court
17   concludes that the indictment should not be accepted, then the
18   Court would promptly and expeditiously convene a preliminary
19   hearing, but I think the interests of justice are best served
20   by the Court making a determination on that threshold issue
21   before it convenes a preliminary hearing in this case.

22         And so I do find that there are extraordinary
23   circumstances for the Court to briefly continue any preliminary
24   hearing pending a determination on whether a valid indictment
25   has been presented to this Court.

1       So I will not be proceeding with the preliminary

2  hearing today.  As I said, if I accept the indictment, then the

3  issue will functionally become moot; and, if not, I will

4  promptly convene a preliminary hearing to take place at the

5  defense request.

6       So that's the Court's ruling on that issue.  Does

7  either side wish to be heard on that before we move on to the

8  other matters to discuss today?

9       All right.

10      MR. LITTLE:  I understand the Court's ruling under 5.1

11 for extraordinary circumstances.  I think it's important for us

12 to make our record that we object to that determination.  We

13 think that extraordinary circumstances --

14      THE COURT:  Can you just pull the mic a little bit

15 closer to you so that we can capture it for the record.

16      MR. LITTLE:  The extraordinary circumstances is Courts

17 of Appeals have interpreted it generally relates to the

18 inability to hold a preliminary hearing.  There is nothing

19 stopping the government from holding that hearing today.  There

20 is nothing stopping the government from holding that hearing

21 previously.

22      I understand the Court's position that it's unclear on

23 the record whose obligation it may have been to set that

24 hearing.  The statute makes that obligation very clear that it

25 rests on the Court to do so at the initial appearance.  And the

1    defendant never waived.  He had a right to that hearing.

2         I understand the government has been put in the

3    position where it may obviate that need.  I think my concern

4    about that is, depending on how quickly that decision is made,

5    my client may lose the irreparable harm that we address in our

6    motion as to the stay factors the Court dealt with in *Nken*.

7         THE COURT:  What is the irreparable harm?

8         MR. LITTLE:  That if he's entitled to have his

9    detention hearing today, he should be released if the

10   government doesn't produce probable cause.  And so he is

11   entitled to release under both 3060(c) -- or sorry, 3060(b) and

12   5.1.  Both those statutes require mandatory release if he's not

13   had a probable cause determination.

14        THE COURT:  Or if an indictment has not been returned.

15        MR. LITTLE:  Absolutely.

16        THE COURT:  That's the issue that I have in front of

17   me.  I have an indictment that I don't know what I can

18   properly -- how I can properly handle that, right.  And I think

19   the interests of justice are best served for everyone if the

20   Court makes a determination on that issue before we move

21   forward with the preliminary hearing that might be moot.

22        MR. LITTLE:  And I'm not objecting -- I mean, I am

23   objecting.  I understand the Court's position, but I want to

24   make our record clear that we should be allowed to do so.

25        I'll note that the government has said there is not an

1    opportunity to indict in front of a federal grand jury until

2    sometime next week.  And so to the extent that there is still a

3    window for us to get that relief if we need to, make that point

4    for the record that there is a window, we recognize that.  We

5    want to make sure we're not waiving it.

6                THE COURT:  All right.  Mr. Little, thank you.

7                MR. LITTLE:  Thank you.

8                THE COURT:  So there is a motion on the docket to

9    clarify that a preliminary hearing would be held today.  So the

10   Court is going to deny that as moot for the reasons stated on

11   the record.  And again, depending on what I decide on the grand

12   jury return, we'll proceed from there.

13               All right.  One other preliminary matter is a motion

14   for discovery that the defense filed on the docket.  That's at

15   ECF No. 22.  Before I proceed on that, let me just turn to the

16   government.

17               I don't know who wants to address this, Mr. Jones,

18   Ms. Ballantine.  Can you provide just an update on the

19   government's discovery efforts to this point, where we stand,

20   what it looks like moving forward?

21               MR. JONES:  Yes, Your Honor.  The government has

22   provided extensive discovery to this point on a rolling basis

23   to the defense.  I'm happy to get into more detail in terms of

24   what exactly that is, but at this point, the government has

25   provided copies of the defendant's custodial interview, as well

     1    as basically the discovery relating to all of the information

     2    discussed in the affidavit in support of the complaint.

     3              THE COURT:  All right.  Thank you.

     4              Who from the defense side wants to address this issue?

     5    I didn't give you a heads-up that we were going to be talking

     6    about it, but it's a pending motion on the docket, so I don't

     7    know who wants to cover that.

     8              MR. WILLIAMS:  Mario Williams for the defendant, Your

     9    Honor.

    10              THE COURT:  Mr. Williams.

    11              MR. WILLIAMS:  We filed that motion as a matter of

    12    course, obviously.  We haven't had any significant, or really

    13    any problems at all so far with the government providing us

    14    information.

    15              We're waiting on an issue dealing with the video of

    16    the explosive devices and stuff like that to clarify if that

    17    exists or not, but we're satisfied so far with the --

    18    (indiscernible).

    19              THE COURT:  All right.  I appreciate that.  I mean,

    20    look, I reviewed the motion.  You know, the categories of

    21    information you are requesting all say, at least generally, are

    22    the types of information I would expect the government to

    23    provide in a case like this.  I mean, a lot of it is *Brady*,

    24    *Jencks*, *Giglio*.

    25              The Court obviously instructed the government at the

1    initial appearance that it had to provide *Brady* information in

2    a timely manner.  You know, the government acknowledged that

3    obligation.  So I don't think what you're asking for is

4    improper in any sense, but it struck me as a little premature

5    to be filed.

6         There is also a local rule in our court, you know,

7    that requires -- it's local rule 16.1 in our criminal rules

8    that says, "No discovery motion shall be heard unless it states

9    that defense counsel has previously requested that the

10   information sought from the United States has not been

11   provided."

12         MR. WILLIAMS:  We don't have any problem with that.

13         THE COURT:  I didn't see that certification in your

14   motion, and it sounds like there haven't been any issues along

15   those lines.  So I'm going to deny that motion without

16   prejudice at this point in time.

17         Obviously, if there becomes an issue with disclosure

18   obligations, if you feel like you're not getting something that

19   you should, you're welcome to renew that motion, whether it

20   comes before me or one of my colleagues or a district judge if

21   and when the case is indicted, you're welcome to renew that

22   motion, but at least for present purposes, I'm going to deny

23   that without prejudice.

24         MR. WILLIAMS:  Yes, Your Honor.  Thank you.

25         THE COURT:  All right.  Thank you.

1    All right.  So that brings us to the issue of the

2  detention hearing this afternoon.  Are the parties prepared to

3  proceed?

4    MR. JONES:  Yes, Your Honor.

5    MR. WILLIAMS:  Yes, Your Honor.

6    THE COURT:  So for the record, I have reviewed the

7  government's memorandum in support of pretrial detention, which

8  was filed on Sunday.  And I have reviewed the defense

9  memorandum in opposition, which was filed this morning.

10    So I'm familiar with the briefs, but given the timing

11  of these filings, I certainly welcome any additional

12  explication or argument that either side wants to make.  People

13  often tell me they don't want to repeat what's in their papers.

14  I don't mind that, particularly under these circumstances, and,

15  frankly, I think it's important that Mr. Cole hear from the

16  government the arguments that it is making in support of your

17  argument that he be detained.

18    So with that backdrop, I'll hear from both sides.

19  It's the government's motion, so I'll start with you, whoever

20  is going to argue.

21    MR. JONES:  Thank you, Your Honor.  The defendant has

22  confessed to manufacturing, transporting and planting two

23  explosive devices, specifically pipe bombs, in the immediate

24  vicinity of the headquarters of the two major political parties

25  in the United States on January 5th of 2021.

1    And he's confessed to doing so for the purpose of
2  influencing those in power, public officials, to act in
3  response to the results of the 2020 election.

4    As the Court knows, the charges against Mr. Cole
5  include a charge under 844(i), which, given the defendant's
6  intent, is a federal crime of terrorism under 2332(b)(g)(5).
7  And that offense under the bail statute, upon a finding of
8  probable cause, which the government submits is easily
9  established here, creates a presumption under the federal bail
10 statute of pretrial detention.

11    The record in this case before Your Honor at this
12 point, in light of the detention factors and in light of the
13 presumption, establishes the need for pretrial detention.

14    Ultimately, what the defense is asking the Court to do
15 in its papers and in its request to release Mr. Cole pending
16 trial is to return him to precisely the same circumstances,
17 living at a family member's home and working for his family's
18 business, that existed first in the fall of 2020 when the
19 defendant was planning his crimes and when he was learning
20 about the historical use of pipe bombs; circumstances that
21 existed in January of 2021, when he transported those explosive
22 devices to Washington, DC and planted them.

23    They are the circumstances that existed in the days
24 and weeks after January 5th of 2021, when Mr. Cole, by his own
25 word, destroyed much of the evidence of his guilt.  They

1  existed through August of 2022, when Mr. Cole continued to

2  purchase components consistent with the materials used to

3  create the pipe bombs in this case, and when he, again, by his

4  own word, experimented with the creation of potassium chlorate,

5  a known oxidizing agent used in explosives.

6         And under the circumstances that existed through the

7  morning of the defendant's arrest on December 4th of 2025, when

8  he wiped his cell phone for the 943rd time since December of

9  2020.

10        So this is not a case that involves an isolated,

11  impulsive act.  This is a case in which the government is

12  requesting detention based off of a pattern of concerning and

13  disturbing conduct, including planned acts of extreme political

14  violence, experimentation with explosive materials, destruction

15  of evidence, a persistent inclination and proclivity for hiding

16  incriminating information from those around him, including his

17  family.

18        THE COURT:  Mr. Jones, I mean, I take your point.

19  These are serious charges.  You don't have to convince me of

20  that.  But your argument is that they are asking to return him

21  to the exact same position.  That's not entirely true, because

22  they are not proposing that Mr. Cole just be released into the

23  community.  They are proposing release subject to a very

24  stringent set of conditions, right, including house arrest or

25  home incarceration, placement on a GPS ankle monitor, pursuant

1    to the court's high intensity supervision program.

2        You know, I'm not expressing a view at this point as

3    to whether that's appropriate or not, but I'm not sure it's

4    entirely fair to say the exact same position as before, because

5    he wasn't subject to any court-imposed conditions before.

6        The defense here is proposing a set of stringent

7    conditions.  Right?

8        MR. JONES:  That's fair, Your Honor.  That said, the

9    defendant was living, at the time and up until his arrest, an

10    incredibly solitary and restrictive lifestyle, much like the

11    one that is proposed here based off of the conditions.

12        Now, when the Court is analyzing a proposed set of

13    release conditions, the Court's responsibility is not simply to

14    look at the set of conditions and determine whether they are

15    sufficiently onerous.  The Court also has to consider whether

16    the Court can rely on the defendant to abide by them, because

17    if the Court can't trust the defendant to abide by those

18    conditions, no matter how onerous they are, they are not going

19    to do anything to mitigate the danger that he poses to the

20    community.

21        And that's why the key issue here is the record before

22    the Court of the defendant's conduct after the fact -- well,

23    before the fact in how he managed to hide all of his activities

24    from those closest to him, family members with whom he was

25    living, up until his arrest, his efforts to continually wipe

1   his phone, and apparent efforts to prevent those around him

2   from learning things about him.

3          I think that should weigh heavily here on the Court's

4   assessment of potential conditions of release.

5          THE COURT:  Let me back up for a moment.  So you're

6   obviously arguing that this is a presumption case, a case that

7   implicates a presumption of detention, which, of course, is the

8   exception to the default under the statute, right, because the

9   Bail Reform Act, the statute that Congress passed to govern

10   these issues, says that an individual generally should be

11   released pending trial unless there are no conditions that can

12   reasonably assure the safety of the community.

13          The presumption cases are exceptions, right.  Congress

14   created a presumption of detention in a certain category of

15   cases.  It's a rebuttable presumption, but it's a presumption

16   that points in the opposite direction.

17          So I think your argument is well taken that this seems

18   to be a presumption case.  The defense argues though that there

19   is no probable cause to conclude that he has engaged or

20   committed an offense under the triggering code section, which

21   here is 844(i).  How do you respond to that?

22          MR. JONES:  Well, putting aside the return of the

23   indictment that we have been discussing --

24          THE COURT:  I don't know that you -- maybe you don't

25   need to put it aside.  I don't know.  That's why I asked.

1        MR. JONES:  Right, but for purposes of this

2    discussion, I would direct the Court to -- I'm sure the Court

3    is aware of the *Smith* case, which has been on the books for

4    30 years now in the DC Circuit, which held that in the

5    detention context, the government can, and under the terms of

6    the statute and as recognized by all of the circuits, proceed

7    by proffer, which includes the Court's determination of whether

8    there is probable cause for purposes of a presumption.

9        And I will say that I was struck by the defense's just

10   outright affirmative statement that when there is no

11   indictment, no pretrial detention hearing can begin with a

12   presumption under the Bail Reform Act, because it didn't take

13   long to find a case from then Chief Judge Howell, *United States*

14   *versus Johnston* -- I can provide the Court the cite, but the

15   relevant part is, quote, "The defendant has not been indicted,

16   and, as a result, no indictment establishes probable cause to

17   believe that the defendant committed the charged offense;

18   nonetheless, the government has proffered evidence."  The Court

19   summarized that evidence.  "For that reason, the Court finds

20   that the government's proffer provides the requisite probable

21   cause, and, thus, the rebuttable presumption of detention

22   applies."

23       THE COURT:  What's the cite for that case?

24       MR. JONES:  It's 2017 WL 4326390.  It's at page 3,

25   footnote 2, and it's a 2017 decision.

1          THE COURT:  Okay.  So the government's view is an

2     indictment is not required to establish probable cause for

3     purposes of triggering the presumption that you argue is

4     applicable here.  The Court itself can make a determination in

5     this setting based on the government's proffer that probable

6     cause exists for that offense?

7          MR. JONES:  That's correct.

8          THE COURT:  All right.  Is the government making --

9     your brief focuses on the dangerousness aspect of the Bail

10    Reform Act.  Of course, there are two bases on which you can

11    seek detention.  One of them is that there is a risk of danger

12    to the community or others, and the other is that there is a

13    risk of flight or nonappearance.

14         Is the government arguing the second here?  I didn't

15    see much in your brief on a risk of flight argument, but I

16    wanted to ask you that here.

17         MR. JONES:  No, Your Honor.  This is a dangerousness

18    case.

19         THE COURT:  All right.  Okay.  Focus for a moment for

20    me on the government's arguments about evidence since the

21    underlying offense, so since January 5th of 2021, basically the

22    last five years or so.

23         What evidence does the government have to proffer that

24    Mr. Cole poses a prospective risk of danger here?  That's the

25    test, right.  The circuit has told us that in *Munchel*, which

1    was also a sort of January 6 case.  This case is sort of

2    January 6 adjacent.  At least that's how the parties seem to be

3    approaching it, but *Munchel* was very clear that the Court needs

4    to focus on a forward-looking assessment and can't just look at

5    past conduct in evaluating danger.

6         So how would the government articulate the

7    forward-looking danger that it contends necessitates detention

8    here?

9         MR. JONES:  So the first fact I would point to, and

10   there is a table provided in our memorandum, are the post

11   January 5, 2021 purchases by the defendant.  I'm sure the Court

12   has it in front of you.  They are extensive, and they are

13   consistent with the same types of bomb-making components that

14   the defendant had purchased in advance of January of 2021, that

15   he in turn used to construct these devices.

16        As I have already discussed somewhat, and it's

17   discussed in our papers, during his interview with agents, the

18   defendant admitted that one of the reasons why he had purchased

19   beaker sets, which the agents asked him about because they were

20   in his purchase history, was that he was experimenting with

21   creating potassium chlorate, which I have already mentioned is

22   an oxidizing agent used in explosives.

23        And I think given the totality of the circumstances

24   and the other aspects of the government's proffer here, it is

25   not an unreasonable inference.  In fact, it's a quite

1  compelling inference to conclude that the reason Mr. Cole was

2  experimenting with potassium chlorate related not to an

3  innocent science experiment, but in fact to bomb making.

4      THE COURT:  I saw the chart.  I agree, it's

5  concerning.  Certainly evidence that he is continuing to

6  purchase, at least based on the government's proffer,

7  additional materials, what the government describes as

8  bomb-making components for at least some period of time after

9  the offense is concerning.

10      Now, the chart you gave me has the last purchase in

11  August of 2022, right, so two and a half years ago, give or

12  take.  So is there any evidence that the government can proffer

13  during that period that it contends evinces a risk of danger?

14      MR. JONES:  I think that's where the Court has to

15  consider the evidence the government has proffered with respect

16  to the defendant's cell phone.  His efforts to factory reset

17  and wipe his phone on a regular basis really pick up after that

18  point.

19      On some days, he's factory resetting and wiping his

20  phone multiple times in one day, but, otherwise, it's a daily,

21  if not weekly, occurrence.  And so, no, I'm not going to tell

22  the Court I have more purchases to point to beyond the last

23  identified purchase that we have proffered, but I am saying

24  that the Court should consider the defendant's efforts to clear

25  his phone of everything on a regular basis in assessing whether

 1    the concern about his conduct in August of 2022 persists to

 2    this day.

 3         THE COURT:  There is four factors I have to consider

 4    under the Bail Reform Act.  One of them is the history and

 5    characteristics of the individual.

 6         The government acknowledges, I think, Mr. Cole has no

 7    criminal history.  That's distinct from a lot of folks who come

 8    in front of this Court on detention matters.  And generally

 9    that's a circumstance that points against pretrial detention.

10         That's not the only factor or the only aspect of that

11    factor the Court has to consider, but I wanted to give you an

12    opportunity to address the government's position on the history

13    and characteristics factor here.

14         MR. JONES:  Yes, Your Honor.  I have addressed it

15    somewhat to this point.  We don't dispute that Mr. Cole lacks a

16    criminal history, but that is not -- the bail statute doesn't

17    carve out an exception for individuals who are charged with

18    their first crime in terms of assessing their dangerousness.

19         The Court has to consider all of the factors and all

20    of the proffered evidence to this point.  And when the Court

21    looks at the totality of the defendant's personal history and

22    circumstances, you see someone who, while they had not had

23    trouble with the law, they otherwise were living an essentially

24    monastic lifestyle in which Mr. Cole found himself online

25    continually obsessing over issues to the point that he

1   radicalized and turned to violence to express his frustration
2   about circumstances otherwise beyond his control.  This was the
3   way that he chose to exert his control on the circumstances
4   around him.

5       And I think when the Court considers that fact in
6   light of where Mr. Cole finds himself now, the very same
7   concern arises.  And perhaps it's even more pronounced now that
8   he finds himself charged with what he did on January 5th of
9   2021.  And the government's concern is that he will turn to
10   precisely the same type of conduct that he in the fall of 2020
11   resorted to in order to express his frustration.

12       THE COURT:  With respect to the two devices that were
13   found, has the government's investigation or analysis indicated
14   what the potential -- I don't know what the right term is --
15   but damage radius would have been from one of these had it
16   detonated?

17       They didn't detonate, thankfully, but had one of these
18   devices detonated, does the government have any information at
19   this point as to what it projects the damage would have been?

20       MR. JONES:  My understanding is that the explosives
21   examiner who assessed the devices would say that it's very
22   difficult given the number of variables to estimate in any sort
23   of reliable way the blast radius, for example, if that's what
24   the Court is thinking of.  It's certainly what I was thinking
25   of when I thought about what these devices could do.

1          But what the examiner also has opined is that these

2     devices had all of the necessary components to explode.  They

3     were viable devices, viable pipe bombs.  And with pipe bombs,

4     for anyone who is in near proximity to those devices when they

5     explode, it's life threatening because of the fragments and the

6     shrapnel that are projected from the explosion of, in this

7     case, a metal pipe.  And there are certainly examples of that

8     kind of device taking lives.

9          And here, as the Court knows, one of those devices was

10    placed under a bench, just on an evening in DC, and one of

11    those devices was placed by a dumpster.  And so while the

12    defendant may have been targeting or upset with public

13    officials and wanted to send a message to the headquarters of

14    these major political parties, the people that were actually at

15    risk here are the kind of folks that might have sat down on

16    that bench at minute 60 if that device had detonated or might

17    have been taking out the trash to that dumpster at minute 60 if

18    one of those devices have detonated.

19         And those are exactly the kinds of people who could

20    have been killed because of the devices that the defendant

21    constructed and planted.

22         THE COURT:  All right.  To put the question to you

23    directly as you wrap up here -- and I'll give you a chance to

24    come back up after I hear from the defense.  You know, I reread

25    *Munchel* today.  I have read that I don't know how many times at

1    this point, but that's probably the most recent articulation

2    from our circuit as to how to approach these questions.  And

3    *Munchel* of course says that detention before trial is the

4    carefully limited exception, and that's due in no small part to

5    the fact that our constitutional system applies the presumption

6    of innocence until proven guilty, right.

7         The Circuit wrapped up its decision by reaffirming

8    that courts, quote, "Have a grave constitutional obligation to

9    ensure that the facts and circumstances of each case warrant

10   this exceptional treatment."

11        So the question again is forward-looking danger, and

12   that's not a question that the Court asks in a vacuum.  The

13   Court has to ask that question alongside of conditions of

14   release that it can impose, because, again, no one is talking

15   about just releasing anyone into the community here.  It's a

16   question of whether someone would be released under very strict

17   conditions.

18        So why, in the government's view, are the conditions

19   that are being proposed by the defense, and I'm not saying I

20   agree with them on these, I just want your take on this, why

21   aren't the conditions of release being proposed, home

22   detention, GPS monitoring, appointment of a third-party

23   custodian and the like, why are those not sufficient to

24   reasonably mitigate the risk of danger that the government has

25   identified?

1          MR. JONES:  Well, at the risk of repeating myself, I

2     think the answer to that question is that the Court has to

3     trust that those conditions will be abided by, that those

4     conditions will be effective.  And it would be one thing if the

5     record before the Court was truly isolated to January 5th of

6     2021, but what the government has proffered here is in fact a

7     pattern of conduct, disturbing conduct, but also a pattern of

8     comprehensive deception of those closest to the defendant.

9          And so when the Court considers whether releasing

10    Mr. Cole to those same -- that same nucleus of people who are

11    closest to him, the same people that he so successfully kept

12    hidden all of this incriminating information from for years, I

13    think the Court, recognizing that your obligation here is a

14    serious one and that detention is -- pretrial detention is for

15    the exceptional cases, I think it compels the conclusion that

16    this is one of those exceptional cases and that pretrial

17    detention is warranted.

18         THE COURT:  All right.  Thank you, Mr. Jones.  As I

19    said, I'll give you a chance to come back up after I hear from

20    the other side.

21         MR. WILLIAMS:  Your Honor, I would like to start off

22    with clarifying something.  We never argued that without an

23    indictment, and this is in our brief, without an indictment you

24    simply cannot find that rebuttable presumption.

25         What we said was is that the preferred method, the

1   more cost-efficient method is in the indictment.

2          THE COURT:  I appreciate that clarification, because

3   I've got to say that's not how I read your brief.

4          MR. WILLIAMS:  Okay.  But that's what we're saying.

5          THE COURT:  You wrote, "For purposes of making that

6   determination," being the probable cause determination, quote,

7   "A grand jury indictment by itself is what establishes the

8   probable cause."  So you were quoting a case, but if you're

9   saying now that that's not the only path --

10          MR. WILLIAMS:  Well, what we did was, Your Honor, a

11   little bit down on the *Contreras* case, that's where we tried to

12   clarify a little bit about our stance.  If you read a little

13   bit further down, the *Contreras* case quote, where it actually

14   literally says that, "In serious matters or criminal matters,

15   the preference is to not undermine the grand jury and allow

16   them to come back with an indictment."

17          But our point is this, Your Honor --

18          THE COURT:  This is an important point, right, because

19   I looked at the cases you cited.  There is two.  One is from

20   the DC Circuit.  It's the *Williams* case.  All right.  That's

21   from 1990.  And the other is the Second Circuit case you

22   mentioned from 1985.  That's a 40-year-old Second Circuit case.

23          In both of those cases, the argument that the courts

24   were considering was that in addition to an indictment, a court

25   must make some further probable cause finding.  And the courts

1  in those cases rejected that argument.  Those courts said an

2  indictment itself is sufficient.  Neither court said an

3  indictment is necessary.  So an indictment is sufficient but

4  not necessary for a probable cause finding.

5       And I think the government is correct that the Court

6  today, based on the proffer and the evidence, can make a

7  determination that probable cause exists.  An indictment is not

8  required.  And in fact, there is authority from this district

9  that says not only you need an offense not be indicted, it

10  doesn't even need to be charged for the Court to consider

11  whether there is probable cause to apply a presumption.  That's

12  my understanding of the law and it has always been.

13       MR. WILLIAMS:  Discretion is with this Court.

14       THE COURT:  I appreciate the clarification.  Look, I

15  understand this briefing plays out quickly, and you all, I

16  think, filed this at 1 o'clock this morning, so I get it.  I

17  just want to make sure that we're all on the same page at this

18  point.  It sounds like we are.

19       MR. WILLIAMS:  We are.  Let's start off with the

20  rebuttable presumption issue.  The clear thing is that we have

21  the burden of production.  Burden of persuasion stays with the

22  government.

23       However, even if we rebut, it still remains as a

24  factor.  I think we're all on the same page as that.  What I

25  want to address is what my colleague said.  He said you have to

1    feel that there is reasonable assurance that he won't be a

2    danger to the community.  That's exactly why we have the

3    factors test.

4         It's not just Mr. Cole doesn't have a criminal

5    history; it's that he has no history of failure to comply with

6    court orders.  He has 21 years living in Woodbridge Virginia,

7    ties to the community.  He's been working since 14 with his

8    father's family-owned business.  He was not on parole.  He was

9    not on probation at the time of the alleged charges.

10        Nobody is coming into this court, Your Honor, to

11   downplay the alleged charges.  Nobody.  But that's why we have

12   this factor test.

13        So the government in its brief chose to say, hey, you

14   know what, we're not going to look at 3142(g), because he meets

15   not just the no criminal history, the whole almost litany of

16   the test.  So then we jump --

17        THE COURT:  (g)(3), you mean, the history and

18   characteristics factor?

19        MR. WILLIAMS:  History and characteristics.  So then

20   we go into circumstances and nature of the allegations.  What

21   the courts have made clear is that just reciting the

22   allegations, as heinous as they are, is not enough.

23        So in the *Klein* case, if you remember, Your Honor,

24   *Klein* they said, hey, look, when we look at the nature and

25   circumstances, we're going to look at the factors, what you

1  actually did, the harm it caused, and even if we can't prove

2  that you actually caused harm, you facilitated harm to someone,

3  you breached that door, you separated -- there was a separation

4  between law enforcement officers and potentially dangerous

5  individuals.  You popped the door open.  And then you also had

6  a pattern of troubling activity that goes beyond the actual

7  allegations.  You actually were participating in political

8  rallies, you had a history of it, with potential violence.

9          They looked at all of that.  None of those factors

10  apply to Brian Cole, Jr.  He has absolutely zero history.  In

11  fact, the government just said, hey, he's on the website

12  getting riled up.  There is no evidence of that.  They don't

13  have one -- just like with Kenneth Harrelson and other

14  defendants on January 6, where they had evidence, hey, they are

15  communicating, we have text messages, we have conspiracy,

16  before January 6 and after with different political

17  organizations, the Oath Keepers.  There is none of that.

18          The government says, and Your Honor quickly pointed

19  this out, we're going to try to put him back in the same

20  situation as before.  No, we're not.  That's not what's going

21  on.  We're dealing with a diagnosis of adult autistic kid,

22  young man.  30 years old is young for me.

23          THE COURT:  Noted.

24          MR. WILLIAMS:  Young man with obsessive compulsive

25  behavior.  So when you say just randomly unsupported, he keeps

 1    deleting cell phone messages, that means nothing without

 2    context.  That has nothing to do with -- it would be different,

 3    just as with Mr. Harrelson and people who got pardoned in this

 4    case, it would be different if you said, hey, look, we're

 5    seeing cell phone messages conspiring to do criminal activity,

 6    and, then in the middle of them, we're seeing you're deleting

 7    things, so we have a reason to believe that you're deleting

 8    things and leaving some things because those things that you're

 9    deleting have even more dangerous characteristics to them that

10    can implicate you in more dangerous activity.  Not the case

11    with Brian Cole.

12            So when we look at the nature and circumstances, at

13    the end of the day, and we can do this as a proffer if Your

14    Honor would like to, but at the end of the day, when you look

15    at the actual activity, no property damage -- and I'm not

16    downplaying, Your Honor.  Just bear with me on this -- no

17    property damage, no actual harm, did not facilitate harm to

18    another person.

19            So what happens is is that --

20            THE COURT:  Granted, but let me borrow a line from a

21    case you cite a lot in your brief, which is the *Klein* case

22    you're talking about.  To borrow a line from Judge Moss, "To

23    me, that's more a product of fortune than fate."

24            MR. WILLIAMS:  It is, but it's still a fact --

25            THE COURT:  Because the intention, at least according

1    to the charges, was that those devices would explode.  They

2    didn't detonate.  Thankfully, but for the grace of God, no one

3    was hurt, no one was killed, but I don't doubt for a second

4    that if they had exploded, that's a real risk here.

5         MR. WILLIAMS:  Oh, yeah.  We would like to eventually,

6    Your Honor, proffer the fact that we have an expert in all of

7    this that says those devices could not explode, they absolutely

8    could not explode.  They left out the black powder in their

9    criminal charge for a reason.

10        The testing of the device has never said -- sure,

11   there is material aspects and parts of the device that match up

12   with an explosive device, you can make that argument, but our

13   expert will tell you, based on the information that's current

14   today, absolutely not viable devices that would have exploded.

15        But getting back to the factors test, the government

16   says, well, he hid this from his parents and family and we're

17   trying to send him back to that situation.  Not true, Your

18   Honor.  The issue is if you are afraid that he's going to

19   purchase -- and he hasn't done it in three years, two and a

20   half years, as Your Honor noted -- if you're afraid he's going

21   to purchase more materials, if you're afraid that he's going to

22   go outside and set down what they allege is a bomb, explosive

23   device, then how is home detention, ankle monitor, unannounced

24   visitation, actual reporting, affirmative reporting, basically

25   Fourth Amendment waiver, not going to give this Court

1    reasonable assurance of a person who has all those other

2    factors in his favor that he will appear in court and he poses

3    no danger.

4         That's the question the government won't answer.

5    That's what they left out of their brief.  The issue is,

6    according to *Munchel*, because of the default favoritism towards

7    liberty, is there a set of conditions strict enough that would

8    manage what you claim he might go out and do.

9         Now, granted, Your Honor, the last purchase is 2022,

10   so we have two and a half to three years.  They were watching

11   him for weeks prior to his arrest.  Okay.  They didn't come in

12   with helicopters.  They didn't come in with every known law

13   enforcement agency in the county thinking, hey, we got the pipe

14   bomber, such as they did with the Unabomber and everybody else.

15        They didn't come in, like, this is a very dangerous

16   person, so now that we found him, now that we have a warrant,

17   get the helicopters, get everybody we know, because we don't

18   know what he's going to do.  No, in fact, quite the opposite.

19        The government knows full well and has never said

20   contrary that he did not obstruct his arrest.  No one

21   obstructed his arrest.  No one obstructed the search of the

22   home, the taking of every known computer, laptop, cell phone,

23   everything.

24        And even when taking all of that information, we don't

25   have one text message showing a conspiracy, not one.

1          THE COURT:  Mr. Williams, I take your point, right.

2    The last purchase of these materials that the government has

3    put in front of me was in August of 2022.  But the government

4    proffers that at the time of the arrest, earlier this month,

5    they recovered a variety of these materials still in the

6    defendant's possession or constructive possession, at least

7    based on the proffer.

8          A number of these things were recovered from his home

9    and a number of these things were recovered from his vehicle.

10   So even if he's not purchasing them, why shouldn't the Court be

11   concerned about the fact that he still has these things in his

12   possession, not only in his possession, but in his car, that I

13   guess he's driving around on a regular basis?

14         MR. WILLIAMS:  One issue is the concern, and I

15   understand that concern.  Another issue is, is there any

16   evidence that he even tried to construct any more devices?

17   There is no -- see, this is the issue.  No purchases since

18   2022, no evidence that he ever went out and planted anything

19   anywhere, no evidence that he ever even tried to use these

20   parts that I can't really get into what I believe they are, but

21   we'll do that later on in the case, because guilt is not at

22   issue here, no evidence that he even tried to construct

23   anything.

24         They are watching him for weeks.  He doesn't do

25   anything.  He has the same routine.  The government said in

1    their brief, Your Honor, that he spent five years trying to

2    avoid detection.  Nothing could be further from the truth.

3          Brian Cole gets up as an autistic male with obsessive

4    compulsive -- and we can put on a proffer with the investigator

5    and his neighbors and businesses that have dealt with him if

6    Your Honor believes that's necessary.  He does the same routine

7    every day.  He walks his dog.  He goes and gets pizza.  He

8    comes home.  He works.  They know that, because they were

9    watching him.  They understand fully that that's truthful.

10         But they wrote in their brief, and this is -- we're

11   all arguing, just like Your Honor said, hey, Mr. Williams, I

12   read your brief, I thought the same thing, it's late night,

13   we're doing stuff, but they are arguing he tried to avoid

14   detection.  He was in plain sight the entire time not trying to

15   do anything to avoid detection.

16         Let's talk about this whole issue with the monestrate

17   (ph) -- I don't know the technical name, but they claim that he

18   was trying to make another bomb-type of explosive.  In that

19   same interview, they asked him, were you trying to, with this

20   liquid formula, were you trying to do another bomb.  He said

21   no, that's just an experiment that I was doing.

22         But here is the ultimate question:  They say, okay,

23   well, he -- the Court says I'm concerned that he had these

24   things.  They are all gone now.  They are all gone.  They took

25   them all.  You know what they actually left in the house?

1    Firearms.  The so-called guy that's so dangerous, they left

2    firearms in the home registered in his name.  He's not

3    dangerous and they know it.  He's not the guy.

4         Your Honor, trying to make sure that I'm up to speed

5    on all of this for Your Honor, this Kenneth Harrelson, I looked

6    up every single docket of those people that got those parts,

7    stock-arming ammunition, all of this kind of stuff.  That's not

8    him.

9         The unfortunate reality in this case, and I have been

10   waiting for this moment, is that he's not the person that the

11   initial press -- I understand it.  I understand why that got

12   out there in the press, but he's not that guy.  He wasn't

13   conspiring with anybody.  He wasn't stockpiling anything.  He's

14   not that person.

15        Whether he's adjudged guilty at a trial is a whole

16   separate matter, but for the purposes of this hearing, he

17   should be released with those stringent set of conditions.

18   They took all the issues.  Your Honor knows you can put an

19   order in saying, hey, look, we're going to do random --

20   unannounced visitations.  I see one material related to

21   anything that's associated with an explosive device, you're

22   back, you're back where you started from after you got

23   arrested.

24        There is absolutely a set of strict conditions that

25   can be met under these facts, because they are unusual.  When I

1  was looking at the issues with everybody else, I said, man,

2  everyone had a history of political activity that was outside,

3  some type of violence, firearms.  Even after, even after the

4  January 6, you still had ongoing activity that would make you

5  think this person might be a problem.

6      Three years, no purchases.  All the information, all

7  the devices taken away.  I don't know -- Your Honor, I can put

8  up -- as you know, Your Honor has read all of these cases.  One

9  of the issues is the vetted pretrial services custodian.

10     So one of the issues, I believe it was *Klein* that

11  said, hey, look, you got to get your custodian vetted through

12  pretrial services.  We have Brian Cole's grandmother here.  I

13  contacted pretrial services this morning.  I left a message.

14  Everybody is busy, you know.

15     And so we're in the process of vetting her to make

16  sure she's approved by pretrial services.  But once that

17  happens, the idea -- and if Your Honor wants to hear from her

18  about her living conditions -- she has cameras everywhere.  Now

19  that they understand -- because one issue is they make it seem

20  like Brian Cole was running around his home and hiding

21  everything from his parents.

22     No, they have an autistic child who has obsessive

23  compulsive behavior that they gave space and privacy to.  And

24  then because things were in his room and in his trunk, and they

25  are -- and he goes on the same pattern every day, they say,

1    okay, but that's not the case anymore.  Now, that this

2    allegation has come out, we have video cameras everywhere,

3    inspections being done by the grandmother, because the last

4    thing a grandmother, a mother or a parent wants to do is see

5    their child violate bail release and go right back to jail

6    where he doesn't belong, because he physically and emotionally

7    -- really, to be honest with you, I have been doing prison

8    cases forever -- could not even begin to be able to survive in

9    prison, begin to be able to survive in the DC jail.

10    So the family is absolutely committed to ensuring that

11    this doesn't happen anymore.  And you can trust in that,

12    because he comes from a very loving family, a very committed

13    family.  The family-owned business is the engine for the

14    family.  He gets up and he works every day.

15    So what I would like to do, Your Honor, if you want to

16    hear -- I know it's our case.  We run it like we want, but I

17    want to make sure Your Honor feels comfortable.  If you want to

18    hear from the grandmother, Ms. Loretta.  If you want to hear

19    from who is going to supervise him on his job, which is his

20    sister, who he has been reporting to for five years working,

21    and still have been doing that up until the day of arrest,

22    doesn't miss a day, doesn't miss a beat, does very good work in

23    the bail bonds industry.

24    I have represented in that industry before, and I know

25    his father personally.  And I know they have great, great,

1    moral character.  It's one of the reasons why we don't have a

2    situation where you have a litany of previous criminal

3    activity.

4         THE COURT:  Mr. Williams, let me just make sure I

5    understand what your proposal is.  So you're asking the Court

6    to release him on conditions that would include home detention

7    at a residence, I think, in Gainesville, Virginia; is that

8    right?

9         MR. WILLIAMS:  Yes, Your Honor, through pretrial

10   vetting.

11        THE COURT:  I'm sorry.  What was that?

12        MR. WILLIAMS:  Through the pretrial services.

13        THE COURT:  Who lives there?

14        MR. WILLIAMS:  Ms. Loretta, the grandmother.

15        THE COURT:  Good afternoon.

16        MR. WILLIAMS:  And her husband.

17        THE COURT:  All right.  And that's Mr. Cole's

18   grandmother?

19        MR. WILLIAMS:  Yes, Your Honor.

20        THE COURT:  Where was Mr. Cole living prior to his

21   arrest?

22        MR. WILLIAMS:  He was living at his mother's home.

23        THE COURT:  Thank you.  You all don't need to stand.

24   I appreciate you.  I see you.  Thank you for being here.

25             And what about on January 5th of 2021, and the weeks

 1  preceding that, where was he living?

 2          MR. WILLIAMS:  Mother.

 3          THE COURT:  With his mother.  All right.  So he hasn't

 4  lived with his grandmother before, or at least in the last few

 5  years?

 6          MR. WILLIAMS:  Not permanently.  He has visited, you

 7  know, stayed over there weekends, stuff like that.  They have a

 8  very close relationship.

