UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

––––––––––––––––––––

No. 26-3009

––––––––––––––––––––

UNITED STATES OF AMERICA,                                    Appellee,

   v.

BRIAN COLE, JR.,                                            Appellant.

### APPELLEE'S MEMORANDUM OF LAW AND FACT

Appellant Brian Cole, Jr., who is charged with placing pipe bombs near the headquarters of the major political parties on January 5, 2021, challenges his pre-trial detention on two grounds. First, he challenges his detention under the Bail Reform Act, 18 U.S.C. § 3142. But the district court's finding that detention is required because of Cole's dangerousness stands on solid footing and is not clearly erroneous. Second, Cole seeks unconditional release on the theory that he was denied a timely preliminary hearing under 18 U.S.C. § 3060. His claim is moot—any release order would be a nullity because he has now been validly indicted by a federal grand jury. And even if the claim were not moot, Cole was

not entitled to a preliminary hearing because the prior indictment (by a Superior Court grand jury) was also valid.

## BACKGROUND

On December 4, 2025, law enforcement arrested Cole on a complaint charging him with interstate transportation of explosives with intent to kill, injure, or intimidate a person, or damage or destroy property, 18 U.S.C. § 844(d), and attempted malicious destruction of property by means of explosives, 18 U.S.C. § 844(i) (see ECF 1).[1] At Cole's initial hearing on December 5, the government moved for detention and the magistrate judge set a detention hearing for December 15 (ECF 12/5/25 Minute Order). On December 8, at the parties' joint request, the magistrate continued the detention hearing until December 30 (ECF 11). On December 28, Cole moved to "confirm" that the December 30 hearing would proceed as both a detention hearing and the preliminary hearing required by 18 U.S.C. § 3060 and Federal Rule of Criminal Procedure 5.1 (see ECF 21).

---

[1] "ECF" refers to the docket numbers on the district court docket, *United States v. Cole*, No. 26-cr-1 (D.D.C.).

On December 29, a District of Columbia Superior Court grand jury returned an indictment charging Cole with violations of § 844(d) and § 844(i) (see Appellant's Supplement ("Supp.") 5).[2] At the detention hearing the following day, the magistrate judge deferred a decision on whether to accept that indictment but determined that his uncertainty over whether he could do so constituted "extraordinary circumstances" justifying continuance of the preliminary hearing (Supp. 9-10). On January 2, 2026, the magistrate judge issued a written order granting the government's motion to detain Cole (ECF 28) and a minute order accepting the Superior Court indictment (ECF 1/2/26 Minute Order).

Cole moved for review of the detention order by the district court and for release on the theory that he had been denied a timely preliminary hearing under § 3060 (see ECF 33, 48). On January 6, the government obtained a superseding indictment from a federal grand jury (see ECF 39). On January 16, given the superseding indictment, the district judge denied Cole's motion for release (ECF 49). After a hearing on January 28, the district judge also denied Cole's motion to revoke the

---

[2] Citations to this supplement refer to the PDF page number.

3

detention order (ECF 1/29/26 Minute Order). Cole timely appealed (see ECF 54).

## The Detention Hearings

### *The Government's Proffered Facts*

In an interview with FBI agents after his arrest, Cole admitted to placing two improvised explosive devices, or "pipe bombs," near the headquarters of the Democratic National Committee (DNC) and Republican National Committee (RNC) on the evening of January 5, 2021 (see ECF 17 at 15). He made the two bombs from basic materials available at hardware stores—pipes, end caps, wiring, steel wool, a nine-volt battery, and kitchen timers (*id.* at 10). For the explosive charge itself, he mixed easily obtainable ingredients (charcoal, sulfur dust, and potassium nitrate, the latter purchased from Lowes) (*id.*). Cole fabricated the devices in the hours before he drove to Washington, D.C. (*id.* at 15). After mixing the explosives, he assembled the remainder of the devices primarily using a hand drill and pliers (*id.*). Cole learned how to make the bombs from a video game and YouTube videos (*id.* at 15).

On the evening of January 5, 2021, Cole drove to D.C. with the two pipe bombs in a shoebox in the back seat of his car (ECF 17 at 15). When

4

he arrived in the city, he parked on D Street SE, between Second and Third Streets, a few minutes' walk from both the DNC and RNC (*id.*). Wearing a mask, hood, and gloves, he walked to the DNC carrying one bomb in a backpack (*id.* at 16). He set the timer to 60 minutes and planted it near the DNC (*id.*). Cole returned to his car, retrieved the other bomb, and did the same at the RNC (*id.*). Afterward, he drove home (*id.*). The next day, he discarded all his remaining bombmaking materials at a nearby dump (*id.*).

The devices did not explode. Law enforcement discovered them around 1:00 p.m. the following day, and hazardous materials experts rendered them safe (ECF 17 at 7). Subsequent FBI analysis confirmed that the two devices had all the necessary components to explode (*id.* at 8).

Video evidence and cell phone data corroborated Cole's admissions. A license plate reader captured Cole's vehicle on South Capitol Street around 7:10 p.m. (ECF 17 at 2). At 7:34 p.m., surveillance video captured Cole walking near the intersection of First Street and North Carolina Avenue, about halfway between where he had parked and the DNC (*id.*). Cole was wearing a mask, hood, and gloves, and holding a backpack (*id.*

at 3). Video also showed Cole walking near the DNC at 7:39 p.m. and 7:44 p.m., shortly before the pipe bomb was planted at 7:54 p.m., and showed him walking away at 7:59 p.m. (*id.* at 4). Surveillance video similarly showed Cole near the RNC at 8:14 p.m. and 8:18 p.m., suggesting that he planted the second bomb around 8:16 p.m. (*id.* at 5). Throughout these hours, Cole's cell phone was interacting with nearby cell towers, confirming that he was the person in the videos (*id.* at 6-7).