 9          THE COURT:  All right.  Well, look, I'll hear from --

10  my practice, all right, you haven't been in front of me before.

11  If you're proposing release to a third-party custodian, my

12  practice is that I want to hear from that person.  And I'll

13  give you an opportunity to ask questions that you think are

14  important.  I'll give the government an opportunity to ask

15  questions.  And I may have some questions.

16          But it's important to me, given the importance of this

17  issue and the attention that I pay to upholding the safety of

18  the community and the importance that I place on that, it's

19  important to me to hear from that individual.

20          MR. WILLIAMS:  Yes, Your Honor.  Right now I would

21  like to call Ms. Loretta Cole-Donnette.

22          THE COURT:  Good afternoon, ma'am.  You can step on up

23  here to the witness stand.  And before you sit down, Ms. Butler

24  will swear you in.  So just right up here.  Thank you.

25      (Oath administered to the witness)

1          THE COURT:  Good afternoon.

2          Mr. Williams?

3          LORETTA COLE-DONNETTE, DEFENSE WITNESS, SWORN

4                    DIRECT EXAMINATION

5    BY MR. WILLIAMS:

6    Q   Can you state your name once again and introduce yourself

7    to Your Honor.

8    A   I'm Loretta Cole-Donnette.

9          THE COURT:  Good afternoon, Ms. Donnette.

10   BY MR. WILLIAMS:

11   Q   Where do you currently live?

12         THE COURT:  Just for privacy purposes, since we're in

13   an open court setting, you can just limit that to the city and

14   state rather than your street address.

15         THE WITNESS:  I live in Gainesville, Virginia, in a

16   gated community.

17   BY MR. WILLIAMS:

18   Q   Okay.  And then do you know Brian Cole, Jr.?

19   A   Yes.

20   Q   How do you know him?

21   A   He's my grandson.

22   Q   Okay.  And how long have you had personal interaction with

23   Brian Cole, Jr.?

24   A   Throughout his whole life.

25         THE COURT:  Could you do me a favor, I'm sorry, just

```
 1   pull the -- the mic pulls closer to you.  You almost have to
 2   kind of get right up in it, but that way the recording picks
 3   you up.
 4   BY MR. WILLIAMS:
 5   Q   Did you say throughout his whole life?
 6   A   Throughout his whole life, yeah.
 7   Q   Can you explain some of the functions and some of the
 8   things you have done with Brian Cole, Jr. over the years to
 9   Your Honor?
10   A   I mean, we have our family reunions.  I visit.  They come
11   and visit me from time to time.  But we work together every
12   day.
13   Q   Okay.
14   A   Except Saturday and Sunday.
15   Q   The current home that you live in, how long have you lived
16   there?
17   A   Well, I live in a community.  I have lived there a year,
18   but I still live in the same community for over ten years.
19   Q   Ten years.  Okay.
20       So you were living there September 6th -- I mean,
21   January 6, 2021?
22   A   Yes.
23   Q   Now, explain to Your Honor security at your home.
24   A   Well, we do have cameras everywhere, everywhere at the
25   house.  It's a quiet community, very quiet.  And it's a gated
```

1    community, so we do have guards at the gate.  Any time you go

2    and come, you have to be announced, so I mean he would be

3    secured.

4            THE COURT:  You said you have cameras.  I'm sorry,

5    Mr. Williams.  You said you have cameras everywhere.  Can you

6    be a little more specific about what the cameras look like.

7            THE WITNESS:  I have cameras watching the front up and

8    down the street, on the side of the house, and the rear.  Most

9    of the people in the neighborhood come to us when they want to

10   know what happened in the neighborhood if something happens.

11           THE COURT:  Okay.  All right.  So you kind of have

12   cameras you would say covering all the exteriors of the home?

13           THE WITNESS:  And they record up to two weeks.

14           THE COURT:  Okay.

15   BY MR. WILLIAMS:

16   Q   Do you have any cameras inside any of the rooms in the

17   home?  I'm not necessarily talking about bedrooms.  Living

18   room, anything?

19   A   No.

20           THE COURT:  Do you have an alarm system in the home?

21           THE WITNESS:  I do.

22           THE COURT:  Okay.  Is that connected to some

23   application on your phone?  Do you have a smart phone that

24   connects to your alarm system?

25           THE WITNESS:  It's connected to my husband's phone.

1          THE COURT:  Okay.  And then you mentioned that it's a

2     gated community and so folks sort of have to be let in or let

3     out.  Is that true?

4          THE WITNESS:  It's an actual guard 24 hours.

5          THE COURT:  Okay.  And so obviously if someone tries

6     to come in, you have got to live there or be a guest of

7     somebody?

8          THE WITNESS:  They already know they have to give me a

9     call and let me know.  If I don't know the person, they call

10    and ask if they can come.

11         THE COURT:  Is the same true when you leave?  Do you

12    need someone to open the gate for you every time you leave or

13    can you just kind of leave on your own?

14         THE WITNESS:  No, you can leave on your own.

15         THE COURT:  Yeah.  Okay.

16         THE WITNESS:  But it's coming in.

17         THE COURT:  Got it.

18    BY MR. WILLIAMS:

19    Q    Now, you're familiar with the allegations that have been

20    made against your grandson?

21    A    Yes.

22    Q    And you're familiar with the fact that the government

23    seized these materials inside, not your home, but the home of

24    his mother, correct?  You're familiar with that.  And the car,

25    correct?

1   A   Yes.

2   Q   Okay.  Explain to Your Honor, just you individually, what

3   types of steps you would take individually to verify and ensure

4   that that wouldn't happen in your home?

5   A   Well, I think that I would keep better communication with

6   him, and I would definitely check and see what he's doing.  I'd

7   keep up with him.  He would be with me.  I don't want him alone

8   by himself all the time, so I want him to be around me and my

9   husband.

10  Q   Now, if he is allowed to work, and let's just assume that

11  Your Honor would say, hey, I want him on home detention, he

12  can't go even to his job, is there a room or a place in your

13  home where he can actually work?

14  A   Yes.

15  Q   Where is that?

16  A   I have two offices in the house.

17  Q   Okay.  So he could perform his duties on work from home?

18  A   From one of the offices.

19  Q   Okay.

20          MR. WILLIAMS:  That's all I have for right now.

21          THE COURT:  Do you have any firearms in your home,

22  ma'am?

23          THE WITNESS:  I think my husband may have one.  I

24  don't, but I think he does.  He's an ex-federal officer, so he

25  has always had one.

```
 1              THE COURT:  Your husband is an ex-federal law
 2   enforcement officer?
 3              THE WITNESS:  He worked with GSA when it was GSA.
 4              THE COURT:  In the event that the Court were to
 5   release Mr. Cole to your home, and, again, I haven't made a
 6   decision on that, but would you have any issue removing the
 7   firearm from your home while he's with you?
 8              THE WITNESS:  No, I don't have no issue with that.
 9              THE COURT:  So your grandson's lawyer is proposing
10   that you be what we call a third-party custodian for Mr. Cole.
11              Do you understand what that means?
12              Let me ask it this way:  What is your understanding of
13   what it means to be a third-party custodian?
14              THE WITNESS:  In other words, to be -- care for him.
15   To keep an eye on him to make sure that he makes his court
16   dates, you know, that he don't go to Lowe's or wherever to
17   purchase or whatever, I don't know.  Just keep him around me so
18   that him and I can communicate better.
19              THE COURT:  You know, I sometimes describe it to
20   people as becoming the eyes and the ears of the Court.  Do you
21   understand that?
22              THE WITNESS:  Yes.
23              THE COURT:  And that would mean that your loyalty
24   would lie with the Court.
25              THE WITNESS:  With the Court.
```

```
 1              THE COURT:  Not your grandson.

 2              THE WITNESS:  Yes.

 3              THE COURT:  And so if --

 4              THE WITNESS:  I don't want him to do anything wrong,

 5    so if I thought he was doing something wrong, I would

 6    definitely let the officials know.  I don't want that in my

 7    house, no.

 8              THE COURT:  Well, that was going to be my next

 9    question, because one of the most important obligations is that

10    if you discover that he has violated any condition of release

11    that the Court imposes, you would have an obligation to report

12    that.  You understand that?

13              THE WITNESS:  Yes.

14              THE COURT:  You think that you could do that?

15              THE WITNESS:  Yes.

16              THE COURT:  Even though that would mean he would

17    likely go back to jail?

18              THE WITNESS:  Yes, I do understand.

19              THE COURT:  I have asked a lot of people this

20    question, but I always ask it, because I never know what the

21    answer is going to be.  I don't think I could do that for my

22    own child, so explain --

23              THE WITNESS:  Well, it depends on --

24              THE COURT:  I just want you to tell me why you think

25    deep down you think you could pick up the phone and make a
```

 1    phone call like that knowing it would send your grandson to

 2    jail.

 3            THE WITNESS:  It's a very high profile case and I know

 4    he have to make it.  We want to make it through this whole case

 5    as easy as we can for him, because he doesn't belong in jail.

 6    He doesn't.  But if he's not doing something right, I have to

 7    let the Court know.  That's just me.  I think with our job, we

 8    kind of understand the court system pretty well.

 9            THE COURT:  And tell me just a little bit about what

10    you do for work.

11            THE WITNESS:  We are a bail bond agency, as well as we

12    have a surety company that insures bondsmen across the country.

13    And we deal with a lot of attorneys, the court system on a

14    regular basis when it comes to forfeitures and stuff, yeah.

15    And I do believe -- we don't believe in forfeitures when you

16    miss your court date.

17            THE COURT:  Mr. Williams, any follow-up questions in

18    light of the Court's questions?

19            MR. WILLIAMS:  No.  You answered.  Thank you, Your

20    Honor.

21            THE COURT:  All right.  I'll give you a chance if you

22    like after the government asks some questions.

23            Mr. Jones, Ms. Ballantine, any questions for this

24    witness, focused on the issue of her suitability as a

25    third-party custodian.

```
 1              MR. JONES:  Thank you, Your Honor.
 2                        CROSS EXAMINATION
 3   BY MR. JONES:
 4   Q    Good afternoon, ma'am.
 5   A    Hi.
 6   Q    You mentioned that you -- your business is a bail bonds
 7   business, correct?
 8   A    Yes.
 9   Q    And that your grandson, Mr. Cole, that he worked there
10   before his arrest?
11   A    Yes.
12   Q    And that he worked there back in January of 2021; is that
13   correct?
14   A    He's been working there for over 12 or 13 years.
15   Q    And he works generally from about 10:00 in the morning
16   until about 2:00 in the afternoon, right?
17   A    About 2:30, 3:00.
18   Q    Okay.  And after that point, he leaves the bail bonds
19   business?
20   A    Yes.
21   Q    You work full days; is that correct?
22   A    Sometimes.
23   Q    Sometimes?
24   A    Not always.
25   Q    Sorry.  You may have said this, but what is your role in
```

1  the business?

2  A    I run the office.

3  Q    Okay.  So you have responsibility for the office for the

4  entire workday?

5  A    Right.

6  Q    So there are occasions where you have to stay late at the

7  office?

8  A    Sometimes, yes.

9  Q    You told us a little bit about the community where you

10  live.  Do you recall that testimony?

11  A    Yes.

12  Q    Okay.  You mentioned that you live -- you described it as a

13  quiet community, right?

14  A    Yes.

15  Q    And that your home has exterior cameras?

16  A    Correct.

17  A    Yes.

18  Q    But no interior cameras?

19  A    No interior.

20  Q    Where Mr. Cole was living back in January of 2021 with his

21  mother, that was also a quiet community, correct?

22  A    From what I understand.

23  Q    Have you spent time at that home?

24  A    No.  I don't live there, but I visit.  But it seems a

25  fairly good neighborhood.

```
 1   Q    Would you visit Mr. Cole at that home?

 2   A    Yes.

 3   Q    Would you ever go into his bedroom?

 4   A    Did I ever go into his bedroom?

 5   Q    Yeah.

 6   A    Not really, no.  I don't just go into his bedroom.

 7   Q    Or his closets?

 8   A    No.

 9   Q    The home of Mr. Cole's mother, that also had exterior

10   cameras, right?

11   A    I don't know.  I think they have a Ring camera, if I'm not

12   mistaken.

13   Q    Are you aware of your grandson, Mr. Cole's activity on

14   YouTube?

15   A    No.

16   Q    Are you aware of his activity on Reddit?

17   A    Red?

18   Q    Reddit, R-e-d-d-i-t?

19   A    No.

20   Q    Are you aware of his activity on Discord?

21   A    I don't know any of those.

22   Q    Okay.  So fair to say you're not aware of any of his

23   activity online?

24   A    Not online, no.

25   Q    Or with video games?
```

1    A    No.

2    Q    Have you ever looked at his phone?

3    A    No.

4    Q    And I think you sort of mentioned this earlier, but you

5    have never looked sort of in his private areas, his bedroom,

6    his closet, his bathroom?

7    A    No, we have never had a reason to, but now, there is a big

8    reason to.

9    Q    So you didn't know about any of these issues?

10    A    No.

11    Q    And you have never looked in his car, in the seats of his

12    car or his trunk?

13    A    No, we didn't have any reason to.  He's old enough.

14    Q    You didn't have any knowledge of his purchasing of any of

15    these components?

16    A    No, not at all.

17    Q    Or any knowledge of his researching these issues online?

18    A    No.

19    Q    Or constructing these devices?

20    A    I have no knowledge.

21    Q    Okay.  Or fair to say or of him planting them?

22    A    No.

23    Q    Or of him getting rid of things afterwards?

24         THE COURT:  I think you have made the point,

25    Mr. Jones.  Again, we're focused on her suitability as a

1    third-party custodian, not the underlying facts or arguments in

2    the case.

3              MR. JONES:  Sure.

4    BY MR. JONES:

5    Q   My last question is:  Is it correct that the defendant,

6    Mr. Cole, never told you about any of those things?

7    A   No, he never told me.

8    Q   Okay.

9              MR. JONES:  That's all.  Thank you.

10             THE COURT:  Thank you.  Mr. Williams, any follow-up

11   questions?

12             MR. WILLIAMS:  No, Your Honor.

13             THE COURT:  So for purposes of your work with your

14   company, you're out of the home during the workweek generally?

15             THE WITNESS:  I'm usually out.  I go in early and come

16   home early sometimes.  I can make any adjustments I need to

17   make because I do run the place and I have employees there.

18             THE COURT:  Who else lives in the home with you?

19             THE WITNESS:  Just my husband.

20             THE COURT:  Just your husband.  Does he work?

21             THE WITNESS:  No.  He's elderly, he doesn't work.

22             THE COURT:  He's retired?

23             THE WITNESS:  Very retired.

24             THE COURT:  Is he home during the day for the most

25   part?

1          THE WITNESS:  All day, never goes anywhere.

2          THE COURT:  All right.

3          THE WITNESS:  And he is aware.  We talked about it.

4          THE COURT:  All right.  Okay.  I don't have anything

5    further.

6          Anything further from the government?

7          MR. JONES:  Nothing.

8          THE COURT:  Thank you very much, ma'am.  You can go

9    ahead and step down.

10       (Witness excused)

11         MR. WILLIAMS:  Just respectfully, I'm new to your

12   courtroom and stuff, did you want to hear the proffer from the

13   expert on the viability of the --

14         THE COURT:  I don't know that I need to hear that

15   today for purposes of the decision that I have to make, you

16   know.  I mean, this is not -- this is a preliminary proceeding

17   to determine a threshold issue of whether Mr. Cole is detained

18   pending a disposition in the case.  This is not a hearing to

19   determine guilt or innocence.

20         All right.  Any other presentation that you want to

21   make with respect to the issues surrounding pretrial detention

22   or release?

23         MR. WILLIAMS:  No, Your Honor.

24         THE COURT:  Thank you.  Mr. Jones or Ms. Ballantine,

25   any final thoughts?

1          MR. JONES:  Briefly, Your Honor, just to respond to a

2     few points that Mr. Williams made during his presentation.

3          I believe he told Your Honor that there is no evidence

4     in this case of the defendant, Mr. Cole, getting riled up, and

5     he made comparisons to other cases where such evidence exists.

6          In this case, we have the defendant's own words about

7     exactly how he got riled up, which was following these matters

8     on YouTube and on Reddit.  That was -- those were his words

9     during his custodial interview.

10          With respect to -- I know Your Honor understandably

11     doesn't want to litigate the issue of the viability of the

12     devices.  I will just say that the government is relying in its

13     proffer on information provided by an explosives examiner who

14     personally examined the devices.

15          Mr. Williams also made the point, and this is made

16     more directly in the papers, that the government is simply

17     reciting the evidence of the defendant's guilt of the charged

18     offenses, and goes so far as to say, at least in the brief,

19     that the Court shouldn't consider evidence of the defendant's

20     guilt.

21          I think the Court knows that that is in fact one of

22     the factors that the Court has to consider, and, of course, in

23     this case, evidence of guilt and evidence of dangerousness are

24     coextensive given the nature of the charged conduct.

25          MR. WILLIAMS:  I'm going to object, Your Honor,

1   because actually as a legal matter that's not true.  The weight

2   of the evidence goes to the dangerousness of the defendant, not

3   his guilt.

4        THE COURT:  I will afford appropriate weight to the

5   factors that I have to consider under the Bail Reform Act.  All

6   right.

7        You have made a point in some questioning about

8   YouTube activity, Reddit activity, online activity.  Does the

9   government have any proffer that Mr. Cole himself was posting

10  anything incendiary or threatening or troubling along those

11  lines?

12       MR. JONES:  No.  He largely appeared to have been a

13  consumer of information.

14       THE COURT:  Okay.  I understand.

15       All right.  Anything further?

16       MR. JONES:  No, thank you.

17       THE COURT:  I'm going to take a brief recess, and I'll

18  be back.

19       DEPUTY CLERK:  All rise.  Court stands in recess.

20    (Recessed from 2:29 p.m. to 2:54 p.m.)

21       DEPUTY CLERK:  All rise.  This Honorable Court is now

22  reconvened.  Please be seated and come to order.

23       THE COURT:  All right.  We're back on the record.

24  Thank you for your patience.  I have -- I'm going to take this

25  matter under advisement.  This is an important issue, to say

1  the least.  It's an important issue to Mr. Cole.  It's an

2  important issue to me.  And there are important arguments that

3  I think both sides have presented today that I want to make

4  sure that I give appropriate consideration to.

5       So I'm sensitive to the urgency of this issue, and I

6  do intend to get a ruling out expeditiously, but, on

7  reflection, I think I need to review the parties' briefs and a

8  few other issues before I can reach a determinative ruling on

9  this, so that's what I'm going to do.

10       In the meantime, Mr. Williams, to the extent that you

11  have not had Mr. Cole's grandmother vetted by pretrial for

12  purposes of whether she's an approved third-party custodian,

13  please do so.  They can update me once they have a

14  determination to that effect, but that I think is something

15  that makes sense to get accomplished in the meantime.

16       So that's where we are.  I'm going to get a decision

17  out to you as expeditiously as I can, hopefully within the next

18  day or so, in writing on this issue.

19       Is there anything further that we need to address this

20  afternoon?

21       MR. JONES:  Not for the government.

22       THE COURT:  Thank you.

23       MR. WILLIAMS:  No, Your Honor.

24       THE COURT:  Mr. Little, if you need to say it, please

25  approach the microphone.  Wait until you get to the microphone

1   so that we get you for the record.

2          MR. LITTLE:  As to the sealed pleadings, will the

3   Court take care of getting those filed?  I think the only place

4   they have been sent is to your clerk.  We're happy to file

5   those separately on the docket if you would rather us do it

6   that way.

7          THE COURT:  So for the grand jury return issue, what

8   I'm going to do, I'll issue an order shortly that summarizes

9   the state of play there.  I'm going to ask both sides to file

10  their briefs on the docket on that issue.  They don't need to

11  be sealed, unless there is some information in them that you

12  think needs to be redacted.  I know the government intends to

13  make some redactions to its submission, so to the extent that

14  either side redacts anything in those submissions, please file

15  a motion to seal with the brief that explains why.

16         MR. LITTLE:  Our only second part on that issue is we

17  would waive any opportunity to respond to the supplemental

18  brief the government wishes to raise about this other case.  We

19  don't think it affects the Court's determination, and so we'd

20  ask that the Court not wait for that supplemental briefing, but

21  if it does, it certainly doesn't need to wait for us again.

22         THE COURT:  All right.  Understood.

23         MR. LITTLE:  Thank you.

24         THE COURT:  All right.  Thank you.  Unless there is

25  anything further, we can stand adjourned.  Thank you.

1      (Proceedings concluded at 2:57 p.m.)

2

3                          CERTIFICATE

4      I, Sonja L. Reeves, Federal Official Court Reporter in and
   for the United States District Court of the District of
5  Columbia, do hereby certify that the foregoing transcript is a
   true and accurate transcript from the digital record in the
6  above-entitled matter and that the transcript page format is in
   conformance with the regulations of the Judicial Conference of
7  the United States.

8      Dated this 9th day of January, 2026.

9

10                              /s/ Sonja L. Reeves
                               SONJA L. REEVES, RDR-CRR
11                             FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## /

**/s** [1] - 59:10

## 1

**1** [1] - 28:16
**10:00** [1] - 49:15
**11-1916(a** [1] - 3:18
**12** [1] - 49:14
**13** [1] - 49:14
**14** [1] - 29:7
**16.1** [1] - 12:7
**18** [1] - 6:17
**1985** [1] - 27:22
**1990** [1] - 27:21
**1:15** [2] - 1:10, 2:1
**1:25-mj-00276-MAU** [1] - 1:5

## 2

**2** [1] - 18:25
**20001** [1] - 1:24
**20036** [1] - 1:18
**2017** [2] - 18:24, 18:25
**2020** [4] - 14:3, 14:18, 15:9, 23:10
**2021** [12] - 13:25, 14:21, 14:24, 19:21, 20:11, 20:14, 23:9, 26:6, 39:25, 42:21, 49:12, 50:20
**2022** [6] - 15:1, 21:11, 22:1, 33:9, 34:3, 34:18
**2025** [3] - 1:10, 4:8, 15:7
**2026** [1] - 59:8
**20530** [1] - 1:14
**21** [1] - 29:6
**22** [1] - 10:15
**2332(b)(g)(5)** [1] - 14:6
**24** [1] - 44:4
**25-276** [1] - 2:3
**25-mj-225** [1] - 3:25
**2:00** [1] - 49:16
**2:29** [1] - 56:20
**2:30** [1] - 49:17
**2:54** [1] - 56:20
**2:57** [2] - 1:10, 59:1
**2nd** [1] - 1:17

## 3

**3** [1] - 18:24
**30** [3] - 1:10, 18:4, 30:22

**30326** [1] - 1:18
**3060** [1] - 6:17
**3060(b** [1] - 9:11
**3060(c** [1] - 9:11
**3142(g** [1] - 29:14
**333** [1] - 1:24
**3480** [1] - 1:17
**3:00** [1] - 49:17

## 4

**40-year-old** [1] - 27:22
**4326390** [1] - 18:24
**4th** [1] - 15:7

## 5

**5** [1] - 20:11
**5.1** [3] - 6:16, 8:10, 9:12
**5th** [6] - 13:25, 14:24, 19:21, 23:8, 26:5, 39:25

## 6

**6** [6] - 20:1, 20:2, 30:14, 30:16, 37:4, 42:21
**60** [2] - 24:16, 24:17
**601** [1] - 1:13
**6th** [1] - 42:20

## 8

**844(d** [1] - 3:8
**844(i** [1] - 14:5
**844(i)** [2] - 3:9, 17:21

## 9

**943rd** [1] - 15:8
**9th** [2] - 4:8, 59:8

## A

**abide** [2] - 16:16, 16:17
**abided** [1] - 26:3
**ability** [1] - 4:15
**able** [2] - 38:8, 38:9
**above-entitled** [1] - 59:6
**absolutely** [6] - 9:15, 30:10, 32:7, 32:14, 36:24, 38:10
**accept** [5] - 3:10, 4:15, 7:2, 7:6, 8:2
**accepted** [3] - 4:23,

7:15, 7:17
**accepting** [1] - 4:20
**accompanied** [1] - 5:7
**accomplished** [1] - 57:15
**according** [2] - 31:25, 33:6
**accurate** [1] - 59:5
**acknowledged** [1] - 12:2
**acknowledges** [1] - 22:6
**Act** [5] - 17:9, 18:12, 19:10, 22:4, 56:5
**act** [2] - 14:2, 15:11
**activities** [1] - 16:23
**activity** [14] - 30:6, 31:5, 31:10, 31:15, 37:2, 37:4, 39:3, 51:13, 51:16, 51:20, 51:23, 56:8
**acts** [1] - 15:13
**actual** [5] - 30:6, 31:15, 31:17, 32:24, 44:4
**add** [1] - 5:17
**addition** [1] - 27:24
**additional** [3] - 6:13, 13:11, 21:7
**address** [8] - 3:1, 9:5, 10:17, 11:4, 22:12, 28:25, 41:14, 57:19
**addressed** [1] - 22:14
**adjacent** [1] - 20:2
**adjourned** [1] - 58:25
**adjudged** [1] - 36:15
**adjustments** [1] - 53:16
**administered** [1] - 40:25
**admitted** [1] - 20:18
**adult** [1] - 30:21
**advance** [1] - 20:14
**advisement** [1] - 56:25
**affects** [1] - 58:19
**affidavit** [1] - 11:2
**afford** [1] - 56:4
**afraid** [3] - 32:18, 32:20, 32:21
**afternoon** [16] - 2:2, 2:7, 2:11, 2:14, 2:18, 2:19, 2:20, 2:22, 13:2, 39:15, 40:22, 41:1, 41:9, 49:4, 49:16, 57:20

**afterwards** [1] - 52:23
**agency** [2] - 33:13, 48:11
**Agency** [1] - 2:21
**agent** [2] - 15:5, 20:22
**agents** [2] - 20:17, 20:19
**ago** [1] - 21:11
**agree** [2] - 21:4, 25:20
**ahead** [1] - 54:9
**alarm** [2] - 43:20, 43:24
**Alex** [1] - 2:16
**ALEX** [1] - 1:16
**allegation** [1] - 38:2
**allegations** [4] - 29:20, 29:22, 30:7, 44:19
**allege** [1] - 32:22
**alleged** [2] - 29:9, 29:11
**allow** [2] - 6:18, 27:15
**allowed** [3] - 4:3, 9:24, 45:10
**allows** [1] - 3:21
**almost** [2] - 29:15, 42:1
**alone** [1] - 45:7
**alongside** [1] - 25:13
**Amendment** [1] - 32:25
**America** [1] - 2:3
**AMERICA** [1] - 1:3
**ammunition** [1] - 36:7
**analysis** [1] - 23:13
**analyzing** [1] - 16:12
**ankle** [2] - 15:25, 32:23
**announced** [1] - 43:2
**answer** [3] - 26:2, 33:4, 47:21
**answered** [1] - 48:19
**apparent** [1] - 17:1
**appealed** [1] - 4:5
**Appeals** [2] - 4:10, 8:17
**appear** [1] - 33:2
**appearance** [2] - 8:25, 12:1
**appearances** [1] - 2:12
**appeared** [1] - 56:12
**applicable** [1] - 19:4
**application** [1] - 43:23

**applies** [2] - 18:22, 25:5
**apply** [2] - 28:11, 30:10
**appointment** [1] - 25:22
**appreciate** [4] - 11:19, 27:2, 28:14, 39:24
**approach** [6] - 2:9, 3:21, 4:3, 5:18, 25:2, 57:25
**approaching** [1] - 20:3
**appropriate** [6] - 5:6, 5:7, 5:15, 16:3, 56:4, 57:4
**appropriately** [1] - 5:14
**approved** [2] - 37:16, 57:12
**areas** [1] - 52:5
**argue** [2] - 13:20, 19:3
**argued** [1] - 26:22
**argues** [1] - 17:18
**arguing** [4] - 17:6, 19:14, 35:11, 35:13
**argument** [8] - 13:12, 13:17, 15:20, 17:17, 19:15, 27:23, 28:1, 32:12
**arguments** [5] - 4:3, 13:16, 19:20, 53:1, 57:2
**arises** [1] - 23:7
**arming** [1] - 36:7
**arrest** [7] - 15:7, 15:24, 16:9, 16:25, 33:11, 33:20, 33:21, 34:4, 38:21, 39:21, 49:10
**arrested** [1] - 36:23
**articulate** [1] - 20:6
**articulation** [1] - 25:1
**aside** [2] - 17:22, 17:25
**aspect** [2] - 19:9, 22:10
**aspects** [2] - 20:24, 32:11
**assessed** [1] - 23:21
**assessing** [2] - 21:25, 22:18
**assessment** [2] - 17:4, 20:4
**associated** [1] - 36:21
**assume** [1] - 45:10

**assurance** [2] - 29:1, 33:1
**assure** [1] - 17:12
**Atlanta** [1] - 1:18
**attention** [1] - 40:17
**Attorney** [1] - 1:12
**Attorney's** [1] - 3:4
**attorneys** [1] - 48:13
**audible** [1] - 6:15
**August** [4] - 15:1, 21:11, 22:1, 34:3
**authority** [1] - 28:8
**autistic** [3] - 30:21, 35:3, 37:22
**Avenue** [1] - 1:24
**avoid** [3] - 35:2, 35:13, 35:15
**aware** [6] - 18:3, 51:13, 51:16, 51:20, 51:22, 54:3

## B

**backdrop** [1] - 13:18
**Bail** [5] - 17:9, 18:12, 19:9, 22:4, 56:5
**bail** [8] - 14:7, 14:9, 22:16, 38:5, 38:23, 48:11, 49:6, 49:18
**Ballantine** [6] - 2:8, 2:11, 5:16, 10:18, 48:23, 54:24
**BALLANTINE** [3] - 1:13, 2:7, 5:18
**based** [7] - 15:12, 16:11, 19:5, 21:6, 28:6, 32:13, 34:7
**bases** [1] - 19:10
**basis** [6] - 7:15, 10:22, 21:17, 21:25, 34:13, 48:14
**bathroom** [1] - 52:6
**beaker** [1] - 20:19
**bear** [1] - 31:16
**bears** [1] - 6:7
**beat** [1] - 38:22
**become** [1] - 8:3
**becomes** [1] - 12:17
**becoming** [1] - 46:20
**bedroom** [4] - 51:3, 51:4, 51:6, 52:5
**bedrooms** [1] - 43:17
**BEFORE** [1] - 1:9
**begin** [3] - 18:11, 38:8, 38:9
**beginning** [1] - 2:9
**behalf** [1] - 2:15
**behavior** [2] - 30:25, 37:23

**believes** [2] - 5:5, 35:6
**belong** [2] - 38:6, 48:5
**bench** [4] - 2:13, 5:20, 24:10, 24:16
**best** [2] - 7:19, 9:19
**better** [2] - 45:5, 46:18
**between** [1] - 30:4
**beyond** [3] - 21:22, 23:2, 30:6
**big** [1] - 52:7
**bill** [1] - 3:7
**bit** [6] - 8:14, 27:11, 27:12, 27:13, 48:9, 50:9
**black** [1] - 32:8
**blast** [1] - 23:23
**Boasberg** [2] - 4:2, 4:7
**bomb** [6] - 20:13, 21:3, 21:8, 32:22, 35:18, 35:20
**bomb-making** [2] - 20:13, 21:8
**bomb-type** [1] - 35:18
**bomber** [1] - 33:14
**bombs** [5] - 13:23, 14:20, 15:3, 24:3
**bond** [1] - 48:11
**bonds** [3] - 38:23, 49:6, 49:18
**bondsmen** [1] - 48:12
**books** [1] - 18:3
**borrow** [2] - 31:20, 31:22
**Brady** [2] - 11:23, 12:1
**breached** [1] - 30:3
**Brian** [10] - 2:3, 2:15, 30:10, 31:11, 35:3, 37:12, 37:20, 41:18, 41:23, 42:8
**BRIAN** [1] - 1:6
**brief** [14] - 19:9, 19:15, 26:23, 27:3, 29:13, 31:21, 33:5, 35:1, 35:10, 35:12, 55:18, 56:17, 58:15, 58:18
**briefing** [5] - 4:17, 4:18, 5:4, 28:15, 58:20
**briefly** [4] - 2:12, 6:3, 7:23, 55:1
**briefs** [4] - 5:13, 13:10, 57:7, 58:10

**brings** [1] - 13:1
**burden** [2] - 28:21
**business** [7] - 14:18, 29:8, 38:13, 49:6, 49:7, 49:19, 50:1
**businesses** [1] - 35:5
**busy** [1] - 37:14
**butler** [1] - 40:23
**BY** [10] - 1:13, 1:16, 41:5, 41:10, 41:17, 42:4, 43:15, 44:18, 49:3, 53:4

## C

**camera** [1] - 51:11
**cameras** [12] - 37:18, 38:2, 42:24, 43:4, 43:5, 43:6, 43:7, 43:12, 43:16, 50:15, 50:18, 51:10
**cannot** [1] - 26:24
**capture** [1] - 8:15
**car** [4] - 34:12, 44:24, 52:11, 52:12
**care** [2] - 46:14, 58:3
**carefully** [1] - 25:4
**carve** [1] - 22:17
**Case** [1] - 2:3
**CASE** [1] - 1:5
**case** [49] - 3:3, 3:24, 4:6, 4:11, 4:20, 4:23, 6:21, 7:21, 11:23, 12:21, 14:11, 15:3, 15:10, 15:11, 17:6, 17:18, 18:3, 18:13, 18:23, 19:18, 20:1, 24:7, 25:9, 27:8, 27:11, 27:13, 27:20, 27:21, 27:22, 29:23, 31:4, 31:10, 31:21, 34:21, 36:9, 38:1, 38:16, 48:3, 48:4, 53:2, 54:18, 55:4, 55:6, 55:23, 58:18
**cases** [11] - 4:12, 17:13, 17:15, 26:15, 26:16, 27:19, 27:23, 28:1, 37:8, 38:8, 55:5
**categories** [1] - 11:20
**category** [1] - 17:14
**caused** [2] - 30:1, 30:2
**cell** [5] - 15:8, 21:16, 31:1, 31:5, 33:22
**certain** [1] - 17:14
**certainly** [5] - 13:11, 21:5, 23:24, 24:7,

58:21
**CERTIFICATE** [1] - 59:3
**certification** [1] - 12:13
**Certified** [1] - 1:23
**certify** [1] - 59:5
**chance** [3] - 24:23, 26:19, 48:21
**character** [1] - 39:1
**characteristics** [5] - 22:5, 22:13, 29:18, 29:19, 31:9
**charge** [2] - 14:5, 32:9
**charged** [6] - 18:17, 22:17, 23:8, 28:10, 55:17, 55:24
**charges** [5] - 14:4, 15:19, 29:9, 29:11, 32:1
**CHARLES** [1] - 1:13
**Charles** [1] - 2:8
**chart** [2] - 21:4, 21:10
**check** [1] - 45:6
**Chief** [3] - 4:2, 4:7, 18:13
**child** [3] - 37:22, 38:5, 47:22
**chlorate** [3] - 15:4, 20:21, 21:2
**chose** [2] - 23:3, 29:13
**Circuit** [7] - 4:6, 18:4, 25:7, 27:20, 27:21, 27:22
**circuit** [3] - 3:12, 19:25, 25:2
**circuits** [1] - 18:6
**circumstance** [4] - 7:3, 7:11, 22:9
**circumstances** [19] - 6:20, 6:22, 7:23, 8:11, 8:13, 8:16, 13:14, 14:16, 14:20, 14:23, 15:6, 20:23, 22:22, 23:2, 23:3, 25:9, 29:20, 29:25, 31:12
**cite** [3] - 18:14, 18:23, 31:21
**cited** [1] - 27:19
**city** [1] - 41:13
**claim** [2] - 33:8, 35:17
**clarification** [2] - 27:2, 28:14
**clarify** [3] - 10:9, 11:16, 27:12
**clarifying** [1] - 26:22

**clear** [6] - 8:24, 9:24, 20:3, 21:24, 28:20, 29:21
**clerk** [1] - 58:4
**CLERK** [3] - 2:2, 56:19, 56:21
**client** [1] - 9:5
**close** [1] - 40:8
**closer** [2] - 8:15, 42:1
**closest** [3] - 16:24, 26:8, 26:11
**closet** [1] - 52:6
**closets** [1] - 51:7
**Code** [3] - 3:18, 3:21, 4:3
**code** [1] - 17:20
**coextensive** [1] - 55:24
**Cole** [37] - 2:4, 2:15, 2:19, 13:15, 14:4, 14:15, 14:24, 15:1, 15:22, 19:24, 21:1, 22:6, 22:15, 22:24, 23:6, 26:10, 29:4, 30:10, 31:11, 35:3, 37:20, 39:20, 40:21, 41:8, 41:18, 41:23, 42:8, 46:5, 46:10, 49:9, 50:20, 51:1, 53:6, 54:17, 55:4, 56:9, 57:1
**COLE** [2] - 1:6, 41:3
**Cole's** [5] - 37:12, 39:17, 51:9, 51:13, 57:11
**Cole-Donnette** [2] - 40:21, 41:8
**COLE-DONNETTE** [1] - 41:3
**colleague** [1] - 28:25
**colleagues** [1] - 12:20
**COLUMBIA** [1] - 1:1
**Columbia** [5] - 3:6, 3:13, 3:16, 7:8, 59:5
**comfortable** [1] - 38:17
**coming** [2] - 29:10, 44:16
**committed** [4] - 17:20, 18:17, 38:10, 38:12
**communicate** [1] - 46:18
**communicating** [1] - 30:15
**communication** [1] - 45:5
**community** [17] -

15:23, 16:20, 17:12, 19:12, 25:15, 29:2, 29:7, 40:18, 41:16, 42:17, 42:18, 42:25, 43:1, 44:2, 50:9, 50:13, 50:21
**company** [2] - 48:12, 53:14
**comparisons** [1] - 55:5
**compelling** [1] - 21:1
**compels** [1] - 26:15
**complaint** [2] - 3:8, 11:2
**comply** [1] - 29:5
**components** [4] - 15:2, 20:13, 21:8, 24:2, 52:15
**comprehensive** [1] - 26:8
**compulsive** [3] - 30:24, 35:4, 37:23
**computer** [1] - 33:22
**concern** [7] - 4:13, 9:3, 22:1, 23:7, 23:9, 34:14, 34:15
**concerned** [2] - 34:11, 35:23
**concerning** [3] - 15:12, 21:5, 21:9
**conclude** [2] - 17:19, 21:1
**concluded** [1] - 59:1
**concludes** [2] - 7:14, 7:17
**concluding** [1] - 4:2
**conclusion** [1] - 26:15
**condition** [1] - 47:10
**conditions** [20] - 15:24, 16:5, 16:7, 16:11, 16:13, 16:14, 16:18, 17:4, 17:11, 25:13, 25:17, 25:18, 25:21, 26:3, 26:4, 33:7, 36:17, 36:24, 37:18, 39:6
**conduct** [8] - 15:13, 16:22, 20:5, 22:1, 23:10, 26:7, 55:24
**conducting** [1] - 5:25
**Conference** [1] - 59:6
**conference** [1] - 5:20
**confessed** [2] - 13:22, 14:1
**confirm** [1] - 5:24
**conformance** [1] - 59:6