Cole's credit card and checking account history showed him buying key hardware and ingredients between 2018 and 2020 (see ECF 17 at 10). He also bought relevant tools like safety glasses, a wire stripper, sandpaper, a machinist's file, and protective gloves (*id.* at 10-11). Importantly, Cole continued to purchase bomb components after January 5, 2021 (*id.* at 11). On various dates between January 21, 2021, and August 13, 2022, Cole bought more timers, pipes, end caps, wiring, and steel wool (*id.*). When law enforcement arrested Cole and executed search warrants, they discovered bomb components in Cole's vehicle and bathroom closet (*id.* at 12). Law enforcement also recovered Cole's phone and discovered that he had "wiped" it (or "factory reset" it) twice in

December 2020 and an additional 941 times between July 15, 2022, and his arrest (*id.* at 12).

In his interview, Cole explained some of his thinking. He told the agents that "something just snapped" after "watching everything, just everything getting worse" (ECF 17 at 16). Cole wanted to do something "to the parties" because "they were in charge," and he did not like either one (*id.* at 16-17). Earlier in the interview, before admitting responsibility, Cole told agents that "it seemed like something was wrong" with the 2020 election, but that "people on top," "on both sides," were ignor[ing] people's grievances" and instead labeling them "conspiracy theorists," "bad people," "Nazis," and "fascists" (*id.* at 13-14).

### *The Defense's Proffered Facts*

The defense emphasized Cole's personal characteristics, including his lack of criminal history and his ties to the community (ECF 23 at 3-4). Cole is a high school graduate, has worked for his family's business since age 14, and would continue do so if released pending trial (*id.* at 4, 12). He has lived in the same community since childhood, and several neighbors and acquaintances vouched for his character (*id.*; see ECF 23-1). Cole has no history of drug or alcohol abuse (ECF 23 at 12). Cole has

also been diagnosed with autism and obsessive-compulsive disorder (OCD) (*id.* at 3).

Cole proposed a variety of conditions of release that he argued would eliminate any risk to the community. These included house arrest, GPS monitoring, weekly reporting to pre-trial services, and unannounced visits by pre-trial services (ECF 23 at 4). Cole proposed that he live with his grandmother, surrender his passport, and agree to travel restrictions (*id.* at 15). He would not possess weapons or any of the materials that the government alleged he used to construct the pipe bombs (*id.*).

At the detention hearing before the magistrate judge, the Honorable Matthew J. Sharbaugh, Cole offered testimony from his proposed custodian, his grandmother (see Supp. 41-54). His grandmother testified primarily about the security setup at her home in a gated community in Virginia, where Cole proposed to live if released (*id.* at 42-46).

### The Magistrate Judge's Detention Order

Judge Sharbaugh granted the government's motion to detain Cole pending trial (see ECF 28). At the threshold, Judge Sharbaugh found probable cause to believe Cole violated § 844(i), triggering a statutory

8

presumption of detention (see *id.* at 8). He then considered the four statutory factors that determine "whether there are conditions of release that will reasonably assure the safety of any other person and the community." 18 U.S.C. § 3142(g).

First, Judge Sharbaugh found that the "nature and circumstances of the charged offenses" were "undeniably serious" (ECF 28 at 9). Not only were the offenses inherently dangerous, but the timing and context—placing the devices near the U.S. Capitol on the eve of the election certification—"amplif[ied] their severity" (*id.* at 10). Although the devices did not explode, Judge Sharbaugh ascribed that to luck (*id.*). Thus, this first factor "point[ed] strongly toward pretrial detention" (*id.* at 11).

Judge Sharbaugh found that the second factor, "the weight of the evidence," "likewise point[ed] toward detention" (ECF 28 at 11). The government's proffered evidence was substantial even before considering Cole's statement to law enforcement, in which he effectively confessed and walked the agents through his commission of the offenses in detail (*id.*).

In contrast, Judge Sharbaugh found that "on balance" Cole's "history and characteristics" favored release (ECF 28 at 12-13). "[S]everal points that tilt[ed] in Mr. Cole's favor" included his lack of criminal history (or violation of court orders), community ties, family support, steady employment, and diagnoses of OCD and autism (*id.* at 12).

Finally, Judge Sharbaugh found that the danger posed by Cole's release was such that that "even the most rigorous set of release conditions" could not "reasonably guard against the risk of future danger" (ECF 28 at 16-17). The starting point was the seriousness of Cole's offense, which "demonstrate[d] a startling and significant capacity for dangerousness" (*id.* at 14). That alone might not suffice, because of the five-year time gap. But the evidence also showed that Cole had continued to purchase bomb-making materials after January 2021, and indeed still had some materials readily available at the time of his arrest (*id.* at 14-16).

Cole's actions also appeared to have a "sudden and abrupt motivation," which, combined with Cole's apparent ability to assemble devices quickly, raised concerns about the risk of another sudden urge driving Cole to action (ECF 28 at 16). Cole's phone wipes were

concerning; even though they "could stem from" OCD, they were "at least equally suggestive of efforts to conceal and destroy information," which could hamper monitoring of Cole's conduct while on release (*id.* at 17). Finally, Cole's argument that his actions stemmed from unique circumstances—the certification of the 2020 election—was not compelling because Cole acted alone and chose "targets accessible to the general public at any time," unlike those defendants involved in the events at the U.S. Capitol (*id.* at 18).