**Congress** [2] - 17:9, 17:13
**connected** [2] - 43:22, 43:25
**connects** [1] - 43:24
**consent** [1] - 6:13
**consider** [11] - 5:6, 16:15, 21:15, 21:24, 22:3, 22:11, 22:19, 28:10, 55:19, 55:22, 56:5
**consideration** [1] - 57:4
**considering** [1] - 27:24
**considers** [2] - 23:5, 26:9
**consistent** [2] - 15:2, 20:13
**conspiracy** [2] - 30:15, 33:25
**conspiring** [2] - 31:5, 36:13
**Constitution** [1] - 1:24
**constitutional** [2] - 25:5, 25:8
**construct** [3] - 20:15, 34:16, 34:22
**constructed** [1] - 24:21
**constructing** [1] - 52:19
**constructive** [1] - 34:6
**consumer** [1] - 56:13
**contacted** [1] - 37:13
**contends** [2] - 20:7, 21:13
**context** [2] - 18:5, 31:2
**continually** [2] - 16:25, 22:25
**continue** [2] - 6:18, 7:23
**continued** [2] - 5:22, 15:1
**continuing** [1] - 21:5
**contrary** [2] - 4:4, 33:20
**Contreras** [2] - 27:11, 27:13
**control** [2] - 23:2, 23:3
**convene** [2] - 7:18, 8:4
**convenes** [1] - 7:21
**conversely** [1] - 3:22
**convince** [1] - 15:19
**copies** [1] - 10:25

**correct** [10] - 19:7, 28:5, 44:24, 44:25, 49:7, 49:13, 49:21, 50:16, 50:21, 53:5
**cost** [1] - 27:1
**cost-efficient** [1] - 27:1
**counsel** [2] - 2:10, 3:2, 5:10, 6:3, 12:9
**country** [1] - 48:12
**counts** [2] - 3:7, 3:8
**county** [1] - 33:13
**course** [7] - 3:16, 6:23, 11:12, 17:7, 19:10, 25:3, 55:22
**Court** [82] - 1:23, 2:1, 2:25, 3:2, 3:6, 3:9, 3:13, 3:15, 3:22, 4:10, 4:13, 4:22, 4:24, 5:4, 5:25, 6:18, 6:19, 7:6, 7:14, 7:16, 7:18, 7:20, 7:23, 7:25, 8:25, 9:6, 9:20, 10:10, 11:25, 14:4, 14:14, 16:12, 16:15, 16:16, 16:17, 16:22, 18:2, 18:14, 18:18, 18:19, 19:4, 20:3, 20:11, 21:14, 21:22, 21:24, 22:8, 22:11, 22:19, 22:20, 23:5, 23:24, 24:9, 25:12, 25:13, 26:2, 26:5, 26:9, 26:13, 28:5, 28:10, 28:13, 32:25, 34:10, 35:23, 39:5, 46:4, 46:20, 46:24, 46:25, 47:11, 48:7, 55:19, 55:21, 55:22, 56:21, 58:3, 58:20, 59:4, 59:4
**court** [18] - 3:12, 3:13, 3:16, 3:23, 7:8, 12:6, 16:5, 27:24, 28:2, 29:6, 29:10, 33:2, 41:13, 46:15, 48:8, 48:13, 48:16, 56:19
**COURT** [102] - 1:1, 2:11, 2:18, 2:22, 5:19, 5:23, 6:16, 8:14, 9:7, 9:14, 9:16, 10:6, 10:8, 11:3, 11:10, 11:19, 12:13, 12:25, 13:6, 15:18, 17:5, 17:24, 18:23, 19:1, 19:8, 19:19, 21:4, 22:3, 23:12, 24:22, 26:18, 27:2, 27:5, 27:18, 28:14, 29:17, 30:23, 31:20, 31:25, 34:1,

39:4, 39:11, 39:13, 39:15, 39:17, 39:20, 39:23, 40:3, 40:9, 40:22, 41:1, 41:9, 41:12, 41:25, 43:4, 43:11, 43:14, 43:20, 43:22, 44:1, 44:5, 44:11, 44:15, 44:17, 45:21, 46:1, 46:4, 46:9, 46:19, 46:23, 47:1, 47:3, 47:8, 47:14, 47:16, 47:19, 47:24, 48:9, 48:17, 48:21, 52:24, 53:10, 53:13, 53:18, 53:20, 53:22, 53:24, 54:2, 54:4, 54:8, 54:14, 54:24, 56:4, 56:14, 56:17, 56:23, 57:22, 57:24, 58:7, 58:22, 58:24, 59:11
**Court's** [9] - 8:6, 8:10, 8:22, 9:23, 16:13, 17:3, 18:7, 48:18, 58:19
**court's** [1] - 16:1
**court-imposed** [1] - 16:5
**courtroom** [1] - 54:12
**courts** [5] - 25:8, 27:23, 27:25, 28:1, 29:21
**Courts** [1] - 8:16
**cover** [1] - 11:7
**covering** [1] - 43:12
**create** [1] - 15:3
**created** [1] - 17:14
**creates** [1] - 14:9
**creating** [1] - 20:21
**creation** [1] - 15:4
**crime** [2] - 14:6, 22:18
**crimes** [1] - 14:19
**criminal** [9] - 12:7, 22:7, 22:16, 27:14, 29:4, 29:15, 31:5, 32:9, 39:2
**Criminal** [2] - 6:17, 6:24
**CROSS** [1] - 49:2
**CRR** [1] - 59:10
**current** [2] - 32:13, 42:15
**custodial** [2] - 10:25, 55:9
**custodian** [9] - 25:23, 37:9, 37:11, 40:11, 46:10, 46:13, 48:25, 53:1, 57:12

**D**

**daily** [1] - 21:20
**damage** [4] - 23:15, 23:19, 31:15, 31:17
**danger** [10] - 16:19, 19:11, 19:24, 20:5, 20:7, 21:13, 25:11, 25:24, 29:2, 33:3
**dangerous** [6] - 30:4, 31:9, 31:10, 33:15, 36:1, 36:3
**dangerousness** [5] - 19:9, 19:17, 22:18, 55:23, 56:2
**date** [1] - 48:16
**Dated** [1] - 59:8
**dates** [3] - 46:16
**days** [3] - 14:23, 21:19, 49:21
**DC** [13] - 1:11, 1:14, 1:18, 1:24, 3:18, 3:21, 4:2, 4:6, 14:22, 18:4, 24:10, 27:20, 38:9
**deal** [1] - 48:13
**dealing** [2] - 11:15, 30:21
**dealt** [2] - 9:6, 35:5
**debate** [1] - 3:11
**December** [4] - 1:10, 4:8, 15:7, 15:8
**deception** [1] - 26:8
**decide** [2] - 4:10, 10:11
**decision** [9] - 4:5, 5:12, 5:14, 9:4, 18:25, 25:7, 46:6, 54:15, 57:16
**deep** [1] - 47:25
**default** [2] - 17:8, 33:6
**defendant** [20] - 2:15, 6:12, 9:1, 11:8, 13:21, 14:19, 16:9, 16:16, 16:17, 18:15, 18:17, 20:11, 20:14, 20:18, 24:12, 24:20, 26:8, 53:5, 55:4, 56:2
**Defendant** [1] - 1:7
**DEFENDANT** [1] - 1:15
**defendant's** [11] - 10:25, 14:5, 15:7, 16:22, 21:16, 21:24, 22:21, 34:6, 55:6, 55:17, 55:19
**defendants** [1] - 30:14
**defense** [14] - 4:4, 4:5, 5:24, 8:5, 10:14,

10:23, 11:4, 12:9,
13:8, 14:14, 16:6,
17:18, 24:24, 25:19
**DEFENSE** [1] - 41:3
**defense's** [2] - 6:14,
18:9
**definitely** [2] - 45:6,
47:6
**deleting** [4] - 31:1,
31:6, 31:7, 31:9
**deny** [3] - 10:10,
12:15, 12:22
**DEPUTY** [3] - 2:2,
56:19, 56:21
**describe** [1] - 46:19
**described** [1] - 50:12
**describes** [1] - 21:7
**destroyed** [1] - 14:25
**destruction** [1] -
15:14
**detail** [1] - 10:23
**detained** [2] - 13:17,
54:17
**detection** [3] - 35:2,
35:14, 35:15
**detention** [28] - 2:4,
2:24, 5:25, 9:9, 13:2,
13:7, 14:10, 14:12,
14:13, 15:12, 17:7,
17:14, 18:5, 18:11,
18:21, 19:11, 20:7,
22:8, 22:9, 25:3,
25:22, 26:14, 26:17,
32:23, 39:6, 45:11,
54:21
**DETENTION** [1] - 1:9
**determination** [14] -
4:16, 4:19, 7:20, 7:24,
8:12, 9:13, 9:20, 18:7,
19:4, 27:6, 28:7,
57:14, 58:19
**determinative** [1] -
57:8
**determine** [3] -
16:14, 54:17, 54:19
**detonate** [2] - 23:17,
32:2
**detonated** [4] -
23:16, 23:18, 24:16,
24:18
**development** [3] -
3:3, 4:22, 6:22
**developments** [1] -
6:5
**device** [7] - 24:8,
24:16, 32:10, 32:11,
32:12, 32:23, 36:21
**devices** [23] - 11:16,
13:23, 14:22, 20:15,
23:12, 23:18, 23:21,

23:25, 24:2, 24:3,
24:4, 24:9, 24:11,
24:18, 24:20, 32:1,
32:7, 32:14, 34:16,
37:7, 52:19, 55:12,
55:14
**diagnosis** [1] - 30:21
**different** [3] - 30:16,
31:2, 31:4
**difficult** [1] - 23:22
**Digital** [1] - 1:25
**digital** [1] - 59:5
**Diplomate** [1] - 1:22
**DIRECT** [1] - 41:4
**direct** [2] - 5:4, 18:2
**direction** [1] - 17:16
**directly** [2] - 24:23,
55:16
**disagreement** [1] -
6:6
**disclosure** [1] -
12:17
**Discord** [1] - 51:20
**discover** [1] - 47:10
**discovery** [5] -
10:14, 10:19, 10:22,
11:1, 12:8
**discrete** [1] - 2:10
**discretion** [1] - 28:13
**discuss** [1] - 8:8
**discussed** [5] - 3:2,
6:23, 11:2, 20:16,
20:17
**discussing** [1] -
17:23
**discussion** [1] - 18:2
**disposition** [1] -
54:18
**dispute** [1] - 22:15
**distinct** [1] - 22:7
**District** [7] - 3:6,
3:13, 3:15, 7:8, 59:4
**DISTRICT** [2] - 1:1,
1:1
**district** [8] - 3:11,
3:17, 3:20, 3:25, 7:9,
7:13, 12:20, 28:8
**disturbing** [2] -
15:13, 26:7
**divested** [1] - 4:14
**docket** [8] - 5:2, 5:5,
10:8, 10:14, 11:6,
36:6, 58:5, 58:10
**dog** [1] - 35:7
**done** [4] - 7:5, 32:19,
38:3, 42:8
**Donnette** [3] - 40:21,
41:8, 41:9
**DONNETTE** [1] -
41:3

**door** [2] - 30:3, 30:5
**doubt** [1] - 32:3
**down** [9] - 2:24,
24:15, 27:11, 27:13,
32:22, 40:23, 43:8,
47:25, 54:9
**downplay** [1] - 29:11
**downplaying** [1] -
31:16
**driving** [1] - 34:13
**due** [1] - 25:4
**dumpster** [2] -
24:11, 24:17
**during** [6] - 20:17,
21:13, 53:14, 53:24,
55:2, 55:9
**duties** [1] - 45:17

### E

**early** [2] - 53:15,
53:16
**ears** [1] - 46:20
**easily** [1] - 14:8
**easy** [1] - 48:5
**ECF** [1] - 10:15
**effect** [2] - 5:3, 57:14
**effective** [1] - 26:4
**efficient** [1] - 27:1
**efforts** [5] - 10:19,
16:25, 17:1, 21:16,
21:24
**either** [5] - 3:24, 5:5,
8:7, 13:12, 58:14
**elderly** [1] - 53:21
**election** [1] - 14:3
**emotionally** [1] -
38:6
**employees** [1] -
53:17
**end** [3] - 4:12, 31:13,
31:14
**enforcement** [3] -
30:4, 33:13, 46:2
**engaged** [1] - 17:19
**engine** [1] - 38:13
**ensure** [2] - 25:9,
45:3
**ensuring** [1] - 38:10
**enter** [1] - 5:2
**entered** [1] - 2:12
**entire** [3] - 4:1,
35:14, 50:4
**entirely** [2] - 15:21,
16:4
**entitled** [3] - 9:8,
9:11, 59:6
**essentially** [1] -
22:23
**establish** [1] - 19:2

**established** [1] -
14:9
**establishes** [3] -
14:13, 18:16, 27:7
**estimate** [1] - 23:22
**evaluating** [1] - 20:5
**evening** [1] - 24:10
**event** [1] - 46:4
**eventually** [1] - 32:5
**everywhere** [5] -
37:18, 38:2, 42:24,
43:5
**evidence** [24] -
14:25, 15:15, 18:18,
18:19, 19:20, 19:23,
21:5, 21:12, 21:15,
22:20, 28:6, 30:12,
30:14, 34:16, 34:18,
34:19, 34:22, 55:3,
55:5, 55:17, 55:19,
55:23, 56:2
**evinces** [1] - 21:13
**ex** [2] - 45:24, 46:1
**ex-federal** [2] -
45:24, 46:1
**exact** [2] - 15:21,
16:4
**exactly** [4] - 10:24,
24:19, 29:2, 55:7
**EXAMINATION** [2] -
41:4, 49:2
**examined** [1] - 55:14
**examiner** [3] - 23:21,
24:1, 55:13
**example** [1] - 23:23
**examples** [1] - 24:7
**except** [1] - 42:14
**exception** [3] - 17:8,
22:17, 25:4
**exceptional** [3] -
25:10, 26:15, 26:16
**exceptions** [1] -
17:13
**excused** [1] - 54:10
**exert** [1] - 23:3
**existed** [5] - 14:18,
14:21, 14:23, 15:1,
15:6
**exists** [4] - 11:17,
19:6, 28:7, 55:5
**expect** [1] - 11:22
**expeditiously** [3] -
7:18, 57:6, 57:17
**experiment** [2] -
21:3, 35:21
**experimentation** [1]
- 15:14
**experimented** [1] -
15:4
**experimenting** [2] -

20:20, 21:2
**expert** [3] - 32:6,
32:13, 54:13
**explain** [4] - 42:7,
42:23, 45:2, 47:22
**explains** [1] - 58:15
**explication** [1] -
13:12
**explode** [5] - 24:2,
24:5, 32:1, 32:7, 32:8
**exploded** [2] - 32:4,
32:14
**explosion** [1] - 24:6
**explosive** [8] -
11:16, 13:23, 14:21,
15:14, 32:12, 32:22,
35:18, 36:21
**explosives** [4] -
15:5, 20:22, 23:20,
55:13
**express** [2] - 23:1,
23:11
**expressing** [1] - 16:2
**extension** [1] - 6:13
**extensive** [2] -
10:22, 20:12
**extent** [5] - 5:7, 5:11,
10:2, 57:10, 58:13
**exterior** [2] - 50:15,
51:9
**exteriors** [1] - 43:12
**extraordinary** [9] -
6:19, 6:21, 7:3, 7:10,
7:11, 7:22, 8:11, 8:13,
8:16
**extreme** [1] - 15:13
**eye** [1] - 46:15
**eyes** [1] - 46:20

### F

**facilitate** [1] - 31:17
**facilitated** [1] - 30:2
**fact** [16] - 16:22,
16:23, 20:9, 20:25,
21:3, 23:5, 25:5, 26:6,
28:8, 30:11, 31:24,
32:6, 33:18, 34:11,
44:22, 55:21
**factor** [6] - 22:10,
22:11, 22:13, 28:24,
29:12, 29:18
**factors** [11] - 9:6,
14:12, 22:3, 22:19,
29:3, 29:25, 30:9,
32:15, 33:2, 55:22,
56:5
**factory** [2] - 21:16,
21:19
**facts** [3] - 25:9,

36:25, 53:1
**failure** [1] - 29:5
**fair** [4] - 16:4, 16:8, 51:22, 52:21
**fairly** [1] - 50:25
**fall** [2] - 14:18, 23:10
**familiar** [4] - 13:10, 44:19, 44:22, 44:24
**family** [11] - 14:17, 15:17, 16:24, 29:8, 32:16, 38:10, 38:12, 38:13, 38:14, 42:10
**family's** [1] - 14:17
**family-owned** [2] - 29:8, 38:13
**far** [4] - 7:9, 11:13, 11:17, 55:18
**fashion** [1] - 4:12
**fate** [1] - 31:23
**father** [1] - 38:25
**father's** [1] - 29:8
**favor** [2] - 33:2, 41:25
**favoritism** [1] - 33:6
**Federal** [1] - 59:4
**federal** [7] - 1:23, 3:13, 10:1, 14:6, 14:9, 45:24, 46:1
**FEDERAL** [1] - 59:11
**Fennell** [3] - 1:20, 2:20, 2:22
**few** [4] - 2:25, 40:4, 55:2, 57:8
**file** [3] - 58:4, 58:9, 58:14
**filed** [9] - 5:4, 5:24, 10:14, 11:11, 12:5, 13:8, 13:9, 28:16, 58:3
**filings** [1] - 13:11
**final** [1] - 54:25
**firearm** [1] - 46:7
**firearms** [4] - 36:1, 36:2, 37:3, 45:21
**first** [4] - 3:2, 14:18, 20:9, 22:18
**five** [3] - 19:22, 35:1, 38:20
**flight** [2] - 19:13, 19:15
**Floor** [1] - 1:17
**focus** [2] - 19:19, 20:4
**focused** [2] - 48:24, 52:25
**focuses** [1] - 19:9
**folks** [3] - 22:7, 24:15, 44:2
**follow** [2] - 48:17, 53:10

**follow-up** [2] - 48:17, 53:10
**following** [1] - 55:7
**follows** [2] - 4:9, 5:22
**footnote** [1] - 18:25
**FOR** [3] - 1:1, 1:12, 1:15
**foregoing** [1] - 59:5
**forever** [1] - 38:8
**forfeitures** [2] - 48:14, 48:15
**format** [1] - 59:6
**formula** [1] - 35:20
**fortune** [1] - 31:23
**forward** [7] - 4:11, 7:16, 9:21, 10:20, 20:4, 20:7, 25:11
**forward-looking** [3] - 20:4, 20:7, 25:11
**four** [1] - 22:3
**Fourth** [1] - 32:25
**fragments** [1] - 24:5
**frankly** [1] - 13:15
**frequently** [1] - 7:12
**front** [8] - 7:2, 9:16, 10:1, 20:12, 22:8, 34:3, 40:10, 43:7
**frustration** [2] - 23:1, 23:11
**full** [2] - 33:19, 49:21
**fully** [1] - 35:9
**functionally** [1] - 8:3
**functions** [1] - 42:7

## G

**g)(3** [1] - 29:17
**Gainesville** [2] - 39:7, 41:15
**games** [1] - 51:25
**gate** [2] - 43:1, 44:12
**gated** [3] - 41:16, 42:25, 44:2
**generally** [6] - 8:17, 11:21, 17:10, 22:8, 49:15, 53:14
**Georgia** [1] - 1:18
**Giglio** [1] - 11:24
**given** [7] - 7:7, 13:10, 14:5, 20:23, 23:22, 40:16, 55:24
**GLOVER** [1] - 1:17
**Glover** [1] - 2:17
**God** [1] - 32:2
**govern** [1] - 17:9
**government** [55] - 2:6, 2:8, 3:19, 4:11, 5:17, 7:4, 8:19, 8:20, 9:2, 9:10, 9:25, 10:16,

10:21, 10:24, 11:13, 11:22, 11:25, 12:2, 13:16, 14:8, 15:11, 18:5, 18:18, 19:8, 19:14, 19:23, 20:6, 21:7, 21:12, 21:15, 22:6, 23:18, 25:24, 26:6, 28:5, 28:22, 29:13, 30:11, 30:18, 32:15, 33:4, 33:19, 34:2, 34:3, 34:25, 40:14, 44:22, 48:22, 54:6, 55:12, 55:16, 56:9, 57:21, 58:12, 58:18
**GOVERNMENT** [1] - 1:12
**government's** [13] - 10:19, 13:7, 13:19, 18:20, 19:1, 19:5, 19:20, 20:24, 21:6, 22:12, 23:9, 23:13, 25:18
**GPS** [2] - 15:25, 25:22
**grace** [1] - 32:2
**grand** [13] - 3:5, 3:7, 3:14, 3:22, 3:23, 4:24, 10:1, 10:11, 27:7, 27:15, 58:7
**grandmother** [8] - 37:12, 38:3, 38:4, 38:18, 39:14, 39:18, 40:4, 57:11
**grandson** [6] - 41:21, 44:20, 47:1, 48:1, 49:9, 51:13
**grandson's** [1] - 46:9
**granted** [2] - 31:20, 33:9
**grave** [1] - 25:8
**great** [2] - 38:25
**GSA** [1] - 46:3
**guard** [1] - 44:4
**guards** [1] - 43:1
**guess** [1] - 34:13
**guest** [1] - 44:6
**guilt** [2] - 14:25, 34:21, 54:19, 55:17, 55:20, 55:23, 56:3
**guilty** [2] - 25:6, 36:15
**guy** [3] - 36:1, 36:3, 36:12

## H

**half** [3] - 21:11, 32:20, 33:10
**handle** [1] - 9:18

**happy** [2] - 10:23, 58:4
**harm** [7] - 9:5, 9:7, 30:1, 30:2, 31:17
**Harrelson** [3] - 30:13, 31:3, 36:5
**HDR** [2] - 1:16, 2:16
**headquarters** [2] - 13:24, 24:13
**heads** [1] - 11:5
**heads-up** [1] - 11:5
**hear** [15] - 2:12, 6:3, 13:15, 13:18, 24:24, 26:19, 37:17, 38:16, 38:18, 40:9, 40:12, 40:19, 54:12, 54:14
**heard** [2] - 8:7, 12:8
**hearing** [28] - 2:4, 2:24, 5:25, 6:1, 6:2, 6:7, 6:9, 6:14, 6:19, 6:25, 7:16, 7:19, 7:21, 7:24, 8:2, 8:4, 8:18, 8:19, 8:20, 8:24, 9:1, 9:9, 9:21, 10:9, 13:2, 18:11, 36:16, 54:18
**HEARING** [1] - 1:9
**heavily** [1] - 17:3
**heinous** [1] - 29:22
**held** [2] - 10:9, 18:4
**helicopters** [2] - 33:12, 33:17
**hereby** [1] - 59:5
**hi** [1] - 49:5
**hid** [1] - 32:16
**hidden** [1] - 26:12
**hide** [1] - 16:23
**hiding** [2] - 15:15, 37:20
**high** [2] - 16:1, 48:3
**himself** [5] - 22:24, 23:6, 23:8, 45:8, 56:9
**historical** [1] - 14:20
**history** [15] - 4:1, 20:20, 22:4, 22:7, 22:12, 22:16, 22:21, 29:5, 29:15, 29:17, 29:19, 30:8, 30:10, 37:2
**hold** [1] - 8:18
**holding** [2] - 8:19, 8:20
**home** [33] - 14:17, 15:25, 25:21, 32:23, 33:22, 34:8, 35:8, 36:2, 37:20, 39:6, 39:22, 42:15, 42:23, 43:12, 43:17, 43:20, 44:23, 45:4, 45:11, 45:13, 45:17, 45:21, 46:5, 46:7, 50:15,

50:23, 51:1, 51:9, 53:14, 53:16, 53:18, 53:24
**honest** [1] - 38:7
**Honor** [54] - 2:2, 2:7, 2:14, 5:18, 10:21, 11:9, 12:24, 13:4, 13:5, 13:21, 14:11, 16:8, 19:17, 22:14, 26:21, 27:10, 27:17, 29:10, 29:23, 30:18, 31:14, 31:16, 32:6, 32:18, 32:20, 33:9, 35:1, 35:6, 35:11, 36:4, 36:5, 36:18, 37:7, 37:8, 37:17, 38:15, 38:17, 39:9, 39:19, 40:20, 41:7, 42:9, 42:23, 45:2, 45:11, 48:20, 49:1, 53:12, 54:23, 55:1, 55:3, 55:10, 55:25, 57:23
**HONORABLE** [1] - 1:9
**Honorable** [1] - 56:21
**hopefully** [1] - 57:17
**hours** [1] - 44:4
**house** [6] - 15:24, 35:25, 42:25, 43:8, 45:16, 47:7
**Howell** [1] - 18:13
**hurt** [1] - 32:3
**husband** [6] - 39:16, 45:9, 45:23, 46:1, 53:19, 53:20
**husband's** [1] - 43:25

## I

**idea** [1] - 37:17
**identified** [3] - 2:10, 21:23, 25:25
**immediate** [1] - 13:23
**implicate** [1] - 31:10
**implicates** [1] - 17:7
**importance** [2] - 40:16, 40:18
**important** [11] - 8:11, 13:15, 27:18, 40:14, 40:16, 40:19, 47:9, 56:25, 57:1, 57:2
**impose** [1] - 25:14
**imposed** [1] - 16:5
**imposes** [1] - 47:11
**improper** [1] - 12:4
**impulsive** [1] - 15:11

**inability** [1] - 8:18
**incarceration** [1] - 15:25
**incendiary** [1] - 56:10
**inclination** [1] - 15:15
**include** [2] - 14:5, 39:6
**included** [1] - 5:21
**includes** [1] - 18:7
**including** [3] - 15:13, 15:16, 15:24
**incredibly** [1] - 16:10
**incriminating** [2] - 15:16, 26:12
**indicated** [1] - 23:13
**indict** [1] - 10:1
**indicted** [3] - 12:21, 18:15, 28:9
**indictment** [32] - 3:4, 3:9, 3:10, 3:14, 4:15, 4:20, 4:23, 6:24, 7:1, 7:2, 7:5, 7:6, 7:15, 7:17, 7:24, 8:2, 9:14, 9:17, 17:23, 18:11, 18:16, 19:2, 26:23, 27:1, 27:7, 27:16, 27:24, 28:2, 28:3, 28:7
**indictments** [1] - 3:23
**indiscernible)** [1] - 11:18
**individual** [3] - 17:10, 22:5, 40:19
**individually** [2] - 45:2, 45:3
**individuals** [2] - 22:17, 30:5
**industry** [2] - 38:23, 38:24
**inference** [2] - 20:25, 21:1
**influencing** [1] - 14:2
**information** [15] - 11:1, 11:14, 11:21, 11:22, 12:1, 12:10, 15:16, 23:18, 26:12, 32:13, 33:24, 37:6, 55:13, 56:13, 58:11
**initial** [3] - 8:25, 12:1, 36:11
**innocence** [2] - 25:6, 54:19
**innocent** [1] - 21:3
**inside** [2] - 43:16, 44:23
**inspections** [1] - 38:3

**instead** [1] - 4:17
**instructed** [1] - 11:25
**insures** [1] - 48:12
**intend** [2] - 5:12, 57:6
**intends** [1] - 58:12
**intensity** [1] - 16:1
**intent** [1] - 14:6
**intention** [1] - 31:25
**interaction** [1] - 41:22
**interest** [1] - 4:10
**interests** [2] - 7:19, 9:19
**interior** [2] - 50:18, 50:19
**interpreted** [1] - 8:17
**interview** [4] - 10:25, 20:17, 35:19, 55:9
**introduce** [2] - 2:5, 41:6
**investigation** [1] - 23:13
**investigator** [1] - 35:4
**involves** [1] - 15:10
**irreparable** [2] - 9:5, 9:7
**isolated** [2] - 15:10, 26:5
**issue** [39] - 4:10, 4:18, 5:9, 5:11, 5:24, 7:20, 8:3, 8:6, 9:16, 9:20, 11:4, 11:15, 12:17, 13:1, 16:21, 28:20, 32:18, 33:5, 34:14, 34:15, 34:17, 34:22, 35:16, 37:19, 40:17, 46:6, 46:8, 48:24, 54:17, 55:11, 56:25, 57:1, 57:2, 57:5, 57:18, 58:7, 58:8, 58:10, 58:16
**issued** [2] - 4:2, 4:7
**issues** [12] - 4:25, 12:14, 17:10, 22:25, 36:18, 37:1, 37:9, 37:10, 52:9, 52:17, 54:21, 57:8
**itself** [3] - 19:4, 27:7, 28:2

## J

**jail** [5] - 38:5, 38:9, 47:17, 48:2, 48:5
**January** [18] - 13:25, 14:21, 14:24, 19:21, 20:1, 20:2, 20:11,

20:14, 23:8, 26:5, 30:14, 30:16, 37:4, 39:25, 42:21, 49:12, 50:20, 59:8
**Jencks** [1] - 11:24
**job** [3] - 38:19, 45:12, 48:7
**Jocelyn** [1] - 2:7
**JOCELYN** [1] - 1:13
**John** [2] - 2:14, 2:17
**JOHN** [2] - 1:16, 1:17
**Johnston** [1] - 18:14
**Jones** [9] - 2:8, 2:11, 5:16, 10:17, 15:18, 26:18, 48:23, 52:25, 54:24
**JONES** [25] - 1:13, 10:21, 13:4, 13:21, 16:8, 17:22, 18:1, 18:24, 19:7, 19:17, 20:9, 21:14, 22:14, 23:20, 26:1, 49:1, 49:3, 53:3, 53:4, 53:9, 54:7, 55:1, 56:12, 56:16, 57:21
**Jr** [6] - 2:4, 2:15, 30:10, 41:18, 41:23, 42:8
**JR** [1] - 1:6
**judge** [2] - 3:19, 12:20
**Judge** [4] - 4:2, 4:7, 18:13, 31:22
**Judicial** [1] - 59:6
**judicial** [1] - 7:7
**jump** [1] - 29:16
**jurisdiction** [1] - 3:24
**jury** [13] - 3:5, 3:7, 3:14, 3:22, 3:23, 4:24, 10:1, 10:12, 27:7, 27:15, 58:7
**justice** [2] - 7:19, 9:19

## K

**keep** [4] - 45:5, 45:7, 46:15, 46:17
**Keepers** [1] - 30:17
**keeps** [1] - 30:25
**Kenneth** [2] - 30:13, 36:5
**kept** [1] - 26:11
**Kevontae** [1] - 3:24
**key** [1] - 16:21
**kid** [1] - 30:21
**killed** [2] - 24:20, 32:3
**kind** [7] - 24:8,

24:15, 36:7, 42:2, 43:11, 44:13, 48:8
**kinds** [2] - 24:19
**Klein** [4] - 29:23, 29:24, 31:21, 37:10
**knowing** [1] - 48:1
**knowledge** [3] - 52:14, 52:17, 52:20
**known** [1] - 15:5, 33:12, 33:22
**knows** [5] - 14:4, 24:9, 33:19, 36:18, 55:21

## L

**lacks** [1] - 22:15
**laptop** [1] - 33:22
**largely** [1] - 56:12
**last** [8] - 19:22, 21:10, 21:22, 33:9, 34:2, 38:3, 40:4, 53:5
**late** [2] - 35:12, 50:6
**law** [5] - 22:23, 28:12, 30:4, 33:12, 46:1
**lawyer** [1] - 46:9
**learning** [2] - 14:19, 17:2
**least** [12] - 3:19, 6:12, 11:21, 12:22, 20:2, 21:6, 21:8, 31:25, 34:6, 40:4, 55:18, 57:1
**leave** [4] - 44:11, 44:12, 44:13, 44:14
**leaves** [1] - 49:18
**leaving** [1] - 31:8
**left** [5] - 32:8, 33:5, 35:25, 36:1, 37:13
**legal** [1] - 56:1
**letting** [1] - 4:10
**liberty** [1] - 33:7
**lie** [1] - 46:24
**lies** [1] - 4:10
**life** [4] - 24:5, 41:24, 42:5, 42:6
**lifestyle** [2] - 16:10, 22:24
**light** [6] - 4:22, 6:4, 14:12, 23:6, 48:18
**likely** [1] - 47:17
**limit** [1] - 41:13
**limited** [1] - 25:4
**line** [2] - 31:20, 31:22
**lines** [2] - 12:15, 56:11
**liquid** [1] - 35:20
**litany** [2] - 29:15, 39:2

**literally** [1] - 27:14
**litigate** [1] - 55:11
**LITTLE** [10] - 1:16, 8:10, 8:16, 9:8, 9:15, 9:22, 10:7, 58:2, 58:16, 58:23
**live** [9] - 41:11, 41:15, 42:15, 42:17, 42:18, 44:6, 50:10, 50:12, 50:24
**lived** [4] - 40:4, 42:15, 42:17
**lives** [2] - 24:8, 39:13, 53:18
**living** [12] - 14:17, 16:9, 16:25, 22:23, 29:6, 37:18, 39:20, 39:22, 40:1, 42:20, 43:17, 50:20
**LLC** [3] - 1:15, 1:16, 2:16
**local** [3] - 3:16, 12:6, 12:7
**look** [15] - 11:20, 16:14, 20:4, 28:14, 29:14, 29:24, 29:25, 31:4, 31:12, 31:14, 36:19, 37:11, 40:9, 43:6
**looked** [6] - 27:19, 30:9, 36:5, 52:2, 52:5, 52:11
**looking** [2] - 20:4, 20:7, 25:11, 37:1
**looks** [2] - 10:20, 22:21
**Loretta** [4] - 38:18, 39:14, 40:21, 41:8
**LORETTA** [1] - 41:3
**lose** [1] - 9:5
**loving** [1] - 38:12
**Lowe's** [1] - 46:16
**loyalty** [1] - 46:23

## M

**ma'am** [4] - 40:22, 45:22, 49:4, 54:8
**MAGISTRATE** [1] - 1:9
**Magistrate** [1] - 2:3
**major** [2] - 13:24, 24:14
**male** [1] - 35:3
**man** [3] - 30:22, 30:24, 37:1
**manage** [1] - 33:8
**managed** [1] - 16:23
**mandatory** [1] - 9:12
**manner** [1] - 12:2

manufacturing [1] - 13:22
Mario [2] - 2:16, 11:8
MARIO [1] - 1:16
match [1] - 32:11
material [2] - 32:11, 36:20
materials [7] - 15:2, 15:14, 21:7, 32:21, 34:2, 34:5, 44:23
matter [10] - 2:4, 2:10, 2:23, 10:13, 11:11, 16:18, 36:16, 56:1, 56:25, 59:6
matters [6] - 2:25, 8:8, 22:8, 27:14, 55:7
MATTHEW [1] - 1:9
McFadden [1] - 1:15
mean [11] - 9:22, 11:19, 11:23, 15:18, 29:17, 42:10, 42:20, 43:2, 46:23, 47:16, 54:16
means [3] - 31:1, 46:11, 46:13
meantime [2] - 57:10, 57:15
meanwhile [1] - 4:7
meets [1] - 29:14
member's [1] - 14:17
members [1] - 16:24
memorandum [3] - 13:7, 13:9, 20:10
memorializes [1] - 5:3
mentioned [6] - 20:21, 27:22, 44:1, 49:6, 50:12, 52:4
message [3] - 24:13, 33:25, 37:13
messages [3] - 30:15, 31:1, 31:5
met [1] - 36:25
metal [1] - 24:7
method [2] - 26:25, 27:1
mic [2] - 8:14, 42:1
microphone [2] - 57:25
middle [1] - 31:6
might [5] - 9:21, 24:15, 24:16, 33:8, 37:5
mind [1] - 13:14
minute [2] - 24:16, 24:17
miss [3] - 38:22, 48:16
mistaken [1] - 51:12
mitigate [2] - 16:19,

25:24
moment [3] - 17:5, 19:19, 36:10
monastic [1] - 22:24
monestrate [1] - 35:16
monitor [2] - 15:25, 32:23
monitoring [1] - 25:22
month [1] - 34:4
moot [3] - 8:3, 9:21, 10:10
moral [1] - 39:1
morning [5] - 13:9, 15:7, 28:16, 37:13, 49:15
Moss [1] - 31:22
most [4] - 25:1, 43:8, 47:9, 53:24
mother [6] - 38:4, 40:2, 40:3, 44:24, 50:21, 51:9
mother's [1] - 39:22
motion [15] - 5:7, 5:24, 9:6, 10:8, 10:13, 11:6, 11:11, 11:20, 12:8, 12:14, 12:15, 12:19, 12:22, 13:19, 58:15
move [3] - 7:16, 8:7, 9:20
moves [1] - 4:11
moving [1] - 10:20
MR [71] - 2:14, 8:10, 8:16, 9:8, 9:15, 9:22, 10:7, 10:21, 11:8, 11:11, 12:12, 12:24, 13:4, 13:5, 13:21, 16:8, 17:22, 18:1, 18:24, 19:7, 19:17, 20:9, 21:14, 22:14, 23:20, 26:1, 26:21, 27:4, 27:10, 28:13, 28:19, 29:19, 30:24, 31:24, 32:5, 34:14, 39:9, 39:12, 39:14, 39:16, 39:19, 39:22, 40:2, 40:6, 40:20, 41:5, 41:10, 41:17, 42:4, 43:15, 44:18, 45:20, 48:19, 49:1, 49:3, 53:3, 53:4, 53:9, 53:12, 54:7, 54:11, 54:23, 55:1, 55:25, 56:12, 56:16, 57:21, 57:23, 58:2, 58:16, 58:23
MS [2] - 2:7, 5:18
multiple [1] - 21:20

Munchel [5] - 19:25, 20:3, 24:25, 25:3, 33:6
must [1] - 27:25

N

name [3] - 35:17, 36:2, 41:6
nature [4] - 29:20, 29:24, 31:12, 55:24
NE [1] - 1:17
near [1] - 24:4
necessarily [1] - 43:17
necessary [4] - 24:2, 28:3, 28:4, 35:6
necessitates [1] - 20:7
need [17] - 6:19, 6:25, 9:3, 10:3, 14:13, 17:25, 28:9, 28:10, 39:23, 44:12, 53:16, 54:14, 57:7, 57:19, 57:24, 58:10, 58:21
needs [2] - 20:3, 58:12
neighborhood [3] - 43:9, 43:10, 50:25
neighbors [1] - 35:5
never [1] - 9:1, 26:22, 32:10, 33:19, 47:20, 52:5, 52:7, 52:11, 53:6, 53:7, 54:1
new [1] - 54:11
next [3] - 10:2, 47:8, 57:17
night [1] - 35:12
Nken [1] - 9:6
NO [1] - 1:5
nobody [2] - 29:10, 29:11
nonappearance [1] - 19:13
none [2] - 30:9, 30:17
nonetheless [1] - 18:18
note [3] - 4:23, 6:2, 9:25
noted [2] - 30:23, 32:20
nothing [6] - 8:18, 8:20, 31:1, 31:2, 35:2, 54:7
November [1] - 4:1
nucleus [1] - 26:10
number [4] - 5:9, 23:22, 34:8, 34:9