### *The District Court's Review*

Cole moved for the district judge, the Honorable Amir H. Ali, to revoke the detention order (ECF 48). In response to the motion, including additional evidence offered by Cole, Judge Ali held another hearing (see Supp. 73-131). At the hearing, Judge Ali agreed that he needed to "undertake an independent review" of Judge Sharbaugh's detention order, but asked defense counsel to be precise in identifying the supposed errors in the order (*id.* at 90-91).

Judge Ali also sought to clarify "[w]hat facts [he had] that were not in front of Judge Sharbaugh" (Supp. at 109). Cole's counsel pointed to three things. First, Cole offered a psychologist's letter confirming Cole's

OCD diagnosis and opining that phone-wiping behavior was "consistent" with OCD (ECF 52-1). Second, Cole offered a declaration from his mother stating that his experimentation with potassium chlorate, which the government originally understood to have post-dated the offenses, occurred in approximately 2018 (ECF 52-2). Third, Cole offered a declaration from his sister explaining that her trip to D.C. on January 5, 2021, was related to her job as a club promoter and had nothing to do with Cole (ECF 52-3).[3] Cole also provided an expert opinion that neither of the pipe bombs was capable of causing an explosion (see ECF 48-1).

In response to Cole's new evidence, the government pointed out that even if the potassium chlorate experiment took place in 2018, it was consistent with a longstanding interest in explosives (see Supp. 116-18) and Cole was already buying bomb components like pipe end caps in 2019 (see ECF 17 at 10). Separately, even if Cole's phone-wiping was

---

[3] In its brief to the district judge, the government noted a text message from Cole's sister to their mother indicating that the sister also traveled to Washington D.C. on January 5 and discussed the trip with Cole's grandmother beforehand (see ECF 50, at 38). Cole had offered his grandmother as a third-party custodian and his sister as an employment supervisor; the government raised this message in relation to their suitability as custodians based on their potential knowledge (or lack thereof) of Cole's whereabouts on January 5.

consistent with OCD, it was "far more consistent with concealing digital activity" (Supp. 124).

After the hearing, Judge Ali denied Cole's motion in a minute order. Judge Ali wrote that he had "independently considered the factors under 18 U.S.C. 3142(g), as well as all the evidence and arguments presented by the parties, and agree[d] with the careful analysis and conclusions in Judge Sharbaugh's 28 memorandum opinion and order" (ECF 1/29/26 Minute Order). Further, Judge Ali had "considered the additional declarations and arguments submitted to this court in the first instance," but "conclude[d] that they [were] insufficient to overcome the government's showing that pretrial detention is appropriate under the relevant factors" (*id.*).

## The Preliminary Hearing Dispute

In parallel to litigation of the Bail Reform Act detention issues, the parties litigated whether Cole was entitled to a preliminary hearing under 18 U.S.C. § 3060 and Rule 5.1. Until December 28, the government understood Cole not to be seeking a preliminary hearing. After an email exchange that day, Cole moved to clarify or "confirm" that the December 30 hearing would "proceed as both the Rule 5.1 preliminary hearing and

the detention hearing" (ECF 21 at 1). Cole contended that he had "not waive[d] the right to a preliminary hearing" but instead had "consistently expected it to proceed on December 30" (*id.*).

In response, on December 29, the government obtained from a D.C. Superior Court grand jury an indictment charging Cole with violations of § 844(d) and § 844(i) (see Supp. 4-7). Judge Sharbaugh, however, declined to immediately accept that indictment (*id.* at 8-9). As Judge Sharbaugh explained at the December 30 hearing, Chief Judge Boasberg had recently held in the *Kevontae Stweart* case, No. 25-mj-225 (D.D.C.), that a Superior Court grand jury can properly issue an indictment returnable in federal district court (Supp. at 5-6). But the Chief Judge had stayed his own order pending appeal, and Judge Sharbaugh was concerned that the "stay order somehow divested [him] of the ability to accept" the Superior Court indictment (*id.* at 6). Judge Sharbaugh therefore requested briefing on the stay's effect (*id.*).

In the meantime, for purposes of the December 30 hearing, Judge Sharbaugh found that the uncertainty over the indictment and the effect of the Chief Judge's stay order was "an extraordinary circumstance" that allowed the court "to continue the time in which a preliminary hearing

14

would need to occur" (Supp. 8-9). The issue was unique to the District of Columbia—this is "the only district in which this could potentially occur"—and the government was not "seeking more time simply so that it [could] pursue an indictment" (*id.* at 9). Judge Sharbaugh further noted that if he concluded he could not accept the indictment, he would "promptly and expeditiously convene a preliminary hearing," but that the "interests of justice [were] best served" by first resolving the "threshold issue" (*id.*).

After briefing, Judge Sharbaugh ruled in a minute order that he would accept the Superior Court indictment, concluding that he was not bound by the stay in the *Stewart* case (ECF 1/2/26 Minute Order). The following day, January 3, Cole filed an emergency motion for the district judge to review this order and release him under 18 U.S.C. § 3060 (ECF 33). On January 6, the government obtained a superseding indictment from a federal grand jury (ECF 39).