NW [2] - 1:13, 1:24

O

o'clock [1] - 28:16
Oath [2] - 30:17, 40:25
object [2] - 8:12, 55:25
objecting [2] - 9:22, 9:23
obligation [6] - 8:23, 8:24, 12:3, 25:8, 26:13, 47:11
obligations [2] - 12:18, 47:9
obsessing [1] - 22:25
obsessive [3] - 30:24, 35:3, 37:22
obstruct [1] - 33:20
obstructed [2] - 33:21
obviate [2] - 6:25, 9:3
obviously [5] - 11:12, 11:25, 12:17, 17:6, 44:5
occasions [1] - 50:6
occur [2] - 6:19, 7:10
occurrence [1] - 21:21
occurs [1] - 7:12
OF [3] - 1:1, 1:3, 1:9
offense [7] - 14:7, 17:20, 18:17, 19:6, 19:21, 21:9, 28:9
offenses [1] - 55:18
office [2] - 50:2, 50:3, 50:7
Office [2] - 1:12, 3:4
OFFICER [2] - 1:20, 2:20
officer [2] - 45:24, 46:2
officers [1] - 30:4
offices [2] - 45:16, 45:18
OFFICIAL [1] - 59:11
Official [2] - 1:23, 59:4
officials [3] - 14:2, 24:13, 47:6
often [2] - 7:12, 13:13
old [2] - 30:22, 52:13
once [5] - 2:10, 4:18, 37:16, 41:6, 57:13
one [41] - 3:19, 4:24, 5:9, 6:8, 7:6, 7:13,

10:13, 12:20, 16:11, 19:11, 20:18, 21:20, 22:4, 23:15, 23:17, 24:9, 24:10, 24:18, 25:14, 26:4, 26:14, 26:16, 27:19, 30:13, 32:2, 32:3, 33:20, 33:21, 33:25, 34:14, 36:20, 37:8, 37:10, 37:19, 39:1, 45:18, 45:23, 45:25, 47:9, 55:21
onerous [2] - 16:15, 16:18
ongoing [2] - 3:11, 37:4
online [5] - 22:24, 51:23, 51:24, 52:17, 56:8
open [3] - 30:5, 41:13, 44:12
opined [1] - 24:1
opportunity [6] - 5:10, 10:1, 22:12, 40:13, 40:14, 58:17
opposite [2] - 17:16, 33:18
opposition [1] - 13:9
order [8] - 4:7, 4:14, 4:19, 5:2, 23:11, 36:19, 56:22, 58:8
Order [1] - 2:1
orderings [1] - 29:6
organizations [1] - 30:17
otherwise [3] - 21:20, 22:23, 23:2
outright [1] - 18:10
outside [3] - 7:13, 32:22, 37:2
own [6] - 14:24, 15:4, 44:13, 44:14, 47:22, 55:6
owned [2] - 29:8, 38:13
oxidizing [2] - 15:5, 20:22

P

p.m [6] - 1:10, 2:1, 56:20, 59:1
page [4] - 18:24, 28:17, 28:24, 59:6
papers [4] - 13:13, 14:15, 20:17, 55:16
pardoned [1] - 31:3
parent [1] - 38:4
parents [2] - 32:16, 37:21

parole [1] - 29:8
part [5] - 4:9, 18:15, 25:4, 53:25, 58:16
participating [1] - 30:7
particularly [1] - 13:14
parties [8] - 2:5, 5:3, 6:6, 6:23, 13:2, 13:24, 20:2, 24:14
parties' [1] - 57:7
parts [3] - 32:11, 34:20, 36:6
party [7] - 25:22, 40:11, 46:10, 46:13, 48:25, 53:1, 57:12
passed [1] - 17:9
past [1] - 20:5
path [1] - 27:9
patience [1] - 56:24
pattern [5] - 15:12, 26:7, 30:6, 37:25
pay [1] - 40:17
Peachtree [1] - 1:17
pending [5] - 7:24, 11:6, 14:15, 17:11, 54:18
people [10] - 13:12, 24:14, 24:19, 26:10, 26:11, 31:3, 36:6, 43:9, 46:20, 47:19
perform [1] - 45:17
perhaps [2] - 7:12, 23:7
period [2] - 21:8, 21:13
permanently [1] - 40:6
permits [1] - 3:20
persistent [1] - 15:15
persists [1] - 22:1
person [8] - 31:18, 33:1, 33:16, 36:10, 36:14, 37:5, 40:12, 44:9
personal [2] - 22:21, 41:22
personally [1] - 38:25, 55:14
persuasion [1] - 28:21
pertinent [1] - 4:8
ph [1] - 35:17
phone [15] - 15:8, 17:1, 21:16, 21:17, 21:20, 21:25, 31:1, 31:5, 33:22, 43:23, 43:25, 47:25, 48:1, 52:2
physically [1] - 38:6

pick [2] - 21:17, 47:25
picks [1] - 42:2
pipe [7] - 13:23, 14:20, 15:3, 24:3, 24:7, 33:13
pizza [1] - 35:7
place [6] - 5:20, 8:4, 40:18, 45:12, 53:17, 58:3
placed [2] - 24:10, 24:11
placement [1] - 15:25
plain [1] - 35:14
Plaintiff [1] - 1:7
planned [1] - 15:13
planning [1] - 14:19
planted [3] - 14:22, 24:21, 34:18
planting [1] - 13:22, 52:21
play [1] - 58:9
plays [1] - 28:15
pleadings [1] - 58:2
point [28] - 5:10, 5:11, 5:17, 6:13, 10:3, 10:19, 10:22, 10:24, 12:16, 14:12, 15:18, 16:2, 20:9, 21:18, 21:22, 22:15, 22:20, 22:25, 23:19, 25:1, 27:17, 27:18, 28:18, 34:1, 49:18, 52:24, 55:15, 56:7
pointed [1] - 30:18
points [3] - 17:16, 22:9, 55:2
political [6] - 13:24, 15:13, 24:14, 30:7, 30:16, 37:2
popped [1] - 30:5
poses [1] - 16:19, 19:24, 33:2
position [9] - 3:19, 3:20, 6:14, 8:22, 9:3, 9:23, 15:21, 16:4, 22:12
possession [4] - 34:6, 34:12
post [1] - 20:10
posting [1] - 56:9
potassium [3] - 15:4, 20:21, 21:2
potential [3] - 17:4, 23:14, 30:8
potentially [2] - 7:10, 30:4
powder [1] - 32:8
power [1] - 14:2

practice [2] - 40:10, 40:12
preceding [1] - 40:1
precisely [2] - 14:16, 23:10
precludes [1] - 4:19
preference [1] - 27:15
preferred [1] - 26:25
prejudice [2] - 12:16, 12:23
preliminary [20] - 2:25, 5:23, 6:1, 6:2, 6:7, 6:9, 6:14, 6:18, 6:25, 7:16, 7:18, 7:21, 7:23, 8:1, 8:4, 8:18, 9:21, 10:9, 10:13, 54:16
premature [1] - 12:4
prepared [2] - 6:9, 13:2
present [1] - 12:22
presentation [1] - 54:20, 55:2
presented [2] - 7:25, 57:3
press [2] - 36:11, 36:12
presumption [17] - 14:9, 14:13, 17:6, 17:7, 17:13, 17:14, 17:15, 17:18, 18:8, 18:12, 18:21, 19:3, 25:5, 26:24, 28:11, 28:20
Pretrial [1] - 2:21
PRETRIAL [2] - 1:20, 2:20
pretrial [15] - 13:7, 14:10, 14:13, 18:11, 22:9, 26:14, 26:16, 37:9, 37:12, 37:13, 37:16, 39:9, 39:12, 54:21, 57:11
pretty [1] - 48:8
prevent [1] - 17:1
previous [1] - 39:2
previously [2] - 8:21, 12:9
principally [1] - 4:14
prison [2] - 38:7, 38:9
privacy [1] - 37:23, 41:12
private [1] - 52:5
probable [5] - 9:10, 9:13, 14:8, 17:19, 18:8, 18:16, 18:20, 19:2, 19:5, 27:6, 27:8, 27:25, 28:4, 28:7,

28:11
probation [1] - 29:9
problem [2] - 12:12, 37:5
problems [1] - 11:13
Procedure [2] - 6:17, 6:24
proceed [6] - 4:21, 6:9, 10:12, 10:15, 13:3, 18:6
proceeding [2] - 8:1, 54:16
proceedings [2] - 5:1, 5:22
Proceedings [2] - 5:20, 59:1
process [1] - 37:15
proclivity [1] - 15:15
produce [1] - 9:10
Produced [1] - 1:25
product [1] - 31:23
production [1] - 28:21
proffer [15] - 18:7, 18:20, 19:5, 19:23, 20:24, 21:6, 21:12, 28:6, 31:13, 32:6, 34:7, 35:4, 54:12, 55:13, 56:9
proffered [5] - 18:18, 21:15, 21:23, 22:20, 26:6
proffers [1] - 34:4
profile [1] - 48:3
program [1] - 16:1
projected [1] - 24:6
projects [1] - 23:19
promptly [2] - 7:18, 8:4
pronounced [1] - 23:7
proper [1] - 3:12
properly [1] - 9:18
property [2] - 31:15, 31:17
proposal [1] - 39:5
proposed [4] - 16:11, 16:12, 25:19, 25:21
proposing [5] - 15:22, 15:23, 16:6, 40:11, 46:9
prospective [1] - 19:24
prove [1] - 30:1
proven [1] - 25:6
provide [5] - 5:10, 10:18, 11:23, 12:1, 18:14
provided [6] - 5:4,

10:22, 10:25, 12:11, 20:10, 55:13
provides [1] - 18:20
providing [1] - 11:13
proximity [1] - 24:4
public [4] - 4:9, 5:5, 14:2, 24:12
pull [2] - 8:14, 42:1
pulls [1] - 42:1
purchase [10] - 15:2, 20:20, 21:6, 21:10, 21:23, 32:19, 32:21, 33:9, 34:2, 46:17
purchased [2] - 20:14, 20:18
purchases [4] - 20:11, 21:22, 34:17, 37:6
purchasing [2] - 34:10, 52:14
purpose [1] - 14:1
purposes [10] - 12:22, 18:1, 18:8, 19:3, 27:5, 36:16, 41:12, 53:13, 54:15, 57:12
pursuant [1] - 15:25
pursue [1] - 7:4
put [8] - 9:2, 17:25, 24:22, 30:19, 34:3, 35:4, 36:18, 37:7
putting [1] - 17:22

## Q

questioning [1] - 56:7
questions [9] - 25:2, 40:13, 40:15, 48:17, 48:18, 48:22, 48:23, 53:11
quickly [3] - 9:4, 28:15, 30:18
quiet [1] - 42:25, 50:13, 50:21
quite [2] - 20:25, 33:18
quote [6] - 4:9, 4:12, 18:15, 25:8, 27:6, 27:13
quoting [1] - 27:8

## R

radicalized [1] - 23:1
radius [2] - 23:15, 23:23
raise [1] - 58:18
rallies [1] - 30:8
random [1] - 36:19

randomly [1] - 30:25
rather [2] - 41:14, 58:5
RDR [1] - 59:10
RDR-CRR [1] - 59:10
reach [1] - 57:8
reached [1] - 4:15
read [5] - 24:25, 27:3, 27:12, 35:12, 37:8
reaffirming [1] - 25:7
real [1] - 32:4
reality [1] - 36:9
really [5] - 11:12, 21:17, 34:20, 38:7, 51:6
Realtime [1] - 1:23
rear [1] - 43:8
reason [7] - 18:19, 21:1, 31:7, 32:9, 52:7, 52:8, 52:13
reasonable [2] - 29:1, 33:1
reasonably [2] - 17:12, 25:24
reasons [3] - 10:10, 20:18, 39:1
rebut [1] - 28:23
rebuttable [4] - 17:15, 18:21, 26:24, 28:20
recap [1] - 5:1
receive [3] - 3:9, 3:14, 4:18
recent [2] - 6:4, 25:1
recess [2] - 56:17, 56:19
Recessed [1] - 56:20
reciting [2] - 29:21, 55:17
recognize [1] - 10:4
recognized [1] - 18:6
recognizing [1] - 26:13
reconvened [1] - 56:22
Record [1] - 1:25
record [17] - 2:5, 2:23, 6:2, 8:12, 8:15, 8:23, 9:24, 10:4, 10:11, 13:6, 14:11, 16:21, 26:5, 43:13, 56:23, 58:1, 59:5
recording [1] - 42:2
recovered [3] - 34:5, 34:8, 34:9
red [1] - 51:17
redacted [1] - 58:12
redactions [3] - 5:5, 5:8, 58:13

redacts [1] - 58:14
REDDIT [1] - 51:18
Reddit [3] - 51:16, 55:8, 56:8
reddit [1] - 51:18
REEVES [1] - 1:22, 59:10
Reeves [2] - 59:4, 59:10
reflection [1] - 57:7
Reform [5] - 17:9, 18:12, 19:10, 22:4, 56:5
registered [1] - 36:2
Registered [1] - 1:22
regular [2] - 21:17, 21:25, 34:13, 48:14
regulations [1] - 59:6
rehashing [1] - 4:1
rejected [2] - 4:3, 28:1
related [2] - 21:2, 36:20
relates [1] - 8:17
relating [1] - 11:1
relationship [1] - 40:8
release [14] - 9:11, 9:12, 14:15, 15:23, 16:13, 17:4, 25:14, 25:21, 38:5, 39:6, 40:11, 46:5, 47:10, 54:22
released [5] - 9:9, 15:22, 17:11, 25:16, 36:17
releasing [2] - 25:15, 26:9
relevant [1] - 18:15
reliable [1] - 23:23
relief [1] - 10:3
rely [1] - 16:16
relying [1] - 55:12
remains [2] - 4:6, 28:23
remember [1] - 29:23
removing [1] - 46:6
renew [2] - 12:19, 12:21
repeat [1] - 13:13
repeating [1] - 26:1
report [1] - 47:11
REPORTER [1] - 59:11
Reporter [4] - 1:22, 1:23, 1:23, 59:4
reporting [3] - 32:24, 38:20
represented [1] -

38:24
request [2] - 8:5, 14:15
requested [2] - 5:8, 12:9
requesting [2] - 11:21, 15:12
require [1] - 9:12
required [1] - 19:2, 28:8
requires [1] - 12:7
requisite [1] - 18:20
reread [1] - 24:24
researching [1] - 52:17
reset [1] - 21:16
resetting [1] - 21:19
residence [1] - 39:7
resorted [1] - 23:11
respect [4] - 21:15, 23:12, 54:21, 55:10
respectfully [1] - 54:11
respond [3] - 17:21, 55:1, 58:17
response [2] - 6:15, 14:3
responsibility [3] - 6:7, 16:13, 50:3
restrictive [1] - 16:10
rests [1] - 8:25
result [1] - 18:16
results [1] - 14:3
retired [2] - 53:22, 53:23
return [7] - 3:23, 6:23, 10:12, 14:16, 15:20, 17:22, 58:7
returned [5] - 3:7, 3:14, 4:24, 7:1, 9:14
reunions [1] - 42:10
review [2] - 5:13, 57:7
reviewed [3] - 11:20, 13:6, 13:8
rid [1] - 52:23
riled [3] - 30:12, 55:4, 55:7
Ring [1] - 51:11
rise [2] - 56:19, 56:21
risk [9] - 19:11, 19:13, 19:15, 19:24, 21:13, 24:15, 25:24, 26:1, 32:4
Road [1] - 1:17
ROBERT [1] - 1:13
role [1] - 49:25
rolling [1] - 10:22
room [3] - 37:24,

43:18, 45:12
rooms [1] - 43:16
routine [2] - 34:25, 35:6
Rule [1] - 6:16
rule [2] - 12:6, 12:7
Rules [2] - 6:17, 6:24
rules [1] - 12:7
ruling [8] - 4:2, 4:6, 4:8, 4:9, 8:6, 8:10, 57:6, 57:8
run [3] - 38:16, 50:2, 53:17
running [1] - 37:20

## S

safety [2] - 17:12, 40:17
sat [1] - 24:15
satisfied [1] - 11:17
Saturday [1] - 42:14
saw [1] - 21:4
scheduled [2] - 6:3, 6:8
science [1] - 21:3
seal [2] - 5:7, 58:15
sealed [3] - 5:20, 58:2, 58:11
search [1] - 33:21
seated [1] - 56:22
seats [1] - 52:11
Second [2] - 27:21, 27:22
second [4] - 5:23, 19:14, 32:3, 58:16
Section [3] - 3:8, 3:18, 6:17
section [4] - 3:18, 3:21, 4:3, 17:20
secured [2] - 3:4, 43:3
security [1] - 42:23
see [8] - 12:13, 19:15, 22:22, 34:17, 36:20, 38:4, 39:24, 45:6
seeing [2] - 31:5, 31:6
seek [1] - 19:11
seeking [1] - 7:4
seem [2] - 20:2, 37:19
seized [1] - 44:23
send [3] - 24:13, 32:17, 48:1
sense [2] - 12:4, 57:15
sensitive [1] - 57:5
sent [1] - 58:4

separate [1] - 36:16
separated [1] - 30:3
separately [1] - 58:5
separation [1] - 30:3
September [1] - 42:20
serious [3] - 15:19, 26:14, 27:14
served [2] - 7:19, 9:19
Service [1] - 2:21
services [5] - 37:9, 37:12, 37:13, 37:16, 39:12
set [11] - 2:4, 2:24, 8:23, 15:24, 16:6, 16:12, 16:14, 32:22, 33:7, 36:17, 36:24
sets [1] - 20:19
setting [2] - 19:5, 41:13
shall [1] - 12:8
Shania [2] - 1:20, 2:20
SHARBAUGH [1] - 1:9
sharp [1] - 6:6
Shoreman [2] - 1:15, 2:15
SHOREMAN [2] - 1:16, 2:14
shortly [1] - 58:8
showing [1] - 33:25
shrapnel [1] - 24:6
side [8] - 5:5, 6:8, 8:7, 11:4, 13:12, 26:20, 43:8, 58:14
sides [4] - 4:17, 13:18, 57:3, 58:9
sight [1] - 35:14
significant [1] - 11:12
similar [1] - 4:12
simply [4] - 7:4, 16:13, 26:24, 55:16
single [1] - 36:6
sister [1] - 38:20
sit [1] - 40:23
sitting [3] - 3:5, 3:22, 3:23
situation [3] - 30:20, 32:17, 39:2
small [1] - 25:4
smart [1] - 43:23
Smith [1] - 18:3
so-called [1] - 36:1
solitary [1] - 16:10
someone [5] - 22:22, 25:16, 30:2, 44:5, 44:12

**sometime** [1] - 10:2
**sometimes** [5] - 46:19, 49:22, 49:23, 50:8, 53:16
**somewhat** [2] - 20:16, 22:15
**SONJA** [2] - 1:22, 59:10
**Sonja** [2] - 59:4, 59:10
**sorry** [5] - 9:11, 39:11, 41:25, 43:4, 49:25
**sort** [7] - 3:20, 20:1, 23:22, 44:2, 52:4, 52:5
**sought** [1] - 12:10
**sounds** [2] - 12:14, 28:18
**space** [1] - 37:23
**specific** [1] - 43:6
**specifically** [3] - 3:3, 6:22, 13:23
**speed** [1] - 36:4
**spent** [2] - 35:1, 50:23
**stance** [1] - 27:12
**stand** [4] - 10:19, 39:23, 40:23, 58:25
**stands** [1] - 56:19
**start** [3] - 13:19, 26:21, 28:19
**started** [1] - 36:22
**starting** [1] - 2:6
**state** [3] - 41:6, 41:14, 58:9
**statement** [1] - 18:10
**STATES** [2] - 1:1, 1:3
**states** [1] - 12:8
**States** [8] - 1:12, 2:3, 3:4, 12:10, 13:25, 18:13, 59:4, 59:7
**statute** [8] - 6:25, 8:24, 14:7, 14:10, 17:8, 17:9, 18:6, 22:16
**statutes** [1] - 9:12
**stay** [4] - 4:14, 4:19, 9:6, 50:6
**stayed** [1] - 40:7
**staying** [1] - 4:7
**stays** [1] - 28:21
**step** [2] - 40:22, 54:9
**steps** [1] - 45:3
**Stewart** [1] - 3:24
**still** [9] - 6:14, 10:2, 28:23, 31:24, 34:5, 34:11, 37:4, 38:21, 42:18
**stock** [1] - 36:7

**stock-arming** [1] - 36:7
**stockpiling** [1] - 36:13
**stopping** [2] - 8:19, 8:20
**Street** [1] - 1:13
**street** [2] - 41:14, 43:8
**strict** [3] - 25:16, 33:7, 36:24
**stringent** [3] - 15:24, 16:6, 36:17
**struck** [2] - 12:4, 18:9
**structure** [2] - 7:7, 7:8
**study** [1] - 5:14
**stuff** [6] - 11:16, 35:13, 36:7, 40:7, 48:14, 54:12
**subject** [5] - 5:12, 15:23, 16:5
**submission** [1] - 58:13
**submissions** [1] - 58:14
**submit** [1] - 4:17
**submits** [1] - 14:8
**subsequent** [1] - 4:5
**successfully** [1] - 26:11
**sufficient** [3] - 25:23, 28:2, 28:3
**sufficiently** [1] - 16:15
**suitability** [2] - 48:24, 52:25
**summarized** [1] - 18:19
**summarizes** [1] - 58:8
**Sunday** [3] - 5:24, 13:8, 42:14
**Superior** [5] - 3:6, 3:15, 3:22, 4:24
**supervise** [1] - 38:19
**supervision** [1] - 16:1
**supplemental** [2] - 58:17, 58:20
**support** [3] - 11:2, 13:7, 13:16
**surety** [1] - 48:12
**surrounding** [1] - 54:21
**survive** [2] - 38:8, 38:9
**swear** [1] - 40:24
**SWORN** [1] - 41:3

**system** [5] - 25:5, 43:20, 43:24, 48:8, 48:13

**T**

**table** [1] - 20:10
**targeting** [1] - 24:12
**technical** [1] - 35:17
**ten** [2] - 42:18, 42:19
**term** [1] - 23:14
**terms** [3] - 10:23, 18:5, 22:18
**terrorism** [1] - 14:6
**test** [5] - 19:25, 29:3, 29:12, 29:16, 32:15
**testimony** [1] - 50:10
**testing** [1] - 32:10
**text** [2] - 30:15, 33:25
**thankfully** [2] - 23:17, 32:2
**THE** [133] - 1:1, 1:9, 1:12, 1:15, 2:11, 2:18, 2:22, 5:19, 5:23, 6:16, 8:14, 9:7, 9:14, 9:16, 10:6, 10:8, 11:3, 11:10, 11:19, 12:13, 12:25, 13:6, 15:18, 17:5, 17:24, 18:23, 19:1, 19:8, 19:19, 21:4, 22:3, 23:12, 24:22, 26:18, 27:2, 27:5, 27:18, 28:14, 29:17, 30:23, 31:20, 31:25, 34:1, 39:4, 39:11, 39:13, 39:15, 39:17, 39:20, 39:23, 40:3, 40:9, 40:22, 41:1, 41:9, 41:12, 41:15, 41:25, 43:4, 43:7, 43:11, 43:13, 43:14, 43:20, 43:21, 43:22, 43:25, 44:1, 44:4, 44:5, 44:8, 44:11, 44:14, 44:15, 44:16, 44:17, 45:21, 45:23, 46:1, 46:3, 46:4, 46:8, 46:9, 46:14, 46:19, 46:22, 46:23, 46:25, 47:1, 47:2, 47:3, 47:4, 47:8, 47:13, 47:14, 47:15, 47:16, 47:18, 47:19, 47:23, 47:24, 48:3, 48:9, 48:11, 48:17, 48:21, 52:24, 53:10, 53:13, 53:15, 53:18, 53:19, 53:20, 53:21, 53:22, 53:23, 53:24,

54:1, 54:2, 54:3, 54:4, 54:8, 54:14, 54:24, 56:4, 56:14, 56:17, 56:23, 57:22, 57:24, 58:7, 58:22, 58:24
**themselves** [1] - 2:10
**thinking** [4] - 6:4, 23:24, 33:13
**third** [7] - 25:22, 40:11, 46:10, 46:13, 48:25, 53:1, 57:12
**third-party** [7] - 25:22, 40:11, 46:10, 46:13, 48:25, 53:1, 57:12
**thoughts** [1] - 54:25
**threatening** [2] - 24:5, 56:10
**three** [3] - 32:19, 33:10, 37:6
**threshold** [2] - 7:20, 54:17
**throughout** [3] - 41:24, 42:5, 42:6
**ties** [1] - 29:7
**timely** [1] - 12:2
**timing** [1] - 13:10
**today** [18] - 2:16, 2:24, 4:6, 5:2, 5:13, 6:1, 6:3, 6:8, 8:2, 8:8, 8:19, 9:9, 10:9, 24:25, 28:6, 32:14, 54:15, 57:3
**together** [1] - 42:11
**took** [2] - 5:20, 35:24, 36:18
**totality** [2] - 20:23, 22:21
**towards** [1] - 33:6
**TRANSCRIPT** [1] - 1:9
**Transcript** [1] - 1:25
**transcript** [4] - 5:21, 59:5, 59:5, 59:6
**transported** [1] - 14:21
**transporting** [1] - 13:22
**trash** [1] - 24:17
**treatment** [1] - 25:10
**trial** [4] - 14:16, 17:11, 25:3, 36:15
**tried** [5] - 27:11, 34:16, 34:19, 34:22, 35:13
**tries** [1] - 44:5
**triggering** [2] - 17:20, 19:3
**trouble** [1] - 22:23

**troubling** [2] - 30:6, 56:10
**true** [7] - 3:7, 15:21, 32:17, 44:3, 44:11, 56:1, 59:5
**truly** [1] - 26:5
**trunk** [2] - 37:24, 52:12
**trust** [3] - 16:17, 26:3, 38:11
**truth** [1] - 35:2
**truthful** [1] - 35:9
**try** [1] - 30:19
**trying** [7] - 32:17, 35:1, 35:14, 35:18, 35:19, 35:20, 36:4
**turn** [4] - 2:24, 10:15, 20:15, 23:9
**turned** [1] - 23:1
**two** [12] - 3:7, 3:8, 13:22, 13:24, 19:10, 21:11, 23:12, 27:19, 32:19, 33:10, 43:13, 45:16
**type** [3] - 23:10, 35:18, 37:3
**types** [3] - 11:22, 20:13, 45:3

**U**

**U.S** [2] - 1:9, 3:12
**U.S.C** [1] - 6:17
**ultimate** [1] - 35:22
**ultimately** [1] - 14:14
**Unabomber** [1] - 33:14
**unannounced** [2] - 32:23, 36:20
**unclear** [1] - 8:22
**under** [19] - 6:24, 8:10, 9:11, 13:14, 14:5, 14:6, 14:7, 14:9, 15:6, 17:8, 17:20, 18:5, 18:12, 22:4, 24:10, 25:16, 36:25, 56:5, 56:25
**underlying** [2] - 19:21, 53:1
**undermine** [1] - 27:15
**understandably** [1] - 55:10
**understood** [1] - 58:22
**unfortunate** [1] - 36:9
**unique** [2] - 7:7
**UNITED** [2] - 1:1, 1:3
**United** [8] - 1:12, 2:3,

3:4, 12:10, 13:25, 18:13, 59:4, 59:7
**unless** [4] - 12:8, 17:11, 58:11, 58:24
**unreasonable** [1] - 20:25
**unsupported** [1] - 30:25
**unusual** [1] - 36:25
**up** [29] - 11:5, 16:9, 16:25, 17:5, 21:17, 24:23, 24:24, 25:7, 26:19, 30:12, 32:11, 35:3, 36:4, 36:6, 37:8, 38:14, 38:21, 40:22, 40:24, 42:2, 42:3, 43:7, 43:13, 45:7, 47:25, 48:17, 53:10, 55:4, 55:7
**update** [2] - 10:18, 57:13
**upholding** [1] - 40:17
**upset** [1] - 24:12
**urgency** [1] - 57:5

## V

**vacuum** [1] - 25:12
**valid** [1] - 7:24
**variables** [1] - 23:22
**variety** [1] - 34:5
**vehicle** [1] - 34:9
**verify** [1] - 45:3
**versus** [2] - 2:3, 18:14
**vetted** [3] - 37:9, 37:11, 57:11
**vetting** [2] - 37:15, 39:10
**viability** [2] - 54:13, 55:11
**viable** [3] - 24:3, 32:14
**vicinity** [1] - 13:24
**video** [3] - 11:15, 38:2, 51:25
**view** [4] - 7:3, 16:2, 19:1, 25:18
**violate** [1] - 38:5
**violated** [1] - 47:10
**violence** [4] - 15:14, 23:1, 30:8, 37:3
**Virginia** [3] - 29:6, 39:7, 41:15
**visit** [4] - 42:10, 42:11, 50:24, 51:1
**visitation** [1] - 32:24
**visitations** [1] - 36:20

**visited** [1] - 40:6
**vs** [1] - 1:5

## W

**wait** [3] - 57:25, 58:20, 58:21
**waiting** [2] - 11:15, 36:10
**waive** [1] - 58:17
**waived** [1] - 9:1
**waiver** [1] - 32:25
**waiving** [1] - 10:5
**walks** [1] - 35:7
**wants** [7] - 5:17, 10:17, 11:4, 11:7, 13:12, 37:17, 38:4
**warrant** [2] - 25:9, 33:16
**warranted** [1] - 26:17
**Washington** [5] - 1:11, 1:14, 1:18, 1:24, 14:22
**watching** [4] - 33:10, 34:24, 35:9, 43:7
**website** [1] - 30:11
**week** [1] - 10:2
**weekends** [1] - 40:7
**weekly** [1] - 21:21
**weeks** [5] - 14:24, 33:11, 34:24, 39:25, 43:13
**weigh** [3] - 5:10, 6:10, 17:3
**weight** [2] - 56:1, 56:4
**welcome** [3] - 12:19, 12:21, 13:11
**whole** [7] - 29:15, 35:16, 36:15, 41:24, 42:5, 42:6, 48:4
**WILLIAMS** [38] - 1:16, 11:8, 11:11, 12:12, 12:24, 13:5, 26:21, 27:4, 27:10, 28:13, 28:19, 29:19, 30:24, 31:24, 32:5, 34:14, 39:9, 39:12, 39:14, 39:16, 39:19, 39:22, 40:2, 40:6, 40:20, 41:5, 41:10, 41:17, 42:4, 43:15, 44:18, 45:20, 48:19, 53:12, 54:11, 54:23, 55:25, 57:23
**Williams** [14] - 2:16, 11:8, 11:10, 27:20, 34:1, 35:11, 39:4, 41:2, 43:5, 48:17, 53:10, 55:2, 55:15,

57:10
**window** [2] - 10:3, 10:4
**wipe** [2] - 16:25, 21:17
**wiped** [1] - 15:8
**wiping** [1] - 21:19
**wish** [2] - 5:11, 8:7
**wishes** [1] - 58:18
**Witness** [1] - 54:10
**witness** [3] - 40:23, 40:25, 48:24
**WITNESS** [30] - 41:3, 41:15, 43:7, 43:13, 43:21, 43:25, 44:4, 44:8, 44:14, 44:16, 45:23, 46:3, 46:8, 46:14, 46:22, 46:25, 47:2, 47:4, 47:13, 47:15, 47:18, 47:23, 48:3, 48:11, 53:15, 53:19, 53:21, 53:23, 54:1, 54:3
**WL** [1] - 18:24
**Woodbridge** [1] - 29:6
**word** [2] - 14:25, 15:4
**words** [4] - 3:21, 46:14, 55:6, 55:8
**workday** [1] - 50:4
**works** [3] - 35:8, 38:14, 49:15
**workweek** [1] - 53:14
**wrap** [1] - 24:23
**wrapped** [1] - 25:7
**writing** [1] - 57:18
**wrote** [2] - 27:5, 35:10

## Y

**year** [1] - 42:17
**years** [17] - 18:4, 19:22, 21:11, 26:12, 29:6, 30:22, 32:19, 32:20, 33:10, 35:1, 37:6, 38:20, 40:5, 42:8, 42:18, 42:19, 49:14
**yesterday** [4] - 3:3, 3:10, 4:13, 5:2
**young** [3] - 30:22, 30:24
**yourself** [1] - 41:6
**yourselves** [1] - 2:5
**YouTube** [3] - 51:14, 55:8, 56:8

## Z

**zero** [1] - 30:10

1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2

3   UNITED STATES OF AMERICA,    )
                                 )
4            Plaintiff,          )
                                 )
5        vs.                     ) CASE NO. 1:26-cr-00001
                                 )
6   BRIAN J. COLE, JR.,          )
                                 )
7            Defendant.          )
    _____)
8

9                 TRANSCRIPT OF BOND REVIEW HEARING
          **BEFORE THE HONORABLE AMIR H. ALI, DISTRICT JUDGE**
10                 Wednesday - January 28, 2026
                    3:36 p.m. - 4:52 p.m.
11                     Washington, DC

12  **FOR THE GOVERNMENT:**
         Office of the United States Attorney
13       BY:  CHARLES ROBERT JONES and JOCELYN S. BALLANTINE
         601 D Street, NW
14       Washington, DC 20530

15  **FOR THE DEFENDANT:**
         McFadden & Shoreman, LLC
16       BY:  JOHN M. SHOREMAN
         1050 Connecticut Avenue, NW, Suite 500
17       Washington, DC 20036

18       Litson PLLC
         BY:  JOSEPH ALEX LITTLE, IV and ZACHARY CARTER LAWSON
19       54 Music Square East, Suite 300
         Nashville, Tennessee 37203
20
         HDR LLC
21       BY:  MARIO BERNARD WILLIAMS
         5600 Roswell Road, Building C, Suite 103
22       Sandy Springs, Georgia 30342
    _____
23                       **SONJA L. REEVES**
                   **Registered Diplomate Reporter**
24                   **Certified Realtime Reporter**
                   **Federal Official Court Reporter**
25         Transcript Produced from the Stenographic Record

1              (Call to Order of the Court at 3:36 p.m.)

2              DEPUTY CLERK:  This is Criminal Matter 26-1, *United*

3    *States of America versus Brian Cole, Junior.*

4              May I have counsel approach the lectern and state your

5    appearance for the record, beginning with the government.

6              MR. JONES:  Good afternoon, Your Honor.  Charles Jones

7    and Jocelyn Ballantine for the United States.

8              THE COURT:  Good afternoon to both of you.

9              MR. SHOREMAN:  Good afternoon, Your Honor.  John

10   Shoreman, Mario Williams, Zach Lawson and Alex Little.  Thank

11   you, Your Honor.

12             THE COURT:  Good afternoon to you, Mr. Shoreman, and

13   to the team as well.

14             Good afternoon, Mr. Cole.

15             THE DEFENDANT:  Good afternoon.

16             THE COURT:  Good to be with you all.

17             Mr. Cole, let me just say at the outset, I know you

18   have appeared in front of a few different judges at this point,

19   and there have been some magistrate judges that have overseen

20   some of the preliminary matters in the case.  I'll be presiding

21   over the case from here on out now that an indictment has been

22   filed, so there will be fewer new faces as you come in and out

23   of the courtroom, at least on this side of the bench.

24             In your last court appearance, you were arraigned

25   under the federal indictment, so, in other words, the charges

1    were presented and you entered your plea of not guilty.  Today

2    we're here for our first status conference in your case.   In

3    other words, I'm going to have some conversation with the

4    government, with your attorneys, and we're going to talk about

5    where things stand and next steps.

6          Turning to the attorneys, I have a couple quick

7    housekeeping matters for counsel.  We'll then proceed with the

8    first status conference.

9          I have resolved, as you know, the detention challenge

10   that was premised on the indictment and the preliminary hearing

11   issue.  I understand defense counsel is challenging the merits

12   of Judge Sharbaugh's detention determination.  I have reviewed

13   the papers and all the evidence that is attached to them, and

14   reviewed Judge Sharbaugh's decision closely.

15         And I'm going to let the parties have some time at the

16   end of this hearing to present argument, and I can kind of

17   direct you to what I'm most interested in at that point.

18         Anything else to put on my radar at the moment before

19   I jump into the housekeeping issues that I mentioned?

20         MR. JONES:  Not from the government.

21         MR. SHOREMAN:  No, Your Honor.

22         THE COURT:  Let me just address counsel for both sides

23   on two preliminary matters.

24         First, this is a case with some public attention

25   attached to it.  I prefer to just say this at the outset to

1   avoid any issue.  This is not made in response to any
2   particular thing that's happened, but let's be clear that this
3   is a court of law.  It's not a pressroom.  I have very little
4   patience for antics from counsel or otherwise.
5        So, you know, my interest is first and foremost going
6   to be to ensure a fair process, that will be for the
7   government, which is entitled to put its case on, and it will
8   certainly be for Mr. Cole as well, whose rights will be
9   respected.
10       And I'll treat you all with dignity.  I'll expect the
11  parties to treat one another with dignity and civility.  So I'm
12  going to leave it at that.  Again, like I said, it's not in
13  response to anything in particular at this point, and let's not
14  have to come back to it at any point.
15       Second, my policy is to have everything take place on
16  the record.  I know different courts, different judges have
17  different practices around this.  I like to just be clear on
18  mine.  If at any point you think you need clarification on
19  something or you're entitled to some sort of relief, do it in
20  writing on the docket rather than through a phone call.
21       My chambers will not give information that route or
22  through an email to chambers, we'll do it through the docket.
23       One caveat is for hearings, scheduling hearings, in
24  which case you can correspond with my courtroom deputy, who
25  will reach out to you when there is a need for that.  Okay?

1   But that won't relate to anything in substance.  All of that

2   will happen on the record.

3          Those are my two housekeeping matters.  Why don't we

4   jump into the status conference, and maybe I'll hear from the

5   government on where we are at a minimum with respect to

6   discovery.

7          MR. JONES:  Thank you, Your Honor.  The government has

8   been providing discovery on a rolling basis.  On January 20th,

9   the government met with the defense team, specifically on the

10  topic of discovery, and explained our approach to what is a

11  considerable amount of information.

12         And during the course of that conversation, we

13  articulated the way we're approaching discovery.  The defense

14  indicated to the government that they did not object to how the

15  government plans to proceed.  So at least from the government's

16  perspective, we plan to proceed consistent with what we

17  discussed during that meeting.

18         And at this time, we don't have anything to raise with

19  the Court, but should that happen, we would involve the Court

20  at that time.

21         THE COURT:  Can you give me more details on what you

22  mean by your approach and how you plan to proceed?

23         MR. JONES:  Sure.  So I don't know how detailed you

24  want me to get, but with respect to --

25         THE COURT:  Maybe you can give me just a high level

1  understanding of what the discovery looks like and what needs

2  to be provided and what's been provided to date or a timeline

3  for providing it.