Judge Ali denied Cole's motion for release under § 3060 (see ECF 49). Judge Ali concluded that Cole had likely waived his right to a hearing entirely (*id.* at 2-3). But even if not, Judge Sharbaugh's finding of extraordinary circumstances was justified, especially "[i]nsofar as Cole

15

continue[d] to dispute the efficacy of the D.C. Superior Court indictment" (*id.* at 3-4). Separately, Judge Ali held that Cole was "not entitled to release based on the lack of a preliminary hearing because he has been indicted" by a federal grand jury (*id.* at 4).

## ARGUMENT

### I.    The District Court's Detention Ruling Was Not Clearly Erroneous.

#### A.    Applicable Legal Principles and Standard of Review.

The Bail Reform Act governs whether an arrested person should be released on their own recognizance, released on conditions, or detained pending trial. *See* 18 U.S.C. § 3142(a). A person may be detained only if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *Id.* § 3142(e)(1). To make that determination, the judge must consider "the nature and circumstances of the offense charged," "the weight of the evidence against the person," "the history and characteristics of the person," and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." *Id.* § 3142(g)(1)-(4).

16

When the government seeks detention for the safety of the community, the burden is ordinarily on the government to prove "by clear and convincing evidence" that "no condition or combination of conditions will reasonably assure the safety of . . . the community." 18 U.S.C. § 3142(f)(2). But that presumption flips—the presumption is detention— if there is probable cause to believe that the defendant committed one of certain enumerated offenses, including § 844(i). *Id.* § 3142(e)(3)(B); *see* 18 U.S.C. § 2332b(g)(5). If a defendant rebuts the presumption of detention, it nevertheless "remain[s] a relevant factor" in determining whether the government has met its burden. *United States v. Manafort*, 897 F.3d 340, 344 (D.C. Cir. 2018). The ultimate question is whether the defendant "poses a concrete, prospective threat to public safety," and "'[t]he inquiry is factbound.'" *United States v. Munchel*, 991 F.3d 1273, 1280, 1283 (D.C. Cir. 2021) (quoting *United States v. Tortora*, 922 F.2d 880, 888 (1st Cir. 1990)).

A defendant may challenge a detention order by filing "a motion for revocation or amendment of the order," to be determined by a district judge. 18 U.S.C. § 3145(b). This Court has "not squarely decided" whether the district judge owes any deference to the magistrate judge's

determinations. *Munchel*, 991 F.3d at 1280. Other courts widely hold that such review is de novo. *E.g.*, *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990). But even with de novo review, the district judge "is not required to start over in every case, and proceed as if the magistrate's decision and findings did not exist." *Id.* Instead, the district court may rule "based solely on a careful review of the pleadings and the evidence developed at the magistrate judge's detention hearing," or "may conduct an evidentiary hearing" of its own. *United States v. King*, 849 F.2d 485, 490 (11th Cir. 1988).

This Court reviews the district court's "dangerousness determinations for clear error." *Munchel*, 991 F.3d at 1282. "'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

### B.    The District Court Did Not Clearly Err in Its Fact-Intensive, Forward-Looking Analysis.

The district court's finding of dangerousness—Judge Sharbaugh's analysis, as adopted by Judge Ali—was not clearly erroneous. At the threshold, Cole concedes (at 14) that the presumption of detention applies. In other words, in the absence of other evidence, Cole's probable violation of § 844(i) satisfied the government's burden to show by clear and convincing evidence that no combination of conditions could reasonably assure the safety of the community if Cole was released. *See* 18 U.S.C. § 3142(e).

With that presumption as the foundation, the district court properly started with the first two factors under § 3142(g)(1) and (2), the nature of the offense and the weight of the evidence. The court found (and Cole can scarcely dispute) that the offenses were "gravely serious," that the "proffered evidence [was] compelling," and that together they showed "a startling and significant capacity for dangerousness" (ECF 28 at 11, 14).

Crucially, the district court did not stop there. Cole argues (at 16) that the court relied on "a backward-looking recitation of alleged offense

19

conduct." To the contrary, the court agreed that, as dangerous as the offense was, "if there were truly no proffered evidence about comparable or otherwise dangerous conduct across the past five years," detention might be unwarranted (ECF 28 at 14). But there was such evidence. As the court noted, Cole continued to purchase bomb components until at least August 2022 and still possessed many such components when arrested (*id.* at 14-15). Those items were in his home and car—"essentially within arm's reach" (*id.* at 15).

Cole's minimization of this evidence is unpersuasive. He points (at 19) to the lack of "any purchase of *explosive powders or ingredients* in the last five years" (emphasis added), but Cole had purchased most of the *other* bomb components during that period and the explosive ingredients were easily obtainable (see ECF 17 at 11, 15). Cole then describes (at 20) the "pipes, end caps, [and] wire" as "ordinary hardware." Perhaps if Cole were a plumber or electrician. But there is no evidence that Cole has ever used these items for anything other than pipe bombs, which justifies the district court's concern that he still possessed them when arrested.

The court was also troubled by Cole's statement in his interview that "something just snapped," combined with the speed with which Cole

20

apparently assembled the explosive devices (ECF 28 at 16). Because the devices could be assembled in hours out of commonplace materials, the court was "concern[ed] about how quickly the same abrupt and impulsive conduct might recur" (*id.*). Cole's phone-wiping activities also suggested he might hide his activities even from a "well-intentioned custodian" (*id.* at 17). And while the court acknowledged that the wiping "could stem from" OCD, it found the behavior "at least equally suggestive of efforts to conceal" (*id.*). That was, at the very least, one "permissible view[] of the evidence." *Anderson*, 470 U.S. at 574.