4      MR. JONES:  This case, obviously, involved a five-year

5  investigation.  The FBI opened a file related to that

6  investigation.  Mr. Cole, as a suspect, did not emerge until

7  very late in that investigation.

8      And so the government's approach in terms of providing

9  discovery to the defense team has been to create a new case,

10  the FBI created a new case for Mr. Cole in particular, and then

11  to re -- what the FBI calls serialize -- but essentially to

12  copy all the information pertaining to Mr. Cole as sort of the

13  first step into a new case file, that has been produced to the

14  defense.

15      And that would include targeted legal process

16  pertaining to Mr. Cole, things like his purchase history, cell

17  phone data, the results of Rule 41 search warrants, those types

18  of things.

19      What we are still in the process of figuring out the

20  best way to provide to the defense is the broader legal process

21  that was issued in the course of the case.  So, for example, a

22  subpoena to a hardware store for all purchases between X date

23  and X date.  In that case, the government didn't have reason to

24  believe that Mr. Cole's identifiers were contained in that set

25  of records, but the government still plans to provide it.  It's

 1  just voluminous.

 2         That's just one example of that kind of category of

 3  information that we are taking on next, as well as legal

 4  process that would have been targeted to individuals other than

 5  Mr. Cole during the course of the investigation, which is also

 6  a large universe of material that the government is in the

 7  process of preparing for the defense to be provided in

 8  discovery.  And these are all in general terms the topics that

 9  I covered with the defense team.

10         THE COURT:  Okay.  Got it.  Is that latter category,

11  just getting it, kind of also you have got the case file as it

12  relates to Mr. Cole in particular, but also, obviously,

13  thinking about it from the lens of *Brady* and all of that?

14         MR. JONES:  Exactly.  As the Court might imagine, over

15  the five years, the FBI looked at various individuals in

16  connection with this investigation, and so we're in the process

17  of preparing that material for production.

18         Of course, that's going to implicate personal

19  identifying information, privacy considerations.  At this time,

20  we have a protective order in place, so we're planning to

21  provide that material to the defense.

22         THE COURT:  That's really helpful.  Anything else that

23  you want to put on my radar at this point?

24         MR. JONES:  Nothing specific at this time, but the

25  defense provided the government with at least a sort of

1  preliminary understanding of the areas that they are interested

2  in beyond what I have been articulating here.

3         I think the most efficient way to deal with that will

4  be for the parties to have an open line of communication, a

5  dialogue on those topics, and if we get to an impasse where the

6  Court would need to resolve a dispute, we can address it then.

7         THE COURT:  That will be fine.  Do you have a rough

8  broader timeline for how long you think you will need to get

9  through these various tranches of production to the other side

10  and also a more immediate next step for us today?

11         MR. JONES:  I think in terms of what I have summarized

12  so far, we would be talking about weeks, several weeks to get

13  that material prepared.  What we're trying to be mindful of is

14  to not bury the defense in material and to be thoughtful about

15  the way that we produce it.

16         But I think we're talking about a matter of several

17  weeks to get those categories of information turned over.

18         THE COURT:  Have you discussed that timeline with the

19  defense?

20         MR. JONES:  I don't know if I put it in those terms.

21         THE COURT:  I can ask them.  That's fine.

22         What are you proposing in terms of a next status

23  conference?

24         MR. JONES:  We discussed prior to the start of the

25  hearing setting a status date for 30 days out.  The defense

1  indicated that they would be willing to toll the speedy trial

2  clock between now and 30 days, and I think that that would

3  allow the parties a little bit of extra time to discuss how

4  this case will proceed from here.

5          THE COURT:  Okay.  Anything else?

6          MR. JONES:  That's all for now.

7          THE COURT:  Okay.  Let me hear from defense counsel.

8          MR. LITTLE:  I don't have anything to disagree with

9  the government on, except to say that there is going to be a

10  ton of discovery.

11          One of the things that we proposed that wasn't

12  mentioned is we need a way to track the discovery that's being

13  provided.  Most of this, if not all of it, is digital, and so

14  it's not easily susceptible to Bates stamps or even load files,

15  any of that sort of thing.

16          We have -- did you receive it today from us, our

17  proposed spreadsheet?  We have provided the government with

18  sort of a proposed running log that is already at 8,000 items

19  that they have produced, so that we can sort of confirm we have

20  it, that we're able to open it, that it was a valid file, that

21  lists what the file is, so we don't have a dispute two months

22  down the road that they say they gave us something and they

23  didn't.  Just as an initial step, we're working on a log

24  between the two of us that's pretty monumental.

25          In the course of those conversations, I understand

1    there is FBI files that the government has mentioned, which is,

2    I think, expected.  One thing we've made a request that we want

3    to put on the Court's radar is if there are other agency

4    communications, and, in particular, interagency communications,

5    we certainly think that would be discoverable and we want

6    access to that information.

7              We're concerned there may be *Brady* hanging out at ATF

8    or the Capitol Police or somewhere like that, and we want to

9    make sure that that stuff is captured in what's being produced.

10             Similarly, I want to put on the Court's radar --

11             THE COURT:  Just give me a minute before you move on.

12   Helpful to have context and understand what's going on, even

13   though these are things that I'll expect you all to largely

14   work out between the two of you, between the two sides.

15             Are you raising that because you anticipate there is

16   going to be an issue, or have those conversations so far been

17   ones you can work out, just in terms of the organization, the

18   systems, and also the interagency component?

19             MR. LITTLE:  I think that given the amount of stuff

20   that's out there, I think it's possible the government, through

21   inadvertence, may not have what they need, so I want to put on

22   the record that we made that request ahead of time that

23   anything that's not just in the FBI more broadly is captured.

24             Similarly, we have made a request around CIPA,

25   classified information.  If there is any information contained

1   in intelligence agency's files about this, it is certainly not

2   I think crazy to believe that intelligence services may have

3   been involved at least in tracking, reporting or looking for

4   reporting about this incident after it happened, and so we want

5   to make sure if there is any reporting that suggests potential

6   perpetrators or things of that sort that we be allowed that.

7   There may be CIPA issues implicated.  The government hasn't

8   raised that so I wanted to put that on the Court's radar as

9   well.

10        THE COURT:  They haven't mentioned it today.  From

11  where you're standing, have they given you any sort of

12  indication that they are not willing to look at that?

13        MR. LITTLE:  No, but I will say when I raised it, I

14  think it was a new idea.  I don't know that it was something

15  that they had started to look for, so we want to again make

16  clear they are looking for that as well.

17        The third category, which we raised on the discovery

18  call that we want to put on the record is there was a very long

19  congressional hearing about this a few weeks back.  I

20  understand it was a whole separate congressional investigation

21  related specifically to this incident.  There have been members

22  of Congress who have talked about whistleblower information

23  that they have obtained.  This is a circumstance where we might

24  be seeking subpoenas of different congressional materials, so

25  that's something I want to put on the Court's radar now in

1    terms of housekeeping.

2         We'll certainly seek to do that sooner to let that

3    process play out, but that is something we're trying to get our

4    head around what might be in congressional files that wouldn't

5    be in DOJ files that would be relevant that we would be

6    entitled to.

7         THE COURT:  Okay.  All right.  Anything else?

8         MR. LITTLE:  I think that's the mass of things that we

9    have today.

10         THE COURT:  Okay.  Let me give the government a chance

11    to respond to anything it wants to respond to there.  I

12    understand it's not like there was a request for relief on any

13    of these things, but just give me any context you want to add.

14         MR. JONES:  Sure.  In our conversation a week ago, we

15    spoke about those general topics at that level of generality.

16    It's hard to address in the abstract.

17         I will say that just as a sort of baseline matter, of

18    course, the government's discovery obligations are not the

19    whole of government, they are defined by the scope of the

20    prosecution team.  So that's something that when the government

21    receives specific requests for materials we would then need to

22    be able to assess whether those are materials that would be in

23    the possession of the prosecution team.

24         At this time, we don't have any reason to believe that

25    there are holdings in the U.S. intelligence community, but,

1  again, those are matters that I think would require more

2  specific requests to be made so the government would be in a

3  position to respond in an informed fashion.

4         THE COURT:  Got it.  I assume what you were just

5  discussing was geared principally towards the intelligence

6  comment, but things like ATF, Capitol Police, other law

7  enforcement, I assume you guys are going to take a look and

8  figure out if there is any information there?

9         MR. JONES:  Again, I think that that would depend on

10  the agency and whether they would be considered part of the

11  prosecution team for purposes of this investigation.

12         And, obviously, with respect to materials in the

13  possession of Congress, that is not something that the

14  government would view as in its possession for purposes of this

15  criminal prosecution.

16         The last point, just because it was raised, is we

17  discussed the idea of a joint log.  I will say the government,

18  when it has produced materials in this case, it has provided

19  letters summarizing the materials that were produced.  It's

20  what we do in normal practice.

21         In principal, I don't have a problem looking at what

22  the defense has provided.  I will just say that at this time I

23  don't know that it's something that's necessary, and the

24  government is not committing to, at this stage, to agreeing to

25  a joint log beyond what the government would normally do, which

1   is to provide summary discovery letters.

2        THE COURT:  Got it.  I mean, obviously, there is, I

3   would think, an interest on both sides in being pretty

4   organized about this so there is not confusion later.

5   Hopefully, you both have incentive to kind of work out a way to

6   communicate back and forth.

7        I don't usually have to get into that type of issue,

8   and I'm certainly not going to get into it in a hearing this

9   early on.  I'm going to count on you all to work that out and

10  be able to communicate back and forth clearly and also stay

11  organized.

12        Let me hear from defense counsel on just timing and

13  next steps as well.

14        MR. LITTLE:  We were in agreement with the 30 days.

15        THE COURT:  Okay.  In agreement with coming back in

16  30 days?

17        MR. LITTLE:  That's right.  As the government noted,

18  they haven't produced everything.  We need to sort of wrap our

19  head around what's produced and what's there.

20        I think 30 days is a reasonable amount of time.  It

21  sounds like they will probably still be producing up until

22  then.  Then we can at least get a sense of how long it's going

23  to take us to review that and think about trial questions.

24        THE COURT:  At this point, you may not have a full

25  sense of it if you don't have the discovery yet, but is the

1  defense team anticipating filing motions?

2      MR. LITTLE:  Yes.  I think there will be extensive

3  motion practice on multiple issues.  Just to raise a couple,

4  the Court may be aware that the Supreme Court took cert

5  recently in a case involving geofence warrants.  We don't

6  believe there were necessarily geofence warrants here, but

7  there were cell phone dump warrants, which implicate some of

8  the same Fourth Amendment issues, and so there will certainly

9  be some Fourth Amendment practice I would suspect.

10      We do have concerns about the alleged confession.  I

11  would expect us to have motions practice around that.  There

12  are other issues specific to this case and the unusual nature

13  of it that I think are particularly unusual that we may be

14  raising as motions as well.

15      Right now, I can imagine four or five separate

16  categories of motion practice.

17      THE COURT:  Those will follow discovery?

18      MR. LITTLE:  I think we will try to move the motions

19  practice as quickly as we can on stuff that is not implicated

20  by discovery.  A few of the things I've mentioned are not

21  implicated by discovery.  We will try to get those before the

22  Court as quickly as possible.

23      Some of them, like the phone dump warrants, the cell

24  sites, that's going to require necessarily us to see the

25  warrants.  We don't have those in place.

1          Also, as you can imagine, given that they said there

2    are multiple sort of persons of interest before our client,

3    it's going to be maybe difficult for us to follow the fruit of

4    the poisonous tree to kind of how they ended up looking at

5    different pieces of information.

6          And so that's going to, I think, take longer than it

7    might in a normal situation to trace back the original sort of

8    point of attack from a Fourth Amendment perspective.

9          THE COURT:  That's helpful context to have.  I know

10   some of my colleagues set trial dates this far out.  I don't do

11   that.  We'll set a time to come back and we'll have a better

12   sense of where we are.  And I like to set trial dates when they

13   stick on my calendar, and I just don't think we have the

14   context right now for that to be the case.

15         Have you all pre-cleared a date for our next status

16   conference or do we need to open up the calendars?

17         MR. LITTLE:  We have not.

18         MR. SHOREMAN:  Is Friday, the 27th, available, Your

19   Honor?

20         THE COURT:  I could have a hearing Friday, the 27th,

21   in the late morning, so, say, 10:30 or 11:00 a.m. would work

22   for me.  That works for the defense team?

23         MR. SHOREMAN:  That's fine for the defense.

24         THE COURT:  Does that work for the government?

25         MR. JONES:  It does.

1          THE COURT:  Let's say Friday, the 27th, at 10:30 a.m.

2          I am going to exclude the time between today and when

3    we get back together on February 27th under 18 U.S.C. Section

4    3161(h).  I find it in the interest of justice to exclude the

5    time, and that those interests outweigh the interests of the

6    public and the parties in a speedier trial.

7          And the reason to exclude time is, of course, to give

8    the parties the opportunity to exchange discovery thoroughly,

9    look for appropriate discovery, *Brady* materials, et cetera, and

10   for defense to have the opportunity to both organize itself,

11   review those files themselves, and then also review those files

12   and the discovery with Mr. Cole.

13         Are those reasons satisfactory from the government's

14   perspective?

15         MR. JONES:  Yes, Your Honor.

16         THE COURT:  Okay.  Having completed the status

17   conference, I did say I would give an opportunity for an

18   argument on the merits of Judge Sharbaugh's detention decision.

19         I will tell you I have reviewed Judge Sharbaugh's

20   decision carefully.  I have reviewed the original briefing,

21   including the government's detention memo and the opposition

22   and the attachments.  I have reviewed the motion to revoke from

23   the defense and the evidence attached to it, including the

24   Phillips report and letters.  I have reviewed the government's

25   opposition and the evidence that's described throughout the

1    opposition.  I have reviewed the reply, and then the

2    declarations that were filed from Mr. Cole's mother, sister and

3    Dr. Black yesterday.  So I have those.  I don't need you to

4    retread all of that ground.

5         It is defense counsel's motion, so I'll hear from

6    defense counsel first.  And it won't surprise you to know I'm

7    most interested in what you think Judge Sharbaugh did

8    incorrectly.  Where is the error in his opinion?

9         Let me let you go ahead and start, and then I'll maybe

10    direct you to a few things I'm most interested in.

11         MR. LITTLE:  So I mean, first, I think I would say

12    this is a de novo determination.  So we're not in a position of

13    this Court looking at that and saying I agree or I don't agree.

14    I think, as the Court knows, it has to make a de novo

15    determination based on the record.

16         I think there are a few things about the record which

17    are different than the way that the magistrate judge viewed the

18    record.  And I think it's most notable when you look at this

19    case it comes down to a question of dangerousness.  Under the

20    statute, the government has to prove by clear and convincing

21    evidence that there is no condition or combination of

22    conditions that would protect the public from a crime.

23         The only crime that the government has accused my

24    client of committing is a crime that occurred five years ago.

25    I don't want to understate the seriousness of what they have

1  charged, but they point to really three factors to say this is

2  why he needs to be locked up to keep the public safe.

3       The first is that the crime was very serious.  The

4  second was that there is continued evidence of bomb making.

5  And the third was that there are reasons to doubt, they say,

6  that he will abide by conditions of release.

7       That somewhat tracks the magistrate judge's reasoning

8  in walking through those issues, but the second and third, I

9  think, are entirely unsupported by the record, and certainly

10  aren't supported by the record at a clear and convincing

11  evidence standard.  I could address a few of those.

12       THE COURT:  Let me just start with, I mean, you have

13  Judge Sharbaugh's opinion.  I take your point about needing to

14  undertake an independent review.  That's why I tell you that I

15  have looked at everything.  But we do have an opinion that's

16  helpful to kind of ground us in and you can kind of work off of

17  to tell me where it went wrong.

18       I have his background section in his opinion where he

19  describes various things, including the investigation and what

20  pointed to Mr. Cole, what was found during the arrest, the cell

21  phone and the cell phone wipes.

22       And then there is also the characterization of the

23  police interview, which at least Judge Sharbaugh says you

24  didn't contest the characterization, the government's

25  characterization of, and I think I didn't see that either.  So

1  I guess starting with just the facts, are we at least working

2  off the same requisite set of facts, and, if not, tell me where

3  we're not.

4         MR. LITTLE:  I don't think so, and there's a couple

5  that are critical.  The idea that the cell phones wiped are at

6  all tied to this is completely fictional.

7         The government doesn't tend to suggest how this

8  individual, who now they have on the record is diagnosed, and

9  if they had been the investigation into this I think they would

10  have confirmed in their interviews, in their own files, is an

11  individual who has extreme autism and OCD, and it is entirely

12  consistent, as the doctor says, to do things like that in a

13  compulsive way.

14         The phone wipes they are talking about happened two

15  years after the alleged offense.  There is no connection to

16  those and to any investigative step, any concern that he was a

17  suspect.  In fact, there were pictures up within days of this

18  suspect.  There wasn't any phone wiping done in 2021.  There

19  wasn't any phone wiping done for the next two years.

20         And so the idea that they just sort of glom onto that

21  as evidence -- they call it evidence of trying to hide his

22  tracks.  I think it is --

23         THE COURT:  I have the point about the phone wipes

24  largely occurring after 2022, if I understand correctly.

25  What's the evidence before 2022?

1          MR. LITTLE:  There is no evidence of any sort of

2   attempt to evade.  There are no phone wipes that were supposed

3   to happen -- the first time they mention it is that this

4   happened in 2022, and on and off for the next two years.

5          What I'm saying is there is an absence of evidence of

6   any similar activity between the time of the alleged crime --

7          THE COURT:  Of any wipe prior to 2022?

8          MR. LITTLE:  That's exactly right.  Of any evasive

9   activity at all.  And the magistrate judge didn't deal with

10  this either, that on the one hand the government is claiming

11  this is just an individual who is doing everything he can to

12  deceive individuals around him about his guilt and hiding

13  facts.

14         On the other end, he has pieces of metal pipes and

15  receipts from Home Depot in his car for years.  And so they

16  sort of when they want to point out that he's a scary guy, they

17  point to he's got bombs.  On the other hand, they say, oh, but

18  he was hiding things, but he didn't happen to hide those

19  things.  I think there's just an incongruity in the way the

20  magistrate court sort of failed to reconcile --

21         THE COURT:  I also have your point about the OCD

22  diagnosis and the declaration that this could be consistent

23  with OCD, but I don't know that that is the same thing from

24  necessarily from showing, proving that it's disconnected from

25  trying to hide something, or maybe you can tell me it is.

1          MR. LITTLE:  I guess my point is there is no evidence

2     that it is connected, other than they say he committed a crime

3     in the past, and so any subsequent act he makes to erase

4     evidence must be connected to that.  Like, there is no -- they

5     don't even posit a causal connection there between those two

6     activities.

7          THE COURT:  It would be a much -- your argument would

8     be at its strongest if you could show that, I suppose, there

9     has been phone wipes for the past 20 years, right, and they

10     have been happening all the time and then there just happened

11     to be this event, and then it probably wouldn't be significant

12     to point to something that happened in 2021 to say -- you know,

13     you would have a good argument, but this did happen afterwards.

14          MR. LITTLE:  Yes, and I think we have a similar sort

15     of fact.  The fact that I can't tell you what compelled him to

16     do that at this time I don't think is evidence that it had to

17     be this sort of idea that there was no reporting, there was no

18     reason to believe he was a suspect.

19          There is just an absence of anything, and so even if

20     you were to say I'll give it 51 percent likelihood, we're in

21     clear and convincing evidence standard land.  And it's

22     certainly not clear and convincing evidence to tie that.  But

23     it also relates, I think a little bit, to the idea around this

24     they say continued interest in bomb making.

25          They point to this discussion, which the entire review

1    is certainly suggestive, but of him sort of doing things with

2    potassium chloride.  And they say, well, here is evidence of

3    continued interest post 2021 in bomb making.

4         We have put in through our declarations definitively

5    that that happened well before this event.  And the family

6    characterized it as sort of exactly the way that he

7    characterized it in the interview as science experiments.

8         THE COURT:  You're talking about the declaration that

9    was filed yesterday?

10        MR. LITTLE:  Yes.  And there is nothing that sort of,

11   again, suggests that that actually happened in the time period

12   the government points it to.  And so there is no evidence of

13   continued interest in bomb making activity.  There is no

14   interest in actual evasive action taken by this individual.

15        And so when you get down to it, all they are left with

16   is he's alleged to have done a very bad thing and look at all

17   the evidence we have.  And on the flip side of that, you have a

18   set of conditions --

19        THE COURT:  Can I come back to the very bad thing?

20   Some of these may be easy questions for you.  If they are easy

21   to kind of narrow the issues, that's productive.  You don't

22   need to get defensive about it.

23        I know that we have a rebuttable presumption in this

24   case.  I know you had some challenges to whether the rebuttable

25   presumption applies in the first place before Judge Sharbaugh.

1    I think it was about whether there had been an indictment or

2    not.  I think he didn't think the indictment was necessarily

3    required.  I think you guys gave that much up in front of him,

4    and now we actually have an indictment.  So are you fighting

5    that there is a rebuttable presumption in the first place?

6         MR. LITTLE:  There is a rebuttable presumption under

7    the statute.

8         THE COURT:  Good.  And then you do say in your

9    briefing that Judge Sharbaugh acknowledged that the presumption

10   was overcome.

11        MR. LITTLE:  I think that's probably incorrect.  He

12   talks about it being met.  At least looking at the --

13        THE COURT:  He says "assuming it was overcome."  All

14   right.

15        MR. LITTLE:  I think it would be difficult on our

16   record to presume that it wasn't met.  And I think to the

17   extent the Court can look at the extensive evidence of

18   third-party custodians or of lack of other criminal history,

19   looking at the other case law in this circuit, that type of

20   evidence that we put forward I don't think has ever been found

21   not to meet the presumption, and so I'll leave it at that.

22        THE COURT:  Understood.  I know there is also case

23   law, and you can tell me if you disagree with it, that says

24   that even if the presumption is overcome, it's still something

25   that a court has to consider.  In other words, the fact that

1  Congress believes this is the type of offense that

2  presumptively should come with detention is something that

3  still stays in the background.

4        MR. LITTLE:  Absolutely, as part of the statutory

5  scheme that also includes the requirement for clear and

6  convincing evidence that he be a danger to the community absent

7  there is no condition.  That's part of that equation.

8        So I think it says, hey, we think the sort of person

9  who might do this is dangerous.  That fits in clearly with

10  saying, but we do think if we can show there is conditions that

11  would make that person not dangerous --

12        THE COURT:  Your argument is, sure, I understand there

13  is a presumption, but if there was ever a case, this is it.

14        MR. LITTLE:  Absolutely.

15        THE COURT:  Okay.  I understand that you have

16  evidence, and some of this I think wasn't before Judge

17  Sharbaugh --

18        MR. LITTLE:  It was not.

19        THE COURT:  -- that the device couldn't have

20  detonated.

21        MR. LITTLE:  That's right.

22        THE COURT:  And I think you rely on that with respect

23  to the nature and circumstances of the offense principally.

24        MR. LITTLE:  I think it goes to the question of

25  dangerousness, and so what the Court --

1          THE COURT:  The question of dangerousness is the

2     overall thing.  That's the overall inquiry.  Of course, that's

3     the ultimate inquiry.

4          MR. LITTLE:  It's not actually in this case, because

5     what we're looking at with respect to that question of whether

6     this thing, if he did it, was viable, is a question of what

7     threat does he currently pose to the public.

8          So for the government to prevail, they have got to

9     convince you beyond clear and convincing evidence that there is

10    nothing that the Court can do in terms of conditions to stop my

11    client from hurting someone.  That's the type of crime that

12    he's charged with. There is no evidence they are suggesting

13    that he's selling drugs or harming the community in any other

14    way.

15         And so the question is how could he harm someone.  As

16    we pointed out the first time around when they sat there for a

17    month and did surveillance for a month between the time they

18    thought he was a suspect or believed he was guilty of this and

19    arrested him.  At the time of the arrest, they left guns in the

20    home.  They certainly didn't think that guns were related to

21    this case in any way.

22         The only evidence they have that this is a violent act

23    related to these pieces of metal and this homemade powder,

24    which they did not have at the time, there was nothing -- no

25    such evidence at the time that they arrested him this past

1    year.

2            So what is their theory as to how he's going to

3    endanger the public?  And this is the point where I do disagree

4    with the magistrate judge's order, that somehow, well, he said

5    he just snapped and we have to be careful that he's not going

6    to snap again, and I can't be sure he's not going to snap

7    again.

8            I think that is a completely counterfactual reading

9    based on some things the government picked out about a

10   suggestive interview as to what happened here.

11           THE COURT:  If I understand that excerpt from the

12   magistrate judge was taken from the description of the

13   interview.  Are you saying that that wasn't said, or are you --

14           MR. LITTLE:  I'm saying to the extent that the

15   government -- like other things were said in that interview,

16   which I think we have talked about that I was not trying --

17   when I did experiment with this other stuff it had nothing to

18   do with this, the government just discounts.

19           They take the things from the interview that they

20   like, but they don't want to sort of acknowledge the entire

21   sort of whole of the interview.

22           And interviews like that, particularly when they are

23   suggestive, particularly with the type of individual involved

24   and his age, you have issues around consistency and is he

25   understanding what he's putting forward.  I think even if you

1    take much of what the government has proffered though as true,

2    none of it suggests present dangerousness.

3          To get back to that issue, the government, I guess,

4    has to be saying that somehow if you were to put him under

5    third-party custody, in some high-intensity supervision with

6    GPS or other monitoring, that he would be able to escape from

7    that monitoring, go to a store, purchase the components to buy

8    a bomb, assemble them with no one noticing, and then leave that

9    bomb somewhere.

10          That is entirely farcical based on the facts.  There

11    is no chance that's going to happen.

12          THE COURT:  Does it have to be that it would be a

13    bomb?  I mean, I think the government gets the benefit of

14    future dangerousness generally, and I think that's the reason

15    of focusing on the language about snapping.

16          MR. LITTLE:  I don't think that there is -- again,

17    give me evidence that he's going to go -- does he use knives?

18    Does he have an obsession with firearms?  There is no evidence

19    of any of the things to suggest that there are types of

20    dangerousness that could not be met with conditions.  Zero.

21          And so that's what -- I don't actually think -- I

22    think I disagree with the Court's conclusion here, and I want

23    to put this on the record.  I don't think that you can just say

24    because we have evidence to suggest this crime is committed in

25    the past that he is dangerous in all possible ways and we have

1    to therefore think about hypothetical ways that someone could

2    be dangerous that they have never previously shown themselves

3    to be.

4           THE COURT:  To be clear, I was never suggesting that.

5    The statute lays out the factors that have to be considered,

6    and all of them have be considered.  I think you are also

7    leaning more heavily on some that you like and away from other

8    that you don't like, and I think the government is leaning on

9    some too.

10           I think just like you're suggesting that the

11    government can't turn away from factors, you can't either.  I

12    mean, the actual nature of the offense matters here.

13           MR. LITTLE:  Absolutely.  And that nature of the

14    offense is the type of offense, this entirely susceptible

15    conditions for exactly the reason I have described, because

16    under those conditions, even if there was a situation, which is

17    not likely based on his history in the past five years of

18    complete -- no evidence of sort of criminal activity,

19    particularly violent criminal activity --

20           THE COURT:  You are just shifting away from nature of

21    the offense.  You are going to the factors you like.  You are

22    talking about his history.  That's a totally different factor.

23           MR. LITTLE:  Take those natures of the offense, there

24    is no world in which that offense could be recreated, or the

25    things the government says led to that offense in the

1  present --

2          THE COURT:  I guess that's where I think you're

3  narrowing.  I don't think the inquiry is consider the nature of

4  the offense, and then once you understand the nature of the

5  offense, the sole inquiry is whether that exact thing could be

6  recreated.  That's not what the statute tells you to look at.

7          MR. LITTLE:  The case law certainly suggests if you

8  have got a drug defendant, this is the type of ways they have

9  harmed the community, we think they may still harm the

10  community in that way.

11          THE COURT:  I guess I'm just saying I don't think -- I

12  didn't even see this argument in your briefing, but I don't

13  think the government is so hamstrung that it has to show that

14  this exact offense would be created.  I think they also have

15  the opportunity to show what the statute talks about, which is

16  danger to people or the community.

17          MR. LITTLE:  With evidence.

18          THE COURT:  Of course.  There is a burden of

19  persuasion.  They also have an evidentiary presumption.

20          MR. LITTLE:  But there is no evidence that he has ever

21  used or shown an obsession with guns or knives.  There is no

22  evidence that he has ever attempted --

23          THE COURT:  Can I ask you -- well, let me just ask you

24  a question that I was trying to get at before.  I understand

25  the point about the devices not being capable of exploding, but

1   let me give you the -- finish that sentence for me, "and

2   therefore," tell me why that's so important.

3         MR. LITTLE:  And therefore the Court, especially with

4   conditions, can feel comforted that there is not certainly

5   clear and convincing evidence --

6         THE COURT:  Now you're just jumping to the conclusion.

7   Is the idea that he couldn't do it even when he wanted to --

8         MR. LITTLE:  Yes.

9         THE COURT:  -- and therefore there is nothing to worry

10  about?  Is that the idea?

11        MR. LITTLE:  There is a difference between creating

12  inert props that could never explode and creating viable

13  weapons.

14        THE COURT:  This is where -- I think where you

15  responded to this was in response to Judge Sharbaugh's point

16  where he said this was luck, not lack of effort.

17        Take away the luck point, just focus with the not lack

18  of effort point.  Does the fact that it wasn't capable of

19  actually exploding, what was actually constructed, take that to

20  be true, assume it to be true, because that's your argument,

21  show that this was not for lack of effort?  That was his point,

22  right?

23        MR. LITTLE:  There is a difference between effort and

24  ability.  If you had an individual who had committed a crime

25  with a gun that turned out to be an airsoft gun, and they tried

1    to commit acts with an airsoft, and the evidence showed that

2    they didn't know the difference between an airsoft gun and a

3    regular gun -- if you had a defendant who committed an armed

4    robbery or something of the same effect with an airsoft gun,

5    the evidence showed that they didn't know the difference

6    between an airsoft gun and a regular gun, I certainly think

7    that factor of the defendant's inability to understand would

8    demonstrate they don't have the ability.

9          And maybe there they chose wrong.  It's easy for that

10    person to get a real gun.  Here, there is a real question of

11    ability that goes directly to dangerousness.  And that's why I

12    think that aspect of --

13          THE COURT:  I do think that -- I'm not going to put

14    words in the government's mouth, but I think that's what is

15    going on here, right.  If you have someone who had a thought

16    that something was a real automatic gun and instead it was a

17    plastic one, but then they still went into that public place

18    and tried to use it, I don't think you would look at that and

19    say, well, no one was hurt and it was a plastic gun and this

20    person is not a danger.

21          They were still willing to do all of that, and it was,

22    again, as Judge Sharbaugh said, not for lack of effort.  I'm

23    trying to understand exactly what the difference is here.

24          MR. LITTLE:  I think the difference is at what point

25    do you sort of have to have show actual dangerousness.  If I

1    have a desire -- I don't want to concede at all that he did,

2    because we don't think that he did and we don't think this is

3    the right person, but if that were true, you then have to at

4    least say he's dangerous because he had a desire to do

5    something which is complicated, which is incapable of doing

6    even if he wanted to.  I do think that goes to the

7    dangerousness analysis in that manner.

8          THE COURT:  Can you explain your argument to me about

9    the second factor.  I think that there is a back and forth

10   between the defense and Judge Sharbaugh on this question of

11   whether the weight of the evidence is relevant for the purposes

12   of guilt or the purposes of dangerousness.

13         MR. LITTLE:  I think it depends on the type of case

14   the government presents for detention.  If this were a case of

15   whether or not the person is going to show up, I think evidence

16   of guilt could suggest that the person might run because they

17   are concerned about certain conviction.

18         And so if this were a flight case, it could be

19   relevant there.  I think it depends on the type of case.  On a

20   dangerousness case, I think the reason and the only way it's

21   relevant is that it supports the government's argument the

22   person is capable of being dangerous.  That's one piece of

23   evidence, they are capable of being dangerous because I have

24   got evidence that he was dangerous before.

25         And the same way that if you had someone who committed

1    crime A, and they showed evidence of crime B, C, D, the

2    evidence and the strength of the evidence about crime B, C, D

3    would suggest that the person is dangerous because they are

4    capable of harming someone.

5            So I think the dangerousness equation here relates

6    only to does that indicate that he was capable of doing this

7    thing which suggests that he is dangerous.  And even then, if

8    you were to accept the government, however much weight they put

9    on it, the government has a five-year gap --

10           THE COURT:  I kind of -- I agree with you at the high

11   level that maybe it turns on -- it's related to or the

12   persuasive value and significance of it depends on the

13   particular context.

14           I don't know that it's fair to say that it's more

15   relevant in the flight context, although I think you

16   constructed a way in which it could be relevant.  It seems to

17   me like it also depends on the first factor, the type of

18   offense and the nature of the circumstance of the offense.

19           I could see how if you would say, look, the offense

20   was tax fraud, there was no violence at all whatsoever, really

21   putting a thumb on the needle, I guess if the government, in

22   that circumstance, if they wanted to say, we've got so much

23   evidence so the second factor wins, how much would that

24   actually show a propensity for danger, right?

25           I guess they could argue, well, we've got a lot of

1    evidence so he's going to be incarcerated at the end of the day

2    so it's less of an injustice, but they wouldn't have that kind

3    of not only do we have a dangerous offense, but we have a lot

4    of evidence.

5            It seems like that doesn't really work for you here

6    because the offense that's being charged is an explosive

7    offense, so one would think that the weight is actually pretty

8    significant.  This is not a percentages game, but if there is a

9    one percent chance someone did an explosive offense versus a

10   higher percentage chance, that would bear on dangerousness.

11           My question is getting at how significant is this

12   distinction between guilt and dangerousness in your particular

13   context.

14           MR. LITTLE:  Massive.  So let me give you a different

15   example.  There are federal murder offenses that have an

16   unlimited or a very long statute of limitations.  If you had a

17   crime charged here in federal court for a murder that occurred

18   25 years ago, and the government came in and said here is the

19   DNA, he confessed to somebody last week, we have got him dead

20   to rights, this guy is going down for a murder case, it's a

21   federal death penalty offense that happened 30 years ago.  And

22   the defense comes in and says let me tell you about those 30

23   years.  Turns out the guy is a literal saint, here is the lack

24   of dangerousness, there is no evidence of any criminal history.

25           The fact that he was -- a very serious offense,

1    actually killed a human being, would have very little weight on

2    a detention question because it ultimately is a question of

3    that person's dangerousness.  They would be able to say, hey,

4    one time you killed somebody.

5            THE COURT:  I think I get the point you're making, but

6    aren't you just shifting to the other factors you like again?

7    I think you're shifting to the history and characteristics of

8    the person and the seriousness of the danger, which are the

9    third and fourth factors.

10           MR. LITTLE:  I'm saying the first factor can have a

11   role, but it can no way be dispositive for exactly that reason.

12           THE COURT:  I was talking about the first and the

13   second factor.

14           MR. LITTLE:  The second factor?  You're going to have

15   to remind me where we are now.

16           THE COURT:  Is the weight of the evidence against the

17   person.

18           MR. LITTLE:  But I think, again, the weight of the

19   evidence only assists the Court in determining how dangerous

20   they are presently, if it's a dangerous offense.

21           For example, in a white collar offense, if you have

22   somebody again --

23           THE COURT:  I guess my point was this is not a white

24   collar offense.

25           MR. LITTLE:  But then it collapses into dangerousness

1   for exactly this reason.

2           THE COURT:  But the ultimate inquiry is about safety

3   of the community and people, so everything collapses into

4   dangerousness.

5           MR. LITTLE:  It collapses into element one, the

6   circumstances of the offense being the type that is

7   dangerousness.  I guess that's the way to sort of expand that

8   thought.  The it, in a particular case like this, collapses

9   into an issue, one category of what is the charged conduct,

10  what does that tell us about the person generally.

11          THE COURT:  Let me give you the opportunity to answer

12  one question that is also important to me.  What facts do I

13  have that were not in front of Judge Sharbaugh?

14          MR. LITTLE:  You have the confirmed diagnosis.  You

15  have the opinion that OCD is consistent with that.  You have

16  the fact that --

17          THE COURT:  You're talking about the Phillips

18  statement and the Black statement?

19          MR. LITTLE:  All the declarations you have.

20          THE COURT:  The letters were in front of Judge

21  Sharbaugh, the character letters?

22          MR. LITTLE:  Yes, but the most recent set of

23  declarations, including the declarations of family laying out

24  the timeline of when these things occurred, so those are all

25  different.

1          THE COURT:  Is there anything else that I have that

2    Judge Sharbaugh didn't have?

3          MR. LITTLE:  I don't think so.  I think those are the

4    primary ones.  He had a bit of this.  We did emphasize it more

5    in the reply that the proposed third-party custodian, her

6    spouse is a former federal law enforcement officer.  That was

7    mentioned briefly.  I don't think it made it in much

8    discussion.  It was very briefly mentioned in the magistrate's

9    order, but I think we expanded on that a bit.

10          It's not been mentioned, and it wasn't really argued

11    originally, she said this in the transcript, but I think we

12    pointed this out again in the reply, the third-party custodian,

13    in fact, this whole family, his job was working in a bail

14    bonding company that operates in multiple states.  You have a

15    family that their whole professional livelihood --

16          THE COURT:  That point I have, and I think it was

17    clear from the character letters, many of whom were business

18    associates.

19          MR. LITTLE:  I think to the extent that we didn't

20    argue that -- the government says in their third point that

21    there is no evidence the third-party custodians can control

22    him.  This is particularly a set of third-party custodians who

23    not only risk the court, whatever sanctions would happen here

24    if they didn't comply, but would have professional

25    repercussions across their entire business in all of the 16

1    states they operate in.  I think that was not something that

2    was sufficiently raised before.

3            THE COURT:  Got it.  That's helpful.  Any other points

4    you want to raise on this?

5            MR. LITTLE:  Not at this time, Your Honor.

6            Oh, for the appellate record, we do think the 3060

7    issue that the Court has already ruled upon, to the extent that

8    there is adverse decision here and we appeal, I think one of

9    our things I want to preserve is what we raised in that

10   original motion was if the government had -- if he had properly

11   been discharged at the time that the sort of fake indictment

12   was brought and properly been released, the government would

13   only be able to redetain on new circumstances.

14           THE COURT:  You made those arguments in your

15   pleadings.

16           MR. LITTLE:  There is no change in circumstances under

17   3164 that would sufficiently allow detention at this time.

18           THE COURT:  I'm not sure I have that, but it sounds

19   like you're trying to build something for appeal.  You can go

20   ahead and pursue whatever remedies you have available to you.