Between Cole's capacity for dangerousness, capability of moving quickly, and efforts to conceal his conduct, the district court was justified in concluding that even strict conditions could not eliminate the risk that Cole might abruptly decide to commit a similar offense and be able to do before he could be stopped. This fact-sensitive, forward-looking analysis, *see Munchel*, 991 F.3d at 1283, layered onto the presumption of detention, was not clearly erroneous.

### C. The District Court Fully Engaged with Cole's Countervailing Evidence.

The district court did not, as Cole suggests (at 16), "fail[] to engage with" Cole's evidence. On the contrary, the court detailed Cole's

community ties and lack of criminal history, agreeing that "several points" tilted in Cole's favor (ECF 28 at 12). Most importantly, the court found "reasonably persuasive" Cole's apparent lack of violent conduct during the five years since the offense conduct (*id.* at 14). But, for the reasons just discussed, the court found the lack of actual violence outweighed by indicators that Cole had the present capability for violence.

The district court also carefully considered Cole's proposed conditions, acknowledging that they were "strict" (ECF 28 at 16). But it had "concrete concerns" about whether Cole would "'actually abide by [the] conditions'" (*id.* (quoting *Munchel*, 991 F.3d at 1281)). Among other things, Cole's "efforts to hide and obfuscate his activities" might "hamper the ability" of his custodian to monitor him (ECF 28 at 17). The court also agreed that home detention and GPS monitoring "would provide some check" against danger, but found that this check did not "rise to the necessary level" given the court's findings that Cole presented an immediate danger (*id.*).

Cole emphasizes (at 21-22) that the conditions should "make unauthorized movement or acquisition of dangerous materials

22

detectable," but it is hardly implausible that Cole might find a way to secretly obtain commonplace items like pipes and wires. Nor is it obvious why, as Cole suggests (at 21) "surprise checks would prevent trips to stores" or how "home detention, GPS, [or] cameras monitoring the residence" would prevent deliveries. Undoubtedly, each condition would have an ameliorative effect. The district court acknowledged as much, but simply concluded that even their combined effect would not sufficiently mitigate the danger. This was not error.

Tellingly, Cole does not point to any critical fact that the court ignored entirely. Instead, his quarrel is with the court's balancing of the government's evidence against Cole's. "Reasonable minds might disagree on that determination, but [the Court's] standard of review is for clear error, not to substitute [its] judgment for that of the District Court." *United States v. Hale-Cusanelli*, 3 F.4th 449, 457 (D.C. Cir. 2021).

### D. The District Judge Adequately Considered Cole's New Evidence Before Adopting the Magistrate Judge's Order.

Cole argument (at 22-23) that the district judge ignored new evidence falls flat for two reasons.

23

First, Judge Ali did not ignore Cole's new evidence. At the hearing, he ensured that he understood this evidence by questioning both sides about it (see Supp. 93, 109). The colloquy included discussion of whether the devices Cole planted could have detonated, the relevance of the OCD diagnosis, and the timeline of Cole's interest in explosives (Supp. 93, 95, 97). Judge Ali also suggested his views on several points, including that regardless of the bombs' viability, the failure to detonate was "not for lack of effort" (Supp. 103-04), and that the phone-wiping could be "consistent with OCD" without being "disconnected from trying to hide something" (Supp. 93). In all, Judge Ali spent more than an hour questioning counsel about the issues, including each piece of new evidence (see Supp. 73-131).

Second, the new evidence added little to what was before Judge Sharbaugh and had been considered by him already. The expert opinion that the bombs were not "capable of causing an explosion" (ECF 48-1 at 2) was unhelpful—it was already evident that the devices did not detonate. The psychologist's four-sentence letter diagnosing Cole with autism and OCD (ECF 52-1) added nothing to what Cole had already argued to Judge Sharbaugh. Cole's sister's declaration clarified that her trip to D.C. on January 5, 2021, was unrelated to Cole (see ECF 52-3),

24

but Cole's sister played no role in Judge Sharbaugh's opinion anyway. The only piece of evidence with any significance whatsoever was the clarification that Cole's potassium chlorate experiment occurred before, not after, January 2021 (ECF 52-2 at 2). This contradicted the government's prior understanding that this experiment occurred afterward, but that fact played only a minor role in Judge Sharbaugh's analysis (see ECF 28 at 15).

Given the unimportance of this evidence, which Judge Ali well understood from the hour-long hearing, Judge Ali was not required to write a lengthy explanation of why the new evidence did not affect the correctness of Judge Sharbaugh's opinion. *See United States v. Vortis*, 785 F.2d 327, 329 (D.C. Cir. 1986) (requirement of written statement of reasons for detention satisfied by magistrate's order, which district judge reviewed and affirmed). *Cf. United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988) ("We find no cause to remand when the transcript clearly embodies the district court's findings and reasons for detention."). It sufficed to explain that he was adopting Judge Sharbaugh's findings after independent review and consideration of the new evidence.

### E. Cole Fails to Identify Comparable Defendants Who Were Released.

Cole identifies (at 23-24) several supposedly comparable cases in which courts declined to detain defendants. Even if those cases were comparable, it would not establish any error here. But none is actually comparable. No January 6 defendants were charged with attempting to detonate an explosive device. In *United States v. Almohandis*, 297 F. Supp. 2d 404, 404 (D. Mass. 2004), the issue was risk of flight, not danger. In *United States v. Goba*, 220 F. Supp. 2d 182, 194 (W.D.N.Y. 2002), the only defendant released had not personally engaged in violence, had voluntarily abandoned and disavowed terrorist groups, and was cooperating with the FBI. In *United States v. Al-Arian*, 280 F. Supp. 2d 1345, 1357, 1360 (M.D. Fla. 2003), the offense conduct related to fund-raising, not personal violence, and only the defendants against whom the evidence was "not substantial" were released.