21           Let me hear from the government on this.

22           MR. JONES:  Your Honor, the answer to the initial

23   question that you asked with respect to Judge Sharbaugh's

24   opinion is that he didn't get anything wrong.  His analysis was

25   careful, it was thorough, it was comprehensive, it addressed

1  every argument that's been raised by the defense.  There is

2  nothing that has changed since he issued that opinion, and it

3  is affirmatively correct and there is no reason to set it

4  aside.

5      I think ultimately the three points that I would like

6  to make in response to the arguments that the defense has made

7  in their papers and today are:

8      One, these bombs were not "harmless," which is the

9  word that the defense has used to characterize them.

10     Two, this conduct, the charged conduct was not

11 isolated.  It was not isolated to January 5th of 2021.  It was

12 part of a broader years-long continuum of conduct that should

13 concern the Court in a variety of ways.

14     And the third point is that the defense, their

15 attempts to explain or characterize the defendant's concerning

16 behavior over the last few years, they fall far short of what

17 would be reliable for the Court to consider in a case like

18 this.  And I'm talking about these -- the four-sentence letter

19 submitted by Dr. Black related to these diagnoses that were

20 apparently made a month ago after the criminal case was

21 initiated.

22     So I'll take those points in turn.  Of course we have

23 briefed this extensively.  But with respect to the first point,

24 the devices that the defendant is charged with using

25 maliciously in this case to try to bomb the national

1  headquarters of the RNC and the DNC on January 5th, the

2  government has never taken the position that the defendant is a

3  professional bomb maker or that he is an expert bomb maker.

4       But what the record before the Court establishes quite

5  clearly is that he is an amateur bomb maker with extensive

6  interest and access to improvised explosive device materials.

7  And an unskilled bomb maker poses a significant threat to the

8  community, and, in fact, poses threats that perhaps somebody

9  skilled in this area wouldn't pose.

10      The submission from the defense, the Phillips report,

11 doesn't change the analysis for this Court.  It doesn't change

12 the analysis that Judge Sharbaugh conducted with respect to the

13 nature of the offenses.

14      I'll note that the proffer was made at the initial

15 detention hearing that there was a defense expert who would

16 opine as Mr. Phillips did in this case, and Judge Sharbaugh

17 deemed it not relevant to consider at that point.

18      But I think ultimately putting aside the factual

19 disputes, which we have laid out why --

20      THE COURT:  In other words, I don't want to focus too

21 much on any one sentence, but sometimes it's just helpful to

22 get reactions to and to understand parties' positions.  Judge

23 Sharbaugh has his sentence where he says "the bomb didn't go

24 off," which is something obviously the government knows and

25 Judge Sharbaugh knew, and he says, "that was luck, not lack of

1    effort."

2        And is your point essentially, if he were to have

3    said, you know, it was not -- or it was luck and inability, not

4    lack of effort, your point is that doesn't change anything?

5        MR. JONES:  It wouldn't change it if it was inability,

6    but I don't think that the record --

7        THE COURT:  You're saying it's just not luck, it might

8    have been lack of skill, but it doesn't matter is your point.

9        MR. JONES:  It doesn't matter as a matter of law.

10    These were explosives under the law regardless.

11        THE COURT:  Go kind of to the facts, not the -- I

12    think it's more helpful to understand specifically the argument

13    as to dangerousness and safety.

14        MR. JONES:  So what the Court should keep in mind is

15    that the devices, when they were disrupted, they were broken

16    into pieces.  I mean, they were destroyed, and so the FBI

17    explosives examiner who assessed them had to put them back

18    together in essence.

19        And in his report, which was attached to the defense's

20    submission, he provided a step-by-step set of instructions as

21    to how you put those pieces back together to create a

22    functional pipe bomb.  It had all of the components necessary

23    to create a viable device.  And what we included in our papers,

24    which is a diagram showing that construction was what the

25    explosives examiner actually put together.

1           And so I think that factually supports conclusively

2    the opinion of the explosives examiner, who is the only person

3    who has actually assessed the devices, that they were viable.

4    The dispute, I think, is about the probability that they would

5    have exploded based on those powder samples with respect to

6    black powder, whether it was explosive in one sample versus not

7    explosive in another sample.

8           I think we have addressed those, and where the defense

9    submission ignores inconvenient facts in the record about those

10   samples, but putting that to the side, what the evidence here

11   shows, and you can see it in the video of the defendant's

12   actions on January 5th, is that he certainly believed that

13   those devices were explosive.

14          There is a reason why he told the FBI that he only put

15   one device in his backpack at a time, and there is a reason why

16   when he had devices in that backpack, he was holding the

17   backpack by the top strap away from his body to keep it stable.

18   He was worried that those devices were volatile and might

19   explode on him, and that's where he told the FBI that he set

20   them to explode, he set those timers to explode 60 minutes

21   later.

22          And so when the Court is assessing dangerousness,

23   we're talking about the nature of these offenses in the context

24   of the ultimate question, which is what kind of danger the

25   defendant poses to the community if released, the Court has to

1   consider --

2          THE COURT:  You had three points.  Is there anything

3   critical on the first point before we move?  I'm interested in

4   the second one.

5          MR. JONES:  No, I think that covers the first point.

6          THE COURT:  I understood the second one to be kind of

7   the pattern and the consistency throughout.  Can you do that,

8   but also make it specifically -- obviously, I have read the

9   pleadings, but specifically responsive, including -- I'm sure

10  you saw the declarations that were filed yesterday.  They are

11  not wholly new, but they do support some of the arguments that

12  the -- I should say they are new declarations, but they are not

13  wholly new ideas in the case.  They do support some of the

14  timeline arguments that the defense has been trying to make.

15  Can you respond to those, but give me your argument at the same

16  time?

17         MR. JONES:  Sure.  So I think first and foremost, what

18  we're relying on here in seeking detention or asking the Court

19  to deny the motion to revoke Judge Sharbaugh's order is a

20  years-long, as I said earlier, continuum of conduct.  And so it

21  stretches from, based on the declarations, it stretches back

22  farther than the government even understood when we previously

23  litigated these issues, because, apparently, back in 2018, the

24  defendant was -- that was when he was experimenting with

25  potassium chlorate.  That's been represented in the declaration

1    as an innocuous science experiment to make rocket fuel.  That

2    was raised for the first time yesterday in the reply brief.

3         So it prompted the government to go back and look at

4    what the defendant was purchasing around the same time in 2018,

5    because, as I said, this is farther back than even we realized.

6    And it showed us that the defendant purchased the beaker sets

7    that he used, on his own admission, to create this potassium

8    chlorate, which is an oxidizer used in IEDs, on the same day

9    from Amazon as the sulfur dust that he used in the pipe bombs

10   in 2021.

11        Later on, in 2018, he purchased copper pipes, he

12   purchased steel pipes, he purchased a hacksaw, he purchased

13   wires.  What didn't he purchase?  He didn't purchase fins or

14   cones or the type of lightweight material that somebody like a

15   hobbiest would purchase if they were going to make a model

16   rocket at home.

17        The record here supports the conclusion, certainly to

18   a clear and convincing standard, that what the defendant was

19   experimenting with in 2018 was another very potent oxidizer

20   that's commonly used in improvised explosive devices, and that

21   I think sets the table for what the record shows happens over

22   the ensuing years, which is that before January 5th of 2021,

23   the defendant is experimenting with these materials.  Then he

24   has this triggering event that prompts him to assemble these

25   devices and to use them in an act of political violence in

1    2021.  That required him to do research in order to understand

2    how to manufacture these pipe bombs.

3         It also required him to understand how to make

4    homemade black powder, the different components that are used

5    to make explosive black powder.  And then ultimately, on

6    January 5th, he executed that plan.

7         THE COURT:  Can I ask you, you used the word

8    "triggering event," which I think was described in the papers

9    as taking the quote of snapping, which I understand is the

10   description of the police interview.

11        I'm not meaning to oversimplify or put words in

12   defense counsel's mouth, so I'll just put it in mine.  If

13   someone were to say, well, look, you have got evidence of one

14   snap over the course of all of those years, your response would

15   be?

16        MR. JONES:  My response would be that the defendant is

17   now under extraordinarily difficult and challenging

18   circumstances facing a public prosecution based on his conduct.

19   That is not at all dissimilar from the type of circumstances

20   that led him to snap.

21        In fact, it might be even more difficult for a person

22   to deal with than in 2020, when he was simply aggrieved about

23   his views on a political matter, and that was the snapping

24   event back then.

25        And of course, all of this is in the context of

1   somebody who has an interest, demonstrated interest and

2   proclivity for assembling these types of devices, accumulating

3   the components used to create these materials.

4        And so I think when the Court is considering the

5   ultimate question, the question is not with absolute certainty

6   can the Court say that if you release the defendant he would

7   never make another bomb, which is the way the defense has kind

8   of characterized it, it is whether the Court can fashion

9   conditions that would reasonably assure the community's safety.

10       And it's an assessment of the risk of danger that the

11  defendant poses.  And here, the defendant's conduct, the

12  sustained conduct, in combination with the wiping of the

13  electronic devices -- and there is additional information on

14  that topic that the government can proffer in response to what

15  the defense has filed -- that leads the Court --

16       THE COURT:  It's hard for me to have you just say that

17  without understanding what you mean.  I was going to ask you to

18  respond to this kind of 2022, everything happened after 2022

19  with respect to the wiping.

20       Can you address that narrow point first?  Is that

21  accurate?

22       MR. JONES:  When we talk about wiping, first of all,

23  we're talking about factory resets of the device.  We're

24  talking about wiping all user content on the phone.  We're not

25  talking about wiping junk files.

1       There were, my understanding is, two factory resets of

2   the device in December of 2020, so it would have been a couple

3   of weeks before the defendant planted the pipe bombs.  And then

4   the next factory reset does not take place until August of

5   2022.

6       Now, the significance of that timeline is that for

7   that 18-month period, there is record evidence that the

8   defendant was continuing to purchase the components that he

9   used to manufacture the pipe bombs.  In fact, his purchasing

10  accelerated.  He bought more pipes and end caps after

11  January 5th of 2021 than he did before January 5th of 2021.

12      But then when you get to the summer of 2022, mid 2022,

13  his use of credit cards and debit cards to purchase those

14  components stops, but what starts, the daily factory resetting

15  of his electronic device.  And that also coincides with in May

16  of 2022, the defendant begins to regularly purchase a PC, a

17  personal computer, a desktop or laptop, cleaner, called

18  CCleaner.  He started to spend hundreds of dollars on those

19  products, which are designed to clear, among other --

20      THE COURT:  Can I ask you to connect the dots to make

21  it explicit in terms of dangerousness.  I mean, one could look

22  at those facts and say, okay, he was really interested in this

23  a long time ago, realized he had snapped this one time, all

24  those other purchases were foolish, and now he's like I feel

25  terrible about this, I'm going to erase all of the proof I ever

1    did this.

2          MR. JONES:  The concern is that something in mid 2022

3    caused him to take extraordinary measures to conceal his

4    digital activity.  Whether that was somebody learning or

5    suspecting or what he was doing, it made him realize that he

6    should no longer be purchasing components using traceable

7    credit cards, and that if he was going to use his cell phone,

8    he needed to factory reset it every day.

9          He also purchased, as I mentioned, the cleaning

10   product for his computer, which would clear browsing data.  And

11   when his devices, the desktop and laptop, were examined in this

12   case, there was a browser called Brave, a secure browser that

13   allows for --

14         THE COURT:  Doesn't this go more towards, like, maybe

15   flight risk or wanting to evade law enforcement than it does to

16   dangerousness?  I know you're not arguing the former, but help

17   me understand why it goes to dangerousness.

18         MR. JONES:  It goes to go whether the Court can or

19   should have confidence that the defendant will abide by

20   conditions, and whether a third-party custodian could

21   effectively monitor him given his penchant for concealing his

22   digital activity.

23         THE COURT:  That's helpful.  Maybe we could turn to

24   that.  And the law requires me to consider whether there is any

25   condition or combination of conditions that would assure

1    safety, and I take that seriously.

2         And here it's not like the defense is coming in saying

3    release on own recognizance.  They are saying home confinement

4    with a custodian and GPS.  I know you have kind of already

5    built some of this, but tell me why can't the government keep

6    the community safe with all of those conditions?

7         MR. JONES:  The fundamental problem with that proposed

8    release plan is that it puts the defendant in substantially the

9    same place that he was in when all of this happened.  This is

10   not somebody who was living on their own unsupervised in an

11   apartment somewhere making bombs.

12        This is somebody who constructed these devices,

13   apparently experimented with potassium chlorate with the

14   knowledge of family members in their home and still was able to

15   effect these criminal offenses, to plant explosive devices at

16   the RNC and the DNC on the eve of a significant and

17   high-security event the next day.

18        He was able to do all of that while living in his

19   family's home with multiple family members, living the same

20   kind of life and existence that the proposed release plan would

21   return him to, which is to live a solitary plaintiff at the

22   family's home and only leave to go to work.  And so under the

23   facts and circumstances of this case, those conditions are

24   simply insufficient to assure the community's safety.

25        THE COURT:  I don't know if you got all the way

1    through the third point you wanted to make, or if there is

2    anything else you wanted to say on that.

3          MR. JONES:  The third point I think was simply to

4    address the defense's attempt to explain everything away with

5    these diagnoses.  And I have addressed to some extent the

6    argument -- I guess I haven't really directly addressed the

7    argument that the phone wiping is explained by OCD.

8          What's before the Court is, as I mentioned, a

9    four-sentence letter written by a doctor yesterday, and it

10   simply says that he examined the defendant for two days and

11   he's diagnosed him with autism level one, which I think defense

12   counsel characterized as extreme autism.  That is the mildest

13   form of autism, as well as OCD.

14         And it simply says that repetitively deleting junk

15   files from your phone is consistent with obsessive compulsive

16   disorder.  Of course, that's not what the defendant did here,

17   but that was what was -- that was the information provided to

18   this doctor informing his opinion.

19         THE COURT:  Can you clarify that.  When you say "this

20   is not what the defendant did here," can you finish that

21   thought for me?

22         MR. JONES:  To be more precise, the defendant in

23   factory resetting his phone was not clearing junk files.  He

24   was deleting all user content on his device on a daily basis.

25         But be that as it may, repetitive behavior might be

1    consistent with OCD, sure, but on the facts and the record

2    before this Court, it is far more consistent with concealing

3    digital activity.

4         The defense has not made any proffer as to how the

5    defendant's OCD diagnosis manifests in any other way other than

6    wiping his cell phone, so there is no proffer that the

7    defendant suffers from any other symptoms of OCD except for

8    wiping his cell phone to explain the otherwise obviously

9    incriminating nature of that kind of conduct.

10        THE COURT:  I heard you make an argument about the

11   credibility of the declaration from Dr. Black that came in

12   yesterday, and I think I have heard you make an argument that

13   it could be consistent with OCD and also consistent with

14   covering your tracks.

15        Are you -- is that your argument?  Is there another

16   component of it, that it just doesn't matter if it's because of

17   OCD?

18        MR. JONES:  No, I'm arguing that it's far more

19   consistent with covering your tracks, which is the analysis

20   that Judge Sharbaugh engaged in.  I mean, he considered the

21   exact same question and he determined based on the facts in

22   this case it was more consistent with concealing and hiding and

23   obfuscating than it was explainable by innocuous explanations.

24        THE COURT:  Okay.  I think I have that argument.

25   Anything else?

1          MR. JONES:  The last one is simply that just because

2     it's been referred to so many times in the pleadings and the

3     proceeding that the defendant has been diagnosed with autism

4     spectrum disorder level one, there has been no attempt to

5     explain what, if any, relationship that diagnosis has to

6     whether the defendant poses a danger to the community if

7     released.

8          But what I will say is that the Court can review the

9     interview, the Court can review the transcript and the video

10     recording of the defendant's four-hour conversation with the

11     FBI agents who arrested him on December 4th.  What you will see

12     is a 30-year-old man who went into an FBI interview after being

13     arrested and proceeded to give them a carefully planned cover

14     story explaining the evidence that placed him in Washington, DC

15     on the evening of January 5th of 2021.

16          That cover story was that he was going to DC to attend

17     a protest at the Capitol, which would explain the evidence

18     placing him in the area that night.  He stuck to that story for

19     two hours before he finally admitted -- realized that there was

20     no way out and admitted that it was in fact him that placed

21     those pipe bombs.  That demonstrates that we're talking about

22     somebody who does not have any appreciable deficit in any

23     meaningful way that would affect the Court's analysis here.

24          And without any specific proffer from the defense,

25     there is no reason for the Court to consider that diagnosis as

 1  bearing on the ultimate question before the Court.

 2       THE COURT:  Got it.  Your point is that autism level

 3  one or not, focused on keeping the community safe, he has shown

 4  what is needed to require detention?  Is that your point?  I'm

 5  trying to just make sure I understand whether that's what

 6  you're arguing or you're trying to say go watch the video and

 7  you're going to find that he doesn't look like he's autistic?

 8       MR. JONES:  I'm saying that, in terms of

 9  dangerousness, there is nothing mitigating on this record about

10  the defendant's diagnosis.  My point is simply that the

11  defendant sat for that four-hour interview, and if you watch

12  that interview, you will see a person who appears to have all

13  of their intellectual faculties.  You can tell that because he

14  is providing the FBI with a carefully planned cover story for

15  his conduct, and he sticks to that story for hours.

16       This is not, contrary to the way it's been portrayed

17  by the defense, this is not a situation where the FBI agents

18  were simply saying things to the defendant and he was

19  responding yes or no.  These were in his own words.  He is the

20  one who provided a carefully planned cover story to the FBI and

21  then eventually, when he realized, based off of the evidence

22  that the FBI had gathered in the investigation that he didn't

23  have a way out, he finally admitted what he had done.

24       There is no intellectual deficit on this record that

25  should concern the Court in terms of dangerousness.

1           THE COURT:  I appreciate your submissions.

2           I can give the defense a brief opportunity to rebut

3    anything focused -- again, this is not a chance to make some

4    broad plea.  This is a chance to focus on error and facts that

5    you think would be helpful for me at this point.

6           MR. LITTLE:  The government asked why we didn't raise

7    all the other ways that OCD might exhibit itself.  Because they

8    weren't relevant to this hearing.  If they were relevant to

9    this hearing, we would have put it forward.

10          We were specifically responding to what the government

11   proffered as somehow as evidence of this dangerousness

12   continuing because he was wiping his phone every day.  I think

13   that fact is just wildly sort of ends oriented.  They say it

14   shows something and they try to make a path as to how it shows

15   something.  It's inconsistent with all the evidence, which is

16   this is not somebody who is sitting out there trying to hide

17   something secretly from everybody, which also goes to the

18   question of the alleged confession and the idea of autism.

19          To the extent there is future motions practice to

20   suppress that alleged confession, I think you can read it

21   differently.  This is somebody who truthfully was telling the

22   truth and then had his will overcome and then just said

23   whatever the government wanted him to say.  I don't think the

24   Court needs to resolve that here.  I don't think it helps the

25   government though at all in any which way.

1          The reason we raised that issue is to address

2     specifically some of the other things, those other categories

3     the government says makes my client dangerous, and they are not

4     there.

5          The last thing they talk about with some of these

6     things.  Well, something caused him to do it.  They don't know

7     what it is.  They are just asking the Court to assume that

8     there is something that happened bad that my client did between

9     2021 and the present that the Court should be concerned of.

10         The fact remains on this record there is just no

11     evidence of any continuing dangerousness that my client

12     exhibited.

13         The last point I'll make is the idea around the

14     third-party custodian, the fact that he allegedly committed

15     this crime in the same situation.  When I was young, my sister

16     almost burned down the house because she had a box of matches

17     and she dropped it and burned down a room.  She continued to

18     live in our house, and we kept the matches away from her

19     because we had the knowledge that she couldn't be trusted with

20     them.

21         This is an individual who the Court could certainly

22     fashion taking away digital access.  The Court can fashion GPS.

23     The Court can fashion certain types of supervision and

24     reporting, all of which will directly address any of the things

25     which allegedly allowed this to occur.

1        The government doesn't really have an answer to that

2   other than to say, well, we disagree.  There is no reasoned

3   basis to believe that the conditions could not sort of directly

4   address the circumstances that allegedly allowed this to occur.

5        THE COURT:  All right.  Okay.  Appreciate your

6   submissions.

7        I'm not going to rule from the bench on this.  I'm

8   going to take this and what I have heard today under

9   advisement, and I'll issue a written order.

10       MR. WILLIAMS:  Is there any way I have can two minutes

11   to add one thing about something you said?

12       THE COURT:  Come on up, Mr. Williams.

13       MR. WILLIAMS:  I'll do it just real quick.  Your

14   Honor, you hit the nail on the head when you said you take

15   seriously whether there is a set of circumstances or

16   conditions, strict conditions that could reasonably assure that

17   this wouldn't happen.

18        And the starting point really is what is the standard

19   we're going by, sufficient evidence to basically convince you

20   to have a firm belief or a conviction that absolutely there is

21   no set of strict conditions that would give you reasonable

22   assurance that he's not going to create bombs, and the

23   government said what we're fearing is is we see a pattern of

24   accumulating components to use these materials to create bombs.

25        But what they won't address, other than to talk about

1   him doing it at a time when he didn't have any conditions, he

2   didn't have any monitoring, he didn't have any conditions at

3   all, is what is it about house arrest and ankle monitor,

4   constant supervision, checking in weekly, and being in the

5   supervision of people who now know or suspect, say, hey, I'm

6   going to really watch you closely, what is it about those

7   conditions that won't basically tell Your Honor, hey, he just

8   tried to go to Wal-Mart and buy something?

9        Because as soon as he leaves the house -- they try to

10  get around the leaving the house saying he wants to go work.

11  We have already conceded we would give that up.  He would stay

12  in that house.  So you're trying to say all of those conditions

13  don't reasonably assure that that he won't go and accumulate

14  bomb materials?  That doesn't make sense.  That's the law.  All

15  this other stuff, Your Honor, I'm willing to concede.

16       THE COURT:  I think I have your point.  I understand

17  the legal standard.  I stated it.  I take it very seriously

18  that that's what's required.  I don't think it's so narrow as

19  you said.  It's not just going to buy the exact same stuff that

20  he's accused of.

21       MR. WILLIAMS:  Leaving the house to purchase anything,

22  to do anything.

23       THE COURT:  I think I have got your point.  And I

24  understand the conditions that are available, and I appreciate

25  it.  Okay.

1          All right.  I will take the parties' arguments under

2   advisement, and I'll issue a written order once I have come to

3   a decision.

4          And I think we have handled everything else through

5   the status conference, so we can go ahead and adjourn.

6   Appreciate it.

7      (Proceedings concluded at 4:52 p.m.)

8

9                          CERTIFICATE

10     I, Sonja L. Reeves, Federal Official Court Reporter in and
    for the United States District Court of the District of
11  Columbia, do hereby certify that the foregoing transcript is a
    true and accurate transcript from the original stenographic
12  record in the above-entitled matter and that the transcript
    page format is in conformance with the regulations of the
13  Judicial Conference of the United States.

14     Dated this 30th day of January, 2026.

15

16                    /s/ Sonja L. Reeves
                   SONJA L. REEVES, RDR-CRR
17                 FEDERAL OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25

**/**

**/s** [1] - 59:16

**1**

**103** [1] - 1:21
**1050** [1] - 1:16
**10:30** [2] - 16:21, 17:1
**11:00** [1] - 16:21
**16** [1] - 38:25
**18** [1] - 17:3
**18-month** [1] - 48:7
**1:26-cr-00001** [1] - 1:5

**2**

**20** [1] - 22:9
**20036** [1] - 1:17
**2018** [4] - 44:23, 45:4, 45:11, 45:19
**2020** [2] - 46:22, 48:2
**2021** [11] - 20:18, 22:12, 23:3, 40:11, 45:10, 45:22, 46:1, 48:11, 53:15, 56:9
**2022** [11] - 20:24, 20:25, 21:4, 21:7, 47:18, 48:5, 48:12, 48:16, 49:2
**2026** [2] - 1:10, 59:14
**20530** [1] - 1:14
**20th** [1] - 5:8
**25** [1] - 35:18
**26-1** [1] - 2:2
**27th** [4] - 46:18, 16:20, 17:1, 17:3
**28** [1] - 1:10

**3**

**30** [7] - 8:25, 9:2, 14:14, 14:16, 14:20, 35:21, 35:22
**30-year-old** [1] - 53:12
**300** [1] - 1:19
**30342** [1] - 1:22
**3060** [1] - 39:6
**30th** [1] - 59:14
**3161(h)** [1] - 17:4
**3164** [1] - 39:17
**37203** [1] - 1:19
**3:36** [2] - 1:10, 2:1

**4**

**41** [1] - 6:17

**4:52** [2] - 1:10, 59:7
**4th** [1] - 53:11

**5**

**500** [1] - 1:16
**51** [1] - 22:20
**54** [1] - 1:19
**5600** [1] - 1:21
**5th** [8] - 40:11, 41:1, 43:12, 45:22, 46:6, 48:11, 53:15

**6**

**60** [1] - 43:20
**601** [1] - 1:13

**8**

**8,000** [1] - 9:18

**A**

**a.m** [2] - 16:21, 17:1
**abide** [2] - 19:6, 49:19
**ability** [3] - 31:24, 32:8, 32:11
**able** [8] - 9:20, 12:22, 14:10, 28:6, 36:3, 39:13, 50:14, 50:18
**above-entitled** [1] - 59:12
**absence** [2] - 21:5, 22:19
**absent** [1] - 25:6
**absolute** [1] - 47:5
**Absolutely** [1] - 25:4
**absolutely** [3] - 25:14, 29:13, 57:20
**abstract** [1] - 12:16
**accelerated** [1] - 48:10
**accept** [1] - 34:8
**access** [3] - 10:6, 41:6, 56:22
**accumulate** [1] - 58:13
**accumulating** [2] - 47:2, 57:24
**accurate** [2] - 47:21, 59:11
**accused** [1] - 18:23, 58:20
**acknowledge** [1] - 27:20
**acknowledged** [1] - 24:9
**act** [3] - 22:3, 26:22,

45:25
**action** [1] - 23:14
**actions** [1] - 43:12
**activities** [1] - 22:6
**activity** [8] - 21:6, 21:9, 23:13, 29:18, 29:19, 49:4, 49:22, 52:3
**acts** [1] - 32:1
**actual** [3] - 23:14, 29:12, 32:20
**add** [2] - 12:13, 57:11
**additional** [1] - 47:13
**address** [10] - 3:22, 8:6, 12:16, 19:11, 47:20, 51:4, 56:1, 56:24, 57:4, 57:25
**addressed** [4] - 39:25, 43:8, 51:5, 51:6
**adjourn** [1] - 59:5
**admission** [1] - 45:7
**admitted** [3] - 53:19, 53:20, 54:23
**adverse** [1] - 39:8
**advisement** [2] - 57:9, 59:2
**affect** [1] - 53:23
**affirmatively** [1] - 40:3
**afternoon** [6] - 2:6, 2:8, 2:9, 2:12, 2:14, 2:15
**afterwards** [1] - 22:13
**age** [1] - 27:24
**agency** [2] - 10:3, 13:10
**agency's** [1] - 11:1
**agents** [2] - 53:11, 54:17
**aggrieved** [1] - 46:22
**ago** [6] - 12:14, 18:24, 35:18, 35:21, 40:20, 48:23
**agree** [3] - 18:13, 34:10
**agreeing** [1] - 13:24
**agreement** [2] - 14:14, 14:15
**ahead** [4] - 10:22, 18:9, 39:20, 59:5
**airsoft** [5] - 31:25, 32:1, 32:2, 32:4, 32:6
**Alex** [1] - 2:10
**ALEX** [1] - 1:18
**ALI** [1] - 1:9
**alleged** [6] - 15:10, 20:15, 21:6, 23:16,

55:18, 55:20
**allegedly** [3] - 56:14, 56:25, 57:4
**allow** [2] - 9:3, 39:17
**allowed** [3] - 11:6, 56:25, 57:4
**allows** [1] - 49:13
**almost** [1] - 56:16
**amateur** [1] - 41:5
**Amazon** [1] - 45:9
**Amendment** [3] - 15:8, 15:9, 16:8
**America** [1] - 2:3
**AMERICA** [1] - 1:3
**AMIR** [1] - 1:9
**amount** [3] - 5:11, 10:19, 14:20
**analysis** [6] - 33:7, 39:24, 41:11, 41:12, 52:19, 53:23
**ankle** [1] - 58:3
**answer** [3] - 37:11, 39:22, 57:1
**anticipate** [1] - 10:15
**anticipating** [1] - 15:1
**antics** [1] - 4:4
**apartment** [1] - 50:11
**appeal** [2] - 39:8, 39:19
**appearance** [2] - 2:5, 2:24
**appeared** [1] - 2:18
**appellate** [1] - 39:6
**applies** [1] - 23:25
**appreciable** [1] - 53:22
**appreciate** [4] - 55:1, 57:5, 58:24, 59:6
**approach** [4] - 2:4, 5:10, 5:22, 6:8
**approaching** [1] - 5:13
**appropriate** [1] - 17:9
**area** [2] - 41:9, 53:18
**areas** [1] - 8:1
**argue** [2] - 34:25, 38:20
**argued** [1] - 38:10
**arguing** [3] - 49:16, 52:18, 54:6
**argument** [18] - 3:16, 17:18, 22:7, 22:13, 25:12, 30:12, 31:20, 33:8, 33:21, 40:1, 42:12, 44:15, 51:6, 51:7, 52:10, 52:12, 52:15, 52:24

**arguments** [5] - 39:14, 40:6, 44:11, 44:14, 59:1
**armed** [1] - 32:3
**arraigned** [1] - 2:24
**arrest** [3] - 19:20, 26:19, 58:3
**arrested** [4] - 26:19, 26:25, 53:11, 53:13
**articulated** [1] - 5:13
**articulating** [1] - 8:2
**aside** [2] - 40:4, 41:18
**aspect** [1] - 32:12
**assemble** [2] - 28:8, 45:24
**assembling** [1] - 47:2
**assess** [1] - 12:22
**assessed** [2] - 42:17, 43:3
**assessing** [1] - 43:22
**assessment** [1] - 47:10
**assists** [1] - 36:19
**associates** [1] - 38:18
**assume** [4] - 13:4, 13:7, 31:20, 56:7
**assuming** [1] - 24:13
**assurance** [1] - 57:22
**assure** [5] - 47:9, 49:25, 50:24, 57:16, 58:13
**ATF** [2] - 10:7, 13:6
**attached** [4] - 3:13, 3:25, 17:23, 42:19
**attachments** [1] - 17:22
**attack** [1] - 16:8
**attempt** [3] - 21:2, 51:4, 53:4
**attempted** [1] - 30:22
**attempts** [1] - 40:15
**attend** [1] - 53:16
**attention** [1] - 3:24
**Attorney** [1] - 1:12
**attorneys** [2] - 3:4, 3:6
**August** [1] - 48:4
**autism** [7] - 20:11, 51:11, 51:12, 51:13, 53:3, 54:2, 55:18
**autistic** [1] - 54:7
**automatic** [1] - 32:16
**available** [3] - 16:18, 39:20, 58:24
**Avenue** [1] - 1:16

**avoid** [1] - 4:1
**aware** [1] - 15:4

# B

**background** [2] - 19:18, 25:3
**backpack** [3] - 43:15, 43:16, 43:17
**bad** [3] - 23:16, 23:19, 56:8
**bail** [1] - 38:13
**BALLANTINE** [1] - 1:13
**Ballantine** [1] - 2:7
**based** [9] - 18:15, 27:9, 28:10, 29:17, 43:5, 44:21, 46:18, 52:21, 54:21
**baseline** [1] - 12:17
**basis** [3] - 5:8, 51:24, 57:3
**Bates** [1] - 9:14
**beaker** [1] - 45:6
**bear** [1] - 35:10
**bearing** [1] - 54:1
**BEFORE** [1] - 1:9
**beginning** [1] - 2:5
**begins** [1] - 48:16
**behavior** [2] - 40:16, 51:25
**belief** [1] - 57:20
**believes** [1] - 25:1
**bench** [2] - 2:23, 57:7
**benefit** [1] - 28:13
**BERNARD** [1] - 1:21
**best** [1] - 6:20
**better** [1] - 16:11
**between** [16] - 6:22, 9:2, 9:24, 10:14, 17:2, 21:6, 22:5, 26:17, 31:11, 31:23, 32:2, 32:6, 33:10, 35:12, 56:8
**beyond** [3] - 8:2, 13:25, 26:9
**bit** [4] - 9:3, 22:23, 38:4, 38:9
**black** [6] - 18:3, 40:19, 43:6, 46:4, 46:5, 52:11
**Black** [1] - 37:18
**body** [1] - 43:17
**bomb** [16] - 19:4, 22:24, 23:3, 23:13, 28:8, 28:9, 28:13, 40:25, 41:3, 41:5, 41:7, 41:23, 42:22, 47:7, 58:14

**bombs** [10] - 21:17, 40:8, 45:9, 46:2, 48:3, 48:9, 50:11, 53:21, 57:22, 57:24
**BOND** [1] - 1:9
**bonding** [1] - 38:14
**bought** [1] - 48:10
**box** [1] - 56:16
**Brady** [3] - 7:13, 10:7, 17:9
**Brave** [1] - 49:12
**BRIAN** [1] - 1:6
**Brian** [1] - 2:3
**brief** [2] - 45:2, 55:2
**briefed** [1] - 40:23
**briefing** [3] - 17:20, 24:9, 30:12
**briefly** [2] - 38:7, 38:8
**broad** [1] - 55:4
**broader** [3] - 6:20, 8:8, 40:12
**broadly** [1] - 10:23
**broken** [1] - 42:15
**brought** [1] - 39:12
**browser** [1] - 49:12
**browsing** [1] - 49:10
**build** [1] - 39:19
**Building** [1] - 1:21
**built** [1] - 50:5
**burden** [1] - 30:18
**burned** [2] - 56:16, 56:17
**bury** [1] - 8:14
**business** [2] - 38:17, 38:25
**buy** [3] - 28:7, 58:8, 58:19
**BY** [4] - 1:13, 1:16, 1:18, 1:21

# C

**calendar** [1] - 16:13
**calendars** [1] - 16:16
**capable** [6] - 30:25, 31:18, 33:22, 33:23, 34:4, 34:6
**Capitol** [3] - 10:8, 13:6, 53:17
**caps** [1] - 48:10
**captured** [2] - 10:9, 10:23
**car** [1] - 21:15
**cards** [3] - 48:13, 49:7
**careful** [2] - 27:5, 39:25
**carefully** [4] - 17:20, 53:13, 54:14, 54:20

**CARTER** [1] - 1:18
**case** [41] - 2:20, 2:21, 3:2, 3:24, 4:7, 4:24, 6:4, 6:9, 6:10, 6:13, 6:21, 6:23, 7:11, 9:4, 13:18, 15:5, 15:12, 16:14, 18:19, 23:24, 24:19, 24:22, 25:13, 26:4, 26:21, 30:7, 33:13, 33:14, 33:18, 33:19, 33:20, 35:20, 37:8, 40:17, 40:20, 40:25, 41:16, 44:13, 49:12, 50:23, 52:22
**CASE** [1] - 1:5
**categories** [3] - 8:17, 15:16, 56:2
**category** [4] - 7:2, 7:10, 11:17, 37:9
**causal** [1] - 22:5
**caused** [2] - 49:3, 56:6
**caveat** [1] - 4:23
**CCleaner** [1] - 48:18
**cell** [9] - 6:16, 15:7, 15:23, 19:20, 19:21, 20:5, 49:7, 52:6, 52:8
**cert** [1] - 15:4
**certain** [2] - 33:17, 56:23
**certainly** [16] - 4:8, 10:5, 11:1, 12:2, 14:8, 15:8, 19:9, 22:22, 23:1, 26:20, 30:7, 31:4, 32:6, 43:12, 45:17, 56:21
**certainty** [1] - 47:5
**CERTIFICATE** [1] - 59:9
**Certified** [1] - 1:24
**certify** [1] - 59:11
**cetera** [1] - 17:9
**challenge** [1] - 3:9
**challenges** [1] - 23:24
**challenging** [2] - 3:11, 46:17
**chambers** [2] - 4:21, 4:22
**chance** [6] - 12:10, 28:11, 35:9, 35:10, 55:3, 55:4
**change** [5] - 39:16, 41:11, 42:4, 42:5
**changed** [1] - 40:2
**character** [2] - 37:21, 38:17
**characteristics** [1] - 36:7

**characterization** [3] - 19:22, 19:24, 19:25
**characterize** [2] - 40:9, 40:15
**characterized** [4] - 23:6, 23:7, 47:8, 51:12
**charged** [7] - 19:1, 26:12, 35:6, 35:17, 37:9, 40:10, 40:24
**charges** [1] - 2:25
**CHARLES** [1] - 1:13
**Charles** [1] - 2:6
**checking** [1] - 58:4
**chlorate** [3] - 44:25, 45:8, 50:13
**chloride** [1] - 23:2
**chose** [1] - 32:9
**CIPA** [2] - 10:24, 11:7
**circuit** [1] - 24:19
**circumstance** [3] - 11:23, 34:18, 34:22
**circumstances** [9] - 25:23, 37:6, 39:13, 39:16, 46:18, 46:19, 50:23, 57:4, 57:15
**civility** [1] - 4:11
**claiming** [1] - 21:10
**clarification** [1] - 4:18
**clarify** [1] - 51:19
**classified** [1] - 10:25
**cleaner** [1] - 48:17
**cleaning** [1] - 49:9
**clear** [15] - 4:2, 4:17, 11:16, 18:20, 19:10, 22:21, 22:22, 25:5, 26:9, 29:4, 31:5, 38:17, 45:18, 48:19, 49:10
**cleared** [1] - 16:15
**clearing** [1] - 51:23
**clearly** [3] - 14:10, 25:9, 41:5
**CLERK** [1] - 2:2
**client** [6] - 16:2, 18:24, 26:11, 56:3, 56:8, 56:11
**clock** [1] - 9:2
**closely** [2] - 3:14, 58:6
**coincides** [1] - 48:15
**COLE** [1] - 1:6
**Cole** [12] - 2:3, 2:14, 2:17, 4:8, 6:6, 6:10, 6:12, 6:16, 7:5, 7:12, 17:12, 19:20
**Cole's** [2] - 6:24, 18:2

**collapses** [4] - 36:25, 37:3, 37:5, 37:8
**collar** [2] - 36:21, 36:24
**colleagues** [1] - 16:10
**Columbia** [1] - 59:11
**COLUMBIA** [1] - 1:1
**combination** [3] - 18:21, 47:12, 49:25
**comforted** [1] - 31:4
**coming** [2] - 14:15, 50:2
**comment** [1] - 13:6
**commit** [1] - 32:1
**committed** [6] - 22:2, 28:24, 31:24, 32:3, 33:25, 56:14
**committing** [2] - 13:24, 18:24
**commonly** [1] - 45:20
**communicate** [2] - 14:6, 14:10
**communication** [1] - 8:4
**communications** [2] - 10:4
**community** [12] - 12:25, 25:6, 26:13, 30:9, 30:10, 30:16, 37:3, 41:8, 43:25, 50:6, 53:6, 54:3
**community's** [2] - 47:9, 50:24
**company** [1] - 38:14
**compelled** [1] - 22:15
**complete** [1] - 29:18
**completed** [1] - 17:16
**completely** [2] - 20:6, 27:8
**complicated** [1] - 33:5
**comply** [1] - 38:24
**component** [2] - 10:18, 52:16
**components** [8] - 28:7, 42:22, 46:4, 47:3, 48:8, 48:14, 49:6, 57:24
**comprehensive** [1] - 39:25
**compulsive** [2] - 20:13, 51:15
**computer** [2] - 48:17, 49:10
**conceal** [1] - 49:3