*United States v. Melville*, 306 F. Supp. 124, 126 (S.D.N.Y. 1969), is the only case cited by Cole that involved personal efforts to detonate explosives, and it was decided when there was "no authority under existing law for confining defendants in noncapital cases prior to trial on the ground that they are likely to commit crimes." Indeed, the court in

that case strongly implied that if such authority existed, pretrial detention would be warranted for defendants "charged with conspiring to explode bombs in a number of federal and other buildings." *Id.* at 125. Current law does permit such detention, and it is fully warranted here based on Cole's danger to the community if released.

## II. Cole Is Not Entitled to Unconditional Release Under 18 U.S.C. § 3060(d).

### A. Applicable Legal Principles and Standard of Review.

A person who has been arrested is entitled to a preliminary hearing before a magistrate judge to determine whether there is probable cause to believe he committed an offense. *See* 18 U.S.C. § 3060(a); *see also Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) (Fourth Amendment requires judicial determination of probable cause as prerequisite to extended detention). For a detained defendant, the magistrate must set the preliminary hearing for a date within 14 days of the initial hearing, but the preliminary hearing may be waived or continued with the defendant's consent. 18 U.S.C. § 3060(b), (c). A magistrate may also continue a hearing "on a showing that extraordinary circumstances exist and that justice requires the delay." *Id.* § 3060(c). Finally, no hearing is required

if the defendant is indicted "prior to the date fixed" for the hearing, *id.* § 3060(e), because an indictment "conclusively determines the existence of probable cause," *Gerstein*, 420 U.S. at 118 n.19.

The statute directs that a person who has been denied a timely preliminary hearing "shall be discharged from custody or from the requirement of bail or any other condition of release." 18 U.S.C. § 3060(d). But that discharge is "without prejudice . . . to the institution of further criminal proceedings against him upon the charge upon which he was arrested." *Id.*

This Court has not set out a standard of review for a claim of denial of a timely preliminary hearing under § 3060(d). It need not do so here because Cole was not entitled to such a hearing, whether the Court reviews de novo or with some degree of deference. A finding of "extraordinary circumstances" under § 3060(c) should be reviewed for abuse of discretion, by analogy to review of such findings in other contexts. *E.g.*, *BLOM Bank SAL v. Honickman*, 605 U.S. 204, 216 (2025) (whether party showed extraordinary circumstances justifying reopening judgment subject to abuse-of-discretion review).

### B.    Cole's Claim Is Moot Because This Court Cannot Provide Meaningful Relief.

At the threshold, the question whether Cole was entitled to a preliminary hearing is moot because, even if he was, he cannot obtain a meaningful remedy.

"'Article III, Section 2 of the Constitution permits federal courts to adjudicate only "actual, ongoing controversies."'" *Tenaska Clear Creek Wind, LLC v. FERC*, 108 F.4th 858, 867 (D.C. Cir. 2024) (quoting *McBryde v. Committee to Rev. Cir. Council Conduct*, 264 F.3d 52, 55 (D.C. Cir. 2001)). "A case becomes moot when the court 'can grant no meaningful relief.'" *Maldonado v. District of Columbia*, 61 F.4th 1004, 1006 (D.C. Cir. 2023) (quoting *McBryde*, 264 F.3d at 55). Federal courts "are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong." *Spencer v. Kemna*, 523 U.S. 1, 18 (1998). And the requirement of an ongoing live controversy "'applies independently to each form of relief sought.'" *Tenaska Clear Creek Wind*, 108 F.4th at 868 (quoting *McBryde*, 264 F.3d at 55).

The Court cannot grant Cole meaningful relief on his § 3060 claim because, even if at some point he were entitled to be "discharged from custody" under § 3060(d), the government is currently entitled to arrest

29

and detain him on the basis of the federal indictment. Cole does not challenge the validity of that indictment. And § 3060(d) is explicit that discharge does not prevent the "institution of further criminal proceedings against [a defendant] upon the charge upon which he was arrested."

Those "further criminal proceedings" include detention proceedings, not just indictment and trial. The ordinary meaning of "criminal proceedings" extends to detention proceedings; for example, the Rules of Criminal Procedure "govern the procedure in all criminal proceedings," including whether to "detain or release the defendant." Fed. R. Crim P. 1(a)(1), 5(d)(3); *see also*, *e.g.*, *Texas Trib. v. Caldwell County*, 121 F.4th 520, 530 (5th Cir. 2024) (discussing First Amendment right of access to "'criminal proceedings,' including bail reduction hearings" and "hearings at which bail is initially set"). Every court to address the issue has for that reason agreed that "the 18 U.S.C. 3060(d) release 'remedy extends only to defendants who remain in custody without being properly charged,'" and "where there has been an indictment, 'there is no relief this court can provide [a defendant] for [a] departure from 18 U.S.C. 3060(b).'" *United States v. Vaughn*, 492 F.