**concealing** [3] - 49:21, 52:2, 52:22
**concede** [2] - 33:1, 58:15
**conceded** [1] - 58:11
**concern** [4] - 20:16, 40:13, 49:2, 54:25
**concerned** [3] - 10:7, 33:17, 56:9
**concerning** [1] - 40:15
**concerns** [1] - 15:10
**concluded** [1] - 59:7
**conclusion** [3] - 28:22, 31:6, 45:17
**conclusively** [1] - 43:1
**condition** [3] - 18:21, 25:7, 49:25
**conditions** [23] - 18:22, 19:6, 23:18, 25:10, 26:10, 28:20, 29:15, 29:16, 31:4, 47:9, 49:20, 49:25, 50:6, 50:23, 57:3, 57:16, 57:21, 58:1, 58:2, 58:7, 58:12, 58:24
**conduct** [10] - 37:9, 40:10, 40:12, 44:20, 46:18, 47:11, 47:12, 52:9, 54:15
**conducted** [1] - 41:12
**cones** [1] - 45:14
**conference** [7] - 3:2, 3:8, 5:4, 8:23, 16:16, 17:17, 59:5
**Conference** [1] - 59:13
**confessed** [1] - 35:19
**confession** [3] - 15:10, 55:18, 55:20
**confidence** [1] - 49:19
**confinement** [1] - 50:3
**confirm** [1] - 9:19
**confirmed** [2] - 20:10, 37:14
**conformance** [1] - 59:12
**confusion** [1] - 14:4
**Congress** [3] - 11:22, 13:13, 25:1
**congressional** [4] - 11:19, 11:20, 11:24, 12:4
**connect** [1] - 48:20

**connected** [2] - 22:2, 22:4
**Connecticut** [1] - 1:16
**connection** [3] - 7:16, 20:15, 22:5
**consider** [7] - 24:25, 30:3, 40:17, 41:17, 44:1, 49:24, 53:25
**considerable** [1] - 5:11
**considerations** [1] - 7:19
**considered** [4] - 13:10, 29:5, 29:6, 52:20
**considering** [1] - 47:4
**consistency** [2] - 27:24, 44:7
**consistent** [11] - 5:16, 20:12, 21:22, 37:15, 51:15, 52:1, 52:2, 52:13, 52:19, 52:22
**constant** [1] - 58:4
**constructed** [3] - 31:19, 34:16, 50:12
**construction** [1] - 42:24
**contained** [2] - 6:24, 10:25
**content** [2] - 47:24, 51:24
**contest** [1] - 19:24
**context** [9] - 10:12, 12:13, 16:9, 16:14, 34:13, 34:15, 35:13, 43:23, 46:25
**continued** [5] - 19:4, 22:24, 23:3, 23:13, 56:17
**continuing** [3] - 48:8, 55:12, 56:11
**continuum** [2] - 40:12, 44:20
**contrary** [1] - 54:16
**control** [1] - 38:21
**conversation** [4] - 3:3, 5:12, 12:14, 53:10
**conversations** [2] - 9:25, 10:16
**conviction** [2] - 33:17, 57:20
**convince** [1] - 26:9, 57:19
**convincing** [8] - 18:20, 19:10, 22:21, 22:22, 25:6, 26:9,

31:5, 45:18
**copper** [1] - 45:11
**copy** [1] - 6:12
**correct** [1] - 40:3
**correctly** [1] - 20:24
**correspond** [1] - 4:24
**counsel** [9] - 2:4, 3:7, 3:11, 3:22, 4:4, 9:7, 14:12, 18:6, 51:12
**counsel's** [2] - 18:5, 46:12
**count** [1] - 14:9
**counterfactual** [1] - 27:8
**couple** [4] - 3:6, 15:3, 20:4, 48:2
**course** [13] - 5:12, 6:21, 7:5, 7:18, 9:25, 12:18, 17:7, 26:2, 30:18, 40:22, 46:14, 46:25, 51:16
**Court** [45] - 1:24, 2:1, 5:19, 7:14, 8:6, 15:4, 15:22, 18:13, 18:14, 24:17, 25:25, 26:10, 31:3, 36:19, 39:7, 40:13, 40:17, 41:4, 41:11, 42:14, 43:22, 43:25, 44:18, 47:4, 47:6, 47:8, 47:15, 49:18, 51:8, 52:2, 53:8, 53:9, 53:25, 54:1, 54:25, 55:24, 56:7, 56:9, 56:21, 56:22, 56:23, 59:10, 59:10
**COURT** [91] - 1:1, 2:8, 2:12, 2:16, 3:22, 5:21, 5:25, 7:10, 7:22, 8:7, 8:18, 8:21, 9:5, 9:7, 10:11, 11:10, 12:7, 12:10, 13:4, 14:2, 14:15, 14:24, 15:17, 16:9, 16:20, 16:24, 17:1, 17:16, 19:12, 20:23, 21:7, 21:21, 22:7, 23:8, 23:19, 24:8, 24:13, 24:22, 25:12, 25:15, 25:19, 25:22, 26:1, 27:11, 28:12, 29:4, 29:20, 30:2, 30:11, 30:18, 30:23, 31:6, 31:9, 31:14, 32:13, 33:8, 34:10, 36:5, 36:12, 36:16, 36:23, 37:2, 37:11, 37:17, 37:20, 38:1, 38:16,

39:3, 39:14, 39:18, 41:20, 42:7, 42:11, 44:2, 44:6, 46:7, 47:16, 48:20, 49:14, 49:23, 50:25, 51:19, 52:10, 52:24, 54:2, 55:1, 57:5, 57:12, 58:16, 58:23, 59:17
**court** [6] - 2:24, 4:3, 21:20, 24:25, 35:17, 38:23
**Court's** [6] - 10:3, 10:10, 11:8, 11:25, 28:22, 53:23
**courtroom** [2] - 2:23, 4:24
**courts** [1] - 4:16
**cover** [4] - 53:13, 53:16, 54:14, 54:20
**covered** [1] - 7:9
**covering** [2] - 52:14, 52:19
**covers** [1] - 44:5
**crazy** [1] - 11:2
**create** [7] - 6:9, 42:21, 42:23, 45:7, 47:3, 57:22, 57:24
**created** [2] - 6:10, 30:14
**creating** [2] - 31:11, 31:12
**credibility** [1] - 52:11
**credit** [2] - 48:13, 49:7
**crime** [14] - 18:22, 18:23, 18:24, 19:3, 21:6, 22:2, 26:11, 28:24, 31:24, 34:1, 34:2, 35:17, 56:15
**criminal** [7] - 13:15, 24:18, 29:18, 29:19, 35:24, 40:20, 50:15
**Criminal** [1] - 2:2
**critical** [2] - 20:5, 44:3
**CRR** [1] - 59:16
**custodian** [5] - 38:5, 38:12, 49:20, 50:4, 56:14
**custodians** [3] - 24:18, 38:21, 38:22
**custody** [1] - 28:5

**D**

**daily** [2] - 48:14, 51:24
**danger** [8] - 25:6, 30:16, 32:20, 34:24, 36:8, 43:24, 47:10,

53:6
**dangerous** [14] - 25:9, 25:11, 28:25, 29:2, 33:4, 33:22, 33:23, 33:24, 34:3, 34:7, 35:3, 36:19, 36:20, 56:3
**dangerousness** [28] - 18:19, 25:25, 26:1, 28:2, 28:14, 28:20, 32:11, 32:25, 33:7, 33:12, 33:20, 34:5, 35:10, 35:12, 35:24, 36:3, 36:25, 37:4, 37:7, 42:13, 43:22, 48:21, 49:16, 49:17, 54:9, 54:25, 55:11, 56:11
**data** [2] - 6:17, 49:10
**date** [5] - 6:2, 6:22, 6:23, 8:25, 16:15
**Dated** [1] - 59:14
**dates** [2] - 16:10, 16:12
**days** [7] - 8:25, 9:2, 14:14, 14:16, 14:20, 20:17, 51:10
**DC** [5] - 1:11, 1:14, 1:17, 53:14, 53:16
**de** [2] - 18:12, 18:14
**dead** [1] - 35:19
**deal** [3] - 8:3, 21:9, 46:22
**death** [1] - 35:21
**debit** [1] - 48:13
**deceive** [1] - 21:12
**December** [2] - 48:2, 53:11
**decision** [5] - 3:14, 17:18, 17:20, 39:8, 59:3
**declaration** [4] - 21:22, 23:8, 44:25, 52:11
**declarations** [8] - 18:2, 23:4, 37:19, 37:23, 44:10, 44:12, 44:21
**deemed** [1] - 41:17
**defendant** [27] - 30:8, 32:3, 40:24, 41:2, 43:25, 44:24, 45:4, 45:6, 45:18, 45:23, 46:16, 47:6, 47:11, 48:3, 48:8, 48:16, 49:19, 50:8, 51:10, 51:16, 51:20, 51:22, 52:7, 53:3, 53:6, 54:11, 54:18
**Defendant** [1] - 1:7

**DEFENDANT** [2] - 1:15, 2:15

**defendant's** [7] - 32:7, 40:15, 43:11, 47:11, 52:5, 53:10, 54:10

**defense** [42] - 3:11, 5:9, 5:13, 6:9, 6:14, 6:20, 7:7, 7:9, 7:21, 7:25, 8:14, 8:19, 8:25, 9:7, 13:22, 14:12, 15:1, 16:22, 16:23, 17:10, 17:23, 18:5, 18:6, 33:10, 35:22, 40:1, 40:6, 40:9, 40:14, 41:10, 41:15, 43:8, 44:14, 46:12, 47:7, 47:15, 50:2, 51:11, 52:4, 53:24, 54:17, 55:2

**defense's** [2] - 42:19, 51:4

**defensive** [1] - 23:22

**deficit** [2] - 53:22, 54:24

**defined** [1] - 12:19

**definitively** [1] - 23:4

**deleting** [2] - 51:14, 51:24

**demonstrate** [1] - 32:8

**demonstrated** [1] - 47:1

**demonstrates** [1] - 53:21

**deny** [1] - 44:19

**Depot** [1] - 21:15

**DEPUTY** [1] - 2:2

**deputy** [1] - 4:24

**described** [3] - 17:25, 29:15, 46:8

**describes** [1] - 19:19

**description** [2] - 27:12, 46:10

**designed** [1] - 48:19

**desire** [2] - 33:1, 33:4

**desktop** [2] - 48:17, 49:11

**destroyed** [1] - 42:16

**detailed** [1] - 5:23

**details** [1] - 5:21

**detention** [11] - 3:9, 3:12, 17:18, 17:21, 25:2, 33:14, 36:2, 39:17, 41:15, 44:18, 54:4

**determination** [3] - 3:12, 18:12, 18:15

**determined** [1] - 52:21

**determining** [1] - 36:19

**detonated** [1] - 25:20

**device** [8] - 25:19, 41:6, 42:23, 43:15, 47:23, 48:2, 48:15, 51:24

**devices** [14] - 30:25, 40:24, 42:15, 43:3, 43:13, 43:16, 43:18, 45:20, 45:25, 47:2, 47:13, 49:11, 50:12, 50:15

**diagnosed** [3] - 20:8, 51:11, 53:3

**diagnoses** [2] - 40:19, 51:5

**diagnosis** [6] - 21:22, 37:14, 52:5, 53:5, 53:25, 54:10

**diagram** [1] - 42:24

**dialogue** [1] - 8:5

**difference** [6] - 31:11, 31:23, 32:2, 32:5, 32:23, 32:24

**different** [1] - 2:18, 4:16, 4:17, 11:24, 16:5, 18:17, 29:22, 35:14, 37:25, 46:4

**differently** [1] - 55:21

**difficult** [4] - 16:3, 24:15, 46:17, 46:21

**digital** [5] - 9:13, 49:4, 49:22, 52:3, 56:22

**dignity** [2] - 4:10, 4:11

**Diplomate** [1] - 1:23

**direct** [2] - 3:17, 18:10

**directly** [4] - 32:11, 51:6, 56:24, 57:3

**disagree** [5] - 9:8, 24:23, 27:3, 28:22, 57:2

**discharged** [1] - 39:11

**disconnected** [1] - 21:24

**discounts** [1] - 27:18

**discoverable** [1] - 10:5

**discovery** [19] - 5:6, 5:8, 5:10, 5:13, 6:1, 6:9, 7:8, 9:10, 9:12, 11:17, 12:18, 14:1, 14:25, 15:17, 15:20, 15:21, 17:8, 17:9, 17:12

**discuss** [1] - 9:3

**discussed** [5] - 5:17, 8:18, 8:24, 13:17

**discussing** [1] - 13:5

**discussion** [2] - 22:25, 38:8

**disorder** [2] - 51:16, 53:4

**dispositive** [1] - 36:11

**dispute** [3] - 8:6, 9:21, 43:4

**disputes** [1] - 41:19

**disrupted** [1] - 42:15

**dissimilar** [1] - 46:19

**distinction** [1] - 35:12

**District** [1] - 59:10

**DISTRICT** [3] - 1:1, 1:1, 1:9

**DNA** [1] - 35:19

**DNC** [2] - 41:1, 50:16

**docket** [2] - 4:20, 4:22

**doctor** [3] - 20:12, 51:9, 51:18

**DOJ** [1] - 12:5

**dollars** [1] - 48:18

**done** [4] - 20:18, 20:19, 23:16, 54:23

**dots** [1] - 48:20

**doubt** [1] - 19:5

**down** [6] - 9:22, 18:19, 23:15, 35:20, 56:16, 56:17

**Dr** [3] - 18:3, 40:19, 52:11

**dropped** [1] - 56:17

**drug** [1] - 30:8

**drugs** [1] - 26:13

**dump** [1] - 15:7, 15:23

**during** [4] - 5:12, 5:17, 7:5, 19:20

**dust** [1] - 45:9

**E**

**early** [1] - 14:9

**easily** [1] - 9:14

**East** [1] - 1:19

**easy** [3] - 23:20, 32:9

**effect** [2] - 32:4, 50:15

**effectively** [1] - 49:21

**efficient** [1] - 8:3

**effort** [7] - 31:16, 31:18, 31:21, 31:23,

**discuss** continued...

**17:12**

**either** [3] - 19:25, 21:10, 29:11

**electronic** [2] - 47:13, 48:15

**element** [1] - 37:5

**email** [1] - 4:22

**emerge** [1] - 6:6

**emphasize** [1] - 38:4

**end** [4] - 3:16, 21:14, 35:1, 48:10

**endanger** [1] - 27:3

**ended** [1] - 16:4

**ends** [1] - 55:13

**enforcement** [3] - 13:7, 38:6, 49:15

**engaged** [1] - 52:20

**ensuing** [1] - 45:22

**ensure** [1] - 4:6

**entered** [1] - 3:1

**entire** [3] - 22:25, 27:20, 38:25

**entirely** [4] - 19:9, 20:11, 28:10, 29:14

**entitled** [4] - 4:7, 4:19, 12:6, 59:12

**equation** [2] - 25:7, 34:5

**erase** [2] - 22:3, 48:25

**error** [2] - 18:8, 55:4

**escape** [1] - 28:6

**especially** [1] - 31:3

**essence** [2] - 42:18

**essentially** [2] - 6:11, 42:2

**establishes** [1] - 41:4

**et** [1] - 17:9

**evade** [2] - 21:2, 49:15

**evasive** [2] - 21:8, 23:14

**eve** [1] - 50:16

**evening** [1] - 53:15

**event** [6] - 22:11, 23:5, 45:24, 46:8, 46:24, 50:17

**eventually** [1] - 54:21

**evidence** [61] - 3:13, 17:23, 17:25, 18:21, 19:4, 19:11, 20:21, 20:25, 21:1, 21:5, 22:1, 22:4, 22:16, 22:21, 22:22, 23:2, 23:12, 23:17, 24:17, 24:20, 25:6, 25:16, 26:9, 26:12, 26:22, 26:25, 28:17, 28:18,

**32:22, 42:1, 42:4**

**28:24, 29:18, 30:17, 30:20, 30:22, 31:5, 32:1, 32:5, 33:11, 33:15, 33:23, 33:24, 34:1, 34:2, 34:23, 35:1, 35:4, 35:24, 36:16, 36:19, 38:21, 43:10, 46:13, 48:7, 53:14, 53:17, 54:21, 55:11, 55:15, 56:11, 57:19**

**evidentiary** [1] - 30:19

**exact** [4] - 30:5, 30:14, 52:21, 58:19

**exactly** [7] - 7:14, 21:8, 23:6, 29:15, 32:23, 36:11, 37:1

**examined** [2] - 49:11, 51:10

**examiner** [3] - 42:17, 42:25, 43:2

**example** [4] - 6:21, 7:2, 35:15, 36:21

**except** [2] - 9:9, 52:7

**excerpt** [1] - 27:11

**exchange** [1] - 17:8

**exclude** [3] - 17:2, 17:4, 17:7

**executed** [1] - 46:6

**exhibit** [1] - 55:7

**exhibited** [1] - 56:12

**existence** [1] - 50:20

**expand** [1] - 37:7

**expanded** [1] - 38:9

**expect** [3] - 4:10, 10:13, 15:11

**expected** [1] - 10:2

**experiment** [2] - 27:17, 45:1

**experimented** [1] - 50:13

**experimenting** [3] - 44:24, 45:19, 45:23

**experiments** [1] - 23:7

**expert** [2] - 41:3, 41:15

**explain** [6] - 33:8, 40:15, 51:4, 52:8, 53:5, 53:17

**explainable** [1] - 52:23

**explained** [2] - 5:10, 51:7

**explaining** [1] - 53:14

**explanations** [1] - 52:23

**explicit** [1] - 48:21

**explode** [4] - 31:12, 43:19, 43:20
**exploded** [1] - 43:5
**exploding** [2] - 30:25, 31:19
**explosive** [9] - 35:6, 35:9, 41:6, 43:6, 43:7, 43:13, 45:20, 46:5, 50:15
**explosives** [4] - 42:10, 42:17, 42:25, 43:2
**extensive** - 15:2, 24:17, 41:5
**extensively** [1] - 40:23
**extent** [6] - 24:17, 27:14, 38:19, 39:7, 51:5, 55:19
**extra** - 9:3
**extraordinarily** [1] - 46:17
**extraordinary** [1] - 49:3
**extreme** [2] - 20:11, 51:12

## F

**faces** [1] - 2:22
**facing** [1] - 46:18
**fact** [15] - 20:17, 22:15, 24:25, 31:18, 35:25, 37:16, 38:13, 41:8, 46:21, 48:9, 53:20, 55:13, 56:10, 56:14
**factor** [8] - 29:22, 32:7, 33:9, 34:17, 34:23, 36:10, 36:13, 36:14
**factors** [6] - 19:1, 29:5, 29:11, 29:21, 36:6, 36:9
**factory** [6] - 47:23, 48:1, 48:4, 48:14, 49:8, 51:23
**facts** [12] - 20:1, 20:2, 21:13, 28:10, 37:12, 42:11, 43:9, 48:22, 50:23, 52:1, 52:21, 55:4
**factual** [1] - 41:18
**factually** [1] - 43:1
**faculties** [1] - 54:13
**failed** [1] - 21:20
**fair** [2] - 4:6, 34:14
**fake** [1] - 39:11
**fall** [1] - 40:16
**family** [6] - 23:5,

37:23, 38:13, 38:15, 50:14, 50:19
**family's** [2] - 50:19, 50:22
**far** [6] - 8:12, 10:16, 16:10, 40:16, 52:2, 52:18
**farcical** [1] - 28:10
**fashion** [5] - 13:3, 47:8, 56:22, 56:23
**FBI** [15] - 6:5, 6:10, 6:11, 7:15, 10:1, 10:23, 42:16, 43:14, 43:19, 53:11, 53:12, 54:14, 54:17, 54:20, 54:22
**fearing** [1] - 57:23
**February** [1] - 17:3
**federal** [6] - 1:24, 2:25, 35:15, 35:17, 35:21, 38:6
**Federal** - 59:10
**FEDERAL** [1] - 59:17
**few** [7] - 2:18, 11:19, 15:20, 18:10, 18:16, 19:11, 40:16
**fewer** [1] - 2:22
**fictional** [1] - 20:6
**fighting** [1] - 24:4
**figure** [1] - 13:8
**figuring** [1] - 6:19
**file** [5] - 6:5, 6:13, 7:11, 9:20, 9:21
**filed** [5] - 2:22, 18:2, 23:9, 44:10, 47:15
**files** [9] - 9:14, 10:1, 11:1, 12:4, 12:5, 17:11, 20:10, 47:25, 51:15, 51:23
**filing** [1] - 15:1
**finally** [2] - 53:19, 54:23
**fine** [3] - 8:7, 8:21, 16:23
**finish** [2] - 31:1, 51:20
**fins** [1] - 45:13
**firearms** [1] - 28:18
**firm** [1] - 57:20
**first** [22] - 3:2, 3:8, 3:24, 4:5, 6:13, 18:6, 18:11, 19:3, 21:3, 23:25, 24:5, 26:16, 34:17, 36:10, 36:12, 40:23, 44:3, 44:5, 44:17, 45:2, 47:20, 47:22
**fits** [1] - 25:9
**five** [6] - 6:4, 7:15, 15:15, 18:24, 29:17,

34:9
**five-year** [2] - 6:4, 34:9
**flight** [3] - 33:18, 34:15, 49:15
**flip** [1] - 23:17
**focus** [3] - 31:17, 41:20, 55:4
**focused** [2] - 54:3, 55:3
**focusing** [1] - 28:15
**follow** [2] - 15:17, 16:3
**foolish** [1] - 48:24
**FOR** [3] - 1:1, 1:12, 1:15
**foregoing** [1] - 59:11
**foremost** [2] - 4:5, 44:17
**form** [1] - 51:13
**format** [1] - 59:12
**former** [2] - 38:6, 49:16
**forth** [3] - 14:6, 14:10, 33:9
**forward** [4] - 24:20, 27:25, 55:9
**four** [5] - 15:15, 40:18, 51:9, 53:10, 54:11
**four-hour** [2] - 53:10, 54:11
**four-sentence** [2] - 40:18, 51:9
**Fourth** [3] - 15:8, 15:9, 16:8
**fourth** [1] - 36:9
**fraud** [1] - 34:20
**Friday** [3] - 16:18, 16:20, 17:1
**front** [4] - 2:18, 24:3, 37:13, 37:20
**fruit** [1] - 16:3
**fuel** [1] - 45:1
**full** [1] - 14:24
**functional** [1] - 42:22
**fundamental** [1] - 50:7
**future** [2] - 28:14, 55:19

## G

**game** [1] - 35:8
**gap** [1] - 34:9
**gathered** [1] - 54:22
**geared** [1] - 13:5
**general** [2] - 7:8, 12:15
**generality** [1] - 12:15

**generally** [2] - 28:14, 37:10
**geofence** [2] - 15:5, 15:6
**Georgia** [1] - 1:22
**given** [4] - 10:19, 11:11, 16:1, 49:21
**glom** [1] - 20:20
**GOVERNMENT** [1] - 1:12
**government** [66] - 2:5, 3:4, 3:20, 4:7, 5:5, 5:7, 5:9, 5:14, 5:15, 6:23, 6:25, 7:6, 7:25, 9:9, 9:17, 10:1, 10:20, 11:7, 12:10, 12:19, 12:20, 13:2, 13:14, 13:17, 13:24, 13:25, 14:17, 16:24, 18:20, 18:23, 20:7, 21:10, 23:12, 26:8, 27:9, 27:15, 27:18, 28:1, 28:3, 28:13, 29:8, 29:11, 29:25, 30:13, 33:14, 34:8, 34:9, 34:21, 35:18, 38:20, 39:10, 39:12, 39:21, 41:2, 41:24, 44:22, 45:3, 47:14, 50:5, 55:6, 55:10, 55:23, 55:25, 56:3, 57:1, 57:23
**government's** [9] - 5:15, 6:8, 12:18, 17:13, 17:21, 17:24, 19:24, 32:14, 33:21
**GPS** [3] - 28:6, 50:4, 56:22
**ground** [2] - 18:4, 19:16
**guess** [10] - 20:1, 22:1, 28:3, 30:2, 30:11, 34:21, 34:25, 36:23, 37:7, 51:6
**guilt** [4] - 21:12, 33:12, 33:16, 35:12
**guilty** [2] - 3:1, 26:18
**gun** [10] - 31:25, 32:2, 32:3, 32:4, 32:6, 32:10, 32:16, 32:19
**guns** [3] - 26:19, 26:20, 30:21
**guy** [3] - 21:16, 35:20, 35:23
**guys** [2] - 13:7, 24:3

## H

**hacksaw** [1] - 45:12
**hamstrung** [1] -

30:13
**hand** [2] - 21:10, 21:17
**handled** [1] - 59:4
**hanging** [1] - 10:7
**hard** [2] - 12:16, 47:16
**hardware** [1] - 6:22
**harm** [2] - 26:15, 30:9
**harmed** [1] - 30:9
**harming** [2] - 26:13, 34:4
**harmless** [1] - 40:8
**HDR** [1] - 1:20
**head** [3] - 12:4, 14:19, 57:14
**headquarters** [1] - 41:1
**hear** [5] - 5:4, 9:7, 14:12, 18:5, 39:21
**heard** [3] - 52:10, 52:12, 57:8
**HEARING** [1] - 1:9
**hearing** [9] - 3:10, 3:16, 8:25, 11:19, 14:8, 16:20, 41:15, 55:8, 55:9
**hearings** [1] - 4:23
**heavily** [1] - 29:7
**help** [1] - 49:16
**helpful** [9] - 7:22, 10:12, 16:9, 19:16, 39:3, 41:21, 42:12, 49:23, 55:5
**helps** [1] - 55:24
**hereby** [1] - 59:11
**hide** [4] - 20:21, 21:18, 21:25, 55:16
**hiding** [3] - 21:12, 21:18, 52:22
**high** [4] - 5:25, 28:5, 34:10, 50:17
**high-intensity** [1] - 28:5
**high-security** [1] - 50:17
**higher** [1] - 35:10
**history** [6] - 6:16, 24:18, 29:17, 29:22, 35:24, 36:7
**hit** [1] - 57:14
**hobbiest** [1] - 45:15
**holding** [1] - 43:16
**holdings** [1] - 12:25
**home** [6] - 26:20, 45:16, 50:3, 50:14, 50:19, 50:22
**Home** [1] - 21:15
**homemade** [2] -

26:23, 46:4
**Honor** [12] - 2:6, 2:9,
2:11, 3:21, 5:7, 16:19,
17:15, 39:5, 39:22,
57:14, 58:7, 58:15
**HONORABLE** [1] -
1:9
**hopefully** [1] - 14:5
**hour** [2] - 53:10,
54:11
**hours** [2] - 53:19,
54:15
**house** [7] - 56:16,
56:18, 58:3, 58:9,
58:10, 58:12, 58:21
**housekeeping** [4] -
3:7, 3:19, 5:3, 12:1
**human** [1] - 36:1
**hundreds** [1] - 48:18
**hurt** [1] - 32:19
**hurting** [1] - 26:11
**hypothetical** [1] -
29:1

## I

**idea** [10] - 11:14,
13:17, 20:5, 20:20,
22:17, 22:23, 31:7,
31:10, 55:18, 56:13
**ideas** [1] - 44:13
**identifiers** [1] - 6:24
**identifying** [1] - 7:19
**IEDs** [1] - 45:8
**ignores** [1] - 43:9
**imagine** [3] - 7:14,
15:15, 16:1
**immediate** [1] - 8:10
**impasse** [1] - 8:5
**implicate** [2] - 7:18,
15:7
**implicated** [3] - 11:7,
15:19, 15:21
**important** [2] - 31:2,
37:12
**improvised** [2] -
41:6, 45:20
**inability** [3] - 32:7,
42:3, 42:5
**inadvertence** [1] -
10:21
**incapable** [1] - 33:5
**incarcerated** [1] -
35:1
**incentive** [1] - 14:5
**incident** [2] - 11:4,
11:21
**include** [1] - 6:15
**included** [1] - 42:23
**includes** [1] - 25:5

**including** [5] - 17:21,
17:23, 19:19, 37:23,
44:9
**incongruity** [1] -
21:19
**inconsistent** [1] -
55:15
**inconvenient** [1] -
43:9
**incorrect** [1] - 24:11
**incorrectly** [1] - 18:8
**incriminating** [1] -
52:9
**independent** [1] -
19:14
**indicate** [1] - 34:6
**indicated** [2] - 5:14,
9:1
**indication** [1] - 11:12
**indictment** [7] - 2:21,
2:25, 3:10, 24:1, 24:2,
24:4, 39:11
**individual** [7] - 20:8,
20:11, 21:11, 23:14,
27:23, 31:24, 56:21
**individuals** [3] - 7:4,
7:15, 21:12
**inert** [1] - 31:12
**information** [14] -
4:21, 5:11, 6:12, 7:3,
7:19, 8:17, 10:6,
10:25, 11:22, 13:8,
16:5, 47:13, 51:17
**informed** [1] - 13:3
**informing** [1] - 51:18
**initial** [3] - 9:23,
39:22, 41:14
**initiated** [1] - 40:21
**injustice** [1] - 35:2
**innocuous** [2] - 45:1,
52:23
**inquiry** [5] - 26:2,
26:3, 30:3, 30:5, 37:2
**instead** [1] - 32:16
**instructions** [1] -
42:20
**insufficient** [1] -
50:24
**intellectual** [2] -
54:13, 54:24
**intelligence** [4] -
11:1, 11:2, 12:25,
13:5
**intensity** [1] - 28:5
**interagency** [2] -
10:4, 10:18
**interest** [11] - 4:5,
14:3, 16:2, 17:4,
22:24, 23:3, 23:13,
23:14, 41:6, 47:1

**interested** [6] - 3:17,
8:1, 18:7, 18:10, 44:3,
48:22
**interests** [2] - 17:5
**interview** [12] -
19:23, 23:7, 27:10,
27:13, 27:15, 27:19,
27:21, 46:10, 53:9,
53:12, 54:11, 54:12
**interviews** [2] -
20:10, 27:22
**investigation** [10] -
6:5, 6:6, 6:7, 7:5,
7:16, 11:20, 13:11,
19:19, 20:9, 54:22
**investigative** [1] -
20:16
**involve** [1] - 5:19
**involved** [3] - 6:4,
11:3, 27:23
**involving** [1] - 15:5
**isolated** [1] - 40:11
**issue** [10] - 3:11, 4:1,
10:16, 14:7, 28:3,
37:9, 39:7, 56:1, 57:9,
59:2
**issued** [2] - 6:21,
40:2
**issues** [9] - 3:19,
11:7, 15:3, 15:8,
15:12, 19:8, 23:21,
27:24, 44:23
**items** [1] - 9:18
**itself** [2] - 17:10,
55:7
**IV** [1] - 1:18

## J

**January** [11] - 1:10,
5:8, 40:11, 41:1,
43:12, 45:22, 46:6,
48:11, 53:15, 59:14
**job** [1] - 38:13
**Jocelyn** [1] - 2:7
**JOCELYN** [1] - 1:13
**John** [1] - 2:9
**JOHN** [1] - 1:16
**joint** [2] - 13:17,
13:25
**JONES** [32] - 1:13,
2:6, 3:20, 5:7, 5:23,
6:4, 7:14, 7:24, 8:11,
8:20, 8:24, 9:6, 12:14,
13:9, 16:25, 17:15,
39:22, 42:5, 42:9,
42:14, 44:5, 44:17,
46:16, 47:22, 49:2,
49:18, 50:7, 51:3,
51:22, 52:18, 53:1,

54:8
**Jones** [1] - 2:6
**JOSEPH** [1] - 1:18
**JR** [1] - 1:6
**Judge** [22] - 3:12,
3:14, 17:18, 17:19,
18:7, 19:13, 19:23,
23:25, 24:9, 25:16,
31:15, 32:22, 33:10,
37:13, 37:20, 38:2,
39:23, 41:12, 41:16,
41:25, 44:19, 52:20
**judge** [4] - 18:17,
21:9, 27:12, 41:22
**JUDGE** [1] - 1:9
**judge's** [2] - 19:7,
27:4
**judges** [3] - 2:18,
2:19, 4:16
**Judicial** [1] - 59:13
**jump** [2] - 3:19, 5:4
**jumping** [1] - 31:6
**Junior** [1] - 2:3
**junk** [3] - 47:25,
51:14, 51:23
**justice** [1] - 17:4

## K

**keep** [4] - 19:2,
42:14, 43:17, 50:5
**keeping** [1] - 54:3
**kept** [1] - 56:18
**killed** [2] - 36:1, 36:4
**kind** [18] - 3:16, 7:2,
7:11, 14:5, 16:4,
19:16, 23:21, 34:10,
35:2, 42:11, 43:24,
44:6, 47:7, 47:18,
50:4, 50:20, 52:9
**knives** [2] - 28:17,
30:21
**knowledge** [2] -
50:14, 56:19
**knows** [2] - 18:14,
41:24

## L

**lack** [9] - 24:18,
31:16, 31:17, 31:21,
32:22, 35:23, 41:25,
42:4, 42:8
**laid** [1] - 41:19
**land** [1] - 22:21
**language** [1] - 28:15
**laptop** [2] - 48:17,
49:11
**large** [1] - 7:6
**largely** [2] - 10:13,

20:24
**last** [7] - 2:24, 13:16,
35:19, 40:16, 53:1,
56:5, 56:13
**late** [2] - 6:7, 16:21
**latter** [1] - 7:10
**law** [11] - 4:3, 13:6,
24:19, 24:23, 30:7,
38:6, 42:9, 42:10,
49:15, 49:24, 58:14
**Lawson** [1] - 2:10
**LAWSON** [1] - 1:18
**laying** [1] - 37:23
**lays** [1] - 29:5
**leads** [1] - 47:15
**leaning** [2] - 29:7,
29:8
**learning** [1] - 49:4
**least** [9] - 2:23, 5:15,
5:25, 11:3, 14:22,
19:23, 20:1, 24:12,
33:4
**leave** [4] - 4:12,
24:21, 28:8, 50:22
**leaves** [1] - 58:9
**leaving** [2] - 58:10,
58:21
**lectern** [1] - 2:4
**led** [2] - 29:25, 46:20
**left** [2] - 23:15, 26:19
**legal** [4] - 6:15, 6:20,
7:3, 58:17
**lens** [1] - 7:13
**less** [1] - 35:2
**letter** [2] - 40:18,
51:9
**letters** [6] - 13:19,
14:1, 17:24, 37:20,
37:21, 38:17
**level** [6] - 5:25,
12:15, 34:11, 51:11,
53:4, 54:2
**life** [1] - 50:20
**lightweight** [1] -
45:14
**likelihood** [1] - 22:20
**likely** [1] - 29:17
**limitations** [1] -
35:16
**line** [1] - 8:4
**lists** [1] - 9:21
**literal** [1] - 35:23
**litigated** [1] - 44:23
**Litson** [1] - 1:18
**LITTLE** [53] - 1:18,
9:8, 10:19, 11:13,
12:8, 14:14, 14:17,
15:2, 15:18, 16:17,
18:11, 20:4, 21:1,
21:8, 22:1, 22:14,

23:10, 24:6, 24:11, 24:15, 25:4, 25:14, 25:18, 25:21, 25:24, 26:4, 27:14, 28:16, 29:13, 29:23, 30:7, 30:17, 30:20, 31:3, 31:8, 31:11, 31:23, 32:24, 33:13, 35:14, 36:10, 36:14, 36:18, 36:25, 37:5, 37:14, 37:19, 37:22, 38:3, 38:19, 39:5, 39:16, 55:6

**live** [2] - 50:21, 56:18
**livelihood** [1] - 38:15
**living** [3] - 50:10, 50:18, 50:19
**LLC** [2] - 1:15, 1:20
**load** [1] - 9:14
**locked** [1] - 19:2
**log** [4] - 9:18, 9:23, 13:17, 13:25
**look** [14] - 11:12, 11:15, 13:7, 17:9, 18:18, 23:16, 24:17, 30:6, 32:18, 34:19, 45:3, 46:13, 48:21, 54:7
**looked** [2] - 7:15, 19:15
**looking** [8] - 11:3, 11:16, 13:21, 16:4, 18:13, 24:12, 24:19, 26:5
**looks** [1] - 6:1
**luck** [5] - 31:16, 31:17, 41:25, 42:3, 42:7

## M

**magistrate** [7] - 2:19, 18:17, 19:7, 21:9, 21:20, 27:4, 27:12
**magistrate's** [1] - 38:8
**maker** [4] - 41:3, 41:5, 41:7
**maliciously** [1] - 40:25
**man** [1] - 53:12
**manifests** [1] - 52:5
**manner** [1] - 33:7
**manufacture** [2] - 46:2, 48:9
**MARIO** [1] - 1:21
**Mario** [1] - 2:10
**Mart** [1] - 58:8
**mass** [1] - 12:8
**massive** [1] - 35:14

**matches** [2] - 56:16, 56:18
**material** [6] - 7:6, 7:17, 7:21, 8:13, 8:14, 45:14
**materials** [12] - 11:24, 12:21, 12:22, 13:12, 13:18, 13:19, 17:9, 41:6, 45:23, 47:3, 57:24, 58:14
**matter** [8] - 8:16, 12:17, 42:8, 42:9, 46:23, 52:16, 59:12
**Matter** [1] - 2:2
**matters** [6] - 2:20, 3:7, 3:23, 5:3, 13:1, 29:12
**McFadden** [1] - 1:15
**mean** [5] - 5:22, 14:2, 18:11, 19:12, 28:13, 29:12, 42:16, 47:17, 48:21, 52:20
**meaning** [1] - 46:11
**meaningful** [1] - 53:23
**measures** [1] - 49:3
**meet** [1] - 24:21
**meeting** [1] - 5:17
**members** [3] - 11:21, 50:14, 50:19
**memo** [1] - 17:21
**mention** [1] - 21:3
**mentioned** [10] - 3:19, 9:12, 10:1, 11:10, 15:20, 38:7, 38:8, 38:10, 49:9, 51:8
**merits** [2] - 3:11, 17:18
**met** [4] - 5:9, 24:12, 24:16, 28:20
**metal** [2] - 21:14, 26:23
**mid** [2] - 48:12, 49:2
**might** [11] - 7:14, 11:23, 12:4, 16:7, 25:9, 33:16, 42:7, 43:18, 46:21, 51:25, 55:7
**mildest** [1] - 51:12
**mind** [1] - 42:14
**mindful** [1] - 8:13
**mine** [2] - 4:18, 46:12
**minimum** [1] - 5:5
**minute** [1] - 10:11
**minutes** [2] - 43:20, 57:10
**mitigating** [1] - 54:9
**model** [1] - 45:15