Supp. 3d 336, 344 (D.N.J. 2020) (quoting *United States v. Aranda-Hernandez*, 95 F.3d 977, 979 (10th Cir. 1996), and collecting circuit and district cases); *see also, e.g.*, *United States v. Williams,* 526 F. App'x 29, 36 (2d Cir. 2013) (unpublished). If Cole were entitled to any discharge, it "went only to his detention prior to indictment," and "[o]nce indicted, the [g]overnment [is] entitled to hold [Cole] under the indictment." *United States v. Rogers*, 455 F.2d 407, 412 (5th Cir. 1972).

No textual or logical support exists for Cole's assertion (at 42) that, once discharged under § 3060(d), a person is immune from future detention as a "sanction on the government." The discharge provision is a protection for defendants against "remaining in custody without being properly charged," *Aranda-Hernandez*, 95 F.3d at 979, not a punishment for procedural missteps by government lawyers. Moreover, such a sanction would be extraordinary, because § 3060(d) goes beyond detention. It directs that a defendant "be discharged from custody *or from the requirement of bail or any other condition of release.*" 18 U.S.C. § 3060(d) (emphasis added). On Cole's reading, not only is he permanently immune from pretrial detention, but the district court cannot even set release conditions. Although two grand juries, a

31

magistrate judge, and a district judge have all found probable cause to believe Cole committed a federal crime of terrorism, Cole's position is that under § 3060(d) the district court cannot even set minimal conditions of release. If Congress had intended such an astonishing remedy for missing a procedural deadline, it would have been clearer.

Finally, Cole misses the point when he asserts (at 37) that an indictment cannot "retroactively cure" a § 3060 violation. For mootness, the only question is whether this Court can grant meaningful relief. Even if there were a § 3060 violation and such a violation is, in some metaphysical sense, incurable, it has "no demonstrable continuing effect." *Spencer*, 523 U.S. at 18. All the Court could do would be to "acknowledge the irregularity in the proceedings." *Aranda-Hernandez*, 95 F.3d at 979. And even that would be the kind of "impermissible advisory opinion[]" that the mootness doctrine prohibits. *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1128 (D.C. Cir. 2024). With no meaningful relief available, Cole's § 3060 claim is moot.

32

### C.   The Superior Court Indictment Was Valid and Satisfied § 3060(e).

Even if the Court could provide meaningful relief, Cole would not be entitled to it. The Superior Court indictment of Cole was valid and obviated the need for a preliminary hearing.

Although most federal felonies are prosecuted by an indictment returned by a federal grand jury, Congress has created an exception in the District of Columbia:

> A grand jury serving in the District of Columbia may take cognizance of all matters brought before it regardless of whether an indictment is returnable in the Federal or District of Columbia courts.

D.C. Code § 11-1916. On its face—as Cole does not dispute—this statute permits a Superior Court grand jury to return an indictment in federal district court. And this Court has upheld the statute's constitutionality, describing the arrangement as adequate to "protect whatever Fifth Amendment right the appellants might have to indictment by a federally-competent grand jury." *United States v. Seals*, 130 F.3d 451, 461 (D.C. Cir. 1997).

Cole's primary argument (at 31-33) is that the 2002 amendments to the Federal Rules of Criminal Procedure repealed or invalidated D.C.

Code § 11-1916. The D.C. Code provision was originally enacted in 1970 and moved to its current section in 1986. *See* District of Columbia Jury System Act, Pub. L. No. 99-650, 110 Stat. 3635, 3640 (Nov. 14, 1986). Cole argues (at 31) that when the 2002 amendments defined "court" to mean "a federal judge performing functions authorized by law," that means that Rule 6 now permits only federal courts to convene grand juries. *See* Fed. R. Crim. P. 1(b)(2), 6(a)(1). In turn, Cole reasons (at 31), Rule 7 now means that a federal felony case may proceed only on an indictment returned by a district-court-convened grand jury. *See* Fed. R. Crim. P. 7(a)(1). And Cole concludes that this supposed conflict between the Federal Rules and § 11-1916 means that the latter is "of no further force or effect" under the Rules Enabling Act, 28 U.S.C. § 2072(b).

This argument runs afoul of a "'cardinal rule'" of statutory interpretation, which is "'that repeals by implication are not favored.'" *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 132 (2003) (quoting *Posadas v. National City Bank*, 296 U.S. 497, 503 (1936)). Instead, when "[p]resented with two statutes, the Court will regard each as effective—unless Congress' intention to repeal is clear and manifest, or the two laws are irreconcilable." *Maine Cmty. Health Options v. United*

34

*States*, 590 U.S. 296, 315 (2020) (quoting *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974)) (internal quotation marks omitted). As long as they "'are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.'" *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 304 (2003) (quoting *J.E.M. AG Supply, Inc. v. Pioneer Hi–Bred Int'l, Inc.*, 534 U.S. 124, 143-44 (2001)).

There is no irreconcilable conflict between the federal rules and § 11-1916. Rule 6(a)(1) authorizes district courts to convene grand juries; indeed, it directs that the district court "must order that one or more grand juries be summoned." Fed. R. Crim P. 6(a)(1). But it does not purport to be the exclusive means by which a "federally-competent grand jury," *Seals*, 130 F.3d at 461, may be convened. Nothing in Rule 6 expressly prohibits grand juries or indictments otherwise authorized by federal law. It does not say, as Cole implies (at 31), that *only* the district court may summon a grand jury. Courts do not "usually read into statutes words that aren't there," *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020), and they certainly should not add words that would create an unnecessary conflict.