**moment** [1] - 3:18
**monitor** [2] - 49:21, 58:3
**monitoring** [3] - 28:6, 28:7, 58:2
**month** [3] - 26:17, 40:20
**months** [1] - 9:21
**monumental** [1] - 9:24
**morning** [1] - 16:21
**most** [7] - 3:17, 8:3, 9:13, 18:7, 18:10, 18:18, 37:22
**mother** [1] - 18:2
**motion** [6] - 15:3, 15:16, 17:22, 18:5, 39:10, 44:19
**motions** [5] - 15:1, 15:11, 15:14, 15:18, 55:19
**mouth** [2] - 32:14, 46:12
**move** [3] - 10:11, 15:18, 44:3
**MR** [90] - 2:6, 2:9, 3:20, 3:21, 5:7, 5:23, 6:4, 7:14, 7:24, 8:11, 8:20, 8:24, 9:6, 9:8, 10:19, 11:13, 12:8, 12:14, 13:9, 14:14, 14:17, 15:2, 15:18, 16:17, 16:18, 16:23, 16:25, 17:15, 18:11, 20:4, 21:1, 21:8, 22:1, 22:14, 23:10, 24:6, 24:11, 24:15, 25:4, 25:14, 25:18, 25:21, 25:24, 26:4, 27:14, 28:16, 29:13, 29:23, 30:7, 30:17, 30:20, 31:3, 31:8, 31:11, 31:23, 32:24, 33:13, 35:14, 36:10, 36:14, 36:18, 36:25, 37:5, 37:14, 37:19, 37:22, 38:3, 38:19, 39:5, 39:16, 39:22, 42:5, 42:9, 42:14, 44:5, 44:17, 46:16, 47:22, 49:2, 49:18, 50:7, 51:3, 51:22, 52:18, 53:1, 54:8, 55:6, 57:10, 57:13, 58:21
**multiple** [4] - 15:3, 16:2, 38:14, 50:19
**murder** [3] - 35:15, 35:17, 35:20
**Music** [1] - 1:19
**must** [1] - 22:4

## N

**nail** [1] - 57:14
**narrow** [3] - 23:21, 47:20, 58:18
**narrowing** [1] - 30:3
**Nashville** [1] - 1:19
**national** [1] - 40:25
**nature** [11] - 15:12, 25:23, 29:12, 29:13, 29:20, 30:3, 30:4, 34:18, 41:13, 43:23, 52:9
**natures** [1] - 29:23
**necessarily** [4] - 15:6, 15:24, 21:24, 24:2
**necessary** [2] - 13:23, 42:22
**need** [11] - 4:18, 4:25, 8:6, 8:8, 9:12, 10:21, 12:21, 14:18, 16:16, 18:3, 23:22
**needed** [2] - 49:8, 54:4
**needing** [1] - 19:13
**needle** [1] - 34:21
**needs** [3] - 6:1, 19:2, 55:24
**never** [5] - 29:2, 29:4, 31:12, 41:2, 47:7
**new** [9] - 2:22, 6:9, 6:10, 6:13, 11:14, 39:13, 44:11, 44:12, 44:13
**next** [10] - 3:5, 7:3, 8:10, 8:22, 14:13, 16:15, 20:19, 21:4, 48:4, 50:17
**night** [1] - 53:18
**NO** [1] - 1:5
**none** [1] - 28:2
**normal** [2] - 13:20, 16:7
**normally** [1] - 13:25
**notable** [1] - 18:18
**note** [1] - 41:14
**noted** [1] - 14:17
**nothing** [8] - 7:24, 23:10, 26:10, 26:24, 27:17, 31:9, 40:2, 54:9
**noticing** [1] - 28:8
**novo** [2] - 18:12, 18:14
**NW** [2] - 1:13, 1:16

## O

**obfuscating** [1] - 52:23
**object** [1] - 5:14
**obligations** [1] - 12:18
**obsession** [2] - 28:18, 30:21
**obsessive** [1] - 51:15
**obtained** [1] - 11:23
**obviously** [7] - 6:4, 7:12, 13:12, 14:2, 41:24, 44:8, 52:8
**occur** [2] - 56:25, 57:4
**occurred** [3] - 18:24, 35:17, 37:24
**occurring** [1] - 20:24
**OCD** [12] - 20:11, 21:21, 21:23, 37:15, 51:7, 51:13, 52:1, 52:5, 52:7, 52:13, 52:17, 55:7
**OF** [3] - 1:1, 1:3, 1:9
**offense** [26] - 20:15, 25:1, 25:23, 29:12, 29:14, 29:21, 29:23, 29:24, 29:25, 30:4, 30:5, 30:14, 34:18, 34:19, 35:3, 35:6, 35:7, 35:9, 35:21, 35:25, 36:20, 36:21, 36:24, 37:6
**offenses** [4] - 35:15, 41:13, 43:23, 50:15
**Office** [1] - 1:12
**officer** [1] - 38:6
**OFFICIAL** [1] - 59:17
**Official** [2] - 1:24, 59:10
**once** [2] - 30:4, 59:2
**one** [32] - 4:11, 4:23, 7:2, 9:11, 10:2, 21:10, 28:8, 32:17, 32:19, 33:22, 35:7, 35:9, 36:4, 37:5, 37:9, 37:12, 39:8, 40:8, 41:21, 43:6, 43:15, 44:4, 44:6, 46:13, 48:21, 48:23, 51:11, 53:1, 53:4, 54:3, 54:20, 57:11
**ones** [2] - 10:17, 38:4
**open** [3] - 8:4, 9:20, 16:16
**opened** [1] - 6:5
**operate** [1] - 39:1

**operates** [1] - 38:14
**opine** [1] - 41:16
**opinion** [9] - 18:8, 19:13, 19:15, 19:18, 37:15, 39:24, 40:2, 43:2, 51:18
**opportunity** [6] - 17:8, 17:10, 17:17, 30:15, 37:11, 55:2
**opposition** [3] - 17:21, 17:25, 18:1
**order** [7] - 7:20, 27:4, 38:9, 44:19, 46:1, 57:9, 59:2
**Order** [1] - 2:1
**organization** [1] - 10:17
**organize** [1] - 17:10
**organized** [2] - 14:4, 14:11
**oriented** [1] - 55:13
**original** [4] - 16:7, 17:20, 39:10, 59:11
**originally** [1] - 38:11
**otherwise** [2] - 4:4, 52:8
**outset** [2] - 2:17, 3:25
**outweigh** [1] - 17:5
**overall** [1] - 26:2
**overcome** [4] - 24:10, 24:13, 24:24, 55:22
**overseen** [1] - 2:19
**oversimplify** [1] - 46:11
**own** [5] - 20:10, 45:7, 50:3, 50:10, 54:19
**oxidizer** [2] - 45:8, 45:19

**P**

**p.m** [4] - 1:10, 2:1, 59:7
**page** [1] - 59:12
**papers** [4] - 3:13, 40:7, 42:23, 46:8
**part** [4] - 13:10, 25:4, 25:7, 40:12
**particular** [8] - 4:2, 4:13, 6:10, 7:12, 10:4, 34:13, 35:12, 37:8
**particularly** [5] - 15:13, 27:22, 27:23, 29:19, 38:22
**parties** [6] - 3:15, 4:11, 8:4, 9:3, 17:6, 17:8
**parties'** [2] - 41:22,
59:1
**party** [8] - 24:18, 28:5, 38:5, 38:12, 38:21, 38:22, 49:20, 56:14
**past** [5] - 22:3, 22:9, 26:25, 28:25, 29:17
**path** [1] - 55:14
**patience** [1] - 4:4
**pattern** [2] - 44:7, 57:23
**PC** [1] - 48:16
**penalty** [1] - 35:21
**penchant** [1] - 49:21
**people** [3] - 30:16, 37:3, 58:5
**percent** [2] - 22:20, 35:9
**percentage** [1] - 35:10
**percentages** [1] - 35:8
**perhaps** [1] - 41:8
**period** [2] - 23:11, 48:7
**perpetrators** [1] - 11:6
**person** [15] - 25:8, 25:11, 32:10, 32:20, 33:3, 33:15, 33:16, 33:22, 34:3, 36:8, 36:17, 37:10, 43:2, 46:21, 54:12
**person's** [1] - 36:3
**personal** [2] - 7:18, 48:17
**persons** [1] - 16:2
**perspective** [3] - 5:16, 16:8, 17:14
**persuasion** [1] - 30:19
**persuasive** [1] - 34:12
**pertaining** [2] - 6:12, 6:16
**Phillips** [1] - 17:24, 37:17, 41:10, 41:16
**phone** [20] - 4:20, 6:17, 15:7, 15:23, 19:21, 20:14, 20:18, 20:19, 20:23, 21:2, 22:9, 47:24, 49:7, 51:7, 51:15, 51:23, 52:6, 52:8, 55:12
**phones** [1] - 20:5
**picked** [1] - 27:9
**pictures** [1] - 20:17
**piece** [1] - 33:22
**pieces** [5] - 16:5, 21:14, 26:23, 42:16,
42:21
**pipe** [6] - 42:22, 45:9, 46:2, 48:3, 48:9, 53:21
**pipes** [4] - 21:14, 45:11, 45:12, 48:10
**place** [8] - 4:15, 7:20, 15:25, 23:25, 24:5, 32:17, 48:4, 50:9
**placed** [2] - 53:14, 53:20
**placing** [1] - 53:18
**Plaintiff** [1] - 1:4
**plaintiff** [1] - 50:21
**plan** [5] - 5:16, 5:22, 46:6, 50:8, 50:20
**planned** [3] - 53:13, 54:14, 54:20
**planning** [1] - 7:20
**plans** [2] - 5:15, 6:25
**plant** [1] - 50:15
**planted** [1] - 48:3
**plastic** [2] - 32:17, 32:19
**play** [1] - 12:3
**plea** [2] - 3:1, 55:4
**pleadings** [3] - 39:15, 44:9, 53:2
**PLLC** [1] - 1:18
**point** [48] - 2:18, 3:17, 4:13, 4:14, 4:18, 7:23, 13:16, 14:24, 16:8, 19:1, 19:13, 20:23, 21:16, 21:17, 21:21, 22:1, 22:12, 22:25, 27:3, 30:25, 31:15, 31:17, 31:18, 31:21, 32:24, 36:5, 36:23, 38:16, 38:20, 40:14, 40:23, 41:17, 42:2, 42:4, 42:8, 44:3, 44:5, 47:20, 51:1, 51:3, 54:2, 54:4, 54:10, 55:5, 56:13, 57:18, 58:16, 58:23
**pointed** [2] - 19:20, 26:16, 38:12
**points** [5] - 23:12, 39:3, 40:5, 40:22, 44:2
**poisonous** [1] - 16:4
**Police** [2] - 10:8, 13:6
**police** [2] - 19:23, 46:10
**policy** [1] - 4:15
**political** [2] - 45:25, 46:23
**portrayed** [1] - 54:16
**pose** [2] - 26:7, 41:9
**poses** [5] - 41:7, 41:8, 43:25, 47:11, 53:6
**posit** [1] - 22:5
**position** [3] - 13:3, 18:12, 41:2
**positions** [1] - 41:22
**possession** [3] - 12:23, 13:13, 13:14
**possible** [3] - 10:20, 15:22, 28:25
**post** [1] - 23:3
**potassium** [4] - 23:2, 44:25, 45:7, 50:13
**potent** [1] - 45:19
**potential** [1] - 11:5
**powder** [5] - 26:23, 43:5, 43:6, 46:4, 46:5
**practice** [7] - 13:20, 15:3, 15:9, 15:11, 15:16, 15:19, 55:19
**practices** [1] - 4:17
**pre** [1] - 16:15
**pre-cleared** [1] - 16:15
**precise** [1] - 51:22
**prefer** [1] - 3:25
**preliminary** [4] - 2:20, 3:10, 3:23, 8:1
**premised** [1] - 3:10
**prepared** [1] - 8:13
**preparing** [2] - 7:7, 7:17
**present** [4] - 3:16, 28:2, 30:1, 56:9
**presented** [1] - 3:1
**presently** [1] - 36:20
**presents** [1] - 33:14
**preserve** [1] - 39:9
**presiding** [1] - 2:20
**pressroom** [1] - 4:3
**presume** [1] - 24:16
**presumption** [9] - 23:23, 23:25, 24:5, 24:6, 24:9, 24:21, 24:24, 25:13, 30:19
**presumptively** [1] - 25:2
**pretty** [3] - 9:24, 14:3, 35:7
**prevail** [1] - 26:8
**previously** [2] - 29:2, 44:22
**primary** [1] - 38:4
**principal** [1] - 13:21
**principally** [2] - 13:5, 25:23
**privacy** [1] - 7:19
**probability** [1] - 43:4
**problem** [2] - 13:21,
50:7
**proceed** [5] - 3:7, 5:15, 5:16, 5:22, 9:4
**proceeded** [1] - 53:13
**proceeding** [1] - 53:3
**Proceedings** [1] - 59:7
**process** [8] - 4:6, 6:15, 6:19, 6:20, 7:4, 7:7, 7:16, 12:3
**proclivity** [1] - 47:2
**produce** [1] - 8:15
**Produced** [1] - 1:25
**produced** [7] - 6:13, 9:19, 10:9, 13:18, 13:19, 14:18, 14:19
**producing** [1] - 14:21
**product** [1] - 49:10
**production** [2] - 7:17, 8:9
**productive** [1] - 23:21
**products** [1] - 48:19
**professional** [3] - 38:15, 38:24, 41:3
**proffer** [5] - 41:14, 47:14, 52:4, 52:6, 53:24
**proffered** [2] - 28:1, 55:11
**prompted** [1] - 45:3
**prompts** [1] - 45:24
**proof** [1] - 48:25
**propensity** [1] - 34:24
**properly** [2] - 39:10, 39:12
**proposed** [6] - 9:11, 9:17, 9:18, 38:5, 50:7, 50:20
**proposing** [1] - 8:22
**props** [1] - 31:12
**prosecution** [5] - 12:20, 12:23, 13:11, 13:15, 46:18
**protect** [1] - 18:22
**protective** [1] - 7:20
**protest** [1] - 53:17
**prove** [1] - 18:20
**provide** [4] - 6:20, 6:25, 7:21, 14:1
**provided** [11] - 6:2, 7:7, 7:25, 9:13, 9:17, 13:18, 13:22, 42:20, 51:17, 54:20
**providing** [4] - 5:8, 6:3, 6:8, 54:14

**proving** [1] - 21:24
**public** [8] - 3:24,
17:6, 18:22, 19:2,
26:7, 27:3, 32:17,
46:18
**purchase** [9] - 6:16,
28:7, 45:13, 45:15,
48:8, 48:13, 48:16,
58:21
**purchased** [6] - 45:6,
45:11, 45:12, 49:9
**purchases** [2] - 6:22,
48:24
**purchasing** [3] -
45:4, 48:9, 49:6
**purposes** [4] - 13:11,
13:14, 33:11, 33:12
**pursue** [1] - 39:20
**put** [23] - 3:18, 4:7,
7:23, 8:20, 10:3,
10:10, 10:21, 11:8,
11:18, 11:25, 23:4,
24:20, 28:4, 28:23,
32:13, 34:8, 42:17,
42:21, 42:25, 43:14,
46:11, 46:12, 55:9
**puts** [1] - 50:8
**putting** [4] - 27:25,
34:21, 41:18, 43:10

## Q

**questions** [2] -
14:23, 23:20
**quick** [2] - 3:6, 57:13
**quickly** [2] - 15:19,
15:22
**quite** [1] - 41:4
**quote** [1] - 46:9

## R

**radar** [6] - 3:18, 7:23,
10:3, 10:10, 11:8,
11:25
**raise** [4] - 5:18, 15:3,
39:4, 55:6
**raised** [9] - 11:8,
11:13, 11:17, 13:16,
39:2, 39:9, 40:1, 45:2,
56:1
**raising** [2] - 10:15,
15:14
**rather** [1] - 4:20
**RDR** [1] - 59:16
**RDR-CRR** [1] - 59:16
**re** [1] - 6:11
**reach** [1] - 4:25
**reactions** [1] - 41:22
**read** [2] - 44:8, 55:20

**reading** [1] - 27:8
**real** [4] - 32:10,
32:16, 57:13
**realize** [1] - 49:5
**realized** [4] - 45:5,
48:23, 53:19, 54:21
**really** [10] - 7:22,
19:1, 34:20, 35:5,
38:10, 48:22, 51:6,
57:1, 57:18, 58:6
**Realtime** [1] - 1:24
**reason** [14] - 6:23,
12:24, 17:7, 22:18,
28:14, 29:15, 33:20,
36:11, 37:1, 40:3,
43:14, 43:15, 53:25,
56:1
**reasonable** [2] -
14:20, 57:21
**reasonably** [3] -
47:9, 57:16, 58:13
**reasoned** [1] - 57:2
**reasoning** [1] - 19:7
**reasons** [2] - 17:13,
19:5
**rebut** [1] - 55:2
**rebuttable** [4] -
23:23, 23:24, 24:5,
24:6
**receipts** [1] - 21:15
**receive** [1] - 9:16
**receives** [1] - 12:21
**recent** [1] - 37:22
**recently** [1] - 15:5
**recognizance** [1] -
50:3
**reconcile** [1] - 21:20
**Record** [1] - 1:25
**record** [25] - 2:5,
4:16, 5:2, 10:22,
11:18, 18:15, 18:16,
18:18, 19:9, 19:10,
20:8, 24:16, 28:23,
39:6, 41:4, 42:6, 43:9,
45:17, 45:21, 48:7,
52:1, 54:9, 54:24,
56:10, 59:12
**recording** [1] - 53:10
**records** [1] - 6:25
**recreated** [2] - 29:24,
30:6
**redetain** [1] - 39:13
**REEVES** [1] - 1:23,
59:16
**Reeves** [2] - 59:10,
59:16
**referred** [1] - 53:2
**regardless** [1] -
42:10
**Registered** [1] - 1:23

**regular** [2] - 32:3,
32:6
**regularly** [1] - 48:16
**regulations** [1] -
59:12
**relate** [1] - 5:1
**related** [6] - 6:5,
11:21, 26:20, 26:23,
34:11, 40:19
**relates** [3] - 7:12,
22:23, 34:5
**relationship** [1] -
53:5
**release** [5] - 19:6,
47:6, 50:3, 50:8,
50:20
**released** [3] - 39:12,
43:25, 53:7
**relevant** [9] - 12:5,
33:11, 33:19, 33:21,
34:15, 34:16, 41:17,
55:8
**reliable** [1] - 40:17
**relief** [2] - 4:19,
12:12
**rely** [1] - 25:22
**relying** [1] - 44:18
**remains** [1] - 56:10
**remedies** [1] - 39:20
**remind** [1] - 36:15
**repercussions** [1] -
38:25
**repetitive** [1] - 51:25
**repetitively** [1] -
51:14
**reply** [4] - 18:1, 38:5,
38:12, 45:2
**report** [3] - 17:24,
41:10, 42:19
**REPORTER** [1] -
59:17
**Reporter** [4] - 1:23,
1:24, 1:24, 59:10
**reporting** [5] - 11:3,
11:4, 11:5, 22:17,
56:24
**represented** [1] -
44:25
**request** [4] - 10:2,
10:22, 10:24, 12:12
**requests** [2] - 12:21,
13:2
**require** [3] - 13:1,
15:24, 54:4
**required** [4] - 24:3,
46:1, 46:3, 58:18
**requirement** [1] -
25:5
**requires** [1] - 49:24
**requisite** [1] - 20:2

**research** [1] - 46:1
**reset** [2] - 48:4, 49:8
**resets** [2] - 47:23,
48:1
**resetting** [2] - 48:14,
51:23
**resolve** [2] - 8:6,
55:24
**resolved** [1] - 3:9
**respect** [10] - 5:5,
5:24, 13:12, 25:22,
26:5, 39:23, 40:23,
41:12, 43:5, 47:19
**respected** [1] - 4:9
**respond** [5] - 12:11,
13:3, 44:15, 47:18
**responded** [1] -
31:15
**responding** [2] -
54:19, 55:10
**response** [7] - 4:1,
4:13, 31:15, 40:6,
46:14, 46:16, 47:14
**responsive** [1] - 44:9
**results** [1] - 6:17
**retread** [1] - 18:4
**return** [1] - 50:21
**REVIEW** [1] - 1:9
**review** [7] - 14:23,
17:11, 19:14, 22:25,
53:8, 53:9
**reviewed** [7] - 3:12,
3:14, 17:19, 17:20,
17:22, 17:24, 18:1
**revoke** [2] - 17:22,
44:19
**rights** [2] - 4:8, 35:20
**risk** [3] - 38:23,
47:10, 49:15
**RNC** [2] - 41:1, 50:16
**Road** [1] - 1:21
**road** [1] - 9:22
**robbery** [1] - 32:4
**ROBERT** [1] - 1:13
**rocket** [2] - 45:1,
45:16
**role** [1] - 36:11
**rolling** [1] - 5:8
**room** [1] - 56:17
**Roswell** [1] - 1:21
**rough** [1] - 8:7
**route** [1] - 4:21
**Rule** [1] - 6:17
**rule** [1] - 57:7
**ruled** [1] - 39:7
**run** [1] - 33:16
**running** [1] - 9:18

## S

**safe** [3] - 19:2, 50:6,
54:3
**safety** [5] - 37:2,
42:13, 47:9, 50:1,
50:24
**saint** [1] - 35:23
**sample** [2] - 43:6,
43:7
**samples** [2] - 43:5,
43:10
**sanctions** [1] - 38:23
**Sandy** [1] - 1:22
**sat** [2] - 26:16, 54:11
**satisfactory** [1] -
17:13
**saw** [1] - 44:10
**scary** [1] - 21:16
**scheduling** [1] - 4:23
**scheme** [1] - 25:5
**science** [2] - 23:7,
45:1
**scope** [1] - 12:19
**search** [1] - 6:17
**second** [9] - 4:15,
19:4, 19:8, 33:9,
34:23, 36:13, 36:14,
44:4, 44:6
**secretly** [1] - 55:17
**section** [1] - 19:18
**Section** [1] - 17:3
**secure** [1] - 49:12
**security** [1] - 50:17
**see** [8] - 15:24,
19:25, 30:12, 34:19,
43:11, 53:11, 54:12,
57:23
**seek** [1] - 12:2
**seeking** [2] - 11:24,
44:18
**selling** [1] - 26:13
**sense** [4] - 14:22,
14:25, 16:12, 58:14
**sentence** [5] - 31:1,
40:18, 41:21, 41:23,
51:9
**separate** [2] - 11:20,
15:15
**serialize** [1] - 6:11
**serious** [2] - 19:3,
35:25
**seriously** [3] - 50:1,
57:15, 58:17
**seriousness** [2] -
18:25, 36:8
**services** [1] - 11:2
**set** [14] - 6:24, 16:10,
16:11, 16:12, 20:2,
23:18, 37:22, 38:22,

40:3, 42:20, 43:19, 43:20, 57:15, 57:21
**sets** [2] - 45:6, 45:21
**setting** [1] - 8:25
**several** [2] - 8:12, 8:16
**Sharbaugh** [15] - 18:7, 19:23, 23:25, 24:9, 25:17, 32:22, 33:10, 37:13, 37:21, 38:2, 41:12, 41:16, 41:23, 41:25, 52:20
**Sharbaugh's** [8] - 3:12, 3:14, 17:18, 17:19, 19:13, 31:15, 39:23, 44:19
**shifting** [3] - 29:20, 36:6, 36:7
**Shoreman** [3] - 1:15, 2:10, 2:12
**SHOREMAN** [5] - 1:16, 2:9, 3:21, 16:18, 16:23
**short** [1] - 40:16
**show** [8] - 22:8, 25:10, 30:13, 30:15, 31:21, 32:25, 33:15, 34:24
**showed** [4] - 32:1, 32:5, 34:1, 45:6
**showing** [2] - 21:24, 42:24
**shown** [3] - 29:2, 30:21, 54:3
**shows** [4] - 43:11, 45:21, 55:14
**side** [4] - 2:23, 8:9, 23:17, 43:10
**sides** [3] - 3:22, 10:14, 14:3
**significance** [2] - 34:12, 48:6
**significant** [5] - 22:11, 35:8, 35:11, 41:7, 50:16
**similar** [2] - 21:6, 22:14
**similarly** [2] - 10:10, 10:24
**simply** [8] - 46:22, 50:24, 51:3, 51:10, 51:14, 53:1, 54:10, 54:18
**sister** [2] - 18:2, 56:15
**sites** [1] - 15:24
**sitting** [1] - 55:16
**situation** [4] - 16:7, 29:16, 54:17, 56:15
**skill** [1] - 42:8

**skilled** [1] - 41:9
**snap** [4] - 27:6, 46:14, 46:20
**snapped** [2] - 27:5, 48:23
**snapping** [3] - 28:15, 46:9, 46:23
**sole** [1] - 30:5
**solitary** [1] - 50:21
**someone** [8] - 26:11, 26:15, 29:1, 32:15, 33:25, 34:4, 35:9, 46:13
**sometimes** [1] - 41:21
**somewhat** [1] - 19:7
**somewhere** [3] - 10:8, 28:9, 50:11
**SONJA** [1] - 1:23, 59:16
**Sonja** [2] - 59:10, 59:16
**soon** [1] - 58:9
**sooner** [1] - 12:2
**sort** [30] - 4:19, 6:12, 7:25, 9:15, 9:18, 9:19, 11:6, 11:11, 12:17, 14:18, 16:2, 16:7, 20:20, 21:1, 21:16, 21:20, 22:14, 22:17, 23:1, 23:6, 23:10, 25:8, 27:20, 27:21, 29:18, 32:25, 37:7, 39:11, 55:13, 57:3
**sounds** [2] - 14:21, 39:18
**specific** [5] - 7:24, 12:21, 13:2, 15:12, 53:24
**specifically** [7] - 5:9, 11:21, 42:12, 44:8, 44:9, 55:10, 56:2
**spectrum** [1] - 53:4
**speedier** [1] - 17:6
**speedy** [1] - 9:1
**spend** [1] - 48:18
**spouse** [1] - 38:6
**spreadsheet** [1] - 9:17
**Springs** [1] - 1:22
**Square** [1] - 1:19
**stable** [1] - 43:17
**stage** [1] - 13:24
**stamps** [1] - 9:14
**stand** [1] - 3:5
**standard** [5] - 19:11, 22:21, 45:18, 57:18, 58:17
**standing** [1] - 11:11
**start** [3] - 8:24, 18:9,

19:12
**started** [2] - 11:15, 48:18
**starting** [1] - 20:1, 57:18
**starts** [1] - 48:14
**state** [1] - 2:4
**statement** [2] - 37:18
**STATES** [2] - 1:1, 1:3
**states** [2] - 38:14, 39:1
**States** [5] - 1:12, 2:3, 2:7, 59:10, 59:13
**status** [8] - 3:2, 3:8, 5:4, 8:22, 8:25, 16:15, 17:16, 59:5
**statute** [6] - 18:20, 24:7, 29:5, 30:6, 30:15, 35:16
**statutory** [1] - 25:4
**stay** [2] - 14:10, 58:11
**stays** [1] - 25:3
**steel** [1] - 45:12
**stenographic** [1] - 59:11
**Stenographic** [1] - 1:25
**step** [6] - 6:13, 8:10, 9:23, 20:16, 42:20
**step-by-step** [1] - 42:20
**steps** [2] - 3:5, 14:13
**stick** [1] - 16:13
**sticks** [1] - 54:15
**still** [9] - 6:19, 6:25, 14:21, 24:24, 25:3, 30:9, 32:17, 32:21, 50:14
**stop** [1] - 26:10
**stops** [1] - 48:14
**store** [2] - 6:22, 28:7
**story** [6] - 53:14, 53:16, 53:18, 54:14, 54:15, 54:20
**strap** [1] - 43:17
**Street** [1] - 1:13
**strength** [1] - 34:2
**stretches** [2] - 44:21
**strict** [2] - 57:16, 57:21
**strongest** [1] - 22:8
**stuck** [1] - 53:18
**stuff** [6] - 10:9, 10:19, 15:19, 27:17, 58:15, 58:19
**submission** [3] - 41:10, 42:20, 43:9
**submissions** [2] - 55:1, 57:6

**submitted** [1] - 40:19
**subpoena** [1] - 6:22
**subpoenas** [1] - 11:24
**subsequent** [1] - 22:3
**substance** [1] - 5:1
**substantially** [1] - 50:8
**suffers** [1] - 52:7
**sufficient** [1] - 57:19
**sufficiently** [2] - 39:2, 39:17
**suggest** [5] - 20:7, 28:19, 28:24, 33:16, 34:3
**suggesting** [3] - 26:12, 29:4, 29:10
**suggests** [5] - 11:5, 23:11, 28:2, 30:7, 34:7
**Suite** [3] - 1:16, 1:19, 1:21
**sulfur** [1] - 45:9
**summarized** [1] - 8:11
**summarizing** [1] - 13:19
**summary** [1] - 14:1
**summer** [1] - 48:12
**supervision** [4] - 28:5, 56:23, 58:4, 58:5
**support** [2] - 44:11, 44:13
**supported** [1] - 19:10
**supports** [3] - 33:21, 43:1, 45:17
**suppose** [1] - 22:8
**supposed** [1] - 21:2
**suppress** [1] - 55:20
**Supreme** [1] - 15:4
**surprise** [1] - 18:6
**surveillance** [1] - 26:17
**susceptible** [2] - 9:14, 29:14
**suspect** [7] - 6:6, 15:9, 20:17, 20:18, 22:18, 26:18, 58:5
**suspecting** [1] - 49:5
**sustained** [1] - 47:12
**symptoms** [1] - 52:7
**systems** [1] - 10:18

**T**

**table** [1] - 45:21
**talks** [2] - 24:12, 30:15
**targeted** [2] - 6:15, 7:4
**tax** [1] - 34:20
**team** [9] - 2:13, 5:9, 6:9, 7:9, 12:20, 12:23, 13:11, 15:1, 16:22
**tend** [1] - 20:7
**Tennessee** [1] - 1:19
**terms** [11] - 6:8, 7:8, 8:11, 8:20, 8:22, 10:17, 12:1, 26:10, 48:21, 54:8, 54:25
**terrible** [1] - 48:25
**THE** [94] - 1:1, 1:9, 1:12, 1:15, 2:8, 2:12, 2:15, 2:16, 3:22, 5:21, 5:25, 7:10, 7:22, 8:7, 8:18, 8:21, 9:5, 9:7, 10:11, 11:10, 12:7, 12:10, 13:4, 14:2, 14:15, 14:24, 15:17, 16:9, 16:20, 16:24, 17:1, 17:16, 19:12, 20:23, 21:7, 21:21, 24:8, 24:13, 24:22, 25:12, 25:15, 25:19, 25:22, 26:1, 27:11, 28:12, 29:4, 29:20, 30:2, 30:11, 30:18, 30:23, 31:6, 31:9, 31:14, 32:13, 33:8, 34:10, 36:5, 36:12, 36:16, 36:23, 37:2, 37:11, 37:17, 37:20, 38:1, 38:16, 39:3, 39:14, 39:18, 41:20, 42:7, 42:11, 44:2, 44:6, 46:7, 47:16, 48:20, 49:14, 49:23, 50:25, 51:19, 52:10, 52:24, 54:2, 55:1, 57:5, 57:12, 58:16, 58:23
**themselves** [2] - 17:11, 29:2
**theory** [1] - 27:2
**therefore** [4] - 29:1, 31:2, 31:3, 31:9
**thinking** [1] - 7:13
**third** [16] - 11:17, 19:5, 19:8, 24:18, 28:5, 36:9, 38:5, 38:12, 38:20, 38:21, 38:22, 40:14, 49:20,

51:1, 51:3, 56:14
**third-party** [8] - 24:18, 28:5, 38:5, 38:12, 38:21, 38:22, 49:20, 56:14
**thorough** [1] - 39:25
**thoroughly** [1] - 17:8
**thoughtful** [1] - 8:14
**threat** [2] - 26:7, 41:7
**threats** [1] - 41:8
**three** [3] - 19:1, 40:5, 44:2
**throughout** [2] - 17:25, 44:7
**thumb** [1] - 34:21
**tie** [1] - 22:22
**tied** [1] - 20:6
**timeline** [6] - 6:2, 8:8, 8:18, 37:24, 44:14, 48:6
**timers** [1] - 43:20
**timing** [1] - 14:12
**today** [8] - 3:1, 8:10, 9:16, 11:10, 12:9, 17:2, 40:7, 57:8
**together** [4] - 17:3, 42:18, 42:21, 42:25
**toll** [1] - 9:1
**ton** [1] - 9:10
**took** [1] - 15:4
**top** [1] - 43:17
**topic** [2] - 5:10, 47:14
**topics** [3] - 7:8, 8:5, 12:15
**totally** [1] - 29:22
**towards** [2] - 13:5, 49:14
**trace** [1] - 16:7
**traceable** [1] - 49:6
**track** [1] - 9:12
**tracking** [1] - 11:3
**tracks** [4] - 19:7, 20:22, 52:14, 52:19
**tranches** [1] - 8:9
**Transcript** [1] - 1:25
**TRANSCRIPT** [1] - 1:9
**transcript** [5] - 38:11, 53:9, 59:11, 59:11, 59:12
**treat** [2] - 4:10, 4:11
**tree** [1] - 16:4
**trial** [5] - 9:1, 14:23, 16:10, 16:12, 17:6
**tried** [3] - 31:25, 32:18, 58:8
**triggering** [2] - 45:24, 46:8
**true** [5] - 28:1, 31:20,

33:3, 59:11
**trusted** [1] - 56:19
**truth** [1] - 55:22
**truthfully** [1] - 55:21
**try** [5] - 15:18, 15:21, 40:25, 55:14, 58:9
**trying** [13] - 8:13, 12:3, 20:21, 21:25, 27:16, 30:24, 32:23, 39:19, 44:14, 54:5, 54:6, 55:16, 58:12
**turn** [2] - 29:11, 40:22, 49:23
**turned** [2] - 8:17, 31:25
**Turning** [1] - 3:6
**turns** [2] - 34:11, 35:23
**two** [15] - 3:23, 5:3, 9:21, 9:24, 10:14, 20:14, 20:19, 21:4, 22:5, 40:10, 48:1, 51:10, 53:19, 57:10
**type** [13] - 14:7, 24:19, 25:1, 26:11, 27:23, 29:14, 30:8, 33:13, 33:19, 34:17, 37:6, 45:14, 46:19
**types** [4] - 6:17, 28:19, 47:2, 56:23

## U

**U.S** [1] - 12:25
**U.S.C** [1] - 17:3
**ultimate** [5] - 26:3, 37:2, 43:24, 47:5, 54:1
**ultimately** [4] - 36:2, 40:5, 41:18, 46:5
**under** [12] - 2:25, 17:3, 18:19, 24:6, 28:4, 29:16, 39:16, 42:10, 46:17, 50:22, 57:8, 59:1
**understate** [1] - 18:25
**understood** [3] - 24:22, 44:6, 44:22
**undertake** [1] - 19:14
**UNITED** [2] - 1:1, 1:3
**United** [5] - 1:12, 2:2, 2:7, 59:10, 59:13
**universe** [1] - 7:6
**unlimited** [1] - 35:16
**unskilled** [1] - 41:7
**unsupervised** [1] - 50:10
**unsupported** [1] - 19:9

**unusual** [2] - 15:12, 15:13
**up** [9] - 14:21, 16:4, 16:16, 19:2, 20:17, 24:3, 33:15, 57:12, 58:11
**user** [2] - 47:24, 51:24

## V

**valid** [1] - 9:20
**value** [1] - 34:12
**variety** [1] - 40:13
**various** [3] - 7:15, 8:9, 19:19
**versus** [3] - 2:3, 35:9, 43:6
**viable** [4] - 26:6, 31:12, 42:23, 43:3
**video** [3] - 43:11, 53:9, 54:6
**view** [1] - 13:14
**viewed** [1] - 18:17
**views** [1] - 46:23
**violence** [2] - 34:20, 45:25
**violent** [2] - 26:22, 29:19
**volatile** [1] - 43:18
**voluminous** [1] - 7:1
**vs** [1] - 1:5

## W

**Wal** [1] - 58:8
**Wal-Mart** [1] - 58:8
**walking** [1] - 19:8
**wants** [2] - 12:11, 58:10
**warrants** [6] - 6:17, 15:5, 15:6, 15:7, 15:23, 15:25
**Washington** [4] - 1:11, 1:14, 1:17, 53:14
**watch** [3] - 54:6, 54:11, 58:6
**ways** [5] - 28:25, 29:1, 30:8, 40:13, 55:7
**weapons** [1] - 31:13
**Wednesday** [1] - 1:10
**week** [2] - 12:14, 35:19
**weekly** [1] - 58:4
**weeks** [5] - 8:12, 8:17, 11:19, 48:3
**weight** [6] - 33:11,

34:8, 35:7, 36:1, 36:16, 36:18
**whatsoever** [1] - 34:20
**whistleblower** [1] - 11:22
**white** [2] - 36:21, 36:23
**whole** [5] - 11:20, 12:19, 27:21, 38:13, 38:15
**wholly** [2] - 44:11, 44:13
**wildly** [1] - 55:13
**Williams** [2] - 2:10, 57:12
**WILLIAMS** [4] - 1:21, 57:10, 57:13, 58:21
**willing** [4] - 9:1, 11:12, 32:21, 58:15
**wins** [1] - 34:23
**wipe** [1] - 21:7
**wiped** [1] - 20:5
**wipes** [5] - 19:21, 20:14, 20:23, 21:2, 22:9
**wiping** [11] - 20:18, 20:19, 47:12, 47:19, 47:22, 47:24, 47:25, 51:7, 52:6, 52:8, 55:12
**wires** [1] - 45:13
**word** [2] - 40:9, 46:7
**words** [7] - 2:25, 3:3, 24:25, 32:14, 41:20, 46:11, 54:19
**works** [1] - 16:22
**world** [1] - 29:24
**worried** [1] - 43:18
**worry** [1] - 31:9
**wrap** [1] - 14:18
**writing** [1] - 4:20
**written** [3] - 51:9, 57:9, 59:2

## Y

**year** [3] - 6:4, 27:1, 34:9
**years** [16] - 7:15, 18:24, 20:15, 20:19, 21:4, 21:15, 22:9, 29:17, 35:18, 35:21, 35:23, 40:12, 40:16, 44:20, 45:22, 46:14
**years-long** [2] - 40:12, 44:20
**yesterday** [6] - 18:3, 23:9, 44:10, 45:2, 51:9, 52:12

**young** [1] - 56:15

## Z

**Zach** [1] - 2:10
**ZACHARY** [1] - 1:18
**zero** [1] - 28:20