Cole similarly attempts to add words to Rule 7 to generate conflict. He asserts (at 31) that "Rule 7(a)(1) requires that felony offenses 'be prosecuted by indictment'—an indictment that must be returned in compliance with Rules 1 and 6." But Rule 7 does not say that an indictment must comply with Rules 1 and 6; it says that an "indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government." Fed. R. Crim. P. 7(c)(1). A Superior Court grand jury indictment can satisfy that requirement while simultaneously drawing its authority from § 11-1916.

No doubt, the typical indictment under the federal rules is returned by a district-court-convened grand jury. But "[w]hile the grand jury arrangement in the District of Columbia may be unique," *Seals*, 130, F.3d at 460, that does not mean that it conflicts with the federal rules. The Court should be especially hesitant to find a conflict because, as Cole acknowledges (at 31), the 2002 amendments consisted largely of a "general restyling" without intent to change "substance" or "practice" except "as noted" specifically. *See* Fed. R. Crim. P. 6 advisory committee's note to 2002 amendment. The Court should avoid interpreting a stylistic

36

amendment to repeal a federal statute, and should instead read the rules in harmony with § 11-1916(a).

Cole separately contends (at 33-34) that a Superior Court grand jury inherently lacks authority to indict federal offenses. As the Court explained in *Seals*, however, Congress has the power to grant the Superior Court "supervision of a federally competent grand jury." 130 F.3d at 457. After all, Congress has broad authority over both inferior federal courts and federal criminal law. *See Palmore v. United States*, 411 U.S. 389, 401 (1973). Indeed, early in the country's history, "Congress left the enforcement of selected federal criminal laws to state courts and to state court judges." *Id.* at 402. Absent a constitutional limitation, it is up to Congress to decide how federal offenses may be charged and prosecuted.

Cole also points (at 34) to "anomalies" resulting from the Superior Court grand jury's power to indict federal offenses, but such anomalies are an expected feature of the unusual court system created by Congress for the District of Columbia. The fact that privilege law may differ between the grand juries is no odder than prosecutors' ability to choose between court systems, or the federal district court's ability to exercise

37

pendent jurisdiction over D.C. Code offenses. *See* D.C. Code § 11-502. The District of Columbia courts are unusual, but that does not nullify D.C. Code § 11-1916.

### D. The Superior Court Indictment Justified the Finding of "Extraordinary Circumstances."

Cole's complaints regarding the preliminary hearing timing also fail for an independent reason: Judge Sharbaugh did not abuse his discretion or otherwise err in finding that the Superior Court grand jury indictment created an "extraordinary circumstance" under § 3060(c) and that the "interests of justice [were] best served by" a brief continuance of the preliminary hearing. As Judge Sharbaugh noted, this district is "the only district in which this could potentially occur" (Supp. 9). And the magistrate was not concerned principally with the validity of the indictment under the statute, but with whether Chief Judge Boasberg's stay order in the *Stewart* case "somehow divested [Judge Sharbaugh] of the ability to accept that indictment" (Supp. 6). It is not clear why Judge Sharbaugh was so concerned—the *Stewart* order on its face stayed only that case, although the order noted that it would be beneficial to have the issue resolved before the government moved forward in *Stewart* or

similar cases. *See Stewart*, No. 25-mj-225, ECF 45, at 2 (D.D.C. Dec. 9, 2025). But regardless, the confluence of circumstances—a contested indictment, under a unique judicial system, with a potential stay in the mix—was extraordinary by any definition. And Judge Sharbaugh sensibly concluded that under these circumstances, the interests of justice favored a brief continuance.

This was not a situation, as Cole suggests (at 36), where the government intentionally created a circumstance to avoid a preliminary hearing. Because the government obtained an indictment, rather than merely seeking more time to indict, this case is not comparable to *Vaughn*, 492 F. Supp. 3d 336, or *Elms v. United States*, 457 F. Supp. 3d 897, 900 (D. Nev. 2020), cited by Cole (at 36-37). There, courts held that extraordinary circumstances must be "circumstances that prevent the government from holding a preliminary hearing," not that prevent the government from obtaining an indictment to avoid a preliminary hearing. *Vaughn*, 492 F. Supp. 3d at 340. Here, as Judge Sharbaugh found, it was "not the government seeking more time simply so that it can pursue an indictment"; it had done so already (Supp. 9).

Further, in seeking a Superior Court indictment, the government reasonably relied on Chief Judge Boasberg's recent *Stewart* decision. Indeed, on December 30, this case was not yet assigned to a district judge. As a result, if Judge Sharbaugh had declined to accept the indictment, that decision would have been subject to review by the Chief Judge, *see* D.D.C. L. Crim. R. 57.14(e), who had just ruled that such an indictment was valid. Given the government's good-faith efforts and Judge Sharbaugh's own uncertainty over the effect of the *Stewart* stay, he did not abuse his discretion in finding a continuance warranted under § 3060(c).

## CONCLUSION

WHEREFORE, the government respectfully submits that the orders of the district court should be affirmed.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

CHRISELLEN R. KOLB
DANIEL J. LENERZ
Assistant United States Attorneys

_____/s/_____
T. DIETRICH HILL

40

D.C. Bar #1046742
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Thomas.Hill@usdoj.gov
(202) 252-6829

## CERTIFICATE OF COMPLIANCE WITH RULE 27(d)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this memorandum contains 7800 words and therefore complies with the Court's order dated March 9, 2026. This motion has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/
T. DIETRICH HILL
Assistant United States Attorney


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing motion to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, J. Alex Little, Esq., alex@litson.co, on this 23rd day of March, 2026.

/s/
T. DIETRICH HILL
Assistant United States Attorney